| | |
|---|---|
| Brian J. Stretch, SBN 163973 | Jesse Bless (*pro hac vice pending*) |
| bstretch@sidley.com | jbless@aila.org |
| Naomi Igra, SBN 269095 | AMERICAN IMMIGRATION LAWYERS |
| naomi.igra@sidley.com | ASSOCIATION |
| Chelsea Davis, SBN 330968 | 1301 G Street, Suite 300 |
| chelsea.davis@sidley.com | Washington, D.C. 20005 |
| SIDLEY AUSTIN LLP | |
| 555 California Street, Suite 2000 | Samina M. Bharmal (*pro hac vice pending*) |
| San Francisco, CA 94104 | sbharmal@sidley.com |
| Telephone: +1 415 772 1200 | SIDLEY AUSTIN LLP |
| Facsimile: +1 415 772 7400 | 1501 K Street NW |
| | Washington, D.C. 20005 |
| | Telephone: +1 202 736 8000 |

*Attorneys for Plaintiffs*
(Additional counsel listed on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER; EAST BAY SANCTUARY COVENANT; COALITION FOR HUMANE IMMIGRANT RIGHTS; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; INTERNATIONAL RESCUE COMMITTEE; ONEAMERICA; ASIAN COUNSELING AND REFERRAL SERVICE; ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, | Case No. _____ |
| | Hon. _____ |
| Plaintiffs, | **COMPLAINT FOR INJUNCTIVE RELIEF AND ADMINISTRATIVE PROCEDURE CASE** |
| v. | |
| CHAD F. WOLF, *under the title of Acting Secretary of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security*; U.S. CITIZENSHIP & IMMIGRATION SERVICES | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

COMPLAINT

## **INTRODUCTION**

1.    This case challenges a final rule that drastically increases the cost of applying for immigration benefits, including naturalization and asylum.  85 Fed. Reg. 46,788 (Aug. 3, 2020) ("Final Rule").  For low income applicants, the Final Rule increases the cost of applying to naturalize, in some cases from $0 to $1,170 for the lowest income applicants.  It also charges a non-waivable fee for asylum applications for the first time in U.S. history, even though the fee will deter vulnerable people from seeking statutory protections.  The Final Rule also requires asylum seekers to pay $580 to obtain their first employment authorization.  In total, the Final Rule increases the price of seeking asylum and work authorization from $0 to $630, with no possibility of a fee waiver. With these and other changes, the U.S. Department of Homeland Security ("DHS") awards U.S. Customs and Immigration Services ("USCIS") an unexplained 21% budget increase at the expense of low-income applicants.

2.    The Final Rule is unlawful because it was proposed under Kevin McAleenan and issued under Chad Wolf, both of whom assumed the title of Acting Secretary of the Department of Homeland Security without constitutional or statutory authority.  The Final Rule is therefore void and without effect under the Homeland Security Act, the Federal Vacancies Reform Act of 1998 and the Appointments Clause of the United States Constitution.  It is also procedurally invalid and contrary to law under the APA.  On this basis alone, the Final Rule should be set aside.

3.    The Final Rule does all this without providing any cogent explanation for the dramatic change in the financial needs of USCIS.  DHS does not disclose calculations underlying its skyrocketing costs, or explain why it projects a massive budget shortfall despite the agency's recent history of running at a surplus with substantial cash reserves.

4.    The Final Rule abandons the prior practice of using an "ability to pay" model and purports to adopt a  "beneficiary pays" model that DHS calls more "equitable."  But merely labeling a practice "equitable" does not constitute a reasoned response to comments cogently explaining the inequity of the fee increases and elimination of fee waivers in the Final Rule.  Nor does it explain the arbitrary application of the "beneficiary pays" model to impose substantial burdens on low income

applicants for naturalization and asylum but not wealthier applicants such as immigrant investors, U.S. citizens applying for overseas adoptions, or visas for religious workers.

5.      Far from promoting equity, the Final Rule transforms the agency from one that serves its statutory purpose of adjudicating immigration benefits to one that serves this Administration's goals of reducing immigration and naturalization for low-income applicants and deterring asylum seekers.  The Final Rule achieves this transformation by adhering to irrational and unsupported financial models, abandoning longstanding ability-to-pay principles, imposing disproportionate costs on those least able to pay, dramatically increasing funds for "fraud detection," and diverting resources to enforcement agencies.  It does all this while ignoring data and comments that contradict what DHS says it "believes."

6.      This is unlawful.  The Final Rule is procedurally defective, contrary to law, and arbitrary and capricious under Administrative Procedure Act ("APA").  It also violates the Due Process Clause and the Equal Protection Clause of the United States Constitution by denying indigent people the right to access a statutory process for seeking immigration benefits, including naturalization and asylum,

7.      The Final Rule is already causing irreparable harm to Plaintiffs. Plaintiffs are non-profit organizations that provide services benefitting low-income applicants for immigration benefits. Plaintiffs have diverted resources to address the implications of the 142-page Final Rule for their organizations including the threat it poses to their funding and organizational models. And when the Final Rule goes into effect, it will immediately frustrate the missions of all Plaintiffs because populations they serve will not be able to afford to apply for immigration benefits, even with Plaintiffs' help.

8.      The Final Rule also causes substantial harm to individuals and the public.  A vast body of literature and data attests to the benefits of naturalization for families, communities, cities, states and the country as a whole. These benefits include higher incomes, increased civic engagement, and more stable families.  The benefits of asylum are even more fundamental.  Those who cannot pay for an asylum application are at risk of being deported back to countries where they may suffer persecution, injury, or even death.  Here, DHS failed to account for how impeding access

to naturalization, asylum, and other immigration benefits harms the public, despite ample evidence in the administrative record.

9.      For these and other reasons, the Final Rule is unlawful and should be set aside.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

11.     Defendants' promulgation of the Final Rule in the Federal Register on August 3, 2020 constitutes final agency action and is therefore subject to judicial review. 5 U.S.C. §§ 704, 706.

12.     Plaintiffs have standing to challenge the Final Rule under 5 U.S.C. § 702 because they have been and will be injured by the Final Rule's operation.  They are also within the zone of interest of the INA, which established the fund into which application fees are collected. *See*, *e.g.*, *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1270 (9th Cir. 2020); *La Clinica de la Raza v. Trump*, 19-CV-04980-PJH, 2020 WL 4569462, at *9 (N.D. Cal. Aug. 7, 2020).

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1) because defendants are officers or employees of the United States or any agency thereof acting his their official capacity or under color of legal authority, or are agencies of the United States, or the United States. Venue is furthermore proper because Immigrant Legal Resource Center's principal place of business is in San Francisco, California, and East Bay Sanctuary Covenant's principal place of business is in Berkeley, California. Therefore, they both reside in this judicial district under 28 U.S.C. § 1391(c)(2).

## PARTIES

### PLAINTIFFS

14.     Plaintiff Immigrant Legal Resource Center ("ILRC") is a national non-profit organization headquartered in San Francisco, California. ILRC's mission is to collaborate with and educate immigrants, community organizations, and the legal sector to build a democratic society that values diversity and the rights of all people. As a key part of that mission, ILRC serves as the lead agency for the New Americans Campaign ("NAC"). The NAC provides, among other things, funding to national and local non-profit partners to provide naturalization assistance such as assisting

with paperwork and navigating fee waiver eligibility. Since the NAC began in 2011, NAC partners have completed hundreds of thousands of naturalization applications. ILRC also trains attorneys, paralegals, and community-based advocates who work with immigrants around the country. To assist practitioners, ILRC produces manuals on naturalization, U-Visas, T-Visas, Special Immigrant Juvenile Status ("SIJS"), the Violence Against Women Act ("VAWA"), Asylum, and Families and Immigration as well as an annotated guide to completing fee waivers. ILRC staff also work with grassroots immigrant organizations to promote civic engagement and social change.

15. Plaintiff East Bay Sanctuary Covenant ("EBSC"), located in Berkeley, California, is part of the National Sanctuary Movement founded in 1982 to assist refugees fleeing the civil wars and violence in El Salvador and Guatemala. EBSC remains dedicated to offering sanctuary, support, community organizing assistance, advocacy, and legal services to people escaping war, terror, political persecution, intolerance, exploitation, and other expressions of violence. Assisting individuals seeking asylum and other forms of humanitarian relief in the United States is a critical part of EBSC's mission. EBSC provides legal and social services to immigrants and refugees within the jurisdiction of the San Francisco Asylum Office, including applicants in California, Washington, and Oregon. EBSC offers its low-income clients legal assistance in applying for affirmative asylum, Deferred Action for Childhood Arrivals ("DACA"), Temporary Protective Status ("TPS"), SIJS, U and T visas, VAWA self-petitions, permanent residency, and naturalization.

16. Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a non-profit, membership-based organization headquartered in Los Angeles, California. CHIRLA's mission is to ensure that immigrant communities are fully integrated into our society with full rights and access to resources. In furtherance of its mission, CHIRLA handles the full spectrum of immigration-related needs of those who form primarily low-income immigrant communities in an area with very high costs of living. CHIRLA provides immigration services, including applications for naturalization, asylum, and lawful permanent residence, in addition to performing outreach and advocating on behalf of its over 12,000-person dues-paying membership. CHIRLA is on the Executive Office of Immigration Review (EOIR) List of Pro Bono Legal Service Providers distributed to all individuals in removal proceedings. Members can receive immigration legal services at no additional cost.

CHIRLA brings this action on its own behalf and on behalf of its members. CHIRLA's members represent a diverse mix of people from various communities and include individuals who are currently and will be eligible for the immigration benefits affected by the Final Rule. A majority of CHIRLA's members are low-income individuals who will be unable to afford the new and increased fees in the Final Rule, such as the fee increase for naturalization and the new fee for asylum and work authorization. CHIRLA's low-income members are similarly situated in all relevant ways, such that their due process injuries from the Final Rule or proposed remedies do not require individual participation in this litigation.

17.     Plaintiff Catholic Legal Immigration Network, Inc. ("CLINIC") is a non-profit organization headquartered in Silver Spring, Maryland. CLINIC's mission is to provide immigration legal services to low income and vulnerable populations. This mission is part of CLINIC's broader purpose of embracing the Gospel value of welcoming the stranger and promoting the dignity and protecting the rights of immigrants. CLINIC administers a network of approximately 400 affiliated immigration programs, which operate out of more than 400 offices in 48 states and the District of Columbia. The network includes faith-based institutions, farmworker programs, domestic violence shelters, ethnic community-focused organizations, libraries and other entities that serve immigrants. Members of the network, referred to as "affiliates," provide immigration services—including applications for asylum, lawful permanent residence, the Nicaraguan Adjustment and Central American Relief Act ("NACARA") relief, and naturalization—using materials, training, education, best practices, and sometimes, funding provided by CLINIC. Ninety-six percent of CLINIC affiliates provide legal services related to naturalization. CLINIC's affiliate network completes 35,000 to 40,000 naturalization applications per year. CLINIC affiliates, including Catholic Charities of the East Bay, are on the EOIR List of Pro Bono Legal Service Providers distributed to asylum applicants. CLINIC also provides direct representation to asylum seekers as part of its Defending Vulnerable Populations section.

18.     Plaintiff International Rescue Committee ("IRC") is a nonprofit organization headquartered in New York City, New York. IRC responds to the world's worst humanitarian crises and helps people whose lives and livelihoods are shattered by conflict and disaster to survive,

recover, and gain control of their future. IRC operates in more than 40 countries and has 26 offices across 15 U.S. states, including Arizona, California, Colorado, Florida, Georgia, Idaho, Kansas, Maryland, Montana, New Jersey, New York, Texas, Utah, Virginia, and Washington. The provision of immigration legal services—in particular, adjustment of status, family reunification, and naturalization—is an integral component of IRC's mission in the United States. Through a paid immigration staff of roughly 50 employees, as well as volunteers, IRC provides high-quality, low-cost immigration legal services to clients, including by filing applications for asylum, adjustments of status, DACA, and naturalization. In fiscal year 2019, IRC provided 13,719 clients with immigration legal services, including by helping over 7,000 individuals become U.S. citizens and filing 2,033 Request for Fee Waiver (I-912) forms in conjunction with naturalization applications. In addition, IRC assisted 5,595 children and parents seeking asylum in the United States through humanitarian and social service programs. IRC's immigration services are funded by a mixture of private and local funding, as well as by nominal fees charged to some clients themselves. IRC also receives funding through the USCIS Citizenship and Integration Grant Program. IRC's Denver and Dallas offices help potential asylees submit asylum applications through federal funding (IRC Denver), and funding from the City of Dallas and the Vera Institute (IRC Dallas). IRC is one of nine nonprofit agencies with federal contracts to resettle refugees in the United States.

19.     Plaintiff OneAmerica is a non-profit organization headquartered in Seattle, Washington. OneAmerica's mission is to advance the fundamental principles of democracy and justice at the local, state, and national levels by building power within immigrant communities. As part of advancing its mission, OneAmerica provides free naturalization services, helping eligible immigrants apply for citizenship and become civically engaged citizens. One of OneAmerica's flagship programs, Washington New Americans (WNA), receives funding from the State of Washington, which shares OneAmerica's conviction that naturalized citizens bring significant economic and civic benefit to the state. WNA's founding goal is to provide free legal counsel in communities where there are few, if any, affordable immigration attorneys or Department of Justice-accredited representatives. OneAmerica uses two essential methods to meet its naturalization grant

requirements: (i) hosting its own naturalization workshops; and (2) re-granting a significant amount of its WNA funding to thirteen local organizations.

20.     Plaintiff Asian Counseling and Referral Service ("ACRS") is a nonprofit organization headquartered in Seattle, Washington. ACRS serves the Asian and Pacific Islander community in Washington through multiple programs that provide culturally and linguistically competent care and services. ACRS provides legal services to a myriad of vulnerable groups including, but not limited to, asylum seekers, TPS applicants, U and T visa applicants, SIJS applicants, VAWA petitioners, and unaccompanied minors. Furthermore, it assists immigrants with adjustment of status to permanent resident, and applications for naturalization. ACRS has provided citizenship and naturalization services since 1997, and in 2019 helped nearly 754 individuals from 31 countries file naturalization applications. Assistance to immigrants seeking to naturalize reflects ACRS's commitment to serving the well-being of its community-at-large. The benefits of citizenship include an increased sense of belonging and connection with communities; increased civic engagement; higher earnings; higher home-ownership; and higher voting levels. ACRS is the largest naturalization services provider in Washington State. Under the conditions of ACRS's grant funding, ACRS must submit 650 naturalization applications on behalf of Washington residents for fiscal year 2020. Among other sources, ACRS receives funding through the USCIS Citizenship and Integration Grant Program.

21.     Plaintiff Illinois Coalition for Immigrant and Refugee Rights ("ICIRR") is a nonprofit organization headquartered in Chicago, Illinois, with operations extending throughout the state. ICIRR is a coalition of more than 100 member organizations throughout Illinois that advocate on behalf of immigrants and refugees at the local, state, and federal levels. Through its member organizations, ICIRR educates and organizes immigrant and refugee communities to assert their rights; promotes citizenship and civic participation; monitors, analyzes, and advocates on immigrant-related issues; and informs the public about the contributions of immigrants and refugees. In partnership with the Illinois Department of Human Services, ICIRR administers the New Americans Initiative ("NAI"), to fund collaborations of community organizations that promote citizenship, conduct outreach, and organize workshops to assist long-term legal immigrants in completing their naturalization applications, as well as assisting immigrants youth in applying for and renewing

DACA status. ICIRR's agreement with Illinois DHS obligates ICIRR and its forty program-partner organizations to complete at least 7,278 N-400 or DACA applications on behalf of Illinois residents each year; serve 3,348 distinct individuals through English-language and civic-education classes; and reach 14,081 distinct individuals through community outreach services. As the NAI Administrator, ICIRR also is responsible for assisting its program-partner organizations, ensuring effective use of NAI funds, and helping them meet the NAI deliverable expectations.

## DEFENDANTS

22.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government. DHS issued the Final Rule.

23.     Defendant Chad Wolf has held the title of Acting Secretary of Homeland Security since November 13, 2019. He issued the Final Rule under that purported authority. He is sued in that capacity.

24.     The U.S. Citizenship and Immigration Service ("USCIS") is a sub-agency of DHS and responsible for providing immigration adjudication services.

25.     Defendant Kenneth Cuccinelli currently holds the role of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security.

## LEGAL AND FACTUAL FRAMEWORK

## I.     CONSTITUTIONAL AND STATUTORY BACKGROUND

26.     Article I of the Constitution gives Congress "the Power … [t]o establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8. Congress has used that power to enact legislation that promotes diversity, unifies families, protects refugees and vulnerable non-citizens, and encourages naturalization.  Through these laws, Congress has established a detailed process for immigrants to obtain status in the United States, adjust status to lawful permanent resident, and naturalize to become a U.S. citizen.[1]

---

[1] *See, e.g.*, Immigration and Nationality Act of 1965, Pub. L. No. 89-236, 79 Stat. 911 ("INA"); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 2009-546 ("IIRIRA"); Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 ("Refugee Act"), Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 ("VTVPA").

## A.    The INA Promotes Diversity and Family Unity

27.    Before 1965, the nation's immigration laws codified discrimination against non-whites. For example, the Naturalization Act of 1790 limited United States citizenship to "any alien, being a free white person." 1 Stat. 103 Chapter 3, 1 Congress, Session 2, An Act: To establish an uniform rule of naturalization. (Mar. 26, 1790). And although this particular law changed, others passed in the 19th and 20th centuries also expressed racist exclusionary preferences. Laws including the Chinese Exclusion Act of 1882 and the 1924 National Origins Quotas Act, created quotas in favor of Northern and Western Europeans and banned most Asians from immigrating to the United States.

28.    The INA of 1952and subsequent legislation, reversed these practices and prioritized family unification and diversity.  They eliminated national origin quotas that favored Northern and Western European immigrants and helped level the playing field for immigrants who hailed from other parts of the world.

29.    The INA makes family unification, regardless of nationality or income, a priority. For example, the INA exempts "immediate relatives," including "children, spouses, and parents," from visa limits, or quotas. 8 U.S.C. § 1151(b)(2)(A)(i). "That exemption, and other priority given to family members of U.S. residents, meant that about three-quarters of visas were set aside for relatives of those already in the U.S.—putting the emphasis in U.S. immigration policy on family reunification."[2]

30.    This is by design. In amending the INA, Senator Kennedy explained, "Reunification of families is to be the foremost consideration." *See* H.R. Rep. 89-748, at 13 (1965).[3]

---

[2] City of Philadelphia, Comment Letter on Proposed Rule on U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements at Attachment 3,  34 n.15. DHS No. USCIS-2019-0010-7628 (citing Pew Research Ctr., *Modern Immigration Wave Brings 59 Million to U.S., Driving Population Growth and Change Through 2065* at 20 (Sept. 28, 2015), https://pewrsr.ch/3l3oneY).

[3] Courts have long recognized that a central purpose of the INA is to keep families together. *See, e.g.*, *Fiallo v. Bell*, 430 U.S. 787, 806 (1977) (The INA's legislative history "establishes that congressional concern was directed at 'the problem of keeping families of United States citizens and immigrants united.'" (quoting H.R. Rep. No. 1199, 85th Cong., 1st Sess., 7 (1957)).

31.     The Treasury and General Government Appropriations Act of 1999, Section 654 requires agencies to consider the impact of proposed agency action on the well-being of all families, not just the families of citizens. *See* Pub. L. No. 105-277, 112 Stat. 2681. It requires federal agencies to prepare a Family Policymaking Assessment before enacting any rule that may affect family well-being and enumerates seven factors the agency must assess, including whether the action erodes stability or safety of the family, erodes the authority of parents in the education, nurture, and supervision of their children, helps the family perform its functions, affects the disposable income or poverty of families and children, and if the proposed benefits of the action justify the financial impacts on the family.

### B.     The Refugee Act Protects Asylum Seekers

32.     The 1951 United Nations Refugee Convention and the 1967 Protocol, to which the United States acceded on November 1, 1968, were designed to prevent a recurrence of the horrors refugees experienced during World War II.  The United States Refugee Act of 1980 (Public Law 96-212) (the "Refugee Act") "conform[ed] United States statutory law to our obligations under Article 33 [of the Refugee Convention]") H.R. Rep. No. 96-608, at 17 (1979); S. Rep. No. 96-256, at 4 (1979) (same).  The Act "imbued these international commitments with the force of law." *R-S-C v. Sessions*, 869 F.3d 1176, 1178 (10th Cir. 2017).

33.     The Refugee Act thus codified a longstanding tradition of "welcoming the oppressed of other nations."  H.R. Conf. Rep. 96-781, at 17–18 (1980).  In the Refugee Act, Congress declared that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including, where appropriate, humanitarian assistance for their care and maintenance in asylum areas." Pub. L. No. 96-212, 94 Stat. 102 § 101(a).

34.     The objective of the Refugee Act is to "provide a permanent and systematic procedure for the admission … of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." Pub. L. No. 96-212, 94 Stat. 102 § 101(b).

35.     The Refugee Act amended the INA to include a formal process for people fearing persecution in their home country to apply for asylum and announced "the policy of the United

States to encourage all nations to provide assistance and resettlement opportunities to refugees to the fullest extent possible." *Id.* § 101(a) (codified as Note to 8 U.S.C. § 1521).

36.     To request asylum in the U.S., an applicant need only be physically present in the United States or have arrived at a U.S. border and apply within one year of their last arrival in the U.S., or qualify for an exception to the one-year rule. *See* 8 U.S.C. § 1158. Today, asylum may be granted to "any person" who has suffered "persecution or who has a well-founded fear of persecution" based on one of five enumerated protected grounds: "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(1)(A); *id.* § 1101(a)(42)(A).

37.     Recognizing the importance of legal assistance for asylum seekers, Congress requires that the Attorney General advise an asylum applicant of her right to be represented by counsel and provide a list of pro bono legal service providers who are available to assist in asylum proceedings. 8 U.S.C. § 1158(d)(5).

**C.     U.S. Immigration Laws Provide Additional Protections for Vulnerable People**

38.     U.S. immigration laws also codify protections for vulnerable groups, including those from countries experiencing significant hardship, battered women, trafficked individuals, and crime victims.

39.     Through the Immigration Act of 1990, Congress created TPS, which provides nationals of specifically-designated countries confronting ongoing conflicts, environmental disasters, or extraordinary and temporary conditions, temporary immigration status. *See* 8 U.S.C. § 1254a. It provides nationals of those countries who are in the United States at the time of the TPS designation work permits and stay of deportation. 8 U.S.C. § 1254a(a)(1). The Secretary of Homeland Security may decide when a country merits a TPS designation. Countries currently designated include: El Salvador, Haiti, Honduras, Nepal, Nicaragua, Somalia, Sudan, South Sudan, Syria, and Yemen. *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075 (N.D. Cal. 2018); USCIS, *Temporary Protected Status* (Mar. 30, 2020), https://bit.ly/3haeGZT.

40.     In 2000, President Clinton signed into law the first federal law to address human trafficking, the Trafficking Victims Protection Act (TVPRA). *See* Pub. L. No. 106-386. Among

other things, this law established trafficking as a federal crime, provided assistance for trafficking victims, and established the T visa, which affords victims of severe trafficking temporary stay in the U.S., access to benefits, and a path to lawful permanent residency if they have assisted in prosecuting human trafficking. *See* Pub. L. No. 106-386.

41.    The William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA) expanded these protections by requiring USCIS to allow applicants for these primary benefits—VAWA, T (trafficked individuals), U (crime victims), VAWA Cancellation, and TPS—to apply for fee waivers for associated filings up to and including the application for permanent residence. *See* 8 U.S.C. § 1255(l)(7); Pub. L. No. 110-457, 122 Stat. 5044 at 5054.

42.    Similarly, the Nicaraguan Adjustment and Central American Relief Act ("NACARA") specifically addresses certain asylum-seekers whose applications were unfairly affected by changes to the immigration law enacted by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA).

43.    In these and other statutes, Congress has recognized that the limited financial means of vulnerable populations should not block their access to immigration benefits

**D.    The Constitution and Congress Recognize the Importance of Naturalization**

44.    The Constitution establishes naturalization as a pathway to citizenship. U.S. Const. amend. XIV, § 1.  "Many invaluable benefits flow from United States citizenship, including rights to vote in federal elections, to travel internationally with a U.S. passport, to convey citizenship to one's own children even if they are born abroad, to be eligible for citizen-only federal jobs, and, indeed, to be free of discrimination by Congress on the basis of alienage." *L. Xia v. Tillerson*, 865 F.3d 643, 650 (D.C. Cir. 2017). Citizenship is among the most momentous elements of an individual's legal status. "It would be difficult to exaggerate its value and importance." *Schneiderman v. United States*, 320 U.S. 118, 122 (1943).

45.    The United States has historically exhibited "extraordinary hospitality to those who come to our country," and "[o]ne indication of this attitude is Congress' determination to make it relatively easy for immigrants to become naturalized citizens." *Foley v. Connelie*, 435 U.S. 291, 294 & n.2 (1978) (citing the INA, 8 U.S.C. § 1427 (1976 ed.)).

46.     Congress promotes the attainment of citizenship for those who are statutorily eligible through the use of appropriations. Just last year, Congress appropriated $10 million to USCIS to fund its Citizenship and Integration Grant Program,[4] Pub. L. No. 116–6, 133 Stat. 13, which awards millions in grants to civic organizations that help lawful permanent residents prepare for U.S. citizenship. "The main goal of the grant program has been to provide citizenship instruction and application assistance to LPRs."[5] At least two Plaintiffs in this case receive these grants in support of their naturalization work.

**E.     The Homeland Security Act Separated Immigration Services from Enforcement**

47.     The Homeland Security Act of 2002 reconfigured the Immigration and Nationalization Service ("INS").  Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002) ("HSA"). Subtitle D of Title IV addressed "immigration enforcement functions" and established the Bureau of Border Security, which now consists of Immigration and Customs Enforcement ("ICE") and Customs and Border Patrol ("CBP").  HSA §§ 441-42, 116 Stat. at 2192-94.  Subtitle E created the Bureau of Citizenship and Immigration Service to handle "adjudications" of immigration applications; that bureau is now USCIS.  HSA § 451, 116 Stat. at 2195-97.

48.     Section 476 of the HSA is entitled "Separation of Funding." HSA § 476, 116 Stat. at 2209.  It specifies separate budgets for the two bureaus, requires that "fees imposed for a particular service, application or benefit shall be deposited" into the account of the bureau "with jurisdiction over the function to which the fee relates," and provides that "no fee may be transferred" between the separate bureaus, with only limited statutory exceptions. HSA § 476(c), (d), 116 Stat. at 2209.

**F.     The Immigration and Examinations Fee Account ("IEFA") Limits the Use of Funds Raised Through Application Fees**

49.     USCIS is funded primarily through the fees it collects for the adjudication and naturalization services it provides. These fees are deposited in the IEFA. The legislation creating the IEFA predates USCIS and defines the agency's fee-setting authority. INA § 286(m) and

---

[4] USCIS now refers to this program as the Citizenship and Assimilation Grant Program.
[5] USCIS, *Learn About the Citizenship and Assimilation Program* (July 30, 2020), https://bit.ly/2FwCZ69.

(n) (codified at 8 U.S.C. § 1356(m) and (n)) establish the IEFA, and provide that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." 8 U.S.C. § 1356(m).

50.     The legislative history confirms that Congress intended to IEFA to cover adjudication and naturalization services only.  The House Conference Report for the 1990 amendment states that: "Examinations Fee Account–Subsection (d)(1) provides that adjudications and naturalization fees be deposited into the Examinations Fee Account as offsetting receipts. Subsection (d)(2) allows the Department to establish adjudications and naturalization fees at a level that will ensure recovery of the full costs of the program, to include the overseas program and administration." H.R. Conf. Rep. 101-909.

51.     An opinion by the General Counsel of the INS in the years following the enactment of §1356 interpreted the term "adjudication and naturalization services" to exclude enforcement. *See* 1994 General Counsel's Opinions, 9 Immigration Law Service 2d PSD 1994 General Counsel Opinions, Opinion 94-8 ("[F]ees which may be deposited into the Examinations Fee Account are those fees which arise from applications that are processed as part of the INS's adjudication service and not its enforcement function. Funds from the Examinations Fee Account may be expended only to reimburse an appropriation for expense incurred in providing adjudicative or naturalization services.").

52.     USCIS does not have boundless authority to use fees collected through the IEFA. It can only use fees to cover the cost of providing adjudication and naturalization services, in line with the agency's mandate under the HSA. *See* Pub. L. No. 107-296, § 451 (6 U.S.C. § 271).

53.     USCIS also manages two other fee accounts funded by statutorily set fees, which the agency has no authority to alter:  the Fraud Prevention and Detection Account (FDNA), INA § 214(c)(12)–(13), 286(v); 8 U.S.C. §§ 1184(c)(12)–(13), 1356(v), and the H-1B Nonimmigrant Petitioner Account, INA §§ 214(c)(9), (11), 286(s); 8 U.S.C. §§ 1184(c)(9), (11), 1356(s).

54.     The fees collected in the separate Fraud Prevention and Detention Account are split among the Department of Homeland Security, Department of Labor, and Department of State to cover the fraud-related detection and prevention work of each department.

55.     Since its creation, the agency has adjusted fees in 2004, 2005, 2007, 2010, and 2016. 84 Fed. Reg. 62,280, 62,285 (Nov. 14, 2019); Supporting Material Appendix Table 7:  USCIS IEFA Fee History.

56.     USCIS's primary source of funding is the IEFA. In FY 2018, USCIS received approximately 95 percent of its funding from the IEFA.

**G.     USCIS Applies Ability-to-Pay Principles Consistent with Congressional Directives**

57.     Consistent with statutory goals of promoting diversity, unifying families, encouraging citizenship, and protecting particularly vulnerable people, USCIS has provided mechanisms for low-income applicants to access immigration benefits.

58.     One mechanism is an "ability-to-pay" model for USCIS fees. *See* 84 Fed. Reg. at 62,298. "Under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for the service than those with less ability to pay." GAO, *Federal User Fees: A Design Guide* (May 29, 2008), https://bit.ly/33txZt3. Applying these principles, USCIS has assessed fees based on applicants' ability to pay and has provided discretionary waivers of fees for certain immigration benefit requests when an applicant is unable to pay. *See* 8 C.F.R. § 103.7(c).

59.     DHS's longtime policy has been "that individuals may apply for and be granted a fee waiver for certain immigration benefits and services based on an inability-to-pay." DHS, *USCIS Fee Waiver Policies and Data*, App'x B at 2 (Sept. 27, 2017), https://bit.ly/2DP8R5u; *see also* 85 Fed. Reg. at 46,807 ("In prior years, USCIS fees have given significant weight to the ability-to-pay principle by providing relatively liberal fee waivers and exemptions and placing the costs of those services on those who pay."). This established practice aligned with express Congressional instructions to keep naturalization and immigration benefits affordable. *See, e.g.*, H.R. Rep. 115-948 at 61 (stating that "USCIS is expected to continue the use of fee waivers for applicants who can

demonstrate an inability to pay the naturalization fee" and "encourage[ing] USCIS to maintain naturalization fees at an affordable level").

60.     The ability-to-pay standard allows an applicant to seek a fee waiver if her household income is at or below 150% of the Federal Poverty Guidelines, or on other grounds showing inability to pay, such as receiving a means-tested benefit or experiencing financial hardship such as medical expenses of family members, unemployment, eviction, or homelessness.[6]

61.     For nearly two decades,[7] USCIS has offered these waivers pursuant to 8 U.S.C. § 1356(m), which authorizes the agency to collect fees for "similar services provided without charge to asylum applicants or other immigrants" as part of the "full cost of providing" "adjudication and naturalization services." USCIS's regulations expressly allow applicants who have demonstrated an inability to pay to obtain fee waivers.[8]

62.     The current fee schedule for lawful permanent resident and naturalization applications also reflect ability-to-pay principles.

63.     Immigrants in the United States who are eligible for adjustment of status may file a Form I-485, Application to Register Permanent Residence—i.e., lawful permanent residence.  Since the FY 2008/2009 Final Rule, USCIS has allowed I-485 applicants to apply for some other benefits

---

[6] *See* current Form I-912 at Part 6 (https://bit.ly/3h56dH7), Instructions for Form I-912 at 8 (https://bit.ly/3axT2wf).

[7] *E.g.*, Michael A. Pearson memorandum, Fee Waiver Relating to Employment Authorization for Victims of Trafficking, dated May 25, 2001.

[8] USCIS may waive fees for the following services based on an inability to pay: Biometrics services fee; Form I-90, Application to Replace Permanent Resident Card; Form I-191, Application for Advance Permission to Return to Unrelinquished Domicile; Form I-751, Petition to Remove Conditions on Residence; Form I-765, Application for Employment Authorization; Form I-817, Application for Family Unity Benefits; Form I-821, Application for Temporary Protected Status; Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100 (NACARA)); Form N-300, Application to File Declaration of Intention; Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA); Form N-400, Application for Naturalization; Form N-470, Application to Preserve Residence for Naturalization Purposes; Form N-565, Application for Replacement of Naturalization/Citizenship Document; Form N-600, Application for Certification of Citizenship; and Form N-600K, Application for Citizenship and Issuance of Certificate under Section 322. Policy Memorandum:  Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11-26 (Mar. 13, 2011), https://bit.ly/3i8UZSe. Additionally the TVPRA requires that "[t]he Secretary of Homeland Security shall permit aliens to apply for a waiver of any fees associated with filing an application for relief through final adjudication of the adjustment of status" for VAWA, U, T, and TPS applicants. 8 U.S.C. § 1255.

without paying a fee. 84 Fed. Reg. at 62,304. Applicants who file Forms I-131, Application for Travel Document, or I-765, Application for Employment Authorization, concurrently with their I-485 application, or while their Form I-485 is pending before USCIS, may do so without paying a fee. 84 Fed. Reg. at 62,304. Furthermore, a reduced fee is available for children under the age of 14. 8 C.F.R. § 103.7(b)(1)(i)(U)(2).

64.    Fees USCIS charges for Naturalization Applications, Form N-400, are $640, and are waivable based upon inability to pay. A reduced fee of $405 is available for applicants with family incomes greater than 150% of the Federal Poverty Guidelines but less than 200%. 8 C.F.R. § 103.7(b)(1)(i)(BBB)(*1*). The biometric fee of $85 is also waivable based on qualifying for a full fee waiver of the naturalization application fee.

65.    The "ability-to-pay" principle has also shaped our asylum fee system. Applicants use Form I-589, Application for Asylum and for Withholding of Removal, to apply for asylum. *See id.* As the agency recognizes, "[t]he U.S. Government has never charged a fee for form I–589, but rather has relied on other fee-paying benefit requestors to subsidize asylum seeking applicants. Application fees from other form types have always been used to fund the operation involved in processing asylum claims." 84 Fed. Reg. at 62,318.

66.    Past fee rules have interpreted the law as directing USCIS not to charge a fee for asylum. As discussed above, USCIS deposits fees from immigration applications into the IEFA.  The fees are specifically "for providing adjudication and naturalization services." 8 U.S.C. § 1356(m). By statute, the fees "may be set at a level that will ensure recovery of the full cost of providing all such services, including the cost of similar services provided without charge to asylum applicants or other immigrants." 8 U.S.C. § 1356(m).

67.    As USCIS previously understood, "Congress directed that the IEFA fund the cost of asylum processing and other services provided to immigrants at no charge." *See* Pub. L. No. 101-515, § 210(d)(1) and (2), 104 Stat. 2101, 2121 (Nov. 5, 1990). USCIS' understanding of that Congressional directive was reflected consistently in the rulemaking proposals for the 2004, 2007, and 2010 USCIS fee rules. 69 Fed. Reg. 5088 (2004); 72 Fed. Reg. 4890 (2007); 75 Fed. Reg. 33448 (2010).  None of these proposed rules resulted in fees for asylum applicants.  For the 2016 Final

Rule, USCIS was explicit about the adoption of this principle: "fees for each benefit type are adequate to cover USCIS' costs associated with processing applications and petitions, as well as providing similar benefits to asylum and refugee applicants and certain other immigrants at no charge." 81 Fed. Reg. 26,904, 26,908 (May 4, 2016).

68.     In addition, the agency recognizes certain statutorily required fee waivers. The TVPRA requires that "[t]he Secretary of Homeland Security shall permit aliens to apply for a waiver of any fees associated with filing an application for relief through final adjudication of the adjustment of status" for VAWA, U, T, and TPS applicants. 8 U.S.C. § 1255.

69.     NACARA provides for relief from deportation for qualifying asylum seekers. NACARA applicants must file Form I-881, Application for Suspension of Deportation or Cancellation of Removal Pursuant to NACARA, to apply for relief. The IEFA fees for these applicants have remained the same since 2005, except for inflation adjustments. 84 Fed. Reg. at 62,323. The fee for this benefit is $285 for individuals, with a $570 cap for families and flat $165 EOIR fee, whether an individual or family. *Id.*

70.     Congress has repeatedly emphasized that cost should not prevent an otherwise eligible lawful permanent resident from naturalizing. On February 13, 2019, Congress reiterated its support of keeping naturalization affordable by making fee waivers more widely available. A bipartisan, bicameral conference report published on Feb. 13, 2019 accompanying the omnibus appropriations act for Fiscal Year 2019 says:

> USCIS is expected to continue the use of fee waivers for applicants who can demonstrate an inability to pay the naturalization fee. USCIS is also encouraged to consider whether the current naturalization fee is a barrier to naturalization for those earning between 150 percent and 200 percent of the federal poverty guidelines, who are not currently eligible for a fee waiver. The conferees encourage USCIS to maintain naturalization fees at an affordable level while also focusing on reducing the backlog of applicants.

71.     Even more recently, Congress encouraged USCIS to preserve fee waivers for applicants who demonstrate an inability to pay. On December 16, 2019, the House Appropriations Committee published an Explanatory statement on the Consolidated Appropriations Act of 2020, which said:

Fee Waivers.—USCIS is encouraged to continue the use of fee
waivers for applicants who demonstrate an inability to pay the
naturalization fee, and to consider, in consultation with the Office of
the Citizenship and Immigration Services Ombudsman (CIS
Ombudsman), whether the current naturalization fee is a barrier to
naturalization for those earning between 150 percent and 200 percent
of the federal poverty guidelines and who are not currently eligible for
a fee waiver, and provide a briefing to the Committees within 60 days
of the date of enactment of this Act.[9]

72.     This explanatory statement shows concern about imposing fees on vulnerable groups:

Further, USCIS is encouraged to refrain from imposing fees on any
individual filing a humanitarian petition, including, but not limited to,
individuals requesting asylum; refugee admission; protection under the
Violence Against Women Act; Special Immigrant Juvenile status; a T
or U visa; or requests [for] adjustment of status or petitions for another
benefit after receiving humanitarian protection. USCIS shall consult
with the CIS Ombudsman on the impact of imposing such fees and
provide a briefing to the Committees within 60 days of the date of
enactment of this Act.[10]

## H.     USCIS Announces A New Mission

73.     In early 2018, USCIS announced a new mission.[11] Its mission statement had read:

"USCIS secures America's promise as a nation of immigrants by providing accurate and useful

information to our customers, granting immigration and citizenship benefits, promoting an

awareness and understanding of citizenship, and ensuring the integrity of our immigration system."[12]

74.     Its new mission statement came to read: "U.S. Citizenship and Immigration Services

administers the nation's lawful immigration system, safeguarding its integrity and promise by

efficiently and fairly adjudicating requests for immigration benefits while protecting Americans,

securing the homeland, and honoring our values."[13]

---

[9] Committee on Appropriations, Explanatory Statement on HR 1158, Pub. L. No. 116-93,
https://bit.ly/2EeoovN (last visited 8/17/2020).
[10] *Id.*
[11] Richard Gonzales, *America No Longer A 'Nation of Immigrants,' USCIS Says,* NPR (Feb. 22,
2018), https://n.pr/316fysK.
[12] *See, e.g.*, Department of Homeland Security, Office of Inspector General, United States
Citizenship and Immigration Services' Employment Based Fifth Preference (EB5) Regional Center
Program, OIG 14-19, at 2, https://bit.ly/3azvE1k.
[13] USCIS, "Mission and Core Values," https://www.uscis.gov/about-us/mission-and-core-values
(last visited Aug. 20, 2020).

75.     In 2019, Ken Cuccinelli noted that he saw "USCIS as a vetting agency, not a benefits agency." Adam Shaw, *Cuccinelli puts hardline stamp on immigration agenda, just 2 months into USCIS job*, Fox News (Aug. 23, 2019), https://fxn.ws/3kWAnyP.

76.     USCIS has assisted with ICE and CBP enforcement work in recent years. For example, in response to heightened immigration levels at the U.S.-Mexico border, USCIS deputy director Mark Koumans sent an email to USCIS staff in July 2019 stating that "[c]urrent conditions are placing extreme stress on our colleagues at Immigration and Customs Enforcement," and that "USCIS has agreed to seek USCIS volunteers to provide ICE with support. . . . I appreciate your willingness to consider helping our colleagues fulfill the DHS mission." Hamed Aleaziz, *Civil Servants Who Process Immigration Applications Are Being Asked To Help ICE Instead*, Buzzfeed News (July 17, 2019), https://bit.ly/3kQ1knH. "One USCIS officer, however, . . . [said] that Cuccinelli appeared focused on helping ICE with its law enforcement work, rather than adjudicating immigration benefits. . . . 'Cuccinelli is diverting resources towards enforcement.'" *Id.; see also* Eric Katz, *Employees Concerned After Agency Threatens Furloughs Over Budget Shortfall*, Gov't Exec. (May 22, 2020), https://bit.ly/3iO4qXt ("USCIS employees employed on a volunteer basis to Border Patrol and Immigration to *help conduct operations within the purview of those agencies*." (emphasis added)).[14] And USCIS leadership has recently moved to expand the agency's authority to initiate removal proceedings and encourage placing applicants into removal proceedings. *See* USCIS Policy Memorandum on Notices to Appear, No. PM-602-0050.1 (June 28, 2018); USCIS Policy Memorandum on Requests for Evidence, No. PM-602-0163 (July 13, 2018).

## II.     IRREGULAR PROPOSED RULEMAKING

77.     USCIS rolled out the Final Rule after an irregular and chaotic proposed rulemaking process that denied the public adequate opportunity to comment.

### A.     Inadequate Opportunity to Comment

78.     On November 14, 2019, USCS published a proposed rule just before the Thanksgiving holiday ("November Proposal"). It specified a deadline for comments of December

---

[14] The Final Rule explicitly takes CBP's costs into account in setting I-192 fees. 85 Fed. Reg. at 46,791, 46,792 n.4.

16, 2019.  This allowed just 32 days for public comment, in contrast to the 45-60 days provided in past fee rules.

79.     The November Proposal included a $207 million transfer of IEFA funds to ICE but also included six alternative fee schedules, including a fee schedule with a $0 to ICE.

80.     On November 22, 2019, USCIS replaced the economic analysis on the regulatory docket with a new economic analysis, without informing the public.  As a result, some commenters were drafting their comments on the basis of the old economic analysis without even realizing it was obsolete.

81.     On December 9, 2019 – just one week before the original deadline for comments – USCIS published a "supplement" that included an entirely different set of budget assumptions.  USCIS extended the deadline for comments to December 30, 2019 ("December Proposal").  That gave commenters 21 days running over the holiday season to comment on an entirely new financial justification for the rule.

82.     The December Proposal advanced new rationales for fee increases not previously suggested in the November Proposal.  It did not include a corresponding new fee schedule and did not propose concrete adjustments of fees in accordance with the new rationales.

83.     On January 24, 2020, and without advance notice to the public, USCIS reopened the public comment period for the proposed rule for another seventeen days, with a deadline of February 10, 2020.

84.     One week before that deadline, USCIS finally held a meeting to demonstrate its cost-modeling to stakeholders, as promised in the November Proposal. However, the meeting was in-person only, with no public telephone or virtual access, and thus only a few people could attend.

85.     In other words, USCIS did not provide 60 days for public comment on the proposed rule with its supplemental material.  It provided 21 days for comment from December 9-30 and 17 days from January 24 to February 10.  Commenters only had access to the agency's highly technical cost-modeling in the final week of that period, from February 3 to 10.

86.     The extra days in January and February did not remedy the problem with the abbreviated comment period because the additional days were given with no notice.  Commenters

had no opportunity to make time for analyzing the new material and drafting a new comment letter. Because of the disjointed comment period, commenters were not able to spend sufficient time analyzing the Proposals in full and providing complete responses.

87.     In spite of the irregular process and insufficient time to comment, regulations.gov shows 39,665 comments were submitted on the November Proposal, and 4,279 comments were submitted when the public comment period was reopened.  The vast majority of the comments were in opposition to the Proposals. Comments to the proposed rule included, among other things, research showing that the proposed rule would disproportionately affect people of color and low-income immigrants and research showing the benefits of increased naturalization.   .   The comments also outlined new unjustified and wasteful practices at USCIS that increased processing times, decreased efficiency, and reduced access to immigration benefits.

**B.     Insufficient Information in the Proposal**

88.     In addition to the timing problems, the contents of both the November Proposal and the December Proposal made it impossible for the public to discern what the agency was proposing.

89.     The narrative portion of the November Proposal proposed fees that would recover USCIS projected costs, as shown in its budget. *See* 84 Fed. Reg. at 62,286-87 & Table 2. Its proposed budget fell into four categories: (i) Transfer to ICE ($207.6 million), (ii) Pay and benefits adjustments for on-board staff ($280.2 million in FY 2019 and $89.8 million in FY 2020, or an average of $185 million), (iii) Pay and benefits for new staff ($116.7 million in FY 2019 and $128.8 million in FY 2020, or an average of $122.75 million), (iv) Net additional costs ($150.8 million in FY 2019 and $6.2 million in FY 2020, or an average of $78.5 million). *See* 84 Fed. Reg. at 62,286.

90.     These dollar figures from the narrative portion of the rule did not match the dollar figures in Table 2 of the November Proposal, adding to the confusion about which amount the agency was proposing to recover through applicants' fees. *See* 84 Fed. Reg. at 62,287 at Table 2 (depicted below).

TABLE 2—COST PROJECTIONS

[FY 2019/2020 fee review IEFA non-premium budget (in millions)]

| | |
|---|---|
| Total Base FY 2018 IEFA Non-Premium Budget | $3,585.6 |
| Plus: Spending Adjustments | 217.2 |
| Total Adjusted FY 2018 IEFA Non-Premium Budget | 3,802.8 |
| Plus: Transfer to ICE | 207.6 |
| Plus: Pay Inflation and Promotions/Within Grade Increases | 280.2 |
| Plus: Net Additional Costs | 267.5 |
| Total Adjusted FY 2019 IEFA Non-Premium Budget | 4,558.1 |
| Plus: Pay Inflation and Promotions/Within Grade Increases | 218.6 |
| Plus: Net Additional Costs | 6.2 |
| Total Adjusted FY 2020 IEFA Non-Premium Budget | 4,782.9 |
| FY 2019/2020 Average Non-Premium Budget | 4,670.5 |

91.     In addition, the explanation for each of the four categories is vague and opaque.

92.     The November Proposal included a $207.6 million transfer to ICE.  That proposed transfer decreased by $95 million in the December Proposal, without an adequate explanation of why the first amount was proposed, or what assumptions applied.

93.     DHS also did not explain why it previously failed to project the need for a substantial increase in staffing.

94.     Its Proposal included a 44% increase in staff above the levels set in 2016 without any adequate explanation for the enormous increase.  *See* Table 6, below.  The November Proposal simply provides that, "This additional staffing requirement reflects the facts that it takes USCIS longer to adjudicate many workloads than was planned for in the FY 2016/2017 Final Rule and that workload volumes, particularly for work types that do not currently generate fee revenue, have grown." 84 Fed. Reg. at 66,286.

**APPENDIX VII – AUTHORIZED IEFA POSITIONS BY USCIS OFFICE**

USCIS forecasts staffing and costs based on projected workload and the existing cost baseline. The table below compared FY 2016/2017 fee rule staffing to the staffing levels in the FY 2019/2020 fee review.

Appendix Table 6: IEFA Positions by Office

| Directorate | FY 2016/2017 Positions | FY 2019/2020 Positions | Difference | % Difference |
|---|---|---|---|---|
| Field Operations Directorate | 5,946 | 7,305 | 1,359 | 23% |
| Fraud Detection and National Security Directorate | 920 | 1,918 | 998 | 108% |
| Refugee Asylum and International Operations Directorate | 1,648 | 2,147 | 499 | 30% |
| Service Center Operations Directorate | 2,866 | 5,579 | 2,713 | 95% |
| Other Offices (External Affairs, Immigration Records and Identity Services, Management, etc.) | 3,163 | 4,009 | 846 | 27% |
| **USCIS Total** | **14,543** | **20,958** | **6,415** | **44%** |

95.     DHS did not address policies it adopted that contribute to longer adjudication times and increased backlog.

96.     DHS did not adequately explain the Proposals' distribution of staffing increases. For example, USCIS admitted in the Final Rule that it "has experienced a continuous, sizeable increase in the affirmative asylum backlog . . . ." but increased staffing for Refugee Asylum and International Operations Directorate by 30%.  85 Fed. Reg. at 46,846; DHS, Immigration Examinations Fee Account: Fee Review Supporting Documentation with Addendum FY 2019-2020 at 42 (May 2020), USCIS-2019-0010-12271.  At the same time, it DHS is increasing the Fraud Detection and National Security Directorate staffing by 108%, without any data to explain why "Fraud Detection" work is doubling. *Id.*

97.     DHS also describes$150.8 million it seeks to recover from individuals and families seeking immigration services as "net additional costs," including "enhancement requests such as secure mail shipping for permanent resident cards, increased background investigations, headquarters consolidations, etc." 84 Fed. Reg. at 62,286. It states these and other operations expenses are "necessary for achieving USCIS's strategic goals," without explaining what new strategic goals require this increase. 82 Fed. Reg. at 62,286. That omission prevents the public from determining whether the fees are being used within the limits of the IEFA's statutory purpose.

98.     The November Proposal claimed an annual additional budget need of $1.26 billion. 84 Fed. Reg. at 62,282. Subtracting the $95 million from its December Proposal's decrease for ICE funding (the first category of its four identified budget components), DHS proposed recovering $1.17 billion from fees. It did not update the other three budget components in the December Proposal. Thus, the following math problem emerges: $112 million to ICE + $185 million for current staff pay + 122.75 million for new staff + $78.5 million for net additional costs = $498.25 million.

99.     In other words, the November Proposal shows that DHS structured its fees to raise $672 million for reasons it does not disclose.

100.    The Proposals were also deficient because it was unclear what fee schedule DHS was actually proposing. The November Proposal identified 6 alternative scenarios with different assigned

fee amounts to address combinations of hypotheticals relating to whether DACA remained in place and whether the ICE transfer was finalized. 84 Fed. Reg. at 62,328 & Table 20. It was impossible to tell what formula or rationale DHS would apply, and whether the agency's actions were reasonable in light of alternatives.

101.    In addition, the November Proposal explained the final amount would reflect fees at an amount "in between" the levels proposed. 84 Fed. Reg. at 62,327. Again, the public could not comment on whether the agency's arrival at an "in between" amount was reasonable or within its discretion.

102.    Furthermore, the December Proposal, though it identified a $95 million decrease in its budget assumptions, did not propose new fees. Instead, DHS stated the resulting fee schedule would be "somewhere between" the levels of full ICE transfer and no ICE transfer identified in the November Proposal. Again, this was insufficient information for public comment. 84 Fed. Reg. 67,246.

103.    DHS proposed allocating costs unevenly and without justification. DHS proposed increasing the fees for Form I-485 (Application to Register Permanent Residence) by 17%, Form I-751 (Petition to Remove Conditions on Residence) by 52%, Form N-400 (Application for Naturalization) by 83%. But it would decrease the Form I-140 (Immigration Petition for Alien Worker) by 9%. The November Proposal provided no adequate explanation for these variations, so the public could not provide comment to help inform the agency's decision making.

104.    DHS also failed to provide an adequate explanation for its projected 2.1 million increase in employment authorization applications. 84 Fed. Reg. at 62,289. The agency provided no supporting data for this figure. Given that DHS projected that employment authorization applications would account for 60% of its projected workload increase, this omission deprived the public of a meaningful opportunity to comment.

105.    The sheer breadth of the chaotic Proposals compounded the confusion. The Proposals reflected changes to some 59 forms. With this volume and complexity of changes, it was unclear whether the Administration was proposing consistent bases for its changes or what those bases might be.

106.    This is particularly true because the fees in the proposed rule stem from DHS's estimates of future costs and revenues but USCIS did not offer enough information for the public to understand its estimates.

### III.    BUDGET REQUESTS AND CONGRESSIONAL HEARINGS

107.    In May 2020, DHS told Congress it would need a $1.2 billion bailout due to the COVID-19 crisis. The agency pitched this as a loan that it would pay back to the Treasury through a 10% surcharge on top of all other fees.[15] *See* Camila DeChalus, *USCIS seeks $1.2 billion from Congress*, Roll Call (May 18, 2020), https://bit.ly/3iW5xVo. The agency claimed that without the funding it would have to furlough some 13,400 employees by the end of August 2020 due to decreased receipts during the COVID pandemic.  But long before COVID, the agency had projected its own financial demise.

108.    This graphic from the April 2019 IEFA Fee Review Supporting Documentation[16] tells the story of how far the agency's financial condition had deteriorated more than a year before it sought the congressional bailout purportedly due to COVID:



Figure 3: IEFA Non-Premium Year-End Carryover Balances

---

[15] Testimony of Joseph B. Edlow, Deputy Director for Policy, USCIS, House Committee on the Judiciary, Submissions on Immigration and Citizenship, Hearing entitled "Oversight of U.S. Citizenship and Immigration Services" at 3 (July 29, 2020).
[16] USCIS, FY 2019 Immigration Examinations Fee Account: Fee Review Supporting Documentation 14 (April 2019), DHS No. USCIS-2019-0010-0007.

109.    After USCIS announced furloughs, members of Congress disclosed that the FY2020 deficit USCIS projected in the Final Rule would not come to pass.

110.    Senators Leahy and Tester sent a letter to USCIS noting that the agency now anticipated a surplus for 2020, rather than a deficit.[17]

111.    DHS postponed the furloughs to August 30, 2020 after receipt of the letter from Senators Leahy and Tester.

112.    Nevertheless, USCIS's Deputy Director for Policy, Joseph Edlow, testified to the U.S. House of Representatives' Committee on the Judiciary, Subcommittee on Immigration and Citizenship that the COVID-19 pandemic was responsible for USCIS insolvency.[18] Yet, he also explained that USCIS's revenues and receipts were increasing in recent months.[19]

113.    To date, DHS still has not submitted to Congress any formal request for emergency supplemental funding, even though it is still threatening furloughs.  The lack of any formal funding requests confirms that DHS is using the COVID-19 crisis opportunistically as pretext for crippling the system of lawful immigration to the United States.

114.    The Final Rule raises fees based on DHS projections that it publicized long before COVID and that appear to conflict with information it provided to Congress in connection with the hearings.  In all events, the Final Rule is clear that it did not take the effects of COVID into account when it issued the final rule.  85 Fed. Reg. at 46,793.

## IV.    THE FINAL RULE

115.    The Final Rule is irrational, arbitrary, contrary to law, and an unjustified reversal of past practice. It allocates fees for the unlawful purposes of deterring applicants from seeking statutory benefits, including naturalization and asylum.

---

[17] *See* Letter from Patrick Leahy, Vice Chairman, U.S. Senate Comm. on Appropriations, and Jon Tester, Ranking Member, U.S. Senate Comm. on Appropriations, to Chad F. Wolf, Acting Sec'y, Dep't of Homeland Sec., and Joseph Edlow, Deputy Dir. for Policy, U.S. Citizen and Immigration Services (Jul. 21, 2020) (on file with U.S. Senate); *see also* Letter from Patrick Leahy, Vice Chairman, U.S. Senate Committee on Appropriations, to Chad F. Wolf, Acting Sec'y, Dep't of Homeland Sec., and Joseph Edlow, Deputy Dir. for Policy, U.S. Citizen and Immigration Services (Aug. 18, 2020) (on file with U.S. Senate).
[18] *Id.* at 2.
[19] *Id.*

A. **The Final Rule's Reasoning Is Incomplete, Inconsistent, and Irrational**

1. Underlying Assumptions about USCIS Budget Needs Are Incoherent

116.    USCIS has asserted that its financial situation necessitates the fee increases.  But the Final Rule does not offer a cogent explanation for how USCIS burned through surplus revenues and cash reserves, why it needs a 20% budget increase now, or how it will spend the new revenue it generates from higher fees.

117.    The November Proposal predicted that even though USCIS had an $800 million carryover balance at the end of FY2019, it would be $250 million in the red by the end of FY 2019 and over $1.5 billion in the red by FY 2020.  And it projected all this long before COVID-19 was a concern.

118.    The Proposals' description of USCIS's financial condition is puzzling because the 2016 Final Rule resulted in an unexpected $400 million budget surplus. USCIS does not account for how it used the surplus or explain why its finances have changed so dramatically. 85 Fed. Reg. at 46,794.

119.    DHS also fails to explain how it spent the $1 billion carryover from FY 2017.[20] USCIS's use of all of this revenue is astonishing. Without some explanation of how it incurred additional expenses of $1 billion, DHS cannot rationally explain its decision, and the public cannot meaningfully comment on whether DHS is raising its fees for a lawful purpose.

120.    USCIS also does not explain why it is anticipating a $1.4 billion increase in its budgetary needs. The Final Rule asserts that the extra revenue generated by the Final Rule will pay for new hires, pay raises, and "net additional costs," but the numbers it provides for these items leave 63% of the new revenue allocation completely unexplained.  The following chart illustrates the point[21]:

---

[20] *See* USCIS Budget Overview, Congressional Budget Justification FY 2019 at CIS-10, https://bit.ly/3g5JcTt.

[21] *See* Supplemental Testimony of Douglas Rand, House Committee on the Judiciary, Submissions on Immigration and Citizenship, Hearing entitled "Oversight of U.S. Citizenship and Immigration Services" (July 29, 2020), Attachment at 2; *see also* cost breakdown in November Proposal, 84 Fed. Reg. at 62,286; December Proposal reduction in proposed cost attributed to ICE diversion, 84 Fed. Reg. 67,243 (Dec. 9, 2019); Final Rule budget, 85 Fed. Reg. at 46,794. The Final Rule updated the "net additional costs" category to $69,050,000, such that the final unexplained amount is in fact $659,148,915.

1
2
3
4
5
6
7
8
9
10
11
12
13



Planned Expenses ($)

"Net additional costs":
78,500,000 (8%)

Hiring new staff:
122,750,000 (12%)

Pay raises for current staff:
185,000,000 (18%)

Totally unexplained:
649,698,915 (63%)

14   121.   Similarly, USCIS asserts that its costs are skyrocketing but without any cogent

15   explanation for the sudden and dramatic pre-COVID increase in the cost of providing adjudication

16   services. The data show the increase in cost but not the reason for the increase.[22]

17
18
19
20
21
22
23
24
25
26
27
28

---

[22] USCIS Immigration Examination Fee Account: Fee Review Supporting Documentation FY 2019 at 6 (Apr. 2019); *see also* 81 Fed. Reg. at 73,323 ($3.038 billion USCIS FY2016/2017 budget); 85 Fed. Reg. at 46,794 ($4.556 billion USCIS FY2019 budget and $4.783 FY2020 budget, or an average FY2019/2020 $4.444 billion budget).

1
2
3
4
5
6
7
8
9
10
11
12
13

Figure 1: IEFA Non-Premium Cost Baseline (Dollars in Millions)



14
15
16
17
18
19
20
21

122.    Meanwhile, DHS has pursued denaturalization efforts, which are by definition ICE-led efforts, by raising funds using USCIS's fee-setting authority.[23] The Proposals sought to directly fund these efforts, none of which are led by USCIS, but instead are led by enforcement agencies such as ICE, and adjudicated by DOJ.[24]

123.    Simultaneously, DHS suggests it is pursuing policies that increase USCIS's costs, but does not provide any supporting detail. Instead, DHS bakes in assumptions of costs for escalated

22
23
24
25
26
27
28

[23] *See, e.g.*, Naturalization Working Grp., Comment Letter on Proposed Rule on U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements (Feb. 10, 2020), DHS No. USCIS-2019-0010-12030.
[24] OneAmerica, Comment Letter on Proposed Rule on U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements (Dec. 30, 2019), DHS No. USCIS-2019-0010-10310; OneAmerica, Comment Letter on Proposed Rule on U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements (Feb. 10, 2020), DHS No. USCIS-2019-0010-12018; Naturalization Working Grp., Comment Letter on Proposed Rule on U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements (Dec. 30, 2019), DHS No. USCIS-2019-0010-11097; Naturalization Working Grp., Comment Letter on Proposed Rule on U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements (Feb. 10, 2020), DHS No. USCIS-2019-0010-12030.

1    vetting, in-person interviews, and unspecified policy changes, and then concludes its costs have

2    increased, requiring additional fees from applicants.[25]

3          124.   The Final Rule's financial assumptions are also inconsistent with USCIS's reports to

4    Congress about their anticipated surplus.

5          125.   DHS cannot reasonably use the previously-projected deficit as justification for the

6    Final Rule.

7          126.   The gap between DHS projections in the November Proposal and the projections

8    USCIS reported to Congress indicates there may be some underlying flaw in the calculations that

9    support the Final Rule.  DHS did not disclose enough about those calculations for the public to offer

10   meaningful comments.

11         127.   DHS's data and assertions about its costs are unreliable in other respects.  For

12   example, DHS has asserted that it is not changing the fee for DACA.  That assertion is deceptive.

13   The DACA fee had been charged every two years and now it will be charged every year.  That

14   means DHS is collecting twice as much money from DACA applicants under the Final Rule.

15         128.   In the Final Rule, DHS explains it has removed all revenues generated from DACA

16   recipients' fees from its cost modeling because it does not "rely" on revenues from DACA. 85 Fed.

17   Reg. at 46,853 n.88. In other words, DHS discounts the revenues it receives from DACA recipients

18   even though it extracts fees from them.

19         129.   DHS does not adequately account for its $10 discount for certain online applications,

20   newly introduced in the Final Rule.

21         130.   DHS makes no account of any purported cost-savings measures or any measures to

22   reduce waste. It also has not stated whether the fee increases relate to the agency's litigation costs or

23   any fees it has been required to pay opposing counsel after DHS policies have been deemed unlawful

24   by a court of law. It is unclear whether or how these costs are being allocated within DHS.

25

26

27   [25] *See* Am. Immigr. Lawyers Ass'n and Am. Immigr. Council, Comment Letter on Proposed Rule on
     U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration

28   Benefit Request Requirements at 4 (Dec. 23, 2019), DHS No. USCIS-2019-0010-7077.

1

2.       The Final Rule Is Based on A False Premise About Inelasticity of Demand

2        131.    The Final Rule is built on a faulty premise that demand for immigration services is

3    inelastic.  This assumption defies common sense, ignores 200 years of free-market economic theory

4    demonstrating that when prices go up, demand usually goes down, and ignores the government's

5    own data.

6        132.    In particular, DHS ignores its own data that show applications for naturalization

7    surged before prior fee increases, and dropped after.[26] DHS also ignores data in the record showing

8    that the fee increases and elimination of fee waivers could decrease demand to such a degree that the

9    agency will collect *less* money as a result of the Final Rule than it does under the current fee regime.

10       133.    Additional analysis by the Congressional Research Service concludes that "Empirical

11   studies suggest that the volume of naturalization petitions filed may be inversely related to the

12   naturalization fee amount." Congressional Research Service, U.S. Naturalization Policy, Jan. 16,

13   2014, https://bit.ly/321UXW0.

14       134.    DHS data also show that naturalization applicants are the highest beneficiaries of fee

15   waivers. The Final Rule recognizes that naturalization applications have continued under prior fee

16   rules, but refuses to consider that under those fee rules, fee waivers and reduced fees were available

17   to naturalization applicants. 85 Fed. Reg. at 46,895.

18       135.    DHS "acknowledges that evidence presented indicating naturalization increases when

19   previous fees were waived entirely" but asserts without explanation that this "does not support the

20   claim that immigration benefits are sensitive to the changes implemented by this rule." *See* 85 Fed.

21   Reg. at 46,895.

22       136.    The Final Rule's claims of inelasticity also fail to account for the interplay between

23   fees. Because the Final Rule increases the N-400 fee for naturalization so significantly, from $640 to

24   $1,170, and slightly decreases the I-90 fee for lawful permanent residence renewal, from $455 to

25   $415, the Final Rule creates a significant financial incentive for renewing lawful permanent

26

27   [26] *See* 2020 USCIS Ombudsman Report to Congress, https://bit.ly/347JQND ("USCIS historically experiences a temporary increase in naturalization filings in presidential election years and when fee increases are proposed, followed by reduced filings in the next fiscal year.").

28

residence status instead of naturalizing.  DHS offers no explanation for why it believes that those faced with the choice of a $415 renewal or a $1,170 naturalization application would not be price sensitive.

137.    Instead, DHS says that it "did not consider any interplay between the fees for Forms I–90 and N–400 in the NPRM, nor do we in the final rule." 85 Fed. Reg. at 46,838. DHS provides no reasoned explanation for failing to consider this important aspect of the problem.

### 3.    Irrational Cost Modeling Results In Unjustified Conclusions

138.    The Final Rule uses an "Activity-Based Cost" ("ABC") model to assign fees to different benefit applications, based on the average cost to USCIS to adjudicate a given type of form. This modeling relies on unexplained and irrational economic assumptions that are contradicted by data.

139.    First, the agency's total budget amount is an input into the ABC model.  Nothing in the model explains how USCIS arrived at the total budget number.  In other words, DHS first determines the total budget for the agency and then uses the ABC model to determine how to allocate that budget to the various fees. But, as described above, the total budget DHS adopted in the Final Rule is itself deeply flawed and unexplained.  That renders the entire cost model irrational.

140.    Second, DHS's belief that the demand for immigration services is inelastic means that the ABC model does not take into account price elasticity. Thus, the rule fails to account for the likelihood that the volume of applications will go down as prices rise, rendering the model's results without analytical support.

141.    Third, the Final Rule uses opaque and varied assumptions and inputs for different benefit applications for no apparent reason. The Final Rule nowhere explains why USCIS costs have changed so dramatically and inconsistently across different form types.

142.    In particular, USCIS has not explained its source for data on hourly cost projections that entered into the ABC model, a key driver of the fees. For example, the Proposed Rule projects that an N-400 takes 1.57 hours to complete at a fee of $1,170, or $745 per hour. But an EB-5 I-526 petition takes 8.65 hours at a fee of $4,015, or $464.16 per hour. DHS does not explain the different hourly costs for different forms.

143.    The disparate hourly rates per form is inconsistent with the agency's purported activity-based cost system. In the Final Rule, its only explanation is that "DHS uses multiple, different techniques to forecast USCIS' workloads." 85 Fed. Reg. at 46,871.

144.    That assertion is not a reasoned explanation of USCIS's inputs into the cost model that it says generated the fees in the Final Rule.

**B.      The Final Rule Is Contrary to Law Because It Increases Fees Intended for the Adjudication of Applications In Order To Fund Other Activities**

145.    The Final Rule's recovery of its costs for performing ICE and CBP functions is contrary to law. The Final Rule is clear that USCIS now interprets its mission and functions broadly to include "securing the homeland," but it is not clear how it is allocating fees to any non-adjudication efforts it has undertaken pursuant to this new mission. *See* 85 Fed. Reg. at 46,789.

146.    Several statutory provisions provide that USCIS cannot recover through the IEFA those costs it incurs in assisting ICE or engaging in enforcement.

147.    Congress established a separate Fraud Prevention and Detection Account over which the agency has no discretion to adjust fees and which is entirely separate from the IEFA. The INA prescribes a fee for the Fraud Detection and Prevention Account in the amount $500 and $150 for non-U.S. citizens applying for certain employment-related visas. 8 U.S.C. § 1184(c)(12)-(13). Congress expressly provided these amounts for fraud prevention and detection services.

148.    Despite this unambiguous statutory provision with set dollar amounts, DHS charges additional fees to cover its costs for training staff on fraud detection and prevention well beyond what can be recovered through these funds.

149.    Although some fraud detection may be attendant to adjudication, the Final Rule proposes a doubling of staff in the fraud detection unit without providing any evidence that this increase is necessary to adjudicate applications.

150.    The Final Rule also recovers the costs of diverting its staff to ICE and CBP under the Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern

1  Border Act of 2019,[27] despite Congress's express and unambiguous prohibition on using IEFA

2  funds for enforcement.

3      151.    The Emergency Act expressly provides that the DHS agencies could provide their

4  personnel "without reimbursement."[28] But that does not mean that USCIS can recover the costs of

5  providing staff to ICE by raising fees charged to applicants.

6      152.    The Final Rule indicates that USCIS administrative staff have been deployed to ICE.

7  85 Fed. Reg. at 46,871. Presumably, the work of those administrative staff members has been spread

8  distributed to the remaining USCIS staff, who are now spread thin. This may explain the sudden

9  need for additional staffing in the USCIS budget.

10     153.    If USCIS is loaning staff to ICE, but continuing to pay that staff through IEFA funds,

11  USCIS is effectively diverting funds to ICE that ICE would have spent on hiring new staff.

12     154.    If USCIS is itself hiring new staff to absorb the work its former staff is now doing for

13  ICE, and passing the costs of hiring new USCIS staff to applicants under the guise of the IEFA, this

14  too is contrary to law.

15     155.    USCIS statements that it sent personnel but not "dollars" to the enforcement agency

16  is merely an attempt to evade Congress's express direction. House Comm. on the Judiciary,

17  *Oversight of U.S. Citizenship and Immigration Services* at 1:21:15-1:22:46 (July 29, 2020),

18  https://bit.ly/31eibZL.

19     156.    In either case, the work that USCIS staff does for ICE is by definition outside of

20  USCIS's mission. A discussed above, Congress, the courts, and the predecessor immigration agency

21  have all understood the adjudication of immigration services is a separate and distinct concept from

22  enforcement. *See supra* section I.E. Because administrative work performed for ICE is not USCIS

23  work providing adjudication services, the related costs cannot be recovered through the IEFA under

24  INA 286(m).

25     157.    In addition to being contrary to law, DHS's attempt to explain away these questions

26  demonstrates that the Final Rule is also arbitrary and capricious. The Final Rule gives no clarity on

27  ────────────────────────────

[27] Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the
Southern Border Act of 2019, Pub. L. No. 116-26, 133 Stat. 1018.
28  [28] Pub. L. No. 116-26, 133 Stat. 1018.

these points because it does not explain how staffing needs have risen by such a dramatic amount: an increase of 6,277 positions, or 43% above the staffing amount identified in the 2016/2017 Final Rule. *See* 85 Fed. Reg. at 46,871. Although DHS claims that the "[m]arginal costs associated with this effort [to assist ICE] are not in this final rule" it is unclear based on the record how they have been accounted for anywhere.

158.    Furthermore, DHS explains the high staffing needs arise from receiving greater volumes of applications, but historical figures show there is no correlation between volume of applications and volume of adjudications. The below infographic, created from USCIS's data available at www.uscis.gov/data, illustrates this point[29]:



159.    In addition, the Final Rule states it needs additional staff because processing times have increased. 85 Fed. Reg. at 46,872. Yet, the agency is not specific about how the additional staff will address the backlog.  The agency merely reasons that additional revenue "*may* be used to fund staff that will adjudicate incoming workload and potentially mitigate or stabilize future backlog growth." *Id.* (emphasis added).  It is unclear what purpose the additional staffing serves and whether

---

[29] *See* Immigrant Legal Res. Ctr., Comment Letter on Proposed Rule on U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements at 39 (Dec. 23, 2019), DHS No. USCIS-2019-0010-7084.

1  it will, in fact, improve processing times.  This is particular true because so much of the increase in

2  staffing is for "Fraud Detection and National Security."

3     160.    Staffing numbers in the Final Rule that seek to recover the costs of DHS's staff

4  shuffling despite statutory prohibitions and are without rational justification provided in the Final

5  Rule. For example, USCIS has allocated staff to assist CBP and ICE with enforcement work. *See* ¶

6  76, *supra* (citing Aleazis, *Civil Servants*, *supra*; Katz, *Employees Concerned*, *supra*). The Final Rule

7  explicitly takes CBP's costs into account in setting I-192 fees. 85 Fed. Reg. at 46,791, 46,792 n.4.

8  And USCIS has devoted significant resources to a new denaturalization unit, which seeks (in

9  diametric opposition to USCIS's mission) to enforce immigration law to *strip* naturalized

10  immigrants of their citizenship, as well as to strip lawful permanent residents of their status.[30]

11  **C.    The Final Rule Unlawfully Allocates Costs Across Fee Categories and Places a**

12  **Disproportionate Burden on Low-Income Applicants for Naturalization or**

13  **Asylum**

14     161.    The Final Rule abandons ability-to-pay principles in favor of the selective use of a

15  beneficiary-pays policy that disproportionately burdens low income applicants, without a reasoned

16  explanation.

17     162.    DHS asserts that the Final Rule adopts a beneficiary-pays policy in the interests of

18  "equity" but there is nothing equitable about the way the Final Rule drastically increases fees for

19  low-income applicants for some benefits, and imposes much smaller increases for some wealthier

20  applicants. The uneven allocation of the fee increases across benefit categories confirms that DHS is

21  using the fee increase to impede access to immigration benefits for low-income applicants who are

22  seeking immigration benefits, including naturalization or asylum.

23

24  _____

[30] *See* Amy Taxin, *US launches bid to find citizenship cheaters*, Assoc. Press (June 11, 2018),
25  https://bit.ly/3h3IJCk ("The U.S. government agency that oversees immigration applications is
launching an office that will focus on identifying Americans who are accused of cheating to get their
26  citizenship and seek to strip them of it. [then-USCIS] Director L. Francis Cissna told The Associated
Press in an interview that his agency is hiring several dozen lawyers and immigration officers to
27  review cases of immigrants who were ordered deported and are suspected of using fake identities to
later get green cards [i.e., lawful permanent residence status] and citizenship through
28  naturalization. . . . He declined to say how much the effort would cost but said it would be covered
by the agency's existing budget, which is funded by immigration application fees.").

1          1.      The Final Rule Dramatically Increases Fees for Low Income Applicants by

2                   Eliminating or Reducing Access To Fee Waivers

3          163.    The Final Rule targets low-income applicants by eliminating discretionary fee

4   waivers for naturalization, lawful permanent residence, and work authorizations for most

5   immigrants.

6          164.    The Final Rule also reduces access to statutorily-required fee waivers.  It limits

7   waivers to applicants with household income under 125% of the federal poverty guidelines ("FPG")

8   instead of the current 150% FPG, and it eliminates the alternative bases for a fee waiver, receipt of a

9   means-tested benefit or demonstration of financial hardship.  And it imposes significantly more

10  demanding requirements for proving income level than ever before.

11         165.    The Final Rule imposes these changes even though commenters referred to studies in

12  the record showing that immigrants who would be ineligible for fee waivers under the Final Rule

13  would suffer significant hardship if forced to pay full fees for immigration filings, or might be priced

14  out of the benefits altogether.

15         166.    DHS offers no cogent response, saying only that it is adopting a "beneficiary pays"

16  model that it believes to be more "equitable" than the ability to pay model.

17         167.    But even this unsupported principle is inconsistently applied. DHS purports to

18  recognize the humanitarian concerns for VAWA (domestic violence), T-visa (trafficking), and U-

19  visa (other crime) nonimmigrant populations, and that such applicants would likely qualify for fee

20  waivers, in deciding to provide fee exemptions for initial employment authorization to these groups.

21  84 Fed. Reg. at 62,302. Yet, DHS gives no similar consideration to asylum applicants who have a

22  statutory right to apply for asylum. 8 U.S.C. 1158(a). Asylum applicants face the same threats that

23  justify granting fee waivers to VAWA/T-visa/U-visa applicants, but DHS nevertheless treats asylum

24  applicants differently, without a legitimate reason.

25         168.    DHS also makes contradictory claims about the impact of changes to fee waivers.  On

26  the one hand, it claims that it does not have data indicating that individuals will delay submitting

27  applications and petitions in response to the fee waiver policy changes.  85 Fed. Reg. at 46,807.

28  Then it claims that it "does not believe" applicants will be prevented from receiving immigration

benefits a result of its change, without citing any basis for that belief. 85 Fed. Reg. at 46,806. Elsewhere, DHS acknowledges, "Limiting fee waivers may adversely affect some applicants' ability to apply for immigration benefits." 85 Fed. Reg. at 46,891. However, according to DHS, the benefits of immigration "continue to outweigh the cost associated." 85 Fed. Reg. at 46,896. With respect to asylum applications, the regulatory impact analysis expressly states, "Some applicants may not be able to afford this fee and will no longer be able to apply for asylum." Regulatory Impact Analysis at 20. The Final Rule states it believes asylum applicants "will find a way" to pay. 85 Fed. Reg. at 46,882.

        2.    The Final Rule Dramatically Increases Fees for Those Seeking to Naturalize

169.    The Final Rule does not apply the fee increase equally across all applicants.  Instead, it is structured to deter naturalization by allocating a disproportionate share of USCIS costs to those seeking to become citizens. This chart summarizes the dramatic increase in the cost to naturalize:

| Form | Application Type | Percentage Change | Total Cost |
|------|-----------------|-------------------|------------|
| Form N-300 | Application to File Declaration of Intention | +383% | $1,305 |
| Form N-336 | Request for Hearing on a Decision in Naturalization Proceeding | +148% | $1,735 |
| Form N-400 | Application for Naturalization for someone who currently qualifies for a reduced fee and must pay a biometric fee | +266% +263% | $1,170 (paper) $1,160 (online) |
| Form N-400 | Application for Naturalization without a fee waiver | +83% (paper) +81% (online) | $1,170 (paper) $1,160 (online) |
| Form N-470 | Application to Preserve Residence for Naturalization Purposes | +346% | $1,585 |
| Form I-90 | Application to Replace Permanent Resident Card | -11% (paper) -9% (online) | $405 (paper) $415 (online) |

170.    For those who previously qualified for fee waivers, the increase is from $0 to the new fee.

171.    The Final Rule does not explain why those pursuing citizenship should shoulder such dramatic fee increases. Nor does it explain why it has increased these fees but *decreased* the fee for

lawful permanent resident status renewal, creating a clear financial incentive to renew permanent residence for those who could naturalize instead. By renewing permanent residence rather than naturalizing, these immigrants remain in peril of removal, are limited in their ability to leave the country, cannot sponsor relatives in pursuit of family unification, cannot register to vote, and are limited in other ways as well. DHS does not offer a reasoned explanation for setting prices in a way that creates incentives *not* to naturalize.

172.    The Final Rule also imposes these dramatic increases on naturalization without consideration of the benefits of increasing naturalization rates. For example, DHS did not address studies suggesting as much as $5.7 billion earrings increase from increased naturalization in 21 major cities, and a $2.03 billion increase in federal, state, city income tax and payroll tax revenue.[31]

173.    Increased naturalization also decreases the cost of government programs as individuals gain access to better employment opportunities. For example, a study of one major city showed a potential net fiscal gain of $823 million.[32]

174.    Comments to the proposed rule noted that USCIS's own data shows that the increases in naturalization fees would disproportionately affect permanent residents of color. Comments to the proposed rule cited to research showing that increases in naturalization fees disproportionately affect Latino populations. DHS nevertheless declined to make any adjustments to mitigate these disparate effects. In fact, in failing to account for the disproportionate harm on permanent residents of color, DHS even ignored its own data showing that most immigrants who naturalized in 2018 were from Mexico, India, Philippines, Cuba, and the People's Republic of China.

175.    DHS did not allow for adequate consideration of the impact of these fee increases on the overall rate of naturalization, how the rate of naturalization impacts the public interest, or the disproportionate impact on communities of color.

[31] Immigrant Legal Res. Ctr., Comment Letter on Proposed Rule on U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements at 6, 19 (Dec. 23, 2019), DHS No. USCIS-2019-0010-7084 (citing Maria E. Enchautegui & Linda Giannarelli, "The Economic Impact of Naturalization on Immigrants and Cities." (Dec. 2015)).
[32] *Id.*

176.     DHS's failure to consider the broader benefits of naturalization in setting its

naturalization fees is also a significant policy shift. The agency acknowledges that this is a shift in

policy but does not give an adequate explanation for the change:

> DHS has historically held the fee for Form N-400, Application for
> Naturalization, below the estimated cost to USCIS of adjudicating the
> form in recognition of the social value of citizenship. Immigration
> services provide varying levels of social benefit, and previously DHS
> accounted for some aspect of the social benefit of specific services
> through holding fees below their cost. However, in this final rule DHS
> is emphasizing the beneficiary pays principle of user fees. Because
> DHS has held the fee for Form N-400 below full cost in the past,
> adjusting to full cost requires an increase in excess of the volume-
> weighted average increase of 20 percent. If DHS did not increase the
> fee for Form N-400 this amount, other fees would need to increase
> further to generate the revenue necessary to recover full cost, including
> the costs of the N-400 not covered by its fee. DHS believes the
> increase in the fee for Form N-400 is fully justified.[33]

177.     Despite this passing acknowledgement of a major policy shift, however, the agency

gives no reason why departing from this previous practice would be beneficial or acceptable, or why

the agency's newfound beneficiary-pays principle should take precedence over accounting for the

social benefits of naturalization when setting fees.

### 3.     The Final Rule Unlawfully Imposes New Fees for Asylum Seekers

178.     For the first time in U.S. history, the Final Rule imposes a non-waivable fee for

asylum applications. Past fee rules have interpreted the law as directing USCIS not to charge a fee

for asylum. *See supra* ¶ 66. The Final Rule also imposes a fee for an asylum seeker's first

application for employment authorization. The fee for the asylum application is $50 and the fee for

employment authorization is $550.

179.     In addition, the Final Rule will impose a $30 biometric fee for asylum applicants

seeking employment authorization. 85 Fed. Reg. at 46,790. This provision was not included or

alluded to in the Proposals.

180.     The $50 fee for an asylum application makes the United States one of just four

countries in the world that charges a fee for humanitarian protection.  DHS attempts to justify the fee

as "in line" with those three countries[34] but the United States is an outliner even in that group.  Each

---

[33] 85 Fed. Reg. at 46,799.
[34] Iran, Fiji, and Australia. *See* 85 Fed. Reg. at 46,845.

of the other countries that charges a fee for the application also offers fee waivers or fee exemptions. The Final Rule does not, with one limited exception for unaccompanied immigrant children.

181.    The Final Rule does not offer a reasoned explanation for the asylum fee or the lack of a waiver.  It asserts without support that it would not take an asylum seeker an "unreasonable amount of time to save, would generate some revenue to offset costs, discourage frivolous filings and not be unaffordable to an indigent alien."  84 Fed. Reg. at 62,320. Yet the agency concludes elsewhere that "[s]ome applicants may not be able to afford this fee and may not be able to apply for asylum."  85 Fed. Reg. at 46,894, and acknowledges that the fee is set "so that it . . . may deter some filings." Regulatory Impact Analysis at 153. Deterring asylum filings is not a lawful basis for a fee under a statute that permits fees only for cost recovery.

182.    The $50 asylum fee does not provide cost recovery and serves no purpose except to discourage filings.  Although DHS has stated the fee will "offset" some costs, the cost-benefit analysis in the rule itself negates that statement. 85 Fed. Reg. at 46,984.

TABLE 7—SUMMARY OF PROVISIONS AND IMPACTS—COSTS, TRANSFERS, AND BENEFITS OF THIS FINAL RULE SUMMARY—Continued

| Provision | Purpose of provision | Estimated costs or transfers of provision | Estimated benefits of provision |
|---|---|---|---|
| (q) Charge a fee for Form I-589, Application for Asylum and for Withholding of Removal. | DHS will require a $50 fee for Form I-589, Application for Asylum and for Withholding of Removal. | Quantitative: Applicants— • A transfer of $5.5 million from asylum applicants filing Form I-589 to different fee-paying applicants. Qualitative: Applicants— • Some applicants may not be able to afford this fee and will no longer be able to apply for asylum. | Quantitative: Applicants— • $0.74 million in transfers from the government to asylum I-589 applicants who will pay a reduced fee of $50 for Form I-485 Application to Register Permanent Residence or Adjust Status from $1,130 to $1,080 because their I-589 was approved. Qualitative: Applicants— • None. DHS/USCIS— • None. |

183.    DHS also asserts that the $50 fee will be refunded as a discount if the asylee seeks lawful permanent residency.  But the cost of the administrative burden associated with tracking and paying these refunds undermines the notion that the $50 asylum fee provides any lawful cost-recovery. And this refund has no benefit at all to the asylum seekers who cannot afford the $50 fee in the first place.

184.    The Final Rule also denies asylum seekers the statutory option of paying the fee in installments. 85 Fed. Reg. at 46,859. DHS does not explain why it requires a single payment except

for a statement that "installments plans, or micro-loans would be administratively complex and would require even higher costs than in the NPRM." *Id.* DHS does not consider the potential benefits to asylum seekers for offering the option of installments and the detrimental impact felt by eliminating this option.

185.   Throughout the Final Rule, Defendants assert that they had no data to indicate that the $50 fee would affect asylum applicants or impede them from seeking asylum. At one point, DHS makes the baseless assertion, defying logic, that the $50 fee's effects are not only unknown, but also unknowable: "the agency has no data describing the myriad complex and changing unobservable factors that may affect each immigrant's unique decision to file for a particular immigration benefit." 85 Fed. Reg. at 46,882, 46,895; *cf. id.* at 46,797-98, 46,841, 46,906. This is false; comments provided this data to DHS and the agency simply declined to address them.[35]

186.   Nor does the Final Rule adequately justify the fee increase. Under the Final Rule, the $50 asylum fee appears intended to deter what DHS considers 'frivolous' asylum applications. *See* 85 Fed. Reg. at 46,887, 46,844. Defendants make no effort to show, however, that refugees with meritorious asylum claims are more likely to have fifty dollars than those with so-called 'frivolous' claims. Both the comments submitted to DHS as well as common sense suggest that the opposite is true: the refugees most in need of asylum protections will have few or no financial resources.

187.   In addition to the $50 application fee, the Final Rule imposes a $550 fee to apply for employment authorization while an asylum application is pending, with a $30 biometric fee. Currently, asylum seekers are exempt from paying a fee for their initial employment authorization applications.

---

[35] *See, e.g.*, Bridget Crawford, Immigr. Equality, Comment Letter on Proposed Rule on U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements at 3 n.3 (Dec. 27, 2019), DHS No. USCIS-2019-0010-10794 (citing Human Rights First, *Callous and Calculated: Longer Work Authorization Bar Endangers Lives of Asylum Seekers and Their Families* (Apr. 29, 2019), https://bit.ly/2DYyYXF)); Natasha Lycia Ora Bannan, LatinoJustice PRLDEF, Comment Letter on Proposed Rule on U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements at 8 n.30 (Dec. 16, 2019), DHS No. USCIS-2019-0010-5755 (citing Lindsay Harris, *Asylum seekers leave everything behind. There's no way they can pay Trump's fee.*, Wash. Post (May 1, 2019)); Elizabeth Foydel, Int'l Refugee Assist. Project, Comment Letter on Proposed Rule on U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements at 5-8 (Dec. 20, 2019), DHS No. USCIS-2019-0010-6858.

188.    By statute, USCIS must complete adjudication of an asylum application within 180 days after the application is filed, absent extraordinary circumstances; and the applicant is not eligible for work authorization until the asylum application has been pending for 180 days.  DHS regulations provide that it will grant work authorization to asylum seekers whose applications have been pending for 180 days and will also adjudicate employment authorizations within 30 days.

189.    But under separate new DHS rules set to take effect on August 21, 2020 and August 25, 2020, DHS will require asylum applicants to wait a year after applying for asylum to apply for employment authorization, will remove the 30-day regulatory deadline to render a decision on those applications, and will significantly restrict asylum seekers' eligibility for employment authorization. 85 Fed. Reg. 37,502 (June 22, 2020); 85 Fed. Reg. 38,532 (June 26, 2020).

190.    The interplay between the rules means that an asylum applicant must now pay $50 to submit her asylum application, could be prohibited from working in the United States for one year if her application remains pending during that time, and then must pay $580 to seek employment authorization, with no assurance as to if or when that employment authorization might be granted such that she can earn any income at all.  And once the work authorization is granted, she would need to pay another $580 for new renewals every two years because the Final Rule eliminates fee waivers for employment authorization renewals.

191.    For context, the $630 that asylum seekers must now pay for the previously no-cost applications for asylum and initial work authorization amounts to roughly two weeks of full time work at the United States minimum wage.  Many asylum seekers will not be able to pay this amount.

192.    DHS does not offer a reasoned explanation for the drastic increase from $0 to $630 for an asylum applicant seeking work authorization.  Its thin responses make no sense for several reasons:

193.    First, DHS suggests that asylum seekers could use credit cards to pay the fees but this ignores the information commenters provided on their financial vulnerability.  Refugees often flee persecution with little advance notice, abandoning their possessions and livelihoods.  Without

1   material wealth, employment, or legal status, asylum seekers cannot easily obtain a credit card in the

2   United States.[36]  DHS provides no data suggesting otherwise.

3       194.   Second, DHS asserts that asylum seekers spend "thousands" of dollars to get to the

4   United States but that is irrelevant to their ability to pay once they arrive in the United States.  DHS

5   ignores comments explaining that most asylum seekers spend their life savings to make the trip and

6   arrive empty-handed.[37]

7       195.   Third, DHS ignores the interplay between the Final Rule and its recently-finalized

8   rules on asylum employment authorization applications. Together, these rules will decrease the

9   volume of asylum seekers applying for employment authorization and the timing of any revenues

10  from such applications, which should have been accounted for in the cost modeling.  This failing is

11  significant because the fee for employment authorization has an impact on a large population of

12  asylum seekers.  In 2019, 74 percent of asylum seekers also sought employment authorization.

13      196.   The Final Rule is dismissive of the inability of asylum seekers to afford the fee for

14  initial employment authorization. DHS asserts, without citation or evidence, that "[m]any asylum

15  seekers spend thousands of dollars to make the journey to the United States." 85 Fed. Reg. at 46,853.

16  As a result, DHS believes that it is "not unduly burdensome to require asylum seekers to plan and

17  allocate their financial resources to pay a fee that all other noncitizens must pay." *Id.*  Many asylum

18  seekers have no financial resources because they are urgently fleeing dangerous situations, but even

19  if they had resources at the time of the journey, DHS ignores that they must provide for themselves

20  for at least a year in the United States without any income before applying for employment

21  authorization.

22  [36] *See* Elizabeth Foydel, Int'l Refugee Assist. Project, Comment Letter on Proposed Rule on U.S.
    Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration

23  Benefit Request Requirements at 10-11 (Dec. 20, 2019), DHS No. USCIS-2019-0010-6858.
    (noting that asylum seekers must abandon their previous homes and possessions); *id.* at 14 (noting

24  that an EAD is often required to obtain an official state identification card or driver's license);
    Asylum Seeker Advoc. Project, Comment Letter on Proposed Rule on U.S. Citizenship and

25  Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request
    Requirements at 4 (Dec. 30, 2019), DHS No. USCIS-2019-0010-7898 (noting that, without an EAD,

26  asylum seekers often have no government-issued identification).
    [37] *See* Jill Marie Bussey, Catholic Legal Immigr. Network, Inc., Comment Letter on U.S. Citizenship

27  and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request
    Requirements at 20 (Dec. 18, 2019), DHS No. USCIS-2019-0010-5894.

28

197. The Final Rules also contravenes the INA as amended by the Refugee Act. The INA sets out the right to seek asylum in the United States for "any person" who is not a citizen of the United States. 8 U.S.C. §§ 1101(a)(3), 1158(a). The word "any" is understood to have "an expansive meaning, that is, one or some indiscriminately of whatever kind." *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (internal quotations omitted). A fee that prevents "any person" from accessing the asylum process violates the statute. The only condition under which the agency has permissive authority to assess such a fee is one set for cost recovery, as opposed to deterrence. 8 U.S.C. § 1158(d)(3). Congress evinced its concern for affordability by allowing both the assessment and payment of fees to occur in installments and over time.

198. Because Congress has the primary role in immigration law, the Executive's power is at its "lowest ebb." *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-40 (1952). Congress's express and implied will is to provide the right for refugees to seek asylum. Here, DHS provided no sufficient explanation to support its decision to effectively deny individuals that right based on whether they can afford the $50 fee.

199. Nor does DHS support its contravention of international law to which the United States is a signatory. Under the 1967 Protocol, which incorporates articles 2 through 34 of the 1951 Convention relating to the Status of Refugees, the United States is required to issue identity papers and travel documents to those seeking asylum absent compelling reasons of national security or public order.

200. Under the Final Rule, asylum seekers who cannot afford the $50 fee cannot apply for asylum, and likewise cannot afford to apply for employment authorization as asylum applicants, such that the United States will fail to issue identity or travel documents to these individuals. This violates the United States' obligations under international law.

201. DHS provides no "compelling reason" for this deviation from the norm..

202. The Final Rule does not consider the significant harm to asylum seekers who will be unable to work as a result of increased fees.  Instead, it deliberately prices out eligible asylum seekers from the opportunity to support themselves and their families.  *See* 85 Fed. Reg. at 46,809.

1  This intentional action is an unjustified end-run around statutory provisions aimed at allowing

2  asylum seekers to support themselves and their families.

3      203.    As comments to the proposed rule noted, DHS's own data shows that these changes

4  to fees for asylum seekers will disproportionately affect people of color. DHS data shows that most

5  asylum applicants are from Venezuela, the People's Republic of China, Guatemala, and Mexico.

6  DHS failed to consider this disparate impact on people of color.

7          4.    The Final Rule Unlawfully Increases Fees for Vulnerable Populations

8      204.    The Final Rule narrows eligibility for fee waivers based on income for the world's

9  most vulnerable people, for whom Congress expressly provided fee exemptions or fee caps under the

10 INA and TVPRA. These include applicants under VAWA, U (crime victim), T (trafficked

11 individuals), and TPS provisions.

12     205.    First, applicants for primary benefits that are fee exempt must obtain associated

13 benefits in order to gain access to their primary benefits. Thus, barriers to accessing those associated

14 benefits can result in barriers to statutorily provided protections.

15     206.    For this reason, while the costs of primary benefits for these groups are statutorily

16 capped or exempted, the TVPRA also requires USCIS to allow applicants for these primary benefits

17 to apply for a fee waiver for associated filings up to and including the application for permanent

18 residence. Pub. L. No. 110-457, 122 Stat. 5044 at 5054.

19     207.    In the Final Rule, DHS erects barriers to this statutory design by drastically narrowing

20 fee waiver eligibility. *See supra* IV.C.1.  In addition to heightening the standards beyond the reach of

21 many survivors and eliminating alternate bases for qualifying for a fee waiver, the Final Rule

22 requires documentation of income that survivors are unlikely to have.  In so doing, the Final Rule's

23 new requirements make it exceedingly difficult for individuals to obtain a fee waiver.

24     208.    These heightened standards will prevent many applicants from qualifying for the

25 main benefit application because associated filings include applications for waivers of

26 inadmissibility, which must be approved in order to qualify for the primary benefit of VAWA, U, T

27 and TPS.

28

209.    The result of making the fee waivers for associated filings so difficult to obtain will be that many survivors will not be able to qualify for the primary benefit of VAWA, U or T status, in direct contravention of the purpose of the INA in making these visas available.

210.    Although many commenters raised this concern in detail, DHS states simply that it "believes that maintaining access to fee waivers for these vulnerable populations mitigates any concerns that the increase in certain fees would limit access for protected categories of individuals." 85 Fed. Reg. at 46,810. This insufficiently responds to this serious issue.

211.    Second, the Final Rule drastically increases fees for family members of these vulnerable populations. The fee for Form I-929, Petition for Qualifying Family Member of a U-1 Nonimmigrant, which is a benefit available to the family members of crime victims, has increased by $1,255, to $1,485. 85 Fed. Reg. at 46,855.

212.    DHS states it raises this fee because it expects many more vulnerable populations will meet fee waiver criteria. 85 Fed. Reg. at 46,855. DHS supplies no data to support its justification for raising fees in this context.

213.    Furthermore, DHS treats similarly situated groups differently. While the Final Rule "reiterates that the rule continues to exempt the VAWA, T, and U populations from fees for the main benefit forms and allows them to submit fee waiver requests for any associated forms up to and including the application for adjustment of status, as provided by statute," 85 Fed. Reg. at 46,811, the Final Rule does not appear to permit fee waivers for derivatives of T and U populations. The revised §106.3 expressly permits fee waivers for VAWA derivatives (§106.3(a)(1)(i)) but makes no mention of derivatives in the subsections pertaining to U and T nonimmigrants (§106.3(a)(1)(ii-iii)). 85 Fed. Reg. at 46,920.

214.    Even if derivatives remain eligible for fee waiver, the new requirements for those fee waivers make it exceedingly difficult for individuals to obtain a fee waiver, as described above.

215.    The heightened fee waiver standards will prevent many applicants from qualifying, which creates the very real risk that individuals eligible for VAWA relief and U and T visas will stay in an abusive or dangerous situation because they cannot afford to pay fees for immigration

applications to keep their family members together. The risk is even greater if U and T derivatives are not fee waiver eligible.

216.    The heightened fee waiver standards would also frustrate the important goal of encouraging individuals to come forward and report when they have been the victim of a crime, in a way that also protects their families. The risk is even greater if the U and T derivatives are not fee waiver eligible.

217.    Thus, more stringent requirements for fee waivers, or the lack of fee waiver eligibility, contravenes Congress's intent to prioritize both public safety and family unity by creating statutory fee exemptions for these vulnerable groups.

218.    Third, the fees established for many benefits available to these statutorily protected groups have skyrocketed without adequate explanation.  For example, the Final Rule sets the fee for I-929, Petition for Qualifying Family Member of a U-1 Nonimmigrant at $1,485, more than 5 times its current cost.  85 Fed. Reg. at 46,919.

219.    These factors combine to demonstrate that the Final Rule erects financial barriers to applicants' ability to access protections that Congress expressly provided.

> 5.    The Final Rule Unlawfully Increases Fees by Unbundling Applications for
> Those Seeking Lawful Permanent Resident Status and Interim Benefits

220.    Since 2007, DHS has charged a flat rate for a bundle of applications for those seeking lawful permanent residency.  The flat fee of $1,140 covered the application for permanent residency (I-485), an employment authorization application (I-765), and application for travel document (I-131). A flat fee of $750 covers the same three documents for children under 14.

221.    DHS has explained that bundling reduces agency workload and processing costs. 72 Fed. Reg. 4,888, 4,894 (Feb 1, 2007).

222.    The Final Rule unbundles these forms and applies fees for each one.  As a result, the Final Rule effectively doubles the fees for applying for the three previously-bundled benefits.  The fees for children under 14 jump nearly 200%.

223.    Despite its prior detailed justifications in support of taking the opposite approach, the Final Rule raises fees for suspending deportation (I-881) from $285/individual, or $570/family, to a flat fee of $1,810 (with exceptions for statutorily protected groups).

224.    DHS charges this fee regardless of whether the applicant is a child or adult for both forms, claiming these changes "reduc[e] the administrative burden." 84 Fed. Reg. at 62,323.

225.    DHS does not explain its reversal on bundling except to say that "USCIS did not realize the operational efficiencies envisioned when it introduced the bundled filing."  85 Fed. Reg. at 46,841.

226.    These two ambiguous statements—a general effort to reduce administration burden, and an alleged failure to "realize operational efficiencies"—are not an adequate justification for the agency to reverse course.

> 6.    The Final Rule drastically increases fees in the NACARA process without adequate justification.

227.    NACARA was specifically enacted as "a political response to the concern that many individuals had spent years in the United States, complying with the immigration laws and establishing countless equities," were nevertheless "adversely affected by the harsh changes in the immigration law as amended by [IIRIRA]."[38] "The law permits these individuals to adjust status even if they have been ordered excluded, deported, removed or have failed to depart voluntarily after an order of voluntary departure."[39]

228.    Nevertheless, despite Congress's intent to make immigration benefits available to nearly all eligible Guatemalans, Salvadorans, or former-Soviet-bloc nationals, the Final Rule drastically increases the fees for filing Form I-881 (Application for Suspension of Deportation or Cancellation of Removal). For individuals who previously paid only $285 to file Form I-881, the Final Rule would now require that they pay $1,810—a 535 percent increase.  85 Fed. Reg. at 46,791. For families who previously paid only $570 together, the Final Rule now imposes a $1,810 fee as well—a 218 percent increase. *Id.*

---

[38] Lourdes A. Rodriguez, Understanding The Nicaraguan Adjustment and Central American Relief Act at 502, https://core.ac.uk/download/pdf/51091763.pdf
[39] *Id.* at 503 (citing NACARA §§ 202(a)(1)(A), 202(b)(1)).

229.   The Final Rule provided only boilerplate justification for this fee increase. Several commenters pointed out that the Proposed Rule "provided no explanation for the 532 percent fee increase for Form I-881," and questioned whether "adjudication had changed drastically to justify the fee increase," and pointed out that "the proposal was contrary to the purpose of [NACARA]." 85 Fed. Reg. at 46,854.  DHS responded only that it "disagrees with the commenters' contention that DHS failed to explain or justify the fee increase for Form I-881," and stated that it had adjusted the fee to "reflect the estimated full cost of adjudication." 85 Fed. Reg. at 46,854.

230.   The Final Rule did not address at all whether DHS believed that the fee increase was consistent with NACARA, or whether the adjudication process had changed so dramatically since 2005 to justify a 535 percent increase. *See* 84 Fed. Reg. at 62,323 (NACARA fees "have not changed since 2005"). Nor did the Final Rule explain why adjudicating a relatively straightforward statutory benefit—explained in full in a few bullet points on a single USCIS webpage[40]—would require USCIS to expend more resources than adjudicating N-400 naturalization applications, which cost $1,170 under the Final Rule. 85 Fed. Reg. at 46,792. And USCIS's website suggests that the entirety of the NACARA Form I-881 adjudication process consists of fingerprinting and a single interview with an asylum officer.[41]

231.   Furthermore, the Final Rule does not attempt to explain why adjudicating an individual Form I-881 would cost DHS exactly as much as adjudicating a family Form I-881 in the NACARA context. See 85 Fed. Reg. at 46,791 (raising both the individual and family fees to $1,810). Common sense suggests this is unlikely.[42]

7.   The Final Rule Favors Wealthier Applicants Without Justification

232.   In contrast to the increased fees for low-income applicants, the Final Rule applies minimal or no increase to the fees paid by some wealthy applicants.

---

[40] *See* USCIS, *Nicaraguan Adjustment and Central American Relief Act (NACARA) 203: Eligibility to Apply with USCIS* (Sept. 21, 2017), https://bit.ly/2PrdogP.
[41] *See* USCIS, *Nicaraguan Adjustment and Central American Relief Act (NACARA) 203: The Decision Making Process* (Mar. 8, 2018), https://bit.ly/2PubKep.
[42] *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (courts evaluating agency action "are 'not required to exhibit a naiveté from which ordinary citizens are free'" (citation omitted)).

233.    For example, the Final Rule reduced the fee employers pay to apply for a visa for an exceptional immigrant employee.  85 Fed Reg. at 46,971.

234.    The fees for forms used by wealthy investors also either did not increase at all or increased only 9 percent.  85 Fed. Reg. at 46,971.

235.    The fees to naturalize an adopted foreign-born child increased by only 4 percent.  85 Fed. Reg. at 46,971.

236.    The Final Rule also applies a minimal increase on the I-360 form used by religious workers.  The Proposed Rule raised the I-360 fee by just 5 percent, in contrast with triple-digit increases for other fees, including the 535 percent increase for NACARA.  84 Fed. Reg. at 62,326. When commenters opposed the proposed 5 percent fee on grounds that it would "harm the ability of religious organizations to petition for their workers," DHS lowered the fee to 3 percent and transferred the costs to all other fee payers.  The Final Rule does not offer a reasoned explanation for why DHS was concerned about harm to religious employers but not harm to others.

## V.    THE FINAL RULE MUST BE SET ASIDE BECAUSE NO AUTHORIZED DHS OFFICIAL ISSUED OR PROPOSED THE RULE

237.    The Final Rule was invalidly finalized under the HSA, Federal Vacancies Reform Act ("FVRA"), and APA because Defendant Wolf was not authorized to issue the Final Rule, and because the Final Rule comes from an invalid proposal that no one at DHS was authorized to issue— neither Defendant Wolf nor his immediate predecessor Kevin McAleenan.

238.    The HSA requires that the DHS Secretary shall be "appointed by the President, by and with advice and consent of the Senate." 6 U.S.C. § 112(a)(1). The HSA mandates that, in the event of the "absence, disability, or vacancy in office" of the Secretary, the Deputy DHS Secretary is first in the order of succession as Acting Secretary and the Under Secretary of Management is second. *Id*. § 113(a)(1)(A), (g)(1). After the Deputy Secretary and Under Secretary of Management, the HSA allows the DHS Secretary to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." *Id*. § 113(g)(2).

239.    The DHS has established multiple orders of succession and/or delegations pertaining to the Office of the Secretary and other DHS positions. Those documents are contained in a broader

1  directive, entitled *DHS Orders of Succession and Delegations of Authorities for Named Positions*,

2  Dep't of Homeland Sec., Delegation No. 00106, Revision No.08.5 (Dec. 15, 2016) ("DHS Orders").

3  240.    From at least December 15, 2016, through and beyond April 11, 2019, Section II.A of

4  the DHS Orders stated in full that: "In case of the Secretary's death, resignation, or inability to

5  perform the functions of the Office, the orderly succession of officials is governed by Executive

6  Order 13753, amended on December 9, 2016." *Id*. (emphases added).

7  241.    Executive Order 13753, in turn, set the order of succession at DHS in cases of

8  resignation of the Secretary. Executive Order 13753 establishes in relevant part that in the event the

9  Secretary resigns, the order of succession is as follows:

10  •  Deputy Secretary of Homeland Security;

11  •  Under Secretary for Management;

12  •  Administrator of the Federal Emergency Management Agency;

13  •  Under Secretary for National Protection and Programs;

14  •  Under Secretary for Science and Technology;

15  •  Under Secretary for Intelligence and Analysis; and

16  •  Commissioner of U.S. Customs and Border Protection.

17  242.    From at least December 15, 2016, through and beyond April 11, 2019, Section II.B of

18  the DHS Orders additionally provided: "I [Secretary of Homeland Security] hereby delegate to the

19  officials occupying the identified positions *in the order listed ([at] Annex A)*, my authority to

20  exercise the powers and perform the functions and duties of my office, to the extent not otherwise

21  prohibited by law, *in the event I am unavailable to act during a disaster or catastrophic emergency*."

22  DHS Orders § II.B (emphases added).

23  243.    President Trump announced Secretary Nielsen's departure from office on April 7,

24  2019 by tweet, and at the same time announced that her successor would be Kevin McAleenan, who

25  was then serving as Commissioner of U.S. Customs and Border Protection ("CBP").

26  244.    Secretary Nielsen announced her resignation later in the day on April 7, 2019 and

27  publicly submitted her resignation letter, which stated that it was "effective April 7th, 2019."

28

245.     A few hours later in the day on April 7, 2019, however, former Secretary Nielsen announced by tweet that she "ha[d] agreed to stay on as Secretary" until April 10, 2019.[43]

246.     On April 10, 2019, prior to her departure, Secretary Nielsen purported to issue an amendment to the DHS Orders (the "April 2019 Amendment"). The only action directed by the April 2019 Amendment was to "strik[e] the text of such Annex [A] in its entirety and insert" a different list of positions "in lieu thereof." The inserted text listed the Commissioner of U.S. Customs and Border Protection third behind the Deputy Secretary of Homeland Security and Under Secretary for Management.

247.     Notably, the April 2019 Amendment did not change Section II.A of the DHS Orders, which continued to state that in the event of the Secretary's resignation, "the orderly succession of officials [would be] governed by Executive Order 13753[.]" Consequently, consistent with Section II.B of the DHS Orders, the April 2019 Amendment to Annex A governed only where the Secretary was "unavailable to act during a disaster or catastrophic emergency."

248.     Executive Order 13753 thus governed succession following Secretary Nielsen's resignation. Notwithstanding this distinction, in apparent reliance on the April 2019 Amendment, then-CBP Commissioner Kevin McAleenan purported to assume the position of Acting Secretary on April 11, 2019.

249.     On November 8, 2019, McAleenan attempted to issue a further amendment to Annex A (the "November 2019 Amendment") revising the order of succession set forth therein to elevate Under Secretary for Strategy, Policy, and Plans to be fourth in line to lead DHS. Unlike Secretary Nielsen's April 2019 Amendment, the November 2019 Amendment also purported to amend Section II.A of the DHS Orders such that the succession of officials would be governed by Annex A "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office."[44]

---

[43] On April 7, 2019, former Secretary Nielsen's effective resignation date, Claire Grady served as the Senate-confirmed Under Secretary for Management, and in that capacity, had been the Acting DHS Deputy Secretary since April 16, 2018. Pursuant to the text of the HSA and DHS Orders in place at the time of Secretary Nielsen's resignation, Grady would have become Acting DHS Secretary as soon as former Secretary Nielsen's resignation was effective. Grady submitted her resignation as Acting DHS Deputy Secretary on April 9, 2019, which became effective April 10, 2019.

[44] Had Annex A already applied in the event of a resignation, this attempted amendment would not have been necessary.

250.    On November 13, 2019, Defendant Wolf (who had been confirmed as Under Secretary for Strategy, Policy, and Plans on that same day) purported to become Acting Secretary of DHS pursuant to McAleenan's attempted November 2019 Amendment.

251.    On August 14, 2020, the U.S. Government Accountability Office ("GAO") issued a decision stating that the "incorrect official assumed the title of Acting Secretary at [the time of Nielsen's resignation]" and that "subsequent amendments to the order of succession made by [McAleenan] were invalid and officials who assumed their positions under such amendments, including Chad Wolf and Kenneth Cuccinelli, were named by reference to an invalid order of succession." U.S. Gov't Accountability Off., GAO- B-331650, *Department of Homeland Security— Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security* at 1 (2020) ("GAO Decision").

252.    On November 14, 2019, DHS published the November Proposal. McAleenan signed the proposal, notwithstanding that (i) the GAO decision suggests that actions he took as Acting Secretary were invalid; (ii) the November Proposal was issued well beyond the 210-day limit set forth in the FVRA; and (iii) he had resigned the day before. 84 Fed. Reg. at 62,280; *see also* Declaration of Juliana Blackwell, *CASA de Md., Inc. v. Wolf*, No. 8:20-cv-02118-PX (D. Md. Aug. 3, 2020), ECF No. 41-1 ("Blackwell Decl.").

253.    On December 9, 2019, DHS published an extension of the comment period. 84 Fed. Reg. 67,243. Then on January 24, 2020, DHS further extended the comment period until February 10, 2020. *See* 85 Fed. Reg. 4,243. Both were issued by Defendant Wolf under his purported authority as Acting DHS Secretary.

254.    On August 3, 2020, DHS published the Final Rule. Defendant Wolf signed the Final Rule under his purported authority as Acting DHS Secretary. Specifically, Defendant Wolf, "having reviewed and approved" the Final Rule, "delegat[ed] the authority to electronically sign" it to Chad Mizelle, "the Senior Official Performing the Duties of the General Counsel for DHS." 85 Fed. Reg. at 46,913.

255.     On August 17, 2020, DHS published corrections to the Final Rule, signed by Chad R. Mizelle as "Senior Official Performing the Duties of the General Counsel for the Department of Homeland Security." 85 Fed. Reg. 49,941 (Aug. 17, 2020).

256.     The Final Rule is therefore invalid for two reasons.

257.     First, DHS did not lawfully issue the Final Rule because Defendant Wolf is not validly serving as the Acting DHS Secretary. His assumption of that office was unlawful under the HSA, because he was not next in the order of succession at the time that he purported to succeed to that office. His succession was pursuant to McAleenan's unlawful November 2019 Amendment to the DHS Orders. *See* GAO Decision at 9-11.

258.     Moreover, Defendant Wolf assumed the role of Acting Secretary after the office of DHS Secretary had remained vacant since Secretary Nielsen's departure, well beyond the 210-day limitation for acting officers provided by the Federal Vacancies Reform Act ("FVRA").  *See* 5 U.S.C. § 3346(a)(1).

259.     As such, Defendant Wolf has no valid legal claim to the Office of Acting DHS Secretary, and the action he has taken in promulgating the final rule "shall have no force or effect."[45]

260.     Second, the Final Rule arises from its invalid Proposal in violation of the APA and must be set aside. As noted above, Defendant Wolf is not validly serving as the Acting Secretary of DHS, and thus was not authorized to issue the December Proposal.

261.     In addition, his immediate predecessor McAleenan was likewise not authorized to issue the November Proposal. The November Proposal was signed on November 9, 2019, well after the 210-day statutory limitation for acting officers under the FVRA.

262.     In addition, McAleenan resigned the day before the November Proposal was published. Thus, the November Proposal was effectively unsigned. *See Yovino v. Rizo*, 139 S. Ct. 706, 709 (2019) (a judge cannot participate in a decision if he becomes inactive before a decision is issued (citing *United States v. Am.-Foreign S.S. Corp.*, 363 U.S. 685 (1960)). A valid proposal published in the Federal Register is required under the APA. 5 U.S.C. § 553(b) ("General notice of proposed rule making *shall* be published in the Federal Register . . . .") (emphasis added); *Louis v.*

---

[45] 5 U.S.C. § 3348.

1   *U.S. Dep't of Labor*, 419 F.3d 970, 975 (9th Cir. 2005) (stating that the APA requires agencies to

2   publish legally sufficient notices of proposed rulemaking, which must "fairly apprise[] interested

3   persons of the subject and issues before the Agency"); *See also Cal. ex rel. Lockyer v. FERC*, 329

4   F.3d 700, 706-07 (9th Cir. 2003) (noting connection between Due Process Clause and APA notice

5   provisions).

6   263.   Because McAleenan's purported succession was unlawful, *see* GAO Decision at 11,

7   he had no valid legal claim to the Office of Acting DHS Secretary on that basis and could not

8   lawfully exercise the authority of that office, including issuing the proposed rule.

9   264.   DHS issued the Final Rule in purported accordance with the rulemaking procedures

10   of the APA. For informal rulemaking such as the Final Rule—i.e., those that are not subject to

11   formal hearing procedures—the APA requires a proposed rule. Because no valid proposed rule was

12   issued, the Final Rule does not comply with the APA and must be set aside.

13   **VI.     THE FINAL RULE HARMS INDIVIDUALS AND COMMUNITIES.**

14   **A.     Individuals**

15            **1.     Naturalization applicants and recipients**

16   265.   By raising fees and practically eliminating access to fee waivers for low-income

17   applicants, the Final Rule leaves many individuals with few, grim options for becoming U.S.

18   citizens. Desperate applicants may become easier targets for predatory lenders and scams. They may

19   also be more likely to accept financial assistance from abusers at the cost of remaining in abusive

20   relationships.

21   266.    Many other applicants will simply be unable to afford the cost of becoming a U.S.

22   citizen.

23   267.   Because fee hikes apply to each individual applicant, families will have to make

24   tough choices about which family members become citizens, if any at all can afford to do so.

25   268.   Because the Final Rule reduces the price of lawful permanent resident status renewal

26   while drastically raising naturalization fees, poorer applicants will rationally choose to remain non-

27   citizens, foregoing the right to vote, serve on juries, and run for elected office, which deprives their

28   communities of this important representation.

269.     The Final Rule risks creating a caste system within our immigration system in which the affluent gain citizenship while the poor remain permanent residents, thereby creating the kind of structural inequality and unequal access to voting and representation that many immigrants came to America to escape.  The calculations and allocations of costs in the Final Rule operate as a poll tax, and are pretext for decreasing the proportion of immigrant voters in the American electorate.

2.     Lawful permanent resident applicants

270.     As discussed above, *supra* IV.C.5*,* the Final Rule significantly increases fees for immigrants who are seeking lawful permanent residence (I-485) and common interim benefits (travel authorization and employment authorization), from $1,140 and $750 for adults and children, respectively, to $2,195 for all applicants. These staggering increases will make lawful permanent residence unaffordable for many eligible foreign nationals and their United-States-citizen and lawful-permanent-resident sponsors. DHS, despite receiving numerous comments and reviewing substantial evidence showing that the proposed fees would be unaffordable for the immigrant population, dismissively waved off these concerns: "Individuals applying for adjustment of status are not required to request a travel document or employment authorization," and "[w]ith bundled interim benefits, individuals may have requested interim benefits that they did not intend to use because it was already included in the bundled price." 85 Fed. Reg. at 46,841. "Debundling," says DHS, "allows individuals to pay for only the services actually requested." *Id.* But the portion of applicants wanting to pay all three separate fees is irrelevant; the harm is that three benefits that previously cost these applicants $1,140 (or $750 for children) now cost $2,195, *id.* at 46,791, and (as the comments submitted to DHS demonstrate) many otherwise-eligible applicants cannot afford to pay that amount.

271.     As numerous commenters pointed out to DHS during the comment period, the unaffordability of the lawful permanent residence fees (and of immigration fees under the Final Rule generally) will drive immigrants increasingly to predatory lenders. For example, one commenter "wrote that many of its clients were 'cut off' from financial institutions and described the dangers of borrowing from 'predatory lending mechanisms' or from family members who may use the debt owed as 'currency for their abusive behavior' in some circumstances." 85 Fed. Reg. at 46,810.

DHS's nonresponse to similar concerns throughout the Final Rule remained consistent: "DHS does not intend for the new fees to prevent individuals from applying for naturalization [or other benefits], that they require applicants to depend on predatory financing to pay naturalization application fees, and we do not believe the rule will have those effects." 85 Fed. Reg. at 46,860. DHS offers no support for that irrational belief, and presents no information to cast doubt on the numerous comments DHS received showing that increased fees would be a boon for predatory lenders.

272.   DHS repeatedly serves up the same tone-deaf suggestion that increased fees would not be problematic because applicants could use credit cards to pay them, *see* 85 Fed. Reg. at 46,797, 46,807, 46,851, 46,877—despite having received comments identifying the fact that many immigrants, particularly poor immigrants, do not have credit cards.

273.   This unaffordable $2,195 fee total makes it increasingly likely that families will be separated simply because they cannot afford to pay for all family members to maintain status, and for working parents to receive employment authorization.  For example, a family of four (two parents, two children) would currently pay $3,780 in fees—already a significant sum for low- and middle-income families—to adjust status and obtain employment and travel authorization for all four family members. Under the Final Rule, that same family of four would have to come up with $8,780 to receive the same benefits. If only the parents applied for employment authorization and nobody applied for travel authorization, the family would still pay significantly more—$5,620 versus $3,780—and all four family members would have fewer benefits than under the current regime.

274.   When certain combinations of benefits become inaccessible due to cost, the loss of those benefits leads to other harms as well. As the prices of these benefits rise, families will be forced to make difficult choices about who receives immigration benefits and who does not. For example, a married adult who could afford to apply for lawful permanent residence status but not employment authorization would be financially dependent on his or her spouse while the lawful permanent residence application is pending—even if that spouse were abusive. If a family could not afford employment-authorization fees for anyone, the parents—quite understandably—would *de facto* need to work unlawfully to provide food and housing. This would put the parents at the mercy of the employer; the parents, for example, might have to accept unfair under-the-table wages,

1  exhausting schedules, and/or unsafe work environments without complaint just so that the employer

2  does not report them to immigration authorities. Everybody loses in these situations.

3       275.    Perhaps the most consequential effect this might have would be to delay, interfere

4  with, or even foreclose naturalization down the road for lawful permanent residence applicants, since

5  an immigrant may file an N-400, at the earliest, after three years of lawful permanent residence

6  status. If an immigrant loses their lawful status because they cannot afford the fees, this could

7  snowball to deportation or removal, a resulting ban on reentering the United States, and difficulties

8  ultimately naturalizing.

9            3.    Asylum Applicants and Asylees

10      276.    The Final Rule will impose a $50 fee on Form I-589 applications for asylum that is

11 not subject to a fee waiver. The Final Rule will irreparably harm those who need to apply for

12 asylum, but now cannot, because of the new fee without the opportunity for a waiver, and will be

13 forced to return to the dangerous conditions that brought them to the United States to seek

14 protection. *See* Regulatory Impact Analysis at 152 ("DHS recognizes that some applicants may not

15 be able to afford this new fee and will no longer be able to apply for asylum.").

16      277.    Seeking asylum is a fundamental human right and tenet of international human rights

17 law to which the United States is bound by treaty to respect, but under the Final Rule, the individuals

18 least likely to have the resources to afford USCIS's new fee would be prevented from receiving the

19 basic protections and opportunities envisioned by the INA. The harm is patently obvious. By

20 definition, individuals and their families seeking asylum have suffered persecution or credibly fear

21 that they will suffer persecution due to their race, religion, nationality, membership in a particular

22 social group, or political opinion. *See* 8 U.S.C. § 1158(b)(1)(A), (B)(i).

23      278.    Individuals seeking asylum in the U.S. frequently arrive with limited resources, and

24 these scarce resources should be reserved for key expenses like food and shelter.  The Final Rule

25 puts asylum applicants in danger by forcing them to choose between foregoing basic necessities and

26 the application fee.

27      279.    The $50 fee puts asylum applicants and their families in a vulnerable position with

28 respect to predatory lending practices.  Because many asylum applicants cannot communicate in

English and have few financial resources, they are vulnerable to predatory lending practices, which might seem appealing in the short term to pay the required fee.

280.    Asylum seekers who cannot afford the filing fee but are fearful of being removed to a country where they will be persecuted may be forced to remain in the United States without documentation. Forced to rely on charity to survive, they are at risk of housing instability, food insecurity, and lack of adequate medical care.  If they work without authorization, they are also vulnerable to exploitation, including trafficking, and abusive work environments.

281.    The Final Rule will cause particular harm to families, including creating a risk of family separation.  The fee increase will force families to make the unconscionable choice of which family member can apply for and possibly attain asylum protections, and which cannot, and who can seek work to provide basic needs, if anyone.

282.    The new fee also forces them to decide between whether to forgo basic medical care and feed their families or pay their asylum application fee.

283.    Families who cannot afford multiple filing fees may be forced to abandon independent claims to asylum relief for certain family members. This will harm children in particular because a child with a strong independent asylum claim cannot include her parents as derivatives, so her family is likely to forego her claim in favor of having a parent serve as the principal applicant if the family cannot afford multiple filing fees. Families may also end up separated because if a principal asylum applicant is denied asylum but granted withholding of removal, his derivative family members may still be subject to removal because that relief does not apply to those family members.

284.    The new fee will also create an obstacle to family reunification. Many asylum seekers who must flee their home countries without their family members. If an asylum seeker is granted asylum, she can petition to bring her immediate family members to the United States, but none of that is possible if she cannot afford to apply for asylum. In addition, the fee hurts families in the U.S. who are willing to receive family members fleeing from other countries.  Asylum applicants who are able to reunify with family in the U.S. may be financially dependent on their family, and a $50 application fee puts an unexpected burden on the families of asylum applicants.

285.     In addition to the asylum application fee, the imposition of a substantial fee of $550 for an I-765 application for employment authorization and the $30 biometric fee will negatively affect asylum seekers while they wait through the asylum process that may last years and, in some cases, decades.  Although USCIS previously imposed a waiting period of 180 days for an asylum applicant to be eligible for employment authorization, the initial application for employment authorization for an asylum seeker had been free.  As of August 25, 2020, asylum seekers are unable to apply for employment authorization until their asylum application has been pending for 365 days. That means that asylum seekers will have to sustain themselves without any income for a year and then come up with $580 per application in order to work.

Many asylum applicants will be unable to afford the cost of the employment authorization application and will thus miss out on opportunities for legal employment in the U.S. and the benefit of having identification issued by the U.S. government because of the $580 total fee requirement. The Final Rule will result in lost wages for asylum applicants.

Moreover, asylum seekers who cannot afford the filing fee for employment authorization will be unable to provide for themselves and their families, who will likely suffer food insecurity, housing instability, and lack of access to adequate medical care. The inability for many asylum seekers to apply to legally work in the United States will destabilize the financial situation of individuals and families already traumatized by the persecution that led them to apply for asylum. The significant collateral consequences of the Final Rule on asylum seekers will be seen in the areas of health, food security, and housing stability.

286.     In the proposed Rule, DHS said that it "does not want the inability to pay the fee to be an extraordinary circumstance excusing an applicant from meeting the one-year filing deadline in INA 208(a)(2)(B), (D)," which indicated that the Final Rule could prohibit a potential applicant from using inability to pay as a grounds for equitable tolling of the one-year asylum filing deadline.[46] But the Final Rule is silent on this issue.  If DHS refuses to allow equitable tolling for inability to pay the $50 fee, asylum seekers face significant harm: they will be denied asylum simply due to their inability to pay the filing fee, regardless of the merit of their asylum claim.

---

[46] 84 Fed. Reg. at 62,320.

COMPLAINT

287.    For those who are able to pay the filing fee and are granted asylum, the Final Rule creates additional harms. Derivative asylees are able to adjust status to lawful permanent resident as long as the principal applicant retains asylee status. The Final Rule eliminates the fee waiver for asylees and the reduced filing fee for children applying for lawful permanent resident status on Form I-485. As a practical matter, this means that families will be forced to complete applications as they can afford them. If a principal asylee naturalizes before all of his derivatives have adjusted status, those family members will lose the ability to adjust as derivatives and may put lawful permanent resident status out of reach for family members of asylees.

4.    Statutorily protected groups

288.    Statutorily protected groups—survivors of domestic violence, victims of crime and physical and mental abuse, victims of human trafficking, and those fleeing armed conflict and natural disasters—are among the most vulnerable people in the world. The lawful status afforded these individuals by statute can increase income and provide stability for their family members. Fee waivers for associated benefits allow survivors to apply for immigration benefits without having to either ask their abuser for funds or to have to forgo other necessities like food or housing in order to pay immigration fees. By way of access to fee waivers, survivors are able to obtain employment authorization and immigration status, work with a Social Security number, and contribute to payroll and other taxes.

289.    But the barriers to lawful status and associated benefits erected by the Final Rule would significantly harm individuals in these statutorily protected groups in several ways.

290.    Indigent survivors struggle to cover basic expenses for themselves and their children, including mental and physical health care needed as a direct result of abuse or victimization. The Final Rule will force survivors to choose between the immigration benefits provided to them by Congress or food, shelter, and other necessities for themselves and their families.

291.    Being forced to remain financially dependent on, and therefore at the mercy of, an abuser, or to make the decision between necessities like food and shelter or immigration benefits, in many cases risking homelessness and hunger, also prolongs trauma-induced mental health conditions from which many survivors suffer.

292.     In narrowing fee waiver eligibility to individuals who can prove they have a household income at or below 125% of the federal poverty guidelines, USCIS will be using the same lack of employment authorization and immigration status that abusers and traffickers exploit in terrorizing survivors to then deny them the chance to apply for immigration status and eventually obtain economic freedom, independence, and safety.

293.     Alternatively, individuals may turn to predatory lenders to try to obtain the required fees, which would victimize both individuals and their families.

294.     Additionally, indigent survivors who do flee their abusers but cannot work due to being unable to afford USCIS's employment authorization renewal fees risk losing their children to the system if they are deemed unable to protect and provide for them.

295.     Furthermore, one abuser parent can easily manipulate the child custody process in his favor while the other parent waits years to secure lawful status. Thus, the abuser can often gain custody of the children, thereby putting the children in further danger of being abused.

296.     DHS received detailed comments of the physical and financial vulnerabilities these groups and their families face, and how the removal of the current eligibility structure for fee waivers could severely harm these groups. DHS ignored these important aspects of the problem posed by its new fee waiver eligibility scheme.

### 5.     Long-Term Harm

297.     The fee increases in the Final Rule will have a chilling effect both on immigration-related filings in the near term as well as immigration and naturalization in the long term. Fundamentally, the Final Rule sends the message that low-income immigrants are not welcome. As fewer people naturalize, communities, states, and the entire nation would lose the economic and societal benefits of immigration and naturalization, including greater diversity, increased earnings, increased tax revenues at all levels of government, and less costly government programs.

### B.     Public Interest, Communities

298.     The fee increase and effective elimination of fee waivers will prevent permanent residents who otherwise would have naturalized from doing so. By making naturalization less accessible, the Final Rule harms the public interest. Controlling for all other factors, naturalized

citizens are more likely to access higher education, become homeowners and business owners, and earn higher wages, than their non-naturalized foreign-born peers. Further, naturalized citizens are less likely than U.S.-born citizens to use SNAP, TANF, and other public welfare programs in the future. In addition, naturalization, on average, accounts for an 8 to 11% increase in wages, which results in higher spending and more federal, state, and local taxes paid. In fact, if all eligible lawful permanent residents naturalized, annual tax revenue could grow by as much as $2 billion.

299.    By effectively placing naturalization beyond the reach of indigent individuals, the Final Rule will result in greater utilization of public benefits and diminished tax realization. Limiting access to naturalization for low income people will also foster inequality in the United States.

300.    In addition to the economic impacts, the Final Rule will keep the nation's cities, states, and country from reaching their full democratic potential by decreasing civic engagement and political representation. By making naturalization less accessible, the Final Rule will have the effect of preventing low-income immigrants from voting, serving as jurors, and running for elected positions.

301.    By increasing the fee for I-765 applications and reducing the availability of fee waivers, the Final Rule will damage state and local economies by increasing unemployment among immigrant workers. When immigrants are unable to renew employment authorization, they lose their jobs and associated benefits like health insurance coverage. Immigrants who are forced to leave their jobs are no longer able to contribute to the local economy as homeowners, consumers, and taxpayers. This also harms employers, including schools, hospitals, and state agencies, who lose workers. By increasing immigrant unemployment, the Final Rule will significantly reduce the potential for millions in tax revenue, to the detriment of government budgets.

302.    By imposing a fee for asylum seekers to obtain their initial employment authorization, the Final Rule harms communities by creating a barrier to asylee self-sufficiency through lawful employment.

303.    The Final Rule will keep some immigrants from obtaining permanent resident status, which harms the interests of state and local governments in encouraging all eligible residents to obtain lawful permanent resident status. Increased acquisition of lawful permanent resident status

has social and economic benefits for local communities. Acquisition of a permanent legal right to reside in the United States increases household stability, increases earnings and household income, and improves outcomes for children in the household. This reduces the burden on local governments to address social ills created by immigrants living without status. Permanent residents also contribute to the local economy and tax base.

304. The Final Rule will harm cities, which benefit from the contributions of immigrants, by making the Unites States a less attractive and welcoming place to live and work.

305. Because of the extraordinary public harms the Rule will inflict, numerous state and local governments and officials, including the states of Washington and New York, and the cities of Los Angeles, Chicago, New York, Minneapolis, Philadelphia, Denver, Boston, San Diego, San Francisco, San Jose, San Antonio, Seattle, and the District of Columbia, submitted comments in opposition to the Rule.

**C.     Plaintiffs are and will be irreparably harmed by the Final Rule.**

306. Plaintiffs are nonprofit organizations that provide and/or support programs to provide legal services in connection with immigration benefit applications for low-income individuals. These programs have relied on the availability of fee waivers and exemptions under Defendants' ability-to-pay policy. The Final Rule's increase in fees, elimination of even the possibility of fee waivers and exemptions for many forms and applicants, and more difficult standard for obtaining a fee waiver will harm Plaintiffs' missions and operations. The Final Rule will make it impossible for Plaintiffs to continue to provide core services benefitting low-income individuals at anywhere near the same level and may cause the organizations to cease operations.

1.     The Final Rule Frustrates Plaintiffs' Missions.

307. Each of the Plaintiffs shares a mission to provide services directed at assisting low-income and vulnerable individuals to obtain immigration status, adjust status to lawful permanent resident, and naturalize to become a U.S. citizen. Advancing immigrant rights is at the core of Plaintiffs' missions. This includes ensuring that immigrants have access to naturalization, family-based immigration, humanitarian relief, asylum, VAWA, U and T visas, adjustment of status, and more. Contrary to Plaintiffs' missions, the Final Rule erects barriers to access to immigration

benefits. Plaintiffs will now serve far fewer low income and vulnerable people in completing applications for asylum, permanent residence, naturalization, and for other immigration-related benefits due to the increases in fees in the Final Rule, the elimination of fee waivers and exemptions, and the new eligibility standard for the limited fee waivers that remain. Additionally, Plaintiffs will experience a drastic reduction in the number of people who will submit applications because they can no longer afford to do so.

### 2.    The Final Rule Diverts Resources from Plaintiffs' Core Programs

308.    Plaintiffs are immediately experiencing an increase in operational costs due to the Final Rule. Plaintiffs have had to divert resources away from providing legal services in order for their staff to understand the Final Rule, update their internal and public-facing materials to conform with the Final Rule, develop materials and webinar presentations to inform and train practitioners on the contours and effects of the Final Rule, develop materials to explain the Rule to the communities they serve, and conduct community outreach on the Rule. The sheer number of significant changes the Final Rule proposes amplifies these effects, as Plaintiffs scramble to understand the contours of the complex 142 pages of the Final Rule, including changes to some 59 forms, update materials to reflect the changes in the Final Rule, scramble to submit as many applications as possible before the Final Rule takes effect, and make plans to address the decline in applications that will result from the Final Rule.

309.    At the same time, Plaintiffs must now attempt to submit as many applications for immigration benefits as possible before the Final Rule takes effect and makes it impossible for many clients to afford to apply for these benefits. The Final Rule is thus straining Plaintiffs' staffs.

310.    Plaintiffs must also change the manner in which they deliver legal services in response to the Final Rule. Plaintiffs have relied on a workshop model as an efficient means of providing assistance to many applicants for immigration benefits at one time. Plaintiffs have expended significant resources to develop this model. The Final Rule jeopardizes the efficacy of that model, which depends on the availability of full fee waivers and reduced fees to convert applications completed at the workshop into applications actually submitted. For example, half of CLINIC's affiliates utilize workshop models to help Lawful Permanent Residents complete naturalization

applications and fee waiver requests. CLINIC anticipates that at least 40 percent of workshop attendees, who currently qualify to request a full fee waivers or reduced fees, will be unable to afford to submit applications once the Final Rule goes into effect.

311.    The dramatic fee increases and the abandonment of the long-standing ability-to-pay policy undermines Plaintiffs' (and other non-profits) decades of reliance interests, will render the workshop model that Plaintiffs use unsustainable, and will force Plaintiffs to devote resources to adapt their service models, including by transitioning to helping clients in one-to-one appointments, which are the least efficient way of helping potential applicants.

312.    Because the populations Plaintiffs serve cannot afford the fees in the Final Rule, Plaintiffs will have to devote resources to try to find a way to cover these fees for applicants. Covering these fees will cause Plaintiffs to expend more money per application. To cover such fees, Plaintiffs will have to either redirect funds from other programs or endeavors or will have to expend staff member and executive time and resources to raise additional funding. Either contingency would frustrate Plaintiffs' execution of legal service and other programs. For example, Plaintiff East Bay Sanctuary Covenant, would have to expend over $270,000—or 16 percent of its 2020 budget—to cover those affected by I-765, Application for Employment Authorization changes.

313.    Furthermore, Plaintiffs have expended and will expend staff time and resources in advocating against this Rule, including by submitting comments opposing the Final Rule during the notice-and-comment period.

                    3.    The Final Rule Threatens Plaintiffs' Funding

314.    Plaintiffs rely on private and public funding to maintain their operations. In Plaintiffs' experience, both private and public funding are dependent on the volume of services Plaintiffs can provide because donors want their funds to have the greatest impact. Plaintiffs' grant funding often requires that they meet specific contract deliverables. For example, ACRS has a yearly deliverable requirement that ACRS submit a certain number of naturalization applications. For fiscal year 2020, ACRS is obligated to help submit 650 N-400 applications. The anticipated decline in the number of people who will be able to afford to submit applications because of the Final Rule will lead to a marked decrease in Plaintiffs' ability to meet their deliverables and put their funding in jeopardy.

315.    Unable to meet their contractual deliverable requirements, Plaintiffs will likely lose their contracts and grant funding. Plaintiffs will have to institute hiring freezes, furlough or reduce staff, or decrease salaries. Plaintiffs will thus lose irreplaceable individuals with institutional knowledge and expertise, which will compound the harm to the organizations' legal services. Plaintiffs will also likely have to divert resources, including funding currently used for outreach, policy, and advocacy work, to fund their legal services. The Final Rule could ultimately lead to the closure of Plaintiff's immigration services programs in their entirety.

            4.    The Final Rule Harms Plaintiff's Reputations and Goodwill.

316.    The Final Rule will immediately harm the reputations that Plaintiffs have built over time. Plaintiffs enjoy strong reputations among donors and grant-making entities because of their robust programs and consistent ability to deliver on their contractual obligations. The Final Rule makes it impossible for Plaintiffs to maintain the same level of programming at the same cost, and Plaintiffs are already having to undertake difficult conversations with donors about the effects of the Final Rule at the same time they are struggling to serve those seeking to apply for benefits prior to the Rule's effective date. Plaintiffs also enjoy strong reputations within the communities they serve because of their ability to deliver high quality legal services for free or at low cost and their robust community engagement and advocacy. As fewer community members are able to afford to apply for immigration benefits, Plaintiffs will experience a decline in goodwill and harm to their reputations. When Plaintiffs must limit the number of clients they serve due to funding constraints, community members will express their dissatisfaction, compounding the reputational harm. For example, CHIRLA has provided its legal services to members for free. The Final Rule might force CHIRLA to charge fees for legal services, which is not in-line with its mission and would compound the reputational harm. As CHIRLA provides fewer services and engages less with the community, membership will decline. This decline in membership will negatively impact CHIRLA's mission as well as its financials.

317.    The Final Rule is causing and will continue to cause a decline in morale among Plaintiffs' staffs. Plaintiffs' staffs work with vulnerable, low-income individuals, which is challenging on its own. The Final Rule denigrates this work. For example, the Final Rule suggests

that an asylum application fee is necessary to deter frivolous filings despite the statutory penalties in-place for making frivolous applications. These unfounded insinuations harm the reputations of Plaintiffs and their staff members. Moreover, in their comments to the proposed rule, Plaintiffs provided information about the expected impact of the rule based on their substantial expertise and experience. By casually dismissing the comments of Plaintiffs, the Final Rule harms Plaintiffs' reputation as experts and leaders in the immigration legal services sphere.

## CAUSES OF ACTION

### COUNT I

**Violation of Administrative Procedure Act, 5 U.S.C. §706**

**Contravention of the Federal Vacancies Reform Act, Homeland Security Act, Appointments Clause, Administrative Procedure Act**

318.    Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs of this Complaint.

319.    Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

320.    The issuance of the Final Rule was an agency action.

321.    The Final Rule is not in accordance with the Federal Vacancies Reform Act (FVRA). Under the FVRA, an "action taken by a person who is not acting" under its requirements "in the performance of any function or duty of a vacant office . . . shall have no force or effect." 5 U.S.C. § 3348(d).

322.    The Secretary of Homeland Security is a principal officer of the United States whose appointment requires presidential nomination and Senate confirmation. 6 U.S.C. § 112(a)(1).

323.    Defendant Wolf issued the Final Rule purportedly in the performance of the function or duty of Acting Secretary. Defendant Wolf was not validly appointed pursuant to the HSA, thus the FVRA does not apply to his actions in that purported role.

324.    Even if the FVRA did apply to Defendant Wolf's assumption of duties, the Final Rule was issued after the statutory 210-day limit on actions by acting officials.

325.    The Final Rule should have no force or effect under the FVRA.

326.    The Final Rule is invalid under the Appointments Clause of the Constitution because Defendant Wolf is not authorized to assume the duties of Acting Secretary under the HSA and the FVRA, and he was not nominated by the President and confirmed by the Senate to occupy that role. U.S. Const. art. II, § 2, cl. 2.

327.    The Final Rule contravenes the APA because it arose from an invalid proposal in violation of the APA.

328.    Both Proposals signed by McAleenan and Wolf were issued after the FVRA allowance period, and thus were issued in contravention of the FVRA and the Assignments Clause. Defendant Wolf was not validly appointed under the HSA and thus was not authorized to issue the December Proposal.

329.    The Final Rule should be set aside under the APA for contravening the HSA, FVRA, Constitution, and APA.

## COUNT II

### Violation of Administrative Procedure Act, 5 U.S.C. §706

### Agency Action Not in Accordance with Law

330.    Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs of this Complaint.

331.    Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

332.    The Final Rule contravenes APA § 553(b)(3) because it does not adequately provide the terms or substance of the Proposal or a description of the subjects and issues involved.

333.    The Final Rule contravenes APA § 553(c) because it fails to give persons adequate opportunity to participate in the rulemaking.

334.    The Final Rule contravenes INA § 286(m) because it recovers costs for providing staffing and administrative assistance to ICE that does not constitute providing adjudication and naturalization services consistent with the statute's plain language. 8 USC § 1356(m).

335.     The Final Rule recovers costs for fraud prevention and detection above the statutory limits for fraud prevention and detection as set forth in statutorily established Fraud Prevention and Detection Account, INA §§ 214(c)(12)–(13), 286(v); 8 U.S.C. § 1184(c)(12)–(13), 1356(v).

336.     The Final Rule contravenes the HSA, which keeps the accounts of USCIS and ICE separate and prohibits transfers of fees for purposes not authorized by 8 USC § 1356. 6 USC § 296.

337.     The Final Rule contravenes the Emergency Supplemental Appropriations Act, which prohibits reimbursement between agencies. Pub. L. No. 116-26, 133 Stat. 1018.

338.     The Final Rule contravenes the INA's prioritization of diversity through imposing dramatic fee increases that disproportionately impact non-European applicants.

339.     The Final Rule contravenes the INA's prioritization of family unification through imposing fees that will result in family separation.

340.     The Final Rule contravenes Section 654 of the Treasury and General Government Appropriations Act of 1999's prioritization of family unification through imposing fees that will result in family separation.

341.     The Final Rule contravenes the INA, Refugee Act, and international law by imposing nonwaivable fees that will result in restricting access to asylum protections.

342.     The Final Rule contravenes the INA § 1158(d) by imposing an asylum fee based on deterrence.

343.     The Final Rule contravenes the INA and HSA by failing to separate funding for adjudication and enforcement.

344.     The Final Rule contravenes the TVPRA by erecting financial barriers between TVPRA applicants and primary benefits.

345.     The Final Rule contravenes NACARA by erecting financial barriers between eligible applicants and NACARA protections.

346.     The Final Rule was issued without lawful authority in violation of the FVRA, HSA, and the United States Constitution.

347.     The Final Rule violates the Due Process Clause and the Equal Protection Clause of the United States Constitution.

348.    The Final Rule violates the RFA.

349.    Defendants' violation is causing ongoing harm to Plaintiffs.

**COUNT III**

**Violation of Administrative Procedure Act, 5 U.S.C. § 706**

**Arbitrary and Capricious Action**

350.    Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs of this Complaint.

351.    The APA states that a court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;. . . (D) without observance of procedure required by law . . ." or "(E) unsupported by substantial evidence." 5 U.S.C. § 706(2). Courts will invalidate agency determinations that fail to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

352.    Furthermore, when an agency substantially alters a position, it must "supply a reasoned analysis for the change," *State Farm*, 463 U.S. at 42, and may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)).

353.    The Final Rule is unlawful under the APA for several independent reasons, each of which is sufficient to require that the Final Rule be set aside.

354.    The Final Rule does not adequately provide the terms or substance of the Proposal or a description of the subjects and issues involved. APA § 553(b)(3).

355.    The Final Rule fails to give persons adequate opportunity to participate in the rulemaking. APA § 553(c).

356.    DHS fails to adequately justify the change in rationale from its historic ability-to-pay policy to the Final Rule's "beneficiary pays" policy.  DHS fails to justify removal of the alternative bases for establishing fee waiver eligibility.

357.    DHS fails to adequately justify its reversal from bundled to unbundled fees for lawful permanent residence applications. DHS fails to adequately justify its removal of a reduced fee for minors applying for lawful permanent resident status.

358.    DHS fails to adequately justify its changed rationale to now charge a fee for seeking asylum and initial employment authorization for asylum seekers.

359.    DHS fails to adequately justify that it is recovering costs authorized under 8 U.S.C. § 1356(m). DHS's budget for USCIS rests on unexplained assumptions, reflects an extreme increase over prior budgets, is inconsistent with prior and contemporaneous representations to Congress, fails to explain loss of carryover funds, and fails to account for efficiencies already realized.

360.    The cost modeling used for setting the fees in the Final Rule suffers from arbitrary and unexplained inputs, fails to account for efficiencies realized, fails to account for costs of foregone benefits, fails to account for revenue from other rule changes, and fails to account for price elasticity, and fails to account for the reliance interests of the affected parties.

361.    The Final Rule fails to apply the model in a rational or objective manner, but instead applies unexplained "value judgments" to different fee categories.

362.    The Final Rule provides inconsistent or mutually exclusive justifications for certain fees. The Rule states that it sets a $50 fee for asylum applications to align with its beneficiary-pays policy and to recover revenues. The Rule also states that USCIS will apply a $50 discount to asylees who apply for lawful permanent resident status, thus undercutting the asserted benefits of realizing those fees. The Final Rule later states that the benefits to USCIS of the $50 fee will be "none" in its cost-benefit analysis.

363.    The Final Rule fails to adequately address comments on the barriers to accessing immigration benefits posed by the unaffordability of the fee schedule for low-income applicants and particular applicant categories—including naturalization applicants, lawful permanent residence applicants, asylum applicants, applicants for TVPRA benefits, NACARA applicants, and applicants for employment authorization.

364.    The Final Rule fails to adequately address comments on the harms such barriers have on applicants, including family separation and loss of income, safety, health, and ability to vote.

365.    The Final Rule fails to adequately address comments on the harms such barriers have on small non-profit immigration service organizations, including Plaintiffs, in meeting their missions, obtaining funding, and qualifying for grants.

366.    The Final Rule fails to adequately address comments on harms such barriers have on the public, including public health, loss of diversity, loss of tax revenue, lower gross domestic product, interference with state and local initiatives to promote diversity and naturalization.

367.    The Final Rule fails to consider the numerous studies and comments in the record raising these important aspects of the problem of its fee schedule. The Final Rule instead repeats its statement that it "believes" its chosen conclusions are correct, without analysis or data to support its conclusions.

368.    The Final Rule is arbitrary and capricious because it claims to have "no data" when data is in the record.

369.    The Final Rule is arbitrary and capricious because it rests on ungrounded assumptions without support to justify the quantified, real harm to public health, state or local economies, or other administrative burdens or adequately address the harms alleged in the record.

370.    The Final Rule is arbitrary and capricious because DHS relied on and considered factors that Congress did not intend for DHS to consider, including: elevating the so-called beneficiary-pays principle above all other considerations; charging asylum fees for the purposes of deterrence instead of for the only authorized reason of cost recovery; considering itself obligated to cover all adjudicative costs with fee revenues; supporting President Trump's anti-immigrant political agenda; DHS "value judgments"; and elevating other considerations over Congress's express direction to keep naturalization affordable.

371.    The Final Rule is arbitrary and capricious because DHS failed to consider factors that Congress did want considered, including: the effect the fee increases would have on application volume; the burden of fee increases on low-income and middle-income immigrants; and the effects of fee increases on immigration and naturalization, diversity, family unification, including under the INA and the Treasury and General Government Appropriations Act of 1999, Section 654, and vulnerable populations.

372.    The Final Rule is arbitrary and capricious because it is not a logical outgrowth of the proposal: DHS failed to propose the Final Rule provision providing a $50 discount in some circumstances for asylees who apply for lawful permanent resident status; its $10 discount for online applications; sufficient information to understand the cost modeling and budget assumptions underlying the fees in the November Proposal and in the alternative Scenario D of that proposal. As a result, DHS incorporates new and unexplained provisions and conclusions as to fee amounts in the Final Rule.

373.    The Final Rule is arbitrary and capricious because it is pretext for discrimination. While the Final Rule's "beneficiary-pays" principle purports to be more "equitable," its application of exceptions to that approach bears no reasonable relationship to USCIS's mission to provide immigration adjudication services and instead demonstrates Defendants' intent to reduce immigration by immigrants of color.

374.    The Final Rule is arbitrary and capricious because Defendants have failed to consider the racially disparate impact of the Final Rule.

375.    Defendants' actions are thus arbitrary and capricious, within the meaning proscribed by 5 U.S.C. §§ 705 and 706.

376.    Defendants' violation is causing ongoing harm to Plaintiffs.

**COUNT IV**

**Violation of Regulatory Flexibility Act**

377.    Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs of this Complaint.

378.    The Regulatory Flexibility Act ("RFA"), as amended, requires federal administrative agencies to analyze the effects on "small entities" of rules they promulgate, and to publish initial and final versions of those analyses. 5 U.S.C. §§ 603-604.

379.    Under the RFA, the court may set aside, stay, or grant other relief for agency action in violation of the RFA, 5 U.S.C. §§ 601, 604, 605(b), 608, and 610. 5 U.S.C. § 611.

380.    The RFA defines "small entities" to include small businesses, small nonprofit organizations, and small governmental jurisdictions. 5 U.S.C. § 601(6).

381.    The Final Rule is a "rule" within the meaning of the RFA. 5 U.S.C. § 601(2).

382.    Each of the Plaintiffs is a "small entity" within the meaning of the RFA and is directly affected by the Final Rule, which, inter alia, will jeopardize their funding sources, will likely cause them to breach contractual requirements (including with state and local governments), will require them to divert resources to address the new requirements in the Final Rule, will devalue their services, and will frustrate their missions.

383.    DHS's final regulatory flexibility analysis does not comply with the RFA because DHS concluded that the Final Rule will not have a significant impact on small business entities. This conclusion is unsupported and irrational when considered in light of the record and numerous comments to the Proposed Rule. 5 U.S.C. §§ 605(b), 608.

384.    The RFA requires DHS to describe and estimate the number of small entities that would be affected by the Final Rule. 5 U.S.C. § 604(a)(4).

385.    DHS refused to include small nonprofit organizations affected by the Final Rule. 85 Fed. Reg. at 46,898.

386.    The RFA requires DHS to describe "the projected reporting, recordkeeping and other compliance requirements of the [Final Rule], including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record." 5 U.S.C. § 604(a)(5).

387.    DHS failed to do so. The agency asserted instead that because small nonprofit entities providing immigration services are not the individuals assessed immigration fees, the RFA excludes their consideration. 85 Fed. Reg. at 46,898.

388.    DHS ignored comments identifying the requirements of the Final Rule that will directly affect small nonprofit entities. DHS does not support its unexplained assertion that form fees are the only direct effect of the Final Rule and its failure to consider the reliance interests of Plaintiffs remains unexplained.

389.    The RFA requires DHS to describe "the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative

adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. § 604(a)(6).

390.    DHS failed describe these steps with respect to small nonprofits. 85 Fed. Reg. at 46,898.

391.    DHS failed to consider "the stated objectives of applicable statutes," including the INA, Refugee Act, TVPRA, Treasury and General Government Appropriations Act, and HSA.

392.    Thus, the Final Rule's final regulatory flexibility analysis does not comply with the RFA because of, as a threshold matter, DHS's erroneous and unexplained conclusion that the Final Rule does not directly affect small entities.

393.    The Final Rule's final regulatory flexibility analysis is also arbitrary and capricious because it does not reflect reasoned decision-making, fails to respond to significant comments demonstrating the critical reliance interests of affected parties, fails to consider available data about the effects of the Final Rule, and fails to support its conclusions with substantial evidence.

394.    The Final Rule is therefore unlawful and must be set aside. See 5 U.S.C. § 611; 5 U.S.C. § 706.

### COUNT V

### Violation of the Due Process Clause

395.    Petitioner repeats and re-alleges the allegations contained in each preceding paragraph.

396.    The Due Process Clauses of the Fifth Amendment of the Constitution guarantees that people cannot be deprived of life, liberty, or property without due process of law.

397.    "A necessary predicate for a due process claim is a constitutionally protected interest." *Brown v. Holder*, 763 F.3d 1141, 1147 (9th Cir. 2014).  Immigrants have "such a protected interest in being able to apply for citizenship," *id.*, and asylum, *see Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1037–38 (5th Cir. 1982), (finding "a clear intent to grant aliens the right to submit and the opportunity to substantiate their claim for asylum"), *disapproved of by Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984).

398.    The Final Rule arbitrarily and intentionally obstructs the rights to naturalization and asylum for low income applicants.

399.    DHS remains deliberately indifferent to whether low income applicants have access to the naturalization and asylum processes.

400.    Through the Final Rule, Defendants have arbitrarily and intentionally imposed barriers to applying for immigration benefits for eligible individuals, unconstitutionally depriving those eligible individuals of their vested interests.

401.    Both the INA and international law give asylum seekers a right to apply for protection in the United States.

402.    The Final Rule imposes a mandatory $50 filing fee on all asylum applications, other than those submitted by unaccompanied immigrant children who are in removal proceedings.

403.    The Final Rule prohibits asylum applicants from receiving a fee waiver.

404.    The Final Rule prohibits USCIS from considering an asylum applicant's ability to pay the $50 fee.

405.    DHS asserted in the Final Rule it had no data to assess the effects of the fees it was imposing, but DHS received extensive comments on asylum seekers' inability to pay and the substantial harms the fee would impose.

406.    DHS inferred that substantial harm from the asylum application fee was likely, stating, "Some applicants may not be able to afford this fee and may not be able to apply for asylum." 85 Fed. Reg. at 46,894.  DHS acknowledges that the fee is set "so that it . . . may deter some filings." Regulatory Impact Analysis at 153. DHS cannot reasonably deny drawing this inference, but even if it did, any reasonable DHS official would be compelled to draw that inference. *Dent v. Sessions*, 243 F. Supp. 3d 1062, 1069-70 (D. Ariz. 2017).

407.    For these reasons, the Final Rule's $50 fee for asylum applications constitutes a due process violation.

408.    In cases where an applicant cannot afford the filing fee, failing to give any consideration to an applicant's ability to pay is the equivalent of denying the relief to which an applicant is entitled by law to seek.

409.    The Final Rule fails to consider the financial circumstances of asylum applicants in its decision to impose a $50 fee on such applicants.

410.    The Final Rule fails to consider the financial circumstances of asylum applicants in its decision to prohibit USCIS from considering an applicant's ability to pay.

411.    An asylum applicant who cannot afford the filing fee will be denied asylum solely based on the inability to pay the filing fee.

412.    The Constitution requires consideration of the financial circumstances of an asylum applicant in assessing a fee to apply for relief to which the applicant is entitled to seek under the INA and international law.

413.    The Final Rule violates the Due Process Clause because due process does not permit an applicant to be denied asylum solely based on lack of financial resources.

414.    The Final Rule imposes a fee of $1,170 for naturalization (or $10 less if filing online).

415.    Currently, the fee for naturalization is $320 (not including the biometric fee) for qualifying low-income applicants, or $640 (not including the biometric fee). The $85 biometric fee is not assessed for applicants 75 or older. There is currently no fee for applicants who qualify for a full fee waiver.

416.    The Final Rule prohibits naturalization applicants from receiving a fee waiver in nearly all cases.

417.    The Final Rule prohibits USCIS from considering a naturalization applicant's ability to pay the $1,170 fee.

418.    DHS asserted in the Final Rule it had no data to assess the effects of the fees it was imposing, but DHS received extensive comments on naturalization applicants' inability to pay and the substantial harms the fee would impose. See 85 Fed. Reg. at 46,799. DHS inferred that substantial harm from the proposed naturalization fee combined with the elimination of fee waivers and reduced fees was likely. It stated, "Limiting fee waivers may adversely affect some applicants' ability to apply for immigration benefits."  85 Fed. Reg. at 46,891. Even if DHS denies making this inference, any reasonable DHS official would be compelled to draw that inference. *Dent*, 243 F. Supp. 3d at 1069-70.

419.    For these reasons, the Final Rule's naturalization fee increase, combined with the elimination of the reduced fee and fee waiver eligibility, constitutes a due process violation.

420.    In cases where an applicant cannot afford the filing fee, failing to give any consideration to an applicant's ability to pay is the equivalent of denying the relief to which an applicant is entitled by law to seek.

421.    The Final Rule fails to consider the financial circumstances of naturalization applicants in its decision to impose a $1,170 fee and eliminate access to reduced fees or fee waivers.

422.    The Final Rule fails to consider the financial circumstances of naturalization applicants in its decision to prohibit USCIS from considering an applicant's ability to pay.

423.    A naturalization applicant who cannot afford the filing fee will be denied citizenship solely based on the inability to pay the filing fee.

424.    The Constitution requires consideration of the financial circumstances of a naturalization applicant in assessing a fee to apply for citizenship, which the applicant is entitled to seek under the INA.

425.    The Final Rule violates the Due Process Clause because due process does not permit an applicant to be denied citizenship solely based on lack of financial resources.

426.    The Final Rule violates the Due Process Clause because it is pretext for reducing immigration and naturalization without a legitimate purpose.

427.    The Final Rule violates the Due Process Clausen because it is designed to have a disproportionate impact on immigrants and communities of color.

**COUNT VI**

**Violation of the Fifth Amendment – Equal Protection**

428.    Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs of this Complaint.

429.    The Due Process Clause of the Fifth Amendment prohibits the Defendants from denying equal protection of laws to persons residing in the United States.

430.    The Final Rule denies equal protection based on indigence, race, and national origin.

431.   The Defendants violated the Fifth Amendment because they acted with racial animus to promote policy that disproportionally affects Latin American immigrants.

432.   Defendants were motivated by "discriminatory purpose" to disparately impact people of color when they promulgated the Final Rule. Defendants not only knew of that disparate impact, but that impact is also consistent with the intent made plain by the Administration's repeated public statements in support of a broader agenda to vilify persons from majority non-white countries, to suppress immigration, and to discourage those individuals from seeking citizenship, exercising the right to vote, and gaining access to certain careers.

433.   The purpose of the Final Rule is to discriminate against non-white individuals and families.

434.   Defendants received many comments, including data and analyses, informing them that the Final Rule would have a targeted, disproportionate impact on people and families from non-white countries, and that the Final Rule departs from rulemaking history and procedure as part of a pattern and practice of discriminatory animus towards persons from majority non-white countries. The Defendants knew the Final Rule would have these effects.

435.   Defendants ignore the record and use facially neutral but pre-textual concerns about self-sufficiency in a thinly-veiled effort to cloak their discriminatory intent against non-white people.

436.   Thus, the Final Rule violates the right to equal protection under the law of non-citizen immigrants of color and Latino immigrants from majority non-white countries.

437.   The Final Rule is pretext for decreasing immigration and naturalization for low-income immigrants primarily from non-European countries, and does not have a legitimate purpose.

438.   Defendants' violation is causing ongoing harm to Plaintiffs by constructing barriers to asylum, citizenship, and other immigration benefits.

**JURY DEMAND**

439.   Plaintiffs demand a jury trial on all counts triable by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A.    Declare that the actions of the Defendants are arbitrary, capricious, and otherwise not in accordance with the law and without observance of procedure required by law in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

B.    Declare the Final Rule unlawful and invalid as a violation of the Fifth Amendment of the United States Constitution.

C.    Enter a preliminary and permanent nationwide injunction, without bond, enjoining Defendants, their officials, agents, employees, and assigns from implementing or enforcing the Final Rule.

D.    Stay the implementation or enforcement of the Final Rule.

E.    Award Plaintiffs reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

F.    Order such other relief as the Court deems just and equitable.

Respectfully submitted,

DATE: August 20, 2020                     /s/  Brian J. Stetch

Jesse Bless (*pro hac vice forthcoming*)          Brian J. Stretch, SBN 163973
jbless@aila.org                                   bstretch@sidley.com
AMERICAN IMMIGRATION LAWYERS              Naomi Igra, SBN 269095
ASSOCIATION                                       naomi.igra@sidley.com
1301 G Street, Suite 300                          Chelsea Davis, SBN 330968
Washington, D.C. 20005                            chelsea.davis@sidley.com
                                                  SIDLEY AUSTIN LLP
                                                  555 California Street, Suite 2000
                                                  San Francisco, CA 94104
                                                  Telephone: +1 415 772 1200
                                                  Facsimile: +1 415 772 7400

                                                  Samina M. Bharmal (*pro hac vice pending*)
                                                  sbharmal@sidley.com
                                                  Emmanuel Hampton
                                                  ehampton@sidley.com
                                                  Katherine Olson
                                                  katherine.olson@sidley.com
                                                  John L. Gibbons, SBN 317720
                                                  jgibbons@sidley.com

David Goldenberg
dgoldenberg@sidley.com
Elizabeth MacGill
emacgill@sidley.com
Brendan Bohn
bbohn@sidley.com
William Chorba
wchorba@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

*Attorneys for Plaintiffs*