Brian J. Stretch, SBN 163973
bstretch@sidley.com
Naomi Igra, SBN 269095
naomi.igra@sidley.com
Chelsea Davis, SBN 330968
chelsea.davis@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Jesse Bless (*pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G Street, Suite 300
Washington, D.C. 20005

Attorneys for Plaintiffs

Samina M. Bharmal (*pro hac vice*)
sbharmal@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
Telephone: +1 202 736 8000
Facsimile +1 202 736 8711

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER; EAST BAY SANCTUARY COVENANT; COALITION FOR HUMANE IMMIGRANT RIGHTS; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.;  INTERNATIONAL RESCUE COMMITTEE; ONEAMERICA; ASIAN COUNSELING AND REFERRAL SERVICE; ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS,<br><br>              Plaintiffs,<br><br>       v.<br><br>CHAD F. WOLF, *under the title of Acting Secretary of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security*; U.S. CITIZENSHIP & IMMIGRATION SERVICES<br><br>              Defendants. | Case No. 4:20-cv-05883-JSW<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION & MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF, AND PETITION FOR REVIEW AND REQUEST FOR STAY**<br><br>Assigned to Hon. Jeffrey S. White<br><br>Date:         October 9, 2020<br>Time:         9:00 a.m.<br>Courtroom:  5, 2nd Floor<br><br>**JURY TRIAL DEMANDED** |

TO ALL PARTIES AND THEIR COUNSEL: PLEASE TAKE NOTICE that on October 9, 2020, at 9:00 a.m., or as soon thereafter as counsel may be heard, at the United States District Court for the Northern District of California, Courtroom 5, 2nd Floor, 1301 Clay Street, Oakland, CA 94612, Plaintiffs will, and hereby do, move for a preliminary injunction against Defendants the Department of Homeland Security ("DHS"), Chad F. Wolf, under the title of Acting Secretary of the Department of Homeland Security, U.S. Citizenship and Immigration Services ("USCIS"), and Kenneth Cuccinelli, under the title of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security, pursuant to Rule 65 of the Federal Rules of Civil Procedure.

Plaintiffs seek a preliminary injunction prohibiting Defendants from implementing the rule DHS published in the Federal Register on August 3, 2020, 85 Fed. Reg. 46,788 ("Final Rule"). Plaintiffs also petition this Court for review of the Final Rule and seek a stay of the effectiveness of the Final Rule pursuant to Administrative Procedures Act ("APA") 5 U.S.C. § 705. Plaintiffs so move on the basis that: (1) they are likely to succeed on the merits of their claims under the APA, 5 U.S.C. §§ 702, 706, 553, and the Federal Vacancy Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq.*; (2) Plaintiffs are likely to suffer irreparable harm absent provisional relief; and (3) the balance of equities and the public interest weigh heavily in favor of maintaining the status. *Nken v. Holder*, 556 U.S. 418, 426 (2009). Plaintiffs' Motion is based upon this Notice of Motion and Motion; the Memorandum of Points and Authorities; the currently available administrative record; the supporting declarations and exhibits filed concurrently herewith; the proposed Preliminary Injunction; and such further evidence and argument as the Court may consider.

Date: August 25, 2020

*/s/ Brian J. Stretch*

Jesse Bless (*pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G Street, Suite 300
Washington, D.C. 20005

Brian J. Stretch, SBN 163973
bstretch@sidley.com
Naomi Igra, SBN 269095
naomi.igra@sidley.com
Chelsea Davis, SBN 330968
chelsea.davis@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Samina M. Bharmal (*pro hac vice*)
sbharmal@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

Page

SUMMARY OF THE ARGUMENT ................................................................................. v

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 1

I.     BACKGROUND ....................................................................................................... 1

     A.     The INA Established the Immigration and Examinations Fee Account ("IEFA") ........ 1

     B.     The Homeland Security Act Separated Immigration Services and Enforcement .......... 2

     C.     USCIS Changes its Mission and Its Financial Projections Change Dramatically ........ 2

     D.     Kevin McAleenan, Chad Wolf and Ken Cuccinelli Assume New Titles Without Authority ........ 2

     E.     DHS Initiates an Irregular Rulemaking Process ........................................... 3

     F.     DHS Provided Inconsistent Information to Congress and the Public ...................... 3

     G.     The Final Rule Dramatically Increases Fees for Asylum and Naturalization Without Explaining How USCIS Will Use The Majority of The New Funding ........ 4

II.    LEGAL STANDARD .............................................................................................. 4

III.   ARGUMENT .......................................................................................................... 4

     A.     Plaintiffs Are Likely To Succeed In Their APA Claims Based on The Invalid Appointments of Mr. McAleenan and Mr. Wolf ........ 4

     B.     Plaintiffs Are Likely to Succeed on the Merits of Their Other APA Claims ............... 6

          1.     Defendants Violated the Procedural Requirements of the APA ............... 6

          2.     The Final Rule Is Contrary to Law and In Excess of Authority ................. 7

          3.     The Final Rule Is Arbitrary and Capricious ............................................. 9

     C.     The Final Rule Will Irreparably Harm Plaintiffs ........................................ 13

     D.     The Equities and Public Interest Factors Tip Sharply In Plaintiffs' Favor ................ 14

IV.   CONCLUSION ...................................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell,*
   623 F.3d 1127 (9th Cir. 2011) ........................................................................... 4

*Am. Fed'n of Gov't Emps., Local 2924 v. FLRA,*
   470 F.3d 375 (D.C. Cir. 2006) ......................................................................... 10

*American Medical Ass'n v. Reno,*
   57 F.3d 1129, 1135 (D.C. Cir. 1995) ............................................................. 6, 8

*California ex rel. Becerra v. U.S. Dep't of the Interior,*
   381 F. Supp. 3d 1153 (N.D. Cal. 2019) .............................................. vi, 6, 7, 10

*Cal. Energy Comm'n v. Dep't of Energy,*
   585 F.3d 1143 (9th Cir. 2009) ......................................................................... 12

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
   698 F.3d 1101 (9th Cir. 2012) ..................................................................... 9, 12

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) ..................................................................................... 13

*E. Bay Sanctuary Covenant v. Barr,*
   964 F.3d 832 (9th Cir. 2020) ................................................... vi, 1, 4, 7, 13

*FCC v. Fox TV Stations, Inc.,*
   556 U.S. 502 (2009) ........................................................................... 10, 12, 13

*Home Box Office, Inc. v. F.C.C.,*
   567 F.2d 9, 35 (D.C. Cir. 1977) ........................................................................ 6

*Kitchens v. Dep't of Treasury,*
   535 F.2d 1197 (9th Cir. 1976) ........................................................................... 9

*League of Women Voters of U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ............................................................................. 14

*Motor Vehicle Mfrs. Ass'n v. State Farm Auto Mut. Ins. Co.,*
   463 U.S. 29 (1983) ..................................................................................... 12, 13

*Nken v. Holder,*
   556 U.S. 418 (2009) .......................................................................................... 4

*Rudebusch v. Hughes,*
   313 F.3d 506 (9th Cir. 2002) ........................................................................... 14

*Winter v. Nat. Resources Defense Council,*
    555 U.S. 7 (2008) .................................................................................................. 14

**Statutes**

5 U.S.C. § 553(b)(3). ................................................................................................ 7

5 U.S.C. § 553(c) ...................................................................................................... 7

5 U.S.C. § 706(2)(A) ....................................................................................... vi, 5, 7

5 U.S.C. § 706(2)(C) ................................................................................................ 5

5 U.S.C. § 706(2)(D) ......................................................................................... vi, 5

5 U.S.C. § 3346(a)(1) ..................................................................................... vi, 5, 6

5 U.S.C. § 3347(a) ................................................................................................... 4

5 U.S.C. § 3348(d)(1) ........................................................................................ vi, 5

5 U.S.C. § 3348(d)(2) ..................................................................................... vi, 5, 6

6 U.S.C. § 112(a)(1) ................................................................................................ 5

6 U.S.C. § 113(a)(1)(A) ........................................................................................... 5

6 U.S.C. § 113(g)(1) .......................................................................................... vi, 5

6 U.S.C. § 113(g)(2) ................................................................................................ 5

6 U.S.C. § 251 ......................................................................................................... 2

6 U.S.C. § 252 ........................................................................................................ vi

6 U.S.C. § 252(b)(2)(A) ........................................................................................... 2

6 U.S.C. § 271 ........................................................................................................ vi

6 U.S.C. § 271(b) .................................................................................................... 2

6 U.S.C. § 291(b) ............................................................................................... vi, 2

6 U.S.C. § 296 ......................................................................................................... 2

8 U.S.C. § 1101(a)(3) .............................................................................................. 8

8 U.S.C. § 1158(a) ................................................................................................... 8

8 U.S.C. § 1158(d)(3) .............................................................................................. 8

iii

8 U.S.C. § 1158(d)(6) ............................................................................................................... 9, 12

8 U.S.C. § 1356(m) ..................................................................................................................... vi, 1

**Other Authorities**

63 Fed. Reg. 43,604-43,610 (Aug. 14, 1998) ........................................................................ 7,10

69 Fed. Reg. 20,528 (Apr. 15, 2004) ................................................................................... 7, 10

72 Fed. Reg. 29,851-29,874 (May 30, 2007)....................................................................... 7, 10

75 Fed. Reg. 58,961-58,991 (Sept. 24, 2010) ........................................................... 7, 10, 11, 12

81 Fed. Reg. 73,292-73,332 (Oct. 24, 2016) ........................................................... 4, 7, 9, 10

84 Fed. Reg. 62,280-62,371 (Nov. 14, 2019) ......................................................... 3, 9, 10

85 Fed. Reg. 46,788-46,929 (Aug. 3, 2020) ...................................................................*passim*

Administrative Procedure Act ("APA") ........................................................................*passim*

Federal Vacancies Reform Act ("FVRA") ....................................................................*passim*

H.R. Rep. No. 115-948 (2018)................................................................................................ 10

Homeland Security Act ("HSA")...................................................................................*passim*

Immigration and Nationality Act ("INA").....................................................................*passim*

Refugee Act ............................................................................................................................. 8

NOTICE OF MOT. & MOTION FOR PRELIMINARY INJUNCTION - CASE NO. 4:20-CV-05883-JSW

## SUMMARY OF THE ARGUMENT

This case challenges a final rule issued by the Department of Homeland Security ("DHS") that drastically increases fees to apply for essential immigration benefits, including naturalization and asylum. 85 Fed. Reg. 46,788 (Aug. 3, 2020) ("Final Rule"). The Final Rule is unlawful and violates the Administrative Procedure Act ("APA"). Because Plaintiffs meet all standards for obtaining a preliminary injunction, the Court should issue an order to maintain the *status quo*. *See E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 845-46 (9th Cir. 2020) ("*EBSC 2020*").

(A) The Final Rule was proposed under Kevin McAleenan and issued under Chad Wolf when each was serving as Acting Secretary of DHS without valid authority under the Homeland Security Act ("HSA"), *see* 6 U.S.C. § 113(g)(1), or the Federal Vacancies Reform Act ("FVRA"), *see* 5 U.S.C. § 3346(a)(1). Under the FVRA, the Final Rule has "no force or effect" and "may not be ratified," 5 U.S.C. § 3348 (d)(1)-(2); it "must" be "set aside" under the APA. 5 U.S.C. § 706(2)(D).

(B) The irregular rulemaking process denied "meaningful public participation," *see, e.g., California ex rel. Becerra v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1173 (N.D. Cal. 2019) ("*Becerra*"), because it (1) failed to disclose thinking and data that animated the proposal; and (2) failed to provide sufficient time to comment on a complete proposal.

(C) The Final Rule is unlawful under 5 U.S.C. § 706(2)(A) because (1) it was promulgated pursuant to invalid authority under the HSA and FVRA; (2) exceeds restrictions on the purpose of fees under the Immigration and Nationality Act, ("INA"), *see* 8 U.S.C. § 1356(m) and the HSA, *see* 6 U.S.C. §§ 271, 252, 296 and (3) creates a financial barrier for the purpose of deterring asylum seekers that is contrary to the INA and international law.

(D) The Final Rule is arbitrary and capricious because it (1) relies on baseless calculations; (2) lacks "reasoned explanations" for reversing policies; (3) ignores data and serious problems; (4) imposes an asylum fee to deter applicants; and (5) erects new financial barriers to citizenship without sufficient justification. *See, e.g., Becerra*, 381 F. Supp. 3d at 1153.

(E) The Final Rule irreparably harms plaintiffs, the equities tip the balance sharply in their favor, and an injunction is in the public interest. *See EBSC 2020*, 964 F.3d at 857-58.

# MEMORANDUM OF POINTS AND AUTHORITIES

This case challenges a final rule issued by the Department of Homeland Security ("DHS") that drastically increases fees to apply for essential immigration benefits, including naturalization and asylum. 85 Fed. Reg. 46,788 (Aug. 3, 2020) ("Final Rule"). For the first time in U.S. history, the Final Rule imposes a non-waivable $50 fee to apply for asylum. Under the Final Rule, the fee for an asylum seeker to apply for status and initial work authorization with biometrics skyrockets from $0 to $630. Reversing past practice, the Final Rule eliminates fee waivers for nearly all applicants seeking to naturalize. For many of the lowest income applicants, the Final Rule increases the fee for naturalization from $0 to $1,170.[1] The Final Rule accomplishes this in a manner that is procedurally defective, contrary to law, and arbitrary and capricious under the Administrative Procedure Act ("APA"). Plaintiffs are likely to succeed on the merits, or at least raise "serious questions" going to the merits, and they are irreparably harmed by the Final Rule. The balance of equities tips sharply in their favor and an injunction is in the public interest. *See E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 845-46 (9th Cir. 2020) ("*EBSC 2020*"). For these reasons, the Court should enjoin the Final Rule or stay the effective date to maintain the *status quo* until final resolution of the case.

## I.     BACKGROUND

### A.     The INA Established the Immigration and Examinations Fee Account ("IEFA")

The United States Citizenship and Immigration Service ("USCIS") deposits fees from immigration applications into the IEFA. The fees are "for providing adjudication and naturalization services." 8 U.S.C. § 1356(m). Fees "may be set at a level that will ensure recovery of the full costs of providing all such services, *including the costs of similar services provided without charge to asylum applicants or other immigrants*." *Id*. (emphasis added). USCIS previously understood that "Congress directed that the IEFA fund the cost of asylum processing and other services provided to immigrants at no charge," Comp. ¶ 67. It also previously understood that Congress intended for the agency to consider applicants' "ability to pay" when setting fees. *Id.* ¶¶ 65-67.

---

[1] For some forms, the Final Rule includes a $10 discount for filing online. This Motion refers to the full fee unless otherwise noted.

### B. The Homeland Security Act Separated Immigration Services and Enforcement

In 2002, the HSA reconfigured the agency formerly known as the Immigration and Nationalization Service ("INS"). Comp. ¶ 47. It transferred the "adjudication" of immigration benefits to a bureau is now USCIS. 6 U.S.C. § 271(b). It transferred "immigration enforcement functions" into another bureau that is now Immigration and Customs Enforcement ("ICE") and Customs and Border Patrol ("CBP"). 6 U.S.C. §§ 251, 252(b)(2)(A). A provision titled "Prohibition" specifies that the two bureaus cannot be reorganized as one agency or "otherwise" joined together, or have their functions "consolidated." 6 U.S.C. § 291(b). A provision entitled "Separation of Funding," mandates separate budgets for the two bureaus, requires that "fees imposed for a particular service, application or benefit shall be deposited" into the account of the bureau "with jurisdiction over the function to which the fee relates," , and provides that "no fee may be transferred" between the separate bureaus, with only limited statutory exceptions. 6 U.S.C. § 296.

### C. USCIS Changes its Mission and Its Financial Projections Change Dramatically

USCIS previously described its mission in terms of service to immigrants. Comp. ¶ 73. That mission changed in 2018, with a new focus on "securing the homeland." *Id.* ¶¶ 74-75. USCIS financial projections changed too. For FY2017, USCIS had a *positive* carryover of nearly $1 billion.[2] In 2019, USCIS projected *negative* carryover over $1 billion in FY2020.[3]

### D. Kevin McAleenan, Chad Wolf and Ken Cuccinelli Assume New Titles Without Authority

In April 2019, a series of events led Kevin McAleenan to assume the title of Acting Secretary of DHS without authorization under the HSA or the FVRA. Comp. ¶ 248. On November 13, 2019, Mr. McAleenan resigned and Chad Wolf assumed the title of Acting Secretary. *Id.* ¶¶ 250-52. Defendant Kenneth Cuccinelli assumed the role of the Senior Officer Performing the Duties of Deputy Secretary of Homeland Security. *Id.* ¶ 251. The GAO has since determined that each of these appointments was unlawful. *Id.*; Decl. of Brian J. Stretch ("Stretch Decl.") Ex. 1 ("GAO Decision"); Stretch Decl. Ex. 2 ("GAO Reconsideration").

---

[2] USCIS, *Fiscal Year 2019 Congressional Budget Justification* CIS-10, CIS-IEFA-6 (Feb. 22, 2018).
[3] USCIS, *FY 2019-2020 Immigration Examinations Fee Account: Fee Review Supporting Documentation with Addendum* 16 (May 2020), DHS No. USCIS-2019-0010-12271.

**E.    DHS Initiates an Irregular Rulemaking Process**

On November 14, 2019, DHS issued its Notice of Proposed Rulemaking, 84 Fed. Reg. 62,280 (Nov. 14, 2020) ("November Proposal"), signed under the name of Acting Secretary McAleenan, who had resigned the day before. Comp. ¶¶ 78, 252. The proposal was 92 pages, included six alternative fee schedules, and proposed transfers to ICE anywhere from $0 to $207 million. *Id.* ¶¶ 79, 100. It reflected changes to 59 USCIS forms within a single proposal, contrary to past practice of conducting separate rulemakings for each rule change. *Id.* ¶ 105. The comment period ran until December 16, 2019 and included the Thanksgiving holiday. *Id.* ¶¶ 79, 81. It allowed just 32 days for public comment, in contrast to the 45-day and 60-day comment periods provided for past fee rule proposals that were far less complex. *Id.* ¶ 78. On November 22, 2019, DHS changed the supporting economic analysis on the regulatory docket without informing the public. *Id.* ¶ 80.

Just one week before the original deadline for comments, DHS published a "supplement" signed by Defendant Wolf ("December Proposal"). *Id.* ¶ 81. It included a different set of budget assumptions, reduced the proposed transfer to ICE by roughly $100 million, and extended the comment deadline to December 30, 2019. *Id.* This gave commenters 21 days over major holidays to comment, without a corresponding fee schedule or concrete fee adjustments. *Id.* ¶ 82. On January 24, 2020, DHS issued a notice that reopened the public comment period for another seventeen days, with a deadline of February 10, 2020. *Id.* ¶ 83. One week before that deadline, USCIS finally demonstrated its cost-modeling to interested parties, as promised in the November Proposal. *Id.* ¶ 84.

**F.    DHS Provided Inconsistent Information to Congress and the Public**

In May 2020, DHS told Congress that USCIS needed a $1.2 billion bailout due to COVID-19. Comp. ¶ 107; Stretch Decl. Ex. 3 (DHS Letter to Sen. Shelby).[4]  But before the COVID pandemic, DHS had projected a dramatic change in USCIS's financial condition. Comp. ¶ 108. Nevertheless, USCIS's Deputy Director for Policy, Joseph Edlow, testified to the U.S. House of Representatives' Committee on the Judiciary, Subcommittee on Immigration and Citizenship that the

---

[4] *See also* Stretch Decl. Ex. 31 (Sen. Leahy July Letter); Ex. 32 (Sen. Leahy August Letter).

COVID-19 pandemic was to blame. *Id.* ¶ 112. DHS later revised those projections and indicated USCIS would have a surplus rather than a deficit. Stretch Decl. Ex. 32 (Sen. Leahy August Letter).

### G. The Final Rule Dramatically Increases Fees for Asylum and Naturalization Without Explaining How USCIS Will Use The Majority of The New Funding

On August 3, 2020—the 264th day of Defendant Wolf's purported tenure as Acting DHS Secretary—DHS issued the Final Rule. Defendant Wolf, "having reviewed and approved" the Final Rule, "delegat[ed] the authority to electronically sign" it to Chad Mizelle, "the Senior Official Performing the Duties of the General Counsel for DHS." 85 Fed. Reg. at 46,913. The Final Rule projects a $1.4 billion increase in USCIS budgetary needs with more than 60% of the total budget unexplained. Comp. ¶ 120.[5] The Final Rule does this to cover a dramatic projected change in USCIS's financial condition, and its inexplicably skyrocketing costs. Comp. ¶¶ 120-121.

## II. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest." *EBSC*, 950 F.3d at 1271. These factors operate on sliding scale so an injunction may issue if "the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [the requesting party's] favor.'" *All. for the Wild Rockies v. Cottrell*, 623 F.3d 1127, 1132 (9th Cir. 2011); *see also Nken v. Holder*, 556 U.S. 418, 434 (2009) (applying the same factors for a stay).

## III. ARGUMENT

### A. Plaintiffs Are Likely To Succeed In Their APA Claims Based on The Invalid Appointments of Mr. McAleenan and Mr. Wolf

Neither Mr. McAleenan nor Mr. Wolf had valid authority to serve in their posts under the FVRA, the HSA or the Appointments Clause of the U.S. Constitution. As a result, the Final Rule has

---

[5] *Compare* 85 Fed. Reg. at 46,794 ($4.444 billion budget for FY2019/FY2020) *with* U.S. Citizenship and Immigration Services Fee Schedule, 81 Fed. Reg. 73,292, 73,323 (Oct. 24, 2016) ("2016 Fee Rule") ($3.038 billion budget for FY2016/2017); *see also* Rand Decl. ¶¶ 23-27.

"no force or effect" under the FVRA, 5 U.S.C. § 3347(a), and must be set aside under the APA. *See* 5 U.S.C. § 706(2)(A), (C), (D) (rules issued "without observance of procedure required by law," "not in accordance with law," or "in excess of statutory authority" must be set aside).

The tenures of both Mr. McAleenan and Mr. Wolf violated the FVRA. The DHS Secretary is a principal officer who must be appointed by the President, with the advice and consent of the Senate. 6 U.S.C. § 112(a)(1). The FVRA permits the Executive to fill the post with an Acting Official but for no "longer than 210 days beginning on the date the vacancy occurs," absent a pending Senate nomination. 5 U.S.C. § 3346(a)(1). The last Senate-confirmed DHS Secretary resigned on April 7, 2019. Comp. ¶ 244. That means any Acting Official in the post after November 6, 2019 was serving in violation of the FVRA's time limits. Because the Final Rule was proposed and issued by Acting Officials after that date, it "shall have no force or effect," under the FVRA.

In this case, Mr. McAleenan issued the proposed rule in violation of both the HSA and the FVRA. The HSA provides that in the event of the "absence, disability, or vacancy in office" of the Secretary, the Deputy DHS Secretary is first in the order of succession and the Under Secretary of Management is second. 6 U.S.C. § 113(a)(1)(A), (g)(1). After the Deputy Secretary and Under Secretary of Management, the HSA allows the DHS Secretary to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2). The DHS Orders provided that in the event of Secretary Nielsen's resignation, Executive Order 13753 would govern succession. Under that Order, then-CBP Commissioner McAleenan was *seventh* in the line of succession and not third, as he asserted. *See* Stretch Decl. Ex. 1 (GAO Decision). In all events, Mr. McAleenan lacked authority to issue the November Proposal because his term already exceeded the 210-day term under FVRA, and he resigned before it was published. Comp. ¶ 261.

Similarly, Mr. Wolf had no authority to approve the Final Rule on August 3, 2020. *Id.* ¶ 257. On November 8, 2019, Mr. McAleenan purported to amend the DHS Orders so he could elevate Mr. Wolf but Mr. McAleenan had no lawful authority to make that amendment. Comp. ¶¶ 249, 251. Also, Mr. McAleenan amended the Orders after the 210-day limit for Acting Officials under the FVRA. Therefore, the amendments had "no force or effect." Comp. ¶ 251; 5 U.S.C. § 3348(d)(1),

(2); *see also* Stretch Decl. Ex. 1. Even if Mr. Wolf had authority under the HSA, the Final Rule has "no force and effect" under the FVRA because Mr. Wolf approved it on 264th day of his tenure.[6]

**B.      Plaintiffs Are Likely to Succeed on the Merits of Their Other APA Claims**

**1.      Defendants Violated the Procedural Requirements of the APA**

*a.      The Proposals Failed to Disclose the Agency's Thinking and Data*

The Final Rule should be set aside because the Proposals failed to disclose adequate information about the thinking and data upon which the rule is based. *See, e.g., Becerra*, 381 F. Supp. 3d at 1173 (N.D. Cal. 2019) (citing *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 35 (D.C. Cir. 1977)). Here, "Congress intends some boundaries on the scope of the program that may be fee-funded" so the public is entitled to information sufficient to determine whether the funded activities fall within the scope of the statute. *American Medical Ass'n v. Reno*, 57 F.3d 1129, 1135 (D.C. Cir. 1995). The Proposals did not meet these standards.

At the most basic level, DHS failed to explain how the work of adjudicating applications changed so dramatically that USCIS burned through surpluses and cash reserves from previous years, and now projects an enormous deficit. Comp. ¶¶ 116-120. In FY2017, USCIS had a *positive* carryover balance of nearly $1 billion. FY2019 Congressional Budget Justification at CIS-10, CIS-IEFA-6. But then in April 2019, USCIS projected a *negative* carryover balance of more than $1 billion for FY2020. It now projects skyrocketing costs of adjudicating applications from $3.067 billion in 2017 to $4.783 billion in 2020 without explaining why costs have increased at such a meteoric and unanticipated rate. *See* Comp. ¶¶ 98-99, 121. The Proposal did not explain how DHS planned to use $672 million in funds the Final Rule would raise, leaving more than 60% of the budget unexplained. Comp. ¶ 99. Without adequate information, the public could not determine if fees would be used consistent with USCIS's statutory mandate or instead to cover functions that are "too far afield to be attributed" to adjudication services. *American Medical Ass'n*, 57 F.3d at 1135.

---

[6] If the period is measured "beginning on the date the vacancy occurs" as mandated by 5 U.S.C. § 3346—*i.e.*, from the date that the Senate-confirmed Secretary Nielsen resigned—Defendant Wolf issued the Final Rule on the 484th day of the relevant period, over twice the 210-day limit allowed by federal law.

Even for the few components of the budget the Proposals disclosed, it is unclear whether the fees collected would be used to provide adjudication services. As of 2018, USCIS interprets its mission and functions broadly to include "securing the homeland." Comp. ¶ 74. The Proposals are not clear how USCIS allocates fees for this new mission. Comp. ¶ 123.[7] Because the Proposals failed to adequately inform the public of "the terms or substance of the proposed rule," the public was deprived a meaningful opportunity to comment. 5 U.S.C. § 553(b)(3), (c).

### b. Irregular Rulemaking Prevented Meaningful Comments

The disjointed rulemaking process also impaired the public's ability to meaningfully comment on the Proposals. *See* 5 U.S.C. § 553(c); Comp. ¶ 77. DHS provided information in fits-and-spurts such that the public did not receive 60 consecutive days to prepare comments on a complete proposal but rather 32 days with one proposal, and 21 days with a different and incomplete proposal. *Id.* ¶¶ 85-86. And DHS only provided information about its cost-modeling software during an in-person meeting with a few people just one week before the final deadline for comment. *Id.* ¶ 84. The irregular comment period and partial releases of information were particularly problematic because of the rule's complexity, the variety of scenarios DHS offered, and the numerous related forms. *Id.* ¶ 105. For context, past fee rules spanned from four to forty pages in the Federal Register;[8] this Final Rule spanned more than 142 pages. Such serious deviations from standard rulemaking procedures warrant setting aside the Final Rule. *Becerra*, 381 F. Supp. 3d at 1178–79.

### 2. The Final Rule Is Contrary to Law and In Excess of Authority

The Final Rule "is not in accordance with law" and "in excess of authority" in at least three ways. 5 U.S.C. § 706(2)(A); *EBSC 2020*, 964 F.3d at 845-46 (striking down asylum bars as inconsistent with federal statutes).

---

[7] For example, the Proposals assigned $122.75 million to new staff without specifying the tasks they would perform. *Id.* ¶ 89. This is particularly troubling given the history of USCIS using staff to support CBP and ICE efforts, and the reported expansion of a USCIS "denaturalization" program that serves ICE and DOJ enforcement efforts. *Id.* ¶¶ 76, 122.

[8] *See* 63 Fed. Reg. 43,604 (Aug. 14, 1998) (7 pages); 69 Fed. Reg. 20,528 (Apr. 15, 2004) ("2004 Fee Rule") (10 pages); 72 Fed. Reg. 29,851 (May 30, 2007) ("2007 Fee Rule") (24 pages); 75 Fed. Reg. 58,962 (Sept. 24, 2010) ("2010 Fee Rule") (31 pages); 81 Fed. Reg. 73,292 (Oct. 24, 2016) ("2016 Fee Rule") (41 pages).

First, the Final Rule violates the FVRA, the HSA, and the Appointments Clause because Kevin McAleenan and Chad Wolf acted without legal authority. *See* Part III.A., *supra.*[9]

Second, the Final Rule violates the HSA's separate funding provisions and the INA's requirement that fees are to cover the cost of "adjudications." *See* Section I.B., *supra*. Contrary to these provisions, the Final Rule charges fees for activities performed by CBP and ICE. Comp. ¶¶ 145, 149-55, 160; 85 Fed. Reg. at 46,871. The Final Rule also raises funds to double the size of the Fraud Detection and National Security directorate, which is a joint effort with ICE. Comp. ¶ 149. It does not explain why it now falls on USCIS to provide twice as many people to perform these joint duties.[10] More fundamentally, it is implausible that USCIS burned through nearly $1 billion in carryover only what DHS historically considered adjudicating applications. Comp. ¶ 119. The Final Rule does not disclose how all that money was spent, but USCIS's new mission suggests it has an expansive view of its reach that crosses the HSA's dividing line between adjudication and enforcement. Comp. ¶¶ 156-60. There are at least serious questions as to whether funding this broader mission contravenes the HSA's separation of functions and funding. *See American Medical Ass'n*, 57 F.3d at 1135.

Third, the asylum fees violate the INA and international law. The INA established that "any person" who is physically present or arriving in the U.S. may seek asylum. 8 U.S.C. §§ 1101(a)(3), 1158(a); Comp. ¶ 197. Applying a fee for asylum without the possibility of a waiver violates that provision because it prevents some people from applying for asylum. It also conflicts with the U.S. commitment under the Refugee Act to accept refugees fleeing their countries, and not to return them to places where they face persecution.[11] The asylum fee is also unlawful because it is not intended for cost recovery but deterrence; deterrence is not an "adjudication service" for which USCIS can charge fees. *See* 8 U.S.C. § 1158(d)(3). Congress has already established penalties for fraudulent

---

[9] *See also* Stretch Decl. Ex. 4 (ASAP Comments) at 19-20.
[10] U.S. Citizenship & Immigr. Servs., Immigration Examinations Fee Account: Fee Review Supporting Documentation FY 2019 at 31 (Apr. 2019).
[11] Comp. ¶ 33; Stretch Decl. Ex. 4 (ASAP Comments) at 4, 8-9; Stretch Decl. Ex. 5 (Lawyers for Civil Rights Comments) at 5-6.

applications; it did not authorize USCIS to invent its own mechanisms. *See* 8 U.S.C. § 1158(d)(6). For these reasons too, the Final Rule is contrary to law and should be set aside.

### 3. The Final Rule Is Arbitrary and Capricious

#### a. The Final Rule Relies on Unexplained Calculations

The Final Rule is arbitrary and capricious because DHS failed to provide the "essential facts upon which the administrative decision was based," and justified decisions with conclusory statements rather than evidence. *Kitchens v. Dep't of Treasury*, 535 F.2d 1197, 1200 (9th Cir. 1976).

The Final Rule is meant to "bridge" an enormous new $1 billion gap between projected costs and revenues without explaining why the gap exists. *See* 84 Fed. Reg. at 62,288. It also aims to cover a $1.4 billion budget increase while leaving $659 million of the budget entirely unexplained. *See* Comp. ¶ 120, *supra* n.6. And the Final Rule reports skyrocketing costs for the adjudication of applications without accounting for the dramatic increase it projects. Comp. ¶ 121. In 142 pages, DHS does not provide any plausible explanation for why the cost of adjudicating applications has increased by more than 45% in just 3 years.[12] The lack of a plausible explanation for enormous changes in the agency's financial projections render the entire rule arbitrary and capricious. *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1109 (9th Cir. 2012) (agency action may be arbitrary and capricious if the explanation is "implausible").

The Final Rule's projected revenues are also inconsistent with projections DHS provided to Congress. DHS projected massive deficits to justify the dramatic increase in fees but then recently informed Congress that it has a surplus and not a deficit. *See* Stretch Decl. Ex. 31 (Senator Leahy July Letter). DHS has not adequately explained why the Final Rule's projections are so far from reality. At a minimum, they are too flawed to constitute a rational explanation for the fee increases based on "essential facts," or evidence beyond conclusory statements, *Kitchens*, 535 F.2d at 1200.

#### b. The Final Rule Does Not Rationally Justify Major Policy Changes

When an agency policy change "rests upon factual findings that contradict those which underlay its prior policy," or "when its prior policy has engendered serious reliance interests," the

---

[12] Calculation compares the IEFA Non-Premium Budget for FY 2017 of $3.038 billion (*see* 81 Fed. Reg. at 73,323) and the Revised IEFA Non-Premium Budget for FY 2020 of $4.556 billion (*see* 85 Fed. Reg. at 46,794).

agency must "provide a more detailed justification." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Becerra*, 381 F. Supp. 3d at 1166-68 (agency must" explain the inconsistencies between its prior findings . . . and its decision"). The Final Rule does not meet this standard.

Every fee rule to date has incorporated ability-to-pay principles.[13] As the Final Rule admits, USCIS fees "have given significant weight to the ability-to-pay principle." 85 Fed. Reg. at 46,807. This established practice aligns with congressional instructions to keep naturalization and immigration benefits affordable. *See, e.g.*, H.R. Rep. No. 115-948, at 61-62 (2018) ("USCIS is expected to continue the use of fee waivers for applicants who can demonstrate an inability to pay the naturalization fee" and "encourage[ing] USCIS to maintain naturalization fees at an affordable level"); Comp. ¶ 59. Plaintiffs have structured their service models based on the ability-to-pay principles USCIS has adhered to for decades. Byun Decl. ¶¶ 15, 25; Byrne Decl. ¶ 34; Chenoweth Decl. ¶¶ 23, 27, 33, 37; Benito Decl. ¶¶ 29-30, 40; *see* Rodgers Decl. ¶¶ 19-25.

The Final Rule reverses course for "beneficiary-pays" principles it calls "equitable." *See, e.g.*, 85 Fed. Reg. at 46,806, 46,819, 46,825, 46,890. But labeling something "equitable" does not make it so. Here, commenters explained why the new fees were not equitable but DHS disregarded their analyses and data.[14] And DHS applies the purported "beneficiary-pay" principles only inconsistently and without justifying deviations. *See Am. Fed'n of Gov't Emps., Local 2924 v. FLRA*, 470 F.3d 375, 380 (D.C. Cir. 2006) (action "'illogical on its own terms" is arbitrary and capricious."). For example, DHS deviates from the model to benefit religious organizations (I-360 form), *see* 85 Fed. Reg. at 46,841, and American families adopting children from overseas (I-600A/600 Supplement 3), *see id.* at 46,850; 84 Fed. Reg. at 62,313. In all events, DHS previously considered the ability-to-pay model more equitable and has not reasonably explained why it changed its view. *See* 63 Fed. Reg. at 43,607.

---

[13] *See* 2004 Fee Rule, 73 Fed. Reg. at 20,528 ("Any applicant or petitioner who has an 'inability to pay' the fees may request a waiver."); 2007 Fee Rule, 72 Fed. Reg. at 29,861 (describing factors USCIS analyzes to determine inability to pay); 2010 Fee Rule, 75 Fed. Reg. at 58,973 (explaining USCIS waives fees "because a large percentage of applicants clearly would be unable to pay"); 2016 Fee Rule, 81 Fed. Reg. at 73,297 (offering fee waivers because USCIS fees "may be overly burdensome on applicants").

[14] Stretch Decl. Ex. 6 (NWG Comments) at 25; Stretch Decl. Ex. 10 (Justice Center Comments) at 5; Stretch Decl. Ex. 11 (Boundless Comments) at 49.

DHS also claims that it does not believe its move to a beneficiary-pays model will prevent anyone from receiving immigration benefits. 85 Fed. Reg. at 46,806. But DHS previously offered fee waivers because "a large percentage of applicants would clearly be unable to pay" the fees. 75 Fed. Reg. at 58,973. Even now, DHS acknowledges, "Limiting fee waivers may adversely affect some applicants' ability to apply for immigration benefits." *Id.* at 46,891. And it recognizes that the new asylum fee may "deter" some applicants. *See* RIA at 153. These contradictions undermine DHS purported "belief" that a beneficiary-pays model will not prevent anyone from applying for benefits.

### c.    The Final Rule Ignores Data in the Record.

DHS falsely asserts that it does not have data on critical issues when in fact the data was provided to DHS in comments. These false assertions include[15]:

- DHS "does not have data indicating that individuals will delay submitting applications and petitions in response to the fee waiver policy."[16]
- DHS "does not have data indicating that its fees will impede naturalization."[17]
- DHS asserts it does not have data indicating that its fees will deter asylum applications (despite its expressed intent for this result, see Part III.B.3.d, *infra*).[18]
- DHS asserts it does not have data indicating that the rule will have any impact on disposable income or the poverty of certain families and children, including U.S. citizen children.[19]

---

[15] Multiple comments provide data; this list is not meant to be exhaustive but instead representative.
[16] *Compare* 85 Fed. Reg. at 46,807 *with* Stretch Decl. Ex. 7 (RHF Comments) at 2 (research shows fee waiver led to 75,000 increase in naturalization applications), Ex. 8 (Lutheran Comments) at 6 (research shows fee waivers increase naturalization), Ex. 11 (Boundless Comments) at 6-7 (availability of fee waivers has a dramatic effect on naturalization rate).
[17] *Compare* 85 Fed. Reg. at 46,798 *with* Stretch Decl. Ex. 6 (NWG Comments) at 6 (decision by an immigrant to naturalize is price sensitive), Ex. 9 (OneAmerica Comments) at 2-4 (describing data on number of individuals eligible to naturalize and relationship to Federal Poverty Guidelines), Ex. 10 (Justice Center Comments) at 4 (price increases for naturalization in 2004 and 2007 were a significant barrier to citizenship for lower income immigrants) *and* Pastor Decl. ¶¶ 14-17.
[18] *Compare* U.S. Citizenship & Immigr. Servs., Regulatory Impact Analysis on U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, Final Rule at 152-53 (July 22, 2020) ("RIA") *with* Stretch Decl. Ex. 4 (ASAP Comments) at 6-7 (asylum seekers often arrive with few, if any, financial resources), Ex. 10 (Justice Center Comments) at 2 (individuals lacking financial resources will effectively be barred from filing asylum applications), Ex. 12 (NIRP Comments) at 10 (asylum application fees can represent a significant obstacle for individuals who recently arrived in the U.S. and who do not have authorization to work).
[19] *Compare* 85 Fed. Reg. at 46,906 *with* Stretch Decl. Ex. 13 (ILRC Comments) at 8 (proposed fee increase would force a family to make the unconscionable choice of which family member can apply for and possibly attain asylum), Ex. 14 (CLINIC Comments) at 10, Ex. 15 (ILAP Comments) at 2 (proposed lawful permanent residency application costs is cost prohibitive for a family of five).

NOTICE OF MOT. & MOTION FOR PRELIMINARY INJUNCTION - CASE NO. 4:20-CV-05883-JSW

DHS's refusal to address the data demonstrates a lack of rational decisionmaking. *See, e.g., Ctr. for Biological Diversity*, 698 F.3d at 1109.

### d. The $50 Fee on Asylum Applications Is Arbitrary and Capricious

For the first time in U.S. history, the Final Rule imposes a non-waivable fee for asylum applications. Until now, DHS consistently interpreted the INA as directing USCIS not to charge a fee for asylum. Comp. ¶ 67. The public relied on this steady historical practice. Comp. ¶ 311. Now, DHS does not even acknowledge the change, much less explain it in a rational way that is consistent with the INA, or takes reliance into account. *See Fox*, 556 U.S. at 515. Instead, DHS says it expects the asylum fee to deter what it considers "frivolous" asylum applications. *See* RIA at 152-53. But deterrence is not a factor Congress "intended for [DHS] to consider." *See Ctr. for Biological Diversity*, 698 F.3d at 1109. Also, Defendants offer no data to show that those with legitimate claims are more likely to have fifty dollars than those with frivolous claims. Commenters suggest the opposite is true; refugees most in need of asylum protections will have the fewest resources. *Supra* n. 18. *See Cal. Energy Comm'n v. Dep't of Energy*, 585 F.3d 1143, 1152 (9th Cir. 2009) (agency action is arbitrary and capricious if contrary to "common sense"). In all events, Congress could not have intended DHS to factor "deterrence" of "frivolous" filings into application fees because it has specifically legislated other penalties for that purpose. 8 U.S.C. § 1158(d)(6).

Defendants' assertions are also internally inconsistent. Defendants say they have no data to indicate that the $50 fee would impede asylum applicants. *See* 85 Fed. Reg. at 46,882, 46,895, but that is not true.[20] DHS previously concluded that fee exemptions were necessary because "a large percentage of applicants would clearly be unable to pay" for services such as "refugee and asylum processing." 75 Fed. Reg. at 58,973. The Final Rule thus "runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).

### e. The Naturalization Fees Are Arbitrary and Capricious

The naturalization fee increase combined with the elimination of fee waivers for most applicants reverses past practice without rational justification, and shows DHS "entirely failed to

---

[20] *See, e.g.*, Stretch Decl. Ex. 16 (Immigration Equality Comments) at 3 n.3, Ex. 18 (IRAP Comments) at 5-8 (same), Ex. 17 (Latino Justice Comments) at 8 n.30; *see also supra* n.18.

consider an important aspect of the problem," *State Farm*, 463 U.S. at 43. In particular, the Final

Rule asserts that "the price elasticity for immigration services is inelastic" because "immigration to

the United States remains attractive to millions of individuals around the world," and so "increases

in price will have no impact on the demand for these services." 85 Fed. Reg. at 46,797. But DHS

then admits it "does not know the price elasticity of demand for immigration benefits, nor does DHS

know the level at which the fee increases become too high for applicants/petitioners to apply." *Id.*

DHS's failure to calculate price elasticity defeats the exercise of setting fees because if volume

substantially decreases, revenue will too.[21] DHS ignores data in the record showing that their

changes could decrease demand so much that the Final Rule will defeat its own purpose.[22] DHS's

statements also defy its previous conclusions supporting fee waivers. *See supra* at n.13.

The Final Rule also fails to adequately justify a major policy shift from ability-to-pay to

beneficiary-pays principles in the naturalization context. Naturalization was offered at significantly

below cost "in recognition of the social value of citizenship." 85 Fed. Reg. at 46,799. The Final Rule

does not offer a rational justification for suddenly discounting that value in the analysis. *See Fox*,

556 U.S. at 515.[23] That failure renders this new approach to naturalization arbitrary and capricious.

## C. The Final Rule Will Irreparably Harm Plaintiffs

The Final Rule causes "a significant change in [Plaintiffs'] programs and a concomitant loss

of funding absent a preliminary injunction enjoining enforcement of the Rule." *EBSC 2020*, 950

F.3d at 1280. Plaintiffs are nonprofit organizations dedicated to promoting immigrant integration and

progress in the U.S.;[24] to advance their mission, they help low-income immigrants apply for

immigration benefits, including naturalization and asylum.[25] Plaintiffs have developed models for

---

[21] DHS's position on inelasticity ignores 200 years of free-market economic theory demonstrating that when prices go up beyond the rate of inflation, demand goes down. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019) (the Court is "not required to exhibit a naiveté from which ordinary citizens are free.").

[22] *See, e.g.*, Stretch Decl. Ex. 13 (ILRC Comments) at Attach. E p. 3 n.5.

[23] Unlike the current approach, the agency's previous recognition of the social value of citizenship comports with legislative intent as expressed in the INA. Comp. ¶¶ 44-46.

[24] *See* Chenoweth Decl. ¶¶ 2-3; Rodgers Decl. ¶¶ 2-3; Salas Decl. ¶ 2; Stolz Decl. ¶¶ 2-3; Smith Decl. ¶¶ 3-4; Byun Decl. ¶¶ 2-4; Byrne Decl. ¶¶ 2-4, 6; Benito Decl. ¶¶ 2-5. Their operations span 36 states and the District of Columbia. *See* Chenoweth Decl. ¶¶ 12-13; Rodgers Decl. ¶ 4; Salas Decl. ¶ 2; Stolz Decl. ¶ 5; Smith Decl. ¶ 4; Byun Decl. ¶ 2; Byrne Decl. ¶ 5; Benito Decl. ¶ 8.

[25] Chenoweth Decl. ¶¶ 2-3, 32; Rodgers Decl. ¶¶ 2, 24; Salas Decl. ¶¶ 2, 14; Stolz ¶¶ 2-3, 33; Smith Decl. ¶¶ 3-5, 7; Byun Decl. ¶¶ 2-5, 14; Byrne Decl. ¶¶ 2-4, 6, 27; Benito Decl. ¶¶ 5, 13.

---

delivery of services that rely on the ability-to-pay principle USCIS adhered to for decades. *See* Chenoweth Decl. ¶ 23; Smith Decl. ¶ 19; Byrne Decl. ¶ 34. Many rely on grants that require them to submit a certain number of applications each year. *See, e.g.,* Stolz Decl. ¶¶ 12-15; Benito Decl. ¶¶ 14-15. The Final Rule will immediately slash the number of immigrants able to submit applications through Plaintiffs' programs. *See* Rodgers Decl. ¶ 24; Stolz Decl. ¶¶ 24-27; Chenoweth Decl. ¶¶ 51-53; Smith Decl. ¶ 8. Many Plaintiffs will not be able fulfill grant requirements and their reputations will suffer. *See* Rodgers Decl. ¶ 25; Stolz Decl. ¶ 28; Chenoweth Decl. ¶¶ 39, 42; Smith Decl. ¶ 8.

The Final Rule forced Plaintiffs to divert resources toward submitting as many applications as possible now despite the strain on staff (Smith Decl. ¶ 38; Stolz Decl. ¶ 34; Byun Decl. ¶ 29); developing training materials (Chenoweth Decl. ¶¶ 42-49; Rodgers Decl. ¶¶ 26, 28; Smith Decl. ¶ 40); conducting community outreach (Stolz Decl. ¶ 34; Salas Decl. ¶ 24); and reassessing budgets. Salas Decl. ¶¶ 23-26; Rodgers Decl. ¶¶ 29-32.[26] If the Rule takes effect, Plaintiffs will be forced to pay the fees for asylum applicants to continue serving them. *See* Smith Decl. ¶¶ 23-27; Byrne Decl. ¶ 24; Salas Decl. ¶¶ 29-33. Some, including CHIRLA members will not apply and others will have to wait, delaying voting and family unification. Smith Decl. at ¶¶ 32-33; Salas Decl. at ¶¶ 29- 31.

### D. The Equities and Public Interest Factors Tip Sharply In Plaintiffs' Favor

"The balance of the equities tip in [Plaintiffs'] favor and [] an injunction is in the public interest." *Winter v. Nat. Resources Defense Council*, 555 U.S. 7, 20 (2008). USCIS currently enjoys a surplus of $416,044,074.[27] Record evidence suggests that the volume of applications could *decrease* if the Final Rule goes into effect and negate potential gains from fees. *See supra* 16-17 & accompanying text. And USCIS admits the asylum fee has no net financial benefit. 85 Fed. Reg. at 46,894.[28]

On the other hand, an injunction will serve the public interest. The Final Rule will prevent

---

[26] *See also* Stolz Decl. ¶¶ 35-39; Smith Decl. ¶¶ 38-42; Byun Decl. ¶¶ 16, 18, 22, 28; Byrne Decl. ¶¶ 33-39; Benito Decl. ¶¶ 26, 39-42.

[27] *See* U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigr. Servs., *Immigration Examinations Fee Account: Fiscal Year 2019 Report to Congress, Statement of Financial Condition*, at 11 (June 23, 2020).

[28] *See also Rudebusch v. Hughes*, 313 F.3d 506, 517 (9th Cir. 2002) ("no compelling government interest" in adjusting salaries where no data supported the decision); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting "substantial public interest" in having federal agencies abide by the law).

vulnerable low-income individuals from applying for essential immigration benefits.[29] The new, non-waivable fees on asylum and work authorization will block access to humanitarian protections,expose vulnerable people to the risk of detention and forced return to danger,[30] and erect a hurdle to self-sufficiency that few can clear.[31] In addition, more than a million low-income permanent residents will likely be deterred from applying for citizenship over the next five years.[32] This will harm cities and states,[33]and the public at-large will suffer because increased wages generated by naturalization yield more federal, state, and local taxes.[34] Making naturalization less accessible also delays or prevents family unification because U.S. citizens can more easily sponsor family members from abroad for immigrant visas,[35] and prevents low-income immigrants from voting, serving as jurors, and running for elected office.[36] These harms are irreparable.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a preliminary injunction preventing implementation of the Final Rule or staying its effective date.

---

[29] *See* 85 Fed. Reg. at 46,894 ("Some applicants may not be able to afford this fee and will no longer be able to apply for asylum."); Stretch Decl. Ex. 12 (NIRP Comments) at 10 (fees bar access to asylum); Stretch Decl. Ex. 14 (CLINIC Comments) at 20-21 (same); Ex. 22 (NILC Comments) at 6 & Ex. A at 4-5 & n.4.
[30] Stretch Decl. Ex. 14 (CLINIC Comments) at 19-21; Ex. 28 (Seattle Comments) at 11-12.
[31] Stretch Decl. Ex. 24 (San Antonio Comments) at 6-7; Ex. 14 (CLINIC Comments) at 22-23.
[32] Lawrence Decl. ¶ 7.
[33] Stretch Decl. Ex. 23 (Philadelphia Office of Immigrant Affairs Comments) at 13-14; Ex. 24 (San Antonio Comments) at 2-5; Ex. 25 (LIRS Comments) at 5-6 (citing Manuel Pastor and Justin Scoggins, Citizen Gain: The Economic Benefits of Naturalization for Immigrants and the Economy (2012)); Ex. 12 (NIRP Comments) at 302 at 2.
[34] Stretch Decl. Ex. 13 (ILRC Comments) at 6, 18-19; Ex. 33 (San Francisco Comments) at 1-2.
[35] *See* Stretch Decl. Ex. 27 (ACRS Comments) at 25 & n.103 at 12; Ex. 25 (LIRS Comments) at 5.
[36] Stretch Decl. Ex. 8 (Lutheran Comments) at 5 & n.11 (citing Pastor & Scoggins, *supra*); Stretch Decl. Ex. 28 (Seattle Comments) at 6 at 2; *see also* Ex. 24 (San Antonio Comments) at 3; Ex. 33 (San Francisco Comments) at 2.

NOTICE OF MOT. & MOTION FOR PRELIMINARY INJUNCTION - CASE NO. 4:20-CV-05883-JSW

Dated: August 25, 2020.

Respectfully submitted,

*/s/ Brian J. Stretch*

Jesse Bless (*pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G Street, Suite 300
Washington, D.C. 20005

Brian J. Stretch, SBN 163973
bstretch@sidley.com
Naomi Igra, SBN 269095
naomi.igra@sidley.com
Chelsea Davis, SBN 330968
chelsea.davis@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Samina M. Bharmal (*pro hac vice*)
sbharmal@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

*Attorneys for Plaintiffs*