Brian J. Stretch, SBN 163973
bstretch@sidley.com
Naomi A. Igra, SBN 269095
naomi.igra@sidley.com
Chelsea Davis, SBN 330968
chelsea.davis@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, California 94104
Telephone: +1 415 772-1200
Facsimile: +1 415 772-7400

Jesse Bless (*pro hac vice*)
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G Street, Suite 300
Washington, D.C. 20005

Samina M. Bharmal (*pro hac vice*)
sbharmal@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
Telephone: +1 202 736 8000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND

IMMIGRANT LEGAL RESOURCE CENTER;
EAST BAY SANCTUARY COVENANT;
COALITION FOR HUMANE IMMIGRANT
RIGHTS; CATHOLIC LEGAL IMMIGRATION
NETWORK, INC.;  INTERNATIONAL
RESCUE COMMITTEE; ONEAMERICA;
ASIAN COUNSELING AND REFERRAL
SERVICE; ILLINOIS COALITION FOR
IMMIGRANT AND REFUGEE RIGHTS,

        Plaintiffs,

    v.

CHAD F. WOLF, *under the title of Acting
Secretary of Homeland Security*; U.S.
DEPARTMENT OF HOMELAND SECURITY;
KENNETH T. CUCCINELLI, *under the title of
Senior Official Performing the Duties of the
Deputy Secretary of Homeland Security*; U.S.
CITIZENSHIP & IMMIGRATION SERVICES,

        Defendants.

Case No. 4:20-cv-05883-JSW

**DECLARATION OF LAWRENCE BENITO**

**DECLARATION OF LAWRENCE BENITO**

I, Lawrence Benito, declare as follows:

1.      I am CEO and Executive Director of the Illinois Coalition for Immigrant and Refugee Rights ("ICIRR" or "organization"), in Chicago, Illinois. The information in this declaration is based on my personal knowledge and on data that ICIRR maintains in its ordinary course of business.  Before becoming Executive Director in 2012, I was the Deputy Director at ICIRR for seven years, during which time I oversaw the organizational program and political operations. I have worked at ICIRR for a total of 17 years.

### ICIRR's Mission, Programs, and Funding

2.      ICIRR is a nonprofit, nonpartisan statewide organization in Illinois dedicated to promoting immigrants' and refugees' rights to participate fully and equally in the civic, cultural, social, and political life of our diverse society. ICIRR is driven by the belief that immigrants should have the opportunity to seek protection in the United States, gain lawful status, and become U.S. citizens.

3.      ICIRR is a coalition of more than 100 member organizations throughout Illinois that advocates on behalf of immigrants and refugees at the local, state, and federal levels. In partnership with its member organizations, ICIRR educates and organizes immigrant and refugee communities to assert their rights; promotes citizenship and civic participation; monitors, analyzes, and advocates on immigrant-related issues; and informs the general public about the contributions of immigrants and refugees. ICIRR has advocated for policy changes that protect immigrant families from deportation and separation, and uphold their rights to due process and equal protection under the law.

4.      Our administrative advocacy with USCIS (or with its predecessor Immigration and Naturalization Service, until March 2003) has included advocating for reducing citizenship processing backlogs, commenting on previous proposed fee schedules, and engaging in the process to redesign the naturalization test. ICIRR is a member of the Fair Immigration Reform Movement ("FIRM"), the New Americans Campaign ("NAC"), and the Naturalization Working Group, all of which actively advocate on issues regarding citizenship and immigration.

5.      ICIRR fulfills its mission through a variety of projects, including but not limited to its current programs: the New Americans Democracy Project (a nonpartisan citizen voter registration, education, and mobilization campaign aimed at engaging and building power for the immigrant community); the Immigrant Health Access Initiative (a program that combines active community education, capacity building, and coordinated policy and advocacy to promote access to healthcare and insurance); the Immigrant Family Resource Program (a partnership between the Illinois Department of Human Services, ICIRR, and dozens of community-based organizations to support access to public benefits for eligible immigrants); the Family Support Network and hotline (which connects families in crisis, including those whose family members have been detained by Immigration and Customs Enforcement, with reliable and immediate information on available services); and the New Americans Initiative ("NAI"), discussed in more detail below.

6.      ICIRR administers the NAI, in partnership with the Illinois Department of Human Services, to fund local collaborations of community organizations that promote citizenship, conduct outreach, provide civics and English-as-a-second-language classes, and organize workshops to assist long-term legal immigrants in completing their naturalization applications. ICIRR, through NAI, has also assisted immigrant youths in applying for and renewing their benefits under the Deferred Action for Childhood Arrivals ("DACA") program.

7.      The NAI uses grassroots and media outreach in 59 different languages to provide legal screening, application process, and English- and citizenship-test preparation services to immigrants throughout Illinois. A crucial part of ICIRR's role in administering the NAI consists of providing training to help sub-grantee partner organizations manage these workshops effectively as well.

8.      ICIRR administers the NAI through a funding grant ("NAI Grant") from the state of Illinois in the amount of roughly $5 million annually. As the NAI administrator, ICIRR re-grants the vast majority of those funds to forty-nine organizations throughout Illinois so that they may complete citizenship applications, run citizenship workshops, and recruit volunteers. ICIRR provides training, oversight, and other guidance to these affiliate organizations, and undertakes general responsibilities related to administering the NAI Grant. Our NAI partner organizations are based in and serve Chicago,

Aurora, Bloomington/Normal, Bolingbrook, Bridgeview, Champaign, Elgin, Joliet, Melrose Park, Moline, the Northwest Suburbs, Rockford, and Waukegan.

9.      Sixty percent of ICIRR's 49 NAI partner organizations (30 out of 49) utilize workshop models in their program design. A naturalization workshop is a one-day community event that brings professionals and trained volunteers together to assist Lawful Permanent Residents ("LPRs") in completing the N-400 naturalization applications, including fee waiver requests. The workshop is an essential tool for efficiently and effectively providing naturalization assistance to large numbers of people. The success of the workshop model depends on careful planning, thorough training of staff and volunteers, and high-quality services.

10.     ICIRR provides training for those partners organizing and hosting workshops as well as for volunteers and staff who assist trainees in completing their naturalization applications. ICIRR conducts quarterly training meetings for partners' staff and volunteers.

11.     ICIRR's NAI Grant requires that the citizenship services provided with the state funds target low-income, Limited English Proficient ("LEP") immigrants/refugees, seniors, women, and youth with special needs. ICIRR estimates that at least 50 percent of naturalization applicants served through NAI qualify to request a full or partial fee waiver. Furthermore, since the average income of applicants served is $18,648, many applicants who could afford a $640 fee will be unable to afford a $1,170 fee.

**Program Funding and Deliverables**

12.     The Illinois General Assembly renews the NAI Grant every year. As the program's administrator, ICIRR is responsible for receiving and reviewing monthly reports from the 49 sub-grantee partner organizations, consolidating those reports, and transmitting a single NAI Grant report to the state of Illinois for each quarter of the year. An annual report is also due once a year.

13.     The NAI Grant Agreement attaches certain conditions to the funding. ICIRR is required to administer the New Americans Initiative and to supervise its sub-grantees in carrying out this important work. The NAI Grant Agreement requires that the "[p]riority target population" for ICIRR partners' services "must be low-income, Limited English Proficient (LEP) immigrants/refugees, seniors, women and youth with special needs." The Agreement also requires that ICIRR and its partners provide

three distinct types of services: "a) Community education and outreach; b) English language classes for citizenship language test and Citizenship civic education classes; and [c]) Assistance, including legal guidance, with the U.S. citizenship or DACA application preparation/submission and interview process, and assistance with a fee waiver application."

14.     In return for providing the NAI Grant funds, the state of Illinois expects that ICIRR's sub-grantee partner organizations complete on average 247 N-400 naturalization applications on behalf of Illinois residents each year, and that ICIRR, through its partners, complete at least 1,855 such applications in the aggregate each quarter. This means that the state expects ICIRR and its partners to complete at least 7,423 N-400s, N-600s, or DACA applications on behalf of Illinois residents each year.

15.     Furthermore, the NAI Grant Agreement requires that ICIRR, through its sub-grantees, meet certain requirements for deliverables, including: reaching 15,327 distinct individuals through community outreach services; serving 3,667 distinct individuals through English-language and civic-education classes; and helping 7,423 distinct individuals to complete naturalization/DACA applications. Similarly, the NAI Grant Agreement lists as "Performance Standards" that the sub-grantees perform 80%, 70% and 70% of these three categories, respectively, to be meeting "performance standards." If NAI sub-grantees fall below these performance standards, ICIRR works with the sub-grantee to increase application volume by improving practices and procedures, or ultimately discontinues sub-grant funding with that sub-grantee.  The state legislature considers the past performance of ICIRR and its sub-grantees when determining new funding levels for future grant cycles.

16.     As the NAI Administrator, ICIRR must exercise oversight over sub-grantee partners, including, among other things: reviewing and approving the partners' budgets, budget narratives, and work plans for NAI work; monitoring their work to ensure compliance with contractual and budgeting requirements (including conducting at least one programmatic audit on program activities each fiscal year); conducting quarterly trainings on program and reporting requirements, as well as providing technical assistance to ensure that the community providers provide quality services and are able to meet production goals; collecting and reviewing monthly financial reports from the sub-grantees; collecting and reviewing monthly programmatic reports of the partners' activities, including citizenship

applications, media campaigns, and community education activities; coordinating services provided through an 800 number for use by potential NAI service recipients; conducting a multi-language media campaign to educate low-income LEP immigrants/refugees on the NAI program; preparing and submitting monthly program reports to Illinois Department of Human Services; and submitting regular application, outreach, and education reports.

17.     The terms of the NAI Grant provide that the state of Illinois, through its Department of Human Services, "may increase or decrease the contract at any time during the term, subject to funding availability and/or satisfactory performance of services." Since the NAI Grant is allocated through legislation, the Illinois General Assembly may simply decline to renew the NAI Grant for any reason. The program has been renewed for fiscal year 2021, but not yet for fiscal year 2022.

**Provisions of the Rule**

18.     I am familiar with the "U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements" (the "Rule"). It is my understanding that the Rule would restrict the ability of applicants to obtain certain immigration benefits by increasing fees and limiting access to fee waivers.

19.     In particular, the Rule would increase fees for N-400 naturalization applications by paper from $640 to $1,170, which is an 83 percent increase. At the same time, the Rule will decrease the fee to renew permanent resident status on form I-90 by paper from $455 to $415, which is a 9 percent decrease. Partial fees will no longer be available for N-400 applications. For applicants who would have qualified for the partial fee, the Rule increases the N-400 fee for filing by paper from $320 to $1,170, which is an increase of 226%.

20.     Table 3 of the Rule shows the limited categories of applicants who are eligible for fee waivers under the Rule. Most applicants will no longer be eligible for fee waivers for any forms, including N-400 naturalization applications, I-765 applications for employment authorization, and I-485 applications for permanent residence. The Rule also changes the requirements to qualify for a fee waiver. The Rule reduces the number of fee waivers available by allowing fee waivers only for those applicants who have household incomes at or below 125% of the federal poverty guidelines. Currently,

applicants may be eligible for a fee waiver if they receive a means-tested benefit, have household incomes at or below 150% of the federal poverty guidelines, or can establish financial hardship. The Rule limits USCIS's own future discretion to change its approach to fee exemptions or waivers.

21.     The Rule also imposes a new mandatory fee of $50 on applications for asylum, a new $550 fee (plus a $30 biometric fee) for the first I-765 application for employment authorization filed by asylum applicants, increases the fee for I-765 (non-DACA) applications for employment authorization from $410 to $550, and increases the fee for children's I-485 applications for permanent resident from $750 to $1,130, which is an increase of 51%. Although the Rule purports to not increase the I-765 application for employment authorization for DACA recipients, holding the fee at $410 for DACA recipients still represents an increase in cost as a practical matter due to the effect of USCIS's decision to decrease the validity period of employment authorization for DACA recipients from two years to one year. This means that DACA recipients will have to pay $820 for I-765 applications plus $170 for biometrics fees for a total of $990 to maintain employment authorization for two years.

22.     The Rule will also unbundle certain fees, which will result in a sharp increase in fees for applicants for permanent residency who are also applying for interim benefits. Since 2007, DHS has charged a flat rate for a bundle of applications for those seeking lawful permanent residency. The flat fee of $1,140 covered the application for permanent residency (I-485), an employment authorization application (I-765), and application for travel document (I-131). A flat fee of $750 covered the same three documents for children under 14. The Rule will require applicants to pay fees for each application and eliminate the flat fee for these bundled applications.

23.     The Rule would also require a $30 fee for biometric services on applicants for Temporary Protected Status ("TPS").

24.     On December 9, 2019, ICIRR submitted a comment in opposition to DHS's proposed Rule, DHS Docket No. USCIS-2019-0010. ICIRR also signed on to a comment in opposition to DHS's proposed Rule submitted on December 30, 2019, by the Naturalization Working Group.

25.     It is my understanding that the Rule will take effect on October 2, 2020.

**Effects of Rule on ICIRR and Sub-Grantees**

26.     The Rule disproportionately harms the low-income immigrants ICIRR and its sub-grantees serve. The Rule has immediately harmed ICIRR's ability to carry out its operations and will continue to do so. Sub-grantee workplans and budgets will need to be revised to account for the dramatic decrease in applications that will be submitted once the Rule takes effect. Because of ICIRR's contractual administrative responsibilities, ICIRR will necessarily allocate staff time and resources to request revised workplans and budgets, and to provide technical assistance to sub-grantees to come up with realistic objectives and submit revised budgets, and to re-issue sub-grant contracts. The time ICIRR staff spends on these tasks will necessarily be diverted from planning and executing other critical training and technical assistance for sub-grantee organizations.

27.     Eliminating the fee waivers for almost all applicants while simultaneously increasing naturalization application fees will immediately devastate the NAI's core mission as carried out by ICIRR and its partner organizations. ICIRR and its partners anticipate being able to serve far fewer low-income and vulnerable people in completing naturalization applications and DACA applications. Additionally, ICIRR and its partners anticipate that partners will experience a 50% reduction in the number of people who will attend citizenship workshops and ultimately submit naturalization applications. Our analysis of this reduction is based on the 50 percent of prior naturalization applicants who needed a partial or full fee waivers to afford the cost of the application. This will lead to a marked decrease in the ability of ICIRR's partners to meet their deliverables and will put the overall grant amount in jeopardy.

28.     This harm to our organizational mission will be immediate and compound over time. Even if the Rule were held invalid at a future date, the significant interim decrease in volume during the Rule's effective period would place our ultimate deliverables-requirements out of reach for the relevant years. ICIRR and its sub-grantees lack the staff or resources to make up lost volume sufficient to overcome these shortfalls in a shortened period of time.

29.     In conjunction with the elimination of the fee waiver for most applicants, the dramatic fee increases will render the workshop business model that ICIRR and its partners use unsustainable and

DECLARATION OF LAWRENCE BENITO – Case No. 4:20-cv-05883-JSW

require significant changes to have a chance at remaining viable and effective. Our sub-grantee organizations have an average of 45 attendees at each naturalization workshop; once our organizations are able to begin holding workshops again,[1] we estimate a 40% reduction in attendees on average, which may cause us to reassess our workshop model moving forward. If the workshop model remains viable following the Rule's implementation, ICIRR will need to undertake extensive work and expense to account for those changes, given that these workshops utilize many volunteers and pro-bono attorneys in order to keep costs low.

30.     These two changes—eliminating the fee waivers for most applicants while increasing naturalization application fees—will mean, in particular, that far fewer people will make the effort to attend ICIRR NAI workshops. Even if, against all odds, the same number of people attended workshops, a far lower number of those individuals—no more than 50 percent—would be able to ultimately submit the naturalization application.

31.     Without waivers available for most applicants, applicants for naturalization would either forego applying or wait significantly longer to save up to apply to apply for citizenship to which they are already legally entitled. The 83% fee increase in conjunction with the nearly total fee-waiver elimination will exacerbate the hardships that these vulnerable applicants face.

32.     The Rule will immediately prevent ICIRR and its partners from serving 3,667 distinct individuals through English-language and civic-education courses, as required by the NAI Grant Agreement. By contract, these courses must be focused on preparing eligible immigrants and refugees for the U.S. citizenship language exam and the naturalization process. However, at least 50% fewer, otherwise eligible, immigrants will be interested in naturalizing due to the prohibitive fee increases, and so fewer potential NAI service recipients will attend these classes.

33.     Even if ICIRR and its partners wished to do so, the NAI Grant Agreement's terms limit their ability to shift focus away from serving low-income individuals, in order to meet application requirements, toward focusing on higher-income individuals able to pay the increased fees in full. The

---

[1] Our sub-grantees have been forced to cancel workshops temporarily in light of the COVID-19 pandemic. We anticipate resuming these workshops once permissible under Illinois law.

DECLARATION OF LAWRENCE BENITO – Case No. 4:20-cv-05883-JSW

NAI Grant Agreement specifically requires ICIRR and its partners to target "low-income, Limited English Proficient (LEP) immigrants/refugee, seniors, women and youth with special needs." These individuals are the groups least likely to be able to afford increased fees. Thus, there is little ICIRR and its partners can do to mitigate the Rule's impact on their NAI Grant deliverables.  Accordingly, we must confront and plan for the impact of the Rule now, including considerations of staff and our budget.

34.     Once ICIRR and its partner organizations realize a 50% drop of volume —a conservative estimate—that loss would significantly endanger our and our partners' overall funding level. ICIRR and its partners would not be able to meet the state's expectations for aggregate completed applications, and would fall short of the 70% "Performance Standards" imposed by the NAI Grant Agreement. The shortfall would be reflected on ICIRR's next set of monthly reports to the state, and we would need to take corrective action to help the sub-grantees address that shortfall. This would almost certainly lead to lost funding, in whole or in part, during the next yearly grant cycle review process, for fiscal year 2021, or (at the very least) ICIRR would be forced to expend time and resources to take further corrective actions. The last time USCIS fees increased (in 2016, by a much smaller amount than the current Rule's increases), our application volumes dropped such that, though we were able to maintain funding levels, we had to expend time and effort to convince the state to not impose corrective action on ICIRR. The fee increases instituted by the current Rule are much greater than the 2016 increases; paired with concomitant elimination of most fee waivers, we estimate the Rule's effect on our volume will be devastating. Without such funding, ICIRR would have to cut down its list of partners and must confront the possibility of closing the NAI altogether.

35.     The decline in naturalization applications will diminish our ability to meet our other deliverables as well. For example, with fewer low-income immigrants in Illinois submitting naturalization applications, there will be a concomitant decline in the attendance at our English-language and civic-education courses for those preparing for the citizenship test, which will prevent our sub-grantees from serving the required 3,667 distinct individuals with these courses.

36.     Unfortunately, ICIRR's injuries are based on actual experience as well. Five years ago, in 2015, a state-budget impasse caused ICIRR to temporarily lose its NAI Grant funding—with

catastrophic results. ICIRR was forced to lay off most of its NAI-related staff; to cut funding to certain grantees; and to eliminate funding to certain grantees altogether. The funding loss, even though only temporary, significantly disrupted ICIRR's ability to carry out its mission through its chosen programs and affiliate organizations. Any lost funding would similarly disrupt ICIRR's work today.

37.    The Rule poses a far more dramatic move that will frustrate ICIRR's ability to carry out other core objectives. For example, ICIRR purposefully selects sub-grantees to receive NAI Grant funds who, to the extent possible, also have the ability to provide other immigration benefits to citizenship applicants, such as family petitions and green-card applications. This allows us to effectuate both the NAI's objectives as well as broader immigration-related objectives shared by ICIRR and the State of Illinois. Losing the NAI Grant funding would materially impair this practice; we would be forced to cut funding to some such partners. This would inevitably make immigration benefits less available to Illinois residents, particularly low-income residents.

38.    The Rule will immediately disrupt ICIRR's ability to carry out its organizational mission of promoting civic participation and voting rights among Illinois' immigrants. Fewer immigrants will be able to afford to naturalize, and so there will be fewer new citizens in Illinois for ICIRR's voting-rights operations to assist. ICIRR's voter registration occurs through volunteers, particularly at naturalization ceremonies. If fewer immigrants naturalize, ICIRR would have to expend additional money for outreach to simply locate new citizens who have not yet registered to vote. Some of ICIRR's partners devote resources to media buys to increase attendance at citizenship workshops, or hire outreach workers. Outreach work will be more resource-intensive and far less fruitful if the Rule takes effect, and may even need to be eliminated entirely.

39.    The Rule has forced, and will continue to force, ICIRR to divert significant resources from its other programs and operations. In anticipation of this Rule, ICIRR staff members invested time lobbying the state of Illinois to set aside funding to pay immigrants' naturalization fees directly. Our internal projections estimate that a grant of roughly $2 million would be necessary to cover the shortfall for NAI beneficiaries. In a state where budget margins are historically tight—and will continue to be

tight—obtaining any such funding would require ICIRR to direct additional time and money towards lobbying efforts.

40.     Even if the NAI program were to survive in some form, ICIRR and its partners would necessarily need to divert funding from other programs and operations to make up any shortfall in the NAI Grant funding, which would necessarily impair those other programs and operations. Furthermore, ICIRR's staff and senior executives currently devote between 10-15% of their time to fundraising. To maintain the same pre-Rule funding levels across the Organization, ICIRR's officers and employees would need to devote significantly more time to fundraising, at the expense of other activities. ICIRR would also need to rework internal budgets to provide for existing employees' salaries and benefits, or would need to reduce them. Since helping create the New Americans Initiative in 2005, we have built, designed, and administered the New Americans Initiative in reliance on USCIS's historic ability-to-pay policy, including maintaining N-400 fees at comparatively low levels and granting fee waivers to those unable to afford them. Because we operate the New Americans Initiative in reliance on the historic ability-to-pay policy, the adjustments we need to make to operate despite a beneficiary-pays policy would be highly disruptive to our work.

41.     Although we will enjoy less funds, ICIRR will have to spend greater staff resources on informing program partners of the Rule's provisions and effects on their workshops (including in one of the four mandatory trainings required by the NAI Grant Agreement); we will need to update ICIRR's informational materials, including its website (which currently contains a link to a fee-waiver eligibility calculator[2]); and we will need to help partners retrain volunteers on the new Rule's provisions. The cruel result of the Rule is that we will ultimately need to expend these resources to adjust despite the fact that fewer and fewer potential citizens will take advantage of our programs and we will have lesser overall resources at our disposal.

42.     Our clients and sub-grantees are already experiencing financial and economic uncertainty due to the ongoing COVID-19 pandemic, and this Rule exacerbates those issues. Nevertheless, the

---

[2] https://www.icirr.org/nai.

damage to our organization would exist independently of COVID-19; we would have experienced these effects anyway.

43.     If the Rule takes effect while this litigation progresses, no later injunctive relief could remedy the organizational harms discussed above, which will already have negatively impacted our organization, budget, sub-grantees, and our progress toward our grant's deliverables requirements. The prospect of the immigrants we serve paying the higher fees first and obtaining later refunds would do nothing for our organizations either; we would not receive such refunds to the immigrants we serve. And, at any rate, that remedy offers nothing to our sub-grantees clients who cannot afford to pay first and seek refunds later. This low-income group will be forced to delay or forgo submitting N-400s, and that drop in application volume would take the above-described toll on our organization.

44.     I am aware of no mechanism in the Rule or any federal or state program by which ICIRR could be compensated for lost funding, lost productivity, or increased costs. Many of the expected impacts to ICIRR, sub-grantee partners, affiliates, clients, and other programs could not be mitigated financially in any event.

1        I declare under penalty of perjury and under the laws of the United States that the foregoing is

2 true and correct. Executed at Chicago, Illinois on August 19, 2020.

3

4                                                      _____

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28