Brian J. Stretch, SBN 163973
bstretch@sidley.com
Naomi A. Igra, SBN 269095
naomi.igra@sidley.com
Chelsea Davis, SBN 330968
chelsea.davis@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, California 94104
Telephone: +1 415 772-1200
Facsimile: +1 415 772-7400

Jesse Bless (*pro hac vice*)
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G Street, Suite 300
Washington, D.C. 20005

Samina M. Bharmal (*pro hac vice*)
sbharmal@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
Telephone: +1 202 736 8000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER; EAST BAY SANCTUARY COVENANT; COALITION FOR HUMANE IMMIGRANT RIGHTS; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.;  INTERNATIONAL RESCUE COMMITTEE; ONEAMERICA; ASIAN COUNSELING AND REFERRAL SERVICE; ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS,<br><br>                 Plaintiffs,<br>          v.<br><br>CHAD F. WOLF, *under the title of Acting Secretary of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security*; U.S. CITIZENSHIP & IMMIGRATION SERVICES,<br><br>                 Defendants. | Case No. 4:20-cv-05883-JSW<br><br>**DECLARATION OF OLGA BYRNE** |

**DECLARATION OF OLGA BYRNE**

I, Olga Byrne, declare as follows:

1.      I am Director, Immigration for the International Rescue Committee ("IRC" or "organization"), in New York City, New York. The information in this declaration is based on my personal knowledge and on data that IRC maintains in its ordinary course of business. In my position, I oversee immigration legal services across IRC's network of twenty-four U.S. offices that provide these services. I have been Director, Immigration for IRC since May 2018. I am also Adjunct Professor of Law at Fordham Law School and have held that position since 2014. From 2015 to 2018, I was a Senior Researcher at Human Rights First. From 2012 to 2015, I was a Project Director at Fordham Law School for a law school program to support improvements to state and local policy and practice affecting immigrant children and families.

**IRC's Mission, Programs, and Funding**

2.      IRC is a nonprofit, nonpartisan organization operating in more than 40 countries and in 25 U.S. cities. IRC responds to the world's worst humanitarian crises and helps people whose lives and livelihoods are shattered by conflict and disaster to survive, recover, and gain control of their future. Our dedicated teams in the U.S. create opportunities for refugees and other vulnerable migrants to survive and thrive. With a network of 25 offices in 15 U.S. states, the IRC's Resettlement, Asylum, and Integration department serves more than 48,000 individuals each year through a diverse portfolio of programs aiming to improve outcomes with respect to immigration legal needs and status, economic empowerment, integration, education, and health. Along with its partner agencies, IRC works in cooperative agreement with the U.S. State Department to resettle refugees.

3.      In fiscal year 2019, IRC assisted over 48,000 people in the United States which included: (i) the enrollment of 14,906 people in our economic empowerment programs; (ii) representation and assistance to 13,719 clients seeking immigration benefits, including lawful permanent residents seeking naturalization; (iii) assistance to 5,595 children and parents seeking asylum in the United States; and (iv) resettlement of 7,627 refugees and Special Immigrant Visa (SIV) recipients across 25 U.S. cities.

Last year, IRC worked with 7,302 volunteers in the U.S. who collectively provided more than 194,000 hours of service.

4.      The IRC serves a broad range of individuals in the United States, including but not limited to refugees and those seeking asylum after arriving in the United States. Typically following referral from UNHCR, the United Nations Refugee Agency, and then clearance for U.S. resettlement by the U.S. federal government, the IRC and eight other national resettlement agencies work with national, state, and local authorities and civil societies to help refugees restart their lives in the United States. The IRC also serves asylees granted asylum from U. S. Citizenship and Immigration Services or the Department of Justice's Executive Office of Immigration Review and other humanitarian immigrants including DACA recipients, TPS holders, and family members of refugees and asylees. In addition to humanitarian immigrants, the IRC's programming in economic empowerment and immigration legal services reach noncitizens of any status, targeting low-income and vulnerable immigrant groups.

5.      IRC has U.S. offices in: Abilene, Texas; Atlanta, Georgia; Baltimore, Maryland; Boise, Idaho; Charlottesville, Virginia; Dallas, Texas; Denver, Colorado; Elizabeth, New Jersey; Los Angeles, California; Miami, Florida; Missoula, Montana; New York, New York; Oakland, California; Phoenix, Arizona; Richmond, Virginia; Sacramento, California; Salt Lake City, Utah; San Diego, California; San Jose, California; Seattle, Washington; Silver Spring, Maryland; Tallahassee, Florida; Tucson, Arizona; Turlock, California; and Wichita, Kansas. IRC offers immigration legal services in fourteen of the fifteen states where we have offices.

6.      The provision of immigration legal services—in particular, adjustment of status, family reunification, and naturalization—is an integral component of our mission in the United States. Immigration legal services are available to anyone in need of our services, which typically are low-income individuals. Accordingly, IRC invests in outreach to the community-at-large to advertise the availability of immigration legal services. IRC conducts outreach through a multi-pronged approach that involves direct outreach to immigrants as well as working through partners to increase referrals and awareness of services. Direct outreach includes Facebook ads, flyers posted at local businesses and markets, ads in ethnic newspapers, ads and interviews on radio and TV stations, and information

sessions conducted at IRC offices and at locations in the community. The IRC works through partners including local public libraries, faith-based organizations and leaders, ethnic community-based organizations and leaders, local school districts, other nonprofit organizations, foreign consulates in the U.S., community centers, and employers. In addition to community outreach, IRC works to ensure that resettled refugees have access to our legal services, whether to petition for family members to join them in the U.S. or to represent them in their application to adjust status to lawful permanent residence, as they are required to do one year after their arrival in the U.S. Resettled refugees comprise 20% of IRC's immigration legal services clients, while 80% of clients have another form of immigration status.

7.      Through paid staff and volunteers, IRC provides high-quality, low-cost immigration legal services to clients. Nationwide, IRC employs an immigration staff of about 50 employees, most of whom are full-time. Four employees are located at IRC headquarters in New York, and the rest are based in U.S. field offices.

8.      In FY19, the IRC provided 13,719 clients with immigration legal services, including helping over 5,522 individuals submit N-400 applications to become U.S. citizens and submitted 618 N-600 applications on behalf of children who derived U.S. citizenship from their parent(s).  Additional types of immigration benefits applications we have filed on behalf of clients before USCIS include applications for adjustment of status, family reunification, Deferred Action for Early Childhood Arrivals ("DACA"), and asylum, among other applications. Two IRC offices also represent clients in removal proceedings before the Executive Office for Immigration Review.

9.      IRC provides a range of services to asylum seekers. Since the beginning of 2019, over 6,000 parents and children seeking asylum have received emergency humanitarian assistance from the IRC. At IRC's Welcome Center in Phoenix, Arizona, we provide critical, immediate services to those being released from immigration detention in route to their final destinations where they can pursue their legal case. We also provide case management and other social services to over 200 asylum-seeking families in seven U.S. offices and represent asylum seekers in their legal proceedings in two U.S. offices. In FY19 and the first three quarters of FY20, IRC helped 35 asylum seekers file an I-589 (Application for Asylum and for Withholding of Removal) through either direct representation or IRC's

DECLARATION OF OLGA BYRNE – Case No. 4:20-cv-05883-JSW

pro bono program. Many asylum-seeking families receiving social-support services from the IRC have little or no financial resources and face both food and housing insecurity, which the COVID-19 pandemic has only exacerbated.  This is compounded by the fact that asylum seekers do not immediately have access to employment in the U.S., and by the time they arrive in the U.S. to request asylum, they have typically spent whatever savings they had or borrowed comparatively enormous sums of money to pay for their journey to this country. In fact, as of August 25, 2020, asylum seekers can only apply for employment authorization documents ("EADs") if 365 days[1] have lapsed since they submitted their asylum application.

10.     In FY19, between 53% and 72% of IRC immigration clients fell below the federal poverty guidelines. This percentage varied across client status – ranging from a high of 70-87% for refugees, decreasing to 31-49% for lawful permanent residents, and falling to 27-44% for U.S. citizens – and also reflects the length of time many clients have lived in the U.S. and advanced in their integration. For example, refugees are required to apply for lawful permanent resident status after one year in status and can apply to become U.S. citizens five years after entering the U.S. as refugees. To assist low-income applicants, IRC helped 5,515 eligible applicants to access USCIS fee waivers during FY19 to obtain an immigration status or benefit that will help them continue to gain financial stability and integrate into and contribute to their communities. We filed 5,300 Request for Fee Waiver (I-912) forms, 432 of which were in conjunction with applications for adjustment of status (I-485), 1,121 of which were in conjunction with renewal of green cards (I-90), and 3,385 of which were in conjunction with naturalization applications (N-400).

11.     Of the 431 DACA recipients that IRC assisted with renewal applications in FY19, 62% were under the age of 25 and 97% were under the age of 35. Many of these individuals are students, and at least half have incomes under the federal poverty guidelines.

---

[1] A new USCIS rule taking effect in August 2020 will extend this period to 365 days, during which asylum seekers will be unable to apply for employment authorization. *See* USCIS, *USCIS Rule Strengthens Employment Eligibility Requirements for Asylum Seekers* (June 22, 2020), https://www.uscis.gov/news/news-releases/uscis-rule-strengthens-employment-eligibility-requirements-asylum-seekers.

**Program Funding and Deliverables**

12.    IRC funds immigration legal services through a diversified set of funding. Public and private grants as well as nominal service fees paid by clients are primary sources of funding. For example, six IRC offices are also current grantees under U.S. Citizenship and Immigration Services' Citizenship and Assimilation Grant Program. A number of offices also rely, in part, on what we call internally "unrestricted" funds—in other words, budget amounts not required to be used for a specific purpose. In FY19, 10% of IRC's immigration program expenses were funded from unrestricted funds.

13.    IRC charges nominal fees[2] for immigration legal services to help support operations. However, we also offer internal fee waivers and fee reductions to clients who cannot afford these nominal fees. Some services, such as representation in asylum proceedings, are always provided at no charge to the client. Our ability to provide free services to asylum-seekers has relied on the fee exemptions and fee waivers that are available to asylum-seekers. In 2019, 67% of clients were charged a nominal fee for IRC services while 3% of clients had their fees completely waived by IRC because of need. Another 30% did not pay an immigration service fee because they qualified for free services under a particular grant, which often has income requirements to reach low-income individuals and families. For naturalization specifically, 58% of clients paid IRC immigration service fees with fee amounts comprising 21% of IRC's total fee revenue. Fees from clients comprise the plurality of funding for the IRC immigration network.

14.    IRC's immigration legal services are also funded by a mixture of private and public funding, from local foundations to state funding and USCIS naturalization grants. Under funding from USCIS, six of IRC's offices must (in FY20 alone) help 1,765 legal permanent residents ("LPRs") file naturalization applications, and provide 1,009 LPRs with civics education to prepare for the naturalization interview.

---

[2] IRC fees are site-specific and vary depending on the service provided. The vast majority of services are offered for fees ranging from $100 to $200.

15. The IRC is also part of the New Americans Campaign, and as such, received private funding to assist 1,115 individuals apply for naturalization last year and is receiving funding to assist 1,057 individuals this year.

16. Several of IRC's offices receive funding administered by states for naturalization purposes. IRC's offices in San Diego, Los Angeles, Oakland, Turlock, Sacramento, and San Jose receive funding from the California Department of Social Services. IRC's Seattle office receives funding from the Washington State Department of Health and Social Services. IRC's Atlanta office receives funding from the Georgia Department of Human Services.

17. Our Denver office funds its asylum legal representation program through the federal Survivors of Torture program administered by the Office of Refugee Resettlement, U.S. Department of Health and Human Services. Our Dallas office provides legal representation to unaccompanied children under a subcontract with the Vera Institute of Justice, with funding coming from the U.S. Office of Refugee Resettlement. The IRC Dallas office is also funded by the City of Dallas and the Vera Institute of Justice to provide legal representation to individuals who are City of Dallas residents facing removal from the US.

**Provisions of the Rule**

18. I am familiar with the "U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements" (the "Rule"). It is my understanding that the Rule would restrict the ability of applicants to obtain certain immigration benefits by increasing fees and limiting access to fee waivers.

19. In particular, the Rule would increase fees for N-400 naturalization applications by paper from $640 to $1,170, which is an 83 percent increase. At the same time, the Rule will decrease the fee to renew permanent resident status on form I-90 by paper from $455 to $415, which is a 9 percent decrease. Partial fees will no longer be available for N-400 applications. For applicants who would have qualified for the partial fee, the Rule increases the N-400 fee for filing by paper from $320 to $1,170, which is an increase of 226%.

20.     Table 3 of the Rule shows the limited categories of applicants who are eligible for fee waivers under the Rule. Most applicants will no longer be eligible for fee waivers for any forms, including N-400 naturalization applications, I-765 applications for employment authorization, and I-485 applications for permanent residence. The Rule also changes the requirements to qualify for a fee waiver.  The Rule reduces the number of fee waivers available by allowing fee waivers only for those applicants who have household incomes at or below 125% of the federal poverty guidelines. Currently, applicants may be eligible for a fee waiver if they receive a means-tested benefit, have household incomes at or below 150% of the federal poverty guidelines, or can establish financial hardship. The Rule limits USCIS's own future discretion to change its approach to fee exemptions or waivers.

21.     The Rule also imposes a new mandatory fee of $50 on applications for asylum, a new $550 fee for the first I-765 application for employment application plus $30 biometrics fee filed by an asylum applicant, increases the fee for I-765 (non-DACA) applications for employment authorization from $410 to $550, and increases the fee for children for I-485 applications for permanent residence from $750 to $1,130, which is an increase of 51%. Although the Rule purports not to increase the I-765 application for employment authorization for DACA recipients, holding the fee at $410 for DACA recipients still represents an increase in cost as a practical matter due to the effect of USCIS's decision to decrease the validity period of employment authorization for DACA recipients from two years to one year. This means that DACA recipients will have to pay $820 for I-765 applications plus $170 for biometrics fees for a total of $990 to maintain employment authorization for two years.

22.     The Rule will also unbundle certain fees, which will result in a sharp increase in fees for applicants for permanent residency who are also applying for interim benefits. Since 2007, DHS has charged a flat rate for a bundle of applications for those seeking lawful permanent residency. The flat fee of $1,140 covered the application for permanent residency (I-485), an employment authorization application (I-765), and application for travel document (I-131). A flat fee of $750 covered the same three documents for children under 14. The Rule will require applicants to pay fees for each application and eliminate the flat fee for these bundled applications.

23.     The Rule would also require a $30 fee for biometric services on applicants for Temporary Protected Status ("TPS").

24.     On December 27, 2019, IRC submitted a comment in opposition to USCIS's proposed Rule, DHS Docket No. USCIS-2019-0010. The proposed Rule was originally published in the Federal Register on November 14, 2019 with a 30-day comment period ending on December 16, 2019. This short window was contrary to past USCIS practice of providing 60 days for review and comment on proposed fee rules and the extensiveness of the proposed Rule, which is over 300 pages. On December 9, 2019, nine days before the end of the original comment period, USCIS reopened and extended the public comment period an additional 15 days to December 30, 2019. On January 24, the review and comment period for the proposed Rule was again reopened for an additional 15 days with a deadline of February 10, 2020. The original shortened timeframe for review and comment limited IRC's ability to conduct a full and thorough analysis on all 300 plus pages of the Rule. While it was extended, the interrupted timeframe and small iterations of extensions did not address or mitigate the challenges.

25.     It is my understanding that the Rule will take effect on October 2, 2020.

### Effects of Rule on IRC

26.     The Rule disproportionately harms the low-income immigrants IRC serves. The increases in fees and elimination of most fee waivers will create a purely financial barrier to the progress of an immigrant's integration in the United States, delaying or precluding status that is critical to safety, security, and protection. These unnecessary and unfounded changes will cause hardship and burden for hardworking foreign nationals and mixed-status families, including U.S. citizens.

27.     The Rule has immediately harmed IRC's ability to carry out its operations and will continue to do so. Simultaneously eliminating most fee waivers while increasing application fees will significantly decrease our low-income clients' ability to pay for, and thus submit, applications for immigration benefits. IRC anticipates that it will experience first a drastic increase in those who will seek to file prior to the Rule's effective date, followed by (after the effective date) a drastic reduction in the number of clients who seek out IRC's legal services to submit immigration applications. This means

that the nominal fees that IRC collects from clients will drop precipitously, creating a budget shortfall for IRC's immigration-services operations.

28.     The fee increases contained in the Rule would significantly harm IRC's organizational operations. Already, with N-400 fees set at $640 plus the $85 biometric fee, 3,477 of the 5,522 applicants we serve receive either full or partial fee waivers from I-912 and I-942 requests. Eliminating these waivers will cause similarly situated applicants to either forego or delay applying for naturalization. The fee increases on top of the fee-waiver elimination will exacerbate the hardships that these vulnerable, eligible citizen-applicants face compared to the prior rule. Approximately 50% of our applicants already needed full or partial fee waivers to mitigate the previous $640 fee; similarly situated applicants will not be able to afford a $1,170 fee. Even those applicants who can afford a $640 fee without a fee waiver would likely be unable to afford the $1,170 fee without a waiver; based on data collected from clients served, we estimate that 63% of our clients have incomes at or below 150% of the federal poverty guidelines; 67% are at or below 200% of the guidelines.

29.     Even if IRC fell short of pre-Rule application volume by only 40%—a conservative estimate, since roughly 50% of our applicants already need full or partial fee waivers to mitigate the previous, lower fees—that loss would significantly endanger our overall funding level and cause us to change the manner in which we fulfill our mission-critical services. IRC will be unable to meet its deliverable requirements for multiple grants and contracts under this scenario. Without such funding— on top of our lost fees—IRC would have to reduce pay for, or even furlough, many of our roughly 50 immigration-services employees. Some of our immigration programs in various offices might not be able to remain open in the event of such shortfalls.

30.     Furthermore, the decrease in low-income applicants who can seek IRC's services, and IRC's decreased capacity after making necessary staff adjustments, will together jeopardize IRC's ability to access grant funding for those services. These grants require IRC to meet certain "deliverable" benchmarks to ensure that IRC is using grant funds effectively; the Rule will immediately prevent IRC from assisting clients and submitting immigration applications, and this affect will compound over time. For example, some grants require IRC or a branch office to submit a certain number of N-400 or DACA

applications. Other grants require IRC or a branch office to work with a particular number of clients. We have no assurances or reason to expect that the grantors would reduce the deliverables requirements or otherwise forgive our shortfall.

31.     For some grants tied to certain benchmark levels, IRC would need to return the grant funds or would suffer contractual penalties. For example, for one grant tied to naturalization, IRC would need to either return the grant funds or would have to work to meet the benchmarks over an extended period without additional funds. Other grants, including multi-year grants, would be in jeopardy if grant funders are unwilling to alter their expectations for deliverables. Failing to meet grant requirements will considerably harm our reputation with the grantors and our ability to get future funding.

32.     The reduction or elimination of funding will materially diminish IRC's ability to provide immigration services at existing levels, and we will have to cut core programs and/or staff as a result. Ceasing to provide core immigration services and closing an immigration program would cause irreparable harm to IRC's reputation as a legal service provider.

33.     IRC's Economic Empowerment program assists asylees, refugee, and work-authorized asylum seekers to find gainful employment and has grants and contracts to deliver services. Some of these services are based on numbers of individuals served. With fewer people able to afford the EAD fees, and due to the unbundling of EADs from I-485 applications for asylees, fewer people will be able to participate fully in Economic Empowerment programming. Individuals without access to EADs will have a more challenging time participating in skills training and workforce programming, thereby limiting their ability to prepare for labor market integration and economic independence.  As such, these individuals are more likely to require emergency cash assistance and resources such as food and housing support within their communities. Staff will have to divert time and attention from providing assistance and service to those seeking immigration benefits, in order to spend greater amounts of time linking clients to assistance for food and housing.

34.     To continue providing services to asylum-seekers in seven offices, IRC would need to find a way to cover asylum application fees for our clients who will overwhelmingly not have the funds to pay them on their own. Helping asylum seekers in the United States is an essential component of the

mission of IRC's Resettlement, Asylum, and Integration department. Our operational model for assisting asylum-seekers has relied on the fee exemption that USCIS has provided to asylum-seekers for the I-589 application and the initial I-765 application as well as the fee waivers that USCIS has provided to asylum seekers for renewal I-765 applications, I-485 applications for permanent residence, and N-400 naturalization applications. We have developed significant programming to assist asylum seekers that only works because of the availability of these fee exemptions and fee waivers.

35.     As of August 25, 2020, asylum seekers can only apply for employment authorization if 365 days have lapsed since they submitted their asylum application. This means that these vulnerable, protection-seeking individuals and families have no lawful access to financial means of paying a USCIS application fee for asylum, and without access to a fee waiver for EADs, will not be able to pay the fee to become self-sufficient through EADs. IRC is spending considerable staff time and effort to find funds to cover asylum and related EAD application fees, and will have a greater financial burden to ensure that asylum seekers have basic food and shelter. Without financial resources, IRC's asylum seeking clients need to apply for asylum before the effective date of the fee rule, October 2, 2020; this pressing need has overwhelmed our staff and strained our resources. The stress to complete these applications prior to October 2, 2020 is causing IRC staff to divert time and effort away from effective case management activities critical to the welfare of clients and required by funders, such as identifying housing options, making referrals for mental health, and responding to crises, in order to respond to the unanticipated legal needs of clients arising as a result of the new fee. IRC's case managers working with asylum seeking families specialize in social services, and thus have to spend considerable time and effort to navigate the questions being raised in regard to legal fees.

36.     Asylum seekers are extremely unlikely to be able to afford a $50 application fee and (as of August 25, 2020) cannot seek work authorization to earn that money for 365 days after filing asylum applications. Thus, to continue to assist asylum seekers, IRC will have to spend time and resources in an attempt to find ways to cover asylum seekers' USCIS application fees. IRC may have to redirect unrestricted internal funds to cover their $50 applications fees, which necessarily would lessen IRC's ability and resources to carry out its other important operations, including provision of emergency

housing, food, and other basic needs. Absent such redirection, IRC would have to expend staff members' and executives' time and resources to either convince existing funders to allow IRC to divert funds from other programs to cover asylum application fees, or would need to work to raise money specifically for asylum application fees. Nor can we confidently predict that these efforts would be successful in any event.

37.     IRC has diverted significant resources to respond to the Rule, and will continue to need to do so. IRC has embarked on an outreach campaign to inform immigrants of the fee changes so that those who cannot afford the fees can apply before the October 2 effective date. The need to process these applications promptly has been particularly acute because COVID-19 has significantly curtailed the ability of low-income clients to afford even the existing, lower fees. This outreach and focus on assisting Lawful Permanent Residents and others applying for naturalization and other immigration benefits will create a larger workload for IRC staff and have an immediate impact on over-time costs for staff, further straining our already-affected budget. IRC will need to expend staff members' time and effort to train immigration employees on the new provisions; will need to update its informational materials, including its website; and will need to help members retrain volunteers on the new Rule's provisions relating to fee waivers. IRC will also need to expend significant time and effort on outreach and education to explain the Rule to impacted immigrants and stakeholders. This will entail group information sessions, one-on-one consultations, external-facing materials, and interpretation and translation services. The cruel result of the Rule is that we will ultimately need to expend these resources to make these adjustments despite the fact that fewer and fewer potential citizens will take advantage of our programs, thanks to the same Rule.

38.     IRC is also currently expending significant time and effort on identifying alternative methods to cover the USCIS fees for asylum, naturalization, adjustment of status, and employment authorization. The IRC's Center for Economic Opportunity offers low-interest loans to immigration clients; however, an asylum seeker with no guaranteed ability to work or remain in the U.S. is not likely to qualify for a loan at the IRC nor any other mainstream loan provider. Further, immigrants arrive in the U.S. without a credit history and no credit score. Building credit takes time and it is false to assert that

refugees, asylees and other immigrants may reliably access revolving lines of credit sufficient to cover existing fees, let alone after the Fee Rule takes effect. Given restrictions on employability, lack of credit histories, and length of time in the U.S., options for financing will in reality be limited to fringe financial service providers that charge high usury rates and strip borrowers and communities of wealth. Additionally, with employment restrictions in place for applicants, immigrants' ability to repay these high-interest products without damaging their credit score is questionable. The IRC provides financial capability programming, including financial coaching and education, to refugees, asylees, and other immigrants.  Utilizing high interest credit products runs counter to financial best practices for individuals; USCIS's encouragement that applicants use high-interest credit to pay for fees undermines IRC's ability to teach financial management and best practices to our clients and community members.

39.     I am aware of no mechanism in the Rule or any federal or state program by which IRC could be compensated for lost funding, lost productivity, or increased costs. Many of the expected impacts to IRC, clients, and other programs, including harm to our reputation, could not be mitigated financially in any event.

1      I declare under penalty of perjury and under the laws of the United States that the foregoing is

2  true and correct. Executed at New York, New York on August 15, 2020.

3

4      _____

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF OLGA BYRNE – Case No. 4:20-cv-05883-JSW