Brian J. Stretch, SBN 163973
bstretch@sidley.com
Naomi A. Igra, SBN 269095
naomi.igra@sidley.com
Chelsea Davis, SBN 330968
chelsea.davis@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

*Attorneys for Plaintiffs*

Jesse Bless (*pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS ASSOCIATION
1301 G Street, Suite 300
Washington, D.C. 20005

Samina M. Bharmal (*pro hac vice*)
sbharmal@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
Telephone: +1 202 736 8000
Facsimile +1 202 736 8711

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER; EAST BAY SANCTUARY COVENANT; COALITION FOR HUMANE IMMIGRANT RIGHTS; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; INTERNATIONAL RESCUE COMMITTEE; ONEAMERICA; ASIAN COUNSELING AND REFERRAL SERVICE; ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, <br><br> Plaintiffs, <br> v. <br><br> CHAD F. WOLF, *under the title of Acting Secretary of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security*; U.S. CITIZENSHIP & IMMIGRATION SERVICES <br><br> Defendants. | Case No. 4:20-cv-05883-JSW <br><br> **DECLARATION OF MICHAEL BYUN** |

**DECLARATION OF MICHAEL BYUN**

I, Michael Byun, declare as follows:

1.	I am Executive Director of the Asian Counseling and Referral Service ("ACRS" or "organization"), in Seattle, Washington. I have been Executive Director since 2018. Prior to joining ACRS, I served for ten years as the Chief Executive Officer for Asian Services in Action, Inc., Ohio's largest health and social services agency serving Asian Americans, Pacific Islanders, and other immigrant and refugee communities. In addition to my professional commitments, I also serve on local, state, and national boards and advisory communities within the Asian and Pacific Islander community. I am the former board co-chair for National Coalition of Asian Pacific American Community Development, and founding member of the national AIM for Equity, a health justice advocacy organization focused on mobilizing Asian American, Native Hawaiian, and Pacific Islander communities and allies to ensure access to high quality, culturally competent health care. In 2014, I was appointed by President Barack Obama to the President's Advisory Commission on Asian Americans and Pacific Islanders. The information in this declaration is based on my personal knowledge and on data that ACRS maintains in its ordinary course of business.

**ACRS' Mission, Programs, and Funding**

2.	ACRS was founded in 1973 and is headquartered in Seattle, Washington. ACRS serves the Asian Pacific Islander and other marginalized communities in King County and throughout Washington State through multiple programs that provide culturally and linguistically competent care and services. ACRS strives to help clients attain self-sufficiency in the United States while maintaining each client's cultural identity. ACRS provides programs and services such as behavioral and wellness programs, youth counseling, immigration assistance, and substance abuse recovery services in order to improve the lives of Asian Americans Pacific Islanders, and other underserved communities, whether immigrant, refugee or native-born.  Last year ACRS assisted over 35,000 people through our services and programs.

3.	ACRS is also the largest naturalization services provider in Washington State. We have provided citizenship and naturalization services since 1997. In 2019, we helped 754 community

1
DECLARATION OF MICHAEL BYUN – Case No. 4:20-cv-05883-JSW

1  members from 31 different countries file their N-400 applications to become U.S. citizens. Of these 754
2  applicants, 67% were eligible for the full or partial fee waiver due to their low- or moderate-income
3  status.

4       4.  The provision of basic immigration legal services—in particular, adjustment of status,
5  family reunification, and naturalization—is a necessary extension and integral component of our mission
6  in Washington State. Helping community members become U.S. citizens is part of our mission, and this
7  work benefits the entire community. Many of our clients come from countries with long histories of war
8  and political instability. When they come to the United States and eventually naturalize, they report a
9  stronger sense of belonging and well-being. They feel more connected with their community and are
10 more civically engaged—especially by exercising the right to vote. Furthermore, research shows that
11 naturalized citizens have higher earnings than their green-card-holding counterparts and are more likely
12 to own homes.

13       5.  Through paid staff and volunteers, ACRS provides high-quality, low-cost immigration
14 legal services to clients through filing petitions for adjustments of status, family reunifications, and
15 naturalization applications, and more. ACRS employs an immigration staff of seven employees.

**Program Funding and Deliverables**

17       6.  Since 1997, ACRS has helped hundreds of green-card holders each year become
18 American citizens. In 2020, we are able to do so with the support of grant funding from five different
19 sources: (1) a United States Citizenship and Immigration Services ("USCIS") program grant;
20 (2) Washington New Americans Program grant through OneAmerica; (3) a New Citizens Program grant
21 from the City of Seattle's Office of Immigrant and Refugee Affairs; (4) a New Americans Collaboration
22 grant from Asian Americans Advancing Justice – Los Angeles and (5) funding from the City of Seattle
23 to do a limited number of complex cases. These grants are tied to payment points that are based on
24 ACRS meeting specific contractual deliverables. While our funding varies year-to-year, this year we
25 have received roughly $500,000 in grant funding from these five funding sources.

26       7.  We have always carefully complied with our grant obligations. We have received a
27 USCIS program grant four times and have never been audited by USCIS. ACRS is effective, efficient,

1  and responsible with grant funds. We are careful to satisfy our deliverable requirements as specified in
2  each of our year-long contracts.  For the current period, we are contractually obligated to submit 650 N-
3  400 applications.

**Provisions of the Rule**

5  8.  I am familiar with the "U.S. Citizenship and Immigration Services Fee Schedule and
6  Changes to Certain Other Immigration Benefit Request Requirements" (the "Rule"). It is my
7  understanding that the Rule would increase fees for N-400 naturalization applications by paper from
8  $640 to $1,170, which is an 83 percent increase. At the same time, the Rule will decrease the fee to
9  renew permanent resident status on form I-90 by paper from $455 to $415, which is a 9 percent
10 decrease. Partial fees will no longer be available for N-400 applications. For applicants who would have
11 qualified for the partial fee, the Rule increases the N-400 fee for filing by paper from $320 to $1,170,
12 which is an increase of 226%.

13 9.  Table 3 of the Rule shows the limited categories of applicants who are eligible for fee
14 waivers and the forms for which waivers are available under the Rule. Most applicants will no longer be
15 eligible for fee waivers for any forms, including N-400 naturalization applications, I-765 applications
16 for employment authorization, and I-485 applications for permanent residence. The Rule also changes
17 the requirements to qualify for a fee waiver.  The Rule reduces the number of fee waivers available by
18 allowing fee waivers only for those applicants who have household incomes at or below 125% of the
19 federal poverty guidelines. Currently, applicants may be eligible for a fee waiver if they receive a
20 means-tested benefit, have household incomes at or below 150% of the federal poverty guidelines, or
21 can establish financial hardship. The Rule limits USCIS's own future discretion to change its approach
22 to fee exemptions or waivers. The Rule provides a $50 reduction in the fee for Form I-485 applications
23 filed in the future for principal applicants who pay the $50 fee for Form I-589 and are subsequently
24 granted asylum.

25 10. The Rule also imposes a new mandatory fee of $50 on applications for asylum, a new
26 $550 fee for the first I-765 application for employment application plus $30 biometrics fee filed by an
27 asylum applicant, increases the fee for I-765 (non-DACA) applications for employment authorization

3
DECLARATION OF MICHAEL BYUN – Case No. 4:20-cv-05883-JSW

1  from $410 to $550, and increases the fee for children for I-485 applications for permanent residence
2  from $750 to $1,130, which is an increase of 51%.

3  11.  On December, 30, 2019, ACRS submitted a comment in opposition to USCIS's proposed
4  Rule, DHS Docket No. USCIS-2019-0010.

5  12.  It is my understanding that the Rule will take effect on October 2, 2020.

### Effects of Rule on ACRS

7  13.  Our organization provides legal services to asylum seekers, TPS applicants, U and T visa
8  applicants, and VAWA self-petitioners, unaccompanied minors, assists immigrants with adjustment of
9  status to permanent resident, naturalization, and more.

10  14.  The majority of our clients are low income, and the Rule makes changes to the
11  availability of fee waivers, fee exemptions, and partial fee waivers that will harm ACRS' ability to serve
12  our clients. Most significantly, the vast majority of our clients will no longer be eligible for fee waivers
13  because the Rule limits the categories of applicants who are eligible for any fee waiver and the form
14  types for which fee waivers are available.  The vast majority of ACRS' Citizenship Program's work is
15  providing assistance on N-400 applications. The Rule eliminates all fee waivers for N-400 applications,
16  other than for applicants in a few humanitarian categories that are only a small part of ACRS' client
17  population for N-400 applications.  In 2019, 67% of our clients were eligible for the full or partial fee
18  waiver for the N-400 application. Under the Rule, most of our clients who would have qualified for a
19  full or partial fee waiver will now have to pay the full $1,170 to naturalize—which simply will not be
20  possible for most of our clients.

21  15.  For the few clients who are in a category where a fee waiver is available for certain forms
22  (like VAWA self-petitioners applying for naturalization[1]), fee waivers will now only be available for
23  clients who have a household income at or below 125% of the federal poverty guidelines. By only
24  considering income and not ability to pay more generally, the Rule will mean that some of our clients

---

[1] The Rule treats asylum applicants differently than applicants seeking other forms of humanitarian protections. For example, although VAWA self-petitioners and those seeking U and T nonimmigrant status retain fee exemption and fee waiver eligibility for certain forms, the Rule eliminates all fee exemptions and fee waivers for asylum applicants.

4
DECLARATION OF MICHAEL BYUN – Case No. 4:20-cv-05883-JSW

who cannot afford the fee due to financial hardship nonetheless will not qualify for a fee waiver. Moreover, the Rule makes it much more difficult and time consuming for ACRS to complete fee waivers for our clients who qualify. Prior to the Rule, we could provide evidence that our client received a means-tested benefit like SNAP. Now we will have to establish their income. Many of our poorest clients do not file taxes because they are not required to do so. We will now have to take more time to get a verification of non-filing letter from the IRS.

16. Our asylum clients will not be able to afford the new $50 asylum application fee. All of the asylum seekers we represent are indigent. Our asylum clients struggle to provide for their basic needs, including housing and food. Asylum seekers cannot seek work authorization to earn money until 150 days after filing asylum applications (and, beginning on August 25, 2020, they will have to wait 365 days). Because of their economic circumstances, our asylum clients are extremely unlikely to be able to afford a $50 asylum application fee without significant hardship. Helping asylum-seekers is an essential component of ACRS' mission. To continue providing services to asylum-seekers in King County, ACRS would have to pay the asylum application fee for these clients. Because USCIS has never previously charged an asylum application fee,[2] we do not currently budget for those fees. Thus, to continue to assist asylum seekers, ACRS would have to spend time and resources in an attempt to find ways to cover asylum-seekers' fees. ACRS may have to redirect unrestricted internal funds to cover their $50 applications fees, which necessarily would lessen the organization's ability and resources to carry out its other important operations, including mental health services, aging services for older adults, youth development programs, and substance abuse recovery programs. Absent such redirection, ACRS would have to expend staff members' and managements' time and resources to either convince existing funders to allow ACRS to divert funds from other programs to cover asylum fees, or would need to work to raise money specifically for asylum fees. We cannot predict that these efforts would be successful in any event.

---

[2] Of the 147 countries that are signatory countries to the 1951 Refugee Convention and/or its 1967 Refugee Protocol, only three countries charge fees for applications for asylum or refugee protection: Australia, Fiji, and Iran. By charging an asylum application fee, the Rule will make the United States only the fourth signatory country to do so.

17. Additionally, the Final Rule imposes a new $550 fee on first-time applications for employment authorization filed by asylum seekers plus a $30 biometrics fee. Previously, asylum seekers had not been charged for their first application for employment authorization. They were only charged for renewal of employment authorization, but even renewal applications were eligible for fee waivers.

18. We have never had to pay initial employment authorization fees for asylum clients because they were free. Because our asylum clients are indigent, they will not be able to afford to pay $580 to apply for employment authorization. Lack of employment authorization puts immigrants at risk of homelessness, hunger, and untreated health issues. It also makes them uniquely vulnerable to domestic violence and predatory practices. To avoid these harms to our clients, we will have to find a way to pay the $580 fee on their behalf. This will divert funds that are currently directed to other parts of our mission.

19. We also provide assistance to immigrants who are seeking adjustment of status. The elimination of the fee waiver for most categories of immigrants and the elimination of the discount for children's I-485 applications will make it difficult for our clients to adjust status. Our clients already struggle to pay the fee for the required medical exam by a designated civil surgeon that is necessary for the I-485 application. Our organization is unlikely to be able to absorb the cost of these fees for our clients. I expect that we will see a decline in clients seeking assistance with the form I-485, solely because it will no longer be affordable to our clients.

20. The elimination of fee waivers and discounts for form I-485 will also increase the time we must spend on I-485 applications and thus increase our costs. We often assist family groups who are adjusting status together. Because of the availability of fee waivers and discounts, families were able to apply at the same time. This resulted in efficiencies for our organization because we could gather information for the entire family at one time. Without fee waivers and discounts, families will be forced to apply for permanent residence as they can afford the fee for each family member. That means that our organization will have to meet with the family more times and over a longer period of time. This represents an opportunity cost for our organization. Meeting repeatedly with the same family in order to

1  complete applications that we could previously complete in one meeting leaves us with less time to help other clients.

21. The inability for families to adjust at the same time also poses unique risks of harm to asylees and their derivatives. A derivative asylee is only able to adjust status through asylum if the principal applicant still retains asylum status. Principal asylum applicants tend to be adults, and these adult asylees may prioritize their own adjustment and naturalization before the adjustment of their children because of the additional benefits that accrue to adults who are US citizens. As a result, I expect that the Final Rule will result in principal applicants naturalizing before all of their derivatives complete adjustment of status. This will leave these derivative asylees unable to adjust through asylum without filing their own nunc pro tunc asylum applications. As legal service providers, this will make the task of helping these families much more complicated and time consuming.

22. Although the Final Rule maintains the statutorily required fee exemptions for certain categories, including U and T visa applicants and VAWA self-petitioners, and fee waivers for ancillary forms, the Rule makes it more difficult for any applicants to qualify for a fee waiver. Our clients in these categories who are not eligible for a fee waiver cannot afford to pay fees for themselves and their derivatives. We cannot risk the chance that our clients will stay in an abusive or dangerous situation because they cannot afford to pay fees for immigration applications to keep their family members together. We will have to find a way to help our clients with these fees, even though that will divert resources from our other services.

23. In sum, the Rule disproportionately harms low-income immigrants. The increases in fees and elimination of fee waivers will create a purely financial barrier to the progress of immigrants' integration in the United States, delaying or precluding status that is critical to safety, security, and protection. These unnecessary and unfounded changes will cause hardship and burden for hardworking immigrants and mixed-status families, including U.S. citizens.

24. The Rule will immediately harm ACRS' ability to carry out its operations on behalf of the immigrants in our community. Simultaneously eliminating fee waivers while increasing application fees will significantly decrease our low-income clients' ability to pay for, and thus submit, applications

for immigration benefits. For example, under the Final Rule, the cost to naturalize would rise to $1,170 for a single application, an amount roughly equal to a month's gross income for an immigrant making the federal minimum wage.  Many ACRS clients in King County earn minimum wage and struggle to make ends meet with the high cost of living in the area.  Many of our clients would need *years* to accumulate the savings needed to cover the $1,170 fee per application.   As result, certain ACRS clients might become eligible to become U.S. citizens but will not be able to afford it. In fact, 67% of our clients in 2019 were unable to pay the application fee at the lower fee amount and applied for a full or partial fee waiver.  The fee hike presents a significant barrier to low income individuals seeking to naturalize.  ACRS thus anticipates that it will experience a drastic reduction in the number of clients who seek out ACRS' services and ultimately submit immigration applications.

25. It is ACRS' mission to promote the well-being of low- and moderate-income immigrants and refugees. Many of the clients that we serve are low-income, elderly, disabled, or live with significant other challenges and cannot afford a $1,170 fee. The clients who need assistance completing and submitting the N-400 application are not affluent. They live paycheck to paycheck or on very limited fixed incomes, and do not have access to credit cards. If the Rule goes into effect, our mission to provide naturalization assistance to low-income green card holders would be irreparably harmed. ACRS cannot work with 650 clients in the course of a single year that could each pay $1,170 for the N-400 application. If the Rule goes into effect, the number of clients with whom we work will significantly decrease, and we will be unable to meet our contractual obligations.  It will be difficult or impossible for ACRS' Citizenship program to fulfill this mission because our clients will not be able to afford the N-400 application. Moreover, the elimination of the fee waiver harms our organization because ACRS has devoted considerable resources to collecting and providing best practices for naturalization assistance. Our work on developing these best practices has relied on the existence of full and partial fee waivers available to those seeking naturalization.

26. As stated above, ACRS' work is facilitated by grant and contract funding, which is tied to payment points that are based on ACRS' achievement of certain contractual deliverables All of our grants and contracts require ACRS to submit a specific number of N-400 applications each month. The

Rule will prevent ACRS from assisting clients and achieving these contractual deliverables. If ACRS is unable to meet our contractual obligations for deliverables, we will lose our contracts and grants, and will have to lay off our staff, many of whom have significant experience in providing naturalization services and other benefits. Ultimately, the Rule could force our citizenship-services program to close.

27. For some grants tied to certain benchmark levels, ACRS could suffer contractual penalties. For example, one of our grants stipulates an application target of 225 completed N400 applications and states that if ACRS is below 35% of the application target upon submission of its second quarterly report, the national partner for funding reserves the right to withhold further disbursements until ACRS has made satisfactory progress towards reaching the target. The national partner reserves the right to permanently withhold funds should ACRS fail to meet its application target. If we fail to meet our contractual deliverables, ACRS' hard-earned reputation as a high-quality naturalization services provider would also suffer in the funder community.

28. ACRS has diverted significant resources to respond to the Rule, and will continue to need to do so. ACRS has had to divert staff members' time and efforts to advocate against this Rule—including preparing and submitting a comment during the Rule's notice-and-comment period and preparing for this litigation. ACRS will also need to expend staff members' time and efforts training immigration employees on the new provisions; will need to update its informational materials, including its website; and will need to help members retrain volunteers on the new Rule's provisions. The cruel result of the Rule is that we will ultimately need to expend these resources to make these adjustments despite the fact that fewer and fewer potential citizens will take advantage of our programs, thanks to the same Rule. Before the Rule, our ability to represent asylum seekers was only limited by the capacity of our legal staff. The Rule will reduce the number of asylum seekers we are able to help because we will have to account for covering the asylum application fee.

29. The Rule is coming out at the worst possible time in light of the economic impact of COVID-19 on our clients. We are already feeling the impact of the Rule because we are fielding calls about the fees in the Rule and are scrambling to file as many applications as possible before it takes effect.

30. I am aware of no mechanism in the Rule or any federal or state program by which ACRS could be compensated for lost funding, lost productivity, or increased costs. Many of the expected impacts to ACRS, clients, and other programs could not be mitigated financially in any event, especially in the current funding environment created by the COVID-19 pandemic.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct. Executed at Seattle, Washington on August 17, 2020.

