Brian J. Stretch, SBN 163973
bstretch@sidley.com
Naomi Igra, SBN 269095
naomi.igra@sidley.com
Chelsea Davis, SBN 330968
chelsea.davis@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Jesse Bless (*pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G Street, Suite 300
Washington, D.C. 20005

Samina M. Bharmal (*pro hac vice*)
sbharmal@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
Telephone: +1 202 736 8000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER; EAST BAY SANCTUARY COVENANT; COALITION FOR HUMANE IMMIGRANT RIGHTS; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; INTERNATIONAL RESCUE COMMITTEE; ONEAMERICA; ASIAN COUNSELING AND REFERRAL SERVICE; ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS,<br><br>Plaintiffs,<br><br>v.<br><br>CHAD F. WOLF, *under the title of Acting Secretary of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security*; U.S. CITIZENSHIP & IMMIGRATION SERVICES<br><br>Defendants. | Case No. 4:20-cv-05883-JSW<br><br>**DECLARATION OF JEFF CHENOWETH** |

**DECLARATION OF JEFF CHENOWETH**

I, Jeff Chenoweth, declare as follows:

1. I am the Capacity Building Director at Catholic Legal Immigration Network, Inc. ("CLINIC" or "organization"), in Silver Spring, Maryland. The information in this declaration is based on my personal knowledge and on data that CLINIC maintains in its ordinary course of business.

**CLINIC's Mission**

2. CLINIC is the nation's largest network of nonprofit legal immigration services programs. CLINIC's mission is to provide immigration legal services to low income and vulnerable populations. This mission is part of CLINIC's broader purpose of embracing the Gospel value of welcoming the stranger, and promoting the dignity and protecting the rights of immigrants. The network includes almost 400 affiliated immigration programs, which operate out of more than 400 offices in 48 states and the District of Columbia. The network includes faith-based institutions, farmworker programs, domestic violence shelters, ethnic community-focused organizations, libraries and other entities that serve immigrants. CLINIC's network employs more than 2,300 attorneys, accredited representatives and paralegals who, in turn, serve hundreds of thousands of low-income immigrants each year.

3. Members of the network, referred to as "affiliates," provide immigration services using materials, training, education, best practices, and sometimes, funding provided by CLINIC.

4. CLINIC's affiliates run the gamut from large to very small organizations, and include organizations that provide a wide-array of immigration legal services, including assistance with naturalization, Deferred Action for Childhood Arrivals (DACA) renewals, the Nicaraguan Adjustment and Central American Relief Act ("NACARA") Temporary Protected Status ("TPS") applications, adjustments of status to permanent resident (including Liberian Refugee Immigration Fairness (LRIF) adjustments with a deadline of December 20, 2020), asylum, special immigrant juvenile status petitions, U and T visa applications, VAWA petitions, as well as organizations that focus only on naturalization.

5. Ninety-six percent of CLINIC affiliates provide legal services related to naturalization. CLINIC estimates that its affiliate network completes 35,000 to 40,000 naturalization applications per

1

DECLARATION OF JEFF CHENOWETH – Case No. 4:20-cv-05883-JSW

year. Forty-three percent of CLINIC affiliates provide affirmative asylum representation. Eighty-five percent of CLINIC affiliates provide assistance with DACA renewals.

6.      In addition to employing attorneys, CLINIC affiliates employ United States Department of Justice ("DOJ")-Accredited Representatives. Accredited representatives are non-attorney staff or volunteers who are approved by the DOJ to represent noncitizens in removal proceedings before the immigration court and the Board of Immigration Appeals ("BIA"). An accredited representative must work for a non-profit or social service organization that provides low- or no-cost immigration legal services. Approximately 45 percent of CLINIC affiliates rely on DOJ- Accredited Representatives for the day-to-day work of their organization. In turn, those DOJ- Accredited Representatives rely on CLINIC's resources for training and guidance.

7.      CLINIC affiliates pay an annual affiliate fee to be a part of the CLINIC network. In return, affiliates get a discount on CLINIC's web-based and in-person trainings, and in some cases gain access to affiliate-only trainings. Trainings take the form of webinars, online courses (both self-directed and with multiple classes), and workshops during our annual affiliate convening. CLINIC provides trainings on the substantive law, legal best practices, and issues of nonprofit management as they relate to a wide range of immigration benefits, including naturalization, adjustment of status, asylum, U- and T-Visas, and relief under the Violence Against Women Act.

8.      CLINIC also provides technical support to its affiliates through the "Ask-the-Experts" portal on its website. Attorneys and accredited representatives from affiliates submit inquiries regarding individual immigration matters that are particularly complex, and CLINIC staff provide an expert consultation. In a typical week, CLINIC attorneys provide ten to eleven consultations on complex naturalizations cases.

9.      The trainings described above are organized by CLINIC's Training and Legal Support section, which employs seven full-time attorneys, and CLINIC's Defending Vulnerable Populations section, which employs seven full-time attorneys. The primary duties of the seven Training and Legal Support attorneys are to serve as training faculty and provide technical assistance on USCIS applications, such as naturalization, and consular processing. The primary duties of the eight Defending

Vulnerable Populations attorneys is to serve as training faculty, draft written resources, and provide technical assistance on asylum, special immigrant juvenile status petitions and, special immigrant juvenile status-based adjustment of status, and other immigration relief in immigration court.

**Naturalization Programs and Funding**

10. CLINIC receives funding from a variety of sources, including grant funding from the New Americans Campaign ("NAC"), led by the Immigrant Legal Resource Center ("ILRC"). The only source of funding CLINIC receives for its naturalization work comes through the NAC.

11. As a requirement of its NAC funding, CLINIC, through its subgrantees, is required to complete and submit a specified number of naturalization applications. Between July 1, 2019 and June 30, 2020, CLINIC was required to complete and submit and 9,159 naturalization applications. Between July 1, 2020 and June 30, 2021, CLINIC must complete 8,846 naturalization applications. Failure to reach at or near the requisite number of naturalization applications will threaten this funding and any future funding.

12. CLINIC's NAC funding supports the equivalent of two and a half-full-time staff, specifically for the purpose of providing project management oversight to 29 funded partners in 15 communities in 12 states[1] in addition to conducting immigration law training and case consultations, designing program best practices, developing materials such as practice advisories and toolkits, monitoring and reporting on local performance outcomes, and providing technical support to NAC subcommittee work.

13. CLINIC has provided up to $20,000,000 in flow-through funding to local nonprofits—including both affiliates and non-affiliates—in 36 states[2] to provide naturalization outreach and application assistance. Nonprofits include faith-based (up to 15 faith traditions) and non-sectarian nonprofits that are separately incorporated by the IRS as 501(c)(3) charitable organizations.

---

[1] States include Arkansas, Arizona, California, Colorado, Florida, Georgia, Minnesota, New York, North Carolina, Pennsylvania, Texas, and the District of Columbia.

[2] States include Alaska, Arkansas, Arizona, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Kentucky, Louisiana, Maine, Massachusetts, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, Wisconsin, and the District of Columbia.

Naturalization work includes public education materials in non-English languages, community events for questions and answers, multi-media public service announcements, legal screening, one-on-one legal representation, in-house clinics focusing on a single immigration benefit, large-scale group application workshops, application form completion, filing forms with USCIS, legal representation, case management, and administrative advocacy in addition to English and naturalization test preparation assistance. CLINIC typically requires quarterly or semi-annual reports on numbers of persons reached, number of applications completed and filed, and demographic data of applicants served. NAC reporting is quite extensive beyond these data points.

14. In addition to the funding received from CLINIC, several affiliates also receive funding through the Citizenship and Assimilation Grant Program, among other sources.

**CLINIC's Workshop Model and Training**

15. Fifty percent of CLINIC's affiliates utilize workshop models in their program design.[3] The average CLINIC affiliate reports submitting approximately 120 fee waivers per year for a variety of immigration benefits, for a total of more than 40,000 fee waivers.

16. A naturalization workshop is a one-day community event that brings professionals and trained volunteers together to assist Lawful Permanent Residents ("LPR") in completing the N-400 naturalization application, including fee waiver requests.

17. The workshop is an essential tool for efficiently and effectively providing naturalization assistance to large numbers of people. The success of the workshop model depends on careful planning, thorough training of staff and volunteers, and high-quality services.

18. CLINIC provides training for those organizing and hosting a workshop as well as for volunteers and staff who assist attendees in completing their naturalization applications. CLINIC's El Paso sub-office began using the workshop model in 1994 and has been promoting and teaching its benefits ever since.

---

[3] Due to the Covid-19 pandemic, workshop utilization has decreased.

19. CLINIC provides trainings for a "mega" workshop that can assist over 500 applicants, "large" workshops that can serve 150 to 400 applicants, and smaller workshops designed to assist 10 to 20 applicants.

20. CLINIC trains affiliates conducting naturalization workshops to provide attendees with a worksheet so they can gather information on their employment, addresses, and trips outside the United States for the past five years. Whenever possible, these worksheets are provided prior to the workshop.

21. Naturalization workshops generally run for six to eight hours. Volunteers spend roughly two-to-four hours per naturalization applicant, including those applying for a fee waiver.

22. CLINIC estimates that at least 40 percent of applicants attending a workshop qualify to request a full or partial fee waiver. In CLINIC's experience, those receiving partial or full fee waivers will likely either not be able to afford the increased fee or, at least, would need to save for significant periods of time to do so.  Delays or lack of naturalization cause longstanding harm for individuals, families and communities including, but not limited to,  fewer: enfranchised voters who would otherwise be eligible to participate in the U.S.' democratic system; jurors who represent the communities where trials occur; families reunified who otherwise would file immediate relative petitions; newer families being formed through immigration for the same reasons; opportunities for jobs or promotions when naturalization is a pre-requisite; travelers having access to U.S. embassy protection given to U.S. citizens abroad; and legal permanent resident minors deriving U.S. citizenship from a parent who naturalizes.  The workshop model is the most-used process by which CLINIC affiliates participating in the NAC and many others in its network provide fee waiver assistance.

23. The effectiveness of the workshop model relies on the availability of fee waivers.

**CLINIC's Asylum Efforts**

24. CLINIC believes the United States has a moral imperative to accept asylum seekers as well as obligations under domestic and international law. Asylum seekers come to the United States fleeing persecution and most come to the shores of the United States with nothing more than the clothes on their back. Consequently, many asylum seekers face severe financial instability and are prone to exploitation, unsafe work environments, and labor or sex trafficking.

25. CLINIC is aware that gaining asylum in the United States is highly dependent on access to competent counsel. CLINIC leverages its Defending Vulnerable Populations section's substantial asylum expertise to provide support to our affiliates on asylum matters, including through trial skills trainings on representing asylum seekers in immigration court, practice advisories, and technical assistance. The Defending Vulnerable Populations section also works to increase the number of fully accredited representatives and attorneys who are qualified to represent immigrants in immigration court proceedings through a specialized curriculum and training program.

26. In addition to the support we provide our affiliates, CLINIC's Defending Vulnerable Populations section provides guidance and orientation to the formerly separated families who are pursuing asylum in the United States, mentorship to the formerly separated families' legal counsel, representation on the initial I-765 employment authorization applications asylum for the formerly separated families who lack legal counsel, representation on motions to reopen to for asylum seekers, pro bono legal counsel to asylum seekers appealing to the BIA and the U.S. courts of appeal through its BIA Pro Bono Project, and, to a lesser extent, direct representation to asylum seekers in immigration court on a pro bono basis. CLINIC's Defending Vulnerable Populations created its family separation project, motions to reopen project, and BIA Pro Bono Project with the understanding that asylum applications had never required a fee and would remain free or, at the very least, subject to a fee waiver. Obtaining payment for the asylum application creates a new time-consuming administration obstacle that CLINIC's Defending Vulnerable Populations section did not anticipate when it created these projects. It is my understanding that my Defending Vulnerable Populations colleagues are concerned about their clients' ability to pay a fee to access asylum protections.

27. Many CLINIC affiliates are on the "List of Pro Bono Service Providers" that EOIR provides to asylum seekers. For example, Catholic Charities of the East Bay in Oakland, California, is on the EOIR list and is a CLINIC affiliate. Providing free services to asylum seekers is a critical part of the mission of CLINIC and its affiliates. The ability to provide these services for free relies on the fee exemptions for I-589 asylum applications and initial I-765 employment authorization applications for

6

DECLARATION OF JEFF CHENOWETH – Case No. 4:20-cv-05883-JSW


25. CLINIC is aware that gaining asylum in the United States is highly dependent on access to competent counsel. CLINIC leverages its Defending Vulnerable Populations section's substantial asylum expertise to provide support to our affiliates on asylum matters, including through trial skills trainings on representing asylum seekers in immigration court, practice advisories, and technical assistance. The Defending Vulnerable Populations section also works to increase the number of fully accredited representatives and attorneys who are qualified to represent immigrants in immigration court proceedings through a specialized curriculum and training program.

26. In addition to the support we provide our affiliates, CLINIC's Defending Vulnerable Populations section provides guidance and orientation to the formerly separated families who are pursuing asylum in the United States, mentorship to the formerly separated families' legal counsel, representation on the initial I-765 employment authorization applications asylum for the formerly separated families who lack legal counsel, representation on motions to reopen to for asylum seekers, pro bono legal counsel to asylum seekers appealing to the BIA and the U.S. courts of appeal through its BIA Pro Bono Project, and, to a lesser extent, direct representation to asylum seekers in immigration court on a pro bono basis. CLINIC's Defending Vulnerable Populations created its family separation project, motions to reopen project, and BIA Pro Bono Project with the understanding that asylum applications had never required a fee and would remain free or, at the very least, subject to a fee waiver. Obtaining payment for the asylum application creates a new time-consuming administration obstacle that CLINIC's Defending Vulnerable Populations section did not anticipate when it created these projects. It is my understanding that my Defending Vulnerable Populations colleagues are concerned about their clients' ability to pay a fee to access asylum protections.

27. Many CLINIC affiliates are on the "List of Pro Bono Service Providers" that EOIR provides to asylum seekers. For example, Catholic Charities of the East Bay in Oakland, California, is on the EOIR list and is a CLINIC affiliate. Providing free services to asylum seekers is a critical part of the mission of CLINIC and its affiliates. The ability to provide these services for free relies on the fee exemptions for I-589 asylum applications and initial I-765 employment authorization applications for

1  asylum seekers and the fee waivers for I-765 renewals applications, I-485 applications, and N-400
2  applications.

3  **Familiarity with the Rule**

4  28.    I am familiar with the "U.S. Citizenship and Immigration Services Fee Schedule and
5  Changes to Certain Other Immigration Benefit Request Requirements" (the "Rule"). It is my
6  understanding that the Rule will increase fees for N-400 naturalization applications by paper from $640
7  to $1,170, which is an 83 percent increase. At the same time, the Rule will decrease the fee to renew
8  permanent resident status on form I-90 by paper from $455 to $415, which is a 9 percent decrease.
9  Partial fees will no longer be available for N-400 applications. For applicants who would have qualified
10 for the partial fee, the Rule increases the N-400 fee for filing by paper from $320 to $1,170, which is an
11 increase of 226%.

12 29.    Table 3 of the Rule shows the limited categories of applicants who are eligible for fee
13 waivers under the Rule. Most applicants will no longer be eligible for fee waivers for any forms,
14 including N-400 naturalization applications, I-765 applications for employment authorization, and I-485
15 applications for permanent residence. The Rule also changes the requirements to qualify for a fee
16 waiver. The Rule reduces the number of fee waivers available by allowing fee waivers only for those
17 applicants who have household incomes at or below 125% of the federal poverty guidelines. Currently,
18 applicants may be eligible for a fee waiver if they receive a means-tested benefit, have household
19 incomes at or below 150% of the federal poverty guidelines, or can establish financial hardship. The
20 Rule limits USCIS's own future discretion to change its approach to fee exemptions or waivers.

21 30.    The Rule also imposes a new mandatory fee of $50 on applications for asylum, a new
22 $550 fee for the first I-765 application for employment application plus $30 biometrics fee filed by an
23 asylum applicant, increases the fee for I-765 (non-DACA) applications for employment authorization
24 from $410 to $550, and increases the fee for children for I-485 applications for permanent residence
25 from $750 to $1,130, which is an increase of 51%. Although the Rule purports not to increase the I-765
26 application for employment authorization for DACA recipients, holding the fee at $410 for DACA
27 recipients still represents an increase in cost as a practical matter due to the effect of USCIS's decision

to decrease the validity period of employment authorization for DACA recipients from two years to one year. This means that DACA recipients will have to pay $820 for I-765 applications plus $170 for biometrics fees for a total of $990 to maintain employment authorization for two years.

31. CLINIC submitted a comment on December 18, 2019 in opposition to USCIS's proposed Rule, DHS Docket No. USCIS-2019-0010. Our ability provide comprehensive comments on the proposed rule was hindered by the timing of the issuance of the initial proposed rule, the short timeframe for comment, irregularities in the comment period, and the complexity of the rule with multiple scenarios and associated forms, rather than a single proposal. The proposed rule was issued on November 14, 2019, with a deadline for comments of December 16, 2019. On December 9, 2019, the agency published a supplement and extended the deadline for comments to December 31, 2019. On January 24, 2020, the agency reopened the public comment period, which closed on February 10, 2020.

**Effect of the Rule**

32. The elimination of the fee waiver and increased fees for naturalization applications will immediately impair the core missions at CLINIC and its affiliates. CLINIC and its affiliates anticipate being able to serve far fewer low income and vulnerable people in completing naturalization applications, asylum applications, adjustments of status, U and T visas, and VAWA petitions. Additionally, CLINIC anticipates that it and its affiliates will experience a drastic reduction in the number of people who will submit applications. Our analysis of this reduction is based on annual survey data provided by affiliates to CLINIC and case data available in LawLogix's EDGE case management system used by 105 affiliates, a strong representation of its entire network. This will lead to a marked decrease in CLINIC's ability to meet its deliverables and put its funding in jeopardy.[4]

33. Our naturalization workshop model relies greatly on the availability of fee waivers and partial fee waivers. In conjunction with the elimination of the fee waiver for most applicants, the dramatic fee increases will render the naturalization workshop business model that CLINIC and its affiliates use unsustainable.

---

[4] To reach CLINIC's FY '21 goal, CLINIC's affiliates will need to complete an average of over 700 N-400 applications per month. Due to the COVID-19 pandemic, workshops have largely been canceled through the end of 2020. CLINIC expects that the Rule will compound the difficulties associated with the COVID-19 pandemic.

34. The removal of the fee waiver for most applicants and the increase in the almost doubling of fees for the naturalization application, in particular, will mean that far fewer people will make the effort to attend the workshops. Even if the same number of people attended the workshops, without access to the fee waiver and due to the increased fee, a vastly lower number of those individuals—approximately 60%[5]—would be able to submit the naturalization application.

35. Under the new fee regime, CLINIC affiliates will need to revert to scheduling people for one-on-one appointments in the office. Even before the fee waiver elimination, CLINIC affiliates had a tight appointment schedule; now CLINIC believes that most clients will have to wait a month to be seen by a CLINIC affiliate. Since the COVID-19 pandemic appointments have been 50% less than before but more affiliates are slowly re-opening offices to do social distancing, one-on-one services for open and new cases. The timing of the Rule will compound the harm the COVID-19 pandemic has and continues to have on CLINIC and its affiliate's clients.

36. These one-on-one, in-office appointments are the most costly use of a legal representative's (that is, an attorney or DOJ-Accredited Representative) time. The addition of one-on-one appointments will reduce time in the legal representative's calendar to see other clients who pay fees to the nonprofit.

37. In sum, CLINIC and its affiliates believe that the new fee regime will severely impair the naturalization workshop model, if not eliminate its sustainability on an on-going basis for the lowest income LPRs across the country. Disabling or eliminating the workshop model will terminate our current model of organizational service due to a sharp reduction in applicants CLINIC and its affiliates assist in completing naturalization applications, as many eligible applicants and low-income immigrants will be forced to forego the opportunity to apply and find themselves "priced-out" of applying for citizenship and return home disappointed. Many within the communities we now serve would spread the word that naturalization is not as accessible or feasible as it once was before the Rule changes. CLINIC

---

[5] Based on our experience with individuals who attend workshops who would, without access to fee waivers or partial fee waivers, be unable to afford the current application fees, let alone the increased application fees.

and its affiliates will suffer damage to their highly-regarded reputation in the community as they will no longer be able to help community members.

38. Due to the changes in the fee waiver process, it is anticipated that the trajectory of NAC application numbers will decline rather than increase as it has since 2011. As naturalization applications for low-income immigrants decline in volume, CLINIC anticipates that funders will divert funds from the NAC, reducing CLINIC's revenue. A decline each year of just ten percent will have an exponentially negative, cumulative impact on the NAC's output and outcomes. CLINIC projects that a decline of ten percent would result in fewer funders joining the NAC as donors, which would reverse the trend prior to the Rule of increasing numbers of funders joining the NAC as donors. Fewer donors mean fewer dollars for the nonprofits participating in the NAC. Also, the board of directors of current donors are far less likely to sustain their giving for an NAC affiliate that is declining in output and outcomes. This, too, will result in fewer dollars. The NAC could become a shell of what it is today.

39. If application numbers decline sufficiently, CLINIC will be in jeopardy of losing its NAC funding for not meeting its deliverables. Currently, CLINIC anticipates that the anticipated reduction in applicants will result in CLINIC being unable to meet the required number of applications it has to submit as part of its agreement to receive NAC funding. If CLINIC is unable to meet those deliverables, it stands to lose funding going forward, or, at least, have the amount of funding reduced. CLINIC's reputation among funders will also be harmed by the failure to meet deliverables.

40. As a result of the Rule, CLINIC anticipates an ongoing loss of funding to its naturalization program. Again, the Rule's fee waiver policy and fee increases are expected to suppress the volume of future applications as well as funder support. Loss of, or even reduced, funding will cause CLINIC affiliates participating in NAC to reduce or layoff full-time NAC Project Coordinators. Loss of staff time or positions altogether, in turn, will reduce or eliminate public outreach and education leading people to workshops, diminish volunteer management time to find new volunteers and pro bono attorneys to replace those who drop-out, decrease the number of workshops that can be organized, and create a longer wait for one-on-one appointments. Reduced output will give funders less cause to use their money to support CLINIC as funders seek to maximize the outcomes of their donations.

41. In sum, CLINIC anticipates losing at least 30 to 40 percent of its funding as a result of the Rule.

42. The changes in the Rule will undermine CLINIC and its affiliates' ability to function and fulfill its central function to provide naturalization assistance, thereby dramatically disrupting our mission of providing immigration legal services to low-income and vulnerable populations. Adjusting to the changes, if possible, will require significant diversion of resources to adapt our trainings, materials, and other internal resources. In a lower funding environment, we would have to invest additional resources and capital to somehow continue delivering assistance in the midst of a drop in the number of applications completed as a result of the lack of a fee waiver option and increased fees for applications. As fewer naturalization applications are completed, CLINIC will experience a concomitant loss in funding, further exacerbating the losses resulting from an expenditure of resources to address the Rule.

43. CLINIC faces immediate harm that will continue if the Rule goes into effect. As the hub of the largest network of immigration service providers, CLINIC is charged with analyzing every significant change to immigration law and policy, and pushing out digestible information to hundreds of organizations and thousands of practitioners nationwide. The Rule will require the same, but at a much larger scale because naturalization is the first or second most frequently provided service by CLINIC affiliates and a significant percentage of naturalization applicants, up to 40 percent, seek fee waiver assistance. As a result of the Rule, CLINIC has made immediate plans to divert significant resources even prior to the Rule's effective date as many will rush to file before the new fees apply. CLINIC has diverted its employees' time and efforts in advocating against this Rule—including submitting a comment during the notice and comment period as well as training staff on the new proposals. CLINIC will devote significant time and resources to informing the communities it serves, participating in further advocacy, and updating its resources. At a minimum, CLINIC will be required, arising from its mission, to: analyze the new rule for consequences to affiliate operations and its client base; write a legal analysis for its newsletter; write a summary analysis for its mass communication; design an updated webinar on the changes (audiences often over 500 persons); update website content where fees and fee waiver language exists; update two web-based Citizenship and Naturalization Application Workshop Toolkits;

field affiliate inquiries to its two webforms answered by training and technical assistance attorneys as well as advocacy attorneys depending on the nature of the inquiry; provide program management consultations with affiliates struggling to serve low-income immigrants due to policy changes resulting in a lower number of people served and declining revenue, if not also staff reductions; and provide technical support given to affiliates needing to fundraise more through grant applications due to declining open cases and client fee-based revenue.

44. The Rule will have an immediate and tangible impact on the day-to-day work of CLINIC affiliates. Each practitioner has immediately begun learning about the Rule and how to assist clients under the new regime; CLINIC's job will be to tell them what to do. All 2,000-plus affiliate legal staff and their volunteers will need to be trained on how to assist absent the fee waiver and with the increased fees. CLINIC estimates that the cost of advocacy work for thirty days prior to the effective date of the rule to be $6,400. CLINIC estimates that, for the thirty days after the effective date of the Rule, it will have to expend $11,700 related to training and technical writing. CLINIC anticipates that additional expenses will accumulate as the Rule remains in effect. These estimates are based upon CLINIC's experience with rule changes in the past and its assessment of the number of hours and resources needed to accomplish the work.

45. In response to the Rule, CLINIC will need to develop and present webinars on the changes. CLINIC's affiliates depend on CLINIC to provide real-time and up-to-date guidance on immigration law and policy. Thus, CLINIC will have to provide timely training on how to evaluate immigrants' ability to pay for any application fee and if eligible for loans or grants, when available, to cover the application cost based on complex factors such as household size, income, assets, expenses and ability to pay back a loan.

46. CLINIC will have to re-work some of its core existing trainings and materials. CLINIC offers many trainings that will be impacted by the proposed change: the Comprehensive Overview of Immigration Law ("COIL") course; Citizenship and Naturalization course; a course on best practices for naturalization workshops; a course on how to hold a "mega workshop" (defined as a workshop with over 500 clients), a course on filing family-based petitions, and few more on refugee and asylee applications..

47. Additionally, CLINIC will have to rewrite chapters and advisories in its Citizenship Toolkit ("Citizenship for Us") and Naturalization Group Application Workshop Toolkit. Each toolkit has over 100 documents that will need to be reviewed for fee waiver relevance with some needing to be rewritten. CLINIC will need to write a newsletter article on the proposed rule and another, in-depth article on the final rule. Multiple social media announcements will need to be sent in addition to texts sent in six languages to members of CLINIC's Text4Refugees listserv. Each translation requires a cost and each text sent is a cost as well.

48. In general, the Rule will result in a significant expenditure of staff resources to accommodate the new fee regime. This will require diversion of resources from other time-sensitive responsibilities. CLINIC has already had to divert resources to respond to numerous changes to immigration regulations spanning public charge determinations, asylum applications, responding to Request for Evidence, and additional changes occurring on a monthly basis. These changes are detrimental to immigrant clients and have resulted in CLINIC having to increase its staffing levels by more than 20% in the past three years in its Training and Legal Support and Defending Vulnerable Populations Sections. CLINIC anticipates that these changes through diversions of resources will only intensify due to the Rule. Much of the work that we will have to initiate in response to the changes will be brand new work. But for the need to respond to the changes in the Rule, our staff would otherwise be devoting time to helping affiliates tackle difficult legal problems under existing law, or training and teaching on other important substantive legal issues including VAWA, T and U visas, refugee and asylee petitions, DACA, and LRIF on or before December 20, 2020.

49. CLINIC will have to respond, in the ways described in the above paragraphs, within two to three days of the rule going into effect and in a concerted way for at least 30 days thereafter, not to mention ongoing work to address the long-term impact of the rule change.

50. In addition to the above harms related to naturalization, CLINIC and its affiliates will be harmed by the imposition of the unprecedented nonwaivable fee to apply for asylum, the new fee for an asylum seeker's initial application for employment authorization, and increased fees for adjustment of status in the rule.

51. The asylum seekers CLINIC and its affiliates represent are indigent and will not be able to afford the $50 application fee without significant hardship. Asylum seeking clients struggle to provide for their basic needs, including housing and food, and do not have access to credit cards and loans in order to pay the $50 application fee. Because of their economic circumstances, CLINIC anticipates that fewer asylum seekers will seek its affiliates' asylum services. This harms CLINIC's mission of providing immigration legal services to low income and vulnerable people.

52. The Rule's imposition of a new fee for asylum seekers who are applying for initial employment authorization will make it difficult for asylum clients to be able to work to support themselves and their families. They cannot afford to pay $550 for an I-765 application in addition to a $30 biometric fee, as is required by the Rule. Their inability to work will make it much more difficult for CLINIC and its affiliates to represent them, particularly if they are unable to afford stable housing without income from working.

53. CLINIC and its affiliates also provide assistance to immigrants who are seeking adjustment of status. The elimination of the fee waiver for most categories of immigrants and the elimination of the discount for children's I-485 application will make it difficult for clients to adjust status. Clients already struggle to pay the fee for the required medical exam by a designated civil surgeon that is necessary for the I-485 application. CLINIC and its affiliates are unlikely to be able to absorb the cost of these fees for clients. I expect that we will see a decline in clients seeking assistance with the form I-485, solely because it will no longer be affordable to clients.

54. The elimination of fee waivers and discounts for form I-485 will also increase the time CLINIC and its affiliates must spend on adjustment of status applications and thus increases those costs. CLINIC and its affiliates often assist family groups who are adjusting status together. Because of the availability of fee waivers and discounts, families were able to apply at the same time. This resulted in efficiencies for our organization because we could gather information for the entire family at one time. Without fee waivers and discounts, families will be forced to apply for permanent residence as they can afford the fee for each family member. That means that CLINIC and its affiliates will have to meet with the family more times and over a longer period of time. This represents an opportunity cost for CLINIC

and its affiliates. Meeting repeatedly with the same family in order to complete applications that could previously complete in one meeting leaves less time to help other clients.

55. The inability for families to adjust at the same time also poses unique risks of harm to asylees and their derivatives. A derivative asylee is only able to adjust status through asylum if the principal applicant still retains asylum status. Principal asylum applicants tend to be adults, and these adult asylees reasonably prioritize their own adjustment and naturalization before the adjustment of their children because of the additional benefits that accrue to adults who are U.S. citizens. As a result, I expect that the Rule will result in principal applicants naturalizing before all of their derivatives complete and can pay for the fees to obtain a green card. This will leave these derivative asylees unable to adjust through asylum without filing their own nunc pro tunc asylum applications. As legal service providers, this will make the task of helping these families much more complicated and time consuming.

56. If the rule is enjoined after it goes into effect, CLINIC will neither recoup any of the various expenditures mentioned above that must be undertaken now as a result of the Rule, nor will it otherwise have the ability to retroactively unwind the harms it continues to endure.

15
DECLARATION OF JEFF CHENOWETH – Case No. 4:20-cv-05883-JSW

1  I declare under penalty of perjury and under the laws of the United States that the foregoing is
2  true and correct. Executed at Los Angeles, California on August 19, 2020.

*Jeff Chenoweth*