Brian J. Stretch, SBN 163973
bstretch@sidley.com
Naomi Igra, SBN 269095
naomi.igra@sidley.com
Chelsea Davis, SBN 330968
chelsea.davis@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Jesse Bless (*pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G Street, Suite 300
Washington, D.C. 20005

Samina M. Bharmal (*pro hac vice*)
sbharmal@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
Telephone: +1 202 736 8000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER; EAST BAY SANCTUARY COVENANT; COALITION FOR HUMANE IMMIGRANT RIGHTS; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; INTERNATIONAL RESCUE COMMITTEE; ONEAMERICA; ASIAN COUNSELING AND REFERRAL SERVICE; ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, | Case No.  4:20-cv-05883-JSW **DECLARATION OF DOUGLAS B. RAND IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiffs, v. | |
| CHAD F. WOLF, *under the title of Acting Secretary of Homeland Security;* U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security;* U.S. CITIZENSHIP & IMMIGRATION SERVICES | |
| Defendants. | |

I, Douglas B. Rand, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.      I am a Senior Fellow and Director of the Technology and Innovation Initiative at the Federation of American Scientists, focusing on the intersection of immigration policy and artificial intelligence (AI) in advancing the nation's national security and economic growth.

2.      I have a J.D. from Yale Law School, and an M.B.A. from Yale School of Management. Before completing my J.D. and M.B.A., I completed an M.A. at the Harvard Graduate School of Arts and Sciences, and an A.B. at Harvard College.

3.      My research has generally focused on immigration policy, particularly as it pertains to technology and economic growth.

4.      I have published several articles and analyses of immigration policies, including *The Case of the Insolvent Federal Agency: A Forensic Analysis of Public Data on U.S. Citizenship & Immigration Services*, N.Y.U. Journal of Legislation & Public Policy Quorum (June 15, 2020).

5.      As Assistant Director for Entrepreneurship in the White House Office of Science and Technology Policy, I helped lead the Obama Administration's high-skill immigration agenda, including core elements of the bipartisan Senate bill on comprehensive immigration reform in 2013, and President Obama's subsequent executive actions on immigration.

6.      As Co-Founder and Founding President of Boundless Immigration Inc., I helped launch a venture-backed technology company that empowers families to navigate the immigration system more confidently, rapidly, and affordably, and led the company's strategy, legal, content, and external affairs functions.

7.      A true and correct copy of my curriculum vitae is attached as Appendix A.

8.      I am providing this declaration in my personal capacity.

9.      A list of all materials I have reviewed in preparing this declaration is attached as Appendix B.

10.     I have personal and professional knowledge of the matters set forth herein. I would testify to the facts in this declaration under oath if called upon to do so.

11.     On November 14, 2019, the U.S. Department of Homeland Security ("DHS") proposed changes to the immigration services fee schedule administered by a DHS subagency, U.S. Citizenship and Immigration Services ("USCIS"). 84 Fed. Reg. 62,280 (Nov. 14, 2019) ("November Proposal"). The November Proposal issued right before the Thanksgiving holiday, with a December 16, 2019 deadline for comments.

12.     DHS subsequently replaced the economic analysis on the regulatory docket for this rulemaking with a new economic analysis, without informing the public, on November 22, 2019.

13.     DHS then published an entirely different set of budget assumptions on December 9, 2019, extending the comment deadline to December 30, 2019. 84 Fed. Reg. 67,243 (Dec. 9, 2019) ("December Proposal").

14.     The December Proposal advanced new rationales for fee increases not previously even alluded to in the November Proposal.  It did not include a corresponding new fee schedule and did not propose concrete adjustment of fees in accordance with the new rationales.

15.     On January 24, 2020, DHS reopened the public comment period for the proposed rule for another seventeen days, with a deadline of February 10, 2020. 85 Fed. Reg. 4,243 (Jan. 24, 2020).

16.     On February 3, 2020, one week before that deadline, I attended a meeting at USCIS where I participated in a demonstration of the cost modeling software USCIS used in the course of determining the fee increase.

17.     On August 3, 2020, the DHS published a final rule, U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Benefit Request Requirements. 85 Fed. Reg. 46,788 (Aug. 3, 2020) (the "Final Rule").

18.     I have also testified before Congress regarding USCIS. My prepared testimony and supplemental testimony to the U.S. House Committee on the Judiciary, Subcommittee on Immigration and Citizenship, for the hearing entitled "Oversight of the U.S. Citizenship and Immigration Services," are attached as Appendices C and D.

19.     I was asked to provide my expert opinion about the technical aspects of the cost modeling that underlies the fee increases in the Final Rule, based on both my expertise and my

DECLARATION OF DOUGLAS B. RAND
Case No. 4:20-cv-05883-JSW

participation in the cost modeling software demonstration, as well as the basis of calculations I made to determine the proportion of the USCIS costs that are unaccounted for in the Final Rule, and the extent to which the public can or cannot make determinations about the components of the USCIS budget based on the data provided to the public in the Final Rule.

20.     In summary, it is my expert opinion that the Final Rule relies on inaccurate and inadequately explained inputs, and that the public is unable to determine, based on the proposals and the Final Rule, the components of the USCIS budget or the basis for the allocation of costs across the various form types.

21.     Despite my policy experience in this area, my considerable time expended in the short period allotted for comments and review, and my in-person meeting with USCIS to see a demonstration of the agency's software, I am unable to discern the basis for key inputs and assumptions in the cost modeling on which the Final Rule is based.

22.     USCIS's budget is an input into the cost-modeling software. Critically, the software does not determine the budget; it merely allocates the agency's budget among all of the various form types. In other words, DHS first determines the total budget for USCIS and then uses the Activity-Based Cost ("ABC") model to determine how to allocate that budget to the various fees.  The public has not been informed about the component parts of the budget, and that information is not captured within the cost-modeling software I observed during my technical meeting with USCIS.

23.     After the Final Rule issued, I conducted the following calculations to determine the proportion of the budget that is unexplained in the rule.

24.     Table 2 of the Final Rule asserts that USCIS requires an additional $1.036 billion in average annual Non-Premium Immigration Examinations Fee Account revenue (hereafter "revenue") in order to operate within its average annual budget projection. USCIS only itemizes three budget categories to account for its increased cost baseline. Although the allocation of costs among these three budget categories is inconsistent as between Table 2 of the November Proposal and the accompanying narrative, and the Final Rule revises these numbers, it can be inferred (with no small difficulty) that USCIS plans to expend an annual average of $185 million for "Pay and benefits adjustments for on-board staff" ($280.2 million in FY 2019 and $89.8 million in FY 2020);

4

1  $122.8 million for "Pay and benefits for new staff" ($116.7 million in FY 2019 and $128.8 million

2  in FY 2020); and $69.1 million for "Net additional costs." These three budget items add up to $376.8

3  million per year, which only accounts for 36% of the $1.036 billion in additional annual revenue that

4  USCIS claims it needs.

5       25.    This calculation leaves over $659 million, or 63.6%, of the new revenue allocation

6  completely unexplained.

7       26.    In addition, the Final Rule does not state the functions that the "new hires" will

8  perform.  It is therefore unclear whether they are "adjudicators," which is the specific term USCIS

9  uses to describe the employees who process immigration applications.

10      27.    I am unable to discern why the Final Rule projects an annual average of $4.444

11  billion in budget needs.

12      28.    USCIS's actual costs in FY 2018, 2019, and 2020 are identified in DHS's annual

13  Congressional budget justifications, which state that the enacted budgets (i.e. actual costs) for

14  USCIS were $3.626 billion in FY 2018, $3.877 billion in FY 2019, and $3.997 billion in FY 2020. (I

15  have manually adjusted these budget numbers to exclude "Premium" budget expenditures, as in the

16  Final Rule.)

17      29.    These costs, as reported by DHS to Congress, were much lower than the  projections

18  in the Final Rule, which alleges a budget need of $4.332 billion in FY 2019 and $4.556 billion in FY

19  2020, or an average of $4.444 billion.  The cost modeling software I observed does not take into

20  account the difference between actual costs and projected costs during the fiscal years in question.

21      30.    Furthermore, the November and December Proposals, the February 3, 2020 meeting

22  with USCIS, and the Final Rule taken together did not provided sufficient detail as to the bases on

23  which the agency relied to project significantly higher costs for a number of individual form types.

24      31.    At a high level, it appears that the cost modeling software DHS relies upon for this

25  rulemaking calculates "Model Output" for each form type as the "Total Cost" for that form type

26  divided by its fee-paying volume.  Then, DHS puts those Model Outputs into a separate spreadsheet,

27  outside of the cost modeling software, to undergo "Cost Reallocation" to determine the fees in the

28  Final Rule.

DECLARATION OF DOUGLAS B. RAND
Case No. 4:20-cv-05883-JSW

32.     The projected costs for various form types have changed dramatically over the past four years since the publication of the 2016 USCIS fee rule. For example, the November Proposal indicated that the USCIS's cost to complete a Form I-129 (Petition for a Nonimmigrant Worker) has increased by 83%, and its cost to complete a Form N-400 (Application for Naturalization) has increased by 32%. The cost modeling software does not articulate the reasons for these changes.

33.     An essential factor in the ABC calculations is the projected future volume of applications.  Neither I nor any other public commenters have any of the information necessary to determine how the USCIS "Volume Projection Committee" takes prior volume data and makes a valid projection into future years.

34.     DHS has not explained its source for data on volume projections that it entered into the model. For example, the November Proposal projects that a N-400 takes 1.57 hours to complete at a fee of $1,170, or $745 per hour. But an EB-5 I-526 petition takes 8.65 hours at a fee of $4,015, or $464.16 per hour. The disparate hourly rates per form is inconsistent with an activity-based cost system in which fee burdens are allocated consistently across form types. In the Final Rule, the only explanation offered is that "DHS uses multiple, different techniques to forecast USCIS' workloads." 85 Fed. Reg. 46,871.

35.     DHS's apparent failure to account for such factors as election-year volume surges, pre-hike volume surges, and post-hike volume drop-offs suggests that the methodology is flawed in ways that the public cannot adequately assess.  Such volume changes have been observed in many studies, including the *2020 State of New American Citizenship Report* that I authored for Boundless Immigration Inc.[1]

36.     As stated above, the Final Rule has nearly $700 million of unexplained costs. In addition, the Final Rule calls for an increase of 6,277 positions, or 43% above the staffing amount identified in the 2016/2017 fee rule, including an unexplained doubling of positions within the Fraud Detection and National Security Directorate. *See* 85 Fed. Reg. at 46,871.

---

[1] Available at https://www.boundless.com/research/state-of-new-american-citizenship-report/.

DECLARATION OF DOUGLAS B. RAND
Case No. 4:20-cv-05883-JSW

37.     USCIS states in the Final Rule that it sent staff to assist Immigration and Customs Enforcement under the Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act of 2019. Pub. L. No. 116-26, 133 Stat. 1018.

38.     Although DHS claims that the "[m]arginal costs associated with this effort are not in this final rule," it is unclear based on the record how they have been accounted for elsewhere.

39.     As described above, the public comment period for the rulemaking was unusual and disjointed. Despite my technical expertise and experience in this area, I did not have adequate time for public comment on such a broad rule.

40.     Instead of the required 60 days with a complete proposal, DHS has provided the following:

- November proposed rule: Nov. 14–Dec.16 (32 days)

- December proposed rule with supplemental information: Dec. 9–30, 2019 (21 days) + Jan. 24–Feb. 10, 2020 (17 days); the supplemental information completely changed the fee schedule in the initial proposed rule of Nov. 14, 2019, requiring public commenters to start over in their data analysis and comment preparation.

- 56 Proposed forms: Nov. 18–Dec. 30, 2019 (42 days) + Jan. 24–Feb. 10, 2020 (17 days)

- Economic analysis: N/A (no proper notice that the new version replaced the old version)

- Cost modeling software: Feb. 3–10 (7 days)

41.     Because of the breaks between the various comment periods, and the lack of advance notice for some of the later comment periods, I had to spend significant time re-orienting and reviewing the new proposals and issuances, which are extremely dense material, in order to provide meaningful comments, with limited ability to shift schedules to make time for meaningful analysis.

1

2  I declare under penalty of perjury under the laws of the United States of America that the foregoing

3  is true and correct to the best of my knowledge.

4

5  Executed on 8/21/2020

6                                                    Douglas B. Rand

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DOUGLAS B. RAND
Case No. 4:20-cv-05883-JSW

# APPENDIX A

# DOUGLAS B. RAND

## EDUCATION

**YALE LAW SCHOOL**                                                                          2007–2010
J.D., June 2010

*Honors:*        Entrepreneurship Challenge (Inaugural Award Winner)

*Activities:*    National Popular Vote Initiative (Founder)
                 Information Society Project and Knight Law & Media Program (Student Fellow)
                 Small Business Legal Services, Community & Economic Development Clinic
                 San Francisco Affirmative Litigation Project
                 Yale Law School Democrats (Co-Chair)
                 American Constitution Society (Voting Rights Committee, Education Committee)

**YALE SCHOOL OF MANAGEMENT**                                                               2008–2010
M.B.A., June 2010

*Honors:*        Yale Entrepreneurial Institute Summer Fellowship (2010)
                 Net Impact Case Competition awardee

*Activities:*    Entrepreneurship Club
                 Energy Club

**HARVARD GRADUATE SCHOOL OF ARTS AND SCIENCES**                                            1999–2001
M.A., Organismic and Evolutionary Biology (OEB)                                             3.93 GPA

*Honors:*        National Science Foundation Graduate Research Fellowship

*Activities:*    Published research on molecular phylogeny and life history evolution
                 Teaching Fellow for courses in biology lab research, evolution, and animal behavior
                 Organizer of roundtable on biology and public policy
                 Research assistant for Professor Emeritus Ernst Mayr

**HARVARD COLLEGE**                                                                         1994–1998
A.B. *cum laude*, concentration in Biology                                                  3.76 GPA

*Honors:*        *Summa cum laude* senior thesis
                 Phi Beta Kappa
                 John Harvard Scholarship for academic excellence (four awards)
                 Harvard College Research Program (three grants)

*Activities:*    Computational biology project at National Center for Biotechnology Information (NCBI)
                 First-Year Outdoor Program (FOP) trip leader
                 On Thin Ice improv comedy troupe and Harvard-Radcliffe Dramatic Club
                 Boston Refugee Youth Enrichment (BRYE) volunteer coordinator and ESL tutor

## EXPERIENCE

**BOUNDLESS**                                                                              Seattle, WA
*Co-Founder and Founding President*                                                        2017–present
Co-founder of a venture-backed technology company that empowers families to navigate the immigration system more
confidently, rapidly, and affordably. Through its online platform and network of independent immigration attorneys,
Boundless has helped thousands of people apply for green cards and U.S. citizenship. Boundless has been featured by
the New York Times, Univision, Newsweek, Fast Company, Techcrunch, and dozens of other media outlets. Its
investors include Foundry Group, Trilogy Equity Partners, Pioneer Square Labs, Two Sigma Ventures, and Founders'
Co-op. As founding President, led the company's strategy, legal, content, and external affairs functions.

**FEDERATION OF AMERICAN SCIENTISTS**                                      Washington, DC
*Senior Fellow*                                                              2019–present
Director of the Technology and Innovation Initiative at the Federation of American Scientists, focusing on the intersection of immigration policy and artificial intelligence (AI) in advancing the nation's national security and economic growth.

**WHITE HOUSE OFFICE OF SCIENCE AND TECHNOLOGY POLICY**          Washington, DC
*Assistant Director for Entrepreneurship*                                    2010–2017
Served in the Obama White House for over six years as a senior advisor, building the new role of Assistant Director for Entrepreneurship.

- Spearheaded the White House Startup America initiative to promote high-growth entrepreneurship in communities across the country, engaging both federal agencies and novel public-private partnerships in efforts including: *Startup in a Day*, a pledge by over 100 mayors and tribal leaders to build online tools that dramatically streamline business licensing and permitting; *White House Demo Day*, an inclusive entrepreneurship agenda yielding major commitments by the venture capital industry, schools of engineering, major tech companies, and other stakeholders to advance opportunities for women and underrepresented minorities; and *Lab-to-Market*, a whole-of-government project to accelerate the commercialization of federally-funded research and development (R&D), including expansion of the Innovation Corps (I-Corps) entrepreneurship training to teams from nearly 200 universities.
- Launched the *Clean Energy Investment Initiative* to expand investment in promising new technologies, including more than $4 billion in private-sector commitments alongside new executive actions to scale up investment in clean energy innovation; and co-drafted the U.S. implementation framework for *Mission Innovation*, a national commitment to increase and optimize clean energy R&D across all federal research agencies.
- Helped develop the bipartisan Jumpstart Our Business Startups (JOBS) Act, signed by President Obama in 2012, which created an "IPO on-ramp" for emerging growth companies, allowed smaller companies to raise up to $50 million annually through "mini public offerings" under Regulation A+, and unleashed a new marketplace of regulated online platforms for securities-based crowdfunding.
- Helped lead the Administration's high-skill immigration agenda, including core elements of the bipartisan Senate bill on comprehensive immigration reform in 2013, and President Obama's subsequent executive actions on immigration, such as:  the *International Entrepreneur Rule*, to make it easier for the world's best and brightest entrepreneurs to start and scale their companies in the United States; the *OPT STEM Rule*, to strengthen and extend on-the-job training for international science and engineering graduates from U.S. universities; and the *H-4 Rule*, to empower the spouses of certain high-skilled immigrants to obtain employment permits and put their own education and talents to work.

**PLAYSCRIPTS, INC.**                                                       New York, NY
*Co-Founder and Founding CEO*                                                1999–2014
Founded a publishing and performance licensing house for new stage plays and musicals, serving tens of thousands of theater groups in over 100 countries with an exclusive catalogue of over 1,900 works by over 1,100 authors. Achieved profitability and double-digit annual revenue growth. Featured by NPR for "bringing the business of theater into the 21st century." As first CEO, executed both long-term strategy and day-to-day management in finance, operations, literary acquisitions, human resources, marketing, and product distribution. (Playscripts, Inc. was acquired in 2014.)

**STAGEGRADE**                                                             New York, NY
*Founding Partner*                                                          2010–2012
Co-founded a dynamic website reporting the critical consensus on plays and musicals in New York City, offering theatergoers a trustworthy source for all reviews, authoritatively aggregated and graded for easy reference. The site was featured on a front-page story in *The New York Times*, and described as "a key bookmark" by *The New York Post*. (StageGrade was acquired in 2012.)

**SENATE JUDICIARY COMMITTEE, OFFICE OF SENATOR RUSS FEINGOLD**     Washington, DC
*Legal intern*                                                             Summer 2009
Wrote a wide range of legal memoranda on the latest developments in civil liberties, marriage equality, intellectual property, international human rights, campaign finance reform, antitrust issues, and clean water legislation. Assisted in preparing Sen. Feingold for floor statements and hearings, including the confirmation of Justice Sonia Sotomayor.

**AMERICAN CIVIL LIBERTIES UNION, PROGRAM ON FREEDOM OF RELIGION AND BELIEF**   Washington, DC
*Legal intern*                                                                                  Summer 2008
Provided both legal and policy support to the ACLU's national coordinating team for constitutional religious issues. Drafted a preliminary injunction brief for a client's free exercise claim. Developed strategy for construing the Louisiana Science Education Act to strengthen evolutionary biology education, consistent with the Establishment Clause.

**DEPARTMENT OF JUSTICE, ENVIRONMENTAL ENFORCEMENT SECTION**                    Washington, DC
*Legal intern*                                                                                  Summer 2008
Conducted legal research and writing in support of suits against violators of federal environmental laws, focusing on complex power plant litigation. Drafted several memoranda related to critical procedural questions.

## PUBLICATIONS

- *N.Y.U. Journal of Legislation & Public Policy Quorum* (June 15, 2020): "The Case of the Insolvent Federal Agency: A Forensic Analysis of Public Data on U.S. Citizenship & Immigration Services" (law journal piece, with Lindsay Milliken).

- *Just Security* (Feb. 7, 2020): "Never Mind 'America First' — Trump's Newly Expanded Immigration Ban Puts Americans Last" (op-ed).

- *Healthcare Business Today* (Dec. 6, 2019): "Trump is fine with healthcare mandates, as long as they hurt immigrants" (op-ed).

- *Slate* (May 7, 2019): "The White House Is Planning a Backdoor Travel Ban on Trump's 'S—thole Countries'" (op-ed).

- *Austin American-Statesman* (Oct. 26, 2018): "The looming threat to American businesses: No immigrants need apply?" (op-ed).

- *Houston Chronicle* (Oct. 9, 2018): "Trump plan could break up nearly 200,000 married couples" (op-ed).

- *Bloomberg* (June 14, 2018): "Doesn't Trump's America Need More Entrepreneurs?" (op-ed, with Stuart Anderson).

- *Houston Chronicle* (Apr. 15, 2018): "Want to get rich? Let in more immigrants" (op-ed).

- *GeekWire* (Aug. 3, 2017): "Why Congress isn't going to cut legal immigration in half" (guest post).

- Kaliszewska, Z.A., Lohman, D.J., Sommer, K., Adelson, G., Rand, D.B., Mathew, J., Talavera, G., and N.E. Pierce. When caterpillars attack: Biogeography and life history evolution of the Miletinae (Lepidoptera: Lycaenidae). *Evolution* 69: 571-588 (2015).

- Gerken, H.K. and D.B. Rand. Creating Better Heuristics for the Presidential Primary: The Citizen Assembly. *Political Science Quarterly* 125:1 (Summer 2010).

- *Hartford Courant* (Feb. 18, 2009): "Let's Make Our Presidential Votes Matter" (op-ed supporting Connecticut's National Popular Vote bill).

- *The Dramatist* (Sept./Oct. 2006): "Let's Raise the Playwright's Minimum Wage" (influential article for the Dramatist Guild's monthly publication, highlighting the long-term stagnation of playwrights' real royalty income).

- *Dramatics Magazine* (Apr. 2006): "Seize the Play: How an accidental festival of student work became a tradition."

- Pierce, N.E., Braby, M.F., Heath, A., Lohman, D.J., Mathew, J., Rand, D.B., and M.A. Travassos. The ecology and evolution of ant association in the Lycaenidae (Lepidoptera). *Annual Review of Entomology* 47: 733-771 (2002).

- Rand, D.B., Heath, A., Suderman, T., and N.E. Pierce. Phylogeny and life history evolution of the genus *Chrysoritis* within the Aphnaeini (Lepidoptera: Lycaenidae), inferred from mitochondrial *cytochrome oxidase I* sequences. *Molecular Phylogenetics and Evolution* 17:85-96 (2000).

- *Dramatics Magazine* (May 1999): "Have some candy: The internet turns a short play into a global phenomenon."

- *Entertainment Weekly* (Dec. 11, 1998): "Reality Check" (Harvard entomologists explore the comparative morphology of *Antz* vs. *A Bug's Life*, co-authored with Scott Brown).

- *Let's Go* budget travel guides to New Zealand (1999; researcher-writer), Alaska and the Pacific Northwest (1998; editor), and Southeast Asia (1997; researcher-writer).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# APPENDIX B

I considered the following materials in preparing this declaration:

- Comment of Boundless Immigration Inc. (Dec. 30, 2019)

- Comment of Boundless Immigration Inc. (Feb. 10, 2020)

- Comment of Boundless Immigration Inc. and immigration advocacy organizations (Feb. 10, 2020)

- *Hearing on Oversight of U.S. Citizenship and Immigration Services Before the H. Comm. on the Judiciary, Subcomm. on Immigration and Citizenship*, 116th Cong. (2020) (statement of Doug Rand)

- *Hearing on Oversight of U.S. Citizenship and Immigration Services Before the H. Comm. on the Judiciary, Subcomm. on Immigration and Citizenship*, 116th Cong. (2020) (supplemental statement of Doug Rand)

- *Hearing on Oversight of U.S. Citizenship and Immigration Services Before the H. Comm. on the Judiciary, Subcomm. on Immigration and Citizenship*, 116th Cong. (2020) (written testimony of Joseph B. Edlow)

- *Hearing on Oversight of U.S. Citizenship and Immigration Services Before the H. Comm. on the Judiciary, Subcomm. on Immigration and Citizenship*, 116th Cong. (2020) (oral testimony of Joseph B. Edlow)

- U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. 62,280 (Nov. 14, 2019)

- U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. 67,243 (Dec. 9, 2019)

- U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 85 Fed. Reg. 46,788 (Aug. 3, 2020)

- Immigration Examinations Fee Account, Fee Review Supporting Documentation (Apr. 2019)

- Immigration Examinations Fee Account, Fee Review Supporting Documentation with Addendum (May 2020)

- U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, Regulatory Impact Analysis (posted Nov. 13, 2019)
- U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, Regulatory Impact Analysis (Oct. 30, 2019, posted Nov. 22, 2019)
- U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, Regulatory Impact Analysis (Jul. 22, 2020)
- Department of Homeland Security, Congressional Budget Justification FY 2013
- Department of Homeland Security, Congressional Budget Justification FY 2014
- Department of Homeland Security, Congressional Budget Justification FY 2015
- Department of Homeland Security, Congressional Budget Justification FY 2016
- Department of Homeland Security, Congressional Budget Justification FY 2017
- Department of Homeland Security, Congressional Budget Justification FY 2018
- Department of Homeland Security, Congressional Budget Justification FY 2019
- Department of Homeland Security, Congressional Budget Justification FY 2020
- Department of Homeland Security, Congressional Budget Justification FY 2021
- U.S. Citizenship and Immigration Services Fee Schedule, 81 Fed. Reg. 73,292 (Oct. 24, 2016)
- Immigration Examinations Fee Account, Fee Review Supporting Documentation (Apr. 2016)
- Immigration Examinations Fee Account, Fee Review Supporting Documentation (Oct. 2016)

# APPENDIX C

Statement for the Record of
Doug Rand
Senior Fellow, Federation of American Scientists

For a Hearing of the Subcommittee on Immigration and Citizenship
U.S. House Committee on the Judiciary

"Oversight of U.S. Citizenship and Immigration Services"

Wednesday, July 29, 2020
9:30am ET

## Statement for the Record

Chair Lofgren, Vice Chair Jayapal, Ranking Member Buck, and members of the Subcommittee on Immigration and Citizenship, it is an honor to appear before you today to address the oversight of U.S. Citizenship and Immigration Services (USCIS).

My name is Doug Rand, and I am providing this testimony in my personal capacity.

Today I wish to emphasize that USCIS is simultaneously suffering from three crises:

- First, a mismanagement crisis that is the fundamental cause of the agency's current demand for a bailout from Congress.

- Second, an accountability crisis that this Congress must remedy.

- And third, a naturalization crisis that could disenfranchise over 300,000 future Americans by this November.

## I. Mismanagement Crisis

In mid-May of 2020, USCIS suddenly announced that without a $1.2 billion bailout from Congress, it would soon need to furlough over 13,000 of its employees because of projected budget shortfalls. USCIS, which is almost entirely funded by user fees, claimed that this sudden insolvency was entirely due to the COVID-19 pandemic suddenly pushing down volume and revenues.

It is clear, however, that the agency's financial troubles are in fact due to mismanagement and deliberate policy choices that long pre-date the COVID-19 crisis.

Let's rewind the clock to the end of 2016. The Obama administration had just increased USCIS user fees in order to put the agency on a firm financial footing for years to come. Over the next three years, annual agency revenue shot up by over $700 million, even as the annual number of cases dropped by 5 percent. By the end of FY 2019, USCIS was pulling in almost 30 percent more revenue per customer, on average.

Apparently all of this extra money wasn't enough for the Trump administration. In November 2019, USCIS proposed hiking fees for a second time in three years. Even though it had an $800 million carryover balance at the end of FY 2018, the agency warned that it would be $250 million in the hole by the end of FY 2019, and over *$1.5 billion* in the hole by the end of FY 2020. In other words, one month before the novel coronavirus causing COVID-19 was even discovered, USCIS was already projecting that a massive cash crunch would occur right around now.

That's because USCIS knew, well before the pandemic, that it was jacking up expenses even faster than revenues—especially payroll expenses.

2

Since the beginning of the Trump administration, USCIS has increased its headcount by nearly 20 percent, from over 15,000 positions in 2016 to over 18,000 in 2020.

But why would USCIS need to increase its staff and its payroll expenses so dramatically when the volume of applications has actually gone down during the same period of time?

There appear to be two primary drivers of this staff surge. First, the Trump administration has prioritized anti-fraud measures—even in the absence of any publicly-disclosed evidence of the need for such measures. Although USCIS provides the public with insufficient data to know how many of its additional 3,000 positions are in the Fraud Detection and National Security (FDNS) Directorate, we know that the agency has declared an ambition to more than double the size of this unit, with nearly 1,000 additional hires.

Second, under the Trump Administration, USCIS has issued a flurry of policies that make its case adjudications more complicated, which reduces the agency's efficiency and requires more staff to complete fewer cases. There are dozens if not hundreds of such policies; three of the most consequential are:

- The institution of mandatory interviews for employment-based green card applicants (some 122,000 per year), for family members of refugees and asylees applying for a green card (some 46,000 per year), and for recently married couples who have already obtained a green card (over 166,000 per year);

- The elimination of the "prior deference" policy that now requires USCIS officers to scrutinize hundreds of thousands of skilled worker renewal applications each year, even if nothing material has changed since the initial adjudication; and

- The "public charge rule," an unlawful wealth test that has made green card adjudications vastly more complex and time-consuming for no legitimate reason.

This buildup of red tape and government employees has led to the worst of both worlds: burgeoning payroll expenses are crippling the financial sustainability of the agency, even as backlogs and processing times have reached crisis levels.

While only USCIS knows the true cost of its misguided policy choices, there is a tell in its latest fee hike proposal. USCIS tallied up its own internal average cost to process each form type, revealing an astonishing increase over the course of just three years. The total additional cost, summed over just five of the agency's most common forms, is over $500 million per year.

Since 2017, USCIS has burdened its users—and its employees—with time-consuming new hurdles, based more on ideological conviction than evidence of need. Thus, the whole organization has become less able to handle backlogs or to process new applications in a reasonable amount of time, which has led to hiring more people just to tread water.

3

**II. Accountability Crisis**

Every two years, USCIS conducts an internal fee review, and if it determines that expenses are on track to outpace revenues, it can increase its fees via regulation. Since the creation of the agency after 9/11, it has significantly raised fees twice, in 2007 and 2016. Apparently the agency knew that it needed to raise fees again as a result of its 2018 fee review, and is only completing a new fee rule now, two years later.

This new fee rule turns out to be a highly ideological document designed to increase the cost of a naturalization application by over 60 percent; eliminate fee waivers for low-income naturalization applicants, despite multiple directives from this Congress not to do so; impose fees on asylum-seekers and DACA renewals for the first time; and transfer some $100 million of USCIS user fees to Immigration and Customs Enforcement (ICE). It defies belief that USCIS has fully evaluated all 40,000 public comments, overwhelmingly in opposition to the fee hike, in the mere four months prior to finalizing this rule.

I've read the hundreds of pages in this fee rule, and you can take my word for it: Nowhere did USCIS adequately explain why it needed $1.3 billion of extra revenue each and every year—even in advance of the COVID-19 pandemic.

For nearly two decades, USCIS has been relatively under-scrutinized by appropriations and oversight committees in Congress, because it always had its own source of funding. Now that the well is running dry, there is a moral hazard in letting the agency hold most of its employees hostage—not to mention our legal immigration system—because of its leadership's own shortsighted decisions.

USCIS has a duty to manage its finances such that it can function properly even in times of hardship.

Before Congress even considers bailing out USCIS, the agency must be fully transparent with all of its financial and operational data, and submit to a thorough independent audit, so that the public and this Congress can understand precisely how this debacle happened and how to prevent it from happening again.


**III. Naturalization Crisis**

Over the past three and a half years, USCIS processing times have spiraled out of control across the board. With a general election just a few months away, and the right to vote at stake for hundreds of thousands of aspiring Americans, let's focus today on the naturalization process.

First, the average processing time for a citizenship application has surged to 10 months—double the processing time between 2012 and 2016. USCIS simply has not kept pace with the volume of incoming applications.

Second, individual field office processing times are much worse than average in many parts of the country, for no apparent reason. To pick a few Congressional districts entirely at random:

| Congressional District | Field office(s) | Median (mo.) | Near-max (mo.) |
|---|---|---|---|
| **AZ-5; Gilbert** | **PHO** | **11** | **25** |
| **AZ-8; Phoenix** | **PHO** | **11** | **25** |
| CA-4; Truckee, Fresno | FRE | 8 | 11.5 |
| CA-19; San Jose | SNJ | 10 | 18 |
| **CA-46; Anaheim, Santa Ana** | **SAA** | **12** | **18** |
| CO-2; Denver, Boulder, Ft. Collins | DEN | 8.5 | 15.5 |
| CO-4; Greeley | DEN | 8.5 | 15.5 |
| FL-17; Sarasota | OFM, [TAM] | 8.5 | 17 |
| **FL-26; Miami** | **MIA, [KND, HIA]** | **10.5** | **31** |
| **ND** | **SPM** | **11** | **25** |
| **PA-5; Swarthmore** | **PHI** | **11** | **18** |
| TX-16; El Paso | ELP | 6.5 | 9.5 |
| **TX-18; Houston** | **HOU** | **12** | **17.5** |
| **TX-29; Houston** | **HOU** | **12** | **17.5** |
| **WA-7; Seattle** | **SEA** | **16** | **24.5** |

*(Based on USCIS data accessed on July 22, 2020. "Near-max" means the time it takes to complete 93% of cases. Boldface indicates field offices with higher-than-average median processing times.)*

Finally, this administration has shown no urgency to ensure that everyone who would normally have been naturalized in time for the general election will still be able to do so come November.

USCIS leadership will expect praise for administering the oath of allegiance to the 110,000 people who had only this step left when the COVID-19 pandemic forced the agency to close its field offices in late March. But credit for this accomplishment belongs to the tireless and creative work of USCIS civil servants across the country, who pioneered new methods like drive-thru naturalization oaths even as agency leadership erroneously claimed that even more efficient virtual oath ceremonies would be legally and logistically impossible.

Meanwhile, USCIS is not remotely on track to naturalize the next 315,000 people in line, who would normally be eligible to vote this November, but still haven't had their interviews yet, much less their oath ceremonies.

These aspiring Americans are young and old, Republicans and Democrats, living all across the country. An estimated 68,000 are in California; 3,300 in Colorado; 40,000 in Florida; 200 in North Dakota; 8,000 in Pennsylvania; 27,000 in Texas; and 6,100 in Washington—all of them at risk of not being able to vote this year.

USCIS has presented no plan to deal with this looming crisis. Unless the agency immediately expedites naturalization interviews and administers same-day oath ceremonies, then by the time

most state voter registration deadlines occur in October, these 315,000 citizenship applicants — some of whom have been in line for nearly two years — will be disenfranchised.

Thank you for your time, and I look forward to any questions you might have.


\*\*\*

*Supplemental materials attached below:*

- Doug Rand & Lindsay Milliken, *The Case of the Insolvent Federal Agency: A Forensic Analysis of Public Data on U.S. Citizenship & Immigration Services*, N.Y.U. J. Legis. & Pub. Pol'y Quorum (2020).

- Over 300,000 Immigrants Still Won't Become U.S. Citizens In Time For the 2020 Election. Boundless (July 16, 2020).

- Who Pays Immigration Fees? Boundless (July 1, 2020).

- 2020 State Of New American Citizenship Report. Boundless (May 12, 2020).

- Comments of Boundless Immigration Inc. on the Department of Homeland Security's Proposed Rules: U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements (Dec. 30, 2019).

- Additional comments of Boundless Immigration Inc. on the Department of Homeland Security's Proposed Rule: U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements (Feb. 10, 2020).

- Letter from organizations united in opposing the proposed fee rule from USCIS (Feb. 10, 2020).

# N.Y.U. Journal of Legislation & Public Policy

*A nonpartisan periodical specializing in the analysis of local, state, and federal legislation and policy*



About   Issues   Subscription Information   *Quorum*   LawsFlaws Podcast   Symposia & Intellectual Life Events

Legislation Competition   Sponsors

## The Case of the Insolvent Federal Agency: A Forensic Analysis of Public Data on U.S. Citizenship & Immigration Services

By **Doug Rand** and **Lindsay Milliken**





June 15, 2020

On May 15, 2020, U.S. Citizenship and Immigration Services (USCIS) suddenly announced that without a $1.2 billion bailout from Congress, it will soon need to furlough over 10,000 of its employees because of projected budget shortfalls due to the COVID-19 pandemic. USCIS, which is part of the U.S. Department of Homeland Security (DHS), is in charge of managing much of the legal immigration system, including applications for permanent residency ("green cards"), U.S. citizenship, asylum, work permits, and various temporary immigration statuses. The agency, which is almost entirely funded by user fees, claims that it will see a decrease in application volume of more than 60 percent from the time it was forced to close its field offices in late March through the end of September 2020.

USCIS claims that in order to stay solvent, Congress must immediately make a supplemental appropriation of $1.2 billion in taxpayer dollars, which would eventually be paid back to the Treasury through a new 10 percent surcharge on all existing user fees. This surcharge would come on top of a dramatic 21 percent fee hike that USCIS is close to finalizing via regulation.

According to USCIS, the culprit is entirely COVID-19, not internal mismanagement, but publicly available data tell a different story.

Based solely on the data that USCIS publishes—however incomplete and difficult to synthesize—it is clear that its financial troubles long pre-date the COVID-19 crisis. The agency has made several questionable policy decisions over the past three and a half years, including failing to implement a timely and moderate fee increase, as well as initiating a surge of red tape and staff hiring that likely led USCIS from surplus to insolvency.

Search

## NEW ON QUORUM

**The Case of the Insolvent Federal Agency: A Forensic Analysis of Public Data on U.S. Citizenship & Immigration Services**
*Doug Rand & Lindsay Milliken*
June 15, 2020

**The Need for a Federal Anti-SLAPP Law**
*Daniel A. Horwitz*
June 15, 2020

**Foresight, Hindsight, and the Merits of a Comprehensive Approach to Protecting Political Campaigns from Cyberattacks**
*Amy Larsen*
April 28, 2020

**Open Letter to Yale Law Journal Denouncing Ableism and Eugenics**
*Disability Allied Law Students Association at NYU School of Law*
April 27, 2020

## ISSUE ARCHIVE

Select Issue

**Starting with a Surplus**

Just last year, USCIS experienced a record year for both revenue overall and revenue per user. The agency pulled in almost $3.9 billion in standard user fees, an increase of about $1 billion since Fiscal Year (FY) 2014. The agency's revenue per user hit a six-year high of $509 from a low of $392 per user only three years prior (see Table 1). This additional revenue comes in large part from an average 21 percent fee increase implemented toward the end of the Obama administration (not to be confused with the additional average 21 percent fee increase that the Trump administration proposed just three years later).

### Table 1: USCIS Key Performance Indicators (FY 2014–FY 2019)

| | Total Volume | Total Revenue | Revenue/User | Notes |
|---|---|---|---|---|
| **FY 2014** | 6,384,648 | $2,996,900,000 | $469 | |
| **FY 2015** | 7,650,475 | $3,112,043,000 | $407 | |
| **FY 2016** | 8,070,917 | $3,167,729,000 | $392 | Includes typical election-year naturalization surge |
| **FY 2017** | 8,530,722 | $3,424,521,000 | $401 | Includes atypical post-election naturalization surge |
| **FY 2018** | 7,527,851 | $3,625,593,000 | $482 | First full year that Obama-era fee increase kicks in |
| **FY 2019** | 7,650,127 | $3,876,847,000 | $507 | Six-year high in revenue per user |

*(Note: Total volume from USCIS forms data. Total revenue is from Immigration Examination Fee Account (Non-Premium) fees, from DHS budget data.)*

Although USCIS has only released recent data for its primary employment-related form types, it is clear that in the six months before the pandemic dramatically affected the United States (Oct. 2019 – Mar. 2020), this subset of USCIS' user volume was up over 17 percent compared with the same period a year earlier (see Table 2). This suggests that when USCIS was forced to close its field offices on March 18, 2020, it had more money in its coffers than it expected to at that moment.

### Table 2: Nonimmigrant Worker Petitions Received by USCIS

| | Q1 FY 2019 | Q2 FY 2019 | Q1 FY 2020 | Q2 FY 2020 | Change (YTD) | Change (Q2 only) |
|---|---|---|---|---|---|---|
| **H-1B** | 60,297 | 67,302 | 78,968 | 79,332 | 24% | 18% |
| **H-2A** | 2,467 | 6,097 | 2,797 | 7,165 | 16% | 18% |
| **H-2B** | 815 | 2,187 | 712 | 2,614 | 11% | 20% |
| **L-1** | 9,871 | 10,100 | 9,572 | 9,174 | -6% | -9% |

**FROM THE ARCHIVES:**

Advice and Consent: A Historical Argument for Substantive Senatorial Involvement in Judicial Nominations
*Matthew D. Marcotte*
Vol. 5, 2002

The Senate in Transition or How I Learned to Stop Worrying and Love the Nuclear Option
*William G. Dauster*
Vol. 19, 2016

Politicization in the Federal Judiciary and Its Effect on the Judicial Function
*David Russell*
Quorum, Feb. 28, 2018

| | | | | | |
|---|---|---|---|---|---|
| O-1 | 5,882 | 6,077 | 6,335 | 5,867 | 2% | -3% |
| P | 3,241 | 3,265 | 3,159 | 3,020 | -5% | -8% |
| R-1 | 2,041 | 2,248 | 2,079 | 1,959 | -6% | -13% |
| TN | 1,575 | 1,563 | 1,549 | 1,984 | 13% | 27% |
| TOTAL | 86,189 | 98,839 | 105,171 | 111,115 | 17% | 12% |

*(Information sourced from USCIS I-129 data. "YTD" change compares Oct. 2019–Mar. 2020 with Oct. 2018–Mar. 2019. "Q2 only" compares Jan.–Mar. 2020 with Jan.–Mar. 2019.)*

Beyond revenue, another metric to assess the financial situation of USCIS is its "carryover balance," defined as the agency's "unobligated/unexpended fee revenue accumulated from prior fiscal years," as of the final date of the current fiscal year. This carryover balance is divided between "Premium Processing" fees (assessed only on certain business users, which are routed to a separate information technology infrastructure account) and "Non-Premium" fees (nearly all other user fees, which go toward agency operations).

According to the agency's past two publicly available fee reviews for 2016/2017 and 2019/2020, its average end-of-year Non-Premium carryover balance was just over $700 million between FY 2012–FY 2018. This balance dropped to its lowest level in FY 2016, just before the Obama-era fee rule kicked in, and rose to over $800 million by the end of FY 2018. What happened next is difficult to nail down based on publicly available sources, but according to the budget documents sent by USCIS to Congress each February, the agency had a *total* (Premium plus Non-Premium) carryover balance of over $1.26 billion at the end of FY 2019.

### Table 3: End-of-Year Immigration Examinations Fee Account (IEFA) Carryover Balance

| | Non-Premium | Premium | Total |
|---|---|---|---|
| FY 2012 | $863,000,000 | $251,000,000 | $1,114,000,000 |
| FY 2013 | $990,000,000 | $324,000,000 | $1,314,000,000 |
| FY 2014 | $734,000,000 | $467,000,000 | $1,201,000,000 |
| FY 2015 | $542,000,000 | $612,000,000 | $1,154,000,000 |
| FY 2016 | $300,600,000 | $632,064,000 | $932,664,000 |
| FY 2017 | $789,000,000 | $191,161,000 | $980,161,000 |
| FY 2018 | $801,500,000 | $499,017,000 | $1,300,517,000 |
| FY 2019 | -$248,800,000 | | $1,265,465,000 |
| FY 2020 | -$1,521,600,000 | | $855,968,000 |
| FY 2021 | | | $340,447,000 |

*Purple = inferred*     *Yellow = projected by USCIS in fee rule*     *Red = projected by USCIS in budget*

*(Note: "Non-Premium" and "Premium" user fees from USCIS' proposed fee rule supporting documentation in 2016 and 2019. "Total" user fees from the agency's Congressional Justifications (budget documents) for FY18, FY19, FY20, and FY21.)*

This suggests that on Oct. 1, 2019, six months before the COVID-19 crisis hit home, USCIS was sitting on a cash cushion of about $787 million in user fees it could use to sustain operations (assuming the historical average 62 percent of total carryover balance going to its Non-Premium account).

**The Road to Ruin**

How could an agency with this much excess cash become insolvent in mere months? Although USCIS is quick to place exclusive blame on the pandemic, it appears that COVID-19 was merely an accelerant, not the culprit. All available evidence suggests that we are witnessing a self-imposed insolvency, borne of the agency's own poor management and policy decisions.

The smoking gun is USCIS' prediction of its own financial troubles *well before* the appearance of COVID-19. Table 3 above shows that at the time USCIS was reporting to Congress an actual total carryover balance of over $1.26 billion (in Feb. 2020), the agency had only recently (in Nov. 2019) predicted a Non-Premium carryover *deficit* of nearly $250 million for FY 2019, growing to over $1.5 billion in FY 2020.

Of course, USCIS had an incentive to forecast a giant deficit in its fee schedule proposal, the better to justify higher user fees. But even if this forecast was overblown, it was pointing in the right direction.

Since the beginning of the Trump administration, USCIS has increased its staffing needs by nearly 20 percent, from over 15,000 in 2016 to over 18,000 in 2020. Table 4 below shows how the total number of positions, the number of full-time equivalent (FTE) positions, and the budget required to support these additional workers increased over time. Using the official budget justifications sent by USCIS to Congress each year, we can determine which parts of the agency hosted most of these increases, such as Service Center Operations, District Operations (including Field Offices and Fraud Detection), and Asylum, Refugee, and International Operations.

**Table 4: Costs and Staffing for All of USCIS (from the Non-Premium Immigration Examinations Fee Account (IEFA))**

| Fiscal Year | Number of Positions | Number of Full-Time Equivalents (FTE) | Budget |
|---|---|---|---|
| 2016 | 15,381 | 14,369 | $3,167,729,000 |
| 2017 | 16,156 | 15,349 | $3,424,521,000 |
| 2018 | 15,939 | 15,142 | $3,625,593,000 |
| 2019 | 17,573 | 16,695 | $3,876,847,000 |
| 2020 (exp.) | 18,392 | 17,473 | $3,997,176,000 |



Why would USCIS need to increase its staff and its payroll expenses so dramatically when the volume of applications has actually gone down since FY 2017 (see Table 1)?

There appear to be two primary drivers of this staff surge. First, the administration has prioritized anti-fraud measures—in the absence of any publicly-disclosed evidence of the need for such measures. As then-acting director Ken Cuccinelli asserted in 2019, "We are not a benefit agency, we are a vetting agency." Although USCIS provides the public with insufficient data to know how many of its additional 3,000 positions work in its Fraud Detection and National Security (FDNS) Directorate, we know that its *ambition* was to more than double the size of this unit with nearly 1,000 additional hires (see Figure 1).

### Figure 1: Authorized IEFA Positions by USCIS Office

APPENDIX VII – AUTHORIZED IEFA POSITIONS BY USCIS OFFICE

USCIS forecasts staffing and costs based on projected workload and the existing cost baseline. The table below compared FY 2016/2017 fee rule staffing to the staffing levels in the FY 2019/2020 fee review.

Appendix Table 6: IEFA Positions by Office

| Directorate | FY 2016/2017 Positions | FY 2019/2020 Positions | Difference | % Difference |
|---|---|---|---|---|
| Field Operations Directorate | 5,946 | 7,305 | 1,359 | 23% |
| Fraud Detection and National Security Directorate | 920 | 1,918 | 998 | 108% |
| Refugee Asylum and International Operations Directorate | 1,648 | 2,147 | 499 | 30% |
| Service Center Operations Directorate | 2,866 | 5,579 | 2,713 | 95% |
| Other Offices (External Affairs, Immigration Records and Identity Services, Management, etc.) | 3,163 | 4,009 | 846 | 27% |
| USCIS Total | 14,543 | 20,958 | 6,415 | 44% |

(Figure copied from the USCIS *Immigration Examinations Fee Account Fee Review Supporting Documentation*, April 2019.)

Second, under the Trump Administration, USCIS has issued a flurry of policies that make its case adjudications more complicated, which reduces the agency's efficiency and requires more staff to complete fewer cases. There are dozens if not hundreds of such policies; four of the most consequential are the institution of mandatory interviews for employment-based green card applicants (some 122,000 per year), family members of refugees and asylees applying for a green card (some 46,000 per year), and recently married couples who have already obtained a green card (over 166,000 per year)—plus the elimination of the "prior deference" policy that now requires USCIS officers to scrutinize hundreds of thousands of skilled worker renewal applications each year, even if nothing material has changed since the initial adjudication.

This buildup of red tape and government employees has led to the worst of both worlds: burgeoning payroll expenses are crippling the financial sustainability of the agency, even as backlogs and processing times have reached crisis levels.

Once again, there are warning signs buried in the agency's publicly available data. In its latest fee hike proposal, USCIS tallied up its own internal average cost to process each form type, revealing an astonishing increase over the course of just three years. The total additional cost of these increased expenses, summed over just five of the agency's most common forms, is over $500 million per year.

## Table 5: Cost Increases per USCIS Form Type

*Scroll to see full table*

| Immigration Benefit Request | Actual Volume (FY 2018) | Activity-Based Cost (2016) | Activity-Based Cost (2019) | Change ($) | Change (%) | Extra Cost to USCIS |
|---|---|---|---|---|---|---|
| I-129 Petition for a Nonimmigrant worker | 551,021 | $327 | $593 | $266 | 82% | $146,571,586 |
| I-130 Petition for Alien Relative | 835,972 | $381 | $464 | $83 | 22% | $69,385,676 |
| I-485 Application to Register Permanent Residence or Adjust Status | 655,416 | $652 | $761 | $109 | 17% | $71,440,344 |
| I-751 Petition to Remove Conditions on Residence | 177,674 | $400 | $610 | $210 | 52% | $37,311,540 |

| N-400 Application for Naturalization | 837,423 | $662 | $875 | $213 | 32% | $178,371,099 |
|---|---|---|---|---|---|---|
| **TOTAL** | | | | | | **$503,080,245** |

*(Data sourced from USCIS' November 14, 2019 proposal in the Federal Register to increase user fees.)*

Since 2017, USCIS has burdened its users—and its employees—with time-consuming new hurdles, based more on ideological conviction than evidence of need. Thus, the whole organization became less able to handle backlogs or to process applications in a reasonable amount of time, which led to hiring more people just to tread water. This hefty payroll burden is the prime suspect in the case of the agency's disappearing budget surplus.

**The Road Not Taken**

Even setting aside the prudence of the policy and staffing changes described above, USCIS could have been better prepared for the financial strain caused by the COVID-19 pandemic, simply by raising its user fees within reason and on schedule.

Every two years, USCIS conducts an internal fee review, and if it determines that expenses are on track to outpace revenues, it can increase its fees via regulation. Since the creation of the agency after 9/11, it has significantly raised fees twice, in 2007 and 2016. If the agency knew that it needed to raise fees again as a result of its 2018 fee review, it has not rushed to get the job done.

Instead, the administration fell far behind schedule on implementing these new fees, which did not appear even in draft form until November 2019. This proposed rule would increase the cost of a naturalization application by 60 percent, eliminate fee waivers for low-income users, impose fees on asylum-seekers for the first time, and transfer some $100 million of USCIS user fees to Immigration and Customs Enforcement (ICE), among other ideological measures that have generated a widespread outcry.

USCIS also botched the rulemaking process, so that its comment period had to be extended until February 2020. Despite receiving well over 40,000 comments, overwhelmingly in opposition to the fee hike, USCIS appears to be preparing a final rule for publication very soon, now that it has a fiscal gun to its own head.

**Spare the Rod, Spoil the Agency**

The Trump Administration has no one but itself to blame for the looming insolvency of an essential U.S. government agency. If USCIS had only increased its fees moderately and on time, or if it had refrained from staffing up to fulfill an ideological mandate in the first place, the agency would not have burned through its budget surplus. While the COVID-19 pandemic certainly made things worse, USCIS was already in a financial hole of its own making.

For nearly two decades, USCIS has been relatively under-scrutinized by appropriations and oversight committees in Congress, because it always had its own source of funding. Now that the well is running dry, there is a moral hazard in letting the agency hold most of its employees and the entire legal immigration system hostage because of its own shortsighted decisions. USCIS has a duty to manage its finances such that it can function properly even in times of hardship.

Before Congress even considers bailing out USCIS, the agency must be fully transparent with all of its financial and operational data, so that the public can understand precisely how this debacle happened and how to fix it fairly.

---

*Doug Rand is a Senior Fellow and Director of the Technology and Innovation Initiative at the Federation of American Scientists, focusing on the intersection of immigration policy and artificial intelligence (AI) in advancing the nation's national security and economic growth. Doug is the co-founder of Boundless, a technology company that empowers families to navigate the immigration system more confidently, rapidly, and affordably. Doug served in the Obama White House for over six years as Assistant Director for Entrepreneurship in the Office of Science and Technology Policy, with a portfolio spanning inclusive high-growth entrepreneurship, access to capital, clean energy innovation, commercialization of federally funded research, and high-skill immigration. Doug was co-founder and CEO of the innovative publishing company Playscripts, Inc., as well as a co-founder of the theater review aggregator StageGrade. He is a graduate of Yale Law School and the Yale School of Management, and received Master's and undergraduate degrees from Harvard, where he studied evolutionary biology. As a writer, Doug's plays have been performed thousands of times worldwide.*

*Lindsay Milliken is a Research Assistant for Science, Technology, and Information Policy at the Federation of American Scientists.  She supports both the Congressional Science Policy Initiative and the Technology and Innovation Initiative. Previously, she worked as a Legislative Research*

*Assistant at Lewis-Burke Associates, a government relations firm specializing in science policy and higher education.*

*Lindsay received her BA in Political Science with a minor in Physics from American University in Washington, DC.  During her time at AU, she worked at the National Association of Biomedical Research, which supports the humane use of animal models in medical research.*

*Her research interests include artificial intelligence, high skill immigration policy, and finding creative ways to support evidence-based policymaking on Capitol Hill.*

---

Suggested Citation: Doug Rand & Lindsay Milliken, *The Case of the Insolvent Federal Agency: A Forensic Analysis of Public Data on U.S. Citizenship & Immigration Services*, N.Y.U. J. Legis. & Pub. Pol'y Quorum (2020).

© 2020 N.Y.U. Journal of Legislation and Public Policy

# Over 300,000 Immigrants Still Won't Become U.S. Citizens In Time For the 2020 Election

## And the government has no plan to catch up



We have good news and we have bad news.

The good news is, over 110,000 people are apparently on track to complete the Oath of Allegiance and become U.S. citizens by the end of July. They had all successfully completed every part of the naturalization process — except for the final 140-word oath ceremony — when the COVID-19 pandemic forced U.S. Citizenship and Immigration Services (USCIS) to close its field offices in late March.

The bad news is, over 300,000 people who would normally be eligible to vote this November are still likely to be disenfranchised by the current freeze on naturalization interviews — the step that comes right before the oath ceremony.

**Citizenship Oath Ceremonies Resume**



USCIS began reopening its field offices in June, with new social-distancing measures in place, and could hardly be expected to hold the mass gatherings that have traditionally naturalized hundreds or even thousands of new Americans in the same moment.

Thanks to the tireless and creative work of USCIS civil servants across the country, however, citizenship ceremonies began to resume in new ways — like drive-thru naturalization oaths. A USCIS spokesperson recently told the

*Los Angeles Times* that the agency "will clear the citizenship backlog from COVID-19 by the end of July."

The political leadership of USCIS could have made this happen faster — for instance, they claimed that it would be legally impossible to administer virtual oath ceremonies, which is not true.

Still, let's pause to celebrate the good news for more than 110,000 people who, as of late March, had nothing but a 10-minute ceremony standing between them and their long-awaited status as proud U.S. citizens.

Now it's the 300,000 people next in line who have cause to worry.

### Citizenship Interviews Still On Hold



Under normal circumstances, as Boundless originally projected, USCIS completes about 63,000 successful naturalization interviews and 63,000 oath ceremonies each month. There is typically a time lag of about two

months between these two events — so, for example, the 63,000 people who would have normally passed their interview in April would have become the 63,000 people taking the oath and becoming citizens in June.

But there were no interviews in April, or in May — all USCIS field offices were closed — and it appears that few if any interviews have occurred even since these offices reopened in June. (Boundless customers were regularly receiving naturalization interview notices from USCIS right up until late March, but to our knowledge none have been rescheduled so far.)

In a normal year, everyone passing their naturalization interview during the five months between April and August would have reasonably expected to take the oath and become a U.S. citizen within the next two months, in time for most states' voter registration deadlines in October.

That's 315,000 people still at risk of being disenfranchised by administrative delay.

Here are the states where they are most likely to live, based on prior naturalization data from DHS:

*Cumulative Number of Citizenship Applicants Who Will Not Be Able Vote in the Nov. 2020 Election, for Each Month USCIS Fails to Resume Interviews*

| State | % of total | April | May | June | July | August |
|-------|-----------|-------|------|------|------|--------|
| **All U.S.** | **100.00%** | **63,000** | **126,000** | **189,000** | **252,000** | **315,000** |
| Alabama | 0.33% | 206 | 412 | 618 | 824 | 1,030 |
| Alaska | 0.18% | 115 | 230 | 345 | 460 | 576 |
| Arizona | 1.60% | 1,008 | 2,015 | 3,023 | 4,031 | 5,038 |
| Arkansas | 0.27% | 173 | 346 | 518 | 691 | 864 |
| California | 21.60% | 13,611 | 27,222 | 40,832 | 54,443 | 68,054 |

Over 300,000 Immigrants Can Vote & Become U.S. Citizens in Time For the 2020 Election - Boundless    7/27/20, 9:55 AM

| | | | | | | |
|---|---|---|---|---|---|---|
| Colorado | 1.06% | 666 | 1,331 | 1,997 | 2,662 | 3,328 |
| Connecticut | 1.35% | 847 | 1,695 | 2,542 | 3,390 | 4,237 |
| Delaware | 0.20% | 129 | 258 | 387 | 516 | 645 |
| District of Columbia | 0.21% | 134 | 268 | 402 | 536 | 670 |
| Florida | 12.72% | 8,011 | 16,023 | 24,034 | 32,046 | 40,057 |
| Georgia | 2.20% | 1,385 | 2,770 | 4,154 | 5,539 | 6,924 |
| Guam | 0.11% | 71 | 142 | 213 | 283 | 354 |
| Hawaii | 0.35% | 223 | 445 | 668 | 890 | 1,113 |
| Idaho | 0.28% | 176 | 351 | 527 | 702 | 878 |
| Illinois | 3.51% | 2,210 | 4,420 | 6,630 | 8,840 | 11,050 |
| Indiana | 0.87% | 549 | 1,098 | 1,647 | 2,196 | 2,745 |
| Iowa | 0.48% | 301 | 603 | 904 | 1,205 | 1,507 |
| Kansas | 0.52% | 329 | 657 | 986 | 1,314 | 1,643 |
| Kentucky | 0.57% | 361 | 723 | 1,084 | 1,446 | 1,807 |
| Louisiana | 0.40% | 249 | 498 | 748 | 997 | 1,246 |
| Maine | 0.15% | 94 | 188 | 281 | 375 | 469 |
| Maryland | 1.65% | 1,038 | 2,076 | 3,114 | 4,152 | 5,189 |
| Massachusetts | 3.29% | 2,072 | 4,145 | 6,217 | 8,289 | 10,361 |
| Michigan | 1.90% | 1,197 | 2,394 | 3,590 | 4,787 | 5,984 |
| Minnesota | 1.11% | 697 | 1,394 | 2,090 | 2,787 | 3,484 |
| Mississippi | 0.15% | 94 | 188 | 282 | 376 | 470 |
| Missouri | 0.70% | 440 | 880 | 1,321 | 1,761 | 2,201 |
| Montana | 0.05% | 33 | 67 | 100 | 134 | 167 |
| Nebraska | 0.42% | 264 | 529 | 793 | 1,058 | 1,322 |
| Nevada | 0.98% | 615 | 1,230 | 1,845 | 2,460 | 3,076 |
| New Hampshire | 0.24% | 152 | 303 | 455 | 606 | 758 |

| New Jersey | 5.31% | 3,346 | 6,693 | 10,039 | 13,385 | 16,731 |
| New Mexico | 0.47% | 299 | 598 | 896 | 1,195 | 1,494 |
| New York | 10.79% | 6,795 | 13,590 | 20,385 | 27,180 | 33,975 |
| North Carolina | 1.80% | 1,137 | 2,274 | 3,411 | 4,548 | 5,685 |
| North Dakota | 0.07% | 43 | 86 | 129 | 172 | 215 |
| Ohio | 1.86% | 1,169 | 2,338 | 3,506 | 4,675 | 5,844 |
| Oklahoma | 0.54% | 338 | 676 | 1,014 | 1,353 | 1,691 |
| Oregon | 1.03% | 647 | 1,295 | 1,942 | 2,590 | 3,237 |
| Pennsylvania | 2.52% | 1,587 | 3,173 | 4,760 | 6,346 | 7,933 |
| Puerto Rico | 0.24% | 150 | 299 | 449 | 598 | 748 |
| Rhode Island | 0.40% | 254 | 509 | 763 | 1,017 | 1,271 |
| South Carolina | 0.52% | 325 | 651 | 976 | 1,301 | 1,626 |
| South Dakota | 0.08% | 52 | 104 | 157 | 209 | 261 |
| Tennessee | 0.73% | 461 | 921 | 1,382 | 1,842 | 2,303 |
| Texas | 8.57% | 5,399 | 10,799 | 16,198 | 21,597 | 26,997 |
| Utah | 0.45% | 284 | 569 | 853 | 1,138 | 1,422 |
| Vermont | 0.09% | 58 | 116 | 174 | 231 | 289 |
| Virginia | 2.40% | 1,512 | 3,025 | 4,537 | 6,049 | 7,562 |
| Washington | 1.95% | 1,231 | 2,462 | 3,692 | 4,923 | 6,154 |
| West Virginia | 0.08% | 48 | 96 | 143 | 191 | 239 |
| Wisconsin | 0.62% | 394 | 787 | 1,181 | 1,574 | 1,968 |
| Wyoming | 0.03% | 21 | 43 | 64 | 85 | 107 |

*Sources:*

*DHS 2018 Yearbook of Immigration Statistics*
*Boundless analysis*

## What Happens Next?

Case 4:20-cv-05883-JSW   Document 27-8   Filed 08/25/20   Page 38 of 179



The sobering reality is that with July almost over, USCIS is already making it impossible for some 252,000 aspiring U.S. citizens to vote in the general election. By the end of August, the full population of 315,000 citizenship applicants — some of whom have been in line for nearly two years — will be disenfranchised.

This is happening during an election year when immigrants have expressed extraordinary interest in becoming U.S. citizens. As Boundless documented in our *2020 State Of New American Citizenship Report*, from October through December 2019, 30% more people applied for U.S. citizenship than during the same period in advance of the 2016 election.

"This means that before the COVID-19 pandemic upended the immigration system, and controlling for past anomalies driven by Congress, **demand for U.S. citizenship this fiscal year was at its highest level in modern**

**history,**" said Doug Rand, immigration policy expert and Boundless co-founder.

This trend didn't hold between January through March 2020, as the pandemic first began to affect a large number of people across the United States — naturalization volume was down 5% compared with the same period in 2016.

That's not the fault of USCIS or the Trump administration.

But this administration does bear responsibility for its apparent failure to resume naturalization interviews for the 315,000 people who need them in order to vote this year — and for the very real chance that USCIS could furlough most of its workforce in August due to years of misguided policy choices, making the resumption of interviews all but impossible.

# Who Pays Immigration Fees?

USCIS gets most of its money from U.S citizens and companies



Facing an insolvency crisis of its own making, U.S. Citizenship and Immigration Services (USCIS) has threatened to furlough most of its 20,000 employees and effectively shut down the U.S. legal immigration system—unless Congress provides a $1.2 billion bailout before August 3, 2020.

USCIS has proposed to recoup this money by imposing a 10 percent surcharge on all fees paid by its users, and paying back the U.S. Treasury over roughly three years. The Trump administration claims "this deficit neutral approach will come at no additional cost to the U.S. taxpayer."

But this claim ignores the fact that the vast majority of the individuals and companies who pay USCIS fees *are* U.S. taxpayers.

Boundless analyzed all of the forms and fees mandated by USCIS, and found that by far the most lucrative class of users is U.S. citizens and their families (35%), followed by permanent residents and their families (18%), permanent residents applying for U.S. citizenship (16%), and companies and their employees (15%).



Whenever USCIS increases its fees—including its looming plan to hike fees by as much as 600%—the burden is felt primarily by U.S. citizens, soon-to-be U.S. citizens, and U.S. companies.

# Appendix

*Methodology*

Boundless used the Fiscal Year 2016 data provided by USCIS in its most recent proposed fee rule to calculate the percentage of agency revenue (i.e. fees) attributable to each form type.

We then assigned a broad category to each form type. In some cases, the categorization is unambiguous: Only "permanent residents becoming U.S. citizens" pay the fees for naturalization forms. In several cases, we used the typical distribution of green card recipients to differentiate among categories within a given form type (e.g. Form I-485 for U.S. citizen relatives vs. permanent resident relatives vs. employees). For some form types—chiefly applications for Employment Authorization Documents and Travel Documents—USCIS does not provide enough data to differentiate among these specific categories, so we used the more general category "individuals without permanent status."

We used a round number ($4 billion) as a reasonable representation of USCIS's average total fee receipts in recent years.

Finally, we excluded biometric fees because USCIS proposes to fold these fees into other form types.

| Form type | Who pays? | % of all fees | Fees collected |
|---|---|---|---|
| I-130 Petition for Alien Relative (U.S. citizen relatives) | U.S. citizen families | 14.5% | $581,081,866 |
| N-400 Application for Naturalization | Permanent residents becoming U.S. citizens | 14.3% | $572,811,101 |
| I-485 Application to Register Permanent Residence or Adjust Status (U.S. citizen relatives) | U.S. citizen families | 13.5% | $538,823,969 |
| I-90 Application to Replace Permanent Resident Card | Permanent resident families | 11.6% | $463,005,268 |
| I-129 Petition for a Nonimmigrant | Companies | 7.0% | $278,822,791 |

| Worker Subtotal | and employees | | |
|---|---|---|---|
| I-765 Application for Employment Authorization | Individuals without permanent status | 5.8% | $231,189,490 |
| I-131/I-131A Application for Travel Document Subtotal | Individuals without permanent status | 4.0% | $158,435,244 |
| I-485 Application to Register Permanent Residence or Adjust Status (employment-based) | Companies and employees | 3.2% | $126,663,601 |
| USCIS Immigrant Fee (U.S. citizen relatives) | U.S. citizen families | 3.1% | $124,412,478 |
| I-751 Petition to Remove Conditions on Residence on Permanent Resident Status (U.S. citizen relatives) | U.S. citizen families | 2.9% | $115,741,473 |
| I-130 Petition for Alien Relative (permanent resident relatives) | Permanent resident families | 2.7% | $106,869,850 |
| I-485 Application to Register Permanent Residence or Adjust Status (permanent resident relatives) | Permanent resident families | 2.5% | $99,097,976 |
| I-539 Application to Extend/Change Nonimmigrant Status | Companies and employees | 2.2% | $89,972,912 |
| I-140 Immigrant Petition for Alien Worker | Companies and employees | 2.2% | $87,880,090 |
| N-600/600K Application for Certificate of Citizenship | Permanent residents becoming U.S. citizens | 1.9% | $77,702,204 |
| I-526 Immigrant Petition by Alien Entrepreneur | Individuals without permanent status | 1.9% | $76,405,703 |

| Inadmissibility Waiver Subtotal | Small categories | 1.4% | $55,215,352 |
|---|---|---|---|
| I-601A Provisional Unlawful Presence Waiver | Small categories | 1.0% | $38,138,381 |
| I-129F Petition for Alien Fiancé(e) | U.S. citizen families | 0.7% | $29,774,179 |
| USCIS Immigrant Fee (permanent resident relatives) | Permanent resident families | 0.6% | $22,881,359 |
| I-751 Petition to Remove Conditions on Residence on Permanent Resident Status (permanent resident relatives) | Permanent resident families | 0.5% | $21,286,629 |
| I-290B Notice of Appeal or Motion | Small categories | 0.5% | $20,042,629 |
| I-829 Petition by Entrepreneur to Remove Conditions on Permanent Resident Status | Small categories | 0.5% | $18,924,662 |
| N-565 Application for Replacement Naturalization/Citizenship Document | Small categories | 0.5% | $18,472,658 |
| I-924 Application For Regional Center Designation Under the Immigrant Investor Program | Small categories | 0.3% | $10,073,033 |
| I-824 Application for Action on an Approved Application or Petition | Small categories | 0.2% | $7,134,297 |
| I-600/600A; I-800/800A Intercountry Adoption-Related Petitions and Applications | Small categories | 0.2% | $6,381,902 |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | Small categories | 0.1% | $5,989,409 |
| I-360 Petition for Amerasian, Widow(er) or Special Immigrant | Small categories | 0.1% | $5,523,236 |
| I-924A Annual Certification of Regional Center | Small categories | 0.1% | $3,793,151 |

| | | | |
|---|---|---|---|
| N-336 Request for a Hearing on a Decision in Naturalization Proceedings | Small categories | 0.1% | $3,563,606 |
| I-817 Application for Family Unity Benefits | Small categories | 0.0% | $1,690,410 |
| I-910 Application for Civil Surgeon Designation | Small categories | 0.0% | $677,298 |
| I-800A Supplement 3 Request for Action on Approved Form I-800A | Small categories | 0.0% | $406,662 |
| G-1041 Genealogy Index Search Request | Small categories | 0.0% | $331,564 |
| G-1041A Genealogy Records Request | Small categories | 0.0% | $222,460 |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | Small categories | 0.0% | $215,375 |
| N-470 Application to Preserve Residence for Naturalization Purposes | Small categories | 0.0% | $181,368 |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | Small categories | 0.0% | $83,600 |
| I-694 Notice of Appeal of Decision | Small categories | 0.0% | $49,593 |
| I-690 Application for Waiver of Grounds of Inadmissibility | Small categories | 0.0% | $17,003 |
| N-300 Application to File Declaration of Intention | Small categories | 0.0% | $14,169 |
| I-589 Application for Asylum and for Withholding of Removal | Small categories | 0.0% | $0 |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600 | Small categories | 0.0% | $0 |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600 | Small categories | 0.0% | $0 |

| I-821D Consideration of Deferred Action for Childhood Arrivals (Renewal) | Small categories | 0.0% | $0 |
|---|---|---|---|
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal | Small categories | 0.0% | $0 |

https://www.boundless.com/research/state-of-new-american-citizenship-report/                                07/27/2020



# Executive Summary

Nearly 9 million immigrants in the United States are lawful permanent residents (green card holders) currently eligible to apply for U.S. citizenship.

Naturalization—the process by which an immigrant becomes a U.S. citizen—brings considerable economic benefits at the individual, regional, and national levels. Naturalized immigrants earn 8-11% more in annual income than non-naturalized immigrants (controlling for variables such as skills, education, and fluency in English), suggesting that naturalization leads to better-paying jobs by signaling to employers that a given immigrant has strong English language skills and a long-term commitment to live and work in the United States.

One study of 21 U.S. cities found that if all eligible immigrant residents were to naturalize, their aggregate income would increase by $5.7 billion, yielding an increase in homeownership by over 45,000 people and an increase in tax revenue of $2 billion. Nationally, if half of the eligible immigrant population of the United States naturalized, the increased earnings and demand could boost GDP by $37-52 billion per year.

But barriers to becoming a U.S. citizen have gotten worse over time, and are not evenly distributed across the country. This report uses a novel integration of public data sets to understand national trends in the government's handling of citizenship applications, as well as barriers at the local level.

Key findings of this report include:

## The coronavirus pandemic has left thousands of potential new American voters in limbo.

On March 18, 2020—due to COVID-19—USCIS stopped conducting in-person interviews and oath ceremonies for immigrants seeking to become naturalized citizens. These immigrants have already made it through most of the naturalization process after many months—sometimes years—of waiting. Nationwide, well over 100,000 naturalization applicants are already stuck in limbo, and with thousands more piling up month by month, these citizens-in-waiting will likely be unable to vote in the 2020 election.

## The national trends were worrisome, even before the pandemic.

The processing time for a citizenship application has surged to 10 months—double the processing time between 2012 and 2016. (Note that the processing time for a citizenship application is from receipt all the way until the final oath ceremony, not just the approval of the application.)

These processing times are almost sure to keep rising, because the government has not kept pace with the volume of incoming applications. After a 2-year spike in 2016–2017, the volume of citizenship applications stabilized in 2018 and fell slightly in 2019, only to surge to historic levels during the first quarter of Fiscal Year 2020.

The likelihood that a citizenship application will be denied has risen slightly over the past few years, peaking in 2018 and falling slightly in 2019.

## Becoming a U.S. citizen is much harder in some places than others.

Immigrants in some cities face citizenship application wait times more than four times higher than in other cities. Immigrants in some cities experience a citizenship application denial rate two times higher than the national average, for no apparent reason.

Some cities have four or five government field offices where immigrants can attend their citizenship interviews (once the COVID-19 restrictions are lifted). Other cities have none and make immigrants travel over 150 miles to the nearest field office.

## New rankings reveal the best and worst places to become a U.S. citizen.

The top 3 best overall metro areas for immigrants to become U.S. citizens are Cleveland, Ohio; Raleigh, North Carolina; and Durham/Chapel Hill, North Carolina.

The worst 3 metro areas for immigrants to become U.S. citizens are Seattle/Tacoma/Bellevue, Washington; Santa Maria-Santa Barbara, California; and Santa Rosa, CA.

# How the Coronavirus Froze Naturalization, State by State

U.S. Citizenship and Immigration Services (USCIS), the federal agency responsible for processing citizenship applications, conducts interviews and oath ceremonies for immigrants seeking to become naturalized citizens. On March 18, 2020—due to the coronavirus pandemic—USCIS stopped doing these interviews and ceremonies. This delay has already left well over 100,000 future Americans in limbo. These would-be citizens have already made it through most of the naturalization process. Now they must wait, perhaps indefinitely, before they can become full citizens and gain the right to vote in the 2020 election. If USCIS does not resume interviews and oath ceremonies using remote methods appropriate for the present emergency, the number of disenfranchised citizens-in-waiting will continue to pile up.

Boundless did the math, and estimated that 2,100 immigrants will run out of time to vote each day that USCIS offices remain closed. The chart below estimates how many disenfranchised citizens-in-waiting will find themselves in limbo in each state. The number increases for each month the COVID-19 shutdown remains in effect.

And the true naturalization crisis may be even worse. USCIS only recently released citizenship application data for the first quarter of Fiscal Year 2020, and the number is staggering: during this period (October through December 2019), 30% more people applied for U.S. citizenship than during the same period in advance of the 2016 election.

This means that before the COVID-19 pandemic upended the immigration system, and controlling for past anomalies driven by Congress, **demand for U.S. citizenship this year was at its highest level in modern history.**

# Immigrants in COVID-19 Limbo, State by State

If oath ceremonies remain closed month after month, how many citizens-in-waiting could be disenfranchised in each state?

Source: Boundless analysis of USCIS data

| State of Residence | May | June | July | August | September |
|---|---|---|---|---|---|
| Alabama | 412 | 618 | 824 | 1030 | 1236 |
| Alaska | 230 | 345 | 460 | 576 | 691 |
| Arizona | 2015 | 3023 | 4031 | 5038 | 6046 |
| Arkansas | 346 | 518 | 691 | 864 | 1037 |
| California | 27222 | 40832 | 54443 | 68054 | 81665 |
| Colorado | 1331 | 1997 | 2662 | 3328 | 3993 |
| Connecticut | 1695 | 2542 | 3390 | 4237 | 5084 |
| Delaware | 258 | 387 | 516 | 645 | 774 |
| District of Columbia | 268 | 402 | 536 | 670 | 804 |
| Florida | 16023 | 24034 | 32046 | 40057 | 48069 |
| Georgia | 2770 | 4154 | 5539 | 6924 | 8309 |
| Guam | 142 | 213 | 283 | 354 | 425 |
| Hawaii | 445 | 668 | 890 | 1113 | 1335 |
| Idaho | 351 | 527 | 702 | 878 | 1053 |
| Illinois | 4420 | 6630 | 8840 | 11050 | 13260 |
| Indiana | 1098 | 1647 | 2196 | 2745 | 3294 |
| Iowa | 603 | 904 | 1205 | 1507 | 1808 |
| Kansas | 657 | 986 | 1314 | 1643 | 1971 |

https://www.boundless.com/research/state-of-new-american-citizenship-report/ 07/27/2020

| | | | | | |
|---|---|---|---|---|---|
| Kentucky | 723 | 1084 | 1446 | 1807 | 2169 |
| Louisiana | 498 | 748 | 997 | 1246 | 1495 |
| Maine | 188 | 281 | 375 | 469 | 563 |
| Maryland | 2076 | 3114 | 4152 | 5189 | 6227 |
| Massachusetts | 4145 | 6217 | 8289 | 10361 | 12434 |
| Michigan | 2394 | 3590 | 4787 | 5984 | 7181 |
| Minnesota | 1394 | 2090 | 2787 | 3484 | 4181 |
| Mississippi | 188 | 282 | 376 | 470 | 564 |
| Missouri | 880 | 1321 | 1761 | 2201 | 2641 |
| Montana | 67 | 100 | 134 | 167 | 201 |
| Nebraska | 529 | 793 | 1058 | 1322 | 1587 |
| Nevada | 1230 | 1845 | 2460 | 3076 | 3691 |
| New Hampshire | 303 | 455 | 606 | 758 | 909 |
| New Jersey | 6693 | 10039 | 13385 | 16731 | 20078 |
| New Mexico | 598 | 896 | 1195 | 1494 | 1793 |
| New York | 13590 | 20385 | 27180 | 33975 | 40770 |
| North Carolina | 2274 | 3411 | 4548 | 5685 | 6822 |
| North Dakota | 86 | 129 | 172 | 215 | 257 |

https://www.boundless.com/research/state-of-new-american-citizenship-report/                    07/27/2020

| | | | | | |
|---|---|---|---|---|---|
| Ohio | 2338 | 3506 | 4675 | 5844 | 7013 |
| Oklahoma | 676 | 1014 | 1353 | 1691 | 2029 |
| Oregon | 1295 | 1942 | 2590 | 3237 | 3885 |
| Pennsylvania | 3173 | 4760 | 6346 | 7933 | 9519 |
| Puerto Rico | 299 | 449 | 598 | 748 | 897 |
| Rhode Island | 509 | 763 | 1017 | 1271 | 1526 |
| South Carolina | 651 | 976 | 1301 | 1626 | 1952 |
| South Dakota | 104 | 157 | 209 | 261 | 313 |
| Tennessee | 921 | 1382 | 1842 | 2303 | 2764 |
| Texas | 10799 | 16198 | 21597 | 26997 | 32396 |
| Total | 126000 | 189000 | 252000 | 315000 | 378000 |
| Utah | 569 | 853 | 1138 | 1422 | 1707 |
| Vermont | 116 | 174 | 231 | 289 | 347 |
| Virginia | 3025 | 4537 | 6049 | 7562 | 9074 |
| Washington | 2462 | 3692 | 4923 | 6154 | 7385 |
| West Virginia | 96 | 143 | 191 | 239 | 287 |
| Wisconsin | 787 | 1181 | 1574 | 1968 | 2361 |
| Wyoming | 43 | 64 | 85 | 107 | 128 |

Powered by  LiveStories

Even before the delay from COVID-19, immigrants seeking naturalization faced an uneven, challenging landscape. USCIS field offices around the United States handle naturalization applications, and the median processing time—from filing all the way to oath ceremony—varies widely, ranging from 3.7 months (in Cleveland) to 15.8 months (in Seattle). Considering that the naturalization process for all immigrants effectively ground to a halt on March 18, this means that immigrants seeking naturalization in Seattle, more often than not, had to file their applications almost *two years* before the election to become eligible to vote.

https://www.boundless.com/research/state-of-new-american-citizenship-report/                07/27/2020

The table below shows data for each USCIS field office serving a given metro area. The **application cutoff** date is simply the field office's median processing time, extended backward from March 18. People who filed by this date are first in line—albeit in limbo—until the citizenship oath ceremonies resume.

USCIS Field Offices
Source: Boundless Analysis

| Field Office | Application Cutoff | Median Wait Time (Months) | Max Wait Time (Months) | Backlog Completion Rate (%) |
|---|---|---|---|---|
| Seattle, WA | 11/30/18 | 15.8 | 19.5 | 37.9 |
| Las Vegas, NV | 1/8/19 | 14.5 | 18.4 | 50.2 |
| San Francisco, CA | 1/20/19 | 14.1 | 16.5 | 42.2 |
| Phoenix, AZ | 1/29/19 | 13.8 | 17.8 | 49.3 |
| St. Paul, MN | 2/4/19 | 13.6 | 22.5 | 52.1 |
| San Fernando Valley, CA | 2/7/19 | 13.5 | 17.1 | 42.4 |
| Houston, TX | 2/7/19 | 13.5 | 21.1 | 57.9 |
| New York, NY | 2/10/19 | 13.4 | 25.3 | 46.0 |
| Dallas, TX | 2/22/19 | 13.0 | 19.7 | 57.6 |
| Santa Ana, CA | 3/9/19 | 12.5 | 16.3 | 38.8 |
| Salt Lake City, UT | 3/18/19 | 12.2 | 19.8 | 54.0 |
| Oakland Park, FL | 3/30/19 | 11.8 | 19.9 | 50.4 |
| Miami, FL | 4/8/19 | 11.5 | 22.1 | 50.9 |
| Baltimore, MD | 4/8/19 | 11.5 | 23.2 | 48.3 |
| New Orleans, LA | 4/17/19 | 11.2 | 18.0 | 51.3 |
| Queens, NY | 4/29/19 | 10.8 | 20.4 | 53.3 |
| Fort Myers, FL | 5/2/19 | 10.7 | 17.3 | 52.5 |
| Los Angeles County, CA | 5/8/19 | 10.5 | 13.7 | 57.0 |
| Atlanta, GA | 5/11/19 | 10.4 | 20.2 | 55.8 |
| Los Angeles, CA | 5/14/19 | 10.3 | 15.7 | 60.0 |

https://www.boundless.com/research/state-of-new-american-citizenship-report/          07/27/2020

| | | | | |
|---|---|---|---|---|
| Atlanta, GA | 5/11/19 | 10.4 | 20.2 | 55.8 |
| Los Angeles, CA | 5/14/19 | 10.3 | 15.7 | 60.0 |
| Spokane, WA | 5/23/19 | 10.0 | 17.7 | 75.4 |
| San Juan, PR | 5/23/19 | 10.0 | 17.7 | 60.5 |
| Agana, GU | 5/23/19 | 10.0 | 17.7 | 76.7 |
| Manchester, NH | 5/23/19 | 10.0 | 17.7 | 78.0 |
| Reno, NV | 5/23/19 | 10.0 | 17.7 | 80.0 |
| St. Albans, VT | 5/23/19 | 10.0 | 17.7 | 71.0 |
| Helena, MT | 5/23/19 | 10.0 | 17.7 | 68.1 |
| Christiansted, VI | 5/23/19 | 10.0 | 17.7 | 0.0 |
| Yakima, WA | 5/26/19 | 9.9 | 15.4 | 83.2 |
| San Jose, CA | 5/29/19 | 9.8 | 13.3 | 62.0 |
| Hartford, CT | 5/29/19 | 9.8 | 15.5 | 55.6 |
| Wichita, KS | 5/29/19 | 9.8 | 17.0 | 73.1 |
| Albany, NY | 5/29/19 | 9.8 | 18.2 | 53.9 |
| Portland, ME | 6/4/19 | 9.6 | 17.2 | 73.8 |
| Fort Smith, AK | 6/7/19 | 9.5 | 16.7 | 62.3 |
| Boise, ID | 6/7/19 | 9.5 | 17.3 | 69.3 |
| Sacramento, CA | 6/10/19 | 9.4 | 13.7 | 56.5 |
| Imperial, CA | 6/13/19 | 9.3 | 16.0 | 70.7 |
| Des Moines, IA | 6/16/19 | 9.2 | 13.0 | 68.2 |
| Newark, NJ | 6/16/19 | 9.2 | 15.3 | 56.2 |
| Anchorage, AK | 6/16/19 | 9.2 | 16.5 | 82.1 |
| San Antonio, TX | 6/19/19 | 9.1 | 15.0 | 65.4 |
| Washington, DC | 6/19/19 | 9.1 | 16.0 | 60.2 |
| Orlando, FL | 6/25/19 | 8.9 | 20.5 | 58.0 |
| Norfolk, VA | 7/4/19 | 8.6 | 18.0 | 62.5 |
| Memphis, TN | 7/4/19 | 8.6 | 16.9 | 71.1 |
| Philadelphia, PA | 7/7/19 | 8.5 | 16.9 | 62.6 |
| Honolulu, HI | 7/7/19 | 8.5 | 18.8 | 65.8 |

https://www.boundless.com/research/state-of-new-american-citizenship-report/                07/27/2020

| Denver, CO | 7/13/19 | 8.3 | 18.0 | 70.8 |
| Chicago, IL | 7/22/19 | 8.0 | 16.7 | 59.4 |
| Portland, OR | 7/25/19 | 7.9 | 12.1 | 73.7 |
| Harlingen, TX | 7/28/19 | 7.8 | 17.6 | 85.2 |
| El Paso, TX | 7/28/19 | 7.8 | 18.1 | 80.2 |
| Albuquerque, NM | 7/31/19 | 7.7 | 14.0 | 75.7 |
| Charlotte, NC | 8/3/19 | 7.6 | 12.6 | 65.6 |
| San Diego, CA | 8/15/19 | 7.2 | 13.5 | 67.0 |
| Milwaukee, WI | 8/18/19 | 7.1 | 14.8 | 70.7 |
| St. Louis, MO | 8/21/19 | 7.0 | 12.2 | 75.1 |
| Lawrence, MA | 8/24/19 | 6.9 | 12.3 | 83.1 |
| Pittsburgh, PA | 8/24/19 | 6.9 | 14.4 | 71.6 |
| San Bernardino, CA | 8/24/19 | 6.9 | 10.9 | 74.6 |
| Long Island, NY | 8/27/19 | 6.8 | 16.5 | 66.7 |
| Omaha, NE | 8/27/19 | 6.8 | 12.6 | 73.7 |
| West Palm Beach, FL | 8/30/19 | 6.7 | 19.0 | 60.6 |
| Tucson, AZ | 9/5/19 | 6.5 | 15.9 | 85.7 |
| Providence, RI | 9/11/19 | 6.3 | 12.1 | 67.5 |
| Kendall, FL | 9/14/19 | 6.2 | 12.8 | 82.8 |
| Hialeah, FL | 9/14/19 | 6.2 | 11.8 | 77.2 |
| Fresno, CA | 9/17/19 | 6.1 | 9.8 | 71.8 |
| Detroit, MI | 9/23/19 | 5.9 | 12.2 | 73.9 |
| Indianapolis, IN | 9/23/19 | 5.9 | 13.1 | 68.0 |
| Oklahoma City, OK | 9/26/19 | 5.8 | 15.0 | 77.3 |
| Mount Laurel, NJ | 10/2/19 | 5.6 | 16.1 | 66.8 |
| Boston, MA | 10/8/19 | 5.4 | 12.2 | 56.9 |
| Kansas City, MO | 10/14/19 | 5.2 | 10.9 | 78.9 |
| Cincinnati, OH | 10/14/19 | 5.2 | 11.9 | 73.2 |

| | | | | |
|---|---|---|---|---|
| Jacksonville, FL | 10/17/19 | 5.1 | 11.2 | 82.3 |
| Tampa, FL | 10/17/19 | 5.1 | 12.4 | 76.9 |
| Buffalo, NY | 10/20/19 | 5.0 | 13.6 | 79.8 |
| Columbus, OH | 10/23/19 | 4.9 | 10.4 | 75.1 |
| Louisville, KY | 10/26/19 | 4.8 | 11.7 | 76.1 |
| Charleston, SC | 10/29/19 | 4.7 | 13.3 | 80.2 |
| Raleigh, NC | 11/7/19 | 4.4 | 13.5 | 80.4 |
| Cleveland, OH | 11/28/19 | 3.7 | 9.0 | 78.1 |

Powered by  LiveStories

# National Trends

Nationwide, is it getting easier or harder to become a naturalized U.S. citizen?

First, consider the baseline: There are nearly 9 million immigrants in the United States who are eligible for U.S. citizenship, but fewer than 1 million typically apply in any given year. Many barriers to citizenship are more or less fixed: given high application fees and the required civics and English tests, it's simply less costly and time-intensive upfront for most people to renew their green card every 10 years than to go through the naturalization process.

The volume of citizenship applications does fluctuate from year to year, typically spiking during election years—or in advance of an application fee increase—and then decreasing sharply the following year. In 2016 and 2017, something unusual happened: Volume spiked at nearly 1 million applications for 2 years in a row.

Has the government's response been adequate? The following data analysis seeks to answer the question.

https://www.boundless.com/research/state-of-new-american-citizenship-report/          07/27/2020

## Surging Backlog



A look at the past decade indicates a worrying trend.

Although application volume was on track to reach a more normal level in 2018 and 2019, processing volume has only recently begun to increase, leading to a surge in the backlog of pending applications.

USCIS, the federal agency responsible for processing citizenship applications, has defended itself by noting that the backlog more than doubled during the Obama administration. This is true: the backlog rose from nearly 292,000 in September 2010 to over 636,000 by the time Donald Trump assumed office in January 2017.

But USCIS has also claimed that the surge in applications during 2016 and 2017 created a "record and unprecedented" workload, and a look at the past 3 decades shows that this is not true.

# Backlogs in Context

Citizenship Applications Filed and Processed Nationwide
Source: USCIS N-400 quarterly data



In 2007, citizenship applications surged to nearly 1.4 million, far higher than the recent uptick. This was driven in part by a looming 80% application fee hike that year, and in part by an increase in newly eligible immigrants who had obtained their green cards 5 years earlier under the Legal Immigration Family Equity (LIFE) Act of 2000.

USCIS responded with a surge in processing volume the following year, and the backlog plunged to a 30-year low of about 257,000 in 2009.

In the mid-1990s, there was a truly "record and unprecedented" surge in citizenship applications, driven in part by a corresponding increase in newly eligible immigrants who had received green cards under the Immigration Reform and Control Act 1986 (IRCA, also known as the "Reagan Amnesty"). Between 1995 and 1998, application volume stayed well above 900,000, peaking at over 1.4 million in 1997. Although the backlog initially shot past 2 million in 1997-1998, USCIS responded with a comparable surge in processing volume that appears to have tamed the backlog by 1999-2000.

The data indicate that when USCIS devotes sufficient resources to a citizenship application surge, it's possible to dramatically reduce a backlog within one year. That's what happened in 2012, 2007, and 2000.

https://www.boundless.com/research/state-of-new-american-citizenship-report/

On the other hand, when USCIS fails to devote sufficient resources, backlogs can get way out of hand. That's what happened in the mid-1990s, and it appears to be happening now, as well.

## Falling Behind

Backlog Completion Rate

Source: USCIS N-400 quarterly data & DHS data



Another way to evaluate this problem is to measure how efficiently USCIS beats back its backlogs. If USCIS processed every citizenship application it received in a given year, plus the applications that were pending from the previous year, that would yield a "backlog completion" of 100%.

In reality, USCIS achieved a backlog completion rate of 77% in 2009—a 30-year high—and this number has been trending downward ever since. There was a 10-point drop in backlog completion between 2016 and 2017 (from 63% to 53%), and while the situation has improved slightly since then, more needs to be done to reduce the backlog.

## Surging Wait Times



Growing backlogs have direct and negative consequences for immigrants seeking to become U.S. citizens: They have to wait longer for their applications to be processed by the government.

Here the trend is unmistakable: Between 2012 and 2016, median application processing times hovered between about 4.5 to 6 months, before shooting past 8 months in 2017 and hovering at about 10 months in 2019. Compounding the worrisome trend, starting in March 2020, and as of this writing (May 2020), the coronavirus lockdown has postponed the final steps for naturalization—interviews and oath ceremonies—indefinitely.

# Denial Rates Have Risen

Denied Citizenship Applications as a Share of Filed Applications

Source: USCIS N-400 quarterly data & DHS data



Another factor that directly affects immigrants is the share of naturalization applications that are denied, potentially closing off the opportunity to become a U.S. citizen. (Denials can be appealed, but this process is expensive and uncertain.)

On the one hand, denial rates have inched up in recent years, from 10.3% in 2016 to 10.5% in 2019.

But looking at the past 3 decades, denial rates used to be quite a bit higher. Although beyond the scope of this report, it's fair to ask why citizenship application denial rates were well below 3% since the early 1950s, then suddenly jumped to 7.5% in 1992, and have never gone lower since then. Meanwhile, nearly one third of all citizenship applications were denied in 1999 and 2000, before dropping back down to a "new normal" in this decade.

Time will tell whether denial rates remain elevated in the years to come.

# What Are the Best (and Worst) Cities to Become a U.S. Citizen?

While the national trends tell one story about U.S. citizenship, there is immense variation by location. Immigrants in some cities are encountering minimal backlogs, short wait times, and convenient locations for the citizenship interview, while immigrants in other cities face large backlogs, long (even outrageous) wait times, and an interview location over 100 miles away.

The following table ranks over 100 U.S. metro areas using a novel index that measures relative ease of naturalization.

## The Best Cities for Becoming a New American

Metro Area Rankings
Source: Boundless Analysis

| Metro area | Overall Rank | Backlog Completion Rate (%) | Median Wait Time (Months) | Miles to Nearest Field Office | Overall Index |
|---|---|---|---|---|---|
| Cleveland-Elyria, OH | 1.0 | 78.1 | 3.7 | 0.0 | 95.0 |
| Raleigh, NC | 2.0 | 80.4 | 4.4 | 0.0 | 91.0 |
| Durham-Chapel Hill, NC | 3.0 | 80.4 | 4.4 | 29.0 | 89.0 |
| Charleston-North Charleston, SC | 4.0 | 80.2 | 4.7 | 0.0 | 89.0 |
| Louisville/Jefferson County, KY-IN | 5.0 | 76.1 | 4.8 | 0.0 | 88.0 |
| Columbus, OH | 6.0 | 75.1 | 4.9 | 0.0 | 87.0 |
| Jacksonville, FL | 7.0 | 82.3 | 5.1 | 0.0 | 87.0 |
| Buffalo-Cheektowaga-Niagara Falls, NY | 8.0 | 79.8 | 5.0 | 0.0 | 87.0 |
| Tampa-St. Petersburg-Clearwater, FL | 9.0 | 76.9 | 5.1 | 0.0 | 86.0 |
| Kansas City, MO-KS | 10.0 | 78.9 | 5.2 | 0.0 | 86.0 |
| Cincinnati, OH-KY-IN | 11.0 | 73.2 | 5.2 | 0.0 | 85.0 |
| Lakeland-Winter Haven, FL | 12.0 | 76.9 | 5.1 | 35.0 | 83.0 |
| Oklahoma City, OK | 13.0 | 77.3 | 5.8 | 0.0 | 82.0 |
| Detroit-Warren-Dearborn, MI | 14.0 | 73.9 | 5.9 | 0.0 | 81.0 |
| North Port-Sarasota-Bradenton, FL | 15.0 | 76.9 | 5.1 | 61.0 | 81.0 |
| Rochester, NY | 16.0 | 79.8 | 5.0 | 74.0 | 81.0 |
| Boston-Cambridge-Newton, MA-NH | 17.0 | 65.2 | 5.9 | 0.0 | 79.0 |
| Fresno, CA | 18.0 | 71.8 | 6.1 | 0.0 | 79.0 |
| Tucson, AZ | 19.0 | 65.7 | 6.5 | 0.0 | 79.0 |
| Indianapolis-Carmel-Anderson, IN | 20.0 | 68.0 | 5.9 | 0.0 | 79.0 |
| Trenton, NJ | 21.0 | 66.8 | 5.6 | 29.0 | 79.0 |
| Providence-Warwick, RI-MA | 22.0 | 67.5 | 6.3 | 0.0 | 77.0 |
| Visalia-Porterville, CA | 23.0 | 71.8 | 6.1 | 43.0 | 75.0 |

https://www.boundless.com/research/state-of-new-american-citizenship-report/     07/27/2020

| | | | | |
|---|---|---|---|---|
| Omaha-Council Bluffs, NE-IA | 24.0 | 73.7 | 6.8 | 0.0 | 75.0 |
| Riverside-San Bernardino-Ontario, CA | 25.0 | 74.6 | 6.9 | 0.0 | 74.0 |
| St. Louis, MO-IL | 26.0 | 75.1 | 7.0 | 0.0 | 74.0 |
| Merced, CA | 27.0 | 71.8 | 6.1 | 56.0 | 74.0 |
| Pittsburgh, PA | 28.0 | 71.6 | 6.9 | 0.0 | 74.0 |
| Tulsa, OK | 29.0 | 77.3 | 5.8 | 106.0 | 73.0 |
| Milwaukee-Waukesha-West Allis, WI | 30.0 | 70.7 | 7.1 | 0.0 | 72.0 |
| Worcester, MA-CT | 31.0 | 83.1 | 6.9 | 54.0 | 72.0 |
| San Diego-Carlsbad, CA | 32.0 | 67.0 | 7.2 | 0.0 | 71.0 |
| Brownsville-Harlingen, TX | 33.0 | 85.2 | 7.8 | 0.0 | 71.0 |
| Modesto, CA | 34.0 | 71.8 | 6.1 | 95.0 | 71.0 |
| El Paso, TX | 35.0 | 80.2 | 7.8 | 0.0 | 70.0 |
| Bakersfield, CA | 36.0 | 71.8 | 6.1 | 111.0 | 70.0 |
| Albuquerque, NM | 37.0 | 75.7 | 7.7 | 0.0 | 70.0 |
| Port St. Lucie, FL | 38.0 | 60.6 | 6.7 | 48.0 | 69.0 |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 39.0 | 63.7 | 7.7 | 0.0 | 68.0 |
| McAllen-Edinburg-Mission, TX | 40.0 | 85.2 | 7.8 | 35.0 | 68.0 |
| Portland-Vancouver-Hillsboro, OR-WA | 41.0 | 73.7 | 7.9 | 0.0 | 68.0 |
| Charlotte-Concord-Gastonia, NC-SC | 42.0 | 65.6 | 7.6 | 0.0 | 68.0 |
| Grand Rapids-Wyoming, MI | 43.0 | 73.9 | 5.9 | 158.0 | 68.0 |
| Springfield, MA | 44.0 | 83.1 | 6.9 | 106.0 | 68.0 |
| Las Cruces, NM | 45.0 | 80.2 | 7.8 | 46.0 | 66.0 |
| Greenville-Anderson-Mauldin, SC | 46.0 | 105.6 | 7.2 | 0.0 | 66.0 |
| Chicago-Naperville-Elgin, IL-IN-WI | 47.0 | 59.4 | 8.0 | 0.0 | 65.0 |
| Denver-Aurora-Lakewood, CO | 48.0 | 70.8 | 8.3 | 0.0 | 65.0 |
| Salem, OR | 49.0 | 73.7 | 7.9 | 47.0 | 64.0 |
| Miami-Fort Lauderdale-West Palm Beach, FL | 50.0 | 63.5 | 8.4 | 0.0 | 63.0 |
| Urban Honolulu, HI | 51.0 | 65.8 | 8.5 | 0.0 | 63.0 |
| Memphis, TN-MS-AR | 52.0 | 71.1 | 8.6 | 0.0 | 63.0 |
| Virginia Beach-Norfolk-Newport News, VA-NC | 53.0 | 62.5 | 8.6 | 0.0 | 62.0 |
| Anchorage, AK | 54.0 | 82.1 | 9.2 | 0.0 | 62.0 |
| Greensboro-High Point, NC | 55.0 | 65.6 | 7.6 | 92.0 | 61.0 |
| Orlando-Kissimmee-Sanford, FL | 56.0 | 58.0 | 8.9 | 0.0 | 59.0 |
| San Antonio-New Braunfels, TX | 57.0 | 65.4 | 9.1 | 0.0 | 59.0 |
| El Centro, CA | 58.0 | 70.7 | 9.3 | 0.0 | 59.0 |
| Des Moines-West Des Moines, IA | 59.0 | 68.2 | 9.2 | 0.0 | 59.0 |

| | | | | |
|---|---|---|---|---|
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 60.0 | 60.2 | 9.1 | 0.0 | 58.0 |
| Portland-South Portland, ME | 61.0 | 73.8 | 9.6 | 0.0 | 58.0 |
| Yakima, WA | 62.0 | 83.2 | 9.9 | 0.0 | 57.0 |
| Allentown-Bethlehem-Easton, PA-NJ | 63.0 | 62.6 | 8.5 | 64.0 | 57.0 |
| Boise City, ID | 64.0 | 69.3 | 9.5 | 0.0 | 57.0 |
| Sacramento--Roseville--Arden-Arcade, CA | 65.0 | 56.5 | 9.4 | 0.0 | 56.0 |
| Reno, NV | 66.0 | 80.0 | 10.0 | 0.0 | 56.0 |
| Wichita, KS | 67.0 | 73.1 | 9.8 | 0.0 | 56.0 |
| Manchester-Nashua, NH | 68.0 | 78.0 | 10.0 | 0.0 | 56.0 |
| Fort Smith, AR-OK | 69.0 | 62.3 | 9.5 | 0.0 | 56.0 |
| Spokane-Spokane Valley, WA | 70.0 | 75.4 | 10.0 | 0.0 | 55.0 |
| Burlington-South Burlington, VT | 71.0 | 71.0 | 10.0 | 0.0 | 55.0 |
| San Jose-Sunnyvale-Santa Clara, CA | 72.0 | 62.0 | 9.8 | 0.0 | 54.0 |
| Yuma, AZ | 73.0 | 70.7 | 9.3 | 65.0 | 54.0 |
| Richmond, VA | 74.0 | 62.5 | 8.6 | 93.0 | 54.0 |
| Hartford-West Hartford-East Hartford, CT | 75.0 | 55.6 | 9.8 | 0.0 | 53.0 |
| Albany-Schenectady-Troy, NY | 76.0 | 53.9 | 9.8 | 0.0 | 53.0 |
| Stockton-Lodi, CA | 77.0 | 56.5 | 9.4 | 49.0 | 52.0 |
| Santa Cruz-Watsonville, CA | 78.0 | 62.0 | 9.8 | 32.0 | 52.0 |
| Fayetteville-Springdale-Rogers, AR-MO | 79.0 | 62.3 | 9.5 | 60.0 | 51.0 |
| New Haven-Milford, CT | 80.0 | 55.6 | 9.8 | 39.0 | 50.0 |
| Atlanta-Sandy Springs-Roswell, GA | 81.0 | 55.8 | 10.4 | 0.0 | 49.0 |
| Bridgeport-Stamford-Norwalk, CT | 82.0 | 55.6 | 9.8 | 55.0 | 49.0 |
| Salinas, CA | 83.0 | 62.0 | 9.8 | 60.0 | 49.0 |
| Laredo, TX | 84.0 | 65.4 | 9.1 | 157.0 | 47.0 |
| New York-Newark-Jersey City, NY-NJ-PA | 85.0 | 53.2 | 10.8 | 0.0 | 46.0 |
| Cape Coral-Fort Myers, FL | 86.0 | 52.5 | 10.7 | 0.0 | 44.0 |
| New Orleans-Metairie, LA | 87.0 | 51.3 | 11.2 | 0.0 | 43.0 |
| Los Angeles-Long Beach-Anaheim, CA | 88.0 | 49.7 | 11.6 | 0.0 | 41.0 |
| Baltimore-Columbia-Towson, MD | 89.0 | 48.3 | 11.5 | 0.0 | 41.0 |
| Naples-Immokalee-Marco Island, FL | 90.0 | 52.5 | 10.7 | 44.0 | 41.0 |
| Salt Lake City, UT | 91.0 | 54.0 | 12.2 | 0.0 | 38.0 |
| Dallas-Fort Worth-Arlington, TX | 92.0 | 57.6 | 13.0 | 0.0 | 33.0 |
| Houston-The Woodlands-Sugar Land, TX | 93.0 | 57.9 | 13.5 | 0.0 | 30.0 |
| Minneapolis-St. Paul-Bloomington, MN-WI | 94.0 | 52.1 | 13.6 | 0.0 | 29.0 |

https://www.boundless.com/research/state-of-new-american-citizenship-report/                    07/27/2020

| | | | | |
|---|---|---|---|---|
| Phoenix-Mesa-Scottsdale, AZ | 95.0 | 49.3 | 13.6 | 0.0 | 27.0 |
| Oxnard-Thousand Oaks-Ventura, CA | 96.0 | 42.4 | 13.5 | 39.0 | 25.0 |
| San Francisco-Oakland-Hayward, CA | 97.0 | 42.2 | 14.1 | 0.0 | 24.0 |
| Austin-Round Rock, TX | 98.0 | 57.6 | 13.5 | 80.0 | 24.0 |
| Las Vegas-Henderson-Paradise, NV | 99.0 | 50.2 | 14.5 | 0.0 | 22.0 |
| Vallejo-Fairfield, CA | 100.0 | 42.2 | 14.1 | 32.0 | 21.0 |
| Santa Rosa, CA | 101.0 | 42.2 | 14.1 | 55.0 | 19.0 |
| Santa Maria-Santa Barbara, CA | 102.0 | 42.4 | 13.5 | 144.0 | 15.0 |
| Seattle-Tacoma-Bellevue, WA | 103.0 | 37.6 | 15.8 | 0.0 | 13.0 |

Powered by LiveStories

For example, immigrants in the Cleveland area enjoy the shortest application processing time in the nation (3.7 months), the 19th-highest backlog completion rate (78.1%), and a USCIS field office in town. Relative to other metro areas, at 95 points—is as good as it gets across all of these weighted factors, and it earns the No. 1 spot on the index.

Meanwhile, the greater Seattle area is at the bottom of the index, with the lowest backlog completion rate of any metro area (37.9%). Since backlog completion is a leading indicator of wait time, the Seattle area's already long median wait time (15.8 months) will likely rise in future years. The second- and third-worst metro areas on the list—Santa Maria-Santa Barbara and Santa Rosa, both in California—had slightly better backlog completion rates and median wait times than Seattle. But immigrants in these areas must travel 55 miles (Santa Rosa) and 144 miles (Santa Maria-Santa Barbara) to get to the nearest field office.

# Conclusion

It should be uncontroversial that in America, every immigrant who seeks U.S. citizenship and is eligible under the law should experience a fair and speedy naturalization process. Barriers to citizenship should certainly not depend on where in America an individual happens to live, or whether a federal agency chooses to embrace basic workarounds during a national emergency.

By illuminating national and local trends in new American citizenship, we hope that this report is useful to immigrants, advocates, and state and local government leaders seeking to make the naturalization process more navigable and equitable.

Going forward, Boundless will continue to watch for new trends in the data on U.S. citizenship:

• Will naturalization rates rise or fall, both nationally and locally?

• Will backlogs and wait times continue to rise?

• Will disparities among metro areas and USCIS field offices persist over time?

In addition, there are several federal government policy changes that could have a major impact on the ease or difficulty of obtaining U.S. citizenship.

USCIS has announced plans to eliminate one of the most common eligibility factors for naturalization fee waivers, which could significantly reduce applications by lower-income immigrants.

USCIS has also proposed to change the naturalization application form, asking much more expansive questions and requiring many applicants to provide 10 years of detailed prior international travel records (rather than the longstanding status quo of 5 years). This change could have an effect on both application volume and field office efficiency.

Also expected in 2020 is a major hike of USCIS user fees across the board, including a nearly 60% increase in total naturalization fees. Will this have the short-term effect of boosting citizenship applications as it has in years past? Will it have longer-term inequitable effects on who can afford to become a U.S. citizen?

Many policy changes that are not directly targeted at U.S. citizenship can still slow down the naturalization process. After all, the USCIS field officers who conduct citizenship interviews have many other duties. Beginning in 2017, USCIS started requiring an in-person interview for anyone applying for an employment-based green card (about 122,000 people each year) or family members of refugees and asylees applying for a green card from within the United States (about 46,000 people each year). At the end of 2018, USCIS effectively expanded the green card interview requirement for another 166,000 married couples each year. Absent a new hiring surge within USCIS, these policies seem likely to further exacerbate backlogs and wait times for U.S. citizenship applications.

If you have feedback on this report, or suggestions for what Boundless should include in future reports, please contact us at press@boundless.com.

# Acknowledgements

This report was researched and written by Doug Rand, co-founder of Boundless Immigration.

Special thanks to Xiao Wang, Richie Bernardo, Alison Moodie, Chris Montes, and the rest of the Boundless team for their work on this report as well.

Melissa Rodgers, Sarah Letson, and Rebeca Rangel from the Immigrant Legal Resource Center and the New Americans Campaign provided essential early feedback, as did Scott Andes from the National League of Cities.

We are also grateful for the work of Manuel Pastor's team at the Center for the Study of Immigrant Integration at the University of Southern California; their data set on naturalization-eligible immigrant populations is extraordinarily helpful.

We also wish to thank the anonymous and hard-working public servants at the Department of Homeland Security (DHS) who, year after year and quarter after quarter, produce the essential DHS Yearbook of Immigration Statistics and USCIS Immigration and Citizenship Data.

# Methodology

## Data Sources

The following data sources were used in this report as the sources for each bulleted data type. Unless otherwise noted, each of these data sources was accessed on or around March 15, 2020.

**Yearbook of Immigration Statistics 2018.** U.S. Department of Homeland Security, Office of Immigration Statistics. "Table 20. Petitions for Naturalization Filed, Persons Naturalized, and Petitions for Naturalization Denied: Fiscal Years 1907 to 2018."
• *Number of citizenship applications filed and processed, FY1990-FY2009*
• *Denial rate, FY1990-FY2009*

**Yearbook of Immigration Statistics 2018.** U.S. Department of Homeland Security, Office of Immigration Statistics. "Table 23. Persons Naturalized by Core Based Statistical Area

(CBSA) of Residence: Fiscal Years 2016 to 2018."
• *Number of immigrants naturalized in FY2018, by metro area*

**Immigration and Citizenship Data.** U.S. Citizenship and Immigration Services. "Form N-400, Application for Naturalization, by Category of Naturalization, Case Status, and USCIS Field Office Location" [several quarters].
• *Number of citizenship applications filed, denied, approved, and pending at year-end, for each USCIS field office, FY2010-FY2019*

**Historical National Average Processing Time for All USCIS Offices.** U.S. Citizenship and Immigration Services.
• *National average processing times for N-400 and other forms, FY2016-FY2020*

**Archive Data Set: Form N-400 Naturalization Average Cycle Time.** U.S. Citizenship and Immigration Services.
• *National monthly processing times (also called "cycle times"), FY2012-FY2013 (partial)*

**Check Case Processing Times.** U.S. Citizenship and Immigration Services.
• *Median and maximum processing times for each field office, recorded each month between July 2018 and December 2019.*

**Field Offices.** U.S. Citizenship and Immigration Services.
• *Required USCIS field office location based on applicant ZIP code*


## Definition of Terms

**Backlog completion:** The number of citizenship applications processed within a fiscal year, divided by the sum of (a) the number of citizenship applications filed within the same fiscal year and (b) the year-end backlog as of the prior fiscal year (expressed as a percentage)

**Citizenship application:** Form N-400, the application for naturalization administered by U.S. Citizenship and Immigration Services (USCIS)

**Denial rate:** Within a given time period, the number of citizenship applications denied, divided by the number of citizenship applications processed

**DHS:** U.S. Department of Homeland Security

**Distance to field office:** Number of miles between the largest city within a given metro area and the location of the field office required by USCIS for residents of that metro area, as estimated using Google Maps (if the required field office is within the metro area, the "distance to field office" is listed as zero)

**Field office:** The local office of U.S. Citizenship and Immigration Services (USCIS) where immigration officials conduct the citizenship interview; applicants for citizenship are assigned to a field office based on the ZIP code of their residence.

**Filed:** The number of citizenship applications received by USCIS within a given time period

**Naturalization rate:** The number of immigrants who naturalized in a given metro area (based on DHS data for FY2017) divided by the total estimated number of immigrants eligible for naturalization within that metro area (based on a methodology developed at the University of Southern California, published in 2016, and based on prior Census data)

**Processed:** The number of citizenship applications approved plus the number of citizenship applications denied by USCIS within a given time period

**USCIS:** U.S. Citizenship and Immigration Services, a component agency of the U.S. Department of Homeland Security

**Processing time (average):** The national average processing time for a given form based on all field offices within a period of time, as estimated by USCIS

**Processing time (max):** The time it takes to complete 93% of cases for a given form within a given field office, as estimated by USCIS; for purposes of this report, this number is the 12-month average between January and December 2019.

**Processing time (median):** The time it takes to complete 50% of cases for a given form within a given field office, as estimated by USCIS; for purposes of this report, this number is the 12-month average between January and December 2019.

**Wait time:** The total time it takes to become naturalized once an application is submitted. This time includes the application processing time as well as the time needed to take citizenship tests and the oath ceremony. Synonymous with "Processing time" for purposes of this report.

**Year-end backlog:** The number of citizenship applications listed "pending" (i.e. not processed) by USCIS at the end of a given fiscal year

## Calculation of Rankings

Best Cities for Becoming a New American

The overall index is derived from three objective criteria for each metro area:

1. Backlog completion (as of FY2019)

2. Median wait time (12-month average between January and December 2019, when data was collected for this report)

3. Distance to field office

For a metro area with more than one field office (New York, Miami, Los Angeles, Boston, and Philadelphia), backlog completion is calculated based on the total number of applications filed, processed, and backlogged across all field offices within that metro area. Median wait time is averaged across all field offices within the metro area, weighted by the percentage of applications filed with each individual field office. Distance to field office is zero.

For a metro area with only one field office, backlog completion and median wait time reflect the values from that field office. Distance to field office is zero.

For a metro area with no field office, backlog completion and median wait time reflect the values from the field office required by USCIS for applicants from that metro area. Distance to field office is the number of miles between the largest city within the metro area and the location of the required field office, as estimated using Google Maps.

Each criterion was normalized as a percentage between the maximum/best (100%) and the minimum/worst (0%) value that appeared across all metro areas. For example, the normalized numbers for Jacksonville, Florida were 35% for backlog completion (relatively poor), 88% for wait time (relatively good), and 100% for field office distance (since there is a field office in Jacksonville).

The overall index value is the weighted average of these normalized numbers:

• Backlog completion: Weighted as 12.5%

• Median wait time: Weighted as 75.0%

• Distance to field office: Weighted as 12.5%

Wait time is deliberately upweighted, since this criterion is likely to be most salient for a citizenship applicant. Backlog completion, by comparison, is more of a warning signal of future wait times, and field office distance represents a potential one-time hassle to travel to the citizenship interview. In the event of a missing criterion, the overall index was reweighted accordingly.

The overall index value represents how close a given metro area is to the best observed values across all criteria. For example, Cleveland has an overall index of 95 points because this is the weighted average of its normalized backlog completion (62.8% as good as the best metro area, which happens to be Portland, Maine), wait time (100%, the best of all the metro areas), and distance to field office (100%, as is true for all metro areas that have their own field office).

Note that metro areas are not included if they have an estimated naturalization-eligible immigrant population of less than 10,000, and they have no USCIS field office.


## Note on Charts

The year-end backlogs for FY1990-2009 are estimated from DHS data on filing and processing volume. This means that the backlog completion values for FY1991-2010 are based in part on that estimated backlog value for each prior year.

There are apparently no government processing time data publicly available for years prior to FY2012.



# BOUNDLESS

Comments of Boundless Immigration Inc. on the
Department of Homeland Security's Proposed Rules:

*U.S. Citizenship and Immigration Services Fee Schedule and Changes to
Certain Other Immigration Benefit Request Requirements*

84 Fed. Reg. 62280 (Nov. 14, 2019)
and
84 Fed. Reg. 67243 (Dec. 9, 2019)

Doug Rand
Co-Founder
Boundless Immigration Inc.
101 4th Ave, Suite 850
Seattle, WA 98121

December 30, 2019

## Table of Contents

*Background*...........................................................................................................................*4*

*The Proposed Rule Would Impose Severe and Irreparable Harms* .......................................*4*

    **Harms to immigrants eligible for U.S. citizenship** .................................................................6

    **Harms to lawful permanent residents** ......................................................................................7

    **Harms to married couples** .........................................................................................................8

    **Harms to individuals seeking lawful re-entry to the United States** .....................................8

    **Harms to green card applicants and their U.S. family members** .........................................8

    **Harms to asylees** .......................................................................................................................9

    **Harms to DACA beneficiaries**...................................................................................................9

    **Harms to victims of domestic violence and human trafficking**...........................................10

    **Harms to family members of crime victims** ..........................................................................10

    **Harms to families who fled Central America and the Soviet Union** ...................................10

    **Harms to family history researchers** .....................................................................................11

    **Harms to U.S. citizens** ............................................................................................................11

    **Harms to U.S. small businesses** ..............................................................................................12

    **Harms to all U.S. businesses** ..................................................................................................12

    **Harms to all underbanked users** ............................................................................................12

    **Harms to all users of the legal immigration system** ............................................................13

    **Harms to all citizens and residents of the United States** .....................................................13

*The Proposed Rule Is Unlawful* ............................................................................................*14*

    **The proposed rule is contrary to Congressional intent** ......................................................14

        The proposed rule violates a plain reading of the Immigration and Nationality Act ................ 14

        The proposed rule violates the will of Congress as expressed through bipartisan appropriations language...... 14

        The proposed rule violates the Immigration and Nationality Act, the Homeland Security Act, and two

        Appropriations Acts in proposing a user fee transfer to ICE................................................................. 17

    **The proposed rule's arbitrary and pretextual "equity" principle is contrary to the
Administrative Procedure Act** ...............................................................................................18

        It is arbitrary to eliminate fee caps for some but not all categories .......................................... 19

        It is arbitrary to eliminate and restrict fee waivers without a rational policy argument ............ 23

        The proposed rule is inconsistent with prior practice.............................................................. 27

        The proposed rule violates reliance interests............................................................................ 30

        The proposed rule ignores Congressional intent ....................................................................... 30

        It is arbitrary to eliminate free interim benefits without a rational policy argument................. 31

        It is arbitrary to impose an essentially random fee on asylum applicants ................................ 32

        It is arbitrary to impose an extraordinary new work permit fee on asylum applicants .................... 34

        It is arbitrary to impose an essentially random fee on TPS...................................................... 34

        It is arbitrary to reverse longstanding naturalization policy .................................................... 35

    **The proposed rule's cost/benefit analysis is utterly deficient and violates the Administrative
Procedure Act** .........................................................................................................................37

The economic analysis is mathematically invalid ..................................................................... 37
There is no accounting for harms ............................................................................................ 39
There is no accounting for price sensitivity............................................................................. 39
There is no accounting for broader costs of restricting immigration........................................ 39
There is no accounting for the impact of new restrictions on fee waivers for applicants with an affidavit of support ..................................................................................................................... 40
The arguments for imposing fees on "interim benefits" are invalid.......................................... 40
The arguments for raising green card application fees on young children are invalid.................. 41
There is inconsistent and inaccurate accounting for the cost of legal assistance ........................ 41
There is no accounting for true cost of eliminating fee reductions for naturalization.................... 42
The cost/benefit analysis of asylum application and work permit fees is invalid ......................... 43
There is no accounting for DACA renewals.............................................................................. 44
Failure to estimate costs of restricting payment methods........................................................ 45
Failure to estimate costs of lengthening premium processing delays........................................ 45
Failure to estimate costs of increasing genealogical record fees.............................................. 45
Invalid and contradictory arguments for eliminating fee waivers and exemptions ..................... 45

**The proposed rule is contrary to the Regulatory Flexibility Act** ................................**48**

**The proposed rule is contrary to the Paperwork Reduction Act** ................................**48**

**The proposed rule is contrary to the Equal Protection Clause of the U.S. Constitution**............**49**

***The Proposed Rule Gives the Public No Opportunity to Evaluate Key Data*** ...........................*50*

**There is no accounting for cost savings from recent USCIS policies** .............................**50**

**USCIS provides inadequate justification for increasing revenue, compared with its prior fee rule** .................................................................................................................................**51**

**USCIS fails to disclose what it would do with more than half of the extra $1.3 billion in annual revenue it seeks to raise** .......................................................................................**52**

**USCIS seeks to extract this extraordinary amount of new revenue from its most vulnerable users** ......................................................................................................................................**55**

**USCIS claims that form-specific processing costs have increased dramatically since 2016, for no reason provided in the proposed rule** .................................................................................**57**

**USCIS provides no explanation for a huge increase in projected work permit applications** ........**58**

**USCIS provides no justification for its revenue projection baseline** ...............................**58**

**USCIS provides insufficient data on prior-year recovered revenue** ................................**58**

***The Proposed Rule Does Nothing to Improve Agency Functions*** ................................*59*

***The Proposed Rule Violates Required Opportunities for Public Review*** ...........................*60*

**The public comment period is too short for adequate review of the proposed rule** .....................**60**

**The public comment period is too short for adequate review of the proposed forms** ...................**61**

**The economic analysis is plagued with errors** ...................................................................**61**

**USCIS reneged on its promised to provide public review of its cost model software**....................**62**

***The Proposed Rule Fails to Consider Alternatives*** ................................................*64*

**USCIS could raise significant additional revenue strictly from users with the greatest ability to pay**...................................................................................................................................**64**

**USCIS could extend the validity period of "interim benefits" rather than new imposing fees** .....**64**

**"Fallback" provisions are not appropriate in a final rule** ...................................................................... **64**

*Conclusion* ........................................................................................................................................ *65*

# Background

This public comment is submitted to U.S. Citizenship and Immigration Services (USCIS) in response to its proposed rule entitled *Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, first published in the Federal Register on Nov. 14, 2019 (84 Fed. Reg. 62280) ("the proposed rule") and revised with an update on Dec. 9, 2019 (84 Fed. Reg. 67243) ("the proposed rule update"). We have also reviewed the agency's Fee Review Supporting Documentation, Regulatory Impact Analysis ("USCIS economic analysis"), and Small Entity Analysis.

This public comment uses the fee schedule provided by USCIS in "Scenario A" of its initial proposed rule, even though the subsequent proposed rule update all but guarantees that "Scenario A" will be impossible for the agency to actually use. As stated in the proposed rule update:

> Table 21 in the [initial proposed rule] outlines the proposed fee levels contained in the proposed rule that would result if the ICE transfer of $207.6 million either did or did not occur. Because the estimated amount of the transfer is $112,287,417 million, the resulting fee schedule would, all else remaining the same, be somewhere between those two levels.

Because "somewhere between those two levels" is an absurdly imprecise target for analysis, this public comment will focus its independent modeling on "Scenario A," as did USCIS in its initial proposed rule.

In evaluating the proposed fee rule, it is helpful to remember that a projected *workload volume* increase does not in and of itself require a *fee schedule* increase, since agency revenues rise with increased volume. USCIS should (but does not) provide a set of specific reasons why the status quo fee schedule is insufficient to fund its operations, irrespective of projected volume.

# The Proposed Rule Would Impose Severe and Irreparable Harms

By hiking fees as high as 559%, imposing entirely new fees on vulnerable populations, and creating new obstacles throughout the legal immigration system, the proposed rule would needlessly inflict harm upon millions of people, both noncitizens and U.S. citizens.

Table A lists the most egregious fee increases in the proposed rule, including the directly affected populations. As a measure of how difficult it would be for many individuals to afford these fees, Table A shows how many weeks of take-home pay each fee would consume for a

person earning the national average minimum wage.[1] (No such table appears in the proposed rule.)

### Table A: Summary of Non-Business Fees and Affected Populations

| Population affected | Current Fee | Proposed Fee | Change ($) | Change (%) | Weeks of minimum-wage take-home pay |
|---|---|---|---|---|---|
| Asylum seekers (I-589, I-765) | $0 | $540 | $540 | N/A | 2 |
| DACA beneficiaries (I-821D) | $0 | $275 | $275 | N/A | 1 |
| Family members of crime victims (I-929) | $230 | $1,515 | $1,285 | 559% | 6 |
| Individuals seeking suspension of deportation (I-881) | $570 | $1,800 | $1,230 | 216% | 7 |
| Green card applicants (I-485, I-130, I-765, I-131) | $1,760 | $2,750 | $990 | 56% | 10 |
| Married couples (I-751) | $595 | $760 | $165 | 28% | 3 |
| Immigrants seeking U.S. citizenship (N-400) | $725 | $1,170 | $445 | 61% | 4 |
| Immigrants declaring intention to naturalize (N-300) | $270 | $1,320 | $1,050 | 389% | 5 |
| Immigrants seeking a naturalization hearing (N-336) | $700 | $1,755 | $1,055 | 151% | 7 |
| Immigrants preserving residence for naturalization (N-470) | $355 | $1,600 | $1,245 | 351% | 6 |
| Individuals seeking temporary permission to enter U.S. (I-192) | $585 | $1,415 | $830 | 142% | 5 |
| Individuals seeking lawful re-entry to U.S. (I-193) | $585 | $2,790 | $2,205 | 377% | 11 |
| Individuals seeking lawful re-entry to U.S. (I-131A) | $575 | $1,010 | $435 | 76% | 4 |
| Individuals seeking lawful re-entry to U.S. (I-601A) | $630 | $960 | $330 | 52% | 4 |
| Family history researchers (G-1041A) | $65 | $385 | $320 | 492% | 1 |
| Family history researchers (G-1041) | $65 | $240 | $175 | 269% | 1 |

Throughout hundreds of pages in its proposed rule and supporting documents, USCIS makes no attempt to quantify one of the most obvious harms that these new fees would inflict: Making it impossible for some individuals to afford the agency services to which they are legally eligible

---

[1] The proposed rule uses $8.25 per hour as the national average prevailing minimum wage, based on an Economic Policy Institute study. According to a study (reported in USA Today) based on IRS data, U.S. taxpayers pay an average of 20% of their gross pay in combined federal, state, and local taxes. Thus the take-home pay of someone earning the national average prevailing minimum wage is approximately $6.60 per hour (80% x $8.25). Assuming a 40-hour work week, the weekly average take-home pay would be $264.00 ($6.60 x 40).

and entitled. It is a matter of basic economics that as prices rise, consumption decreases—yet USCIS refuses to make even a single attempt to estimate how many people would no longer be able to afford the agency's dramatically higher fees.

The following discussion highlights a non-exhaustive set of populations who would clearly be harmed by the proposed rule, in many cases irreparably.

## Harms to immigrants eligible for U.S. citizenship

The economic and civic benefits of U.S. citizenship are thoroughly well-documented (yet just as thoroughly ignored in the proposed rule).[2] By dramatically increasing the cost of an application for naturalization and related forms, USCIS would force many legal immigrants to choose between losing over a month of take-home pay or simply abandoning the dream of becoming a U.S. citizen.

The proposed rule would increase the total costs of naturalization from $725 (the status quo including biometrics) to $1,170. At best, this is an increase of 61% for those who earn more than 200% of the Federal Poverty Guidelines (FPG). By eliminating the currently available 50% fee reduction (for those earning between 150–200% of the FPG) and the 100% fee waiver (for those earning less than 150% of the FPG), the proposed rule would effectively increase fees much more for lower-income naturalization applicants.

According to the USCIS economic analysis, in Fiscal Year (FY) 2017 the agency received 9,198 and approved 7,545 applications for a reduced naturalization fee (Form I-942). Between FY 2013–2017, the agency approved an average of 184,785 fee waiver requests (Form I-912) for immigrants applying for naturalization. Based on DHS data, the agency approved an average of 724,786 naturalization applications during that same period.

This means that *over 26% of recently naturalized immigrants received a fee reduction or fee waiver*. The proposed rule makes no attempt to estimate how many similarly situated individuals would be deterred from naturalization by an entirely new mandate to pay $1,170. One prominent

---

[2] For example:

Enchautegui, M. E. and L. Giannarelli. The Economic Impact of Naturalization on Immigrants and Cities. The Urban Institute (2015): http://www.urban.org/research/publication/economic-impact-naturalization-immigrants-and-cities

Pastor, M. and J. Scoggins. Citizen Gain: The Economic Benefits of Naturalization for Immigrants and the Economy. Center for the Study of Immigrant Integration, University of Southern California (2012): http://dornsife.usc.edu/assets/sites/731/docs/citizen_gain_web.pdf

recent academic study (not cited by USCIS) found that the availability of fee waivers has a dramatic effect on naturalization rate.[3]

The proposed rule would not only harm applicants earning less than 200% of the Federal Poverty Guidelines. *All* applicants for naturalization would face a fee that is 61% higher than the status quo—which was last increased only three years ago. Moreover, immigrants who need to file special forms would face additional barriers to naturalization, as shown in Table A.

- Some immigrants must file a "declaration of intent to naturalize" (Form N-300) in order to work in certain states. The proposed rule would increase this fee by 389%, to $1,320 or five weeks of minimum wage take-home pay.
- Some immigrants must file for "preservation of residence" for naturalization purposes, for example if they plan to work abroad for a U.S. company, university, or government agency before applying for U.S. citizenship. The proposed rule would increase this fee by 351%, to $1,600 or six weeks of minimum wage take-home pay.
- Some immigrants must file an appeal if their naturalization application is denied by USCIS. The proposed rule would increase this fee by 151%, to $1,755 or seven weeks of minimum wage take-home pay.

In all of these cases, immigrants living in the United States could be prevented from increasing their income, obtaining the right to vote, and reuniting with family members abroad because they are unable to afford the proposed naturalization fees.

The proposed rule provides no valid justification for the imposition of these harms on immigrants—and their U.S. citizen relatives—who seek to go through the Congressionally authorized naturalization process.

### Harms to lawful permanent residents

The proposed rule would impose harms on lawful permanent residents (also known as "green card" holders) who must file routine paperwork with USCIS.

All immigrants routinely file to replace their physical green card every ten years—or more frequently if their green card is lost or destroyed. While the proposed rule would lower the relevant fee (Form I-90) by 9% to $415, it would simultaneously eliminate the fee waiver option for this form type.

According to the USCIS economic analysis, between FY 2013–2017, the agency approved an average of 104,388 fee waiver requests for immigrants seeking to renew or replace their green cards—which are essential for maintaining employment and traveling internationally. For this population, the proposed rule would increase this fee from zero to $415, or nearly two weeks of minimum wage take-home pay.

---

[3] Barriers to citizenship for immigrants. Jens Hainmueller, Duncan Lawrence, Justin Gest, Michael Hotard, Rey Koslowski, David D. Laitin. *Proceedings of the National Academy of Sciences.* Jan 2018, 115 (5) 939-944; https://www.pnas.org/content/115/5/939

## Harms to married couples

A U.S. citizen or permanent resident may sponsor their spouse for a green card. If the couple has been married for less than two years at the time this green card is approved, then two years later they must prove the validity of their marriage a second time and apply to "remove the conditions" on the green card. In FY 2018, USCIS received 177,674 of these filings.

The proposed rule would increase the fee for this requirement (Form I-751) by 28% to $760, or three weeks of minimum wage take-home pay. This burden would be even more harmful for a couple earning less than 150% of the Federal Poverty Guidelines, since they would be eligible for a fee waiver under current policy but not under the proposed rule.

## Harms to individuals seeking lawful re-entry to the United States

The proposed rule would impose harmful fee increases on several populations who need special approval to re-enter the United States after making an international trip:

- Individuals with temporary (nonimmigrant) status sometimes find it necessary to apply for a "waiver of passport and/or visa" (Form I-193) in order to re-enter the United States without these documents, for example because a passport was lost abroad. The proposed rule would increase the fee for Form I-193 by 377% to $2,790, or eleven weeks of minimum wage take-home pay.

- Lawful permanent residents sometimes find it necessary to apply for a travel document ("carrier documentation") that allows them to board an airline or other transportation carrier in the event that their green card has been lost, stolen or destroyed while abroad. The proposed rule would increase the fee for this application (Form I-131A) by 76% to $1,010, or four weeks of minimum wage take-home pay.

- Individuals without current immigration status may be eligible for lawful permanent residency, for example via marriage to a U.S. citizen. In many cases, these individuals may apply for a "provisional unlawful presence waiver" that reduces the risk of being barred from re-entry to the United States while traveling abroad to complete their green card application. The proposed rule would increase the fee for this application (Form I-601A) by 52% to $960, or four weeks of minimum wage take-home pay.

## Harms to green card applicants and their U.S. family members

U.S. citizens and lawful permanent residents may sponsor certain relatives to obtain green cards. If these relatives are already living in the United States, they apply to USCIS for "adjustment of status" to permanent residency, which requires several different forms. As shown in Table B, although the proposed rule would slightly reduce the fee for the adjustment of status form itself

(Form I-485) and eliminate the separate biometrics fee, it would effectively *increase the cost of obtaining a family-based green card* by 57% to $2,750, or 10 weeks of minimum wage take-home pay.

**Table B: Full costs of obtaining a family-based green card**

| Fee Type | Current Fee | Proposed Fee | $ Change | % Change |
|---|---|---|---|---|
| Family Sponsorship Form (I-130) | $535 | $555 | $20 | 3.74% |
| Green Card Application Form (I-485) | $1,140 | $1,120 | -$20 | -1.75% |
| Financial Support Form (I-864) | $0 | $0 | $0 | 0.00% |
| Work Permit Application Form (I-765) | $0 | $490 | $490 | N/A |
| Travel Permit Application Form (I-131) | $0 | $585 | $585 | N/A |
| Biometrics (Fingerprints & Photo) | $85 | $0 | -$85 | -100.00% |
| **Total** | **$1,760** | **$2,750** | **$990** | **56.25%** |

In effect, the proposed rule includes hidden fees by newly compelling applicants to pay full price for "interim benefits"—in other words, for the permits required to work in the United States (I-765) and travel internationally (I-131) while waiting for the green card application to be approved.

These fees would impose severe and irreparable harms on families, including U.S. citizens and their immediate relatives. For example, USCIS makes no attempt to determine how many families would be separated by their inability to afford the far higher cost of a green card application.

## Harms to asylees

The proposed rule would impose two new fees on individuals seeking asylum: a $50 fee for the application for affirmative asylum, and a $490 fee for an employment authorization document (work permit). In other words, the proposed rule would change the fees for asylum-seekers from zero dollars (the status quo) to $540, or two weeks of minimum wage take-home pay.

Such fees would clearly inflict irreparable harm on individuals fleeing grave danger. Some individuals may not be able to afford the cost of applying for asylum to begin with. Others may not be able to afford a work permit and could suffer from an inability to support themselves or, at best, from subjecting themselves to an unregulated workplace with a high risk of exploitation.

## Harms to DACA beneficiaries

The proposed rule would, for the first time, impose a fee on renewals of Deferred Action for Childhood Arrivals (DACA). In order to maintain authorization to live and work in the United States, DACA beneficiaries would need to pay an extra $275 every two years, or one week of minimum-wage take-home pay.

## Harms to victims of domestic violence and human trafficking

Currently, fee waivers for certain forms are available to individuals who can demonstrate either an income less than 150% of the Federal Poverty Guidelines (FPG), the receipt of means-tested government benefits, or "financial hardship." Unless an individual is in a category where Congress has mandated the availability of fee waivers, the proposed rule would all but eliminate fee waivers except for rare instances of discretion on the part of the USCIS Director.

Even for those individuals who *are* in a statutorily mandated fee waiver category, however, the proposed rule would drastically restrict eligibility for these fee waivers by (a) lowering the income threshold to 125% of FPG, (b) eliminating means-tested benefits as an eligibility criterion, and (c) eliminating financial hardship as an eligibility criterion.

The restriction of fee waivers, even in cases of demonstrable financial hardship, would inflict particular harm on victims of domestic violence and human trafficking—the very victims whom Congress sought to support by creating the U visa, T visa, VAWA, and other humanitarian programs. As is evident from Table 4 of the USCIS economic analysis, victims may lose their protections from deportation, their ability to work in the United States, and their ability to travel abroad because they can no longer afford the fees to file the required forms. USCIS makes no attempt to assess the harms that would result from individuals compelled to stay in abusive relationships and other conscience-shocking situations.

## Harms to family members of crime victims

Crime victims who have received a U visa are generally eligible to apply for lawful permanent residency as well as sponsoring a spouse and minor unmarried children (as well as parents, if the sponsor is a minor). These petitions for qualifying family members (Form I-929) are only granted by USCIS if the crime victim can demonstrate that their family member would suffer "extreme hardship" if not allowed to remain in or enter the United States.

The proposed rule would increase the fee for this petition (Form I-929) by an extraordinary 559%, to $1,515, or six weeks of minimum-wage take-home pay. USCIS makes no attempt to justify the harms that would ensue by making permanent residency unaffordable for family members of crime victims who would demonstrably experience "extreme hardship" if compelled to stay separated.

## Harms to families who fled Central America and the Soviet Union

Certain nationals of Guatemala, Nicaragua, and the former Soviet Union are eligible for suspension of deportation or cancelation of removal under prior acts of Congress and court settlement agreements. The proposed rule would increase the fee for this application (Form I-881) by at least 216%, to $1,800, or seven weeks of minimum-wage take-home pay. Although USCIS has received relatively few of these applications in recent years—just over 500 in FY

2018—the harm to these individuals under the proposed rule would obviously be severe and deserves to be addressed by the agency.

## Harms to family history researchers

Millions of U.S. citizens derive personal meaning from knowledge of their ancestry, and USCIS often possesses documents that can uniquely shed light on an individual's family history.

The proposed rule would increase the fee for running a genealogy index search (Form G-1041) by 269% to $240, and would increase the fee for a genealogy record request (Form G-1041A) by 492% to $385—in both cases about one week of minimum-wage take-home pay. This would make family history research unaffordable to all but the wealthiest Americans.

## Harms to U.S. citizens

The current mission statement of USCIS is as follows:

> U.S. Citizenship and Immigration Services administers the nation's lawful immigration system, safeguarding its integrity and promise by efficiently and fairly adjudicating requests for immigration benefits while protecting Americans, securing the homeland, and honoring our values.

This mission statement implies that there is a fundamental tension between "efficiently and fairly adjudicating requests for immigration benefits" on the one hand, and "protecting Americans" on the other hand.

In fact, U.S. citizens are often the very people paying for and requesting immigration benefits from USCIS. For example, in FY 2018, U.S. citizens and permanent residents filed the following forms with USCIS:

- 47,495 K visa sponsorship petitions for their fiancé(e)s
- 835,972 green card sponsorship petitions for their spouses, children, and other relatives
- 334,182 "adjustment of status" green card applications for these relatives
- 177,674 petitions to "remove the conditions" on a marriage-based green card

Although USCIS makes a cursory attempt to quantify how much extra these individuals would pay under the proposed rules, the agency utterly fails to address how many U.S. citizens would be unable to live with their families in the United States because they simply can't afford the fees.

For example, a Boundless study found that more than half (53%) of foreign-born spouses who are currently eligible for green cards have a household income below 250% of the Federal Poverty Guidelines. Such families would find it particularly difficult to pay new fees that the

proposed rule would impose—e.g. nearly $1,000 extra for a family-sponsored green card (as described above).

And these are just the fees that are by definition paid by U.S. citizen and permanent resident petitioners. U.S. citizens are also no doubt responsible for paying for a great many of the naturalization applications filed each year (834,251 in FY 2018), on behalf of their immigrant relatives who yearn to join them as fellow-citizens. USCIS makes no attempt to assess the harms inflicted on U.S. citizens by the proposed rule.

## Harms to U.S. small businesses

Similarly, the proposed rule would have a disproportionate negative impact on U.S. small businesses, by increasing fees as much as 87% on sponsors of temporary workers (see Table C). As described in greater detail below, USCIS's Regulatory Flexibility Analysis is woefully inadequate in evaluating—let alone minimizing—the harms that the proposed rule would inflict on U.S. small businesses.

**Table C: Summary of Business Fees and Affected Populations**

| Population affected | Current Fee | Proposed Fee | Change ($) | Change (%) |
|---|---|---|---|---|
| Temporary agricultural workers (H-2A) | $460 | $860 | $400 | 87% |
| Temporary non-agricultural workers (H-2B) | $460 | $725 | $265 | 58% |
| Temporary skilled workers (H-1B) | $460 | $560 | $100 | 22% |
| Temporary multinational office workers (L) | $460 | $815 | $355 | 77% |
| Temporary "genius" workers (O) | $460 | $715 | $255 | 55% |
| Other temporary workers | $460 | $705 | $245 | 53% |

## Harms to all U.S. businesses

The proposed rule would require employers to pay the same fee for "premium processing" of H-1B petitions, but would reduce the value of this service by extending the agency's own service-level agreement from 14 calendar days to 14 business days—this means at least 18 calendar days and a 29% delay over the status quo, or more in the case of federal holidays. USCIS makes no attempt to quantity the harms that this would impose on U.S. businesses, both small and large, which depend on certainty in hiring global talent.

## Harms to all underbanked users

Under the proposed rule, USCIS would reserve the right to eliminate the ability for users to pay using "certain payment types such as cashier's check and money orders for the payment of a particular form or when payments are made at certain offices." This could effectively close off

the legal immigration system to individuals whose only available payment methods are cashier's checks, money orders, and other cash equivalents.

The FDIC estimates in a 2017 survey indicate that 6.5% of U.S. households have no bank account whatsoever (8.4 million households), and an additional 18.7% are underbanked, "meaning that the household had a checking or savings account but also obtained financial products and services outside of the banking system" (24.2 million households).

A 2016 Bankrate survey revealed that 32% of older individuals (65+) and 67% of younger individuals (18-29) do not have a credit card.

Given widespread lack of access to bank accounts and credit, the proposed rule would clearly impose serious harms on a large number of USCIS users who could face insurmountable obstacles in applying for immigration benefits—even those they could afford but for the agency's proposed restrictions on payment type. The agency does not address these harms in the least.


## Harms to all users of the legal immigration system

The proposed rule states clearly and unapologetically that, despite its plans to obtain far more revenue, USCIS does *not* plan to improve its customer service in terms of backlog reduction, processing time reduction, or any other performance indicators. Wait times have increased dramatically over the past three years, yet USCIS makes no attempt to assess the harms imposed by continued deferral of naturalization, family reunification, worker hiring, relief for domestic abuse victims, or any of the other instances of financial loss and human suffering caused by the agency's delays.


## Harms to all citizens and residents of the United States

Although its intent is masked by pretextual justifications, the proposed rule would have the effect of constraining immigration to the United States. There is a wealth of academic literature showing the widespread economic benefits of immigration, including comprehensive studies by the National Academy of Science and the Congressional Budget Office. USCIS makes no attempt to quantify or even address the economic harms that the proposed rule would inflict on all residents of the United States, in terms of reduced economic output, lower wage growth, lower tax revenues, or any other economic indicator of dynamism and prosperity.

# The Proposed Rule Is Unlawful

## The proposed rule is contrary to Congressional intent

### The proposed rule violates a plain reading of the Immigration and Nationality Act

Congress established the Immigration Examinations Fee Account in 8 U.S.C. 1356(m), which states in relevant part:

> Notwithstanding any other provisions of law, all adjudication fees as are designated by the [Secretary of Homeland Security] in regulations shall be deposited as offsetting receipts into a separate account entitled 'Immigration Examinations Fee Account' in the Treasury of the United States[…] Provided further, That fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, **including the costs of similar services provided without charge to asylum applicants or other immigrants**. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected. [emphasis added]

The clear implication of this statutory language is that Congress expects USCIS to provide its services "without charge to asylum applicants." The proposed rule would violate this provision by imposing new fees on both asylum applications and concurrent work permit applications by asylum-seekers.

The statutory language also clearly conveys that Congress anticipates that USCIS will provide its services "without charge" to certain "other immigrants." Even if one adopts the narrowest interpretation of this language, including only those categories of immigrants with explicit statutory fee exemptions, the proposed rule is still deficient in that it makes these fee exemptions practically impossible for a number of vulnerable populations (see discussion above).

## The proposed rule violates the will of Congress as expressed through bipartisan appropriations language

In a laughably inadequate attempt to justify the proposed rule's elimination of fee waivers, USCIS cites a Senate Appropriations Committee Report from May 26, 2016 (S. Rep. No. 114-264), quoted here in relevant part:

> The Committee is concerned about the increased use of fee waivers, as those paying fees are forced to absorb costs for which they receive no benefit. In addition, those unable to pay USCIS fees are less likely to live in the United States independent of government assistance. The Committee directs USCIS to report on the policies and provide data on the use of fee waivers during the last four fiscal years within 90 days of the date of enactment of this act.

While the above report language may have been appropriate for USCIS to cite as part of the prior fee rule, it has clearly been superseded by more recent Congressional reports.

In an omission that would have gotten a first-year associate fired from any reputable law firm, USCIS fails to quote, or even cite, the following language from the bipartisan, bicameral conference report accompanying the omnibus appropriations act for Fiscal Year 2019 (H. Rep. No. 116–9), published on Feb. 13, 2019:

> USCIS is expected to continue the use of fee waivers for applicants who can demonstrate an inability to pay the naturalization fee.

> USCIS is also encouraged to consider whether the current naturalization fee is a barrier to naturalization for those earning between 150 percent and 200 percent of the federal poverty guidelines, who are not currently eligible for a fee waiver.

> The conferees encourage USCIS to maintain naturalization fees at an affordable level while also focusing on reducing the backlog of applicants.

> As USCIS undertakes its next biennial fee study, the conferees urge the agency to include in its final report an estimate of the resources required to clear the backlog of applications for temporary status, adjustment of status, and naturalization, as well as reduce future wait times from the submission to initial adjudication to no more than one year for all petitions processed by the agency.

The proposed rule violates each and every one of these clear directives from Congress.

USCIS proposes to eliminate, not "continue the use of," fee waivers for "applicants who can demonstrate an inability to pay the naturalization fee."

USCIS has undertaken no consideration of whether the *current* naturalization fees ($725) are "a barrier to naturalization for those earning between 150 percent and 200 percent of the federal poverty guidelines," let alone whether its much higher proposed fees ($1,170) would create such a barrier.

USCIS proposes to make naturalization fees much higher for all applicants, utterly defying the directive to "maintain naturalization fees at an affordable level." Moreover, the proposed rule does nothing in terms of "focusing on reducing the backlog of applicants"—in fact, the proposed rule baldly admits that "USCIS estimates that it will take several years before USCIS backlogs decrease measurably."

Finally, in another direct affront to Congressional will, USCIS ignores the explicit urging to include in the proposed rule "an estimate of the resources required to clear the backlog of applications for temporary status, adjustment of status, and naturalization, as well as reduce future wait times from the submission to initial adjudication to no more than one year for all petitions processed by the agency." Such estimates are completely and unapologetically absent from the proposed rule.

Following the publication of the proposed rule, Congress reiterated many of the above directives in its bipartisan joint explanatory statement on the national security appropriations bill (H.R. 1158). This report language was released by the House Appropriations Committee on Dec. 16, 2019, and the appropriations bill was signed into law on Dec. 20, 2019.

First, the FY 2020 explanatory language states:

> Application Processing.—The agreement directs USCIS to brief the Committees within 90 days of the date of enactment of this Act on the number of application forms processed by month for fiscal years 2016 through 2019 for the following: form I-130 (Petition for Alien Relative); form I-485 (Application to Register for Permanent Residence or Adjust Status); form I-751 (Petition to Remove Conditions on Residence); form N-400 (Application for Naturalization); and forms for initial and renewed employment authorization. The briefing shall include the following data, where applicable, on the immigration status of the petitioner (U.S. citizen or legal permanent resident); nationality of the applicant; processing time; and field office or service center to which the application was assigned. The briefing will also include reasons for delays in processing application and petitions, including employment authorizations, and what steps USCIS is taking to address the delays.

Clearly, Congress remains concerned about continued and growing processing delays at USCIS, which the proposed rule does nothing to allay.

Second, the FY 2020 explanatory language states:

> Fee Waivers.—USCIS is encouraged to continue the use of fee waivers for applicants who demonstrate an inability to pay the naturalization fee, and to consider, in consultation with the Office of the Citizenship and Immigration Services Ombudsman (CIS Ombudsman), whether the current naturalization fee is a barrier to naturalization for those earning between 150 percent and 200 percent of the federal poverty guidelines and who are not currently eligible for a fee waiver, and provide a briefing to the Committees within 60 days of the date of enactment of this Act.

As in FY 2019, the will of Congress could not be more clear: USCIS should "continue," not eliminate, the use of fee waivers for "applicants who demonstrate an inability to pay the naturalization fee." And as in FY 2019, Congress directs USCIS to evaluate whether the *current* naturalization fees ($725) are "a barrier to naturalization for those earning between 150 percent and 200 percent of the federal poverty guidelines"—whereas the proposed rule would set much higher fees ($1,170) and thereby create an even higher barrier.

Third, the FY 2020 explanatory language states:

> Further, USCIS is encouraged to refrain from imposing fees on any individual filing a humanitarian petition, including, but not limited to, individuals requesting asylum; refugee admission; protection under the Violence Against Women Act; Special

Immigrant Juvenile status; a T or U visas; or requests adjustment of status or petitions for another benefit after receiving humanitarian protection. USCIS shall consult with the CIS Ombudsman on the impact of imposing such fees and provide a briefing to the Committees within 60 days of the date of enactment of this Act.

The proposed rule is in clear violation of this explicit statement of Congressional intent, by (a) imposing a new $50 fees on individuals requesting asylum, (b) imposing a $490 work authorization fee on asylum-seekers; and (c) effectively imposing fees on those individuals who have received humanitarian protection (including VAWA, Special Immigrant Juvenile status, T visas, and U visas) and subsequently seek adjustment of status and other immigration benefits, by making fee waivers for those immigration benefits all but impossible.

Congress has spoken repeatedly over the course of the last two appropriations cycles, in a clear and bipartisan voice: USCIS should not eliminate fee waivers for naturalization, eliminate fee reductions for naturalization without due deliberation, ignore the adverse impact of widespread processing delays, impose fees on asylum seekers, or constrain fee waivers for other beneficiaries of humanitarian programs.

While certain White House and DHS officials may have nostalgia for a 2016 statement of the Senate Appropriations Committee that occurred while they served in that chamber, such language has been clearly and repeatedly superseded by Congress, and it is policymaking malpractice to pretend otherwise.

### The proposed rule violates the Immigration and Nationality Act, the Homeland Security Act, and two Appropriations Acts in proposing a user fee transfer to ICE

As explained in depth by other commenters (e.g. America's Voice), Congress has given USCIS no authority to transfer fees from its users to U.S. Immigration and Customs Enforcement (ICE). In addition to violating the plain language of the Immigration Nationality Act and the Homeland Security Act, such fee transfer would violate the explicit command of the last two appropriations acts funding DHS, in both FY 2019 and FY 2020.

The only lawful path forward for USCIS on this matter is to abandon all plans to transfer user fees to ICE, and to keep all such fees in the Immigration Examinations Fee Account where Congress demands that they belong.

## The proposed rule's arbitrary and pretextual "equity" principle is contrary to the Administrative Procedure Act

The proposed rule would essentially take four actions that dramatically raise costs for users:

(1) Eliminating nearly all fee waivers and fee reductions
(2) Eliminating fee caps for certain form types (naturalization, work permits, etc.)
(3) Imposing new fees for certain form types (asylum applications and DACA renewals)
(4) Further raising fees for nearly all form types

Action #4 is typical for a fee rule, though as discussed in detail below, the scale of fee hikes in the proposed rule is both unnecessary and unjustified.

Actions #1, 2, and 3, however, are without precedent in the history of USCIS. The proposed rule offers only one primary justification for making this extraordinary departure from prior policy, quoted here:

> The U.S. Government Accountability Office (GAO), an independent, nonpartisan agency that works for Congress, describes equity of federal user fees as a balancing act between two principles:
>
> - Beneficiary-pays; and
> - Ability-to-pay.
>
> This proposed rule emphasizes the beneficiary-pays principle.

In other words, the proposed rule abandons all prior policy motivations to tailor fees based on users' ability to pay, instead insisting that the only policy outcome worth pursuing is a blind adherence to "the beneficiary-pays principle"—i.e. charging each user precisely what it costs to process their application, no more and no less.

The GAO document cited above is a 2008 report to Congress entitled, "Federal User Fees: A Design Guide." Even a cursory review of this document reveals the following facts that completely undermine USCIS's sudden switch to the "beneficiary-pays" principle.

- First, the GAO report is not binding on USCIS in any way. It describes itself as a "guide," and Congress has never enacted the "beneficiary-pays" principle as a binding requirement on USCIS. Indeed, as described at length above, Congress has repeatedly urged USCIS to follow the "ability-to-pay" principle as regards naturalization fee waivers, no imposition of fees on asylum applicants, etc.

- Second, the very first paragraph of the GAO report states: "Although this [beneficiary-pays] principle provides a useful guideline for setting fees, **strictly following the principle is not always desirable or practical**." [emphasis added]

18

- Finally, the very first "key question" that GAO recommends an agency ask itself when setting fees is: "Does use of the program by certain users, or for certain types of uses, provide a public benefit, for example, by **advancing a public policy goal**?" [emphasis added]

As discussed in greater detail below, USCIS has arbitrarily and inconsistently elevated the "beneficiary-pays principle" in a way so divorced from rational policy goals that it can only be explained as a pretext for restricting and deterring legal immigration, against the will of Congress.

### It is arbitrary to eliminate fee caps for some but not all categories

In prior fee rules, USCIS first determined the agency's actual average cost to adjudicate each form type, and then limited the fee increase for certain forms where doing so would advance a clear and longstanding public policy goal.

In the proposed rule, USCIS asserts, but does not adequately justify, its sudden departure from prior practice:

> Some proposed fees are significantly higher than the current fees. In some cases, this is because DHS proposes to not limit those fee increases, as it has done in the past, for policy reasons. Previous fee schedules limited the increase for certain immigration benefit requests, such as most naturalization related forms. In this proposed rule, DHS proposes to not limit the fee increase to 5 percent for the following immigration benefit requests:
>
> Form I-601A, Provisional Unlawful Presence Waiver.
> Form I-765, Application for Employment Authorization.
> Form I-929, Petition for Qualifying Family Member of a U-1 Nonimmigrant.
> Form N-300, Application to File Declaration of Intention.
> Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings.
> Form N-400, Application for Naturalization.
> Form N-470, Application to Preserve Residence for Naturalization Purposes.

The proposed rule goes on to assert that each user should pay USCIS exactly what it costs the agency to serve that particular user, with no one group subsidizing another:

> If DHS were to propose limited fee increases for these immigration benefit requests, then other proposed fees would have to increase to recover full cost. For example, if DHS were to propose limited fee increases for all of the immigration benefit request fees that were limited in the previous fee rule, then some proposed fees could increase by as much as $1,185, with **the average of those changes being an increase of $12 per immigration benefit request**. [emphasis added]

First, this justification is outrageously misleading. USCIS asserts that "some proposed fees could increase by as much as $1,185," without specifying which form type would experience this dramatic fee increase or why. The agency also conveniently omits the fact that such a hypothetical increase "could" happen only as a matter of the agency's own discretion. If USCIS were truly concerned about such egregious fee increases, presumably the proposed rule would not increase several fees by far more than $1,185 (see Table B), including fees for individuals seeking lawful re-entry to the United States ($2,205 increase) and green cards for family members of crime victims ($1,285).

Second, USCIS is admitting that if it maintained the 5% fee cap on these form types, it could accommodate the resulting revenue shortfall by increasing other fees by a mere $12 per form. On its face, this would be a minor abrogation of the agency's own "beneficiary-pays principle" in order to keep its services affordable for individuals seeking naturalization (N-400, etc.), work authorization (I-765), and family reunification to avoid "extreme hardship" (I-601A and I-929).

Third, the proposed rule contains a clear and measurable hypocrisy: Whereas USCIS claims that prior policy must fall in the face of the agency's newfound insistence on the "beneficiary-pay principle," it violates this principle for certain form types.

Table D shows the form types where USCIS proposes to maintain a 5% limit on fee increases above the status quo. Whereas other forms would see fees rise 18-19% higher than the agency's cost of adjudication (the "Model Output," described in greater detail below), certain forms would be processed at a heavy loss (or in one case, an unusual gain) to the agency:

### Table D: Cost Premiums in Proposed Fee Rule

| Form type | Proposed fee | Adjudication cost | Difference |
|---|---|---|---|
| I-90 Application to Replace Permanent Resident Card | $455 | $347 | 19.6% |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $445 | $411 | 19.2% |
| I-129 Petition for a Nonimmigrant worker | $460 | $593 | |
| I-129F Petition for Alien Fiancé(e) | $535 | $438 | 18.7% |
| I-130 Petition for Alien Relative | $535 | $468 | 18.6% |
| I-131/I-131A Application for Travel Document | $575 | $493 | 18.7% |
| I-140 Immigrant Petition for Alien Worker | $700 | $458 | 19.0% |
| I-290B Notice of Appeal or Motion | $675 | $1,966 | **-64.1%** |
| I-360 Petition for Amerasian Widow(er) or Special Immigrant | $435 | $5,572 | **-91.8%** |
| I-485 Application to Register Permanent Residence or Adjust Status | $1,140 | $942 | 18.9% |
| I-526 Immigrant Petition by Alien Entrepreneur | $3,675 | $3,375 | 19.0% |

20

| | | | |
|---|---|---|---|
| I-539 Application to Extend/Change Nonimmigrant Status | $370 | $335 | 19.4% |
| I-600/600A/800/800A Adoption Petitions and Applications | $775 | $1,423 | **-43.1%** |
| I-601A Provisional Unlawful Presence Waiver | $630 | $807 | 19.0% |
| I-687 Application for Status as a Temporary Resident | $1,130 | $0 | |
| I-690 Application for Waiver of Grounds of Inadmissibility | $715 | $649 | 18.6% |
| I-694 Notice of Appeal of Decision | $890 | $609 | 19.0% |
| I-698 Application to Adjust Status From Temporary to Permanent Resident (Under Section 245A of Public Law 99- 603) | $1,670 | $1,359 | 18.8% |
| I-751 Petition to Remove Conditions on Residence | $595 | $639 | 18.9% |
| I-765 Application for Employment Authorization | $410 | $417 | 17.5% |
| I-800A Supplement 3 Request for Action on Approved Form I- 800A | $385 | $1,221 | **-66.8%** |
| I-817 Application for Family Unity Benefits | $600 | $496 | 19.0% |
| I-824 Application for Action on an Approved Application or Petition | $465 | $421 | 18.8% |
| I-829 Petition by Entrepreneur to Remove Conditions | $3,750 | $3,278 | 19.0% |
| I-910 Application for Civil Surgeon Designation | $785 | $546 | 19.0% |
| I-924 Application for Regional Center Designation Under the Immigrant Investor Program | $17,795 | $11,020 | **61.5%** |
| I-924A Annual Certification of Regional Center | $3,035 | $3,757 | 19.0% |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | $230 | $1,273 | 19.0% |
| N-300 Application to File Declaration of Intention | $270 | $1,111 | 18.8% |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings | $700 | $1,474 | 19.1% |
| N-400 Application for Naturalization | $640 | $985 | 18.8% |
| N-470 Application to Preserve Residence for Naturalization Purposes | $355 | $1,347 | 18.8% |
| N-565 Application for Replacement Naturalization/Citizenship Document | $555 | $458 | 19.0% |

What are these outlier forms, and what justification does USCIS provide for treating them differently?

**Notice of Appeal or Motion (I-290B):** This form is used to file an appeal with the USCIS Administrative Appeals Office (AAO); a motion with the USCIS office that issued the latest decision in a given case (including a field office, service center, or the AAO); or certain appeals of the denial of an ICE Form I-17 ("Petition for Approval of School for Attendance by Nonimmigrant Student") with the ICE Student and Exchange Visitor Program. The proposed rule is silent on why the fee increase for this form should be capped at 5%.

**Petition for Amerasian Widow(er) or Special Immigrant (I-360):** This form is used for a number of purposes, but the filing fee apparently only applies to certain widow(er)s of U.S. citizens, religious workers, Panama Canal Zone employees, physicians, international organization employees, U.S. armed forces members, and broadcasters. USCIS projects an annual average of 4,224 fee-paying petitions going forward, based in part on its receipt of 2,446 petitions for religious workers from U.S. institutions in FY 2017. The proposed rule is silent on why the fee increase for this form should be capped at 5%.

**Adoption Petitions and Applications (I-600, I-600A, I-800, I-800A, and I-800A Supplement 3):** These forms are required for international adoptions. The proposed rule provides this justification for capping the fee increase for these forms:

> DHS proposes to limit the increase of adoption-related fees in this rule consistent with previous fee rules. DHS will continue its policy of reducing fee burdens on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications (Forms I-600/600A/800/800A) through the fees collected from other immigration benefit requests. If DHS used the estimated fee-paying unit cost from the ABC [activity-based cost] model for Form I-600, then this benefit request would have a fee of at least $1,423. **DHS believes that it would be contrary to public and humanitarian interests to impose a fee of this amount on prospective adoptive parents seeking to adopt a child from another country.** Therefore, DHS proposes to apply the 5 percent weighted average increase to the current fee of $775, representing a $35 increase to $810 for Forms I-600/600A/800/800A. [emphasis added]

Presumably, then, USCIS no longer believes that it would be "contrary to public and humanitarian interests" to impose similarly high fees on all of the other populations that would experience grave harm under the proposed rule, including but not limited to applicants for U.S. citizenship, family-based green cards, asylum, and protection from domestic violence and other crimes.

**Application for Regional Center Designation (Form I-924):** This form is required for entities that wish to become investment vehicles for the EB-5 "investor visa" program, which allows foreign nationals to ultimately obtain green cards if they invest $500,000–1,000,000 (recently

increased to $900,000–1,800,000) in certain U.S. projects. Curiously, this form is the only one in the entire proposed rule where the proposed fee would exceed the agency's adjudication cost by more than 18-19%—far more, in fact, at over 61%. The proposed rule provides the following justification, quoted here in full:

> DHS proposes no fee change for Form I-924, Application for Regional Center Designation under the Immigrant Investor Program because the current fee is adequate.

This is a curiously terse justification, given the proposed rule's emphasis on the "beneficiary-pays principle." Why should USCIS single out this form for a 61.5% fee premium, thereby extracting from regional centers $6,775 more than what it costs the agency to adjudicate their applications?

The obvious answer is that sophisticated investment groups can well afford such a premium, and it continues to be sensible for USCIS to follow the "ability-to-pay principle" whereby higher-income users subsidize lower-income users. But USCIS refrains from making this argument, because it would undercut its dramatic change in policy regarding so many other form types.

In short, the proposed rule's invocation of the "beneficiary-pays principle" is not made in good faith. The agency is still willing to support subsidies for some users (e.g. adoptive parents and religious institutions) and even a high premium on others ("regional center" investment groups). USCIS cannot hide behind a nonbinding, inconsistently applied "principle" when inflicting harm on individuals who will no longer be able to afford its services. If the agency believes that extraordinary fee hikes somehow serve "public and humanitarian interests," then it should clearly explain how.


### It is arbitrary to eliminate and restrict fee waivers without a rational policy argument

The proposed rule would eliminate fee waivers for the vast majority of individuals who are currently eligible, and would make obtaining fee waivers exceptionally difficult for those few who remain eligible. USCIS would change overnight from an agency that exercises its discretionary authority to grant fee waivers based on demonstrated need, to an agency that only grants fee waivers when explicitly compelled by Congress to do so.

At present, USCIS accepts fee waiver applicants from individuals filing any of the following forms, all of which the proposed rule would eliminate "except in limited circumstances where the law requires that a waiver be made available based on the circumstances of the applicant":

- Form I-90, Application to Replace Permanent Resident Card
- Form I-765, Application for Employment Authorization
- CNMI related petitions and applications, including:
  - Form I-129CW, Petition for CNMI-Only a Nonimmigrant Transitional Worker
  - Form I-539, Application to Extend/Change Nonimmigrant Status
- Form I-485, Application to Register Permanent Residence or Adjust Status, specifically for:

- o Special Immigrant Status for Afghan or Iraqi Interpreters or other Afghan or Iraqi nationals employed by or on behalf of the U.S. Government
  - o Applicants exempt from the public charge grounds of inadmissibility (e.g. Cuban Adjustment Act, Haitian Refugee Immigration Fairness Act, asylees, and Special Immigrant Juveniles)
- ▪ Forms for applicants exempt from the public charge inadmissibility ground, including:
  - o Form I-601, Application for Waiver of Grounds of Inadmissibility
  - o Form I-192, Application for Advance Permission to Enter as Nonimmigrant
  - o Form I-193, Application for Waiver for Passport and/or Visa
- ▪ Form I-751, Petition to Remove Conditions on Residence
- ▪ Naturalization and citizenship-related forms, including:
  - o Form N-400, Application for Naturalization
  - o Form N-470, Application to Preserve Residence for Naturalization Purposes
  - o Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings
  - o Form N-565, Application for Replacement of Naturalization/Citizenship Document
  - o Form N-600, Application for Certification of Citizenship
  - o Form N-600K, Application for Citizenship and Issuance of Certificate

The proposed rule begrudgingly acknowledges that, under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), certain applicants "must have the opportunity to request a fee waiver for any form associated with the main benefit application up to and including the adjustment of status application." Therefore, under the proposed rule, these are the *only* categories of individuals who would be allowed to apply for a fee waiver:

- ▪ Violence Against Women Act (VAWA) self-petitioners
- ▪ Victims of Severe Form of Trafficking (T visas)
- ▪ Victims of Criminal Activity (U visas)
- ▪ Battered spouses of A, G, E-3, or H nonimmigrants
- ▪ Battered spouses or children of a lawful permanent resident or U.S. citizen under INA 240A(b)(2)
- ▪ Temporary Protected Status (TPS) applicants

Even these individuals would have a far more difficult challenge in obtaining a fee waiver under the proposed rule, because USCIS would curtail eligibility in three ways:

    (a) lowering the eligible household income threshold from 150% to 125% of FPG
    (b) eliminating means-tested benefits as an eligibility criterion
    (c) eliminating financial hardship (such as unexpected medical bills or emergencies) as an eligibility criterion

In other words, while a victim of domestic abuse may technically be eligible for a fee waiver for their green card application (Form I-485), if their household income is a penny more than 125% of the Federal Poverty Guidelines, they will have no recourse—even if they are experiencing an emergency that consumes most of this income.

The proposed rule would also curtail the USCIS Director's discretion to grant special fee exemptions or fee waivers on an individual, case-by-case basis, by restricting such exemptions and waivers only to situations involving asylees, refugees, national security, emergencies or major natural disasters, international agreements, or USCIS error. Moreover, the USCIS Director would have *no* discretion to grant a fee waiver to anyone who is either (a) in a household with income greater than 125% FPG, (b) subject to the Affidavit of Support requirement (i.e. sponsored by a U.S. relative or other financial sponsor), or (c) subject to the public charge inadmissibility ground. This provision is clearly a fig-leaf designed to preserve the illusion of discretion, without any intention of exercising such discretion in the near term and with the clear intention of curtailing the discretion of a future administration.

What is the agency's justification for so drastically restricting the availability of fee waivers for vulnerable populations who need them most? Here again, the proposed rule insists that there is no higher public policy interest than making all applicants pay the same amount:

> USCIS believes that making these changes to the fee waiver policy would assure that fee paying applicants do not bear the increasing costs caused by application fees being waived.

First of all, as discussed in greater detail above, the agency's invocation of a "beneficiary-pays principle" is arbitrary and indefensible.

Second, even setting aside this faulty principle, the proposed rule includes no facts to back up its own justification. While it is certainly true that fee-paying applicants effectively provide a subsidy to fee-waived applicants, USCIS presents no evidence that fee-paying applicants are finding it harder to "bear the increasing costs" of fee waivers. Indeed, none of the following factual assertions in the proposed rule hold up to scrutiny:

> …DHS determined that the current trends and level of fee waivers are not sustainable. Work that USCIS provides for free or below cost impacts other fee-paying applicants by making their fees higher so DHS can recover USCIS full cost. DHS is trying to make the USCIS fee schedule more equitable for all applicants and petitioners. As shown in the supporting documentation for this rule, the number and dollar volume of fee waiver requests and foregone revenue has trended upward during periods of economic improvement. That indicates that, should the economy worsen, the number of fee waiver requests will increase to a level that could threaten the ability of USCIS to deliver programs without disruption.

We have combed all of the supporting documentation for the evidence alluded to above showing that "the number and dollar volume of fee waiver requests and foregone revenue has trended upward during periods of economic improvement," but all we could find is this table from the USCIS economic analysis:

| Table 5.  Receipts, Approvals, and Denials for Form I-912, Request for Fee Waiver, for Fiscal Years 2013 – 2017. | | | | | |
|---|---|---|---|---|---|
| **Fiscal Year** | **Total Receipts** | **Approvals**[34] | **Denials** | **Approval Rate (Percent)** | **Estimated Foregone Revenue** |
| 2013 | 539,090 | 401,066 | 138,024 | 74 | $222,078,515 |
| 2014 | 569,968 | 454,745 | 115,223 | 80 | $247,734,345 |
| 2015 | 635,714 | 516,054 | 119,660 | 81 | $282,116,585 |
| 2016 | 751,279 | 625,906 | 125,373 | 83 | $343,548,025 |
| 2017 | 682,999 | 587,168 | 95,831 | 86 | $367,243,540 |

It is true that the five-year period between Fiscal Years 2013–2017 was a time of "economic improvement," and that "the number and dollar volume of fee waiver requests and foregone revenue" were both higher at the end of this period vs. at the beginning. But contrary to the proposed rule's asserting, one five-year span is not "*periods* of economic improvement"—it's a single period, without enough data to establish a "trend."

Even if one accepted that this were a trend, how can it be true that, in the words of the proposed rule, fee waiver volume "trend[s] upward during periods of economic improvement" *and* will increase "should the economy worsen"?

Finally, what does it matter to USCIS if the number and dollar volume of fee waiver requests, if the number and dollar volume of fee-paying form receipts is going up as well? The above table provided by USCIS says nothing about the *ratio* between fee-waived receipts and fee-paying receipts, which could be getting *more* financially favorable to USCIS, for all the public knows.

In fact, USCIS has provided the public with no evidence whatsoever that "current trends and level of fee waivers are not sustainable." Nor has USCIS provided any way for the public to evaluate the unquantified "level" of fee waiver volume that would allegedly "threaten the ability of USCIS to deliver programs without disruption." Absent data, these assertions are unpersuasive at best, and outright deceptive at worst.

The following assertion in the proposed rule is particularly suspect:

> In the FY 2019/2020 fee review, USCIS determined that without changes to fee waiver policy, it would forgo revenue of approximately $1,494 million. The proposed fee schedule estimates $962 million forgone revenue from fee waivers and fee exemptions. The difference in forgone revenue is $532 million. Without changes to fee waiver policy, fees would increase by a weighted average of 31 percent, which is 10 percent more than in the proposed fee schedule.

The proposed rule does not explain how USCIS came up with this estimate of $1.494 billion in "forgone revenue" under the status quo fee waiver system. The table shown above from the USCIS economic analysis adds up to $1.46 billion in "forgone revenue," but this is across a five-

year period, not an annual average. The proposed rule asserts that USCIS would "save" $532 million each year on average by eliminating fee waivers, but that amount is far more than the "forgone revenue" in any given year between FY 2013–2017.

In fact, based on USCIS's own economic analysis, the average amount of "foregone revenue" between FY 2013–2017 was $292.5 million, which is the absolute maximum that USCIS could expect to gain in revenue by eliminating fee waivers. (This number is very close to the ~$300 million that we inferred from our own analysis of the proposed rule, discussed in greater detail below.)

Of course, throughout its discussion of fee waivers, USCIS consistently misuses the concept of "forgone revenue." The proposed rule apparently multiplies the number of fee waivers granted for a given form by the fee for that form, and alleges that these are fees that the agency would have pocketed absent the fee waiver.

In reality, of course, human beings are sensitive to price. If USCIS effectively jacks up the price of an adjudication from zero dollars to $1,170 (in the case of naturalization applications), then fewer people will apply. In other words, USCIS is not "forgoing revenue" from low-income applicants who can't afford to pay the fee in the first place.


## The proposed rule is inconsistent with prior practice

In the proposed rule, USCIS "acknowledges that the proposed changes to the fee waiver policies would be a significant change from past fee waiver regulations and policies." In defending this admittedly "significant change," the proposed rule cites three prior fee rules—but in fact, these citations undercut the arguments in proposed rule.

First, the proposed rule states:

> In past fee rules, DHS has made clear that it would not authorize fee waivers where such a waiver is inconsistent with the benefit requested and that fee waiver policy was based on economic necessity, rather than providing certain applicants with an advantage over another. See 75 FR 58974.

The above citation (75 FR 58974) is to the USCIS final fee rule of Sept. 24, 2010, which states in relevant part:

> DHS has decided not to authorize fee waivers where such a waiver is inconsistent with the benefit requested. For example, several commenters suggested that USCIS should consider allowing fee waivers for reentry permits, refugee travel documents, and advance parole when an alien wants to travel abroad. In essence, this argument suggests that although the applicant is prepared to incur the cost of traveling internationally, USCIS should consider waiving the application fee and instead transfer that cost to others. Expanding fee waivers into such areas moves away from clear economic necessity to merely choosing to provide one applicant with an advantage over another.

27

A number of commenters suggested, however, that USCIS allow fee waiver requests for Application for Travel Document, Form I-131, in cases of humanitarian parole. DHS's experience with the 2010 Haitian earthquake relief efforts has shown that many recipients of humanitarian parole are worthy of consideration of a fee waiver. DHS agrees that some applicants could be of limited means and the fee may be particularly burdensome to this population. Thus, as suggested by the commenters, DHS has decided to revise the final rule to add requests for humanitarian parole to the list of forms that are eligible for a fee waiver upon a showing of the inability to pay. See 8 CFR 103.7(c)(3)(iv). In addition, DHS encourages those who believe that they have a sufficiently sympathetic case or group of cases in any type of benefit request to submit a request to their USCIS local office for a waiver under 8 CFR 103.7(d).

As is clear from the 2010 fee rule, the policy of USCIS was to provide fee waivers based on "clear economic necessity," especially for applicants "of limited means" where the fee "may be particularly burdensome." USCIS even "encourage[d] those who believe that they have a sufficiently sympathetic case or group of cases in any type of benefit request to submit a request to their USCIS local office for a waiver." In other words, longstanding USCIS policy is to provide fee waivers based on economic necessity and other clear humanitarian need, which does *not* constitute "merely choosing to provide one applicant with an advantage over another."

The proposed rule goes on to assert:

> In addition, DHS has responded to comments requesting that it expand USCIS fee waivers by stating that the financial circumstances required to be eligible for certain benefits, such as intercountry adoptions, directly contradict the rationale for shifting costs related to such applications to others through fee waivers. See 72 FR 29863.

The above citation (72 FR 29863) is to the USCIS final fee rule of May 30, 2007, which states in relevant part:

> Many comments focused specifically on the fees for a Petition to Classify Orphan as Immediate Relative, Form I-600, and an Application for Advance Processing of Orphan Petition, Form I-600A. Several comments suggested that USCIS should reduce the fee and offer fee waivers for orphan petitions. These commenters effectively request that USCIS shift the costs of this program to other immigration benefit applications and petitions.

> Adjudicating orphan petitions involves some of the most complex decision-making within immigration services because adjudication of Petitions to Classify Orphan as Immediate Relative and Applications for Advance Processing of Orphan Petition requires knowledge of many state adoption regulations and statutes and foreign country adoption requirements. Each petition must be accompanied by a home study, background checks, and evidence that must be carefully examined. Approval of parents as suitable to adopt is time sensitive as a result of the potential changes in a household that may impact the suitability of the home for an adopted orphan, such as loss of a job or divorce. Such

28

changes often prevent reconsideration of the parents' petition. As a result of this approval expiration period, currently set as eighteen months, prospective adoptive parents must submit a new petition and all supporting documents if they wish to continue with the adoption process if they have not been matched with a child. USCIS sometimes works with a case for months, involving frequent contact with adoption agencies, social workers, and prospective adoptive parents. Finally, international orphan adoption adjudications require an investigation and information verification, and may require travel. This fee increase will allow USCIS to automate case management of adoption cases, further reducing any real or perceived delays in the manual, paper-based process currently in place.

Orphan petitioners must attest that the beneficiary will not become a public charge in order to be approved as a suitable adoptive parent. Further, **the orphan petition fee is a small part of what a United States citizen petitioner chooses to accept as part of the overall process and cost of adopting a child from overseas and raising that child. The financial circumstances required to be eligible for this benefit directly contradict the rationale for shifting costs related to these applications to others, or for offering a waiver of the fee because of inability to pay**. [emphasis added]

In other words, USCIS in 2007 declined to make fee waivers available to U.S. citizens pursuing international adoption, because anyone with the resources to pay for the expensive paperwork and travel required in the adoption process is presumably wealthy enough to pay the USCIS fees. The proposed rule attempts no such balancing, instead seeking to eliminate and restrict availability to fee waivers wherever possible, with absolutely no analysis of a given population's inability to pay.

Finally, the proposed rule states:

As previously stated, fee waiver increases accounted for 9 percent of the 21 percent weighted average fee increase in the FY 2016/2017 fee rule, and DHS stated that it may revisit the USCIS fee waiver guidance with respect to what constitutes inability to pay under 8 CFR 103.7(c) because of the increasing costs of providing free services through fee waivers. See 81 FR 26922.

The above citation (81 FR 26922) is to the USCIS proposed fee rule of May 4, 2016, which states in relevant part:

As noted in the Fiscal Year (FY) 2016/2017 Immigration Examinations Fee Account Fee Review Supporting Documentation, the projected annual impact of fee waivers and exemptions has increased markedly since the 2010 Fee Rule from $191 million to $613 million. Applicants, petitioners, and requestors that pay a fee cover the cost of processing requests that are fee-waived or fee-exempt. Although DHS does not currently plan to do so, it may in the future revisit the USCIS fee waiver guidance with respect to what constitutes inability to pay under 8 CFR 103.7(c). DHS welcomes comment on this issue.

One major factor in the increased annual impact of fee waivers and exemptions as of 2016 was the introduction by USCIS, in 2010, of the 50% fee reduction option for naturalization applicants with a household income between 150-200% FPG. Indeed, the 2016 fee rule raised average fees by 9% specifically to make up for these shortfalls from non-fee-paying users—an action that USCIS now provides no persuasive rationale for repeating a mere three years later.

In 2016, USCIS raised fees in order to cover the cost of continuing to provide fee waivers, exemptions, and reductions.

In 2019, USCIS proposes to eliminate the cost of most of these fee waivers, exemptions, and reductions—yet it also proposes to dramatically increase fees again. This simply makes no sense; the agency can't have its cake and eat it, too.

## The proposed rule violates reliance interests

The proposed rule is remarkably cavalier about trampling on the reliance interests of individuals currently preparing to file forms with USCIS:

> DHS appreciates that individuals who in the past may have received a free service from USCIS may no longer be able to have their USCIS fees waived after these proposed changes take effect. However, to the extent that a person is in the process of completing and filing an immigration benefit request, has paid for assistance in preparing their request, including gathering necessary evidence to support the request, this rule provides public notice of the impending policy change.

Here USCIS is openly admitting that some individuals may have already spent considerable time and money preparing to file a form, including paying for lawyers or other forms of assistance, only to discover in this proposed rule that these resources were wasted now that the lack of a fee waiver will make the total cost unaffordable.

## The proposed rule ignores Congressional intent

Inexplicably, the proposed rule cites a House Appropriations Committee report from September 12, 2018 (H. Rep. No. 115-948) that accompanied an FY 2019 appropriations bill that was never signed into law:

> DHS notes that the House Report on Department of Homeland Security Appropriations Bill, 2019 stated, "USCIS is expected to continue the use of fee waivers for applicants who can demonstrate an inability to pay the naturalization fee. USCIS is also encouraged to consider whether the current naturalization fee is a barrier to naturalization for those earning between 150 percent and 200 percent of the federal poverty guidelines, who are not currently eligible for a fee waiver."

30

Fortunately, this exact same language appeared in the bipartisan, bicameral conference report accompanying the omnibus appropriations act for Fiscal Year 2019 (H. Rep. No. 116-9), published on Feb. 13, 2019, as discussed in detail earlier. It is notable that these directives were put forward by the House of Representatives under both Republican and Democratic majority control. Yet the proposed rule goes on to state:

> USCIS appreciates the concerns of this recommendation and fully considered it before publishing this proposed rule.

As should be clear from the public comment and a great many others, the proposed rule provides absolutely no evidence that USCIS either "appreciates" or "fully considered" these directives from Congress. Instead, the agency is eliminating fee waivers and naturalization fee reductions in direct contravention of Congressional will.

### It is arbitrary to eliminate free interim benefits without a rational policy argument

The proposed rule would increase the total fees for most family-based green card applicants by $990, or over 56%—not by directly increasing the fee for the adjustment of status application (Form I-485), but by suddenly requiring fees for the "interim benefits" of a work permit (Form I-765) and a travel permit (I-131) that applicants depend on while waiting months or years for their green card applications to be approved.

The proposed rule provides no rational justification for this abrupt reversal of course. Remarkably, the proposed rule lays out all of the compelling policy justifications in past fee rules without any attempt to demonstrate why a reversal is better policy:

> For the FY 2008/2009 fee rule, USCIS determined that calculating fees for Form I-485 at an amount that would include interim benefits would improve efficiency and save most applicants money. By providing that the fees for interim benefits would be included in the fee for Form I-485, USCIS addressed the perception that it benefits from increased revenue by processing Forms I-485 more slowly. The FY 2010/2011 fee rule continued the practice of "bundling" the fees for interim benefits and Form I-485. DHS proposes separate fees for interim benefit applications and Form I-485 applications in order to lower the proposed fees for most other applicants, petitioners, and requestors.

The proposed rule does not quantify how much higher the proposed fees would be if the agency maintained its longstanding policy on fee-free interim benefits—probably because these alleged benefits would be very minor when spread across all of the agency's user base. There is simply no way for the public to evaluate the agency's argument without more data and details.

The proposed rule *does* admit that costs are increasing for three reasons that USCIS could easily address, but chooses not to:

> However, the cost reducing effects of unbundling interim benefit fees is partially offset by several other factors that increase the costs of the Form I-485. For example,

background check requirements have increased. USCIS is also interviewing a greater proportion of adjustment of status applicants, requiring more time and effort to adjudicate Form I-485. In addition, USCIS did not realize the efficiency gains anticipated when it bundled interim benefits. This is due to a number of reasons. Mainly, annual numerical visa limits established by Congress and high demand have created long wait times for some visa categories. Many applicants must wait years for visas to become available. While USCIS has some control over its own allocation of resources to address processing times and backlogs, USCIS has no direct control over delays caused by the U.S. Department of State's allocation of visa numbers and Congress' annual visa numerical limits. USCIS has taken some actions to alleviate the filing burden and fees on those individuals whose Form I-485 applications are still pending due to the lack of available immigrant visas. For example, DHS now provides EADs with 2-year validity periods when the final action date for determining visa availability retrogresses.

In other words, it is more costly for USCIS to adjudicate green card applications and related forms because of (a) increased background check requirements, where USCIS has not demonstrated yield benefits that outweigh the costs; (b) more interviews of green card applicants, where USCIS has also not demonstrated yield benefits that outweigh the costs; and (c) work permits that expire before the green card is adjudicated, which USCIS could easily address by extending the validity period more broadly.

### It is arbitrary to impose an essentially random fee on asylum applicants

The proposed rule would impose a fee on asylum applications for the first time, and provides no legitimate rationale for doing so. First, the proposed rule claims that a "minimal fee" is necessary to (a) "alleviate pressure" on the legal immigration system, and (b) cover the agency's costs to adjudicate an increased volume of asylum applications:

> The U.S. Government has never charged a fee for Form I-589, but rather has relied on other fee-paying benefit requestors to subsidize asylum seeking applicants. Application fees from other form types have always been used to fund the operations involved in processing asylum claims. However, DHS has experienced a continuous, sizeable increase in affirmative asylum filings, and processing backlogs continue to grow. DHS is exploring ways to alleviate the pressure that the asylum workload places on the administration of other immigration benefits. A minimal fee would mitigate the fee increase of other immigration benefit requests.

The argument that a minimal fee "would mitigate the fee increase of other immigration benefit requests" is then undercut by the proposed rule when it states:

> The projected FY 2019/2020 workload for Form I-589 is 163,000 annual receipts, or approximately 2 percent of the total USCIS workload forecast. The proposed $50 fee would generate an estimated $8.15 million in annual revenue. Therefore, in addition to alleviating pressure on the immigration benefit system, the proposed $50 fee for Form I-

589 mitigates the proposed fee increase of other immigration benefit requests by approximately $5 or $10.

It defies reason that USCIS would take such a radical and unprecedented step to burden asylum-seekers in order to save other users a mere $5–10. It is far more plausible that the agency's primary motivation is to "alleviate pressure on the immigration benefit system," insofar as this is a thinly-veiled euphemism for deterring people from seeking asylum in the first place.

The proposed rule reveals this true motivation in the following passage:

> DHS considered the authority provided in INA section 208(d)(3), including that the fee be paid in installments or over time, various fee amounts and decided to propose $50 because it could be paid in one payment, would not require an alien an unreasonable amount of time to save, would generate some revenue to offset costs, **discourage frivolous filings**, and not be so high as to be unaffordable to even an indigent alien. [emphasis added]

It is worth noting that the proposed rule provides absolutely no evidence that a $50 asylum application fee "would not require an alien an unreasonable amount of time to save" or would "not be so high as to be unaffordable to even an indigent alien." In any event, the agency's core motivation is clearly to discourage so-called "frivolous filings," which is a term the administration often uses when describing its efforts to deter legitimate asylum-seekers from exercising their rights under national and international law.

Remarkably, the proposed rule (perhaps inadvertently) eviscerates its own justification for a $50 asylum fee in its justification for eliminating a longstanding $30 fee imposed on other kinds of filings whose checks are returned as unpayable. The proposed rule states:

> USCIS data indicates that the cost of collecting the $30 [returned check] fee outweighs the benefits to the government derived from imposing and collecting the fee.

If USCIS has concluded that it is not worth the agency's time and money to collect $30 as a deterrent against bounced checks, how does the cost of collecting a new $50 fee from asylum-seekers outweigh the alleged (but entirely unquantified) benefits asserted in the proposed rule?

Finally, the proposed rule provides a comparison to other countries' asylum fees (or lack thereof) that could not present a more powerful argument against the agency's own proposed policy:

> The Law Library of Congress surveyed the 147 signatory countries to the 1951 Convention and/or the 1967 Protocol, and of 147 countries, identified three countries that charge a fee for initial applications for asylum or refugee protection. Those countries and amounts, provided in Table 14, indicate that the proposed $50 fee is in line with the fiscal charges charged by other countries.

Table 14: Asylum Fees in Other Countries

| Country | Fee Amount | Fee in USD | Notes |
|---|---|---|---|
| Australia | AUD 35 | $25 | No fee for a detained applicant |
| Fiji | FJD 465 | $221 | Allows for fee waivers |
| Iran | IRR 12,321,000 | $293 | For a family of 5 with some fee exemptions |

If only 3 out of 147 countries charge any fee for initial asylum applications, then the median fee is obviously zero dollars (and the average fee is very nearly zero). Thus is absurd to claim that "the proposed $50 fee is in line with the fiscal charges charged by other countries."

Moreover, it is astonishing that USCIS would propose joining such a tiny minority of countries that impose an asylum application fee, comprised of an adversary of the United States (Iran), a small island nation (Fiji), and a country whose asylum policies have been condemned by an independent body of the United Nations Human Rights Council (Australia).

### It is arbitrary to impose an extraordinary new work permit fee on asylum applicants

While the proposed rule's imposition of a new $50 fee on asylum applications is an unjustifiable barrier, it is not the only one. USCIS proposes, for the first time, to compel asylum-seekers to pay the full fee for their work permit applications ($490). As with the agency's justification for the $50 asylum application fee, its argument for an effective additional fee of $490 makes no rational sense:

> Initial applicants with pending claims of asylum are approximately 13 percent of the total Form I-765 workload volume forecast. Continuing to exempt this population from paying the Form I-765 fee would further increase the proposed fee. If DHS exempts initial applicants with pending claims of asylum, then the proposed fee would be $500 instead of $490, meaning fee-paying EAD applicants would pay $10 to fund the cost of EADs for asylum applicants. Therefore, DHS proposes that initial applicants with pending asylum claims pay a $490 Form I-765 fee in order to keep the fee lower for all fee-paying EAD applicants. All other noncitizens applying for employment authorization are required to pay fees.

In other words, USCIS would effectively force asylum-seekers in desperate circumstances to choose between forfeiting asylum altogether or working in the underground economy, solely in order to save other work permit applicants $10. This argument is as unconvincing as it is ghoulish.

### It is arbitrary to impose an essentially random fee on TPS

For nearly all users, the proposed rule would eliminate a separate biometrics fee and roll this cost into the filing fee for the primary immigration or naturalization application. But the proposed

rule makes an exception for Temporary Protected Status (TPS) applicants, solely and admittedly to make an end-run around Congress:

> To reduce the costs of TPS that USCIS must recover from fees charged to other immigration benefit requests, DHS proposes to use the permissive authority in 8 U.S.C. 1254b(a) to require a $30 biometric services fee for TPS initial applications and re-registrations.

In other words, USCIS is effectively breaching Congress's $50 cap on TPS filings by imposing a separate biometrics fee exclusively on this population.

## It is arbitrary to reverse longstanding naturalization policy

The proposed rule would impose a *minimum* fee increase of over 61% on naturalization applicants by increasing the baseline "Activity-Based Cost" to the agency for naturalization and other adjudications, without any explanation for the public to assess; and by setting the new fee at a level 18-19% higher than the "Model Output," rather than capping this increase at 5% as in past fee rules. (By eliminating fee waivers and fee reductions for naturalization, the proposed rule would ensure that many applicants face an even steeper fee increase relative to the status quo.)

In the past two fee rules (2010 and 2016), USCIS explicitly articulated the policy argument *against* high fees for naturalization applicants.

> DHS has determined that the act of requesting and obtaining U.S. citizenship deserves special consideration given the **unique nature of this benefit to the individual applicant, the significant public benefit to the Nation, and the Nation's proud tradition of welcoming new citizens**. [2010 fee rule; emphasis added]

> This sentiment still holds true. DHS believes that increasing the naturalization fee by only the weighted average increase before reallocation will reinforce these principles, **allow more immigrants to fully participate in civic life, and is consistent with other DHS efforts to promote citizenship and immigrant integration**. [2016 fee rule; emphasis added]

In the 2019 proposed rule, however, USCIS abruptly abandons these longstanding policy commitments to the broad social, economic, and civic benefits of naturalization, and offers up no rational justification. In proposing to eliminate the 5% cap on naturalization fee increases, the proposed rule states:

> In crafting prior fee rules, DHS reasoned that setting the Form N-400 fee at an amount less than its estimated costs and shifting those costs to other fee payers was appropriate in order to promote naturalization and immigrant integration. DHS now believes that shifting costs to other applicants in this manner is not equitable given the significant increase in Form N-400 filings in recent years.

35

This allegedly "significant increase in Form N-400 filings in recent years" is not quantified in the proposed rule, but in fact this increase was neither unprecedented nor sustained. As Boundless found in a data-driven report on naturalization, the volume of naturalization applicants was much higher twice in the agency's recent history, and USCIS did not find it necessary to dramatically increase fees at those times. In addition, Form N-400 filing volume was back down to normal levels in FY 2018.

In fact, filing volume has nothing to do with the agency's core explicit justification for raising fees, which is a (mostly) unbending fealty to the "beneficiary-pays principle." This justification appears again in the proposed rule's justification for eliminating naturalization fee reductions:

> DHS implemented this reduced fee option in the FY 2016/2017 fee rule to limit any potential economic disincentives that some eligible naturalization applicants may face when deciding whether to seek U.S. citizenship. DHS now proposes to eliminate the reduced fee option and return to a policy of all naturalization applicants paying the same fee. For the same reasons explained above with regard to no longer limiting the Form N-400 fee, DHS proposes to eliminate the reduced fee in order to recover full cost for naturalization services.

After sticking to this line about the agency's newly discovered policy interest in making all users pay the its exact cost of adjudication, the agency veers in another direction and reveals perhaps its true motivation—in a footnote:

> Recently, Congress encouraged USCIS "to consider whether the current naturalization fee is a barrier to naturalization for those earning between 150 percent and 200 percent of the federal poverty guidelines, who are not currently eligible for a fee waiver." Although USCIS considered this report in formulating this proposed rule, USCIS has determined that it is neither equitable, **nor in accordance with the principle of self-sufficiency** that Congress has frequently emphasized, to continue to force certain other applicants to subsidize fee-waived and reduced-fee applications for naturalization applicants who are unable to pay the full cost fee. [emphasis added]

Here the mask falls: USCIS is relying not only an argument for "equitable" treatment of wealthier applicants (i.e. the "beneficiary-pays principle"), but on an arbitrary and irrelevant obsession with making naturalization unaffordable for lower-income applicants (i.e. "the principle of self-sufficiency"). Instead of following Congress's clear urging to determine whether the *current* naturalization fee is a barrier to those who earn too much to qualify for a fee waiver, the proposed rule makes not even the barest attempt to address this question. Instead, the proposed rule insists on eliminating fee waivers, *and* eliminating fee reductions, *and* dramatically increasing the naturalization fee for all applicants—all in a clear and arbitrary attempt to *increase* barriers to naturalization.

Moreover, the proposed rule provides no evidence whatsoever that "Congress has frequently emphasized" this so-called "principle of self-sufficiency."

36

Although there is no way for a public commenter to know this from the proposed fee rule, USCIS made an argument about Congressional intent regarding "self-sufficiency" in an entirely different proposed rule on public charge inadmissibility grounds, published on Oct. 10, 2018. The public charge proposed rule cites the "Statements of national policy concerning welfare and immigration" section of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Pub. L. 104-193, 110 Stat. 2105, codified in part at 8 U.S.C. 1601). While this section of the U.S. Code does indeed use the term "self-sufficiency," it is concerned entirely with the use of government safety net programs by noncitizens, and has nothing to do with eligibility for naturalization (which does not concern "welfare and immigration" in any reasonable sense).

Once again, the proposed rule's citation of Congressional intent (or in this case, vague uncited gesture toward Congressional intent) is misleading, invalid, and in direct contradiction to Congress's clear and repeated directives to remove—not worsen—financial burdens facing applicants for U.S. citizens.

## The proposed rule's cost/benefit analysis is utterly deficient and violates the Administrative Procedure Act

The proposed rule is accompanied by a Regulatory Impact Analysis (referred to in this comment as the "USCIS economic analysis") that begins with this statement of purpose:

> Executive Orders (E.O.) 12866 and 13563 direct agencies to assess the costs and benefits of available alternatives, and if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This proposed rule has been designated an "economically significant regulatory action" under section 3(f)(1) of E.O. 12866. Accordingly, the rule has been reviewed by OMB.

The USCIS economic analysis fails these directives in almost every particular. As discussed in detail below, the USCIS makes no attempt to quantify—let alone maximize—the net economic, public health, public safety, or distributive impacts of the proposed rule. The agency makes no assessment of available alternatives, provides no legitimate reasons why its regulatory choices are necessary, and restricts rather than promotes flexibility.

## The economic analysis is mathematically invalid

On Nov. 14, 2019, USCIS had posted on Regulations.gov a Regulatory Impact Analysis (ID: USCIS-2019-0010-0005) that began its executive summary as follows:

> USCIS projects an average annual budget of **$4,670.5 million** in FY 2019/2020, a **$1,632.5 million (54 percent)**, increase over the FY 2016/2017 fee rule average annual budget of **$3,038.0 million**. The current USCIS fee schedule would provide USCIS with

estimated average annual revenue of $4,662.8 million per year per immigration benefit with the proposed fees. The FY 2019/2020 fee review forecasts 9,336,015 total workload receipts and 7,789,861 fee-paying receipts. This represents a **60 percent increase** to workload and **18 percent increase** to fee-paying receipt volume assumptions. [emphasis added]

On Nov. 22, 2019, USCIS withdrew this document from Regulations.gov and replaced it with a revised Regulatory Impact Analysis (ID: USCIS-2019-0010-0559), with no explanation save the following notice in the regulatory docket (screenshot taken from Regulations.gov):

Document is replaced with document USCIS-2019-0010-0559, November 22, 2019.
**WITHDRAWN** | **ID:** USCIS-2019-0010-0005

The revised Regulatory Impact Analysis begins its executive summary as follows:

USCIS' current fee schedule is expected to yield **$3.41 billion** of average annual revenue during the FY 2019/2020 biennial period. This represents **a $0.93 billion, or 38 percent**, increase from the FY 2016/2017 fee rule projection of **$2.48 billion**. See 81 FR 26911. The projected revenue increase is due to higher fees as a result of the FY 2016/2017 fee rule and more anticipated fee-paying receipts. The FY 2016/2017 fee rule forecasted 5,870,989 total workload receipts and 5,140,415 fee-paying receipts. See 81 FR 26923-4. However, the FY 2019/2020 fee review forecasts 9,336,015 total workload receipts and 7,789,861 fee-paying receipts. This represents a **59 percent increase** to workload and **52 percent increase** to fee-paying receipt volume assumptions. [emphasis added]

It appears that the initial Regulatory Impact Analysis was shot through with huge errors of the most basic variety.

Worse still, even the revised Regulatory Impact Analysis does not add up, compared with the data provided by USCIS in its own proposed rule.

According to Table 4 of the proposed rule, the average annual workload receipts projection was 5,870,989 in 2016 and 9,336,015 in 2019 (excluding biometrics), yielding a 59% increase. This matches the executive summary above, although as discussed in more detail below, there is no way for the public to understand how USCIS calculated its new projections.

According to Table 5 of the proposed rule, the average annual fee-paying receipts projection was 4,929,707—not 5,140,415—in 2016, and 7,789,861 in 2019 (excluding biometrics), yielding a 58%—not 52%—increase. But Table 5 itself appears to be unreliable, because the sum of the actual numbers in the 2019 fee-paying column adds up to $7,700,364, not the sum of $7,789,861 found in the Subtotal and Grand Total cells. Therefore, using what appear to be the correct numbers, average annual fee-paying receipts projection was 4,929,707 in 2016 and 7,700,364 in 2019 (excluding biometrics), yielding a 56% increase.

The revised Regulatory Impact Analysis is also misleading in its comparison of annual revenue projections. Holding constant the new fees used in Table 8 of the 2016 final rule, the 2016 annual revenue projection was $3.043 billion—not 2.48 billion—compared with the approximately $3.41 billion in revenue that the 2016 fees would be expected to generate absent other policy changes in 2019. USCIS provides no way for public commenters to double-check its methodology for determining this $3.41 billion "business as usual" figure. In any event, this would represent a revenue increase of 12%.

Needless to say, neither the Administrative Procedure Act nor its implementing Executive Orders and OMB guidance encourage federal agencies to provide faulty, inconsistent, and unverifiable data for public commenters to puzzle over.

### There is no accounting for harms

Throughout its economic analysis, USCIS only attempts to quantify the most basic and direct costs of the proposed rule—namely, how much more its users would have to pay in the face of higher fees and absent fee waivers. As discussed above, USCIS makes no attempt whatsoever to quantify the many severe harms that the proposed rule would inflict on noncitizens, U.S. citizens, and U.S. companies. While the agency does not provide any data that would assist public commenters in quantifying these harms—including but not limited to reduced wages, broken families, and increased vulnerability to domestic violence—it is reasonable to predict that these indirect costs would dwarf the direct costs of higher filing fees.

### There is no accounting for price sensitivity

The USCIS economic analysis also fails in the basic task of projecting how many fewer individuals would file a given form in the face of higher fees. The agency simply assumes that everyone will pay the new and higher fees, even if they are being imposed on a population for the first time (e.g. individuals currently eligible for fee waivers). This assumption violates the basic principles of economics, in which human beings respond to price signals.

The agency could have provided data by which public commenters could assess the impact of prior fee increases on application volume—for example, quarterly data on naturalization applications both before and after the fee rule of 2007. But absent such data, there is simply no way for commenters to assess the true costs of the proposed rule—both the cost to the agency in reduced revenue, and the cost to the U.S. economy from the harms described above.

### There is no accounting for broader costs of restricting immigration

Although its intent is masked by pretextual justifications and a failure to project realistic application volumes, the proposed rule would have the effect (and fairly obvious intent) of restricting immigration to the United States. There is a wealth of academic literature showing the widespread economic benefits of immigration, including comprehensive studies by the National

Academy of Science[4] and the Congressional Budget Office.[5] Here again, if USCIS were to undertake the required cost/benefit analysis, the costs to society of reduced economic output, lower wage growth, and lower tax revenues alone would dwarf the direct costs of a higher fee burden.

### There is no accounting for the impact of new restrictions on fee waivers for applicants with an affidavit of support

The USCIS economic analysis asserts that there would be "no material impact" stemming from the proposed rule's new restrictions on fee waivers for applicants with an affidavit of support from a U.S. relative or other financial sponsor. There is no way for public commenters to evaluate the accuracy of this claim, given the lack of data that USCIS has provided.

> In addition, the proposed rule would clarify that an applicants who are subject to an affidavit of support under INA 213A, U.S.C. 1183a or is already a sponsored immigrant as defined in 8 CFR 213a.1 may not receive a fee waiver. […] Those restrictions would not apply to the requests that DHS is required by law from which to permit a fee waiver request. DHS estimates that these clarifying changes will have no material impact on the number of fee waivers approved.

### The arguments for imposing fees on "interim benefits" are invalid

The USCIS economic analysis makes the blithe and unsupportable assumption that all green card applicants who need a work permit (Form I-765) or a travel permit (I-131) will be able to do so, even in the face of nearly $1,000 of new fees on these "interim benefits":

> DHS assumes with this estimate that the number of filings for Forms I-765 and/or I-131 would not increase more than it would have otherwise absent the provision imposing a fee for filing these forms. Further, DHS assumes that imposing a fee would not lead fewer applicants to decide that they would not need an EAD or travel document.

According to Table 14 of the USCIS economic analysis, between FY 2013–2017, an annual average of 434,426 green card applicants filed for an interim travel permit and/or work permit while awaiting adjustment of status. This is a rather large population for USCIS to ignore in terms of estimating the indirect costs of no longer being able to travel internationally or work legally in the United States, in many cases for years at a time.

---

[4] National Academies of Sciences, Engineering, and Medicine. 2017. The Economic and Fiscal Consequences of Immigration. Washington, DC: The National Academies Press. https://doi.org/10.17226/23550

[5] Congressional Budget Office. 2013. The Economic Impact of S. 744, the Border Security, Economic Opportunity, and Immigration Modernization Act. https://www.cbo.gov/publication/44346

In addition, the "qualitative benefits" of this fee hike on work and travel permits, as alleged by the agency, are absurd:

> The proposed provision would produce some qualitative benefits. One benefit of the proposed provision would be to isolate stand-alone interim benefit applicants from those concurrently filing Form I-485 allowing USCIS to more accurately assessed [sic] fee-paying percentages, fee-paying volumes, and fees for all three benefit types. In addition, the proposed change would allow new applicants to only pay for the immigration benefits they wish to receive.

It is difficult to imagine a scenario where the "benefit" of USCIS having redundant form-filing data outweighs even the direct cost to applicants of these new fees. As for the "benefit" of applicants "only pay[ing] for the immigration benefits they wish to receive," presumably any such applicant would rather just pay lower fees. Although USCIS does not include the relevant data in Table 14 (perhaps intentionally), the number of green card applicants who do *not* concurrently apply for a work permit and/or travel permit is probably quite low relative to those who do. (For example, the total volume of approved adjustment of status applications in FY 2017 was 549,086, and that figure includes minor children.)


### The arguments for raising green card application fees on young children are invalid

Currently, the fee for green card applicants younger than 14 is $750, or instead of the $1,120 fee paid by each parents who files concurrently. The proposed rule would increase this fee by 49%, to $1,120 across the board. The justifications in the USCIS economic analysis do not survive serious scrutiny:

> A qualitative benefit DHS believes that a single fee for Form I-485 will reduce the burden of administering separate fees and better reflect the cost of adjudication.

The "burden of administering separate fees" is not quantified, and therefore it is impossible to assess whether the alleged "benefit" is significant or trivial compared with the cost to actual families seeking to stay together in the United States.

As for the of "better reflect[ing] the cost of adjudication," not only is this a paltry "qualitative benefit," it also obscures the fact that USCIS adjudicators must surely spend less time and effort on a typical child's green card application than on a typical adult's. Children, after all, typically lack tax returns, employment histories, criminal records, and most of the other evidentiary files that adjudicators might evaluate in an adult's application.


### There is inconsistent and inaccurate accounting for the cost of legal assistance

When attempting to estimate the costs of filing Form I-129 (petition for a nonimmigrant worker), the USCIS economic analysis "assumes that a petitioner will use a human resources (HR) specialist, an in-house lawyer, or an outsourced lawyer to prepare Form I-129 petitions." Thus

the estimated direct costs for filing this form are relatively high (Table 23 in the economic analysis).

Yet USCIS does not acknowledge the plain fact that many other types of users must rely on lawyers to help them prepare their immigration and naturalization forms. By failing to include legal fees in any of its other cost estimates, USCIS is certainly underestimating the likely cost of the proposed rule.

Furthermore, the USCIS economic analysis uses $173.35 as the average hourly rate for an outsourced lawyer. Even a cursory look at the published hourly rates of immigration law firms would reveal that this number is a gross underestimate.

### There is no accounting for true cost of eliminating fee reductions for naturalization

The USCIS economic analysis is both callous and patently incorrect in its predictions about the impact of the proposed rule eliminating the current 50% fee reduction for naturalization applicants with a household income between 150–200% of the FPG.

> Applicants who would have received a half price N-400 will find some way to come up with the difference.

Later, USCIS articulates what "some way" is supposed to mean:

> Applicants are expected to use other financial means such as credit cards or personal loans to pay the half of the N-400 fee that will no longer be discounted for such applicants.

USCIS cites no actual research or data to back up these claims, even when relevant research is not difficult to find. One recent experimental study in the top-tier journal *Proceedings of the National Academy of Sciences (PNAS)* found that subsidizing the naturalization application fee for individuals earning between 150-300% of the FPG increased the application by 41%.[6] Another *PNAS* study found that by simply introducing a standardized form for fee waiver applications in 2010, USCIS increased the naturalization rate by 1.5% ("about 73,000 immigrants per year gaining citizenship who otherwise would not have applied").[7] This research makes abundantly clear that many immigrants who suddenly lack the current fee reduction option will not be able to "find some way to come up with the difference."

---

[6] Barriers to citizenship for immigrants. Jens Hainmueller, Duncan Lawrence, Justin Gest, Michael Hotard, Rey Koslowski, David D. Laitin. *Proceedings of the National Academy of Sciences.* Jan 2018, 115 (5) 939-944; https://www.pnas.org/content/115/5/939

[7] Standardizing the fee-waiver application increased naturalization rates of low-income immigrants. Vasil Yasenov, Michael Hotard, Duncan Lawrence, Jens Hainmueller, David D. Laitin. *Proceedings of the National Academy of Sciences.* Aug 2019, 116 (34) 16768-16772; https://www.pnas.org/content/116/34/16768

As in the proposed rule, the USCIS economic analysis includes a footnote both citing and patently ignoring a recent Congressional directive to analyze whether the current reduced fee creates a barrier to naturalization:

> Recently, Congress encouraged USCIS "to consider whether the current naturalization fee is a barrier to naturalization for those earning between 150 percent and 200 percent of the federal poverty guidelines, who are not currently eligible for a fee waiver." H. Rep. 115-948 at 61. Although USCIS considered this report in formulating this proposed rule, USCIS has determined that it is neither equitable, nor in accordance with the principle of self-sufficiency that Congress has frequently emphasized, to continue to force certain other applicants to subsidize fee-waived and reduced-fee applications for naturalization applicants who are unable to pay the full cost fee.

It could not be clearer that USCIS has utterly failed to consider even the most recent and compelling available research in its cost/benefit analysis of eliminating the naturalization fee reduction.

### The cost/benefit analysis of asylum application and work permit fees is invalid

The USCIS economic analysis does recognize that imposing a new $50 fee on asylum applicants would reduce the number of individuals seeking asylum, which would be refreshing if its further analysis were not so patently inadequate and self-contradictory.

> DHS recognizes that some applicants may not be able to afford this new fee and would no longer be able to apply for asylum. DHS notes that some applicants would be able to find other means to pay for this application fee, such as borrowing money or taking out a loan. In addition, although the proposed fee is only $50, because the application is no longer free, **a small number of applicants may choose to not immigrate to the United States and request asylum.** However, **DHS is not able to estimate** the effect of the new $50 fee on asylum applicants who may not be able to afford the new fee and cannot accurately or **reliably predict how many applicants would no longer apply for asylum** as result of the proposed $50 fee. [emphasis added]

Here USCIS is simultaneously asserting that the agency cannot "reliably predict" the number of asylum applicants who would be deterred by a $50 fee, but nevertheless that it would be "a small number." The agency provides absolutely no data or research to back up the latter claim.

Given that the proposed rule states that the new fee is designed in part to "alleviate the pressure" on the immigration system stemming from "a continuous, sizeable increase in affirmative asylum filings," it is curious indeed that the USCIS economic analysis predicts only a "small number" of individuals would be deterred. The agency cannot make contradictory statements in the same proposed rule.

The USCIS economic analysis is similarly defective in its analysis of imposing the full work permit fee on asylum applicants:

USCIS experienced increased EAD [employment authorization document] filings through most of this decade, with much of the increase due to changes in immigration law, regulation, and policy. The growth in EAD applications is largely due to the addition, or expansion, of EAD eligibility categories over the last several years, as well as increases in receipts in existing categories. This includes a surge in asylum filings. Plus, the processing of EADs for initial asylum applicants must occur within 30 days. However, the surge in asylum applicants has contributed to increasing EAD processing times due to technology challenges and insufficient staffing. DHS proposes a fee of $490 for Form I-765, which may cause some applicants to not file the Form I-765.

DHS recognizes that there may be some applicants who may not be able to afford this new fee and would no longer be able to apply for employment authorization while their asylum application is pending. DHS acknowledges that not being able to obtain an EAD could result in lost wages for the workers and lost productivity for the sponsoring employers. The lost wages and productivity can be considered as costs of this proposal. DHS does not have relevant data associated with the petitioning companies to estimate the costs for these forgone benefits to estimate the economic effects on those applicants from not being able to obtain lawful employment until a decision is made on their asylum application.

Here USCIS does not even attempt to assert that imposing a new $490 work permit fee on vulnerable asylum-seekers would only deter "a small number" of individuals, and we can only conclude that this fee is designed to impede an alleged "surge in asylum filings" (i.e. filings for a legal immigration status protected under federal and international law).

USCIS also acknowledges that for those individuals who are undeterred from seeking asylum by higher fees but still cannot afford a work permit, the inevitable lost wages and productivity "can be considered as costs of this proposal." But USCIS makes no attempt to quantify these costs, making this acknowledgment all but meaningless in terms of the agency's obligations under the Administrative Procedure Act and related Executive Orders.

### There is no accounting for DACA renewals

The USCIS economic analysis provides absolutely no accounting for the negative effects on individuals who cannot afford the proposed new DACA renewal fee, let alone the negative impacts on their families, communities, and the U.S. economy as a whole.

USCIS even fails to provide the public with its own assessment of direct filing costs for this population. The economic analysis states that "Table 42 shows the estimated current annual cost to request DACA." There is no Table 42, however.

As is all too typical in the proposed rule, USCIS asserts nothing more than the "beneficiary-pays principle" as an alleged benefit of imposing this new fee:

DHS under this proposed provision will have a qualitative benefit, as the costs for processing DACA renewals will be recovered from those who receive the benefit rather than from other fee payers.

### Failure to estimate costs of restricting payment methods

Table 1 of the USCIS economic analysis states "None" for any qualitative or quantitative costs of the proposed rule's provision allowing the agency to restrict users' payment methods, for example disallowing cashiers' checks or money orders. As discussed in greater detail above, there is simply no way that such a policy would be costless for unbanked and underbanked users.

### Failure to estimate costs of lengthening premium processing delays

Table 1 of the USCIS economic analysis states provides the following language regarding quantitative costs of the proposed rule's lengthening of premium processing delays:

> Not estimated. Employers could lose some productivity but USCIS has no way to estimate what that loss may be.

The premium processing program generates hundreds of millions of dollars each year for USCIS, which is a large agency with many full-time economists. It defies belief that USCIS "has no way" to estimate the effects of changing such an important program.

### Failure to estimate costs of increasing genealogical record fees

Table 1 of the USCIS economic analysis states "None" for any qualitative or quantitative costs of the proposed rule's dramatic increase in fees for genealogical records. It makes no sense that that agency provides absolutely no estimate of the quantitative costs, since presumably it could do so as easily for these genealogical forms as it does for all of the other forms.

### Invalid and contradictory arguments for eliminating fee waivers and exemptions

In its discussion of fee waivers, the USCIS economic analysis misrepresents the nature of user payments within a fee-based agency:

> For example, if applicants were previously not required to pay a fee and a fee is proposed, this would be a transfer, because the costs of providing the service were previously being paid for by the Federal government through **tax payments** and are proposed to be paid for by applicants. [emphasis added]

This is nonsensical, since Federal taxpayers play no role in funding the USCIS adjudications assessed in the proposed rule. USCIS is misrepresenting fee waivers as a burden on taxpayers, when in fact the burden is borne by other USCIS filers (traditionally those in the best financial position to do so, under prior fee rules).

Throughout the USCIS economic analysis, the agency makes self-contradictory arguments about the likely impact of eliminating fee waivers. At some points, the agency argues that there will be no impact:

> DHS assumes that these forms would no longer be eligible for a fee waiver for most applicants. DHS also assumes that applicants would submit these immigration benefit requests regardless of eligibility for a fee waiver.
>
> […]
>
> Throughout this analysis, DHS assumes that all of these applicants would apply for immigration benefit requests by finding funds from which to pay their fees including (but not limited to) paying by credit card, borrowing from relatives or others in their social networks, loans, etc.

In other places (sometimes in the same paragraph), USCIS acknowledges the exact opposite:

> DHS also recognizes that limiting fee waivers may also result in some people not applying for an immigration benefit request. At this time, DHS cannot predict how many applicants would no longer be able to file or how that would impact the volumes of the underlying forms.
>
> […]
>
> DHS is aware that eliminating fee waivers may delay or adversely affect some applicants' current ability to apply for immigration benefits.

Both empirical academic research and basic logic confirm that eliminating fee waivers would of course lead to fewer people applying for these immigration benefits, despite the agency's blithe assumption that everyone will be able to find the funds somehow. Yet USCIS abdicates its statutory role in assessing these costs, stating:

> USCIS is unable to estimate the price elasticity of each immigration benefit for which fee waiver requests are currently accepted.

Without estimating this price elasticity, the USCIS economic analysis is useless as a tool for measuring the costs and benefits of the proposed rule. The agency provides no rationale for why it is "unable" to perform this basic function.

This is a particularly egregious defect, given how many individuals currently qualify for fee waivers using the means-tested benefit eligibility criterion—all of whom will no longer be able

to qualify this way under the proposed rule, despite being protected by the Trafficking Victims Protection Reauthorization Act:

> According to the sample results, 26.9 percent of total approved fee waivers are approved on the basis that household income is at or below 150 percent of FPG, 1.2 percent of total approved fee waivers are approved based on demonstrated financial hardship, and **71.9 percent** of total approved fee waivers are approved on the basis of the means-tested benefit criteria. [emphasis added]

The USCIS economic analysis is similarly undisciplined in its assertions regarding the elimination of most fee exemptions for work permits:

> This could result in lost wages for the workers and lost productivity for the sponsoring employers. The lost wages and productivity can be considered as costs of the forgone benefits. This may be a very small population, and USCIS believes they will find some way to pay for their EAD filing fee.

Once again, USCIS provides no methodology whatsoever for its assertion that "they will find some way to pay" the newly imposed fees.

As for economic benefits, the USCIS economic analysis has nothing quantitative to offer:

> DHS anticipates this proposed rule would produce a qualitative benefit. The proposed rule could reduce or eliminate administrative costs to USCIS that are required to maintain training or guidance necessary to adjudicate unique fee waiver requests.

Given that the overwhelming majority of fee waiver requests are submitted via Form I-912, this alleged benefit is a rather weak addition to the positive side of the ledger (perhaps explaining why USCIS fails to quantify it).

The only other benefit presented by USCIS also raises more questions than it answers:

> …DHS thinks that eliminating fee waivers may reduce fee increases in future biennial USCIS fee reviews, which would benefit the overall population of USCIS applicants.

Given how much so-called "forgone revenue" would be saved by eliminating fee waivers, which is effectively the only quantitative effort that USCIS undertakes in this Regulatory Impact Analysis, it is impossible to understand why, by its own logic, USCIS is not reducing fee increases in *this* fee review.

## The proposed rule is contrary to the Regulatory Flexibility Act

Under the Regulatory Flexibility Act (RFA), USCIS is supposed to minimize the burdens of its regulatory actions on small entities, including small businesses and nonprofits. As stated in the USCIS economic analysis:

> While most immigration benefit request filing fees apply to individuals, as described above, some also apply to small entities. USCIS seeks to minimize the impact on all parties, but in particular small entities. An alternative to the increased economic burden of the proposed rule is to maintain fees at their current level for small entities. The strength of this alternative is that it assures no additional fee burden is placed on small entities; however, this alternative also would cause negative impacts to small entities.

Nowhere in the proposed rule, the USCIS economic analysis, or the USCIS small entity analysis does the agency provide any actual explanation for why holding these fees constant "would cause negative impacts to small entities."

Other fatal defects of the proposed rule under the RFA include:

- The USCIS small entity analysis does not take into account the many hundreds of nonprofit immigrant service organizations—most of them vetted and approved by the Department of Justice—that will be affected and even existentially threatened by the proposed rule's barriers to accessing the immigration system.

- In concluding that the proposed rule does not represent a significant impact economic impact on small entities, the USCIS small entity analysis relies on a revenue-based metric for company sponsors of nonimmigrant workers, and a salary-based metric for nonprofit sponsors of religious workers. Both methodologies ignore the fact that many small entities that depend on global talent are startup companies funded by equity investors. For these companies, revenue is not a valid metric because they may be years away from generating revenue, and salary is not a valid metric because skilled employees are heavily compensated with stock options.

In order for this small entity analysis to be valid under the RFA, USCIS must use a credible methodology to assess the proposed rule's impact on nonprofit immigration service organizations and for-profit technology startups.

## The proposed rule is contrary to the Paperwork Reduction Act

When the proposed rule was initially published on Nov. 14, 2019, it provided 60 days for the public to submit comments on draft forms and instructions. USCIS then posted no fewer than 145 such documents on Regulations.gov for public review.

Then, on Dec. 9, 2019, published another proposed rule that reduced the period for public comments on draft forms and instructions to only 45 days. This clear breach of the Paperwork Reduction Act (PRA) leaves insufficient time for the public to adequately comment on the massive volume of form changes proposed by the agency.

USCIS must therefore extend the comment period for PRA review by at least another 30 days.

## The proposed rule is contrary to the Equal Protection Clause of the U.S. Constitution

The discriminatory impacts of the proposed rule cannot be ignored.

Without question, the proposed rule would discriminate based on income, putting permanent residency, U.S. citizenship, and many humanitarian protections out of reach for people of modest means.

At the same time, discrimination by USCIS based on income tends to wreak discrimination based on race, ethnicity, religion, and country of origin. Consider the public charge rule recently published by USCIS (and enjoined by several federal district courts): among other things, it is effectively an income test that would make it far more difficult for individuals to obtain a green card if their household income is below 250% of the Federal Poverty Guidelines. Based on Census data, the Migration Policy Institute found that more than half of all family-based green card applicants would be denied under the public charge rule's income requirement, with disproportionate effects based on national origin and ethnicity. The income requirement alone would block 71% of applicants from Mexico and Central America, 69% from Africa, and 52% from Asia—but only 36% from Europe, Canada and Oceania.

The greater a nation's per-capita income, the more likely its citizens will be to afford the far higher immigration and naturalization fees contemplated in the proposed rule. Canada, Australia, New Zealand, and European nations tend to be on the high end of that income scale.

It would be folly to conclude that such discriminatory impacts are unintentional. Consider the following facts about the current administration:

- President Trump reportedly tasked his ambassador to the European Union to develop a proposal to "fast track" immigration from European countries, in consultation with White House policy advisors Stephen Miller and Jared Kushner. (This proposal has not yet been implemented.)

- A "Presidential Memorandum on Combating High Nonimmigrant Overstay Rates" has set in motion a potential travel ban that would overwhelmingly target African nations, despite the fact that most visa overstays originate in Canada and other countries outside of Africa.

- Litigation against the administration's termination of Temporary Protected Status (TPS) for immigrations from El Salvador, Sudan, Nicaragua, and Haiti has uncovered, in the

words of one federal judge, "sufficient evidence to raise serious questions as to whether a discriminatory purpose was a motivating factor in the decisions to terminate the TPS designations."

# The Proposed Rule Gives the Public No Opportunity to Evaluate Key Data

The public comment process is fundamentally undermined by USCIS's failure to provide a wide range of data that would be essential to understanding and evaluating the proposed rule.

## There is no accounting for cost savings from recent USCIS policies

Since its previous fee rule was finalized in late 2016, USCIS has experienced a number of changes that would presumably reduce agency costs and put *downward* pressure on user fees:

- Increased rates of eProcessing (now a significant and growing percentage of N-400 filings among other forms)
- "Efficiency gains resulting from information technology investments and process improvements" (as articulated in the 2016 fee rule)
- System Assisted Processing (i.e. electronic pre-adjudication)
- InfoMod (i.e. fewer user visits to field offices via InfoPass)
- Closure of international offices
- Realignment and elimination of some District offices
- Lower refugee intake

Remarkably, however, the proposed rule leaves the public entirely in the dark about how much these developments have contributed to cost reductions at USCIS, and even admits that it is wholesale ignoring some unquantified number of cost-saving initiatives:

> USCIS considered all cost data that was available at the time it conducted this fee review, including data on cost-saving measures. **It does not account for recent cost-savings initiatives for which data were not yet available at the time of this fee review.** However, USCIS intends to fully evaluate and capture any relevant cost-savings data during its next biennial fee review.

Until USCIS provides a full and transparent accounting of recent cost savings, the public has no way of understanding whether its alleged budget needs are legitimate.

## USCIS provides inadequate justification for increasing revenue, compared with its prior fee rule

The proposed rule, along with the 2019 fee review supporting documentation, include no way for the public to understanding *why* USCIS requires the revenue from a second 21% across-the-board fee increase in just three years, including how this money would be used and whether it will improve processing times.

In contrast, the 2016 fee review supporting documentation states right up front why USCIS needs more incremental revenue and what the anticipated effects will be on processing times:

> DHS will adjust the current fee schedule by a weighted average of 21 percent. Approximately 8 percent of the overall increase relates to reinstating a surcharge in the fee schedule to fund the RAIO, SAVE, and Office of Citizenship programs, including the CIGP. The remaining increase relates to increased fee waivers and exemptions since the 2010 Fee Rule (approximately 9 percent) and the costs of sustaining current operating levels while allowing for limited, strategic investments necessary to strengthen and mature the USCIS enterprise (approximately 4 percent).

> [...]

> USCIS acknowledges that since it last adjusted fees in FY 2010, the agency has experienced elevated processing times compared to the goals established in FY 2007. These processing delays have contributed to case processing backlogs. This can partially be attributed to having removed the surcharge previously applied to the IEFA fee schedule to recover costs related to the USCIS Refugee, Asylum, and International Operations Directorate (RAIO), SAVE, and the Office of Citizenship. This was done in anticipation of Congress granting the request for annual discretionary appropriations to fund these programs that was in the President's Budget. Those resources did not fully materialize and since FY 2012 USCIS has used other fee revenue to support these programs. DHS is adjusting fees by a total weighted average increase of 21 percent; the total 21 percent weighted average increase would be allocated as follows:

> • Reinstate a surcharge in the fee schedule to fund RAIO, SAVE, and the Office of Citizenship (approximately 8 percent);

> • Account for reduced revenue stemming from an increase in fee waivers granted since FY 2010 (approximately 9 percent); and

> • Recover the costs needed to sustain current operating levels while allowing for limited, strategic investments necessary to ensure the agency's information technology infrastructure is strengthened to protect against potential cyber intrusions, and to build the necessary disaster recovery and back-up capabilities required to effectively deliver the USCIS mission (approximately 4 percent).

Through this rule, USCIS expects to collect sufficient fee revenue to fully support RAIO, SAVE and the Office of Citizenship. This would allow USCIS to discontinue diverting fee revenue to fund these programs, thereby increasing resources to fund the personnel needed to improve case processing, reduce backlogs and achieve processing times that are in line with the commitments in its FY 2007 Fee Rule.

The first 2016 fee increase (8%) is no longer relevant, since this surcharge only needed to happen once. Since 2016, USCIS has operated under the assumption that RAIO, SAVE, and the Office of Citizenship will not be funded by Congressional appropriations, so now this part of the agency's budget should be fully covered under the status quo fee schedule.

The second 2016 fee increase (9%) is also no longer relevant. USCIS had recently started offering new fee reductions for naturalization, and changed the fee schedule to recover any lost revenue from that policy change. This cost recovery is already baked into the current fee schedule.

The third 2016 fee increase (4%) reveals the general level of incremental revenue necessary for "limited, strategic investments" above and beyond business as usual. In 2016, that level was relatively low (4%).

In the 2019 proposed fee rule, USCIS repeatedly cites the prior overall average fee increase of 21%, while concealing the fact that most of the underlying circumstances are no longer relevant. Instead, USCIS should be explaining to the public why it requires so much more than the 4% increase that was necessary just three years ago for general infrastructure investments.

## USCIS fails to disclose what it would do with more than half of the extra $1.3 billion in annual revenue it seeks to raise

In the proposed rule, USCIS claims that it needs an average of $1,262,300,000 ($1.26 billion) in additional annual revenue beyond business as usual, in order to close the gap between its projected revenue and budget for FY 2019 and beyond:

Table 3: IEFA Non-Premium Cost and Revenue Comparison (Dollars in Millions)

| Fiscal Year | FY 2019 | FY 2020 | FY 2019/2020 Average |
|---|---|---|---|
| Non-Premium Revenue | $3,408.2 | $3,408.2 | $3,408.2 |
| Non-Premium Budget | $4,558.1 | $4,782.9 | $4,670.5 |
| **Difference** | **-$1,149.9** | **-$1,374.7** | **-$1,262.3** |

The proposed rule also includes the following table with a somewhat more detailed breakdown of how USCIS plans to spend any additional incremental revenue:

Table 2: Cost Projections

| FY 2019/2020 Fee Review IEFA Non-Premium Budget (in Millions) | |
| --- | --- |
| Total Base FY 2018 IEFA Non-Premium Budget | $3,585.6 |
| Plus: Spending Adjustments | $217.2 |
| **Total Adjusted FY 2018 IEFA Non-Premium Budget** | **$3,802.8** |
| Plus: Transfer to ICE | $207.6 |
| Plus: Pay Inflation and Promotions/Within Grade Increases | $280.2 |
| Plus: Net Additional Costs | $267.5 |
| **Total Adjusted FY 2019 IEFA Non-Premium Budget** | **$4,558.1** |
| Plus: Pay Inflation and Promotions/Within Grade Increases | $218.6 |
| Plus: Net Additional Costs | $6.2 |
| **Total Adjusted FY 2020 IEFA Non-Premium Budget** | **$4,782.9** |
| **FY 2019/2020 Average Non-Premium Budget** | **$4,670.5** |

Based on this table, the proposed rule describes four categories of incremental expense that USCIS asserts have newly arisen since the 2016 fee rule.

> [1.] **Transfer of funding to U.S. Immigration and Customs Enforcement** ($207.6 million in FY 2019 and FY 2020).

The proposed rule update changed this amount from $207.6 million to $112.3 million (a $95 million difference), without explaining why the agency's own initial proposed rule and two cycles of Presidential budget requests included the much higher number, or how it was derived.

In any event, other public comments go into greater depth about how any transfer of funds from USCIS to ICE is patently unlawful.

> [2.] **Pay and benefits adjustments for on-board staff** ($280.2 million in FY 2019 and $89.8 million in FY 2020). Pay adjustments account for cost of living adjustments, within-grade pay increases, and the annualization of prior-year vacancies. The government-wide cost of living adjustment rate assumption is 2.0 percent for both FY 2019 and FY 2020. Within-grade pay increases are routine raises awarded to general schedule employees, based on length of service and performance at an acceptable level of competence. Annualization of prior-year vacancies account for a full-year cost of salaries and benefits for positions that were on-board for only a portion of FY 2018.

USCIS does not explain why this significant increase in expenses was not anticipated in the 2016 fee rule, just three years prior.

> [3.] **Pay and benefits for new staff** ($116.7 million in FY 2019 and $128.8 million in FY 2020). Projected FY 2019 and FY 2020 workloads exceed current workload capacity,

thereby requiring additional staff. The FY 2018 Staffing Allocation Model and new staff enhancement requests yield an additional 2,098 positions necessary to meet adjudicative processing goals and other USCIS mission objectives, including administrative functions. In total, the FY 2016/2017 fee rule assumed a total authorized staffing level of 14,543, whereas estimates used for this proposed rule reflect 20,958. This represents an increase of 6,415 or 44 percent. This additional staffing requirement reflects the facts that it takes USCIS longer to adjudicate many workloads than was planned for in the FY 2016/2017 fee rule and that workload volumes, particularly for work types that do not currently generate fee revenue, have grown.

USCIS does not provide the public with remotely enough information to evaluate how it arrived at a need to bolster staffing levels by 44% since 2016; the high-level assertions above are all that we are provided. If it is taking USCIS longer than expected to adjudicate many cases, this is no doubt in large measure due to policy choices over the past three years that USCIS fails to articulate or analyze in the proposed rule.

[4.] **Net additional costs** ($150.8 million in FY 2019 and $6.2 million in FY 2020). In addition to non-pay general expenses associated with on-boarding the new staff described above, these costs include other enhancement requests such as secure mail shipping for permanent resident cards, increased background investigations, headquarters consolidation, etc. The additional resources are to sustain current operations necessary for achieving USCIS' strategic goals. USCIS considered all cost data that was available at the time it conducted this fee review, including data on cost-saving measures. It does not account for recent cost-savings initiatives for which data were not yet available at the time of this fee review. However, USCIS intends to fully evaluate and capture any relevant cost-savings data during its next biennial fee review.

Here again, USCIS does not provide the public with remotely enough information to evaluate how it arrived at a need to make such significant new infrastructure investments since the 2016 fee rule just three years ago; the high-level assertions above are all that we are provided.

Note that the dollar figures in the proposed rule description do not match the categorizations in Table 2, adding to the public's confusion over how USCIS plans to spend this extra revenue. In any event, the grand total for the new non-ICE expenses is an average of $386,250,000 per year.

Inferring what we can from the limited data USCIS has provided, it would appear that as of the proposed rule update, USCIS claims that it needs a grand total of $1.167 billion in additional annual revenue (which is the original $1.26 billion grand total minus the $95 million difference between the original and updated ICE transfer plans).

This means that of the $1.167 billion USCIS claims it needs in new incremental revenue since 2016, the agency fails to disclose or explain what it plans to do with an astonishing 57% ($668 million) of that total. The following pie chart is from Boundless, not the proposed rule—though the proposed rule is deficient in not including such a disclosure:



**USCIS seeks to extract this extraordinary amount of new revenue from its most vulnerable users**

Based on the difference between the projected revenue levels in the 2016 final fee rule ($3,043,867,000) and in the 2019 proposed fee rule ($4,693,630,000), USCIS claims it needs an extra $1.65 billion in annual revenue. That is a greater than 54% increase in just three years.

USCIS does not disclose how much of this revenue increase would come from current fees applied to increased volume (designated in this comment as "business as usual" or BAU), but Boundless estimates based on available data that this amount is about $300 million. This means that USCIS seeks to increase revenues by around 49% over its own projection of volume growth under of status quo (BAU) revenues.

Where would this extra revenue come from?

- Some of this new revenue (just over $100 million) would come from entirely new fees imposed on asylum applications and DACA renewal applications.

- Much more revenue (over $300 million) would come from eliminating fee waivers for lower-income applicants, including immigrants applying for U.S. citizenship.

- The next biggest revenue category (about $400 million) would come from hiking existing fees.

- By far the biggest new source of revenue (about $640 million) would come from new fees on travel and work permits that are currently not subject to fees—including work permits for asylum-seekers and most green card applicants ("interim benefits").

This chart from Boundless summarizes which populations would bear most of the burden of the proposed rule:



This table from Boundless provides the source data for the chart above:

| Revenue increase from: | $ contribution | % of total |
|---|---|---|
| *Increased volume (business as usual)* | *$301,591,315* | *17.1%* |
| **Eliminating fee waivers (N-400 only)** | $74,939,026 | 4.2% |
| **Eliminating fee waivers (all others)** | $240,733,039 | 13.6% |
| **Fees on all I-131s** | $29,539,214 | 1.7% |
| **Fees on asylee I-765s** | $147,000,000 | 8.3% |
| **Fees on all other I-765s** | $463,683,090 | 26.2% |
| **All other fee changes** | $392,277,316 | 22.2% |
| **New DACA renewal fees** | $108,900,000 | 6.2% |
| **New asylum fees** | $8,150,000 | 0.5% |

(Boundless's inferred total, even excluding the BAU volume increase, is somewhat higher than the $1.26 billion grand total in incremental new revenue presented in the proposed rule. This is because it is impossible to reproduce USCIS's methodology based on the incomplete data the agency provides to the public.)

It is especially notable that the new $50 asylum fee would raise a trivial amount of new revenue (~$8 million) compared with other policy changes in the proposed rule. This undercuts any argument by USCIS that such a fee is primarily designed to keep the agency solvent.

## USCIS claims that form-specific processing costs have increased dramatically since 2016, for no reason provided in the proposed rule

The "Activity-Based Cost" (ABC) is the average cost to USCIS to adjudicate a given type of form. USCIS does not make it easy, but it is possible to infer how these ABC estimates have changed between the 2016 final fee rule and the 2019 proposed fee rule. For example:

- Form I-129: $327 → $593 (83% increase)
- Form I-130: $381 → $464 (22% increase)
- Form I-140: $503 → $458 (9% *decrease*)
- Form I-485: $652 → $761 (17% increase)
- Form I-751: $400 → $610 (52% increase)
- Form N-400: $662 → $875 (32% increase)

USCIS provides no explanation for why its own costs have change so dramatically and inconsistently across different form types in just three years.

We can make an educated guess that the culprit is deliberate policy choices: For example, the elimination of "prior deference" to initial H-1B filings could help explain why the activity-based cost for Form I-129 has nearly doubled. New in-person interview requirements help explain why I-485 and I-751 costs are up.

But there is simply no way for the public to adequately comment on the cost model in the proposed rule without USCIS providing more data and explanation.

*Note that Boundless derived the above numbers using the following formula:*
Activity-Based Cost = Model Output / (projected total volume / fee-paying volume)

## USCIS provides no explanation for a huge increase in projected work permit applications

The 2019 proposed rule projects over 2.1 million *additional* work permit applications (I-765) in 2019 compared with the 2016 final fee rule (747,825 in 2016 increasing to 2,851,000 in 2019). This number can't be accounted for based solely on information disclosed in the proposed rule, which is an incomprehensible omission given that work permit applications alone would account for *over 60%* of the proposed rule's net projected workload increase.

Without even a modicum of explanation for these numbers, the proposed rule is impossible to adequately evaluate by public commenters.

## USCIS provides no justification for its revenue projection baseline

The proposed rule states that it used only one 12-month period as the baseline for all of its volume and revenue projections:

> USCIS uses actual revenue collections from June 2016 to May 2017 as a basis for the fee-paying assumptions in the FY 2019/2020 revenue projections.

Nowhere does USCIS explain why this particular 12-month period was used, rather than incorporating data from years prior or since then. The choice of June 2016 to May 2017 is particularly curious since this time period included a presidential election, when naturalization applications have historically spiked—and indeed did spike in 2016/2017.

## USCIS provides insufficient data on prior-year recovered revenue

The proposed rule makes clear that the amount of revenue recovered from prior year obligations is essential for making predictions about future revenue needs and fee calculations:

> USCIS estimates that recovered revenue from prior year obligations will be insufficient. USCIS estimates that it may recover $91.9 million in FY 2019 and $94.2 million in FY 2020 for the non-premium IEFA. Therefore, DHS proposes to increase revenue through the fee adjustments described in detail throughout this rule.

The proposed rule does not, however, provide the public with any additional information about how these recovered revenue numbers were calculated, or why they are insufficient.

# The Proposed Rule Does Nothing to Improve Agency Functions

Not only does the proposed rule fail to explain what USCIS would do with the majority of the new revenue it seeks to raise (as discussed in detail above)—it creates an expectation that this new revenue will *not* result in any improvements to the agency's core functions. This makes the agency's professed need for nearly $1.3 billion in new annual revenue all the more inexplicable.

At one point in the proposed rule, USCIS claims that it is planning to improve customer service by reducing its ever-increasing processing times and backlogs:

> Through this rule, USCIS expects to collect sufficient fee revenue to fund additional staff that will support FY 2019/2020 workload projections as well as perform more national security vetting and screening. While USCIS is committed to ensuring the integrity of the immigration system and safeguarding national security, it is also **committed to reducing processing times and the current backlog**, without sacrificing proper vetting checks, by identifying ways to increase efficiency, ensuring the successful transition from paper-based to electronic processing, and increasing adjudicative resources. For example, USCIS is transitioning non-adjudicative work from adjudicator to other staff, centralizing the delivery of information services through the USCIS Contact Center, and leveraging electronic processing and automation. [emphasis added]

Yet in another breath, the proposed rule informs the public that none of these efficiency-promoting initiatives will actually make adjudications faster:

> As discussed in the previous section, completion rates are based on reported adjudication hours and completions. **USCIS does not believe the level of effort for future adjudications will decrease.**

The proposed rule alludes to recent USCIS policies that have apparently swamped any efficiency gains with new complexity:

> A number of uncertainties remain that impede efficient case processing and timely decision making. One uncertainty is how to define the specific elements of the screening and national security vetting that USCIS will employ. **This new framework will likely involve greater use of social media screenings and more in-person interviews of applicants for certain immigration benefits.** In addition, USCIS believes that the growing complexity of the case adjudication process over the past few years has also contributed to higher completion rates. For example, it takes more time for officers to adjudicate each case. [emphasis added]

It is unacceptable that the proposed rule fails to quantify how these policies are degrading the agency's ability to achieve its own processing time reduction goals. Absent such data, it is impossible for the public to evaluate the agency's true need for greater revenue.

In addition to promising continued processing delays, the proposed rule also admits that new revenue will do nothing to alleviate the agency's extraordinary backlogs:

> **USCIS estimates that it will take several years before USCIS backlogs decrease measurably.** USCIS experienced an unexpectedly high volume of immigration benefit requests in FY 2016 and FY 2017. In FY 2018, USCIS implemented measures to reduce the backlog, such as adjudicating asylum workload on a last-in-first out basis. As explained in the Cost Projections section of this preamble, projected workloads for FY 2019 and FY 2020 exceed current workload capacity, thereby requiring additional staff.

First of all, higher-than-expected volume is not a convincing explanation for why backlogs have become intractable, given that for a fee-based agency like USCIS, higher volume means higher revenue. Amazon does not tell its consumers to expect delays around holiday season due to high volume; indeed, high volume is generally something to celebrate.

After three years of skyrocketing processing times and backlog accumulation, plus repeated entreaties by Congress to tackle these challenges, USCIS uses this proposed rule as an opportunity to inform the public that $1.3 billion in extra annual revenue will solve nothing. If this extraordinary assertion is true, then the public must be informed as to why.

## The Proposed Rule Violates Required Opportunities for Public Review

Setting aside all of the substantive defects in the proposed rule, as described in detail above, USCIS has violated its obligation to provide the public with adequate time to review and comment on its proposal under both the Administrative Procedure Act and the Paperwork Reduction Act.

### The public comment period is too short for adequate review of the proposed rule

Executive Order 12866 states that agencies should allow "not less than 60 days" for public comment in most cases, in order to "afford the public a meaningful opportunity to comment on any proposed regulation." Executive Order 13563 states that "[t]o the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days."

In its proposed rule, USCIS provides no justification whatsoever for deviating from these executive orders, and initially mandated a 30-day public comment period. A comparison with prior comparable proposed fee rules shows what a dramatic and unprecedented departure from past practice this represents:

- 2007 proposed fee rule: approx. 25,500 words (60 days for public comments)

- ▪ 2016 proposed fee rule: approx. 38,300 words (60 days for public comments)
- ▪ 2019 proposed fee rule: approx. 90,900 words (30 days for public comments)

In other words, USCIS is requiring that the public thoroughly analyze and provide comments on a rule that is over 3.5 times longer than a comparable prior proposed rule, in only half the time.

The fact that USCIS later extended the public comment period to 45 days is not a sufficient remedy, especially since this proposed rule update completely changed the underlying fee schedule by modifying the proposed transfer of USCIS funds to ICE.

## The public comment period is too short for adequate review of the proposed forms

In the initial proposed rule, USCIS provided 60 days for the public to comment on some 145 different forms, instructions, and related documents that would be changed, which is the minimum standard review period under the Paperwork Reduction Act (PRA).

But then, in the proposed rule update, USCIS shrank this PRA public comment period to only 45 days—a surprise reversal which provides far too little time for the public to adequately review so many forms and related documents.

## The economic analysis is plagued with errors

USCIS initially posted an economic analysis that was riddled with typographic errors, including an internal staff comment highlighted in a footnote:

[183] USCIS counts all full-time and part-time employees when determining whether an employer must pay this fee. H-1B and all L-1 employees are combined in the counting to determine if the 50% threshold is met to trigger the fee. See https://www.uscis.gov/working-united-states/temporary-workers/fee-increase-certain-h-1b-and-l-1-petitions-public-law-114-113. DHS is adding the words "in the aggregate" to proposed 8 CFR 106.2(c)(8) and (9) to clarify its interpretation and how employees would be counted, consistent with current practice, to determine if this additional fee is required.  Added citation to USCIS web page to support our existing policy as to the fee generally. Unclear if that is what you suggested or if you wanted something more specific to the reference to past practice. Note that the existing language on our website is ambiguous as to counting in the aggregate, hence the proposal to clarify it in this rulemaking, and we are not aware of existing policy that expressly refers to counting in the aggregate or otherwise confirms that we have been doing that in practice.  But we do not believe stakeholders will contest that this has been our past practice, although they may comment accordingly if they disagree with our assertion and we can address that further in the final rule, if needed.  For purpose of this NPRM, we think a citation to our website to reflect existing policy regarding the PL fee generally should suffice.]

In addition, this economic analysis included a key set of cost/benefit justifications (Table 1) that was formatted in such a way as to be unreadable.

One week later, USCIS posted a revised economic analysis, with no explanation as to what was changed between the two documents. As discussed in detail above, several important top-line revenue and workload numbers were changed, meaning that any member of the public who analyzed the initial document was wasting their time.

Even the updated economic analysis is still missing critical information, due to an apparent formatting error. At least the first three items in Table 47 (Summary of Estimated Annual Costs to Petitioners in the Proposed Rule by Provision/Form) are missing.

In effect, USCIS provided the public with 7 fewer days to analyze and comment on its economic analysis than the already-inadequate 45 days for the rest of the proposed rule—and its analysis is still missing critical information.

## USCIS reneged on its promised to provide public review of its cost model software

Both the proposed rule and the proposed rule update invite the public to arrange an appointment with USCIS to review the software it uses to generate cost assumptions that undergird the entire fee schedule:

> The software used to compute the immigration benefit request fees and biometric fees is a commercial product licensed to USCIS that may be accessed on-site, by appointment, by calling (202) 272-1969.

When we first tried calling this phone number, on Nov. 14, 2019, we reached an individual in the USCIS Office of the Chief Financial Officer. When asked to arrange an appointment per the proposed rule, this individual stated: "I have no idea. This is the first I've ever received a call like this. I don't know who I'd even call about that."

Based on the email quoted below, it appears that relevant USCIS officials were not informed how to respond to appointment inquiries until Nov. 25 (nearly two weeks after the publication of the proposed rule, and halfway through the initial comment period).

We called this number again on Dec. 10, 2019, and were told that we would receive a response from the appropriate USCIS official within three business days to schedule the on-site appointment promised in the proposed rule.

As of Dec. 30, 2019 (the final deadline for public comments), we had still not received a response.

> **From:** Scott, Kika M
> **Sent:** Monday, December 09, 2019 10:41 AM
> **To:** […]
> **Subject:** RE: FY 2019 - FY 2020 Fee Rule/Notice of Proposed Rulemaking (NPRM)
>
> Good morning,

The comment period has been extended to December 30th.  Please let Rich or I know who, if any, has contacted the main phone line and we would like to have an update every 3 days, in order to stay current.

Thank you

**From:** Reilly, Richard M
**Sent:** Monday, November 25, 2019 10:50 AM
**To:** […]
**Subject:** FY 2019 - FY 2020 Fee Rule/Notice of Proposed Rulemaking (NPRM)
**Importance:** High

All - On 11/14/19, USCIS published a notice of proposed rulemaking (NPRM) to adjust its fees.  The 30-day public comment period will close on <u>Monday, 12/16/19</u>.  During this time, please be aware that any member of the public may contact the OCFO front office main phone line (202-272-1969) to request an on-site appointment to view the software used to compute USCIS' immigration benefit request fees.  If this occurs, please follow these steps:

1.  Thank the caller for their interest in USCIS' proposed fee rule.
2.  Request their name, organization name, and contact information.
    a.  Update columns A – D (G if necessary) of the public participation log located […]
    b.  Inform the caller that a USCIS representative will provide a follow-up response to their inquiry within 2 business days and will provide multiple options of available appointment dates and times.
3.  Send an e-mail to Tony Tozzolo, James Yankay, Jim Wearmouth, and Jackie White (the USCIS representatives) informing them that there is new call information available in the public participation log described in step 2a.
    a.  One of these USCIS representatives will follow-up and provide the caller with multiple options of available appointment dates and times.
    b.  After the caller selects their desired appointment date and time, the USCIS representative will send him/her a calendar invitation via e-mail, which will include meeting logistics and any other relevant information.
    c.  The USCIS representative will provide updates to columns B, E & F (G if necessary).

Please let me know if you have questions.

Thanks!
Rich

# The Proposed Rule Fails to Consider Alternatives

USCIS fails to meet its obligations under the Administrative Procedure Act to consider alternatives to the proposed fee schedule and proceed with the least burdensome.

## USCIS could raise significant additional revenue strictly from users with the greatest ability to pay

The proposed rule makes no attempt to model alternatives to the "beneficiary-pays principle," which serves as a pretext for the agency to places the greatest new fee burdens on those least able to afford them.

Even without access to the full range of data at USCIS's disposal, it is fairly simple to create alternative scenarios that would provide the agency with significant extra revenue without eliminating fee waivers or raising fees across the board. For example, doubling fees for core business users (i.e. I-129 nonimmigrant worker petitions, I-140 employment-based green card petitions, and EB-5 program forms) would raise an extra $463 million per year. (USCIS does not provide enough data for us to model how this number would be affected by a small business exemption from such a fee hike, which would be desirable.)

Such a fee schedule would raise more than enough extra revenue to cover the only potentially legitimate new expenses that the proposed rule describes with any level of detail, namely pay raises and benefits for current staff, cost of hiring new staff, and "net additional costs" (total of $386 million, as discussed above).

## USCIS could extend the validity period of "interim benefits" rather than new imposing fees

As discussed above, USCIS admits in the proposed rule that by making users pay for work and travel permit applications and renewals ("interim benefits") while awaiting adjudication of their green card applications, the agency can be credibly accused of creating a cash cow for itself, with no legitimate policy purpose.

The proposed rule does not consider the alternatives of either continuing to refrain from imposing such fees, and/or extending the validity period of these interim benefits so that continued renewals are less frequently necessary.

## "Fallback" provisions are not appropriate in a final rule

In the proposed rule, USCIS presents six different fee schedule scenarios, based on whether or not the courts eliminate DACA and whether or not Congress approves a transfer of funds from USCIS to ICE. This comment only evaluates Scenario A (continued DACA and approved ICE transfer), because this the scenario that USCIS focuses on in the proposed rule, and it would be

utterly unreasonable for the agency to compel the public to evaluate six different scenarios. The proposed rule states:

> In addition, litigation regarding various fees may result in DHS not implementing certain fees or fee increases. DHS is considering whether to include a severability provision in the final fee rule, or "fallback" provisions that provide for alternative fee schedules in the event that certain aspects of the rule are not implemented. DHS requests comment on this option.

To be valid, a final rule must include only the fee schedule that the public was given adequate time to evaluate. The agency may not use the final rule to codify a suite of alternative fee schedules that it can switch among at will without public comment.

## Conclusion

In this proposed rule, USCIS has run afoul of elementary principles of agency rulemaking. If the agency decides to move forward with this fee schedule—and it should not—it must first publish an entirely revised proposed rule that cures each of the defects described in this comment (and all other public comments), this time giving the public adequate time (at least 60 days) to submit additional comments.

# BOUNDLESS

Additional comments of Boundless Immigration Inc. on the Department of Homeland Security's Proposed Rule:

*U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*

84 Fed. Reg. 62280 (Nov. 14, 2019)
and
84 Fed. Reg. 67243 (Dec. 9, 2019)
and
85 Fed. Reg. 4243 (Jan. 24, 2020)

Doug Rand
Co-Founder
Boundless Immigration Inc.
101 4th Ave, Suite 850
Seattle, WA 98121

February 10, 2020

## Table of Contents

*Background* .................................................................................................................... **3**

*Summary of USCIS meeting* ........................................................................................... **4**

General Overview ........................................................................................................... 4

Agency Budget ("Resources") ....................................................................................... 5

Types of Work ("Activities") .......................................................................................... 6

Types of Forms ("Cost Objects") ................................................................................... 7

Cost Reallocation ........................................................................................................... 8

Effect of Policy Changes on Cost Estimates ................................................................. 9

Volume Projections ....................................................................................................... 9

Backlog Reduction (or lack thereof) .............................................................................. 9

Why the Surge in Projected Agency Budget? ............................................................... 10

*The Proposed Rule Uses Opaque and Invalid Budget Assumptions* ........................... **11**

Cost and revenue baselines are not aligned .................................................................. 11

Projected costs and revenues do not match actual costs and revenues.......................... 12

Projected costs do not match the agency's own official budget justification to Congress ............... 15

Without evidence, USCIS cannot assert any budget it chooses........................................ 16

USCIS proposes a staffing surge with no adequate justification ..................................... 16

*The Proposed Rule Uses Opaque and Invalid Volume Projections* ............................. **17**

*The Proposed Rule Uses Opaque and Invalid Cost Modeling* ..................................... **18**

*USCIS Fails to Consider Less Burdensome Alternatives* ............................................. **18**

*USCIS Failed to Provide the Same Information to the Entire Public* ........................... **19**

*Conclusion* ................................................................................................................... **19**

## Background

On Dec. 30, 2019, Boundless submitted a public comment (the "first public comment") to U.S. Citizenship and Immigration Services (USCIS) in response to its proposed rule entitled *Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, first published in the Federal Register on Nov. 14, 2019 (84 Fed. Reg. 62280) ("the proposed rule") and revised with an update on Dec. 9, 2019 (84 Fed. Reg. 67243) ("the proposed rule update").

Both the proposed rule and the proposed rule update invited the public to arrange an appointment with USCIS to review the software it uses to generate cost assumptions that undergird the entire fee schedule:

> The software used to compute the immigration benefit request fees and biometric fees is a commercial product licensed to USCIS that may be accessed on-site, by appointment, by calling (202) 272-1969.

When we first tried calling this phone number, on Nov. 14, 2019, we reached an individual in the USCIS Office of the Chief Financial Officer. When asked to arrange an appointment per the proposed rule, this individual stated: "I have no idea. This is the first I've ever received a call like this. I don't know who I'd even call about that."

Based on an email quoted in our first public comment, it appears that relevant USCIS officials were not informed how to respond to appointment inquiries until Nov. 25 (nearly two weeks after the publication of the proposed rule, and halfway through the initial comment period).

We called this number again on Dec. 10, 2019, and were told that we would receive a response from the appropriate USCIS official within three business days to schedule the on-site appointment promised in the proposed rule.

As of Dec. 30, 2019 (the final deadline for public comments), we had still not received a response.

On Jan. 24, 2020, USCIS reopened the public comment period (85 Fed. Reg. 4243), with a new deadline of Feb. 10, 2020, "to allow additional time for interested persons to provide comments on the proposed rule."

That morning, we received a phone call from a different representative of the USCIS Office of the Chief Financial Officer, who extended an invitation to visit USCIS and view the activity-based costing (ABC) software that the agency uses to compute immigration benefit request fees. This meeting occurred on Feb. 3, 2020, as described below.

This public comment (the "second public comment") is being submitted by Boundless to USCIS on Feb. 10, 2020, to provide *additional* data, views, and arguments on the proposed rule. Our second public comment does not supersede or replace our first public comment.

## Summary of USCIS meeting

The representatives we met from the Office of the Chief Financial Officer were all very courteous and informative, and we appreciated their efforts to explain the USCIS activity-based costing (ABC) software.

What follows is our best attempt to summarize what we learned in this meeting.

Throughout this public comment, unless otherwise noted, all references to costs and revenues refer to "Immigration Examinations Fee Account (IEFA) Non-Premium"—in other words, only those activities funded by standard USCIS fees excluding Premium Processing fees.

### General Overview

USCIS provided the following handout as a general description of its Activity-Based Cost (ABC) modeling system:



Since the 2010 fee rule, the USCIS Office of the CFO (OCFO) has used off-the-shelf software called SAP BusinessObjects for its cost-modeling process. The fee review is conducted every two years, even though USCIS does not necessarily change its fees with the same frequency.

There are three different ways to organize the agency's costs, all of which must add up to the same total:

- **Resources**: This is the line-item budget for USCIS, including each operational component.

- **Activities**: USCIS breaks down its costs into 15 different types of work (for more information, see below, and see Table 17 in the proposed rule).

- **Cost Objects**: USCIS also breaks down its costs among all of the agency's different form types (N-400 for naturalization applications, I-90 for green card renewals/replacements, etc.).

## Agency Budget ("Resources")

The agency budget is an *input* to the software; the software does not determine the budget. In other words, it is the job of the software to take in an overall agency budget number and create an output that informs the cost allocation among form types.

Everything we viewed in the software demonstration was based on "Scenario A" from the proposed rule, which puts forward a total annual agency budget of $4.67 billion. (Note that the Dec. 9, 2019 proposed rule update obviates this number, since it asserts that the agency's actual demand for user fees to transfer to Immigration and Customs Enforcement (ICE) will be substantially less than the fees indicated in its original proposed rule and two prior budget requests to Congress.)

If this $4.67 billion input number were changed, that would change the model's output. For example, Table 20 of the proposed rule includes six scenarios with different topline budget numbers—the higher that budget number, the greater the weighted average fee increase.

We were told that if the agency's proposed transfer of fees to ICE were *not* to occur, this would affect the Resources part of the software's cost model (i.e. the budget agency input), which would in turn alter the distribution of costs within both Activities and Cost Objects. We did not see any evidence of scenario modeling other than references to the six Scenarios A-F as described in the proposed rule.

Although we were not shown the details of this "Resources" input, we were told that it includes every line item in the USCIS budget, which comprises some 900 items. Apparently most of these individual items are for contracts issued by the agency, not payroll for agency employees.

The USCIS FY2020 budget request to Congress, released in March 2019, does *not* match the "Resources" input to the fee rule. We were told that this is because the budget request to Congress is designed to manage the agency's cash flow and carryover "based on latest needs."

## Types of Work ("Activities")

USCIS categorizes its work into 15 different "Activities" (also presented in Table 17 in the proposed rule, and described in greater detail in the Fee Review Supporting Documentation). For some of these activities, the cost is determined empirically, based on how many hours are directly recorded by agency adjudicators. For most activities, however, the cost consists of prorated overhead, based on work not directly tied to adjudications.

- *Activity costs directly recorded by adjudicators:*

  - **Make Determination**: The costs of adjudicating an actual case; includes Payroll, General Expenses, and Overhead.

  - **Conduct TECS Check**: TECS stands for "Treasury Enforcement Communication System"; the TECS check is also a time commitment directly recorded by adjudicators and reported to the OCFO.

  - **Inform the Public**: To the extent that adjudicators spend time on inquiries via phone, written correspondence, and walk-ins, these hours are also aggregated and reported to the OCFO.

- *Activity costs that are prorated overhead:*

  - **Inform the Public:** Agency budget for its external affairs directorate, call centers, etc. (separate and apart from direct adjudicator work described above).

  - **Fraud Detection and Prevention**: Most activities performed by the Fraud Detection and National Security (FDNS) Directorate.

  - **Direct Costs**: These costs "support a specific immigration benefit type. For instance, USCIS applies costs specific to naturalization, including conducting naturalization ceremonies and naturalization benefits processing." Another example provided to us is site visits by FDNS, which are only relevant to certain employment-based form types.

  - **Intake**: Includes agency budget for the lockbox facility; part of contractors' work doing data prep; etc.

  - **Issue Document**: Includes agency budget for the Office of Intake and Document Production.

  - **Management & Oversight**: Includes agency budget for the front office, OCFO, etc.

- **Records Management**: Includes part of the agency budget for the Immigration Records and Identity Services Directorate; part of records-related work by the Field Office Directorate and Service Center Operations Directorate; non-intake data prep by contractors; FOIA responses; etc.

- **Research Genealogy**: Genealogy record requests separate from adjudicating immigration and naturalization cases.
- **Systematic Alien Verification for Entitlements (SAVE)**: This program is separate from adjudications.

- **Capture Biometrics Data**: Includes work by contractors at the Application Support Center.

- **Check Fingerprints**: Includes the cost of a USCIS contract with the FBI.

- **Check Name**: Includes the cost of another USCIS contract with the FBI.

- **Manage Biometrics Services**: Includes the cost of the USCIS office that manages its biometrics program, plus contractors that take the actual fingerprints.

USCIS adjudicators code some of their time by form type (N-400, I-485, etc.), and this cost is attributed to the "Make Determination" activity. There are separate activities for adjudicators when they "Conduct TECS Check" and "Inform the Public," as well. An individual adjudicator's timesheet won't necessarily add up to 40 hours per week, because they have other demands on their time as well (trainings, etc.).

Adjudicators record the aggregate hours they spend on a given form type and/or activity, not the hours they spend per individual case. This data is reported to and aggregated by OCFO on a monthly basis, at the level of each office (not each adjudicator). Apparently there is no permanent record of what hours an individual officer recorded.

## Types of Forms ("Cost Objects")

The USCIS software uses factors called "Activity Drivers" to translate between Activities (work types) and Cost Objects (form types).

Each form type has a code, and adjudicator hours are self-reported by the field offices and service centers, with relevant hours tied to the appropriate code.

OCFO only tracks how many hours are spent on a given form type in aggregate. For example, OCFO would know how many hours were spent agency-wide on adjudicating applications for Employment Authorization Documents (Form I-765), but would not be able to break out the dozens of scenarios underlying these applications (e.g. work permit applications as part of an adjustment of status, asylum case, etc.).

In the proposed rule, "Completions" means the total number of approvals or denials for a given form type.

"Completion Rate" for a given form type means the average hours per completion, calculated as the total hours reported for that form type divided by the total number of forms completed (see Table 6 in the proposed rule).

Because an individual case can span numerous months between filing and completion, OCFO looks at the relevant data over the course of an entire fiscal year.

The higher the Completion Rate, the greater the time expended by adjudicators and the more costly the form is for USCIS.

For a given form type, the Completion Rate multiplied by the total number of Completions equals total "Adjudication Hours." By way of example, if a particular form type comprises 10% of all Adjudication Hours, then that form type should be allocated 10% of all costs attributed to the "Make Determination" activity.

The percentage of Adjudication Hours for a given form type is also connected to how much prorated overhead is allocated to that form type. Again by way of example, and an oversimplified one, if a particular form type comprises 10% of all Adjudication Hours, then that form type could be allocated 10% of other non-adjudicator activities, such as "Management & Oversight."

The USCIS software model has several ways to view "Cost Objects"—that is, all the different form types.

- "Cost Objects 1" displays each individual form type, including those that currently do not impose fees on users.

- "Cost Objects 2" breaks down costs either by Field Office Directorate region (COR, NER, SER, WOR) or by service center within the Service Center Operations Directorate.

- "Cost Objects 3" is a new breakdown that differentiates between unnamed and named beneficiaries. Apparently OCFO is unable to differentiate costs among the different use cases of Form I-129.

## Cost Reallocation

The USCIS software calculates "Model Output" for each form type as the "Total Cost" for that form type divided by its fee-paying volume.

Then the Model Outputs go in a separate spreadsheet, *outside* the SAP BusinessObjects software, for a process of "Cost Reallocation" to determine the fees in the proposed rule.

We were not given the opportunity to view this cost reallocation spreadsheet.

## Effect of Policy Changes on Cost Estimates

In our first public comment, we noted that USCIS's projected costs for various form types have changed dramatically and inconsistently in just three years, between the 2016 final fee rule and the 2019 proposed fee rule. For example:

- Form I-129: $327 → $593 (83% increase)
- Form I-130: $381 → $464 (22% increase)
- Form I-140: $503 → $458 (9% *decrease*)
- Form I-485: $652 → $761 (17% increase)
- Form I-751: $400 → $610 (52% increase)
- Form N-400: $662 → $875 (32% increase)

USCIS provides no explanation for these cost changes in its proposed rule.

During our meeting with OCFO, we were informed that the cost-modeling software uses information from 2017, which precedes most of the notable USCIS policy changes of the past three years. Apparently, USCIS attempts to predict how costs for a given form type will change in the future, but there has been no comprehensive modeling of the many recent developments that would tend to reduce agency costs and put *downward* pressure on user fees.

We were told that the reason a given form type has a cost increase could involve salary increases, more time spent per application, or anything that increases the overall agency budget. No greater clarity was provided.

## Volume Projections

USCIS has a Volume Projection Committee, composed of representatives from OCFO and other relevant components of the agency.

Few if any details of the volume projection process were provided at this meeting, and there was no detailed accounting of why the proposed rule assumes such an extraordinarily great increase in work permit applications. (As noted in our first public comment, the data in the USCIS proposed rule and supporting materials do not add up to such a high number.)

## Backlog Reduction (or lack thereof)

The OCFO representatives confirmed that their fee review process is designed to match revenue collections to the projected costs of addressing incoming workload.

In other words, reduction of backlogs based on *prior* workload is *not* accounted for in the cost model or the proposed rule.

## Why the Surge in Projected Agency Budget?

As noted above, everything in the cost-modeling software flows from the topline budget number entered as input. For "Scenario A" in the proposed rule, USCIS claims that it will need an average annual budget of $4.67 billion (not including "non-IEFA" revenue that is from other sources and for other purposes, such as Congressional appropriations and Premium Processing fees).

We were told that to determine this number, USCIS begins with a baseline workload estimate, and then develops a staffing model—in other words, how many people will be needed for that amount of work. "Other inputs" are also used to establish the overall budget, in accordance with OMB Circular A-25, which directs agencies to use the best available information to estimate future budget needs. If the agency lacks relevant data, however, this will impede its ability to account for certain factors that may influence the actual budget.

Every baseline year for a proposed fee rule involves a time-lag. Twelve months within Fiscal Years 2013–2014 were the baseline year for revenue projections in the 2016 fee rule, and twelve months within Fiscal Years 2016–2017 were the baseline year for revenue projections in the 2019 fee rule proposal.

We were told that volume, overhead, and adjudication efficiency have changed between these baseline years, driving up costs.

We were told that, as a general matter, costs are increasing faster than workload is increasing—but the software model does not answer the question of *why*.

One major contributor to greater cost projections is greater staffing projections. Table 6 of the Fee Review Supporting Documentation shows a 44% increase in staffing forecasts between the 2016 fee rule and the 2019 proposed fee rule:

**APPENDIX VII – AUTHORIZED IEFA POSITIONS BY USCIS OFFICE**

USCIS forecasts staffing and costs based on projected workload and the existing cost baseline. The table below compared FY 2016/2017 fee rule staffing to the staffing levels in the FY 2019/2020 fee review.

**Appendix Table 6: IEFA Positions by Office**

| Directorate | FY 2016/2017 Positions | FY 2019/2020 Positions | Difference | % Difference |
|---|---|---|---|---|
| Field Operations Directorate | 5,946 | 7,305 | 1,359 | 23% |
| Fraud Detection and National Security Directorate | 920 | 1,918 | 998 | 108% |
| Refugee Asylum and International Operations Directorate | 1,648 | 2,147 | 499 | 30% |
| Service Center Operations Directorate | 2,866 | 5,579 | 2,713 | 95% |
| Other Offices (External Affairs, Immigration Records and Identity Services, Management, etc.) | 3,163 | 4,009 | 846 | 27% |
| **USCIS Total** | **14,543** | **20,958** | **6,415** | **44%** |

It is important to note that all of the data in the above table are projections—"FY 2016/2017 Positions" was the staffing *projection* in the prior fee rule, and "FY 2019/2020 Positions" is the staffing *projection* in the new proposed rule.

Other key factors in the proposed rule are projections, as well, including volume, hours it will take for adjudicators to complete a given form type, and the volume of fee-waived forms vs. fee-paying forms. For example, the proposed rule states that "USCIS uses actual revenue collections from June 2016 to May 2017 as a basis for the fee-paying assumptions in the FY 2019/2020 revenue projections."

Apparently, however, USCIS did not use a projection for one of its budget inputs: USCIS used the *final approved operating plan for FY2018* ($3,585,600,000) as the basis for its average expected budget in FY2019/2020 ($4,670,000,000).

## The Proposed Rule Uses Opaque and Invalid Budget Assumptions

All of the fees in the proposed rule stem from the agency's estimates of future costs and revenues—yet neither proposed rule nor our Feb. 3, 2020 meeting with USCIS have provided any way for the public to adequately understand, much less analyze, these estimates.

### Cost and revenue baselines are not aligned

In the 2019 proposed fee rule, "USCIS' FY 2018 annual operating plan (AOP) is the basis for the FY 2019/2020 cost projections," whereas "USCIS uses actual revenue collections from June 2016 to May 2017 as a basis for the fee-paying assumptions in the FY 2019/2020 revenue projections."

In other words, USCIS is using two completely different time periods to inform its proposed fee rule: a relatively antiquated time period (June 2016 to May 2017) as the baseline for revenues, and a relatively recent time period (FY 2018) as the baseline for costs. USCIS provides no justification for using two different baselines, when the only reasonable procedure would appear to be an apples-to-apples comparison of costs and revenues in the same most recent available time period.

This is especially perplexing because USCIS surely knows its actual costs and revenues for any prior fiscal year—indeed, the agency reports these numbers to Congress each year as part of the President's budget proposal, although they appear nowhere in the proposed rule or supporting materials.

## Projected costs and revenues do not match actual costs and revenues

Drawing on the official Congressional Justifications put forward by DHS, Boundless undertook our best effort to reconstruct the actual costs of USCIS over the past several years.

**Table 1. Enacted Budget Authority, Number of Positions, and Number of Full-Time Employees (FTEs) for USCIS (IEFA Non-Premium)**

| Fiscal Year | # positions | # FTEs | Budget |
|---:|---:|---:|---|
| 2014 | 14,166 | 12,219 | $2,996,900,000 |
| 2015 | 15,266 | 12,771 | $3,112,043,000 |
| 2016 | 15,381 | 14,369 | $3,167,729,000 |
| 2017 | 16,156 | 15,349 | $3,424,521,000 |
| 2018 | 15,939 | 15,142 | $3,625,593,000 |
| 2019 | 17,573 | 16,695 | $3,876,847,000 |
| 2020 | 18,392 | 17,473 | $3,997,176,000 |

We combined the above cost numbers with the carryover balances in the 2016 and 2019 proposed fee rules to estimate actual fee revenues. Since neither the proposed rule nor the Congressional Justification provide the public with a clear methodology for calculating actual revenues, we assumed that actual fee revenue within a given year equals that year's actual budget, plus end-of-year carryover, minus prior-year carryover.

**Table 2. Estimated Actual Revenue from USCIS User Fees (IEFA Non-Premium)**

| Fiscal Year | Prior-year carryover | Budget | End-of-year carryover | Actual revenue (est.) |
|---:|---|---|---|---|
| 2014 | $990,000,000 | $2,996,900,000 | $734,000,000 | $2,740,900,000 |
| 2015 | $734,000,000 | $3,112,043,000 | $542,000,000 | $2,920,043,000 |
| 2016 | $542,000,000 | $3,167,729,000 | $300,600,000 | $2,926,329,000 |
| 2017 | $300,600,000 | $3,424,521,000 | $789,700,000 | $3,913,621,000 |
| 2018 | $789,700,000 | $3,625,593,000 | $801,500,000 | $3,637,393,000 |
| 2019 | $801,500,000 | $3,876,847,000 | [not available] | [not available] |

We then placed these actual budget numbers alongside the projections in the current and prior fee rule proposals.

12

**Table 3. Comparison of 2016 fee rule projections vs. estimated actual budget numbers (IEFA Non-Premium)**

| Cost projections | Fee rule numbers | Actual numbers | Difference |
|---|---|---|---|
| | | | |
| | | | |
| Total FY 2015 Adjusted IEFA Budget | $2,863,889,000 | $3,112,043,000 | -$248,154,000 |
| Plus: Pay Inflation and Promotions/Within Grade Increases | $130,092,000 | | |
| Plus: Net Additional Costs | $137,381,000 | | |
| Less: Spending Adjustments | -$122,338,000 | | |
| Plus: Transfer to ICE | N/A | | |
| Total FY 2016 Adjusted IEFA Budget | $3,009,024,000 | $3,167,729,000 | -$158,705,000 |
| Plus: Pay Inflation and Promotions/Within Grade Increases | $38,072,000 | | |
| Plus: Net Additional Costs | $19,452,000 | | |
| Total FY 2017 Adjusted IEFA Budget | $3,066,548,000 | $3,424,521,000 | -$357,973,000 |
| **FY 2016/2017 Average Non-Premium Budget** | **$3,037,786,000** | **$3,296,125,000** | **-$258,339,000** |
| | | | |
| | | | |
| **Revenue projections** | | | |
| FY 2016 (based on June 2013—May 2014) | $2,507,683,000 | $2,926,329,000 | $418,646,000 |
| FY 2017 (based on June 2013—May 2014) | $2,448,596,000 | $3,913,621,000 | $1,465,025,000 |
| **FY 2016/2017 average** | **$2,478,139,500** | **$3,419,975,000** | **$941,835,500** |
| | | | |
| **Average difference** | **-$559,646,500** | **$123,850,000** | **$683,496,500** |

*Note that FY 2017 is when the 2016 fee schedule kicked in, yielding significantly greater revenues.*

**Table 4. Comparison of 2019 proposed fee rule projections vs. estimated actual budget numbers (IEFA Non-Premium)**

| Cost projections | Fee rule numbers | Actual numbers | Difference |
|---|---|---|---|
| Total Base FY 2018 IEFA Non-Premium Budget | $3,585,600,000 | | |
| Plus: Spending Adjustments | $217,200,000 | | |
| Total Adjusted FY 2018 IEFA Non-Premium Budget | $3,802,800,000 | $3,625,593,000 | $177,207,000 |
| Plus: Pay Inflation and Promotions/Within Grade Increases | $280,200,000 | | |
| Plus: Net Additional Costs | $267,500,000 | | |
| Less: Spending Adjustments | $0 | | |
| Plus: Transfer to ICE | $207,600,000 | | |
| Total Adjusted FY 2019 IEFA Non-Premium Budget | $4,558,100,000 | $3,876,847,000 | $681,253,000 |
| Plus: Pay Inflation and Promotions/Within Grade Increases | $218,600,000 | | |
| Plus: Net Additional Costs | $6,200,000 | | |
| Total Adjusted FY 2020 IEFA Non-Premium Budget | $4,782,900,000 | $3,997,176,000 | $785,724,000 |
| **FY 2019/2020 Average Non-Premium Budget** | **$4,670,500,000** | **$3,937,011,500** | **$733,488,500** |
| | | | |
| | | | |
| **Revenue projections** | | | |
| FY 2019 (based on June 2016—May 2017) | $3,408,200,000 | [not available] | |
| FY 2020 (based on June 2016—May 2017) | $3,408,200,000 | [not available] | |
| **FY 2019/2020 average** | **$3,408,200,000** | | |
| | | | |
| **Average difference** | **-$1,262,300,000** | | |

This above tables raise several issues that USCIS must explain to the public:

- In the 2016 fee rule, it appears that USCIS underestimated its actual costs for FY 2016 and 2017, by an annualized average of $258 million. In the 2019 proposed fee rule, on the other hand, it appears that USCIS *overestimated* its actual costs for FY 2019 and 2020, by an average of $733 million. Why is there so much greater imprecision in the 2019 proposed rule compared with the prior 2016 fee rule?

- Given that USCIS appears to have spent less than it anticipated needing in FY 2018 ($177 million), FY 2019 ($681 million), and FY 2020 ($786 million), why does the agency still need to recover these sums from future users?

- In the 2016 fee rule, USCIS presented somewhat different revenue projections for FY 2016 ($2.507 billion) compared with FY 2017 ($2.449 billion), which suggests some work to estimate changing trends in volume. In the 2019 fee rule, however, USCIS presents the same revenue projection for both FY 2019 and 2020 ($3.408 billion), which suggests less effort than in the prior fee rule. As USCIS officials have stated in testimony before Congress, the agency expects application volume (and therefore revenue) to increase in an election year. Why is this expectation reflected in revenue projections for the prior 2016 fee rule but not the current 2019 proposed rule?

## Projected costs do not match the agency's own official budget justification to Congress

USCIS appears to be reporting one set of numbers to the public in its proposed fee rule, and a different set of numbers to Congress (and the public) in its Congressional Justifications accompanying the president's annual budget proposals.

Boundless pieced together the table below based on numbers in all available documents, including the FY 2021 Congressional Justification—which only happened to be released today, the deadline for public comments.

**Table 5. Fee revenues requested in budget proposal vs. requested in fee rule**

| Fiscal year | Budget proposal | | | Fee rule | |
| | IEFA Non-Premium | Extra for ICE | Total Requested | Total Requested | Difference |
|---|---|---|---|---|---|
| FY 2019 (released Feb. 2018) | $3,881,927,000 | $207,600,000 | $4,089,527,000 | $4,558,100,000 | $468,573,000 |
| FY 2020 (released Mar. 2019) | $3,997,176,000 | $207,600,000 | $4,204,776,000 | $4,782,900,000 | $578,124,000 |
| FY 2021 (released Feb. 2020) | $4,195,259,000 | $112,300,000 | $4,307,559,000 | N/A | N/A |

In the proposed fee rule, USCIS is claiming that it needs $489–578 million more in FY 2019 and 2020, respectively, than it claimed it would need in its budget justifications to Congress for those same years.

Even the agency's just-released budget justification for FY 2021 anticipates lower needs ($4.31 billion) than the total average annual fees demanded in the proposed fee rule ($4.67 billion).

USCIS provides no explanation to the public for this significant disparity. Why is the agency proposing to require its users to pay higher fees than its own idealized budget would demand?

## Without evidence, USCIS cannot assert any budget it chooses

There is an especially great burden on USCIS to disclose a full and transparent accounting for why it requires an average annual budget of $4.67 billion, since even if the agency turns out to require only a smaller amount of fee revenue, that full $4.67 billion will still be recovered from future users in the form of (needlessly) higher fees. The role of the agency's cost-modeling software is simply to accept this number as a received truth and allocate it among all of the various form types.

In theory, USCIS could project an annual average budget of $10 billion or $100 billion, with a comparably gigantic overshoot of actual agency needs, resulting in even more extraordinary fee hikes on future users. If these budget needs fail to materialize, future users will be stuck footing the bill for an imaginary deficit.

Unfortunately, the proposed rule does not provide the public with credible assurances that USCIS is not pursuing this kind of absurd and unfair outcome. USCIS provides almost no explanation for why it is projecting such high costs—especially when the agency's *actual* costs in FY 2018, 2019, and 2020 were so much lower than its own projections.

## USCIS proposes a staffing surge with no adequate justification

As noted above, the proposed rule's supplemental materials do include a staffing forecast "based on projected workload and the existing cost baseline," but this raises more questions than it answers. Again, the following table comes from the Fee Review Supporting Documentation:

**APPENDIX VII – AUTHORIZED IEFA POSITIONS BY USCIS OFFICE**

USCIS forecasts staffing and costs based on projected workload and the existing cost baseline. The table below compared FY 2016/2017 fee rule staffing to the staffing levels in the FY 2019/2020 fee review.

**Appendix Table 6: IEFA Positions by Office**

| Directorate | FY 2016/2017 Positions | FY 2019/2020 Positions | Difference | % Difference |
|---|---|---|---|---|
| Field Operations Directorate | 5,946 | 7,305 | 1,359 | 23% |
| Fraud Detection and National Security Directorate | 920 | 1,918 | 998 | 108% |
| Refugee Asylum and International Operations Directorate | 1,648 | 2,147 | 499 | 30% |
| Service Center Operations Directorate | 2,866 | 5,579 | 2,713 | 95% |
| Other Offices (External Affairs, Immigration Records and Identity Services, Management, etc.) | 3,163 | 4,009 | 846 | 27% |
| **USCIS Total** | **14,543** | **20,958** | **6,415** | **44%** |

The *actual* number of "IEFA Positions" in FY 2016/2017 was not far off from the projection in the 2016 fee rule: 14,859 actual positions when averaging the actual budget numbers for those two years (see Table 1 above), compared with 14,543 projected positions.

The actual number of positions for FY 2019 was 17,573, and for FY2020 was 18,392, for an average of 17,983 (again, see Table 1 above). These actual numbers are approaching the projection provided by USCIS above, even though USCIS has not yet imposed higher fees to drive this kind of staffing surge.

The proposed rule provides almost no justification for this staffing surge, even though this is one fundamental reason why such a dramatic fee hike is deemed necessary by USCIS. Why is a 44% increase in positions necessary, let alone a doubling of positions within the Fraud Detection and National Security Directorate and the Service Center Operations Directorate? The public is left completely in the dark.

Moreover, because DHS's annual Congressional Justifications do not differentiate among all of the directorates in the above table, it is impossible for the public to know how many positions there were at FDNS, Field Operations, etc. for any prior years. USCIS should at the very least provide the public with a version of the above table that goes back 10 years, broken down by directorate, and using *actual* staffing numbers for each fiscal year.

Based on all available evidence, the proposed fee rule is making invalid projections about agency costs (higher than reality) and revenues (lower than reality), in order to create an illusory budget deficit that "justifies" higher fees across the board.


## The Proposed Rule Uses Opaque and Invalid Volume Projections

As noted in our first public comment, the proposed rule does not provide the public with adequate data on how USCIS projects future volume—an essential foundation for justifying fee increases. The proposed rule merely asserts various generalizations, such as, "This additional staffing requirement reflects the facts that it takes USCIS longer to adjudicate many workloads than was planned for in the FY 2016/2017 fee rule and that workload volumes, particularly for work types that do not currently generate fee revenue, have grown."

Unfortunately, our Feb. 3, 2020 meeting with USCIS did not provide further illumination. Neither we nor any other public commenters have any of the information necessary to determine how the USCIS "Volume Projection Committee" takes one year's worth of volume data and makes a valid projection into future years.

The agency's apparent failure to account for such factors as election-year volume surges, pre-hike volume surges, and post-hike volume drop-offs suggests that the methodology is flawed in ways that the public cannot adequately assess.

## The Proposed Rule Uses Opaque and Invalid Cost Modeling

Neither the proposed rule nor the Feb. 3, 2020 meeting with USCIS provided sufficient detail as to why the agency is projecting significantly higher costs for a number of individual form types. The burden is on USCIS to explain to the public why it forecasts the need for such higher fees, when recent developments within the agency would presumably put *downward* pressure on costs.

As listed in our first public comment, such developments include:

- Increased rates of eProcessing (now a significant and growing percentage of N-400 filings among other forms)
- "Efficiency gains resulting from information technology investments and process improvements" (as articulated in the 2016 fee rule)
- System Assisted Processing (i.e. electronic pre-adjudication)
- InfoMod (i.e. fewer user visits to field offices via InfoPass)
- Closure of international offices
- Realignment and elimination of some District offices
- Lower refugee intake

Because the proposed rule is apparently based on data from FY 2016–2017, it apparently does not take into account any of the agency's significant policy and operational changes over the past three years, leading to an erroneous fee schedule.

## USCIS Fails to Consider Less Burdensome Alternatives

Although agencies are required to consider less burdensome alternatives when developing regulations, USCIS has clearly made no such attempt in the proposed rule. The following section of the proposed rule is breathtaking in its abdication of regulatory responsibility:

> Because projected costs are higher than projected revenue, USCIS has several options to address the shortfall:
>
> 1. Reduce projected costs;
> 2. Use carryover funds or revenue from the recovery of prior year obligations; or
> 3. Adjust fees with notice and comment rulemaking.
>
> DHS believes that reducing the projected costs to equal the projected revenue would risk degrading USCIS operations funded by the IEFA.

USCIS certainly devotes hundreds of pages to the third option—hiking its fees. The agency provides at least a few pages, however cursory, to assert why it cannot pursue the second option (using carryover or recovered funds).

But USCIS utterly dismisses the first option—reducing projected costs—with the single sentence quoted above: That reducing costs "would risk degrading USCIS operations." No further explanation is given, even as costs are projected to balloon in a way that was apparently unforeseeable just three years prior.

For all our newfound information about the agency's cost-modeling process, as described in detail above, the public remains in the dark as to why USCIS is projecting higher costs. Making government work more efficiently is clearly less burdensome to users than saddling those users with higher fees. The agency's casual dismissal of this less-burdensome option is a fatal defect in the proposed rule.

## USCIS Failed to Provide the Same Information to the Entire Public

As stated above, we appreciated the opportunity to meet with USCIS representatives and view the agency's cost-modeling software. We were treated courteously and professionally by all of the OCFO representatives in attendance.

At the same time, we are concerned that none of the information we received was made available to the rest of the public for purposes of commenting on the proposed rule, which surely would have generated additional important perspectives. USCIS should have included all relevant information, both procedural and substantive, in the proposed rule to begin with.

## Conclusion

In its proposed rule, USCIS has run afoul of elementary principles of agency rulemaking. If the agency decides to move forward with this fee schedule—and it should not—it must first publish an entirely revised proposed rule that cures each of the defects described in this comment, as well as all other public comments that were submitted during both comment periods. Moreover, any such future proposed rule publication must give the public adequate time—60 continuous days at the very least—to prepare and submit comments.

# BOUNDLESS

Boundless Immigration Inc.
101 4th Ave, Suite 850
Seattle, WA 98121

February 10, 2020

Samantha Deshommes
Chief, Regulatory Coordination Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services (USCIS)
20 Massachusetts Avenue NW
Washington, DC 20529-2140

Re: DHS Docket No. USCIS-2019-0010 – Comment on Proposed Fee Rule

Dear Ms. Deshommes,

Our organizations are united in opposing the proposed fee rule from USCIS, and appreciate your attention to this joint comment in addition to the many others we have submitted, individually and collectively, during both public comment periods.

Despite its most recent reopening of the public comment period, USCIS has violated its obligation to provide the public with adequate time to review and comment on its proposed rule, proposed forms, and supplemental information.

The notice-and-comment process for this proposed rule has been unacceptably chaotic:

- Nov. 14, 2019: USCIS first publishes its proposed rule and form changes, providing 32 days for public comment on the proposed rule (deadline: Dec. 16, 2019) and 63 days for public comment on the proposed forms (deadline: Jan. 16, 2020).

- Nov. 18, 2019: USCIS finishes posting all of its proposed forms in the online regulatory docket.

- Nov. 22, 2019: USCIS removes its originally posted economic analysis from the regulatory docket and replaces it with a new economic analysis, without informing the public via any Federal Register notice. Inevitably, an uncountable number of public commenters analyzed the old economic analysis without realizing that it was obsolete.

- Dec. 9, 2019: USCIS publishes supplemental information, including an entirely different set of budget assumptions, extends time for public comment on the proposed rule (deadline: Dec. 30, 2019) and reduces time for public comment on the proposed forms (deadline: Dec. 30, 2019).

- Jan. 24, 2020: USCIS reopens the public comment period for the proposed rule and proposed forms for an additional 17 days (deadline: Feb. 10, 2020).

- Feb. 3, 2020: USCIS hosts its first (to our knowledge) demonstration of its cost-modeling software, as promised in the original proposed rule.

Executive Order 12866 states that agencies should allow "not less than 60 days" for public comment in most cases, in order to "afford the public a meaningful opportunity to comment on any proposed regulation." Executive Order 13563 states that "[t]o the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days."

The minimum standard review period under the Paperwork Reduction Act (PRA) is also 60 days (5 C.F.R § 1320.8(d)(1)).

But USCIS has not provided 60 days for public comment on *any* of the following materials, much less 60 uninterrupted, continuous days:

- Proposed rule with supplemental information: Dec. 9–30, 2019 (21 days) + Jan. 24–Feb. 10, 2020 (17 days)
- Proposed forms: Nov. 18–Dec. 30, 2019 (42 days) + Jan. 24–Feb. 10, 2020 (17 days)
- Economic analysis: N/A (no proper notice that the new version replaced the old version)
- Cost modeling software: Feb. 3–10 (7 days)

USCIS's latest 17-day comment period does not remedy the inadequacy of its notice-and-comment process, because it was not anticipated and was too short. With no advance notice of the new comment period, our ability to change our schedules and make time for a new comment letter was severely limited.

Further, with this stop-and-start approach, we could not simply pick up our work where we left off last time; we were compelled to spend time reorienting ourselves to the proposal and the areas we did not address earlier. As a result, once again, we and other members of the public have not been able to devote the time required to examine the proposal in full, identify relevant issues, consult and engage among ourselves and with others, and provide a more complete response.

During this latest comment period, as in the preceding period, we were forced by USCIS to triage among many competing demands on our time, and many critical issues in the proposed rule and related materials. We have by necessity forgone important analyses, including more detailed review of the proposed rule, the proposed forms, the cost-modeling software, and all the other extensive supplemental documentation that USCIS placed online—including additional outside research that could have shed more light on USCIS's analysis and the authorities it cites. Many of us have not been able to provide any additional comment during this new period because it is so short and discontinuous.

In other words, the combination of the first comment period and this second comment period does *not* equate to a 60-day comment period, especially when USCIS has repeatedly introduced new material, shortened one comment deadline, and given commenters no reason to anticipate or plan for the second comment period.

Notably, even one continuous 60-day period would be a modest amount of time for commenting on a proposal of this complexity. Under the Paperwork Reduction Act, commenters are generally given 60 days to comment on a single proposal to change a single form. Here, USCIS's proposal implicates 145 different form-related documents, many of which are entirely new or involve proposed substantive revisions. And USCIS has proposed those form changes in combination with complex regulatory changes, accompanied by lengthy supporting analyses that require substantial time to understand and analyze.

To be clear, USCIS should withdraw its proposed rule, for all of the reasons given by a great many public commenters to date. If USCIS seeks to move forward with any version of a fee rule proposal, it must start its comment period over entirely, allowing commenters one continuous period of 60 days—or longer—to comment on the full proposal including all relevant supplementary materials.

Sincerely,

African Communities Together
American Immigration Lawyers Association (AILA)
Arkansas Immigrant Defense
Arkansas United
Asian Americans Advancing Justice—Atlanta
Asian Americans Advancing Justice—Los Angeles
Asian Counseling & Referral Service
ASISTA
Bhutanese Community Association of Pittsburgh (BCAP)
Boundless Immigration Inc.
CASA—Maryland, Virginia, Pennsylvania
Campesinos Sin Fronteras
Catholic Legal Immigration Network, Inc. (CLINIC)
Center for Gender & Refugee Studies, University of California Hastings College of the Law
Central American Resource Center of California (CARECEN Los Angeles)
Citizenship News
Coalition for Humane Immigrant Rights (CHIRLA)
Colorado Immigrant Rights Coalition (CIRC)
Equality California
Employee Rights Center
Entre Hermanos
Families Belong Together
FWD.us
Global Cleveland
GMHC, Inc.

Greater Portland Immigrant Welcome Center
HIAS Pennsylvania
Hispanic Interest Coalition of Alabama
Illinois Coalition for Immigrant and Refugee Rights (ICIRR)
Immigrant Legal Resource Center (ILRC)
Indian Horizon of Florida
Interfaith Refugee & Immigration Service, Los Angeles
Iowa Coalition Against Domestic Violence
Irish International Immigrant Center
Maine Immigrants' Rights Coalition
Mayor Muriel Bowser, Washington, DC
Michigan United
NALEO Educational Fund
National Association of Social Workers – Texas Chapter
National Hispanic Caucus of State Legislators (NHCSL)
National Immigration Law Center (NILC)
National Korean American Service & Education Consortium (NAKASEC)
National Partnership for New Americans
New York Immigration Coalition
Long Beach Immigrant Rights Coalition
Oasis Legal Services
OCA—Greater Houston
OneAmerica
Orange County Communities Organized for Responsible Development (OCCORD)
Pennsylvania Immigration and Citizenship Coalition
Proteus Inc. California
Refugee Women's Alliance
San Joaquin College of Law – New American Legal Clinic
Self-Help for the Elderly
Service Employees International Union (SEIU)
Service Employees International Union (SEIU), Local 32BJ
Silver State Equality-Nevada
SIREN (Services, Immigrant Rights & Education Network)
South Asian Network
Southeast Asia Resource Action Center
South Carolina Appleseed Legal Justice Center
UnidosUS
United African Organization
United We Dream
World Relief

# APPENDIX D

Supplemental Statement for the Record of
Doug Rand
Senior Fellow, Federation of American Scientists

For a Hearing of the Subcommittee on Immigration and Citizenship
U.S. House Committee on the Judiciary

"Oversight of U.S. Citizenship and Immigration Services"

Wednesday, July 29, 2020
9:30am ET


*Submitted to the Subcommittee on Aug. 3, 2020 as a supplement to initial written testimony*

## Supplemental Statement for the Record

Chair Lofgren, Vice Chair Jayapal, Ranking Member Buck, and members of the Subcommittee on Immigration and Citizenship, thank you again for the honor of appearing before you on July 29, 2020 to address the oversight of U.S. Citizenship and Immigration Services (USCIS).

I submitted my first statement for the record two days prior to this hearing, per the Subcommittee's instructions. Since then, new written and oral testimony was provided to the Subcommittee by Mr. Joseph Edlow, USCIS Deputy Director for Policy, in addition to the publication of a new USCIS fee schedule.

I am submitting this supplemental statement for the record, again in my personal capacity, in order to respond to the latest assertions made by USCIS leadership.

## 1. Trump administration mismanagement and policy choices are the fundamental cause of the USCIS insolvency crisis.

During the July 29 hearing, Mr. Edlow repeated his frequent claim that the COVID-19 pandemic is solely responsible for USCIS facing its current insolvency crisis. At the same time, however, he made the following contradictory statement:

> "Prior to COVID we were operating at a deficit. Frankly we've been operating at a deficit for the last several years, but we were no way in a budget shortfall that was going to cut into our mission and potentially bring about furloughs."

If USCIS has been "operating at a deficit for the last several years," then it was in fact *inevitable* that the agency would face a budget shortfall that would "cut into our mission and potentially bring about furloughs," even under business as usual—absent a new fee rule, which by the agency's own accounting is two years overdue. USCIS was already skirting dangerously close to insolvency, and the COVID-19 pandemic only made this fiscal reckoning happen some months sooner.

## 2. The Trump administration squandered the USCIS budget surplus that it inherited from the Obama administration.

In the 2016 USCIS fee rule that was finalized on Oct. 25, 2016, USCIS projected about $2.5 billion in annual revenues and about $3 billion in annual costs, averaged between FY 2016 and FY 2017. This rule raised user fees enough to cover this anticipated deficit of about $500 million per year.

Table 3—IEFA Cost Baseline and Revenue Comparison
[Dollars in thousands]

| Fiscal year | FY 2016 | FY 2017 | FY 2016/2017 Average |
|---|---|---|---|
| Non-Premium Revenue | $2,507,683 | $2,448,596 | $2,478,139 |
| IEFA Cost Baseline | $3,009,024 | $3,066,548 | $3,037,786 |
| Difference | ($501,341) | ($617,952) | ($559,647) |

Just four years later, in the 2020 USCIS fee rule that was just finalized on Aug. 3, 2020, USCIS projected over $3.4 billion in annual revenues and about $4.4 billion in annual costs, averaged between FY 2019 and FY 2020. This rule would raise user fees high enough to cover an alleged anticipated deficit of over $1 billion per year.

Table 2: Revised IEFA Non-Premium Cost and Revenue Projections Comparison

| IEFA Non-Premium Cost and Revenue Projections Comparison | | | |
|---|---|---|---|
| Comparison | FY 2019 | FY 2020 | FY 2019/2020 Average |
| Non-Premium Revenue | $3,408,233,376 | $3,408,233,376 | $3,408,233,376 |
| Non-Premium Budget | $4,331,978,119 | $4,556,386,463 | $4,444,182,291 |
| Difference | ($923,744,743) | ($1,148,153,087) | ($1,035,948,915) |

This means that, by collecting higher fees under the Obama-era fee rule, USCIS projected nearly $1 billion more in revenues for FY 2019 ($3.4 billion) than just two years earlier in FY 2017 absent these fee increases ($2.5 billion).

Meanwhile, under Trump administration policies, USCIS projected over $1.3 billion more in costs for FY 2019 ($4.3 billion) than just two years earlier in the FY 2017 Obama-era cost projection ($3 billion).

It is abundantly clear that the Trump administration inherited a fiscally sound USCIS, but then burdened the agency with skyrocketing costs that put it on the path to insolvency well before the COVID-19 pandemic.


**3. USCIS has made highly inconsistent estimates of its budget needs.**

The new USCIS fee rule projects an average annual budget (i.e. costs) of $4.4 billion, but the DHS Congressional Budget Justification for FY 2021 tells a different story. Here USCIS informed Congress that its average *enacted* annual budget for these same two fiscal years was only $3.9 billion.

This suggests that the new USCIS fee rule will extract $500 million per year from the agency's users based on inflated budget needs alone.

**USCIS Budget in Fee Rule vs. Congressional Budget Justification**
*(IEFA Total budget minus Premium Processing budget equals IEFA Non-Premium budget.)*

|         | Fee rule projection | Enacted budget | Difference    |
|---------|---------------------|----------------|---------------|
| **FY 2019** | $4,331,978,119  | 3,876,847,000  | $455,131,119  |
| **FY 2020** | $4,556,386,463  | 3,997,176,000  | $559,210,463  |
|         |                     |                |               |
| Average | $4,444,182,291      | 3,937,011,500  | $507,170,791  |

**4. USCIS cannot justify a $1.2 billion bailout based on the far lesser revenue shortfall documented in its testimony.**

Accompanying its written testimony, USCIS provided the following chart documenting its weekly receipts (apparently based on the number of forms filed) over the past four fiscal years:



Clearly, receipts began to decline in mid-March 2020, coinciding with the temporary closure of USCIS field offices in response to the COVID-19 pandemic. Receipts began to pick up in late April, however, and were back to near-normal levels as USCIS reopened field offices in early June.

Notably, during nearly every week of FY 2020 prior to mid-March, weekly receipts were *higher* than during the same week in FY 2019. This presumably would have generated surplus cash, making it easier for USCIS to absorb the temporary decline in receipts that ensued between March and June.

How much surplus cash? While USCIS does not provide this highly relevant information, we can estimate revenues based on an average revenue per customer of $507 in FY2019.[1] The following table uses the weekly receipts data from the above USCIS chart, and multiplies these receipts by $507 to estimate both weekly and cumulative revenues.

- As of the third week of March 2020, weekly receipts were still higher than the same week during 2019, and USCIS had generated approximately $138 million in extra cumulative revenue since the start of the fiscal year.

- Starting with the fourth week of March 2020 through the third week of June 2020, weekly receipts were lower than the same period during 2019, and USCIS accumulated approximately $252 million less in revenues.

- We can only extrapolate from the fourth week of June 2020 until the end of September 2020 (the conclusion of FY 2020), but if weekly receipts remain only 4.8% below last year's level, then USCIS will have accumulated approximately $303 million less in revenues than during mid-March through September 2019. (If one assumes an average 10% shortfall in weekly receipts, the accumulated revenue shortfall only increases to $357 million.)

Therefore, even setting aside the prior cash surplus that USCIS had at the onset of the COVID-19 pandemic and the closure of USCIS field offices in mid-March, the expected cumulative revenue shortfall between mid-March and September is only about $300-350 million—far less than the $1.2 billion bailout that USCIS first demanded in May, reiterated in late June, and has not adjusted even now.

This Subcommittee deserves a full reckoning from the Trump administration as to why its demand for $1.2 billion has not been modified downward in light of new—and better than anticipated—receipts and revenue data.

---

[1] Doug Rand & Lindsay Milliken, *The Case of the Insolvent Federal Agency: A Forensic Analysis of Public Data on U.S. Citizenship & Immigration Services*, N.Y.U. J. Legis. & Pub. Pol'y Quorum (2020).

## USCIS Weekly Form Volume and Estimated Revenues

*(Highlighted cells are extrapolated based on an observed 4.8% shortfall as of late June 2020.)*

| Month | 2017 Weekly | 2017 Cumulative | 2018 Weekly | 2018 Cumulative | 2019 #forms received Weekly | 2019 #forms received Cumulative | 2019 Est. revenue $ Weekly | 2019 Est. revenue $ Cumulative | 2020 #forms received Weekly | 2020 #forms received Cumulative | 2020 Est. revenue $ Weekly | 2020 Est. revenue $ Cumulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct | 137,697 | 137,697 | 159,839 | 159,839 | 134,028 | 134,028 | $67,952,196 | $67,952,196 | 156,291 | 156,291 | $79,239,537 | $79,239,537 |
| Oct | 127,315 | 265,011 | 120,384 | 280,224 | 153,156 | 287,184 | $77,650,092 | $145,602,288 | 150,503 | 306,794 | $76,305,021 | $155,544,558 |
| Oct | 155,336 | 420,347 | 126,965 | 407,189 | 140,585 | 427,769 | $71,276,595 | $216,878,883 | 143,493 | 450,287 | $72,750,951 | $228,295,509 |
| Oct | 161,081 | 581,427 | 120,974 | 528,163 | 133,037 | 560,806 | $67,449,759 | $284,328,642 | 162,430 | 612,717 | $82,352,010 | $310,647,519 |
| Nov | 158,328 | 739,755 | 135,313 | 663,476 | 148,380 | 709,186 | $75,228,660 | $359,557,302 | 156,713 | 769,430 | $79,453,491 | $390,101,010 |
| Nov | 146,096 | 885,852 | 120,406 | 783,882 | 140,836 | 850,022 | $71,403,852 | $430,961,154 | 170,605 | 940,035 | $86,496,735 | $476,597,745 |
| Nov | 172,944 | 1,058,796 | 127,065 | 910,947 | 120,706 | 970,728 | $61,197,942 | $492,159,096 | 135,247 | 1,075,282 | $68,570,229 | $545,167,974 |
| Nov | 143,564 | 1,202,360 | 110,279 | 1,021,226 | 127,570 | 1,098,298 | $64,677,990 | $556,837,086 | 159,641 | 1,234,923 | $80,937,987 | $626,105,961 |
| Dec | 178,823 | 1,381,183 | 115,517 | 1,136,743 | 130,336 | 1,228,634 | $66,080,352 | $622,917,438 | 116,934 | 1,351,857 | $59,285,538 | $685,391,499 |
| Dec | 199,359 | 1,580,543 | 124,253 | 1,260,996 | 119,212 | 1,347,846 | $60,440,484 | $683,357,922 | 142,946 | 1,494,803 | $72,473,622 | $757,865,121 |
| Dec | 200,960 | 1,781,503 | 119,719 | 1,380,715 | 136,829 | 1,484,675 | $69,372,303 | $752,730,225 | 134,552 | 1,629,355 | $68,217,864 | $826,082,985 |
| Dec | 187,021 | 1,968,524 | 119,978 | 1,500,693 | 137,460 | 1,622,135 | $69,692,220 | $822,422,445 | 147,046 | 1,776,401 | $74,552,322 | $900,635,307 |
| Dec | 130,805 | 2,099,329 | 104,628 | 1,605,321 | 100,561 | 1,722,696 | $50,984,427 | $873,406,872 | 109,917 | 1,886,318 | $55,727,919 | $956,363,226 |
| Jan | 140,653 | 2,239,982 | 100,936 | 1,706,277 | 110,312 | 1,833,008 | $55,928,184 | $929,335,056 | 125,045 | 2,011,363 | $63,397,815 | $1,019,761,041 |
| Jan | 164,097 | 2,404,078 | 132,762 | 1,839,039 | 122,216 | 1,955,224 | $61,963,512 | $991,298,568 | 148,229 | 2,159,592 | $75,152,103 | $1,094,913,144 |
| Jan | 163,649 | 2,567,727 | 115,022 | 1,954,061 | 142,539 | 2,097,763 | $72,267,273 | $1,063,565,841 | 142,335 | 2,301,927 | $72,163,845 | $1,167,076,989 |
| Jan | 165,046 | 2,732,773 | 166,257 | 2,120,318 | 122,433 | 2,220,196 | $62,073,531 | $1,125,639,372 | 128,991 | 2,430,918 | $65,398,437 | $1,232,475,426 |
| Feb | 170,124 | 2,902,898 | 207,857 | 2,328,175 | 155,168 | 2,375,364 | $78,670,176 | $1,204,309,548 | 154,687 | 2,585,605 | $78,426,309 | $1,310,901,735 |
| Feb | 156,947 | 3,059,845 | 189,293 | 2,517,468 | 139,987 | 2,515,351 | $70,973,409 | $1,275,282,957 | 150,691 | 2,736,296 | $76,400,337 | $1,387,302,072 |
| Feb | 167,148 | 3,226,993 | 217,400 | 2,734,868 | 146,563 | 2,661,914 | $74,307,441 | $1,349,590,398 | 148,581 | 2,884,877 | $75,330,567 | $1,462,632,639 |
| Feb | 154,937 | 3,381,930 | 185,514 | 2,920,382 | 122,186 | 2,784,100 | $61,948,302 | $1,411,538,700 | 133,949 | 3,018,826 | $67,912,143 | $1,530,544,782 |
| Mar | 187,118 | 3,569,048 | 203,759 | 3,124,141 | 161,754 | 2,945,854 | $82,009,278 | $1,493,547,978 | 174,999 | 3,193,825 | $88,724,493 | $1,619,269,275 |
| Mar | 189,072 | 3,758,120 | 198,235 | 3,322,376 | 161,355 | 3,107,209 | $81,806,985 | $1,575,354,963 | 175,782 | 3,369,607 | $89,121,474 | $1,708,390,749 |
| Mar | 183,522 | 3,941,642 | 190,432 | 3,512,808 | 156,730 | 3,263,939 | $79,462,110 | $1,654,817,073 | 166,863 | 3,536,470 | $84,599,541 | $1,792,990,290 |
| Mar | 188,121 | 4,129,763 | 185,665 | 3,698,473 | 161,302 | 3,425,241 | $81,780,114 | $1,736,597,187 | 152,414 | 3,688,884 | $77,273,898 | $1,870,264,188 |
| Mar | 189,872 | 4,319,635 | 169,842 | 3,868,315 | 160,745 | 3,585,986 | $81,497,715 | $1,818,094,902 | 113,664 | 3,802,548 | $57,627,648 | $1,927,891,836 |
| Apr | 172,338 | 4,491,972 | 157,076 | 4,025,391 | 162,381 | 3,748,367 | $82,327,167 | $1,900,422,069 | 108,875 | 3,911,423 | $55,199,625 | $1,983,091,461 |
| Apr | 189,435 | 4,681,407 | 168,328 | 4,193,719 | 164,745 | 3,913,112 | $83,525,715 | $1,983,947,784 | 113,817 | 4,025,240 | $57,705,219 | $2,040,796,680 |
| Apr | 196,523 | 4,877,929 | 181,264 | 4,374,983 | 165,647 | 4,078,759 | $83,983,029 | $2,067,930,813 | 103,160 | 4,128,400 | $52,302,120 | $2,093,098,800 |
| Apr | 199,424 | 5,077,353 | 178,115 | 4,553,098 | 175,218 | 4,253,977 | $88,835,526 | $2,156,766,339 | 117,087 | 4,245,487 | $59,363,109 | $2,152,461,909 |
| May | 180,010 | 5,257,362 | 176,415 | 4,729,513 | 181,759 | 4,435,736 | $92,151,813 | $2,248,918,152 | 124,657 | 4,370,144 | $63,201,099 | $2,215,663,008 |
| May | 158,291 | 5,415,653 | 180,865 | 4,910,378 | 177,508 | 4,613,244 | $89,996,556 | $2,338,914,708 | 121,527 | 4,491,671 | $61,614,189 | $2,277,277,197 |
| May | 160,264 | 5,575,917 | 157,598 | 5,067,976 | 162,630 | 4,775,874 | $82,453,410 | $2,421,368,118 | 133,709 | 4,625,380 | $67,790,463 | $2,345,067,660 |
| May | 165,381 | 5,741,298 | 148,840 | 5,216,816 | 163,366 | 4,939,240 | $82,826,562 | $2,504,194,680 | 129,383 | 4,754,763 | $65,597,181 | $2,410,664,841 |
| Jun | 138,758 | 5,880,055 | 121,031 | 5,337,847 | 131,330 | 5,070,570 | $66,584,310 | $2,570,778,990 | 112,914 | 4,867,677 | $57,247,398 | $2,467,912,239 |
| Jun | 166,415 | 6,046,470 | 145,171 | 5,483,018 | 147,616 | 5,218,186 | $74,841,312 | $2,645,620,302 | 139,947 | 5,007,624 | $70,953,129 | $2,538,865,368 |
| Jun | 160,387 | 6,206,857 | 151,249 | 5,634,267 | 145,931 | 5,364,117 | $73,987,017 | $2,719,607,319 | 139,194 | 5,146,818 | $70,571,358 | $2,609,436,726 |
| Jun | 161,402 | 6,368,259 | 150,364 | 5,784,631 | 150,045 | 5,514,162 | $76,072,815 | $2,795,680,134 | 142,775 | 5,289,593 | $72,386,925 | $2,681,823,651 |
| Jun | 154,447 | 6,522,706 | 154,671 | 5,939,302 | 152,658 | 5,666,820 | $77,397,606 | $2,873,077,740 | 145,261 | 5,434,854 | $73,647,527 | $2,755,471,178 |
| Jul | 139,071 | 6,661,777 | 134,004 | 6,073,306 | 125,461 | 5,792,281 | $63,608,727 | $2,936,686,467 | 119,382 | 5,554,237 | $60,526,749 | $2,815,997,927 |
| Jul | 157,705 | 6,819,481 | 146,953 | 6,220,259 | 152,319 | 5,944,600 | $77,225,733 | $3,013,912,200 | 144,939 | 5,699,175 | $73,483,982 | $2,889,481,908 |
| Jul | 159,781 | 6,979,262 | 148,503 | 6,368,762 | 148,442 | 6,093,042 | $75,260,094 | $3,089,172,294 | 141,250 | 5,840,425 | $71,613,582 | $2,961,095,490 |
| Jul | 150,898 | 7,130,159 | 137,590 | 6,506,352 | 151,799 | 6,244,841 | $76,962,093 | $3,166,134,387 | 144,444 | 5,984,869 | $73,233,116 | $3,034,328,606 |
| Aug | 159,730 | 7,289,889 | 143,173 | 6,649,525 | 156,289 | 6,401,130 | $79,238,523 | $3,245,372,910 | 148,716 | 6,133,586 | $75,399,248 | $3,109,727,854 |
| Aug | 151,894 | 7,441,783 | 166,195 | 6,815,720 | 162,427 | 6,563,557 | $82,350,489 | $3,327,723,399 | 154,557 | 6,288,143 | $78,360,432 | $3,188,088,286 |
| Aug | 151,043 | 7,592,826 | 114,418 | 6,970,138 | 157,525 | 6,721,082 | $79,865,175 | $3,407,588,574 | 149,893 | 6,438,035 | $75,995,537 | $3,264,083,823 |
| Aug | 143,752 | 7,736,578 | 146,960 | 7,117,098 | 148,072 | 6,869,154 | $75,072,504 | $3,482,661,078 | 140,898 | 6,578,933 | $71,435,081 | $3,335,518,904 |
| Aug/Se | 146,189 | 7,882,767 | 145,136 | 7,262,234 | 141,368 | 7,010,522 | $71,673,576 | $3,554,334,654 | 134,518 | 6,713,451 | $68,200,839 | $3,403,719,743 |
| Sept | 119,388 | 8,002,155 | 119,725 | 7,381,959 | 126,564 | 7,137,086 | $64,167,948 | $3,618,502,602 | 120,432 | 6,833,883 | $61,058,874 | $3,464,778,617 |
| Sept | 112,900 | 8,115,055 | 151,692 | 7,533,651 | 148,993 | 7,286,079 | $75,539,451 | $3,694,042,053 | 141,774 | 6,975,657 | $71,879,404 | $3,536,658,021 |
| Sept | 160,190 | 8,275,244 | 138,118 | 7,671,769 | 145,895 | 7,431,974 | $73,968,765 | $3,768,010,818 | 138,826 | 7,114,483 | $70,384,821 | $3,607,042,841 |
| Sept | 155,509 | 8,430,753 | 115,594 | 7,787,363 | 151,538 | 7,583,512 | $76,829,766 | $3,844,840,584 | 144,196 | 7,258,679 | $73,107,200 | $3,680,150,041 |

(Note: According to a recently released USCIS report,[2] non-premium IEFA revenues were $3,318,000,000 in FY 2019. Combined with total annual receipt volume of 7,650,127 drawn from the FY 2021 Congressional budget justification, this suggests an average revenue per user of $434. If this average is correct, rather than the $507 average used above, then USCIS experienced an even *smaller* revenue shortfall—$216 million—between the fourth week of March 2020 through the third week of June 2020.)

---

[2] U.S. Citizenship and Immigration Services. *Immigration Examinations Fee Account: Statement of Financial Condition, Fiscal Year 2019 Report to Congress* (June 23, 2020).

**5. USCIS must be transparent with Congress about its transfer of resources internally and to other agencies.**

In his response to questioning at the July 29 hearing, Mr. Edlow stated that "[p]utting a lot of our officers dealing with credible fear cases along the southern border, that has pulled away from our ability to handle some of the backlog in the affirmative asylum cases."

USCIS has not been fully transparent about any of the following matters:

- How many USCIS officers, and from which directorates, have been transferred to the southern border to conduct credible fear interviews, what staff outside of USCIS has been tasked with performing these functions, and what were the associated costs?

- How long were these officers transferred before returning to their usual lines of work?

- Which case backlogs and processing times were affected by these transfers, and to what precise extent?

Mr. Edlow also stated, "My understanding is that there has not been a single dollar transferred from USCIS to ICE in at least the last two fiscal years, if not before that too," and further, "I do not believe any money has been transferred to ICE for the hiring of any agents or for any other purposes."

These statements do not inspire confidence. USCIS must be completely forthcoming and unequivocal with the Subcommittee about whether *any* USCIS funds *or* other resources have been transferred to or otherwise used by ICE or CBP since the first day of the Trump administration, including any reimbursable agreements with such agencies for any core mission work performed.

**6. There is ample evidence that the Trump administration's policies have caused a reduction in USCIS revenues.**

The USCIS testimony includes a highly misleading chart intended to rebut criticism that Trump administration policies have driven a decline in revenue:

> "Importantly, there are no data or evidence to suggest that the Administration's policies have caused a significant reduction in revenue. In fact, the chart below depicts relatively flat revenue from FY 2017 – FY 2020 (note: FY 2020 revenue is pre-COVID-19 estimate):"

7



The above chart directly contradicts prior data provided by USCIS to Congress and to the public, and raises several important questions:

1) This chart appears to present *total* Immigration Examinations Fee Account (IEFA) revenue, instead of isolating only *non-premium* IEFA revenue. (According to a recent USCIS report to Congress, total FY 2019 IEFA revenue collections were $3,896,000,000—$3,318,000,000 non-premium and $578,000,000 premium.) Premium IEFA revenue is largely at the discretion of USCIS, which frequently (and unpredictably) turns its Premium Processing service on and off. Therefore only non-premium IEFA collections are relevant to whether administration policies have resulted in a decline in revenue. Why is USCIS presenting the Subcommittee with data that cannot establish a valid trendline?

2) "Flat" revenues are nothing to brag about if USCIS revenues would have been even higher absent adverse administration policies. Has USCIS made any attempt to model the impact of administration policies on revenues, either before or since enactment?

3) Does the USCIS FY 2020 revenue estimate include the projected effects of President Trump's April and June Proclamations that will dramatically reduce application volume for the remainder of the fiscal year, across a wide range of immigrant and nonimmigrant visa categories?

4) There does exist, in fact, "data or evidence to suggest that the Administration's policies have caused a significant reduction in revenue." For example, as documented in a study of 182 USCIS policies from DHS Watch, since the first year of the Trump administration, USCIS has lost almost $600 million annually in fees from the highest-volume forms (N-400: Naturalization; I-765: Employment Authorization; I-485: Adjustment of Status; I-90: Replacement of Permanent Resident Card; I-130: Petition for Alien Relative; and I-129: Petition for Nonimmigrant Worker). How does USCIS respond to this specific data-driven evidence?

Indeed, there is additional evidence that, contrary to the USCIS testimony, agency revenues have suffered due to Trump administration policies. To account for variables beyond the administration's direct control over revenue, the following form types are excluded in the table below:

- N-400 (naturalization applications) and I-130 (family green card sponsorships): These forms likely increased in volume *in anticipation* of adverse policies, even prior to January 2017, based on a general uneasiness about future changes in the immigration system.
- I-765 (work authorization applications): These forms follow an erratic pattern that may be an artifact of internal USCIS accounting changes.
- I-589 (asylum applications): While asylum applications have certainly decreased, this does not affect revenue because these forms do not (at present) require a fee.

Excluding all of the above form types, and summing up all other forms provided by USCIS in its quarterly reports, a clear trend emerges: By FY19, form receipts—and likely revenue as well—were well below FY15 and FY16 levels.

**USCIS Form Receipts (excluding N-400, I-130, I-765, and I-589)**

| FY15 | FY16 | FY17 | FY18 | FY19 |
|---|---|---|---|---|
| 3,993,413 | 4,010,356 | 4,171,834 | 4,000,362 | 3,788,080 |

(Note that FY 2017 includes Oct. 2016 through Jan. 2017, prior to the Trump administration.)

USCIS must provide the Subcommittee with an honest and thorough explanation of such trends, not simply wave them away.


**7. The Trump administration is treating USCIS employees with barely-concealed apathy or worse.**

It is surely difficult for career USCIS employees, now threatened with furloughs or even layoffs through no fault of their own, to read the following passage from Mr. Edlow's testimony:

"Nothing is more important to me than the men and women of USCIS who continue to perform our agency's critical mission. They have successfully adjusted to doing business in the unprecedented times of this pandemic, but they now face this financial uncertainty, which is beyond their control. The dedication and commitment of the USCIS workforce is inspiring, and the agency has achieved numerous accomplishments over the past few fiscal years because of their tireless efforts. I am committed to working with you to avert catastrophic furloughs."

If USCIS employees are so valued, why did USCIS leadership provide them with so little transparency about furlough plans?

In May, an agency spokesperson told the press that furloughs would begin "on approximately July 20." Furlough notices did not go out until late June, with a furlough start date of Aug. 3. In late July, the furlough start date was extended to Aug. 30, following pressure from Congress that the agency had sufficient balances to fully fund its workforce for at least another month, if not into fiscal year 2021.

Moreover, why is the furlough date still set at Aug. 30, when the agency's own data—provided to this Subcommittee as part of the USCIS testimony, as described in detail above—show that revenues are back up to near-average levels since early June?

Since May, USCIS employees have been scrambling to find alternative employment, and many have been forced to consider raiding their own retirement accounts.

This is no way to treat people whom USCIS leadership allegedly admires and is committed to helping.


**8. USCIS case completion volume reveals nothing about the metrics that actually matter to the agency's users.**

In its written testimony to the Subcommittee, USCIS leadership trumpeted the following statistic, and not for the first (or last) time:

"In FY 2019, USCIS naturalized 834,000 new U.S. citizens, an 11-year high."

While this may be so, the following is also true about FY 2019:

- USCIS ended the year with a backlog of over 647,000 naturalization applications, which would have been a 12-year high—but for the prior two years of the Trump administration, which were even worse.

- The average 10-month processing time was twice as long as compared to FY 2016.

- In some parts of the country, people were forced to wait well over two years for their naturalization applications to be processed.

(For source data, see the 2020 State of New American Citizenship Report from Boundless.)


USCIS also attempted to impress the Subcommittee with these data points in its testimony:

"[In FY 2019,] USCIS granted lawful permanent residence to nearly 577,000 individuals and processed more than 2.1 million employment authorization applications. We also verified more than 40 million new hires through E-Verify."

This may be so, but the average processing times for many permanent residence applications are nearly double what they were in 2016, while the processing time for employment authorization is up 73%.

Nobody who depends on USCIS is enthusiastic about how many applications the agency has processed, *unless it's enough to bring down backlogs and wait times.*

## 9. USCIS is heedlessly disenfranchising future Americans.

In both written and oral testimony to this Subcommittee, USCIS leadership sought accolades for administering the oath of citizenship to all 110,000 individuals who had only this last step left at the moment that field offices temporarily closed in late March.

While this is certainly a welcome development, USCIS has made no mention of the estimated 315,000 naturalization applicants who would normally have become citizens in time for the general election but have not yet been *interviewed*.

It does not inspire confidence that USCIS secretly suspended green card application processing between April and June, and only resumed once Congress and the press caught on.

USCIS must inform this Subcommittee how it plans to deal with this looming naturalization crisis of its own making. Mr. Edlow stated in his oral testimony that catching up on naturalization interviews "will take some time." This is an unacceptably vague and noncommittal response.

Unless USCIS immediately expedites naturalization interviews and administers same-day or remote oath ceremonies, then by the time most state voter registration deadlines occur in October, these 315,000 citizenship applicants — some of whom have been in line for nearly two years — will be effectively disenfranchised.

## 10. USCIS has no legitimate reason to refrain from conducting naturalization interviews and oath ceremonies remotely.

The USCIS testimony states:

"In March, we temporarily paused in-person services to mitigate the spread of COVID-19. USCIS continued to conduct limited naturalization ceremonies, taking precautions to prevent the spread of COVID-19. USCIS used innovative strategies to conduct these ceremonies in a manner that ensured the safety of our employees and the public while also in full compliance with statutory and regulatory requirements."

This evades the urgent question of why USCIS leadership still refuses to even contemplate remote oath ceremonies, let alone naturalization interviews. Nearly every other business, nonprofit, and government entity has adapted to the COVID-19 pandemic by using virtual

meeting technology. Indeed, it is currently possible to appear in a federal court hearing, take the oath of office for a Trump administration political position, or be evicted from one's home through an online videoconference.

Yet USCIS refuses to implement a remote solution for the 40-second naturalization oath ceremony, claiming that such ceremonies would run afoul of statute, regulation, and logistical hurdles. The Immigrant Legal Resource Center (ILRC) has comprehensively demonstrated that all such claims by USCIS leadership are false.

In light of these facts, it is astonishing that USCIS further states in its testimony:

> "Further, to facilitate the reopening of in-person services at asylum offices in June 2020 while protecting applicant and employee safety during the ongoing COVID-19 pandemic, USCIS began conducting video-facilitated asylum interviews using available technology, including mobile devices provided by USCIS, to ensure that the asylum officer, applicant, interpreter, and representative can fully and safely participate in the interview while maintaining social distancing."

If USCIS can conduct video-facilitated asylum interviews in an office environment, why can't naturalization applicants and USCIS officers do the same thing from the safety of their own respective homes?


## 11. The Trump administration has severely damaged the integrity of our nation's immigration system.

Echoing frequent claims by Trump administration officials, the USCIS testimony states that "USCIS plays a key role in safeguarding our nation's immigration system and ensuring that only those who are eligible for a benefit receive one."

Nowhere does USCIS leadership emphasize the agency's no less important role in ensuring that all those are eligible for a benefit duly receive it. The integrity of our immigration system is severely damaged when a significant number of people who are eligible under the law for citizenship, permanent residence, and other immigration services are routinely and illegitimately denied.

Since the beginning of the Trump administration, USCIS has implemented over 80 new policies transforming how it administers the legal immigration system, the vast majority in a more restrictive manner. Just a few of the most egregious examples include:

- The public charge rule, which guarantees that many thousands of people will be denied green cards based on wealth, health, and a host of other arbitrary factors, even if they satisfy the statutory requirement of not being "likely" to use public benefits in the future.

- The so-called "N/A policy" of rejecting U visa and other applications whenever a field is left empty, or includes the notation "NA" or "not applicable," instead of the strict

formulation "N/A."

- The denial of EB-1 "genius visa" applications, which has gone up 26 *percentage points* since 2017, even in the absence of any official policy change. For example, a Nobel laureate was rejected because USCIS demanded more information on the interpreter translating the Nobel citation.

These are not the actions of an administration with true reverence for the integrity of the nation's immigration system or fidelity to the law.

\*\*\*

*Supplemental materials attached below:*

- USCIS Fee Hike: How Immigrants Are Affected. Boundless (updated July 31, 2020).

13



U.S. Citizenship and Immigration Services (USCIS) plans to enact its **second ~20% fee increase in four years**, paid for primarily by U.S. citizens, U.S. businesses, and citizenship applicants—with **over 60% of its new expenses unexplained**. Where will the money come from, and where will it go? This report explores the data in depth.

**U.S. Citizenship and Immigration Services (USCIS)** is the federal agency primarily in charge of legal immigration to the United States. Part of the Department of Homeland Security (DHS), this agency handles most visa applications, green card applications, and naturalization, and provides many other immigration services. USCIS currently employs about 19,000 workers and has around 90 field offices across the country. USCIS—distinct from Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP)—is charged with the administration of immigration applications, not deportations or border security.

Unlike most government agencies, USCIS is funded almost entirely through **user-paid fees,** not taxpayer dollars. Every two years, USCIS is required to reevaluate their current fees and make appropriate adjustments. The last fee adjustment in 2016 increased fees by an average of 21%. The **new rule** would hike fees by another 20% overall, beginning on October 2, 2020. USCIS estimates that the status quo, with no fee increases, would leave the agency underfunded by about $1 billion dollars annually.

https://www.boundless.com/research/uscis-fee-hike-immigrants-affected/      August 3, 2020

# Why does USCIS claim to need this additional revenue?

This pie chart displays how USCIS claims it will spend the new revenue it generates from higher fees.



Planned Expenses ($)



USCIS plans to use the extra fees for new hires, pay raises, and "net additional costs" (including non-pay general expenses associated with onboarding staff, secure mail shipping, increased background investigations, headquarters consolidation, and other "additional resources to sustain current operations necessary for achieving USCIS' strategic goals").

Remarkably, the allocation of about 63% of new revenue is completely unexplained in public documentation about the new fee rule.

USCIS has also publicly stated that this increased revenue will not decrease immigration application backlogs nor decrease application wait times any time soon. From

the **proposal**: *"USCIS does not believe the level of effort for future adjudications will decrease … USCIS estimates that it will take several years before USCIS backlogs decrease measurably."*

# Where would the extra revenue come from?

Some of this new revenue (just over $8 million) would come from **entirely new fees** imposed on asylum applications.

Another big chunk of revenue (about $300 million) would come from **eliminating fee waivers** for lower-income applicants, including immigrants applying for U.S. citizenship.

The next biggest revenue category (about $400 million) would come from **hiking existing fees**—see specific examples in the section below.

By far the biggest new source of revenue (about $640 million) would come from **new fees on travel and work permits** that are currently not subject to fees—including work permits for asylum-seekers and most green card applicants.



# Who would be affected by the fee increases?

While USCIS's fee rule would change fees for over 60 different form types, this chart focuses on the most dramatic fee increases for relatively high-volume cases.



**Family history enthusiasts** would pay $200 more for genealogy records— more than three times as much as currently—and they are **not pleased**.

**Businesses** would pay higher fees for all categories of temporary workers, including skilled workers (H-1B), agricultural workers (H-2A), and non-agricultural seasonal workers (H-2B).

**Green card applicants** would pay much higher fees, since work and travel permits would now require separate fees. For a spouse seeking a marriage-based green card, the total expenses for the process would **increase by over a thousand dollars,** from $1,760 to $2,830. Recently married couples would have an extra fee hike of $165 to obtain permanent green cards.

**Citizenship applicants** would pay much higher fees, with the main application for naturalization (N-400) going up by $530—nearly twice as much as its current cost (although applicants would no longer have to pay a separate $85 biometrics fee).

**Asylum seekers** would have to pay an unprecedented new $50 application fee, as well as the full work permit fee. There would be significant burdens on other humanitarian programs as well, including the **unlawful presence waiver** (applied for using I-601A) that allows permission to return to the United States after applying for a green card.

The largest percentage fee increase is for the I-929, which grants a temporary visa for **family members of a crime victim**. Applicants will now pay $1,255 more, making the form over 5 times as expensive as its current cost.

# How have USCIS fees changed over time?

The chart below shows how the price for the N-400, the naturalization form required for citizenship, has changed over time compared to the Consumer Price Index (CPI). Here we use the CPI—which tracks how the weighted average price of U.S. goods changes over time—pegged to an initial value of $35, to match the N-400 form's cost in 1985.



Naturalization Form Fee vs. Consumer Price Index

The N-400 fees have increased much more than the CPI. USCIS is supposed to reevaluate their fee structure every two years, but does not always opt to change fees. The most notable fee increases were in 2007 and now the anticipated increase in 2020.

https://www.boundless.com/research/uscis-fee-hike-immigrants-affected/                                    August 3, 2020

## Additional Resources

**The State of New American Citizenship** | This report from Boundless Immigration explains the citizenship process and the worrisome national trends among processing times, application backlogs, and application denials.

**LiveStats: Immigration and Citizenship** | A comprehensive data hub for immigration statistics, available for every state, county, and city in the United States.

## About the Data

Boundless aggregated and analyzed data that **USCIS released to the public** in its proposed fee rule, final fee rule, and related documents. CPI values were generated via the Bureau of Labor Statistics' **CPI Inflation Calculator**.

