1 | Brian J. Stretch, SBN 163973
bstretch@sidley.com
Naomi Igra, SBN 269095
naomi.igra@sidley.com
Chelsea Davis, SBN 330968
chelsea.davis@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Jesse Bless (*pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G Street, Suite 300
Washington, D.C. 20005

Samina M. Bharmal (*pro hac vice*)
sbharmal@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
Telephone: +1 202 736 8000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER; EAST BAY SANCTUARY COVENANT; COALITION FOR HUMANE IMMIGRANT RIGHTS; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; INTERNATIONAL RESCUE COMMITTEE; ONEAMERICA; ASIAN COUNSELING AND REFERRAL SERVICE; ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS,<br><br>Plaintiffs,<br><br>v.<br><br>CHAD F. WOLF, *under the title of Acting Secretary of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security*; U.S. CITIZENSHIP & IMMIGRATION SERVICES<br><br>Defendants. | Case No. 4:20-cv-05883-JSW<br><br>**DECLARATION OF DUNCAN LAWRENCE, PH.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, Duncan Lawrence, hereby declare as follows:

1. I have personal and professional knowledge of the matters set forth herein. I would testify to the facts in this declaration under oath if called upon to do so.

2. I received a Ph.D. and MA in Political Science from the University of Colorado, Boulder and a BA in World Politics from Hamilton College. I am a two-time Fulbright recipient.

3. Since 2014, I have been the Executive Director at the Immigration Policy Lab at Stanford University. The Immigration Policy Lab collects and analyzes data, designs, implements and evaluates programs and policies, and uses cutting-edge analytical tools to bring new evidence to bear on immigration issues. I have also published numerous peer-reviewed articles on immigration issues.

4. A true and correct copy of my curriculum vitae appears in Appendix A.

5. Counsel for Plaintiffs asked me to provide an analysis of certain questions concerning U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements published in the Federal Register on August 3, 2020 (the "Final Rule").

6. Specifically, I was asked to analyze the likely impact that the Final Rule will have on the volume (increase or decrease) of applications for naturalization among those previously eligible for the fee waiver. My analysis and opinions on these topics are set forth below.

**I.  The Final Rule's Impact on Naturalization**

7. Based on research demonstrating that fees create barriers to citizenship and in evaluating just one aspect of the Final Rule's impact on naturalization, the following analysis shows that over the next five years more than 1 million low-income immigrants will likely be deterred from applying for citizenship due to the Final Rule's increased fees and restrictions on fee waiver usage.

8. The Final Rule will increase the fee for an N-400 Application for Naturalization from $640 to $1170, with a $10 discount for online filers. The Final Rule eliminates the N-400 Reduced Fee for applicants with income between 150 percent and 200 percent of the federal poverty guidelines.

9. The Final Rule changes the fee waiver eligibility requirements. The Final Rule lowers the income criteria from 150 percent to 125 of the federal poverty guidelines. The Final Rule also eliminates fee waivers based on receipt of means-tested benefits and financial hardship.

10. The Final Rule also eliminates the availability of fee waivers for most N-400

applicants. Fee waivers for the N-400 will remain available to VAWA self-petitioners and derivatives, U and T nonimmigrants, battered spouses or children of a lawful permanent resident or U.S. citizen and derivatives under INA section 240A(b)(2), Special Immigrant Juveniles who have been placed in out-of-home care under the supervision of a juvenile court or a state child welfare agency at the time of filing, and Special Immigrants as an Afghan or Iraqi Translator or Interpreter, Iraqi National employed by or on behalf of the U.S. Government, or Afghan National employed by or on behalf of the U.S. government or employed by the International Security Assistance Forces.

11. The Final Rule fails to account for the downward pressure on demand exerted by such a drastic increase in fees, especially among those who are no longer eligible for a fee waiver.

12. The Final Rule states, "DHS does not know the price elasticity of demand for immigration benefits, nor does DHS know the level at which the fee increases become too high for applicants/petitioners to apply." 85 Fed. Reg. 46,881. Subsequently, the Final Rule states, "DHS believes the price elasticity of demand for immigration services is inelastic and increases in price will have a minimal or no impact on the demand for these services." 85 Fed. Reg. 46,896.

13. The Final Rule states that "DHS recognizes that, if the increase in fee for Form N-400 discouraged significant numbers of individuals from naturalizing, USCIS could realize less revenue than with a lower fee for Form N-400. However, DHS believes that most individuals will continue to value American citizenship, even if it is more expensive to naturalize." 85 Fed. Reg. 46,858.

14. The Final Rule states that DHS does not believe it is equitable to continue the long-standing practice of setting the naturalization fee at an amount that is affordable, "given high volumes of Form N-400 filings." 85 Fed. Reg. 46,858.

15. Research demonstrates that the fee for naturalization is a barrier that prevents immigrants from becoming United States citizens and estimates that 75% of individuals who use the fee waiver would otherwise not be able to become United States citizens.[1] In calendar year 2017,

---

[1] Hainmueller, J., Lawrence, D., Gest, J., Hotard, M., Koslowski, R., & Laitin, D. D. (2018). A randomized controlled design reveals barriers to citizenship for low-income immigrants. *Proceedings of the National Academy of Sciences*, *115*(5), 939-944; Yasenov, V., Hotard, M., Lawrence, D., Hainmueller, J., & Laitin, D. D. (2019). Standardizing the fee-waiver application increased naturalization rates of low-income immigrants. *Proceedings of the National Academy of Sciences*, *116*(34), 16768-16772.

3
DECLARATION OF DUNCAN LAWRENCE, PH.D.
Case No. 4:20-cv-05883-JSW

approximately 348,000 individuals submitted fee waiver requests with their N-400 applications, which implies that over the next five years under the Final Rule's fee waiver restrictions approximately 1.17 million lawful permanent residents ("LPRs") would be unable to apply for citizenship.

16. The calculation of the estimated number of immigrants prevented from applying for citizenship due to the Final Rule's limitations on fee waiver use and higher fees for the N-400 begins with the number of fee waivers submitted with N-400s in 2017 (348,110).[2] Because the Final Rule allows fee waivers for the N-400 for VAWA petitioners, U and T nonimmigrants, Special Immigrant Juveniles, and Special Immigrant Visas, the calculation makes the conservative assumption that all individuals receiving these types of visas in 2012 and who were therefore likely eligible to apply for citizenship in 2017 did so and all (100%) were eligible and applied for the fee waiver as well. Therefore the total number of fee waivers is reduced by 35,449.[3] What remains (312,661) is an estimate of fee waivers for individuals who under the Final Rule would no longer be eligible to receive them. Given that some individuals who apply for the fee waiver may apply for citizenship even in the absence of the fee waiver (i.e., apply under the Final Rule), the calculation multiplies the total remaining fee waivers by 75%, which from prior peer-reviewed research is the percent of fee waiver users applying for citizenship who would not be able to apply for citizenship due to the fee (previously $640 application fee, $85 biometric fee).[4] This results in an estimate of 234,496 individuals in 2017 who would have been unable to apply for citizenship under the fee and fee waiver conditions set forth in

---

[2] Information provided by USCIS on May 29, 2019. Calculations based on information provided by USCIS on April 17, 2018 (report representing the total number of I-90, I-551, DACA, TPS and N-400 receipts submitted electronically and by paper during calendar year 2017), Mar. 7, 2018 (USCIS Fee Waivers by Office Received, Approved and Denied Fiscal Year 2017, Quarter 4, and Fiscal year 2018, Quarter 1), and Aug. 30, 2017 (USCIS Fee Waivers by Office Received, Approved and Denied Fiscal Year 2017, Quarters 2 and 3).

[3] USCIS Data Report, Number of Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, With a Classification of VAWA Self-Petitioner By Fiscal Year, Quarter, and Case Status Fiscal Years 2010-2020; USCIS Data Report, Number of I-360 Petitions for Special Immigrant with a Classification of Special Immigrant Juvenile (SIJ) By Fiscal Year, Quarter and Case Status Fiscal Years 2010-2020; Bruno, A. (2014). *Iraqi and afghan special immigrant visa programs*. Congressional Research Service; USCIS Report (2020), "U Visa Filing Trends Analysis of Data through FY 2019"; Department of Homeland Security, "U and T Visa Law Enforcement Resource Guide for Federal, State, Local, Tribal and Territorial Law Enforcement, Prosecutors, Judges, and Other Government Agencies".

[4] Yasenov, V., Hotard, M., Lawrence, D., Hainmueller, J., & Laitin, D. D. (2019). Standardizing the fee-waiver application increased naturalization rates of low-income immigrants. *Proceedings of the National Academy of Sciences*, *116*(34), 16768-16772.

the Final Rule. Assuming no increase in the size of the citizenship eligible population each year, if the Final Rule stays in place for five years, the single year estimate is multiplied by five, resulting in 1,172,479 individuals blocked from applying for citizenship due to the Final Rule's fee and fee waiver provisions. This estimate is likely a floor in terms of the number of people prevented from applying for citizenship. It does not take into account the many immigrants who could previously afford the $725 fee, but will be unable to afford the $1,170. The total number prevented from applying for citizenship is likely larger as this calculation only estimates the number prevented as it relates to the elimination of the fee waiver coupled with the higher fee.

17.     If demand for immigration services, such as naturalization, were 'inelastic' as DHS argues, reducing or eliminating fees would have no effect on the number of individuals applying for naturalization. In fact, prior research demonstrates a significant and positive effect on the number of naturalization applications when obtaining a fee waiver became easier, thus contradicting DHS' assertion.[5]

18.     Since 2015, immigrants have been able to use a credit card to pay naturalization fees and have always had the option to save or borrow to try and cover fees. If these approaches were sufficient to overcome the financial barriers to citizenship as DHS argues, programs reducing or eliminating fees should not have a measurable effect on naturalization application rates. However, research examining the impact of fee vouchers (similar to fee waivers) shows that by eliminating fees, naturalization rates nearly double.[6] While DHS may not know the precise level at "which fee increases become too high for applicants/petitioners to apply," there is existing evidence that the previous fee of $725 was in fact already too high for some applicants/petitioners to apply for naturalization.[7]

---

[5] Yasenov, V., Hotard, M., Lawrence, D., Hainmueller, J., & Laitin, D. D. (2019). Standardizing the fee-waiver application increased naturalization rates of low-income immigrants. *Proceedings of the National Academy of Sciences*, *116*(34), 16768-16772.

[6] Hainmueller, J., Lawrence, D., Gest, J., Hotard, M., Koslowski, R., & Laitin, D. D. (2018). A randomized controlled design reveals barriers to citizenship for low-income immigrants. *Proceedings of the National Academy of Sciences*, *115*(5), 939-944.

[7] Hainmueller, J., Lawrence, D., Gest, J., Hotard, M., Koslowski, R., & Laitin, D. D. (2018). A randomized controlled design reveals barriers to citizenship for low-income immigrants. *Proceedings of the National Academy of Sciences*, *115*(5), 939-944; Yasenov, V., Hotard, M., Lawrence, D., Hainmueller, J., & Laitin, D. D. (2019). Standardizing the fee-waiver application increased naturalization rates of low-income immigrants. *Proceedings of the National Academy of Sciences*, *116*(34), 16768-16772.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on August 16, 2020

_____
Duncan Lawrence, Ph.D.

# APPENDIX A

# Duncan Lawrence

*Curriculum Vitae*

## Education

2007–2013 **PhD/MA**, *University of Colorado*, Boulder, *CO*.
Political Science

2000–2004 **BA**, *Hamilton College*, Clinton, *NY*.
World Politics

## Professional Experience

2014–Present **Executive Director**, Immigration Policy Lab, Stanford University, Stanford, CA.

2012–2016 **Co-Founder/Managing Partner**, Telluride Research Group, LLC, Denver, CO.

2011–2012 **Graduate Instructor**, University of Colorado, Boulder, CO.

2011 **Research Methods Mentor/Field Survey Coordinator**, University of Colorado, Arequipa, Peru.

2008–2011 **Research Assistant**, University of Colorado, Boulder, CO.

2007–2011 **Teaching Assistant**, University of Colorado, Boulder, CO.

## Publications

### Peer Reviewed Articles

17. "In search of opportunity and community: Internal migration of refugees in the United States" (with N. Mossaad, J. Ferwerda, J. Weinstein and J. Hainmueller) *Science Advances*, 2020.

16. "Extending Delivery Coverage to Include Prenatal Care for Low-Income, Immigrant Women Is a Cost-Effective Strategy" (with M. Rodriguez, J. Swartz, and A. Caughey) *Women's Health Issues*, 2020.

15. "Public Health Insurance Expansion for Immigrant Children and Interstate Migration of Low-Income Immigrants" (with V. Yasenov, F. Mendoza, and J. Hainmueller) *JAMA Pediatrics*, 2019.

14. "Standardizing the fee waiver application increased naturalization rates of low-income immigrants" (with V. Yasenov, M. Hotard, J. Hainmueller, and D. Laitin) *Proceedings of the National Academy of Sciences*, 2019.

13. "A low-cost information nudge increases citizenship application rates among low-income immigrants" (with M. Hotard, J. Hainmueller, and D. Laitin) *Nature Huiman Behaviour*, 2019.

12. "Determinants of refugee naturalization in the United States" (with N. Mossaad, J. Ferwerda, J. Weinstein, and J. Hainmueller) *Proceedings of the National Academy of Sciences*, 1-10, 2018.

11. "Oregon's Expansion of Prenatal Care Improved Utilization Among Immigrant Women" (with J. Swartz, J. Hainmueller, and M. Rodriguez) *Maternal and Child Health Journal*, 115(37): 9175-9180, 2018.

10. "Improving refugee integration through data-driven algorithmic assignment" (with K. Bansak, J. Hainmueller, J. Ferwerda, A. Dillon, D. Hangartner, and J. Weinstein) *Science*, 359(6373): 325-329, 2018.

9. "A randomized controlled design reveals barriers to citizenship for low-income immigrants" (with J. Hainmueller, J. Gest, M. Hotard. R. Koslowski, and D. Laitin) *Proceedings of the National Academy of Sciences*. 2018.

8. "Expanding Prenatal Care to Unauthorized Immigrant Women and the Effects on Infant Health" (with J. Swartz, J. Hainmueller, and M. Rodriguez) *Obstetrics and Gynecology*. 2017.

7. "Protecting unauthorized immigrant mothers improves their children's mental health" (with J. Hainmueller et al.) *Science*. 2017.

6. "Providing driver's licenses to unauthorized immigrants in California improves traffic safety." (with H. Leuders and J. Hainmueller) *Proceedings of the National Academy of Sciences*. 114(16):4111-4116, 2017.

5. "When lives are put on hold: Lengthy asylum processes decrease employment among refugees." (with D. Hangartner and J. Hainmueller) *Science Advances*, 2(8):e1600432, 2016.

4. "More trees, more poverty? The socioeconomic effects of tree plantations in Chile, 2001–2011." (with K. Andersson, J. Zavaleta, and M. R. Guariguata) *Environmental Management*, 57(1):123–136, 2016.

3. "Crossing the cordillera: Immigrant attributes and Chilean attitudes." *Latin American Research Review*, 50(4):154–177, 2015.

2. "Local cohesion and radical right support: The case of the Swiss People's Party." (with J. Fitzgerald) *Electoral Studies*, 30(4):834–847, 2011.

1. "Immigration Attitudes in Latin America: Culture, Economics, and the Catholic Church." *The Latin Americanist*, 55(4), 143-170, 2011.

## Grants & Gifts

2019  NEO Philanthropy (Four Freedoms Fund)
2018  Schmidt Futures
2018  Rockefeller Foundation
2018  Russell Sage Foundation
2018  Stanford Child Health Research Institute
2017  Ford Foundation
2017  Stanford Child Health Research Institute

| | |
|---|---|
| 2017 | STANFORD CENTER FOR CLINICAL AND TRANSLATIONAL RESEARCH AND EDUCATION |
| 2016 | ROBERT WOOD JOHNSON FOUNDATION - EVIDENCE FOR ACTION |
| 2016 | RUSSELL SAGE FOUNDATION |
| 2016 | FORD FOUNDATION |
| 2016 | ROBIN HOOD FOUNDATION |
| 2016 | NEW YORK COMMUNITY TRUST |
| 2015 | UPS ENDOWMENT FUND |

## Fellowships

| | |
|---|---|
| 2013 | Fulbright Scholar – Chile |
| 2011 | University of Colorado Department of Recreation Services Graduate Fellowship |
| 2008–2011 | University of Colorado Department of Political Science Summer Research Fellowship |
| 2009 | CARTSS Scholars Grant (co-investigator) |
| 2005 | Fulbright English Teaching Fellowship – Argentina |

## Selected Presentations

| | |
|---|---|
| 2019 | **Intergovernmental Consultations on Migration**, *Senior Officials Meeting*, Geneva, Switzerland. |
| 2019 | **Bipartisan Policy Center**, *Overcoming Health Care Challenges in Immigrant Communities*, Washington, D.C.. |
| 2019 | **World Government Summit**, *Edge of Government*, Dubai, UAE. |
| 2018 | **World Refugee Council**, *Technology Workshop*, Berkeley, CA. |
| 2018 | **Commonwealth Club of California**, *Marin Conversations*, Marin, CA. |
| 2018 | **Robert Wood Johnson Foundation**, *Sharing Knowledge to Build a Culture of Health Conference*, Chandler, AZ. |
| 2017 | **All Are Welcome Symposium**, Oakland, CA. |
| 2017 | **San Mateo County**, *Immigrant Integration Summit*, Redwood City, CA. |
| 2016 | **Bureau of Population, Refugees and Migration**, *Refugee Admissions Workshop*, Washington, D.C.. |

## Teaching Experience

| | |
|---|---|
| Instructor | International Political Economy (2011,2012); Global Development (2012) |
| Teaching Assistant | Comparative Politics (2007–2010); Topics in Political Data Analysis (2010) |
| Experiential Education Instructor | Hamilton College Outdoor Leadership Program (2001–2004); Hulbert Outdoor Center (2004); Wilderness Ventures (2004, 2006) |

## Awards and Honors

| | |
|---|---|
| 2012 | Best Graduate Instructor, Department of Political Science, University of Colorado Boulder |
| 2004 | Phi Beta Kappa Honor Society |
| 2004 | Pi Sigma Alpha Honor Society |
| 2004 | Constantine Karamanlis Award – Outstanding Senior Concentrator in World Politics |

## Skills

| | |
|---|---|
| Basic | LaTeX, R |
| Advanced | Google Apps, Microsoft Office, Smartsheets, Stata, Qualtrics, Zotero |