Brian J. Stretch, SBN 163973
bstretch@sidley.com
Naomi A. Igra, SBN 269095
naomi.igra@sidley.com
Chelsea Davis, SBN 330968
chelsea.davis@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

*Attorneys for Plaintiffs*

Jesse Bless (*pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G Street, Suite 300
Washington, D.C. 20005

Samina M. Bharmal (*pro hac vice*)
sbharmal@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
Telephone: +1 202 736 8000
Facsimile +1 202 736 8711

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER; EAST BAY SANCTUARY COVENANT; COALITION FOR HUMANE IMMIGRANT RIGHTS; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; INTERNATIONAL RESCUE COMMITTEE; ONEAMERICA; ASIAN COUNSELING AND REFERRAL SERVICE; ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS,<br><br>Plaintiffs,<br>v.<br><br>CHAD F. WOLF, *under the title of Acting Secretary of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security*; U.S. CITIZENSHIP & IMMIGRATION SERVICES<br><br>Defendants. | Case No. 4:20-cv-05883-JSW<br><br>**DECLARATION OF MICHAEL SMITH** |

DECLARATION OF MICHAEL SMITH – Case No. 4:20-cv-05883-JSW

**DECLARATION OF MICHAEL SMITH**

I, Michael Smith, declare as follows:

1. I am the Refugee Rights Program Director of the East Bay Sanctuary Covenant ("EBSC"). I helped start EBSC's affirmative asylum program in 1992, and have been with the organization since then. In my current role, I oversee our affirmative asylum practice, which includes over 500 cases currently pending before the U.S. Citizenship and Immigration Services ("USCIS"), as well as our other programs. EBSC is headquartered in Berkeley, California.

**EBSC's Mission**

2. EBSC is part of the National Sanctuary Movement founded in 1982 to assist refugees fleeing the civil wars and violence in El Salvador and Guatemala.

3. EBSC's mission is to offer sanctuary, support, community organizing assistance, advocacy, and legal services to people escaping war, terror, political persecution, intolerance, exploitation, and other expressions of violence. In particular, one of EBSC's critical missions is to assist individuals fleeing persecution in applying for asylum and similar humanitarian relief in the United States. EBSC also trains and mentors law students and attorneys to help clients apply for asylum.

4. As part of its mission, EBSC provides legal and social services to immigrants and refugees within the jurisdiction of the San Francisco Asylum Office, including applicants in California, Washington, and Oregon. We offer our clients legal assistance in applying for affirmative asylum, Deferred Action for Childhood Arrivals ("DACA"), Temporary Protective Status ("TPS"), Special Immigrant Juvenile Status ("SIJS"), U Visas, T Visas, permanent residency, and naturalization. We also provide social services, including regular workshops on integrating new immigrants into the United States, English as a second language tutoring program, and one-on-one assistance in finding housing, employment, or educational opportunities.

5. EBSC's affirmative asylum program is a key component of our organization; it accounts for nearly half our organizational budget. Affirmative asylum applications are those that are filed with USCIS rather than in immigration court, on behalf of applicants who are not in removal proceedings. Individuals not in removal proceedings cannot apply for other forms of relief like Withholding of

1  Removal or protection under the Convention against Torture, which only an Immigration Judge can adjudicate.  The success of EBSC's affirmative asylum program is the reason that EBSC has been able to grow and develop other programs.

6. EBSC's affirmative asylum program is among the largest in the country and provides legal services to individuals applying for affirmative asylum within the San Francisco Asylum Office jurisdiction. Since the affirmative asylum program began in 1992, we have filed more than 5,000 cases. Over 97% of adjudicated asylum applications have been granted. Currently, we handle between 30 and 40 intakes per month and have well over 500 pending cases before USCIS.

7. We work mainly with low-income and poor refugees and immigrants from around the world in the jurisdiction of the San Francisco Asylum Office. We work closely with vulnerable populations in the immigrant and refugee community, including victims of gender-based violence and domestic violence, indigenous Guatemalans, LGBT (lesbian, gay, bi-sexual, transgender) individuals, and those suffering from HIV/AIDS, as well as unaccompanied children.

8. Funding for EBSC's affirmative asylum program is based in part on the number of cases handled per year, and the number of cases we anticipate serving. For instance, one of our main grants is currently from the California Department of Social Services ("CDSS").  In our CDSS grant application we noted that we had filed 279 CDSS affirmative asylum cases in 2019. This number does not include Unaccompanied Minors or clients living outside California. The total number of cases we filed in 2019 was 296. For 2020, CDSS has awarded EBSC funding for 210 cases. Under that grant we receive $2,000 for every affirmative asylum case we handle, which does not cover the full cost of our services. EBSC also receives funding through private foundations and other state and local grants. Many of these other sources of funding come with expectations or requirements that EBSC achieve certain metrics in its immigration services work. If EBSC was unable to meet its deliverables, it is likely the grantor would at the very least request a pro-rated amount of money back reflecting the shortfall in deliverables. Furthermore, failing to meet our deliverables also harms our reputation with grantors and puts future funding at risk.

2

DECLARATION OF MICHAEL SMITH – Case No. 4:20-cv-05883-JSW

9. Prior to the Covid-19 pandemic, EBSC provided services in-person at its office in Berkeley, California. Four days a week, EBSC's office would have walk-in hours for new clients. These walk-in services covered the range of EBSC's services. During the COVID-19 pandemic, EBSC has had to change its operations to accommodate offering services remotely—often through posted mail. While the delivery model has changed, EBSC's services have not.

10. Currently we have 15 staff members who work primarily in our Refugee Rights Program. These include 6 attorneys, 3 OLAP (formerly BIA) accredited representatives and 7 paralegals. We also have 5 attorneys and 5 paralegals working primarily in the Affirmative Asylum Program. These individuals carry out legal intakes, work with clients to fill out paperwork, help clients collect relevant evidence for their case, prepare clients for interviews, and represent clients in interviews with USCIS officers.

11. We strongly believe that an important part of our mission is education. As such, we work with and train law students and volunteer attorneys to represent clients in affirmative asylum cases. Prior to the pandemic, we averaged about 25 laws students, 20 volunteer attorneys and 100 undergraduate volunteers per year. Since the beginning of our affirmative asylum program in 1992, we have trained/educated more than 500 law students and several thousands of undergraduates.

**Familiarity with Rule**

12. I am familiar with the "U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements" (the "Rule"). It is my understanding that the Rule would increase fees for N-400 naturalization applications by paper from $640 to $1,170, which is an 83 percent increase. At the same time, the Rule will decrease the fee to renew permanent resident status on form I-90 by paper from $455 to $415, which is a 9 percent decrease. Partial fees will no longer be available for N-400 applications. For applicants who would have qualified for the partial fee, the Rule increases the N-400 fee for filing by paper from $320 to $1,170, which is an increase of 226%.

13. Table 3 of the Rule shows the limited categories of applicants who are eligible for fee waivers under the Rule. Most applicants will no longer be eligible for fee waivers for any forms,

3
DECLARATION OF MICHAEL SMITH – Case No. 4:20-cv-05883-JSW

including N-400 naturalization applications, I-765 applications for employment authorization, and I-485 applications for permanent residence. The Rule also changes the requirements to qualify for a fee waiver. The Rule reduces the number of fee waivers available by allowing fee waivers only for those applicants who have household incomes at or below 125% of the federal poverty guidelines. Currently, applicants may be eligible for a fee waiver if they receive a means-tested benefit, have household incomes at or below 150% of the federal poverty guidelines, or can establish financial hardship. The Rule limits USCIS's own future discretion to change its approach to fee exemptions or waivers.

14. The Rule also imposes a new mandatory fee of $50 on applications for asylum, a new $550 fee for the first I-765 application for employment application plus $30 biometrics fee filed by an asylum applicant, increases the fee for I-765 (non-DACA) applications for employment authorization from $410 to $550, and increases the fee for children for I-485 applications for permanent residence from $750 to $1,130, which is an increase of 51%.

15. The Rule will also unbundle certain fees, which will result in a sharp increase in fees for applicants for permanent residency who are also applying for interim benefits. Since 2007, DHS has charged a flat rate for a bundle of applications for those seeking lawful permanent residency. The flat fee of $1,140 covered the application for permanent residency (I-485), an employment authorization application (I-765), and application for travel document (I-131). A flat fee of $750 covered the same three documents for children under 14. The Rule will require applicants to pay fees for each application and eliminate the flat fee for these bundled applications.

16. Although the Rule purports not to increase the I-765 application for employment authorization for DACA recipients, holding the fee at $410 for DACA recipients still represents an increase in cost as a practical matter due to the effect of USCIS's decision to decrease the validity period of employment authorization for DACA recipients from two years to one year. This means that DACA recipients will have to pay $820 for I-765 applications plus $170 for biometrics fees for a total of $990 to maintain employment authorization for two years.

**Harm to EBSC**

17. The Rule's changes to eligibility for fee exemptions, fee waivers, and reduced fees will profoundly affect EBSC's clients and thus will be particularly harmful to our organization. The Rule limits the availability of fee waivers to a relatively small category of applicants and only for certain applications. Asylum applicants and asylees, for example, will not be eligible for any fee waivers for any forms under the Rule. The Rule also eliminates entirely partial fee waivers for naturalization. Our clients who have household incomes between 150% to 200% of the federal poverty guidelines were previously able to pay $320 to apply for naturalization. The Rule will now require them to pay $1,170 to apply.

18. Some of our clients, including those with T and U nonimmigrant status, are in categories that are still able to seek fee waivers for certain forms. However, even these clients, who are all low-income, may not qualify for fee waivers under the Rule because fee waivers will now only be available for clients who have a household income at or below 125% of the federal poverty guidelines. The Rule does not permit a fee waiver based on financial hardship or receipt of a means-tested benefit.

19. EBSC's ability to help low-income immigrants has relied on the availability of fee exemptions, fee waivers, and reduced fees. In 2019, 66% of our clients seeking adjustment of status qualified for a fee waiver; 32-50% of our clients seeking work authorization were eligible for a fee waiver, and 44-49% of our clients applying for naturalization were eligible for a fee waiver. Our budgets, staffing levels, and client deliverable metrics are all based on a system in which our clients can seek immigration benefits based on their ability to pay the fee. EBSC will be forced to make changes because of the Rule.

20. Our organization is funded, in part, from the small fees we charge clients in order to provide certain immigration services such as renewal work authorization ($25), residency ($400) and naturalization ($400). If clients have to pay additional fees to USCIS under the new Rule, they will not be able to afford our fees. As a result, EBSC will have to find additional funding to cover the cost of our services.

21. Moreover, it will be much more difficult and time consuming for EBSC to complete fee waivers for our clients who qualify. Prior to the Rule, we could provide evidence that our client received a means-tested benefit like SNAP. Now we will have to establish their income. Many of our poorest clients do not file taxes because they are not required to do so. We will now have to take more time to get a verification of non-filing letter from the IRS.

22. All of the asylum seekers we represent are indigent and would not be able to afford the $50 application fee without significant hardship.  Our asylum clients struggle to provide for their basic needs, including housing and food.  Asylum seekers often have been forced to flee for their lives to escape persecution and arrive in the United States with nothing more than the clothes on their backs.  When they arrive in the United States, they are not immediately authorized to work and thus have no legal way of earning money.  Asylum seekers often are dealing with physical injuries and psychological trauma from the persecution they have endured and the journeys they have undertaken to arrive to safety, which leaves them in a particularly vulnerable position.

23. EBSC expects that inability to pay the fee for the asylum application will prevent bona fide asylum seekers from being able to seek relief.  If our clients are delayed in submitting asylum applications due to their inability to pay the fee, this will have cascading effects. Any delay in submitting the application will delay their eligibility for employment authorization. Furthermore, delays might make the client ineligible for asylum due to the one-year bar imposed by the Illegal Immigration Reform and Immigration Responsibility Act, 1996.  Even more importantly, most of our asylum clients do not have lawful immigration status. They are at risk of deportation if they do not have an asylum application pending. If they are detained and put in removal proceedings before we are able to submit their affirmative asylum applications, EBSC's representation of them will be more complicated and time consuming.

24. Helping asylum-seekers is an essential component of our mission. Because of their economic circumstances and vulnerability, we would have to pay the asylum application fee for these clients. Because USCIS has never previously charged an asylum application fee, we do not currently budget for those fees. To continue providing services to asylum-seekers in the Bay Area, EBSC would

need to find a way to cover asylum fees, which will require EBSC to spend time and resources on that effort. If the Rule takes effect, EBSC will immediately have to take action to mitigate the harm to our asylum clients. EBSC may have to redirect unrestricted internal funds to cover their $50 applications fees, which necessarily would lessen the organization's ability and resources to carry out its other important operations. Absent such redirection, EBSC would have to expend staff members' and executives' time and resources to either convince existing funders to allow EBSC to divert funds from other programs to cover asylum fees, or to fundraise specifically for asylum fees. We cannot predict that these efforts would be successful in any event. Most likely, EBSC will have to limit the number of asylum-seekers we can serve due to budget considerations.

25. Additionally, the Final Rule imposes a new $550 fee on first-time applications for employment authorization filed by asylum seekers plus a $30 biometrics fee. Previously, asylum seekers had not been charged for their first application for employment authorization. They were only charged for renewal of employment authorization, but even renewal applications were eligible for fee waivers. This new fee will be very burdensome for our asylum clients. Our asylum clients need to be able to work to provide for themselves and their families. In addition to the financial benefits, having a job also has psychological benefits for our asylum clients. Our asylum clients have experienced trauma and are afraid that they will be deported back to the dangers they escaped. When they are unable to work, they suffer from housing instability and food insecurity, which takes a further psychological toll on them. Being unable to work lawfully also makes them uniquely vulnerable to domestic violence and predatory practices. Being able to work helps our asylum clients with recovery.

26. Many of our asylum clients also rely on the employment authorization document (EAD) as a form of photo identification. Some often have no valid form of photo identification because their identity documents are lost during the journey to the United States or because dire circumstances forced them to flee without any documentation. Many of our asylum clients lack passports. Some of these individuals are Eritreans and lack passports because Eritrea has no consular presence in the United States, while others are Tibetans and China refuses to give them passports. Being without valid identification contributes to a sense of uncertainty and vulnerability for our asylum clients, which also

takes a psychological toll. This lack of photo identification also requires EBSC staff to expend more time and resources to assist our asylum clients with obtaining services they need. For example, our asylum clients often need psychological and medical care due to the trauma they have endured. Obtaining such services without identification can be difficult in United States, which requires intervention by our staff. Furthermore, while employment authorization is incidental to a grant of asylum, many employers still insist on valid EADs. And for clients without photo IDs, the Social Security Office will not issue Social Security Cards, which are necessary for employment, and the California Department of Motor Vehicles will not issue IDs or driver's licenses—again requiring intervention by our staff.

27. We have never had to pay initial employment authorization fees for asylum clients because they were free. Because our asylum clients are indigent, they will not be able to afford to pay $580 to apply for employment authorization. To avoid harms to our clients and because of the benefits of employment for our clients, we will have to find a way to pay the $580 fee on their behalf. The impact of this increase is significant. Last year we filed 471 I-765s for clients. If we had to cover the full filing fees for all applicants, that would cost us $273,180, which is about 16% of our 2020 budget of $1,661,027. If the Rule takes effect, we will have to immediately take action to mitigate the harm to our asylum clients. We will either have to divert funds that are currently directed to other parts of our mission or expend valuable resources to fundraise to cover those costs. Given the size of EBSC's overall budget, the cost of paying fees for employment authorization applications for our asylum clients represents a tremendous cost for our organization.

28. We also provide assistance to immigrants who are seeking adjustment of status. The elimination of the fee waiver for most categories of immigrants and the elimination of the discount for children's I-485 applications will make it difficult for our clients to adjust status. Our clients already struggle to pay the fee for the required medical exam by a designated civil surgeon that is necessary for the I-485 application. Our organization is unlikely to be able to absorb the cost of these fees for our clients. I expect that we will see a decline in clients seeking assistance with the form I-485, solely

1  because it will no longer be affordable to our clients. As noted above, this will cause a decline in
2  revenue for EBSC because we will not collect our modest fees for these services.

3   29. The elimination of fee waivers and discounts for form I-485 will also increase the time
4  we must spend on I-485 applications and thus increase our costs. We often assist family groups who are
5  adjusting status together. Because of the availability of fee waivers and discounts, families were able to
6  apply at the same time. This resulted in efficiencies for our organization because we could gather
7  information for the entire family at one time. Without fee waivers and discounts, families will be forced
8  to apply for permanent residence as they can afford the fee for each family member. That means that our
9  organization will have to meet with the family more times and over a longer period of time. This
10 represents an opportunity cost for our organization. Meeting repeatedly with the same family in order to
11 complete applications that we could previously complete in one meeting leaves us with less time to help
12 other clients.

13   30. The inability for families to adjust at the same time also poses unique risks of harm to
14 asylees and their derivatives.  A derivative asylee is only able to adjust status through asylum if the
15 principal applicant still retains asylum status.  Principal asylum applicants tend to be adults, and these
16 adult asylees may prioritize their own adjustment and naturalization before the adjustment of their
17 children because of the additional benefits that accrue to adults who are U.S. citizens. As a result, I
18 expect that the Final Rule will result in principal applicants naturalizing before all of their derivatives
19 complete adjustment of status. This will leave these derivative asylees unable to adjust through asylum
20 without filing their own nunc pro tunc asylum applications. As legal service providers, this will make
21 the task of helping these families much more complicated and time consuming.

22   31. Although the Rule purports to keep the fee for DACA renewals the same, the fee has
23 effectively doubled due to a change in the validity period of employment authorization for people with
24 DACA status from two years to one year. Instead of paying a $410 I-765 fee plus $85 for biometrics for
25 two years of employment authorization, people with DACA status will have to pay $990 for two years
26 of employment authorization. Many of our clients will be unable to pay these much higher fees, which
27 puts them at risk of having to work without authorization at unfair wages and under poor conditions.

28

9

DECLARATION OF MICHAEL SMITH – Case No. 4:20-cv-05883-JSW

Moreover, the change in validity periods will require our organization to expend more staff time to attend to our 1,200+ DACA clients who need our services to renew their status, which will now need to be completed on an annual basis. This will effectively doubles our workload.

32. Although the Rule maintains the statutorily required fee exemptions for certain categories, including U and T visa applicants and VAWA self-petitioners, and fee waivers for ancillary forms, the Rule makes it more difficult for any applicants to qualify for a fee waiver. Our clients in these categories who are not eligible for a fee waiver cannot afford to pay fees for themselves and their derivatives. We cannot risk the chance that our clients will stay in an abusive or dangerous situation because they cannot afford to pay fees for immigration applications to keep their family members together. We will have to find a way to help our clients with these fees, even though that will divert resources from our other services.

33. The Rule will also make our intake process more complicated. For example, we will have to expend more time and resources during intake to determine if a permanent resident applying for naturalization is within a category that is eligible for a fee waiver. For asylees seeking adjustment of status, we will have to figure out if they are entitled to the $50 discount, which applies to only one adjustment application per principal asylum application under the Rule.

34. The Rule immediately harms EBSC's mission because it disproportionately harms low-income immigrants. The increases in fees and elimination of fee waivers will create a purely financial barrier to the progress of immigrants' integration in the United States, delaying or precluding status that is critical to safety, security, and protection. These unnecessary and unfounded changes will cause hardship and burden for hardworking immigrants and mixed-status families, including U.S. citizens. As an immediate consequence of the Rule, some of our clients who are otherwise eligible for immigration benefits will be unable to even apply due to the increase in fees and unavailability of fee waivers. These results are contrary to EBSC's mission to provide sanctuary for immigrants in need.

35. The Rule will immediately harm EBSC's ability to carry out its operations on behalf of the immigrants in our community. Simultaneously eliminating fee waivers while increasing application fees will significantly decrease our low-income clients' ability to pay for, and thus submit, applications

for immigration benefits. For example, under the Rule, the cost to naturalize would rise to $1,170 for a single application, an amount roughly equal to a month's gross income for an immigrant making the federal minimum wage.  Many EBSC clients in the Bay Area earn minimum wage and struggle to make ends meet with the high cost of living in the area.  Many of our clients would need *years* to accumulate the savings needed to cover the $1,170 fee per application.   As a result, certain EBSC clients might become eligible to become U.S. citizens but will not be able to afford it. The fee hike presents a significant barrier to low income individuals seeking to naturalize.  EBSC thus anticipates that it will experience a drastic reduction in the number of clients who seek out EBSC's services and ultimately submit immigration applications.

36. It is EBSC's mission to promote the well-being of low- and moderate-income immigrants and refugees, and to educate law students, volunteer attorneys, and undergraduates. Many of the clients that we serve are low-income, elderly, disabled, or live with significant other challenges and cannot afford a $1,170 fee. While USCIS might suggest that this fee can be paid on a credit card, that is not a reasonable solution. The clients who need assistance completing and submitting immigration applications are not affluent, and they cannot easily access credit or financing. If the Rule goes into effect, our mission to provide immigration assistance to low-income clients will be irreparably harmed. If the Rule goes into effect, the number of clients with whom we work will significantly decrease, and we will be unable to meet our contractual obligations.  It will be difficult or impossible for EBSC to fulfill our mission because our clients will not be able to afford the application fees and we will have many fewer volunteers.

37. As stated above, EBSC's work is facilitated by grant funding, which is tied to certain fixed deliverables. For example, our major source of income, CDSS, commits us to file 210 affirmative asylum applications and 96 Naturalization applications in fiscal year 2020. We anticipate that we will receive a similar grant for fiscal year 2021. The Rule will prevent EBSC from assisting clients and achieving these contractual deliverables. If EBSC is unable to meet our contractual obligations for deliverables, we will not only lose a fixed amount such as $2,000 for each affirmative asylum case and $300 for each simple Naturalization case, but also we will lose our contracts and grants. As a result, we

1  will have to lay off our staff, many of whom have significant experience in providing naturalization
2  services. Ultimately, the Rule could force our immigration services program to close.

3      38.    EBSC has diverted significant resources already to respond to the harms imposed by the
4  Rule, and will continue to need to do so. EBSC has diverted staff members' time and efforts to submit as
5  many applications as possible before the Rule takes effect. We have a waitlist for services, and we have
6  had to triage the application types that will be most affected by the Rule to prioritize those filings.
7  Clients have already reached out to EBSC in an effort to have their case bumped up from the waitlist,
8  and EBSC is feeling the pressure of serving as many clients as possible.  Because of this Rule and the
9  rule concerning asylum EADs that takes effect on August 25, 2020, clients are anxious to have their
10 cases handled quickly, and this puts a drain on EBSC resources.  EBSC staff is working overtime to
11 handle these requests.  Due to the client pressure in anticipation of the Rule, EBSC has had to refer
12 clients out to other organizations to ensure the clients can get legal help.  These necessary referrals cause
13 financial harm to EBSC: our organization cannot collect fees for these clients who we would be able to
14 serve under normal circumstances.  In addition, the referrals cause reputational harm because potential
15 clients might see us as overloaded and understaffed.

16     39.    The morale of EBSC staff is also immediately and negatively affected by the Rule. We
17 now must try to file as many applications as possible before the Rule takes effect, which increases the
18 workload and stress of our staff.  Moreover, our staff works with a vulnerable population and is exposed
19 to secondary trauma from their work with this population. EBSC staff is under tremendous pressure to
20 help clients who are in life or death situations. Although the Rule seems to treat asylum seekers with
21 suspicion that they are merely coming to the United States for economic opportunity, the extremely high
22 grant rate of EBSC's asylum applications is incontrovertible proof that this suspicion is without merit.
23 EBSC staff knows the dangers our asylum clients are fleeing, how profoundly traumatized the majority
24 are, and how fearful they are of being deported. Because the stakes are so high, our staff is already taxed
25 by this work. The Rule imposes new barriers that might well create a sense of hopelessness among our
26 staff. The Rule also denigrates our work by suggesting that there is a need to deter certain asylum
27 applications. This insinuation of wrongdoing causes immediate and irreparable harm to our staff.
28

Serving a low-income immigrant population is already hard enough; the Rule is immediately contributing to a sense of futility among our staff that will have personal costs for our staff and real costs for our organization. Some staff will quit due to burnout, which requires EBSC to hire and train new staff.

40. EBSC is already having to expend staff members' time and efforts to understand this complicated and lengthy Rule.  EBSC must also expend resources training immigration employees on the new provisions of the Rule; updating its informational materials, including its website; and helping members retrain volunteers on the new Rule's provisions. The cruel result of the Rule is that we will ultimately need to expend these resources to make these adjustments despite the fact that fewer and fewer potential citizens will take advantage of our programs, thanks to the same Rule.

41. This Rule is taking effect at the worst possible time in light of the economic impact of COVID-19 on our clients.

42. I am aware of no mechanism in the Rule or any federal or state program by which EBSC could be compensated for lost funding, lost productivity, or increased costs. Many of the expected impacts to EBSC, our clients, and other programs could not be mitigated financially in any event.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct. Executed at Berkeley, California on August 19, 2020.

_Michael Smith_

13
DECLARATION OF MICHAEL SMITH – Case No. 4:20-cv-05883-JSW