Brian J. Stretch, SBN 163973
bstretch@sidley.com
Naomi Igra, SBN 269095
naomi.igra@sidley.com
Chelsea Davis, SBN 330968
chelsea.davis@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Jesse Bless (*pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS ASSOCIATION
1301 G Street, Suite 300
Washington, D.C. 20005

Samina M. Bharmal (*pro hac vice*)
sbharmal@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
Telephone: +1 202 736 8000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER; EAST BAY SANCTUARY COVENANT; COALITION FOR HUMANE IMMIGRANT RIGHTS; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; INTERNATIONAL RESCUE COMMITTEE; ONEAMERICA; ASIAN COUNSELING AND REFERRAL SERVICE; ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS,<br><br>Plaintiffs,<br><br>v.<br><br>CHAD F. WOLF, *under the title of Acting Secretary of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security*; U.S. CITIZENSHIP & IMMIGRATION SERVICES<br><br>Defendants. | Case No. 4:20-cv-05883-JSW<br><br>**DECLARATION OF MELISSA RODGERS** |

## DECLARATION OF MELISSA RODGERS

I, Melissa Rodgers, declare as follows:

1. I am the Director of Programs at the Immigrant Legal Resource Center ("ILRC" or "organization"), in San Francisco, California. I am also the director of the New Americans Campaign, described in more detail below. The information in this declaration is based on my personal knowledge and on data that ILRC maintains in its ordinary course of business.

**ILRC's Mission**

2. ILRC, founded in 1979, is a national non-profit organization that works to advance immigrant rights through advocacy, educational materials, and legal trainings. ILRC's mission is to work with and educate immigrants, community organizations, and the legal sector to continue to build a democratic society that values diversity and the rights of all people. As a key part of that mission, ILRC serves as the lead agency for the New Americans Campaign ("NAC").

**The New Americans Campaign and Other Services**

3. The New Americans Campaign is a national nonpartisan effort that brings together private philanthropic funders, leading national immigration and service organizations, and over two hundred local services providers across more than twenty different regions, to help prospective Americans apply for U.S. citizenship. The founding purpose of the NAC was and continues to be closing the gap between the number individuals who currently qualify for citizenship and the number of individuals who apply for citizenship. At the NAC's inception, as few as 8% of eligible individuals applied for citizenship. There are over nine million eligible to naturalize who have yet to apply. *See* https://www.dhs.gov/sites/default/files/publications/lpr_population_estimates_january_2015_-_2019.pdf. The NAC exists to reduce barriers—including the complex filing process and high fees—for those applying for citizenship. As the lead organization for the campaign, ILRC receives and re-grants substantial philanthropic dollars to local immigration service providers across the United States who help lawful permanent residents apply for naturalization. Our local partners have completed naturalization applications impacting more than 474,000 permanent residents; over 40% of the applications funded by the New Americans Campaign included a fee waiver or reduced fee request. In

the most recent year that number was nearly 45%. In the most recent quarter, April through June 2020, that number increased to 48%.

4. The NAC network, led by ILRC, includes naturalization services providers who receive NAC funding in Arizona, Arkansas, California, Colorado, the District of Columbia, Florida, Georgia, Illinois, Maryland, Michigan, Nevada, New York, North Carolina, Ohio, Minnesota, Pennsylvania, Texas, Virginia, and Washington. In addition, service providers in Alabama, Hawaii, Idaho, Indiana, Iowa, Kentucky, Louisiana, Maine, Massachusetts, New Mexico, Oklahoma, Oregon, Tennessee, Utah, and Wisconsin participate in the NAC as non-funded affiliates.[1]

5. As the lead agency for NAC, ILRC receives all of the funding for the NAC in the first instance. Because the sole purpose of the NAC is to increase the number of "new Americans," all of ILRC's NAC funders require that ILRC, through the NAC, sub-grant funds to organizations to generate naturalization applications. This goal is embedded in ILRC's agreements with each funder. ILRC updates its funders as to its progress toward this goal through regular reporting and in-person presentations.

6. Some of ILRC's funders have even more specific quantitative requirements, including specific numerical goals for the number of naturalization applications that NAC partners generate. Several funders require completion of fee waivers in addition to naturalization applications and, for at least two funders, ILRC has committed to having a quarter or more of the applications ILRC generates through the NAC be accompanied by fee waivers or reduced fee requests.

7. ILRC sub-grants NAC funding that it receives to seven of its NAC national partners (all non-profit organizations). The terms of the agreements between ILRC and five of the national partners have explicit quantitative requirements[2] (that is, a numerical requirement for naturalization applications that each national partner must fulfill) that enable ILRC to meet its own grant requirements.

---

[1] ILRC enters into formal Letters of Agreement with many of its non-funded affiliates. These Letters of Agreement expire at the end of the NAC fiscal year, this year on June 30, 2020. ILRC is in the process of renewing the Letters of Agreement for the next fiscal year, however some of the NAC's non-funded affiliates are still reviewing the renewed Letters of Agreement. ILRC anticipates that these non-funded affiliates will execute the Letters of Agreement soon.

[2] One national partner only performs policy work, and another performs technology-related work. ILRC's agreements with these partners therefore do not include quantitative requirements for completed naturalization applications.

8. Six of the ten national partners (including ILRC) sub-grant funding to local legal services organizations (called "local partners"). These grants, too, have explicit quantitative requirements that enable the national partners, and ILRC, to meet their own grant requirements. In this way, ILRC funds between 100 and 150 local partners in a given year.

9. Through its management of the NAC, ILRC has been directly responsible for (and accountable to its funders for) about 30,000 naturalization applications per year for each of the last few years.[3]

10. If ILRC is unable to meet the quantitative requirements of its naturalization grants or fails to increase the number of naturalization applications each year, our grants could extinguish without being renewed or, at least, be at risk of being reduced.

11. In addition to administering the NAC, ILRC provides myriad resources and services to assist with naturalization, family-based immigration including adjustment of status, humanitarian relief, access to Deferred Action for Childhood Arrivals (DACA), asylum, the Violence Against Women Act (VAWA), U and T visas, and more.

12. As part of its work to promote access to naturalization, ILRC has devoted considerable resources to collecting and providing best practices for naturalization workshops. Our work on developing these best practices has relied on the existence of fee exemptions and fee waivers available to those seeking naturalization.

13. Although in-person workshops have largely been suspended during the COVID-19 pandemic, the ILRC expects workshops to resume in the future and continue to be the primary mechanism for providing efficient naturalization legal services to large numbers of eligible applicants.

14. Naturalization workshops are one-day events that serve Lawful Permanent Residents (or "Green Card Holders") who are eligible to apply for naturalization. Although every workshop provider modifies the model to serve its particular community, in general the workshops serve as a one-stop-shop for completing a naturalization application that is ready to file with the United States Citizenship and

---

[3] Over the past five fiscal years ("FY"), NAC-funded applications have been: FY16: 32,302; FY17: 27,318; FY18: 34,503; FY19: 36,100; FY20: 29,636.

Immigration Services ("USCIS"). Participants are asked to come with everything they need to complete their application, including documentation supporting their eligibility for a fee waiver.

15. A significant percentage of workshop participants are eligible for and submit fee waiver applications. Since 2011, 40.5% of naturalization applications completed by NAC local partners using the NAC funding re-granted through ILRC in both workshop and office contexts included a fee waiver application or reduced fee request (Form I-912 or I-942). And, the percentage has increased in recent years: in the last year that figure was nearly 45%. Because of the ubiquity of the fee waiver, ILRC provides training to organizations on incorporating fee waiver assistance at workshops.

16. ILRC also publishes materials for the various services it supports. As relevant here, ILRC publishes "Naturalization and U.S. Citizenship: The Essential Legal Guide," "Essentials of Asylum Law," "A Guide for Immigration Advocates," "Families and Immigration," "Hardship in Immigration Law," "The U Visa," "Removal Defense," "DACA: The Essential Legal Guide," and "The VAWA Manual." In addition to these manuals, ILRC publishes dozens of practice advisories annually. ILRC provides training to attorneys, Department of Justice accredited representatives, and other individuals such as paralegals, legal assistants, coordinators, and other staff from private law firms and direct services provider organizations. ILRC conducts these trainings via webinars, web-based roundtable discussions and trainings, and in person seminars when permissible in light of public health considerations. Through our Attorney of the Day program, ILRC also engages in case-specific consultations with immigration practitioners, pro bono attorneys, and public defenders. ILRC provides more than 100 trainings each year on a wide range of immigration topics, including scheduled fall and spring semester of webinar trainings, numerous multi-day in-person (when permissible) seminars around the country on naturalization, and regular in-person training around California. From January 1, 2019 through June 30, 2020, ILRC conducted approximately 240 in-person trainings and 95 webinars, for over 19,000 attendees.

**Familiarity with Rule**

17. I am familiar with the "U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements" (the "Rule"). It is my

understanding that the Rule would increase fees for seeking naturalization by over 80%, increase the fee to appeal a naturalization denial by 148%, place new fees on applications for asylum, and increase the fee for employment authorization; it would double green card fees by unbundling fees for the green card application, employment authorization, and travel documentation, while also removing the lower green card fee for children and increasing fees for necessary waivers of conditions or inadmissibility grounds. Although the Rule eliminates a separate biometrics fee for most applications, it will impose biometrics fees on asylum applicants seeking employment authorization (thus making the total cost for employment authorization $580 for asylum applicants), on applicants for Temporary Protected Status ("TPS"), and on DACA renewals. It is my understanding that the Rule would also eliminate most fee exemptions, affecting asylum and TPS applicants in particular, eliminate the naturalization reduced fee option, and eliminate fee waivers for most immigration benefits and naturalization except for a limited number of humanitarian applicants, and, narrow significantly the eligibility for fee waivers for vulnerable populations such as domestic violence survivors and victims of crime and human trafficking, and limit USCIS's own future discretion to change its approach to fee exemptions or waivers.

18. ILRC submitted three comments[4] in opposition to USCIS's proposed Rule, DHS Docket No. USCIS-2019-0010. Making three comments was necessary due to the irregular and chaotic rulemaking process, which made it difficult for ILRC to completely comment on the proposed Rule.

**Effect of the Rule**

19. The Rule will materially impact ILRC's ability to carry out its mission and maintain an adequate level of funding to accomplish its purpose to foster access to naturalization for eligible permanent residents.

20. By raising fees for naturalization applications by over 80%, the Rule will effectively place naturalization financially out of reach for individuals who previously could access the opportunity to become U.S. citizens and are otherwise eligible. The population that ILRC's New Americans Campaign sub-grantees serve are significantly low-income individuals. In the last year, 41% of NAC-funded naturalization applications included a fee waiver and 4% included a reduced fee request. In the

---

[4] The first December 23, 2019, with supplemental comments February 10, 2020 and March 13, 2020.

most recent quarter of April through June 2020, the combined total was 48%. Nationally, 32% of individuals eligible to naturalize, nearly three million people, are within 150% of the federal poverty line, and therefore fee waiver eligible on the basis of income alone. *See* https://dornsife.usc.edu/assets/sites/731/docs/CSII_Citizenship_Brief_May2016_Final_Web.pdf. An additional 12% of individuals eligible to naturalize, close to one million people, are between 150% and 200% of the federal poverty guidelines—the population eligible to benefit from the reduced fee for naturalization, also known as the partial fee waiver. *Id.* ILRC anticipates that all individuals who currently qualify for a fee waiver would not be able to afford the new naturalization fee. ILRC anticipates that individuals who are between 150% and 200% of the federal poverty guidelines would similarly not be able to afford the new naturalization fees.

21. Similarly, removal of the fee waiver and reduced fee option for almost all N-400 applications will cause engagement with naturalization workshops to plummet. The overwhelming majority of the 44% of naturalization applicants within 200% of the federal poverty guidelines who are eligible for a fee waiver or reduced fee and who at most recent count attended the workshops very likely will, based on ILRC's data on how many applicants require fee waivers, either simply stop accessing services, or choose not to submit their applications.

22. Even if the same number of people attended the workshops, without access to the fee waiver and due to the increased fee, a vastly lower number of those individuals would be able to submit the naturalization application.

23. If workshops remain viable in light of the Rule change, ILRC will need to devote significant new resources to revise the workshop model to account for the elimination of the fee waiver for the majority of applicants, the narrowing of fee waiver criteria for a small minority of naturalization applicants who will still be permitted to apply for it, and the increase in the application fees. ILRC will also have to revise its workshop training, triaging survivors of domestic violence, victims of crime, and other humanitarian applicants for fee waiver screenings, removing all fee waiver assistance for others, and figuring out how to implement some other, more complex process to support low-income applicants. ILRC will need to invest significant time and effort into developing new partnerships, new screening

processes, and new service models. This will not be a simple fix. Despite what the Rule propounds, in ILRC's experience, many low income immigrants do not have access to credit cards. And, if they do, the interest rates are typically prohibitively high.

24. Because the low-income population that ILRC aims to support will be unable to afford the various application fees, ILRC anticipates that completed applications will significantly decline. The decline in applications will have a direct, cascading effect on ILRC's funding. As naturalization applications decline in volume, funders are likely to divert funds from the NAC, reducing ILRC's ability to support its staff and achieve its mission through re-granting those funds. A decline each year of just 10% will have a negative, cumulative impact on the NAC's output and outcomes. A decline of 20% or more could result in fewer funders joining the NAC as donors, which would reverse the trend in the years prior to the Rule of increasing numbers of funders joining the NAC as donors. Fewer donors means fewer dollars for the nonprofits participating in the NAC. Also, the foundations that are current donors are far less likely to sustain their giving for the NAC in the face of declining output and outcomes.

25. Some of ILRC's grantors require that ILRC (through its sub-grantees) achieve certain metrics such as completed naturalization applications. Given the anticipated decline of individuals who will complete naturalization applications, ILRC will not be able to meet those metrics. Failure to do so will place ILRC in breach of its agreements with those grantors. This, too, will result in fewer dollars. Simply put, if this happens the ILRC would have to significantly unwind the NAC network that we have been building for almost ten years, reduce staffing, and as a result reconstruct the structure of the NAC to have much less impact. With less impact, we will have even less ability to raise funds going forward, leading to a potential death spiral for the NAC. Moreover, ILRC's failure to meet its deliverables will likely cause reputational harm, which could happen through partners, allies, and funders sharing our failure.

26. ILRC will be required to devote extensive staff time and resources to quickly creating new educational and training materials; editing and re-publishing existing materials, including books and law manuals; and re-training hundreds of lawyers and United States Department of Justice-

Accredited Representatives across the country. ILRC will have to revise and republish numerous major publications that include chapters or sections on fee waivers, including its Naturalization Manual (a 1,000-page volume used by practitioners nationwide); other manuals on U-Visas, T-Visas, Special Immigrant Juvenile Status, the Violence Against Women Act, Asylum, and Families and Immigration; and the Annotated Guide to Completing Fee Waivers. To educate immigrants on the changes in the Rule and the impact on them, ILRC will need to create community alerts and pay for the alerts to be translated into several languages.

27. In addition to harming ILRC's funding, the Rule will directly harm ILRC's mission. Putting applications financially out of reach of indigent immigrants means that the immigration practitioners that ILRC supports will not be able to assist as many individuals as before the rule. Some practitioners will be unable to continue providing services if they lose their client base because immigration avenues are curtailed to such an extent that fewer immigrants apply for immigration benefits or naturalization. Reduced assistance by the practitioners ILRC serves also harms ILRC's ultimate goal of advancing immigrant rights. Advancing immigrant rights is at the core of ILRC's mission. This includes ensuring that immigrants have access to naturalization, family-based immigration, humanitarian relief, asylum, VAWA, U and T visas, adjustment of status, and more.

28. The Rule has already forced ILRC to divert significant resources and will continue to require that ILRC divert resources.

29. We have already had to shift funding away from a digital advertising campaign, which was designed to allow the NAC to acquire contact information from lawful permanent residents so we could communicate with them over time about applying for naturalization thereby fulfilling a core goal of our work, to a digital advertising campaign solely focused on raising awareness about the fee changes. We were running the lead-generation digital campaign before the Notice of Proposed Rule Making for the Rule, and afterwards had to shift to an awareness campaign instead, which does not allow us to generate leads or gather contact information. This shift is costing ILRC $262,000 in digital outreach costs, which includes $175,000 for the media buy alone, over $64,000 of which had been spent by August 13, 2020. These costs cannot be made up.

8
DECLARATION OF MELISSA RODGERS – Case No. 4:20-cv-05883-JSW

30. ILRC will have to revise its published materials to account for the changes in the Rule. For example, ILRC will have to divert resources to understand the scope of implications of the Rule on children, including Special Immigrant Juveniles, children facing barriers to status due to increased fees for adjustment of status, and lawful permanent resident children who lose the opportunity to derive citizenship as minors because their parents cannot afford to apply before they turn 18. The long-range implications of the Rule on children remain to be fully understood. ILRC will then need to spend additional time to answer Attorney of the Day questions and provide training on these changes. Additionally, ILRC will have to issue community alerts regarding the changes. This new work will cause the ILRC to move attorneys to other lines of work. We will have to look for additional resources and we do not know where those resources will come from. If we cannot secure the additional resources, we may have to cut back on or eliminate other vital programs and even change our budget by declining other work we might normally accept.

31. As a result of the Rule, ILRC has engaged in and will have to continue to engage in extensive administrative advocacy, lobbying, and educational efforts. ILRC expended considerable resources to draft comments that demonstrated why the dramatic fee increases will prove so harmful and should not be made effective. We cannot make up the time we have had to divert from planned activities to this work. Moreover, the pressure of having to respond to the fee changes, which affect every aspect of the immigration and naturalization system and therefore every area of our work, has put intolerable strain on staff time, which has already caused a sense of burnout and exhaustion. ILRC anticipates that it will need to continue to engage in administrative advocacy, lobbying, and educational efforts as a result of this Rule.

32. I am aware of no mechanism in the Rule or any federal program by which ILRC could be compensated for lost funding, lost productivity, or increased costs. Many of the expected impacts to ILRC and its sub-grantees and other programs, including reputational harm, could not be mitigated financially in any event.

1  I declare under penalty of perjury and under the laws of the United States that the foregoing is
2  true and correct. Executed at San Francisco, California on August 18, 2020.

_____

10
DECLARATION OF MELISSA RODGERS – Case No. 4:20-cv-05883-JSW