Brian J. Stretch, SBN 163973
bstretch@sidley.com
Naomi Igra, SBN 269095
naomi.igra@sidley.com
Chelsea Davis, SBN 330968
chelsea.davis@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Jesse Bless (*pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS ASSOCIATION
1301 G Street, Suite 300
Washington, D.C. 20005

Samina M. Bharmal (*pro hac vice*)
sbharmal@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
Telephone: +1 202 736 8000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER; EAST BAY SANCTUARY COVENANT; COALITION FOR HUMANE IMMIGRANT RIGHTS; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; INTERNATIONAL RESCUE COMMITTEE; ONEAMERICA; ASIAN COUNSELING AND REFERRAL SERVICE; ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS,<br><br>Plaintiffs,<br><br>v.<br><br>CHAD F. WOLF, *under the title of Acting Secretary of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security*; U.S. CITIZENSHIP & IMMIGRATION SERVICES<br><br>Defendants. | Case No. 4:20-cv-05883-JSW<br><br>**DECLARATION OF ANGELICA SALAS** |

**DECLARATION OF ANGELICA SALAS**

I, Angelica Salas, declare as follows:

1. I am the Executive Director of Coalition for Humane Immigrant Rights ("CHIRLA" or "organization"), in Los Angeles, California. I have been the Executive Director of CHIRLA since 1999. The information in this declaration is based on my personal knowledge and on data that CHIRLA maintains in its ordinary course of business.

**CHIRLA's Mission**

2. CHIRLA's mission is to ensure that immigrant communities are fully integrated into our society with full rights and access to resources. CHIRLA is the largest statewide immigrant rights organization in California. In furtherance of its mission, CHIRLA handles the full spectrum of needs of those primarily residing within low-income immigrant communities in an area with very high costs of living, including providing immigration legal services. From August 15, 2012 to December 31, 2019, CHIRLA processed 2,593 completed N-400 petitions; 1,843 (71%) included total fee waivers, and 42 (1.6%) included partial fee waivers. From 2016 to 2019, CHIRLA submitted 13,886 Deferred Action for Childhood Arrivals ("DACA") applications (including renewals that are accompanied with requests for employment authorization).

3. CHIRLA is a membership based organization funded, in part, by its 12,970 dues-paying and active members.[1] CHIRLA also receives funding through private foundations and state and local grants. Many of these other sources of funding come with expectations or requirements that CHIRLA achieve certain metrics in its immigration services work. For example, CHIRLA receives funding from the New Americans Campaign ("NAC") and directly from the State of California. For both of these reimbursable grant sources, CHIRLA must meet certain deliverables—e.g., completed applications— every year prior to receiving any funds. If CHIRLA was unable to meet its deliverables the grantors would either not reimburse CHIRLA for its expenses,, require that CHIRLA during an extension complete its commitments without additional funding for staffing or to cover the increased fees resulting from the Final Rule , or decrease, perhaps terminate, any future grant of funding due to the shortfall in

---

[1] Membership is a minimum of $20, although family discounts are available.

deliverables. Additionally, CHIRLA's reputation in the grantor community would subsequently be harmed, jeopardizing future funding.

4. Prior to the COVID-19 pandemic, CHIRLA provided services in-person at its main office in Los Angeles as well as in satellite offices across California. Three days a week, CHIRLA's main office would have walk-in hours for new clients. These walk-in services covered the range of CHIRLA's services, including removal defense, asylum seekers, family unity, DACA renewals and its concomitant employment renewal application, and naturalization application assistance. All of the services CHIRLA offers to walk-ins are free. For DACA renewals only, CHIRLA held clinics where it can complete DACA renewal applicants in one meeting. CHIRLA also had a Student Legal Services program on several community college and California State University campuses to provide a range of services.

5. Since the COVID-19 pandemic, CHIRLA has restructured its operations to provide services remotely—often through telephonic and video conferencing as well as posted mail depending on the technological skillset and availability of the clients and members. While the delivery model has changed, CHIRLA's services have not, and CHIRLA still offers its services for free.

6. In addition to offering immigration legal services, CHIRLA pays naturalization and DACA employment authorization renewal fees when it has funds available. From 2017 to May 2020, CHIRLA received funding from the State of California to pay for USCIS' DACA renewal fees of $495.. Additionally, CHIRLA has a DACA renewal fee fund that private donors have financed. CHILRA actively solicits donations to support its DACA renewal fee fund and regularly receives donations that it uses to pay for DACA renewal fees. Similarly, CHIRLA held a similar donation drive for a naturalization fee fund in 2017 and 2018. Although CHIRLA has not actively solicited funds for its naturalization fee fund, CHIRLA anticipates that it will need to do so in the immediate future.

7. CHIRLA engages in significant outreach and advocacy on behalf of its members and other clients. Beginning in 2004, CHIRLA began working to help empower active, educated voters with a project that reached out to 1,200 new and infrequent voters through phone banking and canvassing. In 2018, CHIRLA founded the Immigrant Political Power Project (IPPP), a joint initiative with the CHIRLA Action Fund to contact new American voters, English learners, and infrequent voters and

provide them with non-partisan information about prospective laws, candidates, and the census. In 2018, the IPPP reached more than 240,000 voters. Every year, the IPPP engages a team of paid and volunteer canvassers and phone bankers, many of them undocumented immigrants, to get out the vote, increase census participation, and inform voters about new issues.

8. CHIRLA is listed on the "List of Pro Bono Legal Service Providers" that the Executive Office of Immigration Review provides to individuals in removal proceedings. (https://www.justice.gov/eoir/file/probonofulllist/download).

9. CHIRLA also engages in advocacy efforts on behalf of its members at the local, state, and national levels. For example, CHIRLA has been advocating for increased naturalization for eligible immigrants with the City of Los Angeles through services at public libraries and with the State of California by providing a tax credit equal to the naturalization fee for individuals who obtain naturalization.

**Familiarity with Rule**

10. I am familiar with the "U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements" (the "Rule"). It is my understanding that the Rule would increase fees for N-400 naturalization applications by paper from $640 to $1,170, which is an 83 percent increase. At the same time, the Rule will decrease the fee to renew permanent resident status on form I-90 by paper from $455 to $415, which is a 9 percent decrease. Partial fee waivers will no longer be available for most N-400 applications. For applicants who would have qualified for the partial fee waiver, the Rule increases the N-400 fee for filing by paper from $320 to $1,170, which is an increase of 226%.

11. Table 3 of the Rule shows the limited categories of applicants who are eligible for fee waivers under the Rule. Most applicants will no longer be eligible for fee waivers for any forms, including N-400 naturalization applications, I-765 applications for employment authorization, and I-485 applications for permanent residence. The Rule also changes the requirements to qualify for a fee waiver. The Rule reduces the number of fee waivers available by allowing fee waivers only for those applicants who have household incomes at or below 125% of the federal poverty guidelines. Currently,

applicants may be eligible for a fee waiver if they receive a means-tested benefit, have household incomes at or below 150% of the federal poverty guidelines, or can establish financial hardship. The Rule limits USCIS's own future discretion to change its approach to fee exemptions or waivers.

12. The Rule also imposes a new mandatory nonwaivable fee of $50 on applications for asylum, a new $550 fee for the first I-765 application for employment application plus $30 biometrics fee filed by an asylum applicant, increases the fee for I-765 (non-DACA) applications for employment authorization from $410 to $550, and increases the fee for children for I-485 applications for permanent residence from $750 to $1,130, which is an increase of 51%. Although the Rule purports not to increase the I-765 application for employment authorization for DACA recipients, holding the fee at $410 for DACA recipients still represents an increase in cost as a practical matter due to the effect of USCIS's decision to decrease the validity period of employment authorization for DACA recipients from two years to one year. This means that DACA recipients will have to pay $820 for I-765 applications plus $170 for biometrics fees for a total of $990 to maintain employment authorization for two years.

13. CHIRLA submitted a comment to the Rule on December 30, 2019. The irregular initial 30 day comment period was inadequate for the organization to fully and completely respond to the harm the rule would cause to its members and itself. The multiple reopening of the time to comment to the rule revisions were confusing to members and CHIRLA staff, which increased the staff expense and resources CHIRLA had to use to continually reassess the rule.

**Harm to CHIRLA**

14. The Rule will continue to irreparably harm CHIRLA and its members. The vast majority of the members and other clients for whom CHIRLA provides immigration services are low income. A majority of the individuals that would have qualified for a fee waiver under the prior scheme will not be able to afford the higher fees under the Rule. In our experience, even with the current fees, those who are eligible for a fee waiver but decline to utilize it[2] need to wait months to gather the money to afford the fees, if they are able to afford them at all.

---

[2] In our experience, many individuals refuse to use the fee waiver for fear that using it will be considered a public benefit, meaning they will be categorized as inadmissible as a public charge. See, https://www.uscis.gov/green-card/green-card-processes-and-procedures/public-charge.

15. This is an immediate problem and fear among our membership is widespread. For example, CHIRLA recently assisted one of its members who could only afford to obtain a copy of their green card by utilizing a fee waiver. This individual had already qualified for a green card, but did not have a copy of the card. The individual could not afford the fee to submit an I-90 application to receive a replacement copy of the green card and were unaware of the possibility of a fee waiver. Without the copy of the green card, this individual was unable to obtain work to pay for the green card copy fee. CHIRLA was able to educate the individual about the fee waiver and he obtained a copy of their green card. Without the fee waiver, however, this individual would have been unable to obtain a green card and unable to obtain employment to afford to get a copy of the green card. This is not an isolated example. In CHIRLA's experience, many of its members and other clients will face similar issues after the Rule is in place for all of the various applications at issue.

16. Similarly, many of those who were able to afford the fees under the current fee scheme will not be able to afford higher fees, if at all, without considerable delays. For example, in CHIRLA's experience, many of the individuals it assists with DACA renewals have to wait for months to have the funds to pay the current $495 for the I-765 fee and biometrics fee. Some of those individuals are currently eligible to submit a green card application, also known as an application for adjustment of status to that of a legal permanent resident (LPR), based on family relationships.  This application used to require a bundled expense of $1,225, which included the application for work authorization and advance permission to travel during the pendency of the application. Even some of those eligible to apply for a green card and who would prefer to apply for this benefit have opted to instead submit DACA renewals because of the lower cost to renew DACA. Under the Rule, the unbundled costs of the I-485 application for permanent residence plus the new fees for employment authorization and a travel document will dramatically increase the number who forego to apply for a green card.

17. The number of individuals who will not be able to afford the fees under the Rule will result in a dramatic decrease in the number of CHIRLA members and other clients who submit applications and, consequently, those who attain crucial immigration benefits for which they are eligible. CHIRLA experienced this type of decline with the functional elimination of the "U-Visa" and Violence

5
DECLARATION OF ANGELICA SALAS – Case No. 4:20-cv-05883-JSW

Against Women Act (VAWA) fee waivers. Beginning in 2018, USCIS began to summarily deny applications for both fee waivers for these vulnerable individuals. Because almost all waivers were denied, CHIRLA was forced to institute a policy requiring that applicants have the funds for the full fee available up front because we were unable to cover the costs for these members. When fee waivers were not available, the number of submitted applications materially declined, from e.g. 93 in 2017 (when fee waivers were available) to 10 during 2020 to date. Similarly, when CHIRLA has funding to pay for DACA employment authorization applications, an average 80 individuals/week submit their DACA renewal application. When funding is unavailable, that number drops by half, to 40.

18. The expected decline in completed applications will reduce CHIRLA's funding and membership. The precise decline in applications is difficult to predict. Even assuming, however, that only half of those currently using fee waivers (approximately 75% of applications) will be unable to submit applications, CHIRLA will likely fail to meet its deliverables. Although deliverables are measured at the end of the funding year, this harm will be immediate as CHIRLA needs to consistently meet its deliverables to be able to achieve its year-end requirement. Some grantors have indicated that they will agree to a "no cost" extension of the time CHIRLA needs to meet its deliverables. This, however, does not eliminate the harm. Even when a grantor offers an extension, CHIRLA will be expected to cover salary costs during the period needed to meet the deliverables and cover the increased fees for the applicants all while receiving no additional funding to do so. CHIRLA does not have those resources. The Rule would negate any amount of effort CHIRLA could mount to process more applications within that timeframe, even if the pandemic-imposed conditions are loosened.

19. Less immediately, but no less realistic is the expected decrease in grant making and donations overall. CHIRLA is familiar with the grant making and private philanthropy processes. In CHIRLA's experience, if it is unable to achieve the results it has historically been able to achieve, it is likely that current donors and grantees will re-allocate funding elsewhere where it can be more effectively put to use. For example, this past year funding from the NAC was diverted to assist with census outreach efforts. CHIRLA expected to recapture those resources for naturalization following the

DECLARATION OF ANGELICA SALAS – Case No. 4:20-cv-05883-JSW

completion of the census, but the impact of the rule makes this less likely as NAC itself has to reevaluate how its funds are dispersed to organizations like CHIRLA given the new naturalization fee regime.

20. The Rule will immediately have a negative impact on CHIRLA's financial condition because CHIRLA must expend more money per application when funding the application fee. As a result, CHIRLA's naturalization grants will be able to fund far fewer applications due to the increased fees and elimination of the fee waiver for most applicants. CHIRLA's DACA fund will serve far fewer eligible members because the Rule now requires those with DACA to pay renewal fees annually instead of every two years.

21. The imposition of a new, nonwaivable fee for asylum-seekers will only compound the harm to our organization. CHIRLA handles over 100 hundred asylum applications every year, including a number of affirmative filings that are processed by USCIS. In the Rule, and as emphasized in the Executive Office for Immigration Review's own proposed rule,[3] all filings that request asylum in addition to withholding from removal and protections under the Convention Against Torture (CAT) are subject to a new mandatory $50 charge, which would result in a cost of $5000 at a rate of 100 applications per annum. Additionally, both affirmative and defensive asylum applicants, who were previously were exempt from paying a fee for their first I-765 application for employment authorization, would now have to pay $580 to be eligible to work ($550 I-765 fee plus $30 biometrics fees). None of these fees would be subject to a fee waiver or exemption, so an asylum seeker will have to pay $630 to seek protection and work in the United States even though they cannot legally work while they wait for an adjudication, making the real cost burden to CHIRLA $63,000 at a rate of 100 applications per annum. CHIRLA would not have the capacity to absorb these new costs without dramatically reducing the benefits offered to other members.

22. For defensive asylum filings, that is those filed in removal proceedings, the elimination of a fee exemption or waiver for employment authorization applications creates scenarios where CHIRLA clients may remain in detention solely based on their lack of funds. Some CHIRLA asylum

---

[3] https://www.federalregister.gov/documents/2020/02/28/2020-03784/executive-office-for-immigration-review-fee-review

7
DECLARATION OF ANGELICA SALAS – Case No. 4:20-cv-05883-JSW

clients who are currently released on bond are able to work to recover the cost of the bond to their families. The Rule may put CHIRLA asylum clients in a position where they find themselves unable to work because they cannot afford the I-765 fee. Unable to recover the cost of bond by working, they may be forced to remain in detention, complicating CHIRLA's work on their cases. In CHIRLA's experience, working with clients in detention takes more time and is more complicated, in part because of barriers to communicating with detained clients.

23. The expected decrease to funding due to the inability to meet our deliverables under the new fee regime will negatively and immediately prevent CHIRLA from fulfilling its mission. CHIRLA will have to institute a hiring freeze, meaning it would not be able to retain the individuals it needs to provide even the reduced spectrum of services. CHIRLA will also need to cut staff or decrease salaries, thereby losing irreplaceable individuals with institutional knowledge and expertise, compounding the harm to the organization's legal services, its largest component. CHIRLA will likely have to divert resources from its general fund that currently go to outreach, policy, and advocacy work to fund its legal services. With less funding for community engagement, CHIRLA will experience a decline in good will and harm to its reputation. CHIRLA might also have to consider a restructuring of its business-model, including charging for legal services, which is not in-line with its mission, and would compound the reputational harm. As CHIRLA provides fewer services and engages less with the community, CHIRLA naturally expects membership in the organization to decline. This decline in membership will negatively impact CHIRLA's mission as well as exacerbate the stress to its financial condition.

24. As a result of the Rule, CHIRLA has already diverted significant resources from its other core programs. CHIRLA has held conversations with concerned funders, both those who provide direct support for naturalization efforts and those who provide general support. CHIRLA has also shifted its employees' times and efforts from other core responsibilities to learning about and advocating against this Rule on behalf of members—including submitting a comment during the notice and comment period. CHIRLA remains burdened by the significant need to expend time and resources on informing its members and the communities it serves, participating in further advocacy, and updating its resources.

In order to best serve its members, CHIRLA has absorbed the cost of providing resources that ensure communities are informed of the increased fees.

25. During this unique time in history, CHIRLA has taken every measure to serve its members, but it will not be able to meet the demand from members to process all eligible applications prior to the October 2, 2020 effective date for the new fees. During the pandemic, communication with most naturalization clients has been via slower telephonic conferencing and postal mail. This has meant that both consultation and processing have taken much longer for each applicant, resulting in less total applicants. CHIRLA is already diverting resources from its DACA program in response to the Rule, requiring an on the fly retraining of staff, to help finish as many naturalization applications as possible. This resulting stress on CHIRLA staff and lack of ability to meet the surge in demand will harm our organization and further jeopardize CHIRLA's strong reputation. Members with applications that are pending on October 2 will be dissatisfied if they must pay new fees because CHIRLA could not file the applications beforehand and will likely share their profound dissatisfaction. Further, members who request services after that date, but have not heard about the increased fees, will not understand why CHIRLA can no longer provide services free of charge.

26. The Rule undermines the efforts CHIRLA has undertaken and resources CHIRLA has already spent to encourage eligible individuals to naturalize. For example, CHIRLA has already used considerable resources to advocate for a state bill, AB2795, which would see the state of California offer a tax credit of $725 for California residents filing for naturalization. The fee rule undermines these efforts by raising the price of naturalization while the state of California is not in position to increase the tax credit. Further, while the pandemic has compelled California to set AB2795 aside due to lack of resources, USCIS draws no lessons from the pandemic as it moves ahead with the fee rule.

27. CHIRLA member Q.N. is representative of the Rule's impact on the organization both at present and if the Rule should go into effect. Q.N. is in the process of applying for naturalization, is unable to work due to a disability and has filed for a fee waiver. Due to the Rule, CHIRLA has expedited the filing of Q.N's application in lieu of filing other member applications because of this member's personal situation, which is by no means unique, but requires immediate attention. As

1  processing of the waiver is likely to extend beyond October 2, despite CHIRLA's expediting, a denial of
2  the fee waiver would mean that naturalization would be even more expensive than when the application
3  was filed. Further, Q.N. would withdraw the application, and without even the possibility of a fee waiver
4  after October 2, would have to delay naturalization for the foreseeable future. Q.N. would also be unable
5  to renew the green card when it expires and would then be unable to prove the legal status necessary to
6  secure essential public benefits providing food and shelter.

7  28. I am aware of no mechanism in the Rule or any federal program by which CHIRLA
8  could be compensated for lost funding, lost productivity, or increased costs. Many of the expected
9  impacts to CHIRLA and its clients and other programs, including harms to our mission and reputation,
10 could not be mitigated financially in any event.

11 **Harm to CHIRLA's Members**

12 29. As detailed above, many of CHIRLA's members will be immediately harmed by the
13 Rule. Several of CHIRLA's members will be unable to afford the heightened fees and CHIRLA will not
14 have the funds to cover the enormous costs. Those members who would have submitted applications
15 will either not do so, or will have to wait to do so in order to gather sufficient funding, which will
16 ultimately reduce our membership overall.

17 30. Delayed applications will have several negative effects on CHIRLA's members.

18 31. For members applying to naturalize, a delayed application will mean a delay in obtaining
19 naturalization. Delayed naturalization will inhibit members from being eligible to vote or enjoy any
20 other benefits that obtain only to citizens. Additionally, delayed naturalization will result in a delay for
21 those individuals who wish to sponsor family members who wish to immigrate to the United States.
22 Citizens are able to sponsor immediate relatives, which includes only spouses, unmarried children under
23 the age of 21, and parents for citizens who are over the age of 21. Because immigrant visas for
24 immediate relatives of U.S. citizens are unlimited, visas are available with no waiting period. A delay in
25 naturalization for CHIRLA's members who have children who are approaching the age of 21 may result
26 in having to wait for a visa to become available to be reunited. Citizens are able to sponsor entry of a
27 greater range of family members than non-citizens, including siblings and married sons and daughters.

28

Moreover, family members of citizens have more favorable preference categories than family members of lawful permanent residents for obtaining visas. First preference is given to unmarried sons and daughters (21 years of age and older) of citizens whereas second preference is given to unmarried sons and daughters (21 years of age and older) of lawful permanent residents. This difference in category can result in a lengthy delay in family reunification.

32. For members seeking DACA renewals, delayed employment authorization applications will mean that CHIRLA members face the potential for losing work authorization. Individuals who currently have DACA status may lose their jobs due to a disruption in work authorization. Similarly, for CHIRLA members seeking asylum, a delayed application means a delay in work authorization and a delay in the ability to bring family members into the United States.

33. Delays in filing asylum applications will cause multiple harms to asylum seekers. Unlike some other immigration forms, asylum applicants have a deadline by which they must file their applications. The proposed fee rule stated that inability to pay the new unwaivable $50 fee would not be considered an exceptional circumstance that tolled the one-year deadline for filing an asylum application. Thus, if an asylum seeker is delayed in filing an application because she cannot afford the fee, she will be ineligible for asylum. Moreover, under another rule set to take effect on August 25, 2020, failure to apply for asylum within one year of entry makes an asylum seeker ineligible for employment authorization while her application is pending, unless and until an officer or an immigration judge determines that a statutory exception to the one-year filing deadline applies. Thus, an asylum applicant who must delay filing the I-589 application due to lack of funds may lose the opportunity to work even if she is deemed eligible to apply for asylum.

34. Even if some of CHIRLA's members are able to afford the increased fees, those members will be harmed by being required to pay the higher fees they otherwise would not have had to absent the Rule. This is particularly true in the case of families who submit initial applications such as asylum and U visa together, and then subsequently their LPR and naturalization applications. The elimination of the discounted fee for minors filing I-485 applications for permanent residence will exponentially harm families with any children. Most egregious is the over 500% increase, for family members of U-1 Visa

applicants. While the INA precludes the elimination of the fee waiver for the U-1 visa applicant and derivatives, as outlined above it is already being denied routinely. As this extreme vetting is expected to continue, this particular fee increase effectively separates the victims from family that can help them heal.

35. Because our members who are otherwise eligible for immigration benefits will not be able to afford them in light of the Rule, the Rule causes harm to our members.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct. Executed at Los Angeles, California on August 19, 2020.

_____