Brian J. Stretch, SBN 163973
bstretch@sidley.com
Naomi Igra, SBN 269095
naomi.igra@sidley.com
Chelsea Davis, SBN 330968
chelsea.davis@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Jesse Bless (*pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G Street, Suite 300
Washington, D.C. 20005

Samina M. Bharmal (*pro hac vice*)
sbharmal@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
Telephone: +1 202 736 8000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER; EAST BAY SANCTUARY COVENANT; COALITION FOR HUMANE IMMIGRANT RIGHTS; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; INTERNATIONAL RESCUE COMMITTEE; ONEAMERICA; ASIAN COUNSELING AND REFERRAL SERVICE; ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS,<br><br>    Plaintiffs,<br><br>    v.<br><br>CHAD F. WOLF, *under the title of Acting Secretary of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security*; U.S. CITIZENSHIP & IMMIGRATION SERVICES<br><br>    Defendants. | Case No. 4:20-cv-05883-JSW<br><br>**DECLARATION OF RICH STOLZ** |

ACTIVE 256546371

DECLARATION OF RICH STOLZ – Case No. 4:20-cv-05883-JSW

**DECLARATION OF RICH STOLZ**

I, Rich Stolz, declare as follows:

1. I am the Executive Director of OneAmerica ("OneAmerica" or "organization"), in Seattle, Washington. The information in this declaration is based on my personal knowledge and on data that OneAmerica maintains in its ordinary course of business.

**OneAmerica's Mission**

2. OneAmerica's mission is to advance the fundamental principles of democracy and justice at the local, state, and national levels by building power within immigrant communities. OneAmerica is a not for profit 501(c)(3) organization and the largest immigrant and refugee advocacy organization in Washington State. We play an active role in state and national coalitions working on immigrant rights, education, economic and environmental justice, voting rights, and immigrant and new citizen integration.

3. OneAmerica achieves its mission with community organizing and leadership development in immigrant and refugee communities of color to create civic and political space for our grassroots leaders to shape and reform critical policies, practices, institutions, and movements that impact their lives. We engage grassroots leaders and members in targeted geographic communities through our non-partisan civic engagement model: organizing, leadership development, naturalization, voter registration, voter education and turn-out. The ability to naturalize is a critical component for civic engagement in our communities. As such, helping eligible immigrants apply for citizenship and become civically engaged citizens is a crucial and integral component of our mission.

4. OneAmerica has a strong reputation among funders because we consistently meet the deliverable requirements in our contracts and because we are a model of best practices for naturalization workshops.

5. OneAmerica employs only 29 full time employees[1] based in Seattle, Yakima and Vancouver, Washington, and operates on a yearly budget of approximately $4.3 million.

---

[1] OneAmerica's citizenship department engages six full time staff.

1

DECLARATION OF RICH STOLZ – Case No. 4:20-cv-05883-JSW

**Naturalization Programs and Funding**

6. One of our flagship programs, Washington New Americans ("WNA"), has provided free citizenship screening and application preparation workshops throughout Washington State since 2008, in partnership with the Washington Chapter of the American Immigration Lawyers Association ("AILA-WA"). Since its inception, the WNA program has been funded by Washington State, which shares our conviction that naturalized citizens bring significant economic and civic benefit to our state. The founding goal of the WNA program is to provide access to free legal counsel in communities where there are few, if any, affordable immigration attorneys or Department of Justice-accredited representatives. Since July 2017, the legislative appropriation—and therefore the WNA—has been fully funded at $1 million per year. Of this amount, OneAmerica receives $950,000 per year (the remaining $50,000 stays with the state Department of Commerce to cover administrative costs).

7. With this funding, together with volunteer attorneys from AILA-WA and other community volunteers, we plan and organize pro bono naturalization workshops throughout Washington State. These workshops provide access to counsel and assistance otherwise beyond the financial means of the individuals we serve, especially in the more rural parts of the state where there are fewer lawyers with immigration expertise. At these events, our volunteers provide naturalization screening, assistance with preparing the Form N-400 application for naturalization, and fee waiver application preparation, followed by quality review by experienced immigration lawyers. We provide the naturalization exam questions for study, explain what the process will be and provide resources so that applicants can represent themselves pro se at their USCIS interviews. Approximately 30-40% of those who attend our workshops qualify for fee waivers. Without the WNA grant, we would be unable to hold these workshops.

8. Since 2008, we have organized more than 100 workshops in more than 20 cities, together with AILA-WA. We have become a national leader in citizenship workshops. Many other organizations across the country model their workshops after our program.

9. We also re-grant roughly half of our funding to thirteen other legal and community organizations statewide who provide free or low-cost citizenship assistance year-round. These grantee

organizations provide a mix of direct and indirect naturalization legal services to clients who would otherwise not be able to afford a private attorney. Nearly all of these grantee organizations use a portion of the funding to provide civics education and citizenship preparation classes. Although OneAmerica does not offer similar classes itself, facilitating their provision by grantees is part of OneAmerica's mission and a funding requirement of OneAmerica's state grant. OneAmerica's re-granting furthers our mission generally by building a statewide network of naturalization providers who can share best practices among one another and strengthening local community civic engagement efforts.

10. The State of Washington's legislative appropriation accounts for approximately 90 percent of OneAmerica's funding for naturalization application services. Other sources of funding include OneAmerica's general fund—largely made up of grants, including a grant from the New Americans Campaign ("NAC")—and a grant from the City of Seattle earmarked for naturalization application assistance.

11. The grants from the State of Washington, the NAC, and the City of Seattle all require that OneAmerica meet certain requirements to receive the funding.

12. OneAmerica's current contract with Washington's Department of Commerce requires that OneAmerica complete at least 900 naturalization applications, host "Citizenship Day" workshops in three cities twice a year, host four other workshops, and screen at least 1,400 green card holders for eligibility every year, among other deliverables. OneAmerica must also perform outreach and marketing such as maintaining a multilingual website and placing advertisements in a variety of ethnic media outlets. We also have to report back to Washington State on outcomes, such as how many applications were completed and how many people actually naturalized. Should OneAmerica fail to meet the deliverables in the contract, it would be in breach of its contractual obligations.

13. The NAC grant imposes strict quantitative requirements on OneAmerica, requiring it to complete 50 naturalization applications per year and four workshops. Failure to complete the requisite number of applications or hold the requisite number of workshops would result in the loss of this funding.

14. The grant from the City of Seattle requires that OneAmerica organize one to two naturalization workshops a year, send OneAmerica staff to assist with additional workshops sponsored by the City of Seattle and other partners, and report on client naturalization outcomes. Failure to hold the requisite number of workshops would result in the loss of funding.

15. Should OneAmerica fail to meet its grant obligations, the above funding sources may be substantially reduced or become unavailable as a failure to meet our deliverables will limit our ability to demonstrate an investment in our program remains worthwhile. OneAmerica's experience suggests that it would not likely be able to find sufficient funding from other sources. OneAmerica must match 10% of the state funding it receives—$95,000. Historically, OneAmerica has attempted to raise that amount from private donors and other sources. Private fundraising efforts typically yield approximately half of the needed funds. OneAmerica must use its own general fund to meet the other half of the match requirement. The inability to raise even $95,000 from private donations indicates that OneAmerica will not likely be able to raise over ten times that amount to make up for the funding lost from current grants. In other words, OneAmerica's naturalization application assistance program, including its sub-granting, is entirely dependent on receiving the funding it currently does.

**OneAmerica's Workshop Model: Clinics and Citizenship Days**

16. OneAmerica uses two essential methods to meet its naturalization grant requirements: one, by hosting its own naturalization workshops (also called clinics); and two, by re-granting a significant amount of its WNA funding to thirteen local organizations. These local partners provide naturalization services that count towards OneAmerica's Washington New Americans Program grant requirements.

17. Prior to the Covid-19 pandemic, OneAmerica met about 20 to 25 percent of its total grant obligations by hosting at least 20 naturalization clinics (workshops) per year. This included six Citizenship Day events, at least four other clinics throughout the state, and a once-monthly weekday evening clinic in downtown Seattle. OneAmerica does not directly provide in-office naturalization

application services outside of the clinic setting. While the pandemic initially restricted our in-person events, we have since been able to successfully transition our naturalization workshops online.[2]

18. OneAmerica's clinic and workshop models typically involve the following elements: *first,* client outreach for appointments or walk-ins; *second*, recruitment of attorneys, United States Department of Justice ("DOJ") Accredited Representatives, paralegals, interpreters and general volunteers for a variety of roles; *third*, coordination and planning with site hosts at mostly community colleges and other trusted sites with the help of local partner organizations, some of whom are OneAmerica's grantees; *fourth,* on the day of the clinic or workshop, applicants meet first with a screening attorney or DOJ-Accredited Representative for a thorough analysis of eligibility or referral to other resources, and if approved to proceed, a paralegal helps prepare the application, including a fee waiver or reduced fee request; *fifth*, a second review of the completed forms with a different experienced immigration lawyer or DOJ-Accredited Representative (Quality Review); and then final preparation and copying of the application ready for *pro se* filing and instructions on next steps.

19. Using this model, OneAmerica serves between 10 to 80 clients per clinic.

20. In the course of providing services, we collect income data for the individuals we assist. Although our program is not income-limited, more than 80% of all clients served are at or below 300% of the federal poverty line. In FY19-20, 32% of the naturalization applications we prepared at our clinics included fee waivers. During the same period, on average, 15% of the applications we completed at our workshops were not mailed. Of those applicants who did not mail their application after successfully completing it at our workshop who we spoke with, approximately 40% did not mail in their application because they could not afford the current fee of $725.00 and did not qualify for a fee waiver.

**Familiarity with the Rule**

21. I am familiar with the "U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements" (the "Rule"). It is my

---

[2] Although the data are too preliminary for meaningful analysis, OneAmerica believes that long term use of online workshops will exclude eligible individuals who do not have access to technology from utilizing OneAmerica's services. OneAmerica believes that permanent, exclusive use of technology to provide services is incompatible with its mission.

5
DECLARATION OF RICH STOLZ – Case No. 4:20-cv-05883-JSW

understanding that the Rule would increase fees for N-400 naturalization applications by over 80%. At the same time, the Rule will decrease the fee to renew permanent resident status on form I-90 by paper from $455 to $415, which is a 9 percent decrease. Partial fees will no longer be available for N-400 applications. For applicants who would have qualified for the partial fee, the Rule increases the N-400 fee for filing by paper from $320 to $1,170, which is an increase of 226%. Over the last two years, approximately 5% to 12% of OneAmerica's filed N-400 applications have included a request for a partial fee.

22. Table 3 of the Rule shows the limited categories of applicants who are eligible for fee waivers under the Rule. Most applicants will no longer be eligible for fee waivers for any forms, including N-400 naturalization applications, I-765 applications for employment authorization, and I-485 applications for permanent residence. Of those applicants who can even seek a fee waiver, the Rule also changes the requirements to qualify for a fee waiver.  The Rule reduces the number of fee waivers available by allowing fee waivers only for those applicants who have household incomes at or below 125% of the federal poverty guidelines. Currently, applicants may be eligible for a fee waiver if they receive a means-tested benefit, have household incomes at or below 150% of the federal poverty guidelines, or can establish financial hardship. The Rule limits USCIS's own future discretion to change its approach to fee exemptions or waivers. Additionally, the Rule significantly limits how those who remain eligible for fee waivers can establish that they qualify by eliminating the option to prove eligibility via receipt of a means-tested benefit, income below 150% below the poverty guidelines, and economic hardship. The Rule also changes the legal standard for fee waiver eligibility from "inability to pay" to a set income-based standard. These changes mean that individuals in the statutorily protected populations who, under the prior rule, would have qualified for a fee waiver, will no longer qualify. The Rule also imposes a new mandatory fee of $50 on applications for asylum, increases the fee for I-765 (non-DACA) applications for employment authorization from $410 to $550, and increases the fee for children for I-485 applications for permanent residence from $750 to $1,130, which is an increase of 51%.

23. OneAmerica submitted a comment to the Rule on December 30, 2019 and a supplemental comment on February 10, 2020. In light of the complexity of the proposed rule and lack of clarity about basis for costs or spending, the irregular comment period was inadequate for the organization to fully and completely respond to the harm the rule would cause to its grantees, clients, and itself.

**Effect of the Rule**

24. The Rule will have a profound impact on our program and on the clients we serve. The fee increases for naturalization will harm our organization's mission of making citizenship accessible to everyone who is eligible. The Rule will impose a new barrier for people who are eligible for citizenship, impacting primarily low income immigrant communities of color. When the Rule takes effect on October 2, 2020, we expect that the number of people who seek our assistance to apply for their citizenship will be greatly reduced.

25. In a comment we submitted to the proposed rule as part of the Naturalization Working Group, we cited research that demonstrates that the decision to apply for naturalization is price sensitive and that access to fee waivers resulted in naturalization of low-income immigrants who would not otherwise have applied. See Naturalization Working Group comment letter at page 6 (citing Manuel Pastor, Jared Sanchez, Rhonda Ortiz, Justin Scroggins, National Partnership for New Americans, "Nurturing Naturalization: Could Lowering the Fee Help" 17 (Feb. 2013) and Yasil Yasenov, Michael Hotard, Duncan Lawrence, Jens Hainmueller, and David D. Laitin, "Standardizing the fee-waiver application increased naturalization rates of low-income immigrants," 116 Proceedings of the National Academy of Sciences of the United States 16768 (Aug. 6, 2019)). We estimate that up to 80% of the population we serve would not be able to afford the new $1,170 paper filing fee, which represents an 83% increase from the current fee of $640 (+$85 biometrics fee). This estimate is based on the income information we have gathered, as well as our experience in providing service in the midst of the COVID-19 pandemic. Approximately 80% of applicants we assist fall within 300% of the federal poverty line. For a family of four, for example, that means the applicants earn less than $78,600 per year. Even for someone at the top of that income level, a $1,170 fee is almost a week's net wages. It would be very difficult for someone even at the very top of the 300% federal poverty line range to afford

the fee.[3] For someone at 200% of the federal poverty guidelines, the $1,170 represents a week and a half's wages. The 32% of our applicants who currently qualify for a fee waiver would face an even more significant burden. Under the previous rule, an individual making 150% of the federal poverty line or less could qualify for a fee waiver. For a family of four, for example, that means that former fee waiver eligible applicants earn $39,300 per year or less. Last fiscal year, our program helped more than 1,100 people.[4] An approximate 25 percent reduction in applications would put OneAmerica below the 900 applications required under the WNA contract. As explained above, OneAmerica expects that it will experience a significantly greater reduction in applications than just 25%.

26.     We have already witnessed a marked decrease in submitted applications. From our recent experience during the economic downturn and other historical financial data, we know that our target population is extremely cost-sensitive. Eliminating the possibility of a fee waiver or partial fee and increasing the fee for citizenship applications imposes monetary burdens that will suppress the number of our clients who will be able to submit citizenship applications similarly to the current pandemic.[5] The Rule further disproportionately impacts communities of color who not only suffer most from this rule's wealth test, but also suffer disproportionately from the impact of COVID. Many lawful permanent residents work in essential services with high risk of exposure, tend to live with multigenerational families with members at higher risk, have been laid off from work and are struggling to pay rent and

---

[3] Currently, when we follow-up with past attendees of our citizenship workshops, we find that individuals who were eligible and completed their N-400 successfully, never mailed the application in because they couldn't afford the fee. In FY19-FY20, we found that financial burden was the reason cited by 40% of the individuals we spoke with who did not mail their applications after our workshops. Sometimes people are able to save up the money to apply. For those saving, sometimes 6 months to a year goes by until they have the money. When this happens, we must start their application over because enough information has changed or there's a new form edition. That means we're doing double the work to help the same person. We anticipate that this scenario will become more frequent as fees increase.
[4] This number includes individuals OneAmerica helped directly as well as individuals helped through OneAmerica's grantee organizations. Several of OneAmerica's grantee organizations rely nearly entirely on funding from OneAmerica to support their organizations. The loss of funding from OneAmerica would be catastrophic for those organizations. Even organizations that have funding sources in addition to OneAmerica would face significant funding challenges. OneAmerica also provides training to grantees on complex naturalization issues. Some of the grantees do not have attorneys or DOJ representatives on staff meaning this training is essential to their ability to provide services.
[5] The combination of increased and un-waivable fees, necessity of using technology imposed by COVID-19, and the use of credit cards disproportionately impacts individuals that OneAmerica serves in rural areas or who have low income and little or no access to technology.

buy food, and lack access to affordable healthcare. An 83% increase in the filing fee along with elimination of the fee waiver will prevent people from applying if they must direct those funds to the basics of food, shelter and healthcare. Nor will individuals be able to simply pay for the fees in the Rule by credit card. Based on interactions with our clients, OneAmerica knows that many of the clients we serve do not have access to credit cards—some do not even have bank accounts.

27. The reduction in screenings and N-400s completed that result in new citizens will decimate the number of clients OneAmerica and our sub-grantees serve. The high costs of the applications and lack of waivers means that many individuals who would otherwise participate in OneAmerica's workshops and who would submit applications will not do so because they will be priced out of the process. We expect that many lawful permanent residents will opt to simply renew their green cards by submitting an I-90, the price for which decreased in the Rule. Our historical data show that individuals are cost sensitive and, even before the changes in the Rule, would often opt for the lower fee to renew their green card because they were unable to raise the funds to apply for naturalization.

28. Based on our estimated decline in applications, we would not be able to meet the requirements for our major sources of funding. Even for those grants not tied directly to application deliverables, the loss of other funding sources means that we will not be able to run the requisite number of workshops and citizenship days. In other words, the decline in completed applications will have a cascading effect that puts all of OneAmerica's naturalization funding at risk. Even if funding sources decide not to pull all funding due to OneAmerica not meeting its deliverables, it is likely that any reduced deliverable metric will be coupled with reduced funding. Further, OneAmerica has never failed to meet its deliverables. To do so would immediately damage OneAmerica's reputation as a community leader in the immigration advocacy and naturalization space. Of course, the inability to serve our community would not only blemish OneAmerica's reputation, but would prevent it from fulfilling its mission.

29. The decline in applications poses additional threats to OneAmerica's mission. In OneAmerica's experience, donors and government funders seek to maximize the impact their funding has. In the case of the State of Washington, part of the rationale for the WNA campaign came from its

calculation that it would end up *saving* money by assisting eligible individuals to attain citizenship. Controlling for all other factors, naturalized citizens are more likely to access higher education, become homeowners and business owners, and earn higher wages, than their non-naturalized foreign-born peers. Limiting access to naturalization for low income people fosters inequality in the United States. Further, naturalized citizens are *less* likely to use SNAP, TANF, and other public welfare programs in the future. In addition, naturalization, on average, accounts for an 8 to 11% increase in wages, which results in higher spending and more federal, state, and local taxes paid. With the anticipated decline in applications, OneAmerica anticipates that private and public funding sources will reassess the effectiveness of their investment and, in all likelihood, redirect those funds to other more impactful applications. OneAmerica is already planning a much bigger-than-usual spring advocacy campaign to make a case to the legislature to keep our funding even though we anticipate that we will be serving fewer people.

30. OneAmerica anticipates that it might have to lay staff off—losing invaluable expertise—or at the very least re-allocate staff within the organization to other programs.

31. The decline in submitted applications will also frustrate OneAmerica's mission. Assisting people to attain citizenship is the engine OneAmerica uses to drive political and civil leadership and build power within immigrant communities. OneAmerica's naturalization efforts are the starting point of connection with many of the individuals it seeks to empower and engage civically. Through the naturalization process, OneAmerica obtains contact information for its clients. Once those clients successfully naturalize, OneAmerica provides information about and assistance with non-partisan voter registration as well as more general civic engagement resources including leadership training. A decline in naturalization in the population OneAmerica serves means it will civically engage and empower fewer people. Should OneAmerica's naturalization program become defunct, this loss would significantly weaken our ability to deliver on our mission of advancing civic engagement and empowering the broader immigrant community.

32. Part of OneAmerica's mission is to provide citizenship classes through the organizations it re-grants funding to. With the imposition of heightened fees and the elimination of fee waivers,

1  OneAmerica anticipates that engagement in those programs will plummet. If individuals are unable to
2  afford naturalization, their need to attend citizenship classes would become less urgent to them.

3      33.    OneAmerica anticipates that the only way it might be able to account for the decline of
4  applications in the population it serves is to market its services to those with higher incomes. This
5  change in focus, however, would represent an abandonment of OneAmerica's mission—and the state's
6  purpose in funding the WNA—to serve those who would be otherwise unable to afford legal services.
7  Targeting a new client population would also be in tension with OneAmerica's efforts in addition to
8  naturalization. OneAmerica's programs all target low-income communities. Were OneAmerica to
9  change the population to which it offers naturalization resources, those connections would no longer
10 feed into OneAmerica's other efforts.

11     34.    This Rule has and will require OneAmerica to divert its resources. OneAmerica has
12 already begun shifting its resources to focus to informing LPR's about the new fees and is spending
13 additional resources to inform the community. Writing, editing, and placing ads as part of this work is
14 taking up far more staff time than expected which has limited our ability to keep up with the demand for
15 services. OneAmerica has found it necessary to assist as many applicants as possible, especially those
16 who are currently eligible for fee waivers, prior to the effective date of the Rule. This unexpected surge
17 in demand and diversion of our resources has begun. For example, OneAmerica will hold two virtual
18 citizenship days in September instead of its usual one and has decided to change its pre-event screening
19 to identify fee-waiver eligible applicants and prioritize their attendance. OneAmerica is also developing
20 new post-workshop closing procedures to verify all fee waivers and applications to minimize lockbox
21 rejections. Additionally, OneAmerica is reaching out to all recent past clients who have not mailed their
22 applications to let them know about the fee increases.

23     35.    As fewer people in the population OneAmerica serves can afford to file citizenship
24 applications, OneAmerica will need to expend additional resources and extend its efforts in an effort to
25 accomplish the same number of completed applications. Adjusting to the changes will require us to
26 adapt, if not wholly restructure, our service delivery model, the resources for which the State or NAC
27 have not funded.

28

36. We will have to invest additional resources to continue delivering citizenship assistance as we realize a drop in the number of naturalization applications completed as a result of the more onerous fee waiver application process for the fee applicants who would qualify for a fee waiver under the Rule. Alternatively, OneAmerica will incur expenses as it transforms its program to reach communities it currently does not serve that may afford the fee thereby keeping our organization operational.

37. OneAmerica will invest countless hours of unbudgeted staff time to revise materials for volunteers and potential applicants to inform all about the increased fees and elimination of the fee waiver and the complexity of the new regime with respect to the sliver of individuals who can still receive fee waivers.

38. Additionally, OneAmerica has and will continue to expend precious time and resources advocating against the rule and working to mitigate its deleterious impact. OneAmerica anticipates needing to divert resources in an attempt to have the State establish a naturalization subsidization fund or to engage private philanthropy to assist in providing funding both to OneAmerica and to assist applicants with being able to afford filing the applications. At the national level, OneAmerica has already been engaged in efforts to have Congress legislatively prohibit the removal of fee waivers. OneAmerica anticipates continuing these efforts after the Rule becomes effective. Time spent on the above efforts would otherwise have been spent on other work to further OneAmerica's mission.

39. I am aware of no mechanism in the Rule or any federal program by which OneAmerica could be compensated for damage to our reputation, lost funding, lost productivity, or increased costs. Many of the expected impacts to OneAmerica and its clients and other programs could not be mitigated financially in any event.

1  I declare under penalty of perjury and under the laws of the United States that the foregoing is
2  true and correct. Executed Seattle, Washington on August 18, 2020.

_____