1  ALLISON A. DAVIS (CA State Bar No. 139203)
   MARK ROGGE (CA State Bar No. 298381)
2  DAVIS WRIGHT TREMAINE LLP
   505 Montgomery Street, Suite 800
3  San Francisco, California  94111
   Telephone:     (415) 276-6500
4  Facsimile:     (415) 276-6599
   Email: allisondavis@dwt.com
5          markrogge@dwt.com

6  Attorneys for *Amici Curiae* Cato Institute

7              **IN THE UNITED STATES DISTRICT COURT**

8             **THE NORTHERN DISTRICT OF CALIFORNIA**

9                      **OAKLAND DIVISION**

10

11  IMMIGRANT LEGAL RESOURCE CENTER;        Case No. 4:20-cv-05883-JSW
    EAST BAY SANCTUARY COVENANT;
12  COALITION FOR HUMANE IMMIGRANT          **BRIEF FOR *AMICUS CURIAE* CATO**
    RIGHTS; CATHOLIC LEGAL IMMIGRATION      **INSTITUTE IN SUPPORT OF**
13  NETWORK, INC.; INTERNATIONAL            **PLAINTIFFS**
    RESCUE COMMITTEE; ONEAMERICA;
14  ASIAN COUNSELING AND REFERRAL           Assigned to Hon. Jeffrey S. White
    SERVICE; ILLINOIS COALITION FOR
15  IMMIGRANT AND REFUGEE RIGHTS,           Date: October 9, 2020
                                            Time: 9:00 a.m.
16          Plaintiffs,                     Department: 5, 2nd Floor

17     v.

18  CHAD F. WOLF, *under the title of Acting*
    *Secretary of Homeland Security*; U.S.
19  DEPARTMENT OF HOMELAND SECURITY;
    KENNETH T. CUCCINELLI, *under the title of*
20  *Senior Official Performing the Duties of the*
    *Deputy Secretary of Homeland Security*; U.S.
21  CITIZENSHIP & IMMIGRATION SERVICES,

22          Defendants.

23

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE* ............................................................. vii

SUMMARY OF ARGUMENT ..................................................................... vii

I.    THE PRESIDENT HAS NO POWER TO MAKE TEMPORARY, NON-RECESS
      APPOINTMENTS OUTSIDE OF THOSE AUTHORIZED BY STATUTE ................... 1

      A.    The Text and Purpose of the Appointments Clause Limits Presidential
            Appointment Power ................................................................. 1

      B.    For Over 100 Years, the Executive Branch Unfailingly Agreed ........................... 2

      C.    The Courts Have Consistently Ruled That the Appointment Power Is Limited. ..... 5

      D.    Congressional Acts Are Aligned with This Limited Interpretation. ....................... 7

II.   COURTS SHOULD INTERPRET STATUTES PURPORTEDLY WAIVING "ADVICE
      AND CONSENT" UNDER A CLEAR STATEMENT STANDARD ............................... 9

      A.    Statutes That Alter Default Balances of Power Are Interpreted under a Clear-
            Statement Standard ................................................................. 10

      B.    "Advice and Consent" Was Intended to Be—and Remains—the Default Balance
            of Power ........................................................................... 13

      C.    The Attorney General and the Courts Have Strictly Interpreted the Vacancies
            Act ................................................................................. 16

III.  THE FVRA DOES NOT CLEARLY AND EXPLICITLY WAIVE "ADVICE AND
      CONSENT" FOR APPOINTMENTS OF INDETERMINATE DURATION ................. 19

CONCLUSION ...................................................................................... 22

DAVIS WRIGHT TREMAINE LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Atascadero State Hospital v. Scanlon*,
    473 U.S. 234 (1985) ............................................................................................... 11, 12

*BFP v. Resolution Trust Corp.*,
    511 U.S. 531 (1994) ............................................................................................... 11, 12

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
    403 U.S. 388 (1971) ..................................................................................................... 13

*Buckley v. Valeo*,
    424 U.S. 1 (1976) .......................................................................................................... 2

*Carlson v. Green*,
    446 U.S. 14 (1980) ...................................................................................................... 13

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*,
    536 U.S. 424 (2002) .................................................................................................... 12

*Cleveland v. United States*,
    531 U.S. 12 (2000) ...................................................................................................... 12

*Davis v. Passman*,
    442 U.S. 228 (1979) .................................................................................................... 13

*Doolin Sec. Sav. Bank v. Office of Thrift Supervision*,
    329 U.S. App. D.C. 166, 139 F.3d 203 (1998) .......................................................... 20

*Edelman v. Jordan*,
    415 U.S. 651 (1974) .................................................................................................... 11

*Edmond v. United States*,
    520 U.S. 651 (1997) ............................................................................................ 1, 13, 15

*Freytag v. Comm'r*,
    501 U.S. 868 (1991) .............................................................................................. 10, 15

*George v. Ishimaru*,
    849 F. Supp. 68 (D.D.C. 1994) ................................................................................... 4

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ............................................................................................... 11, 12

*I.N.S. v St. Cyr*,
    533 U.S. 289 (2001) .................................................................................................... 13

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

*Kucana v. Holder*,
    558 U.S. 233 (2010) ...................................................................................... 13

*L.M.-M. v. Cuccinelli*,
    442 F. Supp. 3d 1 (D.D.C. 2020) ................................................. viii, 7, 10, 19

*Morrison v. Olson*,
    487 U.S. 654 (1988) ................................................................................. 2, 10

*NLRB v. SW Gen., Inc.*,
    137 S. Ct. 929 (2017) ......................................................................... *passim*

*Olympic Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision*,
    732 F. Supp. 1183 (D.D.C. 1990) ...................................................... 6, 16, 18

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947) ...................................................................................... 12

*Ryder v. United States*,
    515 U.S. 177 (1995) ...................................................................................... 15

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001) ...................................................................................... 12

*United States v. Bass*,
    404 U.S. 336 (1971) ...................................................................................... 11

*United States v. Germaine*,
    99 U.S. 508 (1878) .......................................................................................... 1

*United States v. Maurice*,
    26 F. Cas. 1211 (C.C.D. Va. 1823) ................................................................. 5

*Will v. Mich. Dep't of State Police*,
    491 U.S. 58 (1989) ........................................................................................ 12

*Williams v. Phillips*,
    360 F. Supp. 1363 (D.D.C. 1973) .............................................................. 5, 6

**Statutes**

5 United States Code
    ch. 33 ............................................................................................................ 20
    § 551 ............................................................................................................. 21
    § 551(13) ....................................................................................................... 21
    § 706(2)(A) ...................................................................................................... 7
    §§ 3345–3349 (Federal Vacancies Reform Act) ................................... *passim*
    § 3345(a) ...................................................................................................... 19
    § 3346 (1998) ............................................................................................... 20
    § 3346(a)(1) ............................................................................................ 19, 20
    § 3346(a)(2) .................................................................................................. 20

§ 3347(a) .................................................................................................... 9
§ 3347(a)(1)(A) ........................................................................................ 19
§ 3348 ................................................................................................ 20, 21
§ 3348 (1997) ............................................................................................ 20
§ 3348(d)(1) .......................................................................................... 7, 21

6 United States Code
§ 113 ......................................................................................................... 21
§ 113(g)(1) ................................................................................................ 20
§ 113(g)(2) ................................................................................................ 20
§ 113(g)(3) ................................................................................................ 20

Act of February 13, 1795, Chapter 21, 1 Stat. 415 ........................................ 8

Act of July 23, 1868 (1868 Vacancies Act), Chapter 227, 15 Stat. 168 §§ 3, 4 .......................... 9

Act of May 8, 1792, Chapter 37, § 8, 1 Stat. 281 .......................................... 8

**Regulations**

Executive Order 13753 ................................................................................. 21

**Constitutional Provisions**

United States Constitution
Eleventh Amendment ................................................................................ 11
Article I, § 8, cl. 3 (Commerce Clause) ................................................... 11
Article II, § 2, cl. 2 (Appointments Clause and Excepting Clause) ............................... *passim*
Article II, § 2, cl. 3 (Recess Appointments Clause) ............................... 1, 2
Article II, § 3 (Take Care Clause) ...................................................... 4, 5, 6

**Legislative Materials**

144 Congressional Record S12,824 (daily ed. Oct. 21, 1998) (statement of Sen. Byrd) ............... 9

144 Congressional Record S6 (daily ed. June 16, 1998) (statement of Sen. Thompson) ............ 19

Cong. Globe, 40th Cong., 2d Sess. (1868) ............................................... 8, 9

**Administrative Proceedings**

6 U.S. Op. Atty. Gen. 1 (1853) ....................................................................... 3

15 U.S. Op. Atty. Gen. 3 (1875) ................................................................... 17

15 U.S. Op. Atty. Gen. 449 (1878) ............................................................. 17

16 U.S. Op. Atty. Gen. 596 (1880) ............................................................... 3

17 U.S. Op. Atty. Gen. 530 (1883) ............................................................... 3

17 U.S. Op. Atty. Gen. 532 (1883) ............................................................... 3

DAVIS WRIGHT TREMAINE LLP

18 U.S. Op. Atty. Gen. 409 (1886) ................................................................. 17

18 U.S. Op. Atty. Gen. 58 (1884) ..................................................................... 3

18 U.S. Op. Atty. Gen. 98 (1885) ..................................................................... 4

19 U.S. Op. Atty. Gen. 503 (1890) ................................................................. 17

20 U.S. Op. Atty. Gen. 8 (1891) ....................................................................... 3

27 U.S. Op. Atty. Gen. 337 (1909) ................................................................. 18

28 U.S. Op. Atty. Gen. 95 (1909) ................................................................... 17

2 Op. O.L.C. 113 (1978) ..................................................................................... 4

20 Op. O.L.C. 124 (1996) ................................................................................... 4

*Department of Homeland Security—Legality of Service of Acting Secretary of*
*    Homeland Security and Service of Senior Official Performing the Duties of*
*    Deputy Secretary of Homeland Security (2020) ("GAO Decision")* ...................................... 21

*In re Acting Fed. Ins. Administrator's Status & Auth.*,
    56 Comp. Gen. 761 (Comp. Gen. June 29, 1977) ................................................. 4, 5

Mem. for Neil Eggleston, Associate Counsel to the President, from Walter Dellinger,
    Assistant Attorney General, Office of Legal Counsel, *Re: Appointment of an Acting*
    *Staff Director of the United States Commission on Civil Rights* ................................ 4

**Other Authorities**

2 Max Farrand, The Records of the Federal Convention of 1787 (Max Farrand
    ed., 1911) ..................................................................................................... 14

3 Max Farrand, The Records of the Federal Convention of 1787 (Max Farrand
    ed., 1911) ..................................................................................................... 14

4 Elliot's Debates (Jonathan Elliot ed., 1861) ................................................. 14

Adam J. White, *Toward the Framers' Understanding of "Advice and Consent": A*
    *Historical and Textual Inquiry*, 29 Harv. J. L. & Pub. Pol'y 103 (2005) ............................... 16

Brannon P. Denning, *Article II, the Vacancies Act and the Appointment of*
    *"Acting" Executive Branch Officials*, 76 Wash. U. L.Q. 1039 (1998) .................................. 6

*The Federalist No. 76* (Alexander Hamilton) (Clinton Rossiter ed., 1961) ................................ 14

*The Federalist No. 82* (Alexander Hamilton) (Clinton Rossiter ed., 1961) ................................ 10

Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev.
    527 (1947) ..................................................................................................... 11

DAVIS WRIGHT TREMAINE LLP

Laurence H. Tribe, American Constitutional Law § 6-25 (2d ed. 1988) ..................................... 11

Lois Reznick, *Temporary Appointment Power of the President*, 41 U. Chi. L. Rev. 146 (1973) ................................................................................................................. 1

U.S. Government Policy and Supporting Positions (Plum Book) 2012, Appointment Type: Presidential Appointment with Senate Confirmation (PAS), http://bit.ly/2cX8BBY ............................................................................... 15

U.S. Government Policy and Supporting Positions (Plum Book) 2012, Appointment Type: Presidential Appointment (without Senate Confirmation) (PA), http://bit.ly/2d2AcTx ............................................................................... 15

William Loughton Smith, *Alteration in the Treasury and War Departments, Communicated to the House of Representatives, Feb. 29, 1792*, 1 American State Papers: Miscellaneous 46–47 ................................................................. 8

DAVIS WRIGHT TREMAINE LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTEREST OF *AMICUS CURIAE***

The Cato Institute is a nonpartisan public-policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, and produces the annual *Cato Supreme Court Review*. This case interests Cato because it concerns how courts approach statutes that purportedly waive the Senate's advice-and-consent role, a core check-and-balance mechanism in our separation of powers.

No counsel for any party authored this brief in whole or in part, and no person or entity other than amicus funded its preparation or submission.

**SUMMARY OF ARGUMENT**

The Federal Vacancies Reform Act (FVRA), 5 U.S.C. §§ 3345–3349, authorizes the president to make appointments of "acting" officers, without the Senate's advice and consent, when vacancies arise in certain offices. These "acting" officers have as much power as their permanent counterparts, but can only stay on the job for a limited time, during which Congress and the president can (hopefully) find someone mutually agreeable for the permanent position. The limited time of these appointments is the basis for Congress waiving its advice and consent in favor of administrative efficiency. If the president were allowed to exceed the limited time at will, that would provide an end-run around advice and consent.

This case is a dispute about whether the FVRA authorized the appointment of Kevin McAleenan and Chad Wolf as successive acting secretaries of the Department of Homeland Security (DHS), and therefore whether rules promulgated by them have any force. The ramifications of this case go beyond its facts about enforcement of a statute. At its core, this case is about preserving the historical balance of power between the executive and legislative branches of government.

Put simply, the FVRA is a congressional waiver of advice and consent, as permitted by the Constitution's "Excepting Clause." It vests the appointment of limited-tenure officers in "the

DAVIS WRIGHT TREMAINE LLP

President alone." It thus alters the default rule, where the Senate serves as a check on the executive's appointments, in favor of administrative efficiency. This fact illuminates how the Court should approach disputes concerning the validity of unilateral appointments that exceed the bounds of the FVRA.

When courts confront statutes that purportedly alter the government's balance of power—whether between the states and the federal government or between federal branches—courts do not treat both sides of a textual argument with equal weight. Instead, balance-of-power concerns require that the reading of a statute that would *alter* the traditional balance must be supported by a "clear statement" of legislative intent. Put simply, even if a statute is ambiguous—which the FVRA is not—the tie must go to the default balance our Framers designed. Recently, the Supreme Court strictly interpreted the FVRA, finding that a complaint by an acting general counsel was invalid because his appointment violated the FVRA. *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929 (2017). The D.C. Circuit has recently reviewed an appointment by Mr. McAleenan, finding that the appointment of Kenneth Cuccinelli violated the FVRA. *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020).

Applying this approach here makes the necessary result clear. Advice and consent is undoubtedly a core component of the balance of powers between the executive and legislative branches. And Congress did not, in the FVRA, make a "clear statement" that appointments such as those of Kevin McAleenan and Chad Wolf could bypass advice and consent. On the contrary, Congress has mandated strict time limits on such appointments. This Court should err on the side of the accountability that comes from the two-branch appointment process, just as the Framers did in designing the Appointments Clause. For this reason, these unilateral appointment should be held invalid, and any rules promulgated under them should have no force or effect.

DAVIS WRIGHT TREMAINE LLP

BRIEF OF *AMICUS CURIAE* CATO INSTITUTE                    Case No. 4:20-cv-05883-JSW

## I.   THE PRESIDENT HAS NO POWER TO MAKE TEMPORARY, NON-RECESS APPOINTMENTS OUTSIDE OF THOSE AUTHORIZED BY STATUTE

### A.   The Text and Purpose of the Appointments Clause Limits Presidential Appointment Power

The Appointments Clause declares that the president

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

> The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.

U.S. Const. art. II, § 2, cl. 2-3.

Under the plain text of these clauses, "the President is given express authority to make appointments without the advice and consent of the Senate in only two instances—where Congress has by law given this right to the President and where a vacancy occurs while the Senate is in recess." Lois Reznick, *Temporary Appointment Power of the President*, 41 U. Chi. L. Rev. 146, 148 (1973). Not only does the clause lack any other *express* grant of appointment power, but also the structure of the clause excludes

> any implied powers of appointment, in particular any implied power to make temporary appointments to insure the smooth flow of governmental functions pending submission of a nomination to the Senate. If the President had such power, the recess vacancy clause would be mere surplusage. . . . The recess vacancy clause thus compels rejection of an implied temporary appointment power.

*Id.* The last portion of the Appointments Clause, known as the "Excepting Clause," provides further evidence that no such inherent power to appoint exists. This clause gives Congress the option, if it chooses, of vesting the appointments of particular officers in "the President alone." Although almost no debate occurred at the Constitutional Convention concerning the Excepting Clause, the Supreme Court has recognized that the clause's "obvious purpose is administrative convenience." *Edmond v. United States*, 520 U.S. 651, 660 (1997). The Framers included the Excepting Clause "foreseeing that when offices became numerous and sudden removals necessary, [advice and consent] might be inconvenient" in particular circumstances. *United*

DAVIS WRIGHT TREMAINE LLP

*States v. Germaine*, 99 U.S. 508, 510 (1878). But if the president could make unilateral temporary appointments for the sake of administrative convenience *without* statutory authorization, the Excepting Clause, like the Recess Appointments Clause, would be surplusage; it would authorize Congress to give the president a power he already has.

Finally, the Appointments Clause leaves no room for the concept of an "acting officer" who is not a constitutional officer, and thus need not be appointed under the Appointments Clause. As the Court has said, "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by [the Appointments Clause]." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976). While acting officers serve, they exercise just as much authority as permanent officers. And the Court has recognized that where such significant authority is exercised, even appointments to explicitly time-limited offices must still be made in accordance with the Appointments Clause. *See id.* at 132 ("No class or type of officer is excluded [from the Appointments Clause] because of its special functions."). Thus, any argument that "acting officers" need *not* be appointed pursuant to the Appointments Clause merely because their tenure is limited would be in severe tension with precedent.

The best view of both the original Vacancies Act and the FVRA, then, is that "acting" officials are "inferior officers,"[1] and that the FVRA derives its constitutionality from Congress's power to vest the appointment of inferior officers in "the President alone." The FVRA does not *take away* any emergency appointment power that the president would otherwise have; it instead *grants* additional power, which the president can only wield when it is given by statute.

**B.     For Over 100 Years, the Executive Branch Unfailingly Agreed**

Until the last 40 years, when controversies between the executive and legislative branch began to grow more heated (and more litigious), the executive branch's interpretation of its temporary appointment power was consistent with that of the plain text of the Appointments

---

[1] Although some officers covered by the FVRA are considered principal officers when acting in a permanent capacity, the time-limited nature of acting officers plausibly makes them inferior officers. The Supreme Court has held that limited tenure is one of the factors tending to indicate that an officer is inferior rather than principal. *See Morrison v. Olson*, 487 U.S. 654, 672 (1988).

DAVIS WRIGHT TREMAINE LLP

Clause. Going as far back as 1853, and for over 100 years since, the attorney general repeatedly advised the president that in the absence of express statutory authority, *all* appointments, including temporary appointments, must be made with the advice and consent of the Senate.

The foundational opinion in this sequence occurred during the Pierce administration, when a statute creating the new office of "assistant secretary of state" was silent as to the method of that officer's appointment. Asked whether, in this situation, the new officer could be appointed by the president alone or the secretary of state, Attorney General Caleb Cushing gave the following view of the structure of the Appointments Clause:

> Of course, without there be [sic] express enactment to the contrary . . . the appointment of any officer of the United States belongs to the President, by and with the advice and consent of the Senate. As there is no such express exceptional enactment in the present case, I think the Assistant Secretary of State must be nominated to the Senate by the President.

6 U.S. Op. Atty. Gen. 1, 1 (1853).

After the passage of the Vacancies Act in 1868, the attorneys general expanded this reasoning to *temporary* appointments, definitively holding that no appointment power existed beyond the Act's authorization. In 1880, after the Senate had failed to fill a vacancy in the office of secretary of the navy for ten days (then the statutory length of tenure for acting officers), President Hayes asked Attorney General Charles Devens if he could make a second acting appointment to that office for an additional period of ten days. Devens responded

> that the vacancy in the office of Secretary of the Navy . . . cannot be filed by designation of the President beyond the period of ten days. This power of the President is a statutory power, and we must look to the statute for its definition. *. . . The statutory power being exhausted, the President is remitted to his constitutional power of appointment.*

16 U.S. Op. Atty. Gen. 596, 597 (1880) (emphasis added). *See also* 17 U.S. Op. Atty. Gen. 530 (1883) (likewise advising that temporary appointments are limited to 10 days); 18 U.S. Op. Atty. Gen. 58 (1884) (same); 20 U.S. Op. Atty. Gen. 8 (1891) (same).

Later, in two separate opinions, Attorney General Benjamin H. Brewster advised that even where a statute *formerly* vested nomination in the president alone or in a department head, advice and consent is still necessary when an updated version of the statute is silent as to the appointment method. *See* 17 U.S. Op. Atty. Gen. 532 (1883) (treasury secretary can no longer

DAVIS WRIGHT TREMAINE LLP

appoint assistant engineers in the revenue-cutter service after revised statute eliminated appointments language); *see also* 18 U.S. Op. Atty. Gen. 98 (1885) (treasury secretary can no longer appoint assistant collector at the port of New York for same reason). In both opinions, Brewster emphasized the necessity of current and explicit statutory authorization for appointments without advice and consent:

> [W]ithout any statutory provision on the subject of appointment . . . the general rule which is deducible from [the Appointments Clause] becomes applicable to and controls the question under consideration, namely, that the appointment of all officers of the United States belongs to the President, by and with the advice and consent of the Senate, where the appointment thereof is not otherwise provided for in the Constitution itself or by legislative enactment.

18 U.S. Op. Atty. Gen. 98, 98 (1885).

It is only recently, as relations between the branches have grown more acrimonious, that the executive branch's legal interpretation has moved toward an interpretation more favorable to its own powers. Even in 1977, the Comptroller General of the United States agreed that, "After [the then 30 day period for an acting administrator to serve had expired], there was no legal authority for incumbent or anyone else to serve as Acting Insurance Administrator." *In re Acting Fed. Ins. Administrator's Status & Auth.*, 56 Comp. Gen. 761 (Comp. Gen. June 29, 1977). But in 1978, the Office of Legal Counsel advised that without statutory authority "the reasonableness of a given interim appointment should be measured not by a per se rule but by a variety of pragmatic factors." 2 Op. O.L.C. 113, 118 (1978). More recently, during the height of a highly partisan battle over appointments to the U.S. Commission on Civil Rights (and in a decade when the president had twice argued in court that temporary appointments were authorized by the Take Care Clause, *see*, *e.g.*, *George v. Ishimaru*, 849 F. Supp. 68, 71 (D.D.C. 1994)), an OLC official went so far as to argue that "the Vacancies Act constitutes a restriction on the President's authority, as opposed to a source of power." *See* 20 Op. O.L.C. 124, 164 (1996) (quoting Mem. for Neil Eggleston, Associate Counsel to the President, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Appointment of an Acting Staff Director of the United States Commission on Civil Rights* at 3 (Jan. 13, 1994)).

Even though a contrary interpretation would often have been of great use to the executive branch, for over 100 years the office of the attorney general advised against any inherent power

DAVIS WRIGHT TREMAINE LLP

of unilateral appointment, temporary or otherwise. Given the frequent litigation over temporary appointments in recent decades, it should not be surprising that OLC opinions have begun to look more favorably on such a power. Courts should put greater weight on the fact that a long line of attorneys general, examining our constitutional structure dispassionately, were willing to tell their own president that a power he would have liked to wield simply didn't exist.

### C. The Courts Have Consistently Ruled That the Appointment Power Is Limited.

Courts have consistently rejected presidential appointments—even *acting* appointments—without statutory authority. As early as 1823, when none other than Chief Justice John Marshall, sitting as circuit justice, held that the president's general duty to "take care that the laws be faithfully executed" did not give him the power to unilaterally create an office and appoint an officer to it. *See United States v. Maurice*, 26 F. Cas. 1211 (C.C.D. Va. 1823) (No. 15,747). Marshall rejected the proposition that any type of officer existed which need not be appointed pursuant to the Appointments Clause. The Excepting Clause in particular, he wrote, "indicates an opinion in the framers of the constitution, that they had provided for all cases of offices." *Id.* at 1213. Marshall thus held the unilateral appointment in question to be invalid, *id.* at 1218, and affirmed that *all* appointments must be made with the advice and consent of the Senate unless otherwise provided for by law. *Id.* at 1213-14.

More recently, the D.C. District Court confronted a case that—like this one—concerned the validity of a temporary appointment made under the Vacancies Act. *See Williams v. Phillips*, 360 F. Supp. 1363 (D.D.C. 1973), Motion for Stay Pending Appeal denied, 482 F.2d 669 (D.C. Cir. 1973) (per curiam). President Nixon had appointed Howard Phillips to be Acting Director of the Office of Economic Opportunity (OEO), *id.* at 1366, but the terms of the Vacancies Act did not expressly encompass appointments to the OEO. *Id.* at 1370. Phillips, like Maurice 140 years earlier, argued that the president had appointed him under his general Take Care Clause powers and that he therefore did not need statutory authorization. *Id.* at 1367.

The court rejected this argument, holding the appointment to be invalid and enjoining Phillips from acting as director of the OEO. *Id.* at 1371. As the court noted, the view that the president has some inherent temporary appointment power is in conflict with the 200-year-old

practice of Congress of authorizing *particular* temporary appointments by statute: "If the President has an inherent (or more properly, derivative) power to make temporary appointments of federal officers . . . then the Vacancies Act would be unconstitutional." *Id.* at 1369. The court recognized instead that "[t]he vacancies statutes . . . are clear examples of the vesting by the Congress of an appointive power in the President or Department head alone that would not otherwise exist. Congress has merely exercised the power conferred upon it by the Constitution." *Id.* at 1371. Thus, "in the absence of . . . legislation vesting a temporary power of appointment in the President, the constitutional process of nomination and confirmation must be followed." *Id.*

Seventeen years later, the same court reached the same conclusion. *See Olympic Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision*, 732 F. Supp. 1183 (D.D.C. 1990), appeal dismissed as moot and case remanded, 903 F.2d 837 (D.C. Cir. 1990) (per curiam). President George H.W. Bush had appointed Salvatore Martoche to be acting director of the Office of Thrift Supervision, but the court found that the appointment was not authorized under the Vacancies Act. *Id.* at 1199. With the statutory authorization held invalid, the *Olympic* court once again rejected the Take Care Clause argument. The court noted that if the president held such a power, the Vacancies Act would be either meaningless surplusage or an unconstitutional limitation on presidential power, and that it was "not inclined to hold that the Vacancies Act, relied on by all branches of the government for more than 100 years, is and always has been unconstitutional." *Id.* at 1200 (citations omitted).

As one scholar summarized, "courts have consistently rejected the proposition that the President may evade the Appointments Clause by claiming an inherent power to fill vacancies under the so-called 'Take Care Clause.'" Brannon P. Denning, *Article II, the Vacancies Act and the Appointment of "Acting" Executive Branch Officials*, 76 Wash. U. L.Q. 1039, 1042 (1998). Although not binding precedent, these opinions are highly persuasive, particularly as to the place of the Vacancies Acts in our constitutional structure. If the FVRA *grants* the president additional powers, its authority is found in the Excepting Clause. But if the FVRA were instead imagined to *take away* a preexisting and inherent presidential power, identifying the constitutional authority for such an abrogation would be very hard indeed.

In a recent U.S. Supreme Court case that narrowly construes the FVRA, the Court held an official's complaint was void, as he could not act in the capacity of general counsel of the NLRB. *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929 (2017). In 2010, President Obama directed Lafe Solomon to serve as acting general counsel for the National Labor Relations Board ("NLRB"). Then, in 2011, the president nominated Solomon to serve permanently. The Senate did not take action on the nomination, and the President withdrew Solomon. During the time Solomon was acting general counsel, the NLRB issued an unfair labor practices complaint against SW General, Inc., which challenged the NLRB complaint under the FVRA. It argued that the complaint was invalid because Solomon was ineligible to be acting general counsel after being nominated to fill the position. The Court agreed with SW General, and voided the complaint. *Id.,* 943-944.

This Court is not the first to review appointments stemming from Kevin McAleenan. *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 29 (D.D.C. 2020); Comp. ¶ 248. The Government Accountability Office ("GAO") issued a decision that McAleenan incorrectly assumed the title of acting secretary, and therefore his amendments to DHS orders were an invalid basis for other officials to assume their positions, including Chad Wolf and Kenneth Cuccinelli. Comp. ¶ 251. The D.C. District Court held "that Cuccinelli was designated to serve as the acting Director of USCIS in violation of the FVRA." *Cuccinelli*, 442 F. Supp. at  29. Because Cuccinelli was not lawfully appointed, two directives at issue in that case were "set aside as *ultra vires* under both the FVRA, 5 U.S.C. § 3348(d)(1), and the APA, 5 U.S.C. § 706(2)(A)." *Id.* at 37.

**D.    Congressional Acts Are Aligned with This Limited Interpretation.**

The fact that Congress has enacted a Vacancies Act—as well as several comprehensive revisions to that act—underscores that Congress believes its own authorization is necessary for any unilateral temporary appointments. The Second Congress, which comprised many people who had signed or ratified the Constitution, demonstrated this view just three years after the government was first established. In 1792, Congress passed an act declaring that in the case of a vacancy in any office

> whose appointment is not in the head [of that office's department], . . . it shall be lawful for the President of the United States, in case he shall think it necessary, to

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

authorize any person or persons at his discretion to perform the duties of the said respective offices until a successor be appointed, or until such absence or inability by sickness shall cease.

Act of May 8, 1792, ch. 37, § 8, 1 Stat. 281.[2]

Unlike later statutes authorizing temporary appointments, this grant of appointment power did not come with any limit on the tenure of these appointments, meaning its enactors could not have possibly intended the statute as a *limitation* on some preexisting presidential appointment power.[3] This strongly suggests that a majority of the Second Congress believed the power would *not* have existed at all without the Act's passage.

Moreover, the exclusion of officers appointed by the "heads of departments" from the grant of presidential appointment power clearly implies that the Second Congress had the Excepting Clause in mind when drafting the statute, specifically its three potential repositories of the appointment power ("in the President alone, in the Courts of Law, or in the Heads of Departments"). Congress had already vested some appointments in the heads of departments in order to aid administrative efficiency, and was now vesting other—temporary—appointments in "the President alone" for the same purpose.

The text and debates concerning the first Vacancies Act, passed in 1868, show the same understanding in the 40th Congress as there was in the Second Congress. Members of Congress frequently referred to the Act as a bill "to *authorize* the temporary supply of vacancies in the Executive Departments." *See, e.g.,* Cong. Globe, 40th Cong., 2d Sess., 4025 (1868) (statement of Sen. Trumbull, emphasis added) [hereinafter Globe]; *see also id.* at 1769 (statement of Rep. Wilson). The term "authorize" was likewise used in the text of the act itself.[4] When introducing

---

[2] The Second Congress added the Act's grant of temporary appointment power during the amendment process, a power not included in the original committee draft written. *See* William Loughton Smith, *Alteration in the Treasury and War Departments, Communicated to the House of Representatives, Feb. 29, 1792,* 1 American State Papers: Miscellaneous 46–47 (original draft, proposing a cumbersome system of succession to fill vacant offices within each department, §§ 8–11, and not providing for any presidential power of temporary appointment). This fact increases the interpretive weight of the Act's grant of temporary appointment power, as it reflected the views of a majority of the Second Congress.

[3] It was only three years later, in 1795, that the statute was amended so that "no one vacancy shall be supplied, in manner aforesaid, for a longer term than six months." Act of Feb. 13, 1795, ch. 21, 1 Stat. 415.

[4] The Act provided, "[t]hat nothing in this act shall *authorize* the supplying as aforesaid a vacancy for a longer period than ten days when such vacancy shall be occasioned by death or

---

8

the bill, Senator Trumbull described it as providing that "it shall be *lawful* for the President" to make certain temporary appointments up to 10 days. Globe at 1163 (emphasis added). And like the Second Congress, the 40th also included the phrase "it shall be lawful" in the text of the bill itself. *See* 1868 Vacancies Act § 3.

Had Congress believed that the Act constrained some preexisting power of temporary appointment, it would have been more natural to describe it as making unlawful any temporary appointments *beyond* 10 days. But this terminology was never used; Congress consistently referred to the Act as an authorization and never as a restraint. Additionally, the Act repealed, by its own terms, all prior laws "which empower the President to authorize any persons" to act as temporary officials—1868 Vacancies Act § 4—which strongly suggests that Congress viewed such prior acts as granting the president a new power he did not already possess.

Most recently, in enacting the FVRA of 1998, Congress intended to end the executive branch's practice of using general-purpose statutes as justification for temporary appointments. The FVRA declares that, apart from other statutes that explicitly authorize temporary appointment power, it is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of" positions requiring Senate advice and consent. 5 U.S.C. § 3347(a). As one of the bill's primary sponsors explained, this language was included so that "general 'housekeeping' statutes . . . shall not be construed as providing an alternative means of filling vacancies." 144 Cong. Rec. S12,824 (daily ed. Oct. 21, 1998) (statement of Sen. Byrd). Once again, the premise upon which all of the drafters of the FVRA clearly operated was that temporary appointments could only be authorized by other statutes. Congressional intent underscores that the appointment power granted to the president by statute and the total appointment power of the president are one and the same.

## II. COURTS SHOULD INTERPRET STATUTES PURPORTEDLY WAIVING "ADVICE AND CONSENT" UNDER A CLEAR STATEMENT STANDARD

The FVRA, as permitted by the Excepting Clause, alters the default constitutional rule of appointments, allowing certain temporary appointments to bypass the advice-and-consent

resignation." Act of July 23, 1868, ch. 227, 15 Stat. 168 § 3 (emphasis added) [hereinafter 1868 Vacancies Act].

DAVIS WRIGHT TREMAINE LLP

procedure that would be necessary in the absence of an express statute. The dispute in this present case is how temporary those appointments must be.

Previous cases have dealt with issues of statutory interpretation such as whether a particular officer was "inferior" (*see, e.g.*, *Morrison*, 487 U.S. at 654), whether a designated appointer was a "Head of Department" or "Court of Law" (*see, e.g.*, *Freytag v. Comm'r*, 501 U.S. 868 (1991)), or the reach of the word "notwithstanding" (*see NLRB v. SW Gen., Inc.,* 137 S. Ct. 929 (2017)). But this case, and *Cuccinelli,* illustrate brazen end-runs around advice and consent. Clearly, statutes granting the president limited unilateral appointment powers should be interpreted under a clear-statement standard. Previous cases concerning equally serious alterations of default constitutional rules call for this standard. As waiving advice and consent alters a balance of power between branches of government designed to be the default equilibrium, courts need to hold such alterations to a clear-statement standard of explicitness.

### A.  Statutes That Alter Default Balances of Power Are Interpreted under a Clear-Statement Standard

When our constitutional design shows a preference for a default balance of power, courts require a high degree of statutory clarity before ruling that a legislature intended to alter that default balance. This principle has been applied most frequently in disputes between the federal government and the states and has a long history.[5] The Supreme Court has explained the reason for the clear-statement standard: "In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *United States v. Bass,* 404 U.S. 336, 349 (1971). Thus, "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." *Id.* As the Court

---

[5] Support for applying a clear-statement rule in state-federal relations has a distinguished pedigree. Alexander Hamilton himself recommended that the default rule of concurrent state and federal jurisdiction only be overruled by a clear statement:

When . . . we consider the State governments and the national governments, as they truly are, in the light of kindred systems, and as parts of ONE WHOLE, the inference seems to be conclusive that the State courts would have a concurrent jurisdiction in all cases arising under the laws of the Union *where it was not expressly prohibited.*

*The Federalist No. 82,* at 492 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (italics added, caps in original).

BRIEF OF *AMICUS CURIAE* CATO INSTITUTE                                    Case No. 4:20-cv-05883-JSW

DAVIS WRIGHT TREMAINE LLP

reiterated 20 years later, "[w]hen the Federal Government . . . radically readjusts the balance of state and national authority, those charged with the duty of legislating must be reasonably explicit." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 539–40 (1947) (internal quotations and alterations omitted).

In protecting this federal balance, the Supreme Court has been at its most strict when interpreting state statutes that purportedly waive a state's *own* rights against the federal government. In *Atascadero State Hospital v. Scanlon*, 473 U.S. 234 (1985), the Court declined to hold that a state had waived its immunity from suit in federal court "[i]n the absence of an unequivocal waiver specifically applicable to federal-court jurisdiction." *Id.* at 241. The Court thus affirmed a clear-statement rule going forward:

> because the Eleventh Amendment implicates the fundamental constitutional balance between the Federal Government and the States . . . a State will be deemed to have waived its immunity "only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction."

*Id.* at 239–40 (quoting *Edelman v. Jordan*, 415 U.S. 651, 673 (1974)) (internal alterations and quotation omitted).

The Supreme Court has taken a similar approach when interpreting federal statutes that purportedly encroach upon core state governmental functions, and thereby "upset the usual constitutional balance of federal and state powers." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Although that balance can be altered by means of "intrusive exercises of Congress' Commerce Clause powers," the Court "must be absolutely certain that Congress intended such an exercise" and thus will never "give the state-displacing weight of federal law to mere congressional ambiguity." *Id.* at 464 (quoting Laurence H. Tribe, American Constitutional Law § 6-25, at 480 (2d ed. 1988)). Instead, "Congress should make its intention 'clear and manifest' if it intends to pre-empt the historic powers of the States." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Under this high standard, the Supreme Court has held that to read a federal statute as superseding a state's own law on the eligibility of state judges, Congress must have "made it

DAVIS WRIGHT TREMAINE LLP

clear that judges are *included*. . . . [I]t must be plain to anyone reading the Act that it covers judges." *Gregory*, 501 U.S. at 467. Similarly, although Congress has the power to "abrogate the States' constitutionally secured immunity from suit in federal court" and thereby alter "the usual constitutional balance between the States and the Federal Government," it may do so "only by making its intention unmistakably clear in the language of the statute." *Atascadero*, 473 U.S. at 242. For this reason, the Court refused to read a federal statute as compelling states to entertain damages suits against themselves in state courts. *See Will*, 491 U.S. at 65.

For decades, this clear-statement standard has been consistently used to protect numerous other default rules of our state-federal balance. "Absent clear statement by Congress," the Supreme Court would not read a statute "to place under federal superintendence a vast array of conduct traditionally policed by the States." *Cleveland v. United States*, 531 U.S. 12, 27 (2000). Likewise, the Supreme Court has refused to interpret an ambiguous statute as granting powers to the federal government that "would result in a significant impingement of the States' traditional and primary power over land and water use." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001). Similarly, the Court declined to read an ambiguous statute such that the traditional state power of regulating title would be altered and "[t]he title of every piece of realty purchased at foreclosure would be under a federally created cloud." *BFP*, 511 U.S. at 544. Finally, "[a]bsent a clear statement to the contrary," the Court would not read a federal statute as "preempt[ing] the traditional prerogative of the States to delegate their authority to their constituent parts." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 429 (2002).

But the clear-statement rule is not just used to protect against unintended encroachment on the federal-state balance; it also has been implemented to protect the balance *between* the federal branches. As the Supreme Court noted recently, "[s]eparation-of-powers concerns . . . caution us against reading legislation, absent clear statement, to place in executive hands authority to remove cases from the Judiciary's domain." *Kucana v. Holder*, 558 U.S. 233, 237 (2010). For this reason, the Court has had a "longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction." *I.N.S. v St. Cyr*, 533 U.S. 289, 298 (2001).

BRIEF OF *AMICUS CURIAE* CATO INSTITUTE                     Case No. 4:20-cv-05883-JSW

DAVIS WRIGHT TREMAINE LLP

Likewise, the Court will not interpret a statute to preempt the ordinary jurisdiction of courts to hear damage suits for executive-branch violations of constitutional rights when there is "no *explicit* congressional declaration" making such an abrogation. *Davis v. Passman*, 442 U.S. 228, 246–47 (1979) (emphasis in original) (quoting *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971)); *see also Carlson v. Green*, 446 U.S. 14, 19 (1980). Practice to the contrary will also not ratify executive encroachment onto legislative prerogative. Neither an opinion of the Office of Legal Counsel nor 112 nominations contrary to the FVRA were sufficient so suggest that Congress had acquiesced to the OLC's interpretation of the FVRA. *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929 (2017).

In sum, courts have consistently held that long-standing and fundamental balances of power in our multi-branch, federal system can only be altered when a legislature has spoken clearly and unambiguously. As we see below, the advice-and-consent rule for federal appointments represents just such a balance between the executive and legislative branches.

### B. "Advice and Consent" Was Intended to Be—and Remains—the Default Balance of Power

The structure of the Appointments Clause shows the Framers' preference for advice and consent. Congress must affirmatively act—through a cumbersome process of bicameralism and presentment—in order to waive it in the appointment process of *each* inferior officer. Thus, "[t]he prescribed manner of appointment for principal officers is also the default manner of appointment for inferior officers." *Edmond*, 520 U.S. at 660. But this preference for advice and consent—and the importance of that mechanism for our balance of powers—is not only discernible from the text of the clause; it is also evident in the Framers' arguments made at the time of its enactment, by the repeated statements of courts, and by the continual practice of the federal government.

During the debates at the Constitutional Convention, supporters of an advice-and-consent requirement defended the importance of including both the executive and legislative branches in the decision-making process. Governor Morris supported the proposal because "as the President was to nominate, there would be responsibility, and as the Senate was to concur, there would be

DAVIS WRIGHT TREMAINE LLP

security." 2 Farrand's Records: The Records of the Federal Convention of 1787, at 539 (Max Farrand ed., 1911).

In the Federalist Papers, Alexander Hamilton defended the Appointments Clause entirely on the basis of its superiority to proposals that would have vested appointments in one branch alone.[6] Addressing himself to those who "contend that the President ought solely to have been authorized to make the appointments under the federal government" Hamilton argued that the Senate "would be an excellent check upon a spirit of favoritism in the President." *The Federalist No. 76*, at 455–56 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Hamilton further warned of the dangers of unilateral appointments, since

> [i]t will readily be comprehended that a man who had himself the sole disposition of offices would be governed much more by his private inclinations and interests than when he was bound to submit the propriety of his choice to the discussion and determination of a different and independent body, and that body an entire branch of the legislature.

*Id.* at 456. This defense of advice and consent—as a necessary component in a system of checks and balances—continued at the ratifying conventions. Advocating for the adoption of the proposed constitution in the Pennsylvania Convention, James Wilson assured his listeners that no one branch had been given too much power, pointing out that "the President must nominate before [the Senate] can vote. So that if the powers of either branch are perverted, it must be with the approbation of some one of the other branches of government: thus checked on one side, they can do no one act of themselves." 3 Farrand's Records: The Records of the Federal Convention of 1787, at 162 (Max Farrand ed., 1911). And at the North Carolina Ratifying Convention, James Iredell similarly defended the proposed system because the Senate would be "a restraint on improper appointments" by the president. 4 Elliot's Debates, at 134 (Jonathan Elliot ed., 1861).

The common thread in each of these defenses, from the Constitutional Convention through ratification, is the assumption that advice and consent would remain the default rule long after ratification. Adoption of the advice-and-consent requirement at the Convention represented the *defeat* of those who had wanted appointments vested in the unitary executive. It would have

---

[6] Apart from where the Appointments Clause is quoted in full at the beginning of Federalist 76, the Excepting Clause goes entirely unmentioned in the Federalist Papers.

DAVIS WRIGHT TREMAINE LLP

been incoherent for the same convention that rejected such a unitary model to have also passed the Excepting Clause unless the Framers assumed that its provisions would be used sparingly.

The Supreme Court has heeded the Framers' wisdom and repeatedly recognized that "[t]he principle of separation of powers is embedded in the Appointments Clause." *Freytag*, 501 U.S. at 882. As with so many of the mechanisms the Framers designed, "[the Appointments] Clause is a bulwark against one branch aggrandizing its power at the expense of another branch." *Ryder v. United States*, 515 U.S. 177, 182 (1995). As the Court has explained, any threat to the Appointments Clause is a threat to the accountability of the system as a whole. "Our separation of powers jurisprudence generally focuses on the danger of one branch's aggrandizing its power at the expense of another branch" and the Appointments Clause "guards against this encroachment." *Freytag*, 501 U.S. at 878. Thus, "[t]he structural interests protected by the Appointments Clause are not those of any one branch of Government, but of the entire Republic." *Id.* at 880. In sum, "the Appointments Clause of Article II is more than a matter of 'etiquette or protocol'; it is among the significant structural safeguards of the constitutional scheme." *Edmond*, 520 U.S. at 659.

Given the obvious dangers that the Framers recognized in single-branch appointments, the Excepting Clause must have been intended as an exception that Congress would resort to only when it is *certain* that the needs of administrative efficiency outweigh the needs of political accountability. This is, in fact, how the system has developed. A search of the federal government's online database of employees reveals 1,217 positions that currently require presidential nomination and senate confirmation (PAS), compared to 362 positions appointed by the president alone (PA). *Compare* U.S. Government Policy and Supporting Positions (Plum Book) 2012, Appointment Type: Presidential Appointment with Senate Confirmation (PAS), http://bit.ly/2cX8BBY *with* Plum Book 2012, Appointment Type: Presidential Appointment (without Senate Confirmation) (PA), http://bit.ly/2d2AcTx (both last visited Sept. 8, 2020). The fact that PAS positions still outnumber PA positions by a factor of more than 3-to-1 shows that waiving advice and consent has remained the exception to the rule.[7]

_____

[7] PA positions generally fall into one of two categories: largely apolitical and uncontroversial positions, such as the 12 members of the American Battle Monuments Commission, and

DAVIS WRIGHT TREMAINE LLP

The "intersection of the legislative and executive branches in appointments, with the responsibility of the President reinforced by the security of the Senate, constitutes a core inter-branch 'check and balance.'" Adam J. White, *Toward the Framers' Understanding of "Advice and Consent": A Historical and Textual Inquiry*, 29 Harv. J. L. & Pub. Pol'y 103, 143 (2005). The Framers' expressed preference for the mechanism of advice and consent as a check on the executive branch, courts' recognition of the importance of that check, and its sustained use as a check, are all as longstanding and fundamental as the other separation-of-powers rules that courts will not alter in the absence of a clear statement. Statutes purportedly overruling advice and consent must be held to exactly the same standard of explicitness and clarity.

### C.    The Attorney General and the Courts Have Strictly Interpreted the Vacancies Act

As the D.C. Circuit has recognized, "the Vacancies Act is generally strictly and narrowly interpreted." *Olympic*, 732 F. Supp. at 1198. The Supreme Court observed that "Congress's failure to speak up does not fairly imply that it has acquiesced [to an interpretation of the FVRA that allowed appointments in contravention of the FVRA]." *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017). Affirming the longstanding preference for advice and consent, both the courts and the office of the attorney general have employed *de facto* clear-statement rules.

Where appointments statutes have been ambiguous, attorneys general have frequently rejected the readings that would waive advice and consent. In 1875, there was some ambiguity as to whether a law vested the appointment power of several newly created offices in the treasury secretary. Attorney General Edwards Pierrepont interpreted the law narrowly, stressing that such waivers must be explicit: "It is true that in regard to [similar, previously established officers], their appointment is in the Secretary of the Treasury. But this is by force of express legislative enactment, specially applicable to those officers." 15 U.S. Op. Att. Gen. 3, 6 (1875). Thus, "there being no other statutory provision . . . which imparts to [the secretary of the treasury] this

---

positions whose primary role is to directly advise the president, such as the president's chief of staff and national security advisor. https://m.gpo.gov/plumbook/ - positionsList?&appointmenttype=PA&filterTokens=appointment&vacant=false

BRIEF OF *AMICUS CURIAE* CATO INSTITUTE                    Case No. 4:20-cv-05883-JSW

DAVIS WRIGHT TREMAINE LLP

authority," Pierrepont concluded "that under the Constitution their appointment can only be made by the President, with the advice and consent of the Senate." *Id.*[8]

A decade later, a statute stated that the "[Civil Service] Commission is authorized to *employ* a chief examiner." 18 U.S. Op. Atty. Gen. 409, 410 (1886) (emphasis added). Although some interpreted this as suggesting an intent to vest the *appointment* power in the commission, Attorney General Augustus Hill Harland held that only explicit language waiving advice and consent could have such effect, and that therefore "[t]he examiner is an officer to be appointed by the President by and with the advice and consent of the Senate." *Id.* at 411.

This same narrow approach has been applied specifically to the Vacancies Act. In 1890, the Act made "the assistant or deputy" of an officer the default acting officer in case of a vacancy. Solicitor General William Howard Taft interpreted the meaning of "assistant or deputy" at its narrowest, such that it "can only refer to assistants or deputies whose appointment is specifically provided for by statute." 19 U.S. Op. Atty. Gen. 503, 504 (1890). Thus, a naval officer who was the "assistant to the chief" of a naval bureau—but who did not receive this designation by statute—could not assume the role of chief during a vacancy. *Id. See also* 28 U.S. Op. Atty. Gen. 95 (1909) (naval officers designated as advisors to the secretary of the navy were not "officers" in the narrowest sense, so Vacancies Act provision authorizing the appointment of Naval Department "officers" to be acting secretary did not authorize such appointment).

In 1909, the Chief of the Bureau of Steam Engineering was forced into retirement for health reasons, and President Roosevelt appointed an acting chief, believing he was authorized to do so under the Vacancies Act. But the Act authorized temporary appointments only "[i]n case of the death, resignation, absence, or sickness of the chief of any bureau," with "no provision . . . made in any of these sections for temporarily filling a vacancy caused by the *retirement* of the chief of a bureau." 27 U.S. Op. Atty. Gen. 337, 344, 345 (1909) (emphasis added). Since "'[r]esignation' of an office implies the consent of the incumbent to the giving up of the office

---

[8] *See also* 15 U.S. Op. Atty. Gen. 449 (1878) (rejecting argument that Congress intended the appointment of the appraisers for the port of New York to remain with the treasury secretary, and instead reaffirming that "[w]here there is no express enactment to the contrary, the appointment of any officer of the United States belongs to the President, by and with the advice and consent of the Senate").

and does not include the compulsory retirement of an officer by reason of disability to perform the duties of the office," *id.* at 345, Attorney General George W. Wickersham advised that "the Bureau remains without a head until the place is filled [by a permanent successor]," and that the acts of Roosevelt's temporary appointee were invalid. *Id.*

As the D.C. District Court accurately summarized, "the Attorney General and other senior government officials have, for the last 100 years, interpreted the Vacancies Act as giving the President authority to make interim appointments only when the express conditions of the Act are satisfied." *Olympic*, 732 F. Supp. at 1197. These opinions are relevant to this Court's FVRA interpretation because they show that "Congress has been on notice for more than 100 years that the Vacancies Act has generally been interpreted as giving the President authority to designate officers only when the statute's express terms are satisfied." *Id.* at 1196.

The *Olympic* court, which made that observation, is also the one lower court to squarely confront an ambiguous provision of the Vacancies Act. At the time, the language of the Vacancies Act authorized temporary appointments "[w]hen an officer of a bureau of an Executive department" leaves an office vacant. *Id.* at 1195. The court gave the word "officer" its narrowest meaning—that of a "Constitutional Officer" who took office in accordance with the Appointments Clause. *Id.* The officer whose resignation triggered the disputed appointment had *not* taken office in accordance with the Appointments Clause, so the court ruled the temporary appointment to be invalid. *Id.* at 1199. The clear-statement rule which the court applied recognized that "it is up to Congress . . . to decide the conditions under which the President may designate temporary replacements." *Id.* at 1196.

The Supreme Court recently interpreted the FVRA, relying on its text, which was in tension with post-enactment practice. *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929 (2017). In that case, an acting secretary had been nominated to be the permanent secretary. First assistants who became nominees were prohibited from serving as acting secretaries, and the question arose "whether that limitation [of nominees serving as acting] applies only to first assistants who have automatically assumed acting duties, or whether it also applies to PAS officers and senior

DAVIS WRIGHT TREMAINE LLP

employees serving as acting officers at the President's behest."[9] *Id.* at 935. After parsing the meaning of a clause beginning with "notwithstanding," the Court held that, despite a history of acting secretaries being nominated, the limitation did apply to all acting secretaries. *Id.* at 944.

Similarly, the D.C. District Court has closely read the meanings of the words "first assistant" in interpreting the FVRA, finding that labels "without *any* substance" do not "satisfy the FVRA's default rule." *Cuccinelli*, 442 F. Supp. 3d at 25-26.

Finally, in addition to the persuasive arguments from both the executive and judicial branch, there is clear evidence that Congress *itself* intends waivers of advice and consent to be read narrowly. One of the purposes of the FVRA was to "expressly repudiate[] the contention that a law authorizing the head of a department to delegate or reassign duties among other officers is a statute that provides for the temporary filling of a specific office." 144 Cong. Rec. S6, 414 (daily ed. June 16, 1998) (statement of Sen. Thompson). Instead of reading such statutes to allow for temporary appointments by implication, the FVRA requires that such effect be given only to statutes "expressly" authorizing the President to designate acting officials. *See* 5 U.S.C. § 3347(a)(1)(A). Thus, the FVRA effectively mandates a clear-statement approach to all other appointment statutes. Not to apply that approach when interpreting the FVRA *itself* would be in severe tension with the stated goal of its drafters: to limit waivers of advice and consent to situations where Congress unambiguously intended them.

### III.   THE FVRA DOES NOT CLEARLY AND EXPLICITLY WAIVE "ADVICE AND CONSENT" FOR APPOINTMENTS OF INDETERMINATE DURATION

The FVRA unambiguously authorizes the president to appoint several types of government officials to be temporary acting officers in the event of a vacancy. 5 U.S.C. § 3345(a). As these are acting officers are meant to be *temporary*, the may serve "for no longer than 210 days beginning on the date the vacancy occurs." 5 U.S.C. § 3346(a)(1). At the time of filing this brief there had not been a nomination, but that period may be extended if there were a nomination. 5 U.S.C. § 3346(a)(2).

---

[9] PAS indicates an officer requiring Presidential Appointment with Senate Confirmation. PA indicates an officer requiring only Presidential Appointment.

The Homeland Security Act ("HSA") also specifies that succession for a vacancy of the secretary shall be the deputy secretary and then the undersecretary for management. *See* 6 U.S.C. § 113(g)(1). The secretary may designate further succession, "[n]ot withstanding chapter 33 of title 5, United States Code [which contains the FVRA]." 6 U.S.C. § 113(g)(2). The secretary must notify Congress of "any vacancies that require notification under sections 3345 through 3349d of title 5, United States Code (commonly known as the 'Federal Vacancies Reform Act of 1998')." 6 U.S.C. § 113(g)(3). These references to the FVRA indicate Congress was well aware of FVRA and drafted the HSA subject to the limitations of the FVRA.

The appointment of Chad Wolf was invalid for multiple reasons. The simplest is that "Wolf assumed the role of Acting Secretary [purportedly on November 13, 2019] after the office of DHS Secretary had remained vacant since Secretary Nielsen's departure [at the latest on April 10, 2019], well beyond the 210-day limitation for acting officers provided by the Federal Vacancies Reform Act …." Comp. ¶ 258. In another context, missing a date by a week[10] may not seem fatal, but in this case the date dictates the acting secretary's maximum term. Appointing a new acting secretary does not reset the 210-day clock, as, under the FVRA, the 210 days runs from "the date the vacancy occurs." 5 U.S.C. § 3346(a)(1). This is not an accident. In 1997, the Federal Vacancies Act, § 3348, entitled "Details; limited in time," allowed a vacancy to be filled for "not more than 120 days" unless there were a nomination or the vacancy occurred during adjournment of Congress *sine die*.[11] 5 U.S.C. § 3348 (1997). Passage of the FVRA in 1998 moved the time limitation to § 3346, entitled "Time Limitation," and reworded the limitation to be "for no longer than 210 days beginning on the date the vacancy occurs." 5 U.S.C. 3346 (1998). This change clarified that stringing together successive appointees would not extend the time limitation.

---

[10] Secretary Nielsen resigned April 7, 2019. Comp. ¶ 243. She "agreed to stay on" until April 10, 2019. Comp. ¶ 245. Even treating her resignation as effective April 10, 210 days after April 10, 2019 is November 6, 2019.

[11] Under the previous version, the Vacancies Act, courts had interpreted the period as not starting "until someone actually takes office pursuant to the Vacancies Act." *Doolin Sec. Sav. Bank v. Office of Thrift Supervision*, 329 U.S. App. D.C. 166, 171, 139 F.3d 203, 208 (1998).

DAVIS WRIGHT TREMAINE LLP

1    By the time Wolf was appointed as acting secretary, no one was eligible to be acting

2    secretary because the 210 days had elapsed. Because Wolf was not acting under any section of

3    the FVRA, "an action taken" by him "in the performance of any function or duty of a vacant

4    office [in this case, as DHS secretary]… shall have no force or effect." 5 U.S.C. § 3348(d)(1).

5    This raises the question of what constitutes "an action." Under the FVRA, "the term

6    'action' includes any agency action as defined under section 551(13) [5 USCS § 551(13)]." 5

7    U.S.C. § 3348. Agency action "includes the whole or a part of an agency rule, order, license,

8    sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551. The plain

9    language includes an agency rule, and a "final rule" is challenged here. Comp. ¶ 1.

10    In addition to being beyond the 210-day limit, there are other reasons to question Wolf's

11    appointment. The initial appointment of McAleenan, and the ensuing appointments of Wolf and

12    Cuccinelli, have all been questioned by a General Accounting Office decision. U.S. Gov't

13    Accountability Off., GAO- B-331650, *Department of Homeland Security—Legality of Service of*

14    *Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of*

15    *Deputy Secretary of Homeland Security* at 1 (2020) ("GAO Decision"). Comp. ¶ 251. At the time

16    of the previous Secretary's resignation, McAleenan was Commissioner of U.S. Customs and

17    Border Protection ("CBP"). Comp. ¶ 243. Under the Homeland Security Act, "the Secretary may

18    designate such other officers of the Department in further order of succession to serve as Acting

19    Secretary." 6 U.S.C. § 113. Prior to Secretary Nielsen's resignation and McAleenan's

20    appointment, Executive Order 13753 governed succession of the DHS secretary. Interestingly,

21    DHS has two lines of succession, one for resignation of the secretary and one for catastrophic

22    events. Though outgoing Secretary Nielsen amended the succession in accordance with 6 U.S.C.

23    § 113, she did not amend both lines of succession. Comp. ¶ 242. This left the succession

24    according to Executive Order 13753 in place in case of resignation of the secretary, and

25    McAleenan was not the next in line. Compl. ¶ 247-248. *See also* GAO Decision, p. 7 ("Because

26    the Secretary did not amend the order of succession established in E.O. 13753 otherwise, the

27    Delegation maintained the order set out therein whenever the position became vacant as a result

28    of the Secretary's death, resignation, or inability to perform the functions of the office:

(1)  Deputy Secretary, (2) Under Secretary for Management, (3) Administrator of FEMA, and (4) Director of CISA.").

Because McAleenan was not properly the acting secretary, he could not alter the succession of the secretary, as he purported to do. Comp. ¶ 249. And again, note the date of McAleenan's succession order: November 8, 2019. Comp. ¶ 249. As discussed above, McAleenan's 210 days ended November 6, 2019. As any authority for Wolf to become secretary would depend on McAleenan's succession order, Wolf is also not properly the acting secretary. This may seem a technicality, but, given the import of the balance of powers between the branches, the plain meaning of the regulations must control.

## CONCLUSION

For the foregoing reasons, *amicus* Cato urges this Court to grant plaintiffs' motion for a preliminary injunction, because the final rule challenged here is void.


DATED: September 9, 2020     Respectfully submitted,

                   DAVIS WRIGHT TREMAINE LLP
                   ALLISON A. DAVIS
                   MARK ROGGE


                   By: */s/ Allison A. Davis*
                      Allison A. Davis

                   Attorneys for the Cato Institute

DAVIS WRIGHT TREMAINE LLP

# CERTIFICATE OF SERVICE

I hereby certify that on the date given below, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the persons registered as CM/ECF recipients for this case.

Dated this 9th day of September, 2020

*/s/ Allison A. Davis*
Allison A. Davis

DAVIS WRIGHT TREMAINE LLP