JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
BRIGHAM J. BOWEN
Assistant Branch Director
JULIE STRAUS HARRIS (DC Bar No. 1021928)
Senior Trial Counsel
CHARLES E.T. ROBERTS (PA Bar No. 326539)
BRADLEY CRAIGMYLE (IL Bar No. 6326760)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Phone: (202) 353-7633
Fax: (202) 616-8470
Email: julie.strausharris@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER, *et al.*,<br><br>                     Plaintiffs,<br><br>          v.<br><br>CHAD F. WOLF, *et al.*,<br><br>                     Defendants. | Case No. 4:20-cv-5883-JSW<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Judge:     Honorable Jeffrey S. White<br>Hearing:  September 25, 2020 at 9:00 a.m. |

1

## TABLE OF CONTENTS

2

SUMMARY OF ARGUMENT ................................................................................................ vi

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 1

    I.    Statutory and Regulatory Background ................................................................. 1

    II.   This Litigation ....................................................................................................... 2

ARGUMENT ...................................................................................................................... 3

    I.    Plaintiffs Are Unlikely to Succeed on the Merits of Their APA Claims. ................. 3

        A.    Mr. McAleenan's and Mr. Wolf's service was lawful. ................................. 3

        B.    The agency's funding calculations were adequately explained and the public was provided a meaningful opportunity to comment on them. ......................... 5

        C.    The rulemaking process allowed for meaningful comment. ........................ 7

        D.    The rule was not contrary to the HSA, the INA, or international law. .......... 9

        E.    The Final Rule is not arbitrary and capricious. ........................................ 10

    II.   Plaintiffs Fail to Establish Irreparable Harm. ...................................................... 14

    III.  The Remaining Equitable Factors Require Denial of Plaintiffs' Motion. ............... 15

CONCLUSION ................................................................................................................ 15

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Alaska Dep't of Envtl. Cons. v. EPA,*
   540 U.S. 461 (2004) ........................................................................................ vi, 7

4

*All. For The Wild Rockies v. Cottrell,*
5
   632 F.3d 1127 (9th Cir. 2011) ................................................................... vi, 14, 15

6
*Am. Med. Ass'n v. Reno,*
   57 F.3d 1129 (D.C. Cir. 1995) ............................................................................. 9
7

8
*Barapind v. Reno,*
   225 F.3d 1100 (9th Cir. 2000) ........................................................................... 10

9
*Boardman v. Pac. Seafood Grp.,*
   822 F.3d 1011 (9th Cir. 2016) ...................................................................... vi, 14
10

*Cal. Citizens Band Ass'n v. United States,*
11
   375 F.2d 43 (9th Cir. 1967) ................................................................................. 5

12
*Cal. ex rel. Becerra v. U.S. Dep't of the Inter.,*
   381 F. Supp. 3d 1153 (N.D. Cal. 2019) ............................................................... 8
13

14
*Cal. Wilderness Coal. v. U.S. Dep't of Energy,*
   631 F.3d 1072 (9th Cir. 2011) ............................................................................. 8

15
*City of Sausalito v. O'Neill,*
   386 F.3d 1186 (9th Cir. 2004) ......................................................................... 8, 9
16

17
*Clarke v. Sec. Indus. Ass'n,*
   479 U.S. 388 (1987) .......................................................................................... 11

18
*Consumer Elecs. Ass'n v. FCC,*
   347 F.3d 291 (D.C. Cir. 2003) ........................................................................... 12
19

20
*Drakes Bay Oyster Co. v. Jewell,*
   747 F.3d 1073 (9th Cir. 2014) ........................................................................... 15

21
*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ................................................................................. vi, 10, 11
22

23
*Guedes v. ATF,*
   356 F. Supp. 3d 109 (D.D.C. 2019) ..................................................................... 5

24
*Hooks v. Kitsap Tenant Support Servs.,*
   816 F.3d 550 (9th Cir. 2016) ........................................................................ vi, 5
25

26
*Idaho Farm Bureau Fed'n v. Babbitt,*
   58 F.3d 1392 (9th Cir. 1995) ............................................................................... 6

27
*Karnoski v. Trump,*
   926 F.3d 1180 (9th Cir. 2019) ....................................................................... vi, 3

28

*Kitchens v. Dep't of Treasury,*
  535 F.2d 1197 (9th Cir. 1976) .................................................................................... 7

*Lopez v. Brewer,*
  680 F.3d 1068 (9th Cir. 2012) .................................................................................... 3

*Medellin v. Texas,*
  552 U.S. 491 (2008) ................................................................................................... 10

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
  463 U.S. 29 (1983) ................................................................................... 7, 11, 12, 13

*Munaf v. Geren,*
  553 U.S. 674 (2008) .................................................................................................... 3

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
  551 U.S. 644 (2007) ............................................................................................... vi, 13

*NRDC v. EPA,*
  863 F.2d 1420 (9th Cir. 1988) .................................................................................... 6

*Palmer v. IRS,*
  116 F.3d 1309 (9th Cir. 1997) .................................................................................... 7

*Phillips Petroleum Co. v. EPA,*
  803 F.2d 545 (10th Cir. 1986) .................................................................................... 8

*Riverbend Farms, Inc. v. Madigan,*
  958 F.2d 1479 (9th Cir. 1992) ............................................................................... vi, 8

*Shinseki v. Sanders,*
  556 U.S. 396 (2009) .................................................................................................... 8

*United States v. BNS Inc.,*
  858 F.2d 456 (9th Cir. 1988) .................................................................................... 15

*United States v. Freeman,*
  44 U.S. 556 (1845) ...................................................................................................... 9

*United States v. Lucido,*
  373 F. Supp. 1142 (E.D. Mich. 1974) ........................................................................ 5

*Vt. Yankee Nucl. Power Corp. v. NRDC,*
  435 U.S. 519 (1978) .................................................................................................... 8

**Statutes**

5 U.S.C. § 553 .................................................................................................................. 8

5 U.S.C. § 553(b)(3) ......................................................................................................... 5

5 U.S.C. § 705 ................................................................................................................ 15

5 U.S.C. § 706 .................................................................................................................. 8

5 U.S.C. § 3346 ........................................................................................................... 5

5 U.S.C. § 3346(a)(1) .................................................................................................. 5

5 U.S.C. § 3347(a)(1)(A) ............................................................................................ 4

5 U.S.C. § 701 *et seq.* ................................................................................................. 2

6 U.S.C. § 112(b)(1) .................................................................................................... 4

6 U.S.C. § 113(g)(1) .................................................................................................... 5

6 U.S.C. § 113(g)(2) ............................................................................................ 3, 4, 5

6 U.S.C. § 291(b) ......................................................................................................... 9

8 U.S.C. § 1158(a)(1) .................................................................................................. 9

8 U.S.C. § 1158(d)(3) .................................................................................................. 2

8 U.S.C. § 1182(a)(7) .................................................................................................. 9

8 U.S.C. § 1356 ..................................................................................................... *passim*

31 U.S.C. § 902 ........................................................................................................... 2

Pub. L. No. 107-276, 116 Stat. 1929 (2002) ............................................................. 1

**Regulations**

8 C.F.R. § 103.7(c)(3) ................................................................................................ 11

8 C.F.R. § 211.1(b)(3) ................................................................................................. 9

75 Fed. Reg. 58, 962 (Sept. 24, 2010) ..................................................................... 10

81 Fed. Reg. 26,904 (May 4, 2016) ........................................................................... 6

81 Fed. Reg. 73, 292 (Oct. 24, 2016) ........................................................................ 8

81 Fed. Reg. 90,067 (Dec. 9, 2016) ........................................................................... 4

84 Fed. Reg. 62,208 (Nov. 14, 2019) .................................................................. *passim*

84 Fed. Reg. 67,243 (Dec. 9, 2019) ........................................................................... 7

85 Fed. Reg. 4,243 (Jan. 24, 2020) ............................................................................ 7

85 Fed. Reg. 46,788 (Aug. 3, 2020) ................................................................... *passim*

**Legislative Materials**

S. Rep. No. 105-250 (1998) ........................................................................................ 5

1

**Other Authorities**

2

Historical Collections, USCIS FY 21 Congressional Justification,
    https://www.dhs.gov/sites/default/files/publications/united_states_citizenship_and_immigration_

3
    services.pdf. ................................................................................................................................... 6

4

Oversight of USCIS: Hearing Before the H. Comm. on the Jud., Subcomm. on Immigration & Citizenship,
    116th Cong. 7 (2020) (statement of Joseph B. Edlow, Deputy Director for Policy,

5
    USCIS)https://docs.house.gov/meetings/JU/JU01/20200729/110946/HHRG-116-JU01-Wstate-
    EdlowJ-20200729.pdf. .................................................................................................................. 7

6

Price Elasticity of Demand, Investopedia,

7
    https://www.investopedia.com/terms/p/priceelasticity.asp ...................................................... 13

8

USCIS Organizational Chart,
    https://www.uscis.gov/sites/default/ files/document/charts/USCIS_OrgChart.pdf. ...................... 9

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SUMMARY OF ARGUMENT**

Plaintiffs challenge a Rule issued by U.S. Citizenship and Immigration Services (USCIS), following notice and comment, to address an over $1 billion projected average annual funding shortfall by adjusting its fees and revising certain fee waiver and exemption policies, forms, and fee structures. Emergency injunctive relief should be denied because Plaintiffs cannot establish the four factors requisite for such an extraordinary remedy. *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019).

(1) Plaintiffs are unlikely to succeed on the merits. *First*, Mr. McAleenan and Mr. Wolf both were lawfully serving under the Homeland Security Act (HSA) and the succession order designated by former Secretary Nielsen, when they took the challenged actions. The Federal Vacancies Reform Act's 210-day time limit is thus inapplicable because the HSA's office-specific vacancy statute governs the designation of an acting officer. *See Hooks v. Kitsap Tenant Support Servs.*, 816 F.3d 550, 556 (9th Cir. 2016). *Second*, the agency complied with the Administrative Procedure Act's procedural requirements by adequately explaining its calculations and providing the public a "meaningful" opportunity to comment. *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1484, 1486 (9th Cir. 1992); *Alaska Dep't of Envtl. Cons. v. EPA*, 540 U.S. 461, 497 (2004). *Third*, the funding addressed by the Rule comports with the HSA and the Immigration & Nationality Act (INA) because Customs & Border Protection performs and supports adjudicatory functions, and imposing an asylum fee–which is intended for cost recovery, not deterrence–does not violate the INA or any binding international law. *Fourth*, the Rule is not arbitrary and capricious because the agency adequately and rationally explained its policy changes (moving to a beneficiary-pays model, raising the naturalization fee, and adding an asylum fee), *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), and considered the data and comments before it, although it disagreed with some conclusions. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007).

(2) Plaintiffs cannot demonstrate irreparable harm. The alleged harms to their *annual* funding would not plausibly be irreparably incurred in the time between the Rule's effective date and a merits decision. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016).

(3) Plaintiffs cannot show that the balance of equities tips in their favor or that the public interest favors an injunction. *All. for The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). An injunction would cause USCIS to continue to forgo millions of dollars of revenue daily, forcing corresponding funding cuts, furloughs, and swelling backlogs of the very applications Plaintiffs claim the Rule will delay.

**INTRODUCTION**

When U.S. Citizenship and Immigration Services (USCIS) completed its biennial fee review for Fiscal Years (FY) 2019 and 2020, the agency identified an over $1 billion projected average annual cost and revenue shortfall. USCIS Fee Schedule & Changes to Certain Other Immigration Benefit Request Requirements, 84 Fed. Reg. 62,280, 62,282 (Nov. 14, 2019) (Proposed Rule). As a result, by notice-and-comment rulemaking, USCIS adjusted its fees to recover the full cost of providing immigration adjudication and naturalization services, pursuant to 8 U.S.C. § 1356(m), revised certain fee waiver and exemption policies, and made changes in USCIS's forms and fee structures. *See* USCIS Fee Schedule & Changes to Certain Other Immigration Benefit Request Requirements, 85 Fed. Reg. 46,788, 46,790-46,792 (Aug. 3, 2020) (Final Rule or Rule).

Disregarding the plenary fee-setting discretion vested in the agency, 8 U.S.C. § 1356(m) (granting discretionary authority to provide some immigration adjudication and naturalization services "without charge," but specifically mentioning neither waivers nor exemptions nor limitations), Plaintiffs–organizations that provide legal and other services to immigrants–seek emergency injunctive relief against the Rule. For the reasons explained herein, Plaintiffs' claims are founded only on their disagreements with the agency's policy choices and are meritless. Moreover, Plaintiffs have failed to demonstrate that they will suffer irreparable injury in the relatively short time between the Rule's effective date and this Court's merits decision, while a grant of the emergency relief they seek would cause the agency to continue to forgo millions of dollars of revenue daily, forcing corresponding funding cuts, furloughs, and swelling backlogs of the very applications Plaintiffs claim the Final Rule will delay. Accordingly, Plaintiffs' motion should be denied.

**BACKGROUND**

**I.      Statutory and Regulatory Background**

The Homeland Security Act of 2002 (HSA) created the Department of Homeland Security (DHS) and, within it, several entities including USCIS. *See* Pub. L. No. 107-276, § 451 (2002). The HSA charged USCIS with adjudicating immigration and naturalization benefits requests. *Id.* § 451(b). It established accounts "for appropriated funds and other deposits for" USCIS and for the "Bureau of Border Security," requires that "[f]ees imposed for a particular service, application or benefit shall be deposited into the account … that is for the bureau with jurisdiction over the function to which the fee relates," and prohibits the transfer of fees between bureaus "for purposes not authorized by [8 U.S.C. § 1356]." *Id.* § 476(a), (c), (d). The entities now

known as U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) were created from within the now-defunct Bureau of Border Security.

Congress structured USCIS to be fee-funded. 8 U.S.C. § 1356(h), (m). It created the "Immigration Examinations Fee Accounts" (IEFA), and authorized DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants and other immigrants," and "at a level that will recover any additional costs associated with the administration of the fees collected." *Id.* § 1356(m). DHS's "longstanding interpretation" of the "including" clause is that it "offers … a non-exhaustive list of some of the costs that DHS may consider as part of the full costs of providing adjudication and naturalization services." 85 Fed. Reg. 46,789 n.2. While the INA does not "require" DHS "to charge fees for adjudication services provided to asylum applicants," DHS may do so, 8 U.S.C. § 1158(d)(3), so long as "[s]such fees [do] not exceed the … costs in adjudicating the applications." Further, IEFA funds may "reimburse any appropriation … for expenses in providing immigration adjudication and naturalization services." *Id.* § 1356(n).

31 U.S.C. § 902 requires the Chief Financial Officer of each agency, including DHS, to "review, on a biennial basis, the fees … imposed by the agency for services … it provides, and make recommendations on revising those charges to reflect costs incurred by it in providing those services." In 2019, USCIS completed its biennial review of non-statutory fees deposited into the IEFA for FY19-20. 84 Fed. Reg. 62,282. The "primary objective" of the review was to determine whether USCIS's fees would cover its anticipated costs, *id.*, and it "identified a projected average annual cost and revenue differential" of over $1 billion. 85 Fed. Reg. 46,794. Accordingly, the Rule "adjust[s] USCIS' fee schedule to recover the full cost of providing immigration adjudication and naturalization services." *Id.* Additionally, and as described fully in the Proposed and Final Rule, DHS revised certain fee waiver and exemption policies, established multiple fees for different categories of petitions for nonimmigrant workers, limited petitions for nonimmigrant workers, and made changes in USCIS's forms and fee structures. *See* 84 Fed. Reg. 62,295-331; 85 Fed. Reg. 46,790-92.

## II.   This Litigation

Plaintiffs challenge the Final Rule under, *inter alia*, the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* (APA), Compl., ECF No. 1, and on the basis of their APA claims, Plaintiffs seek a preliminary injunction preventing implementation or staying the effective date of the Final Rule. Mot., ECF No. 27.

1

**ARGUMENT**

2      A preliminary injunction is "an extraordinary and drastic remedy" that should not be granted "unless

3  the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir.

4  2012). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits,

5  that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips

6  in his favor, and that an injunction is in the public interest." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir.

7  2019); *see Munaf v. Geren*, 553 U.S. 674, 690 (2008) (likelihood of success requires far more than identifying

8  "serious, substantial, difficult and doubtful" questions). Plaintiffs fail to meet any of these requirements.

9  **I.     Plaintiffs Are Unlikely to Succeed on the Merits of Their APA Claims.**

10      As a result of its statutorily-mandated biennial fee review for FY19-20, USCIS determined that it

11  would face an over $1 billion projected average annual cost and revenue shortfall absent fee schedule changes.

12  Through notice and comment rulemaking, the agency–pursuant to Congress's instruction in 8 U.S.C.

13  § 1356(m)–adjusted its fee schedule to recover the full cost of providing immigration adjudication and

14  naturalization services, and–consistent with the plenary fee-setting discretion Congress vested in the agency–

15  revised certain fee waiver and exemption policies, and made changes in USCIS's forms and fee structures.

16  The changes effected by the Rule are consistent with the INA and HSA, and over the course of an 8.5-month

17  rulemaking during which the public had the opportunity to submit tens of thousands of comments, the agency

18  satisfied its obligations under the APA. Plaintiffs' claims to the contrary lack merit or any basis in the record.

19      **A.   Mr. McAleenan's and Mr. Wolf's service was lawful.**

20      Mr. McAleenan and Mr. Wolf were each lawfully serving as Acting Secretary of DHS under the HSA

21  when they took the challenged actions. On April 9, 2019, then-Secretary Nielsen exercised her authority under

22  the HSA, 6 U.S.C. § 113(g)(2), to designate a new order of succession for the office of Secretary. This order

23  applied to all vacancies in the office, regardless of reason. Under this order, Mr. McAleenan, as the Senate-

24  confirmed CBP Commissioner, began serving as Acting Secretary when Ms. Nielsen resigned. Acting

25  Secretary McAleenan later amended the succession order pursuant to § 113(g)(2). Under that order, Mr. Wolf,

26  as the Senate-confirmed Under Secretary for Strategy, Policy, and Plans, began serving as Acting Secretary

27  when Mr. McAleenan resigned. The FVRA does not apply here, and each official lawfully served under the

28  HSA. Thus, Plaintiffs are unlikely to succeed on the APA claim that the Rule is "not in accordance with law."

*First*, the April 2019 signed order–and not Executive Order (EO) 13753, as Plaintiffs allege–controlled the succession order when Ms. Nielsen resigned. The order says five times that Ms. Nielsen is designating a succession order for the Secretary. The order's unqualified language shows that it would apply to all vacancies. Next, Ms. Nielsen expressly relied on her authority under § 113(g)(2), which empowers only the Secretary to designate an "order of succession" for officers to serve as Acting Secretary in the event of a vacancy.

Plaintiffs rely on a Government Accountability Office (GAO) Decision[1] to argue otherwise, but this Decision analyzes the wrong document and fails to recognize the relationship between § 113(g)(2) and the FVRA. Plaintiffs and the GAO claim that EO 13753 controlled the order of succession when Ms. Nielsen resigned, Mot. 2, 5, but in doing so incorrectly assume that Revision 8.5 to DHS Delegation No. 00106 is the controlling document. It is not. Ms. Nielsen never signed Revision 8.5, an administrative document that DHS uses to compile the orders of succession for many senior positions in DHS. Revision 8.5 cannot override the Secretary's signed order; under § 113(g)(2), only the Secretary can designate an order of succession, and Ms. Nielsen exercised her § 113(g)(2) authority by signing the order. The GAO Decision also incorrectly concludes that Ms. Nielsen's order altered Sec. II.B (a delegation of authority that governs during disaster or emergency) but not Sec. II.A (an order of succession that governs when the office of Secretary is vacant). In doing so, the GAO incorrectly reasons that EO 13753–which sets out the President's order of succession under the FVRA– governs rather than the Secretary's succession order. But the EO was issued before Congress authorized the Secretary to set an order of succession in § 113(g)(2). When Congress gave the Secretary this power, it made clear that the Secretary's authority to designate an order of succession applies "[n]otwithstanding" the FVRA, § 113(g)(2), and the FRVA expressly recognizes an agency head's authority under a statute like § 113(g)(2), *see* 5 U.S.C. § 3347(a)(1)(A). Thus, Ms. Nielsen's first-ever § 113(g)(2) order of succession superseded that FVRA order. Finally, by concluding that Ms. Nielsen only amended Sec. II.B, the GAO finds that–by signing an order to "amend the order of succession" under § 113(g)(2)–Ms. Nielsen only amended the order for delegation of authority under § 112(b)(1). But the order shows that Ms. Nielsen employed both § 112(b)(1) and § 113(g)(2) powers and provided that Annex A would serve both succession and delegation purposes.

---

[1] *See* U.S. Government Accountability Office, Decision: Department of Homeland Security–Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security, File No. B-331650 (Aug. 14, 2020) (GAO Decision).

*Second*, because Mr. McAleenan and Mr. Wolf each served as Acting Secretary under the HSA, neither's service is subject to the FVRA's time limit, 5 U.S.C. § 3346. The FVRA is generally the "exclusive means" of designating an acting officer for a Senate-confirmed office. *Id.* § 3347(a). But it recognizes exceptions to this general rule, including for statutes (like § 113(g)(2)) that "authorize[] … the head of an Executive department, to designate" an acting officer. § 3347(a)(1)(A). When a vacancy arises in an office with its own vacancy statute, that statute supplies an alternate means of designating an acting officer. *See Hooks v. Kitsap Tenant Support Servs.*, 816 F.3d 550, 556 (9th Cir. 2016) (FVRA and office-specific statute coexist as "statutory alternatives").

The FVRA's initial 210-day limit only applies to a "person serving as an acting officer *as described under section 3345*." 5 U.S.C. § 3346(a)(1) (emphasis added). When enacting the FVRA, Congress was aware that "[m]ost" office-specific vacancy statutes "do not place time restrictions on the length of an acting officer." S. Rep. No. 105-250, at 17 (1998). But it still retained these statutes as alternatives to the FVRA. 5 U.S.C. § 3347(a)(1)(A)-(B). And it imposed the 210-day limit only on persons serving under the FVRA. *Id.* § 3346(a)(1). That is, Congress placed no time limit on service under *office-specific vacancy statutes. See Guedes v. ATF*, 356 F. Supp. 3d 109, 142 (D.D.C. 2019) (unlike Attorney General vacancy statute, service under FVRA was subject to "specific time limits").[2] The HSA is one such office-specific vacancy statute. *See* 6 U.S.C. § 113(g)(1)-(2). By § 3346's unambiguous text, the 210-day limit does not apply to designations under the HSA. The HSA contains no express time limit and provides that the Secretary's authority to designate an officer under § 113(g)(2) applies "*[n]otwithstanding*" the FVRA. (Emphasis added.) The "notwithstanding" phrase makes clear that § 113(g)(2)–consistent with § 3347(a)(1)(A)–authorizes the Secretary to designate a line of succession for service under the HSA, which is distinct from the FVRA and, thus, not subject to the FVRA's 210-day limit. Thus, Plaintiffs are unlikely to succeed on the merits of their claim that the Rule is "contrary to law" in violation of the APA, by virtue of the alleged FVRA violations.

### B. The agency's funding calculations were adequately explained and the public was provided a meaningful opportunity to comment on them.

"[A] notice of rule making is sufficient if it provides a description of the subjects and issues involved." *Cal. Citizens Band Ass'n v. United States*, 375 F.2d 43, 49 (9th Cir. 1967); *see* 5 U.S.C. § 553(b)(3). In other words,

---

[2] *See also United States v. Lucido*, 373 F. Supp. 1142, 1150-51 (E.D. Mich. 1974) (Deputy Attorney General could serve as Acting Attorney General under office-specific statute after pre-FVRA Vacancies Act time limit).

the APA requires no more than an opportunity "for meaningful public participation." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995). Plaintiffs and other "interested parties reasonably could have anticipated the final rulemaking from the" Proposed Rule here, which exceeded the level of detail required. *NRDC v. EPA*, 863 F.2d 1420, 1429 (9th Cir. 1988). Therefore, the Rule should be upheld.

USCIS more than adequately explained why its fiscal situation justifies the Final Rule. *E.g.*, 84 Fed. Reg. 62,283-84. Because USCIS is fee-funded, it has to ensure that it maintains a carryover balance to continue operating. *See* FY 19-20 IEFA Fee Review Supporting Documentation with Addendum at 16. And 8 U.S.C. § 1356(m) authorizes the agency to set fees at a level to recover "the full costs" of providing "*all*" "adjudication and naturalization services," and "the administration of the fees collected." (Emphasis added.) This necessarily includes indirect and support costs, *e.g.*, infrastructure, information technology, and human resources. *See* 85 Fed. Reg. 46,872. And although budget *forecasts* typically predict deficits based on fully funding all operations, in practice, agencies such as USCIS end up making up that difference either by cutting costs (curtailing operations) or increasing revenue (receiving more than predicted). *See* 84 Fed. Reg. 62,286; 81 Fed. Reg. 26,910-11; Historical Collections, USCIS FY 21 Congressional Justification at 5, https://www.dhs.gov/sites/default/files/publications/united_states_citizenship_and_immigration_services.pdf.

Plaintiffs conflate and confuse *projected* and *actual* budget figures for FY17 and FY19 to argue that the agency provided inadequate notice. *See* Mot. 6.[3] For FY17, USCIS projected a budget deficit of over $600 million (~25% over projected revenue); only through realized cost reductions and increased revenue as a result of increased fees was USCIS able to avoid a deficit. The same was true for FY19: USCIS projected a budget deficit of over $900 million (~27% over projected revenue). And again, in FY20 the forecast showed a deficit of over $1 billion (~33% over projected revenue). As the Proposed Rule shows, that worsening, unsustainable trend requires increasing revenues to even approach fully funding USCIS operations. *See* 84 Fed. Reg. 62,286 (detailing payroll, workload, strategic investment, and other cost drivers); *see also* 85 Fed. Reg. 46,872; 84 Fed. Reg. 62,286; 81 Fed. Reg. 26,910. That is why the agency issued the Final Rule: to close that gap. Now, each

---

[3] Plaintiffs similarly misunderstand the Proposed Rule's new revenue allocations to argue that "60% of the budget [is] unexplained." Mot. 6. The Proposed Rule compared projected new expenditures for *FY18* actual costs, which were higher than the FY16-17 projections Plaintiffs use. *See* 84 Fed. Reg. 62,286. That FY18 spending was simply rolled into the FY19-20 projections, and adequately explained. *See* 84 Fed. Reg. 62,283.

day the agency goes without the Final Rule will require millions of dollars of cost cuts to avoid future deficits.[4]

For the same reasons, Plaintiffs' substantive attack on the agency's funding calculations falls flat. *See* Mot. 9. The Final Rule more than adequately explains "the grounds of decision and the essential facts upon which [it] was based." *Kitchens v. Dep't of Treasury*, 535 F.2d 1197, 1200 (9th Cir. 1976); *see id.* (*not* requiring "detailed findings of fact"); *see also Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) (describing arbitrary and capricious review's "narrow" scope). The agency explained its growing funding gap (which reflects *all* USCIS costs related to adjudications and other naturalization services, not just the direct costs), new funding allocations, and, therefore, why the Final Rule falls within its authority to set fees such that USCIS recovers total costs. *See supra*; *see, e.g.*, 85 Fed. Reg. 46,876 (explaining growth in non-revenue-generating workloads, increased time requirements per case, additional staff, and other growing cost drivers); *see also id.* at 46,788 (explaining that fee schedule reflects "a weighted average increase of 20 percent," not the 45 percent Plaintiffs assert).[5] At bottom, "the agency's path may reasonably be discerned" and, therefore, the Final Rule should be upheld, and it certainly should not be enjoined on a preliminary basis. *Alaska Dep't of Envtl. Cons. v. EPA*, 540 U.S. 461, 497 (2004).

## C.  The rulemaking process allowed for meaningful comment.

The agency afforded the public a cumulative 63 comment days.[6] *See* 84 Fed. Reg. 62,280 (comment period from Nov. 14, 2019 through Dec. 16, 2019); 84 Fed. Reg. 67,243 (extending comment period through Dec. 20, 2019); 85 Fed. Reg. 4243 (second comment period from Jan. 24, 2020 through Feb. 10, 2020).

---

[4] Plaintiffs' conjecture that new spending may not end up being consistent with the agency's statutory mandate is both contrary to the record, *see, e.g.*, 84 Fed. Reg. 62,283; AR791-843 (staffing summary), and insufficient to overcome the government's "presumption of regularity." *Palmer v. IRS*, 116 F.3d 1309, 1311 (9th Cir. 1997).

[5] USCIS has not "informed Congress that it has a surplus." Mot. 9. Rather, the agency informed Congress that it will not deplete its carryover balance. *See* Oversight of USCIS: Hearing Before the H. Comm. on the Jud., Subcomm. on Immigration & Citizenship, 116th Cong. 7 (2020) (statement of Joseph B. Edlow, Deputy Director for Policy, USCIS), https://docs.house.gov/meetings/JU/JU01/20200729/110946/HHRG-116-JU01-Wstate-EdlowJ-20200729.pdf. Indeed, USCIS does not have sufficient resources to keep up with incoming work, fund necessary staff, or avoid massive budget cuts in this and future fiscal years. As explained, the agency curtails projected costs as needed to avoid depleting its carryover balance so it can pay its bills. Thus, the revised projection reflects a positive carryover balance, but it cannot fairly be described as a surplus.

[6] Plaintiffs claim that DHS only shared its cost-modeling software in a meeting "one week" before the final comment deadline, Mot. 7, but they fail to acknowledge that in the Proposed Rule DHS invited the public to visit USCIS and view the software, as it has done for the previous 3 fee rules, and only received a single request for such a visit. *See* 84 Fed. Reg. 62,281 ("The software … is a commercial product licensed to USCIS that may be accessed on-site, by appointment, by calling (202) 272–1969."); 85 Fed. Reg. 46,805.

Plaintiffs argue that "the public's ability to meaningfully comment" was "impaired" because the process was "disjointed" and did not include "60 consecutive days to prepare comments." Mot. 7. This argument fails. *First*, 5 U.S.C. § 553 sets forth the procedures necessary in informal rulemaking: the agency must provide notice of the proposed rulemaking, and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." This opportunity to participate is all that the APA requires. [7] *Second*, the APA "mandates no minimum comment period," *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1484 (9th Cir. 1992); some "opportunity to participate is all that the APA requires," *Phillips Petroleum Co. v. EPA*, 803 F.2d 545, 559 (10th Cir. 1986); *see also Riverbend Farms*, 958 F.2d at 1484 (noting with approval the "usual[]" practice to allow "thirty days or more" for comment). *Third*, the APA entrusts this sort of procedural minutiae to an agency's reasonable discretion. *Vt. Yankee Nucl. Power Corp. v. NRDC,* 435 U.S. 519, 543 (1978) ("[A]dministrative agencies should be free to fashion their own rules of procedure and methods of inquiry permitting them to discharge their multitudinous duties."). [8]

Even if a different comment period were preferred, there was no prejudice to plaintiffs. *See* 5 U.S.C. § 706. "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination," *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)); *see Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1091-92 (9th Cir. 2011), and an alleged error of a failure to afford adequate opportunity for comment is harmless "where the agency's mistake clearly had no bearing on the procedure used or the substance of decision reached." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1220 (9th Cir. 2004). Here, Plaintiffs demonstrate no harm from any alleged comment-period error (or with any alleged calculation-explanation error, *see supra* section I.B.), as their motion does not contain a single substantive argument that they claim they were unable to present during the comment period for lack of time (or insufficient information, *see supra* section I.B.). In fact, Plaintiffs' motion relies heavily on submitted comments, *see, e.g.*, Mot. 8 nn. 9 & 10, or reiterates comments in expert declarations, *see, e.g.*, Mot. 4 n.5 (citing Rand Decl.), *and compare with* Stretch

---

[7] Nor should the Court credit Plaintiffs' suggestion that the Final Rule's length is relevant here; 95 of the Rule's 142 pages consist of responses to the more than 43,000 comments received. *Compare* 85 Fed. Reg. 46,794-46,889 *with* 81 Fed. Reg. 73,292, 73,295 (Oct. 24, 2016) (41 pages) (received 475 comments) *and* 75 Fed. Reg. 58,962, 58,965 (Sept. 24, 2010) (31 pages) (received 225 comments).

[8] The sole district court case Plaintiffs cite does not contravene this appellate precedent. *See Cal. ex rel. Becerra v. U.S. Dep't of the Inter.*, 381 F. Supp. 3d 1153, 1172-78 (N.D. Cal. 2019) (holding meaningful opportunity for comment not provided where agency failed to explain reasons justifying complete repeal of rule, limited scope of comments to be considered to only part of the agency action, and allowed only 30 days for comment).

Decl., Ex. 11. Indeed, their failure to even attempt to argue they were harmed by any such error is sufficient to warrant a finding of harmlessness. *See City of Sausalito*, 386 F.3d at 1220.

**D.  The rule was not contrary to the HSA, the INA, or international law.**

1. The Final Rule is consistent with the HSA's structure because it does not improperly combine DHS component functions or funding. When the HSA provisions Plaintiffs cite are read in conjunction with the INA's relevant fee provisions, it is clear that the "resource allocation and policy priorities" in the Final Rule are consistent with the HSA and of the kind "typically left to agency discretion." *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1135 (D.C. Cir. 1995); *cf. United States v. Freeman*, 44 U.S. 556, 564 (1845) ("[I]f divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them .…").

The INA authorizes DHS to set fees for all components, not just USCIS. 8 U.S.C. § 1356(m). Fees deposited into IEFA may be used to support adjudication and naturalization services and support functions for such services by DHS components. *Id.* § 1356(n). Thus, Plaintiffs' argument that the Final Rule's fee changes relating to CBP-adjudicated forms "violates the HSA's separate funding provisions" is wrong. Mot. 8.[9] Because CBP also adjudicates certain forms (*e.g.*, Forms I-192, I-193, I-212, I-824), it is entirely appropriate for DHS to incorporate that component's costs and workload into its cost model, and, once those fees are collected, to use them to recover full CBP adjudication costs. *See* 85 Fed. Reg. 46,840; 84 Fed. Reg. 62,321; *cf.* 8 U.S.C. § 1182(a)(7), (c), (d)(4), (k); 8 C.F.R. §§ 211.1(b)(3); 212.1(g), (j). Such accounting neither combines the components' functions, nor establishes any transfers between them. *See* 6 U.S.C. §§ 291(b), 296(d).

2. The Final Rule's imposition of a $50 fee on asylum applicants is also consistent with the INA and international law. None of Plaintiffs' three arguments otherwise has merit. *First*, the Refugee Act at 8 U.S.C. § 1158(a)(1) by its plain terms requires only that an alien be permitted to "apply" for asylum; it does not forbid imposing an application fee. In fact, § 1158(d)(3) (which Plaintiffs ignore) specifically authorizes the imposition of "fees for the consideration of an application for asylum[ and] for employment authorization under this section," provided such fees do not exceed the costs of adjudicating the applications. The assertion that "[a]pplying a fee for asylum without the possibility of a waiver violates [§ 1158] because it prevents some

---

[9] Plaintiffs' claim that the Rule funds ICE operations is belied by the record. 85 Fed. Reg. 46,875 (fees "not calculated to provide funds to ICE"). Similarly, the USCIS Fraud Detection and National Security Directorate is not a joint program with ICE. *See* USCIS Organizational Chart, https://www.uscis.gov/sites/default/files/document/charts/USCIS_OrgChart.pdf (last visited Sept. 8, 2020).

people from applying for asylum," Mot. 8, therefore, is plainly wrong.

*Second*, Plaintiffs' argument that the asylum fee violates international law relies on comments asserting that "international law prohibits conditioning eligibility for asylum on financial means," and referencing the 1951 U.N. Convention Relating to the Status of Refugees (1951 Convention) and the 1967 U.N. Protocol Relating to the Status of Refugees (1967 Protocol). Mot. 8 (citing Stretch Decl. Exs. 4 & 5). But an international norm does not become a right on U.S. soil absent an act of Congress. *See, e.g.*, *Medellin v. Texas*, 552 U.S. 491, 504-05 (2008); *Barapind v. Reno*, 225 F.3d 1100, 1107 (9th Cir. 2000) (noting that 1967 Protocol, which incorporates the substantive provisions of the 1951 Convention, "was not intended to be self-executing"). It is the plain language of the Refugee Act that governs, and that statute expressly permits a fee. *Id.* (1967 Protocol is "only as a useful guide in determining congressional intent in enacting the Refugee Act").

*Finally*, Plaintiffs' assertion that the asylum fee "is not intended for cost recovery but deterrence," Mot. 8, is belied by the record. *See, e.g.*, 85 Fed. Reg. 46,844 (explaining that $50 asylum fee is intended to "generate some revenue to offset adjudication costs," which, for asylum adjudications, exceeds $50, and specifically disclaiming intention to "discourage meritorious asylum claims or unduly burden any applicant, group of applicants, or their families"); *see also*, *e.g.*, 85 Fed. Reg. 46,842, 46,850, 46,882 (all explaining that $50 fee is intended to cover some operational costs of adjudicating asylum applications).[10]

### E. The Final Rule is not arbitrary and capricious.

1. The agency adequately justified its change to a beneficiary-pays funding model.

Plaintiffs' argument that the agency failed to "rationally justify major policy changes," Mot. 9 (casing fixed), is premised on a misreading of controlling Supreme Court precedent. In *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), the Court reversed a decision holding that "agency action that changes prior policy" "requir[es] a more substantial explanation" than a decision made in the first instance. *Id.* at 514. The Supreme Court found "no basis in the [APA] or in our opinions for a requirement that all agency change be subjected to more searching review" or any "heightened standard." *Id.* On the contrary, when an agency changes course

---

[10] For the same reasons, Plaintiffs' argument that the asylum fee is arbitrary and capricious must be rejected, for it, too, relies on Plaintiffs' erroneous assertion that the fee is intended for deterrence, not cost recovery. In support thereof, Plaintiffs seize upon a single reference to "discourag[ing] frivolous filings," which appears not in the Regulatory Impact Assessment (RIA) (as Plaintiffs cite) but in the Proposed Rule, 84 Fed. Reg. 62,320. Whatever this phrase's intended meaning in the Proposed Rule, in the Final Rule the agency specifically (and repeatedly) disclaimed that the fee was intended for deterrence. *See, e.g.*, 85 Fed. Reg. 46,844.

it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one"; "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* at 515. Plaintiffs ignore this deferential standard, likely because the Rule easily satisfies it. DHS both acknowledged its policy change and discussed extensively its decision to apply a beneficiary-pays principle—rather than an ability-to-pay model—explaining, *inter alia*, that a substantial increase in the volume of no-or-reduced-fee naturalization applications rendered the previous model less equitable.[11]

Rather than grapple with the agency's rationale, Plaintiffs rely on a narrow exception whereby an agency "sometimes" should provide "a more detailed justification than what would suffice for a new policy created on a blank slate," including "when its prior policy has engendered serious reliance interests that must be taken into account." *Fox*, 556 U.S. at 515. But Plaintiffs do not claim the agency ignored the reliance interests of immigrant applicants–*i.e.*, beneficiaries–but of *Plaintiffs. See* Mot. 10 ("Plaintiffs have structured their service models based on the ability-to-pay principles USCIS has adhered to for decades."). Plaintiffs' purported economic interests in completing a minimum number of applications annually on behalf of clients cannot provide a basis to require a more-searching inquiry under *Fox* because those interests fall outside the zone of interests served by the relevant statute, 8 U.S.C. § 1356(m), and the fee-waiver regulation, 8 C.F.R. § 103.7(c)(3). *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 389 (1987) (holding that APA plaintiff falls outside the zone when its "interests are … marginally related to or inconsistent with the purposes implicit in the statute"). In other words, at most the agency was required to–and did–consider beneficiaries' interests, but it was not further required to align its fees with the purported best interests of advocacy groups that have selected particular funding models to serve the individuals whose interests *are* directly implicated by the Rule.

Plaintiffs' additional arguments are readily dispatched. DHS did not, as they charge, "disregard[] the[] analysis and data" from commenters contending that the new fees are inequitable; the Rule addresses[12] these

---

[11] *See, e.g.*, 85 Fed. Reg. 46,806 ("DHS acknowledges that this is a change from its previous approach to fee setting and believes that these changes will make USCIS' fee schedule more equitable for all immigration benefit requests by requiring fees to be paid mostly by those who receive and benefit from the applicable service."); *id.* at 46,825 ("DHS explained in the [Proposed Rule] that fee waivers had increased to unmanageable levels and that DHS had to do something to curtail the amount of free services being provided … DHS noted that the estimated annual forgone revenue from fee waivers and exemptions has increased markedly … DHS is aligning USCIS' fees more closely to the beneficiary-pays principle. Without the changes to fee waiver policy … fees would increase by a weighted average of 30 percent, which is 10 percent more than in the fee schedule implemented in this final rule.").

[12] *See* 85 Fed Reg 46,815 ("DHS believes that by continuing to provide the opportunity to request fee waivers,

---

comments, but disagrees with their conclusion. And there is nothing "illogical," as Plaintiffs claim, in DHS's decision to limit the fee increase for a small number of forms. *See* Mot. 10 (challenging "deviations" in retaining reduced fee for religious workers and American families adopting children abroad). DHS demonstrated *responsiveness* to commenters' concerns by, *e.g.*, agreeing that a full-cost model for religious organizations "would place an unreasonable burden on petitioners," 85 Fed. Reg. 46,841, and determining it "contrary to public and humanitarian interests to impose a [full-cost recovery] fee" "on prospective adoptive parents seeking to adopt a child from another country." *See* 84 Fed. Reg. 62,312. Plaintiffs' disagreements with those discretionary policy choices provide no reason to set aside the Rule.[13] Nor does DHS's disagreement with concerns "that individuals will be prevented from filing applications or receiving immigration benefits" "contradict[]," Mot. 11, its recognition that the absence of "fee waivers may adversely affect some applicants' ability to apply for immigration benefits." *Compare* 85 Fed. Reg. 46,806, *with id.* at 46,891. Rather, the agency recognized that increased fees will require some applicants to save additional money, use credit, or delay filing, (*e.g., id* at 46,807 ("While DHS acknowledges that the use of a credit card may add interest expenses to the fee payment, a person can generally use a debit or credit card to pay their benefit request fee and does not have to delay their filing until they have saved the entire fee.")), but reasonably determined that a more-equitable model where beneficiaries generally pay the cost of their applications was warranted.

    2.  The agency adequately considered the data available to it.

    Plaintiffs cannot overcome the deference owed to the agency's expertise, "especially [since] the agency [was] called upon to weigh the costs and benefits of alternative policies." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003). In short, the Rule was the "product of reasoned decisionmaking" and should be upheld. *State Farm*, 463 U.S. at 43, 52. The agency did not ignore data in the record; rather, it disagreed with certain comments and explained why. *E.g.*, 85 Fed. Reg. 46,797-98 ("DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2007, 2010, and 2016 …."); *id.* at 46,805 ("[B]ased on the numbers of filings received after past fee increases, DHS does not anticipate that the

---

the final rule will not unduly burden these populations or delay the submission of their applications and petitions"); 85 Fed. Reg 46,881 ("DHS acknowledges that some individuals will need to save, borrow, or use a credit card in order to pay fees because they may not receive a fee waiver.").

[13] Plaintiffs cherry-pick their challenges to DHS's deviations from beneficiary-pays; they fail to note that the agency set fees well below full-cost recovery in circumstances Plaintiffs presumably support, including asylum applications, 85 Fed. Reg. 46,795, and requests to appeal or reconsider an adverse decision, *id.* at 46,840.

fees would affect application levels or that it will create barriers to family reunification or stymie noncitizens seeking to adjust their status or naturalize."); *id.* at 46,882 ("DHS agrees … that USCIS cannot reliably estimate the number of asylum applications who may not be able to afford the $50 fee" but "does not believe that the new fee will deter asylum applications," noting that "previous fee increases … had no effect on the number of filings that USCIS received."); *id.* at 46,795, 803, 807, 815, 860, 881, 884, 886.[14] Thus, Plaintiffs' arguments boil down to what can only "be ascribed to a difference in view"–in an area of particular expertise for the agency–not a failure "entirely … to consider an important aspect of the problem" and not grounds for invalidating the Rule under the APA. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007).

     3.   The agency rationally explained its naturalization fee changes and addition of an asylum fee.

Plaintiffs' arguments challenging increased naturalization fees and the addition of an asylum fee lack merit. Plaintiffs contest DHS's conclusion that demand for immigration benefits is relatively inelastic. Mot. 13. The record reflects DHS's determination that "immigration to the United States remains attractive to millions of individuals around the world and [] its benefits continue to outweigh the costs noted by [] commenters." 85 Fed. Reg. 46,797. Plaintiffs insist, as if immigration fees must reflect monolithic macroeconomic theory, that "when prices go up beyond the rate of inflation, demand goes down," Mot. 13 n.21, and that "if volume substantially decreases, revenue will too." *Id.* at 13. But even a basic grasp of economics demonstrates that demand is not necessarily impacted by an above-inflation price change.[15] Moreover, Plaintiffs' argument ignores direct, far more relevant evidence that "DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2007, 2010, and 2016 and has no data that would indicate that the fees … would prevent applica[tions] from being filed." 85 Fed. Reg. 46,798; *see also id.* at 46,882 (same).[16] The agency reasonably relied on historical data and its expertise to

[14] Deterring fee-paying filings would harm the agency, which relies on fees to operate. Moreover, as the agency must study the adequacy of its fee schedule biennially, that process provides the opportunity for it to address any unanticipated effects the Final Rule might have going forward.

[15] *See* Price Elasticity of Demand, Investopedia, *available at* https://www.investopedia.com/terms/p/priceelasticity.asp ("some goods are very inelastic, … their prices do not change very much given changes in supply or demand"; "other goods are very elastic, their price moves cause substantial changes in [] demand"). DHS reasonably concluded, based on experience, that demand for naturalization is quite inelastic. *See* 85 Fed. Reg. 46,797.

[16] Plaintiffs' insistence that "DHS ignore[d] data in the record showing that their changes could decrease demand so much that the Final Rule will defeat its own purpose" by lowering total revenue, Mot. 13, is patently incorrect. As "support," Plaintiffs cite a single footnote in an exhibit to a lengthy comment submitted in response to the Proposed Rule; that footnote contains only a reference to a blog post. *See id.* n. 22 (citing

determine that demand for naturalization and asylum will not plummet as a result of increased fees.

Plaintiffs' additional contention–that DHS failed to adequately justify a policy shift to a beneficiary-pays principle–recycles their previous argument, *see supra* section I.E.1., and is incorrect. The agency adequately explained its choice to no longer hold naturalization fees well below their cost to adjudicate because, "given the significant increase in [] filings in recent years," "shifting costs to other applicants … is not equitable." 84 Fed. Reg. 62,316. Similarly, Plaintiffs' assertion that the agency failed to "even acknowledge … much less explain" the policy change reflected in the new asylum fee, is wrong. *See*, *e.g.*, 85 Fed. Reg. 46,844 (noting that agency provided "advance notice of and the reasons for the change in its longstanding [asylum] policy). The agency acknowledged the "circumstances" of asylum seekers and, in recognition thereof, did not "align[] the fee with the beneficiary-pays principle." *Id*. Nevertheless, the agency explained that the fee would "alleviate the pressure that the asylum workload places on the administration of other immigration benefits and determined that a minimal fee would mitigate fee increases for other immigration benefit requests." *Id*. Plaintiffs may disagree with the agency's judgments that other applicants should no longer artificially hold down the cost to naturalize (a decision fully in line with the beneficiary-pays principle, to be sure), or fully cover asylum application costs, but that does not render these decisions arbitrary and capricious.

## II.   Plaintiffs Fail to Establish Irreparable Harm.

"[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (*AFWR*). Plaintiffs "must do more than merely allege imminent harm sufficient to establish standing; [they] must *demonstrate* immediate threatened injury." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016). Plaintiffs do not meet these standards. They rely on economic harm: Implementation of the Rule "will immediately slash the number of immigrants able to submit applications" and prevent Plaintiffs from "fulfill[ing] grant requirements." Mot. 13. But Plaintiffs gloss over the fact that, *even if* the Rule were to have the immediate effect Plaintiffs claim, it is implausible that the organizations would suffer irreparable injury in the relatively short timeframe between the Rule's effective date and this Court's merits decision.

Stretch Decl. Ex. 13, Att. E at 3 n. 5). The study discussed in the blog cited in the footnote to an attachment to a comment in no way supports Plaintiffs. On the contrary, the blog discusses a study finding that naturalization rates increased markedly when LPRs with income too high for a fee waiver were provided a voucher to cover the cost of naturalization applications. That *elimination* of a fee may increase utilization of a service does not demonstrate that *increases* to the fee will cause demand to plummet.

Plaintiffs admit that their grant requirements are tied to *annual* performance metrics, Mot. 14, and Defendants have produced the Administrative Record concurrently with this filing such that the parties may promptly move for summary judgment. Plaintiffs have not shown that implementation of the Rule between October 2 and this Court's final judgment would thwart their ability to meet annual metrics. All other injuries Plaintiffs claim have already occurred[17] and thus cannot constitute any imminent or threatened harm. Finally, Plaintiffs are not entitled to injunctive relief with respect to any aspect of the rule where they have not substantiated a specific harm based on this theory of injury.

**III.    The Remaining Equitable Factors Require Denial of Plaintiffs' Motion.**

Plaintiffs must also show that the balance of equities tips in their favor and the public interest favors an injunction. *AFWR*, 632 F.3d at 1135. These factors merge when the federal government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Here, Plaintiffs fail in all respects.

If the Court enjoins the Rule, USCIS would continue to forgo millions of dollars of revenue each day, forcing corresponding funding cuts, furloughs, and swelling backlogs of the very applications Plaintiffs claim the Rule will delay. *See* section I.B., *supra*; 85 Fed. Reg. 46,876; AR82612-17. Plaintiffs' identified harms cannot outweigh the harm to the United States and to benefit applicants. The Rule's changes to streamline adoption, payment, and many other services would also be delayed. *See* 84 Fed. Reg. 62,295-314. On the other hand, Plaintiffs have not demonstrated irreparable harm from the Rule. *See* section II, *supra*.[18] And again, one may reasonably expect that halting the Rule will cause direr versions of these same alleged harms as the agency's fiscal situation worsens and its backlog swells at increasing rates. The seeming Catch-22 of increasing fees or cutting services was not of the agency's design; it results from Congress's decision to structure USCIS as fee-funded. But, crucially, Congress also left to USCIS the discretion to strike that balance. *See* 8 U.S.C. § 1356(m).

**CONCLUSION**

For reasons stated herein, the Court should deny preliminary relief.

---

[17] *See* Mot. 14 ("The Final Rule forced Plaintiffs to divert resources toward submitting as many applications as possible … developing training materials … conducting community outreach … and reassessing budgets.").

[18] And Plaintiffs' have alleged harm only from the fee waiver and asylum fee provisions. *See* Mot. 13-14. Accordingly, any injunction should be limited to, at most, those two severable provisions, not the entire Rule. *See* 5 U.S.C. § 705 (relief pending review available only to the extent *necessary* to prevent irreparable injury" (emphasis added)); *United States v. BNS Inc.*, 858 F.2d 456, 464 (9th Cir. 1988) ("A preliminary injunction should be narrowly tailored to remedy the specific harm alleged."); 85 Fed. Reg. 46,921 (severability provision).

Dated:  September 9, 2020                              Respectfully submitted,

                                                      JEFFREY BOSSERT CLARK
                                                      Acting Assistant Attorney General

                                                      BRIGHAM J. BOWEN
                                                      Assistant Branch Director
                                                      Federal Programs Branch

                                                       /s/ Julie Straus Harris
                                                      JULIE STRAUS HARRIS
                                                      DC Bar No. 1021298
                                                      Senior Trial Counsel
                                                      CHARLES E. T. ROBERTS (PA Bar No. 326539)
                                                      BRADLEY CRAIGMYLE (IL Bar No. 6326760)
                                                      Trial Attorneys
                                                      U.S. Department of Justice
                                                      Civil Division, Federal Programs Branch
                                                      1100 L Street NW
                                                      Washington, DC 20530
                                                      Tel: (202) 353-7633
                                                      Fax: (202) 616-8470
                                                      Email: julie.strausharris@usdoj.gov

                                                      *Attorneys for Defendants*

### CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of September, 2020, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing.

                                                       /s/ Julie Straus Harris
                                                      JULIE STRAUS HARRIS