David B. Rankin, S.D.N.Y. Bar No. DR 0863
(*pro hac* application forthcoming)
BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, 26th Floor/PH
New York, NY 10016
Telephone: (212) 277-5825
Facsimile: (212) 277-5880
Email: drankin@blhny.com

Matthew Strugar, SBN 232951
Law Office of Matthew Strugar
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
(323) 696-2299
matthew@matthewstrugar.com

*Counsel for Amicus Curiae Reclaim the Records*

UNITED STATES DISTRICT COURT

NORTHERN DIVISION OF CALIFORNIA

OAKLAND

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER; EAST BAY SANCTUARY COVENANT; COALITION FOR HUMANE IMMIGRANT RIGHTS; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; INTERNATIONAL RESCUE COMMITTEE; ONEAMERICA; ASIAN COUNSELING AND REFERRAL SERVICE; ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS,<br><br>Plaintiffs,<br><br>v.<br><br>CHAD F. WOLF, *UNDER THE TITLE OF ACTING SECRETARY OF HOMELAND SECURITY*; U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, *UNDER THE TITLE OF SENIOR OFFICIAL PERFORMING THE DUTIES OF THE DEPUTY SECRETARY OF HOMELAND SECURITY*; U.S. CITIZENSHIP & IMMIGRATION SERVICES,<br><br>Defendants | Case No. 4:20-cv-05883-JSW<br><br>**AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND PETITION FOR REVIEW AND REQUEST FOR STAY**<br><br>**DATE: OCTOBER 9, 2020<br>TIME: 9:00 A.M.<br>COURTROOM: 5, 2ND FLOOR** |

AMICUS CURIAE RECLAIM THE RECORDS
CASE NO. 4:20-CV-05883-JSW

# TABLE OF CONTENTS

STATEMENT OF INTEREST……………………………………………………………………1

I. INTRODUCTION .................................................................................................................. 3

II. ARGUMENT ........................................................................................................................ 5

    A. **The Final Rule is Arbitrary and Capricious As It Fails to Plausibly Account for the Increasing Fees Being Imposed in Relation to Agency Costs** ............................................. 5

    B. **The Final Rule is Contrary to Law as DHS Misinterprets the Genealogical Fee Statute and Charges Individuals for Fees Beyond Those Statutorily Authorized** ........... 6

    C. **Fee Increases to This Level Will Have Serious Financial Implications that Will Prohibit Many Individuals, Professionals, and Organization from Being Able to Access the Records** ................................................................................................................ 8

    D. **Making Historical Immigration Records Inaccessible Through Significant Fee Increases Causes Overall Harm to Societal Interests** ........................................................ 9

III. CONCLUSION ................................................................................................................... 10

# **STATEMENT OF INTEREST**

Amicus curiae, Reclaim the Records (RTR), is a non-profit activist group of genealogists, historians, researchers, journalists, open government advocates, teachers, and open data users whose mission is to increase public access to genealogical records and historical materials held in government archives, agencies, and libraries. RTR identifies genealogical record sets containing information valuable to the public, files requests for the release of records through the Freedom of Information Act (FOIA), and then digitizes the records and places them online for the public to access for free. RTR is one of the largest open records organizations in the United States, and has pursued legal action in nine separate lawsuits, recently succeeding in Freedom of Information suits against such diverse agencies as the United States Department of Veterans Affairs, the Missouri Department of Health and Senior Services, and the New York City Department of Records and Information Services. In addition to making their own records requests, RTR serves as an educational resource and teaches individuals how to effectively make requests for records.

Significant fee increases for historical immigration and naturalization paperwork at the level described in the Final Rule would prove especially burdensome to the genealogical and historian community as a whole, and would directly counteract RTR's goal of increasing public access to records, as the fees would be cost-prohibitive. RTR therefore supports Plaintiffs' request for a preliminary injunction of a final rule issued by the Department of Homeland Security (DHS). 85 Fed. Reg. 46788 (Aug. 3, 2020) ("Final Rule"). RTR supports Plaintiffs' detailed and persuasive legal arguments showing the unlawfulness of the Final Rule. Whereas Plaintiffs focused on the significant increase of fees to apply for immigration benefits, RTR as amicus respectfully seeks to offer information relating to the Final Rule's significant increase of

fees for USCIS' unique "Genealogy Program" that has provided public access to millions of historical agency files. Specifically, the Final Rule is contrary to law, as it violates the original genealogical fee statute 8 U.S.C. § 1356(t), and is arbitrary and capricious, as DHS failed to offer calculations or demonstrate the budgetary necessity of such significant fee increases. RTR especially seeks to emphasize the substantial harm the genealogical community—professionals, organizations, individuals, and others—would suffer should the Final Rule take effect. Lastly, given the weight of importance of the access to historical records, RTR will detail the harm such a drastic fee increase would cause for the public as a whole.

## I. INTRODUCTION

The United States Citizenship and Immigration Services (USCIS) not only processes current immigration applications, but the agency also holds millions of historical records that covers about 150 years of American immigration and naturalization. For example, individuals wanting to learn their family history can access these records and venture beyond merely learning names in a family tree, they can learn the circumstances of how their family members or other public figures gained or lost their American citizenship. Many of the files USCIS currently holds provide an abundance of previously unknown details—pictures of great-grandfathers in their youth, signatures on handwritten documents, and other glimpses into the past that create an image of a real person, rather than a name or date of birth. These records include the files of immigrants who came through Ellis Island in the late nineteenth century, as well as refugees who fled Nazi Germany and Communism in the twentieth century, and many other groups. They also document the history of America's maltreatment of our naturalized citizens and permanent residents. For example, historical USCIS records allowed family members of Raymond Hiroshi Hirai to access a file of over a hundred pages and find in it a picture of Mr. Hirai—who was born

in 1908; documents detailing his height, weight, and occupation as a motion picture actor; transcripts of government interviews about his internment in a Santa Fe, New Mexico camp for Japanese Americans during World War II; and his subsequent expatriation to Japan and then repatriation to the United States.[1] No other American government agency would have held all of these records, nor in such detail.

Despite this, USCIS has now issued a rule increasing its fees drastically—without offering plausible explanations for such significant increases. Given the history of how USCIS created this program in the first place, large fee increases especially blindside genealogists and the public. To briefly summarize, USCIS, as the holder of records[2] covering nearly 150 years of American immigration and naturalization, naturally received many FOIA requests, which it was mandated to process, as a federal agency. *See* 5 U.S.C. § 552. In 2008, in response to delayed processing of the large volume of FOIA requests, DHS established the "Genealogy Program"—a "fee-for-service" system allowing USCIS to provide historical documents in return for fees, so as to redirect these requests from personnel handling FOIA and to a streamlined "dedicated queue for genealogists and other researchers." *See* 8 CFR Parts 103 and 299, 28026–27. Notably, the

---

[1] Records Not Revenue, *Examples of the kinds of historical records affected by this proposed fee hike: Example A-File (with Alien Registration and Japanese Internment Camp Records)* (last visited Sept. 8, 2020), *available at* https://www.recordsnotrevenue.com/example-files/.

[2] USCIS is authorized to provide the following records: (1) Immigrant Files [A-files]—official files for all immigration records since April 1, 1994; (2) Alien Registration Forms [AR-2]—copies of forms of immigrants residing or entering the United States between April 1, 1940 and March 31, 1944; (3) Naturalization Certificate Files [C-Files]—copies of records of various naturalizations, among other events; (4) Registry Files—records documenting the creation of immigrant arrival records for persons who entered the United States before July 1, 1924, but for whom an arrival could not later be found; (5) Visa Files—original arrival records of immigrants admitted for permanent residence under Immigration Act of 1924. *See* 8 CFR 103.39 (May 15, 2008).

fees charged were reasonable—between $20 and $35. *Id*. at 28028. Genealogists and other individuals accessing records then experienced an abrupt shift in 2016, when the fees were tripled to $65, and set up in a manner requiring many individuals to pay that fee twice. *See* 85 Fed. Reg. 46792 (Table 7) (describing current fees). Such a large fee increase was burdensome at that time, especially for those who needed to request multiple records, and for organizations and individuals performing frequent, in depth genealogical work, such a drastic increase raised serious concerns about how to continue to use the Genealogy Program.

Now, in a drastic shift, the Final Rule sets genealogical fees at *$160-$170* for certain searches, *$255-$265* for others, and will often require both fees just to procure one record. *See* 85 Fed. Reg. 46792. Whereas current fees pose difficulties presently, a scenario requiring payment of fees at that level would be untenable for many. Paying steadily increasing fees to USCIS--an agency that previously provided records at a cheaper rate through FOIA *and* is now behind on its retention schedule to transmit documents to another agency who could provide them to the public at a cheaper rate—is no longer a viable option for many.

USCIS wants to institute this fee hike on records that the agency itself agrees it should not even possess.[3] Many of these records should now actually be residing at the National Archives and Records Administration (NARA), and they have been subject to a records retention schedule to transfer them for years. DHS admits as much in their recent comments in the Federal Register about these fees. However, USCIS has failed to adhere to that schedule and continues to

---

[3] In response to numerous comments urging USCIS to fulfill its obligation to transfer the records, DHS acknowledged the failure to adhere to the schedule but stated that operational issues delayed transfer. *See* 85 Fed. Reg. 46837. Then, DHS declined changing the Final Rule in light of this.

AMICUS CURIAE RECLAIM THE RECORDS
CASE NO. 4:20-CV-05883-JSW
4

hold these millions of records overdue for a transfer, which has prevented individuals from benefitting from free public access for them onsite at the National Archives.[4]

It is currently USCIS' position that these historical files are now solely accessible to the public through its Genealogy Program, and what was originally designed as a faster way to process FOIA requests for historical materials is now being treated as the *only* way for the public to acquire those files at all. Thus, the effect of this dramatic fee increase of hundreds of dollars should be measured not merely against the previous fee hike of $65 nor the original fee of $20 or $35, but more properly in relation to the far lower costs if the records were made available through the regular FOIA processing channel at USCIS, or the completely free onsite access to the documents if they were properly de-accessioned to the National Archives.

II. **ARGUMENT**

**A. The Final Rule is Arbitrary and Capricious As It Fails to Plausibly Account for the Increasing Fees Being Imposed in Relation to Agency Costs**

In discussing the steep fee increase, DHS explains that the Genealogy Program does not have its own discrete operating budget and expenditures are not tracked, but rather, USCIS must "estimate the costs of the genealogy program." 85 Fed. Reg. 46834. DHS explains its failure to track expenditures by explaining that the Genealogy Program is located within the National Records Center, where FOIA operations, as well as maintaining, storing, and moving records occurs. *Id*. In explaining why costs rose so dramatically, DHS stated that for Fiscal Year

---

[4] In response to numerous comments urging USCIS to fulfill its obligation to transfer the records, DHS acknowledged the failure to adhere to the schedule but stated that operational issues delayed transfer. *See* 85 Fed. Reg. 46837. Then, DHS declined changing the Final Rule in light of this.

2016/2017, it underestimated the cost of the staff required to process requests in the Genealogy Program. *Id*. DHS claims that it made this discovery in the next budgetary year, when DHS had incorporated the Genealogy Program into the National Records Center (NRC). *Id*. DHS claims that following the incorporation, USCIS was then able to "revise its cost estimation methodology to incorporate a proportional share of the NRC's operating costs based on the staffing devoted to the genealogy program," and from this sprung the proposed fees. *Id*. DHS is both attempting to sort through staffing costs between the Genealogy Program and the NRC, but also states that it cannot track expenditures and create a budget because of how the program operates alongside others at the NRC. DHS's failure to provide more details about its calculations is especially arbitrary and capricious in the present situation, in which the agency seeks to increase fees by hundreds of percentages.

**B.     The Final Rule is Contrary to Law as DHS Misinterprets the Genealogical Fee Statute and Charges Individuals for Fees Beyond Those Statutorily Authorized**

The Genealogy Fee established by federal statute allows fees for "genealogy and information services" to be set "at a level that will ensure the recovery of the full costs of providing all such services." 8 U.S.C. § 1356(t). In the Final Rule, DHS describes its genealogical services, for which it can charge user fees, including the (1) direct costs of identifying records and manually reviewing them in compliance with privacy statutes and (2) overhead costs of storing and managing the records. *See* 85 Fed. Reg. 46836. Under DHS's reading of the statute, many of the fees USCIS accrued in compliance with FOIA—storing, maintaining, reviewing records for privacy concerns—are now under Genealogy Fees, as records requests were redirected away from the slower FOIA channel. This distinction is crucial, as Genealogy Fees now soar into the hundreds of dollars. In comparison, FOIA allows individuals to access public records and only

pay a search and copy fee with fee waivers available,[5] and in practice more modern A-Files are actually provided free through USCIS. Before the Genealogy Program was implemented, USCIS, as a federal agency, was responsible for keeping its records, paying staff to review them for privacy concerns, and handling FOIA requests. The plain language of the statute describing "genealogy and information services," 8 U.S.C. § 1356(t), does not support charging individuals for services such as storage which USCIS already was obligated to do.

When it developed the Genealogy Program, DHS stated that the Office of Budget and Management directs agencies that are collecting user fees to include various additional costs in the calculation of fees, such as management and personnel costs and overhead. *See* 8 CFR Parts 103 and 299, 28028. However, Genealogy Fees were low for many years. It is also unclear from DHS's rules whether the savings that USCIS enjoys from not directing resources to FOIA has then been calculated into its cost estimates overall. For instance, if USCIS is able to spend less money on FOIA, but then directs resources to the Genealogy Program, which users fully reimburse, then charging such hefty fees strips the public of both the benefits established by the Genealogy Program, as well as FOIA.

Additionally, the Office of Budget and Management's provisions, as the agency notes, do not trump statutes, and they must be applied in accordance with the law. To the extent that USCIS attempts to collect user fees under regulatory directives, it would also need to heed the requirements to proper collection of user fees, which include maintaining records of "the information used to establish charges and the specific method(s) used to determine them," as

---

[5] U.C. Citizenship and Immigration Services, *Freedom of Information Act Request Guide* (July 10, 2019), *available at* https://www.uscis.gov/sites/default/files/document/guides/USCIS_FOIA_Request_Guide.pdf.

well as "the collections from each user charge imposed."[6] As noted, DHS has both imposed significant fees while also failing to properly document their costs nor explain why those costs have skyrocketed since 2008.

**C.      Fee Increases to This Level Will Have Serious Financial Implications that Will Prohibit Many Individuals, Professionals, and Organization from Being Able to Access the Records**

Numerous individuals and organizations provided comments to DHS detailing the widespread harm to individuals, organizations, and community education as a whole should DHS begin to charge such high fees. In response, DHS briefly responded that these cost estimates reflected the amount needed for USCIS to continue to provide genealogical services. *See* 85 Fed. Reg. 46586. On a direct level, the harm is quite apparent. Any individual or organization seeking a record from USCIS will now pay hundreds of dollars more to access the records, even if the result may be just two sheets of paper. The specific dollar amount will vary based on the request as some individuals' files require copies of multiple types of records, and some individuals will need to use multiple searches.

Doubling, tripling, or quadrupling fees every four years undercuts the purpose of providing a Genealogy Program at all, and it starkly contrasts with the spirit of the program at its creation. With the new fees, many individuals simply would not have the means to spend hundreds of dollars to procure records from USCIS, and DHS is aware of the significant number of individuals that use the Genealogy Program to obtain records. *See id*. at 46899. At the onset of the Genealogy Program in 2008, DHS examined the economic impact of implementing a

---

[6]     OMB Circular No. A–25 (Revised), *available at* https://www.whitehouse.gov/wp-content/uploads/2017/11/Circular-025.pdf (last visited Sept. 8, 2020).

AMICUS CURIAE RECLAIM THE RECORDS
CASE NO. 4:20-CV-05883-JSW               8

Genealogy Program and described the increase in engagement in genealogy among the general community, with many individuals searching for records themselves as records became more accessible with Internet. *See id*. at 28029. DHS implemented the Genealogy Program with this in mind and anticipated that not only would it redirect many FOIA requests, but it would also *increase* overall requests for records as more individuals completed their own record searches as discrete projects or as part of longer-term research. *Id*. DHS also considered the impact of the creation of the program for professional genealogists, as DHS needed to consider whether creating its own service would economically damage business owners. After speaking with many professional genealogists and researchers, DHS concluded that individuals using their services often did so in more complex cases after they had already become stuck in their own searches. *See* 8 CFR Parts 103 and 299, 28029. DHS then created its own Genealogy Program after deciding that it would not divert business from a group of professionals, and notably, DHS also provided reassurance that fees from its program would not hurt professional genealogists either, as they would simply add those on as an expense, charging their clients. *Id*.

However, with this new Final Rule, DHS did not even attempt to estimate the magnitude of the harm to the businesses of thousands of professional genealogists, historians, and researchers who depend on being able to access these government records at a fee their clients will be able and willing to absorb. One of our board members at RTR, a professional genealogist who works with high-profile clients, estimates that his client work alone accounted for approximately 1.5% of the Genealogy Program's annual revenue in 2019, and that raising these fees to their new level would be devastating to his ability to continue to provide the same work to his clients at a reasonable cost.

    At its creation and for years after, the Genealogy Program was a highly accessible and reasonable program, charging an individual $20 or $35 for a record and providing a more

streamlined process so that individuals could pay a small fee and receive public records quickly, while USCIS could now use its FOIA personnel for other tasks. With the implementation of the Final Rule, individuals, professionals, researchers, journalists, and many others will no longer be able to use the Genealogy Program with fees having risen hundreds of dollars more. This will fundamentally transform the public records—available, but not accessible.

**D.      Making Historical Immigration Records Inaccessible Through Significant Fee Increases Causes Overall Harm to Societal Interests**

While large fee increases will harm individuals, professional genealogists, organizations, scholars, and many others, it will also effect broader communities and national values. Among the many record sets that USCIS holds, almost any late-nineteenth or twentieth-century immigrant (pre-1951) would likely appear in these records.[7] The many Americans who are family members of this particular set of immigrants may lack connection or knowledge of their family history and how it may relate to modern immigration and national policy. As the United States presently has approximately 40 million immigrants, or more than any other country in the world,[8] national unity is strengthened and common ground is formed when public records such as these are accessible and individuals can learn about their families' immigration story. Strengthening, rather than weakening, public access to historical immigration and naturalization files could even have a salutary effect on USCIS' own rule-making. For example, a living descendant of an unemployed widow and her minor child who were detained for special inquiry

---

[7]     Also, any immigrant who arrived on or after July 1, 1924 will appear, among others. Records, Not Revenue, *What are UCSIC Genealogy Program Records & Why Should I Care*, *available at* https://www.recordsnotrevenue.com/uscis/ (last visited Sept. 8, 2020).

[8]     Pew Research Center, *Key Findings About U.S. Immigrants* (Aug. 20, 2020), *available at* https://www.pewresearch.org/fact-tank/2020/08/20/key-findings-about-u-s-immigrants/.

AMICUS CURIAE RECLAIM THE RECORDS
CASE NO. 4:20-CV-05883-JSW                    10

at Ellis Island as a "Likely Public Charge" but whose family were released and went on to lives of respectable American citizenship, might be more disinclined to resurrect the Likely Public Charge doctrine today, had he better knowledge of his own family's experience with the policy.[9] DHS states that it "recognizes the importance of genealogical records and the connections they provide to immigrant ancestors," 85 Fed. Reg. 46836, yet DHS fails to account for fee increases that directly impede access these valuable records.

Given the significant value that the records hold for both individuals and the public as a whole, DHS's arbitrary spike of fees without sufficient explanation and demonstration of its necessity, nor the provision of breakdown of the program's existing actual costs, is in direct opposition to the public interest, and furthers demonstrates the arbitrary nature of their actions and the need to enjoin the final rule.

### III. CONCLUSION

For these reasons, amicus curaie respectfully urges the Court to grant Plaintiffs' Motion for Preliminary Injunction and Petition for Review and Request for Stay.

Dated: September 10, 2020
Los Angeles, CA

Respectfully summitted,

By: _____/s/_____
Matthew Strugar, SBN 232951
Law Office of Matthew Strugar
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010

---

9    Jennifer Mendelsohn, *Their Own Two Feet* (Aug. 30, 2019), discussing the Cuccinelli family history, *available at* https://medium.com/@CleverTitleTK/their-own-two-feet-8ddd1dbb1602 .

(323) 696-2299
matthew@matthewstrugar.com

David B. Rankin, S.D.N.Y. Bar No. DR 0863 (pro hac application forthcoming)
BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, 26th Floor/PH
New York, NY 10016
Telephone: (212) 277-5825
Facsimile: (212) 277-5880
Email: drankin@blhny.com

# CERTIFICATE OF SERVICE

I, Matthew Strugar, hereby certify that on September 10, 2020, the foregoing document was filed and served through the CM/ECF system.

DATED: September 10, 2020

/s/ Matthew Strugar
_____
Matthew Strugar