Brian J. Stretch, SBN 163973
bstretch@sidley.com
Naomi Igra, SBN 269095
naomi.igra@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Samina M. Bharmal (*pro hac vice*)
sbharmal@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, D.C. 20005
Telephone: +1 202 736 8000
Facsimile +1 202 736 8711

Jesse Bless (*pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G Street, Suite 300
Washington, D.C. 20005

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND

| | |
|---|---|
| IMMIGRANT LEGAL RESOURCE CENTER; EAST BAY SANCTUARY COVENANT; COALITION FOR HUMANE IMMIGRANT RIGHTS; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.;  INTERNATIONAL RESCUE COMMITTEE; ONEAMERICA; ASIAN COUNSELING AND REFERRAL SERVICE; ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS,<br><br>          Plaintiffs,<br><br>     v.<br><br>CHAD F. WOLF, *under the title of Acting Secretary of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security*; U.S. CITIZENSHIP & IMMIGRATION SERVICES<br><br>          Defendants. | Case No. 4:20-cv-05883-JSW<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION & MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF, AND PETITION FOR REVIEW AND REQUEST FOR STAY**<br><br>Assigned to Hon. Jeffrey S. White<br><br>Date:          September 25, 2020<br>Time:          9:00 a.m.<br>Courtroom:     5, 2nd Floor<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

ARGUMENT ..............................................................................................................................1

I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claim that Mr. McAleenan and Mr. Wolf Acted Without Valid Authority. ..........................................................................................1

     A.     The April 2019 Order Did Not Grant Mr. McAleenan Authority to Serve as Acting Secretary under the HSA When Secretary Nielsen Resigned. ...........................................1

     B.     Mr. McAleenan and Mr. Wolf Assumed Their Posts In Violation of the FVRA. .............3

          1.     Defendants Cannot Evade the FVRA's Time Limits ...............................................3

          2.     This Court Should Not Adopt the FVRA Analysis in *CASA v. Wolf* .................5

II.     Plaintiffs Are Likely to Succeed On The Merits Of Their Other APA Claims. ...........................7

     A.     Defendants Violated the Procedural Requirements of the APA ......................................7

          1.     The Proposals Failed to Disclose the Agency's Thinking and Data ....................7

          2.     Defendants' Disjointed Process Prevented Meaningful Comment......................9

     B.     Plaintiffs Are Likely to Succeed In Showing The Final Rule Is Contrary to Law............11

     C.     Plaintiffs Are Likely to Succeed in Showing the Final Rule is Arbitrary and Capricious. 13

          1.     Defendants Fail To Rebut Plaintiffs' Argument that the Final Rule Relies on Unexplained Calculations. ...................................................................................13

          2.     Defendants Fail To Show They Rationally Justified Major Policy Changes........13

          3.     Defendants Ignored Data and Analysis in the Record ........................................14

III.     Plaintiffs Established Irreparable Harm with Uncontroverted Declarations..............................16

IV.     Balance of Equities and Public Interest Tip Sharply in Plaintiffs' Favor ....................................19

V.     CONCLUSION...........................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Dep't of Envtl. Cons. v. EPA,*
    540 U.S. 461 (2004) .................................................................................................................... 8

*All. For the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ............................................................................................ 4, 11, 19

*Am. Med. Ass'n v. Reno,*
    57 F.3d 1129 ..........................................................................................................................7, 8

*Am. Radio Relay League, Inv. v. FCC,*
    524 F.3d 227 (D.C. Cir. 2008) ................................................................................................. 10

*Becerra v. U.S. Dep't of Interior,*
    381 F. Supp. 3d 1153 (N.D. Cal. 2019) ..............................................................................10, 13

*Boardman v. Pacific Seafood Group,*
    822 F.3d 1011 (9th Cir. 2016) ..............................................................................................16, 17

*Cal. Wilderness Coal. v. U.S. Dep't of Energy,*
    631 F.3d 1072 (9th Cir. 2011) ................................................................................................. 11

*CASA de Md, Inc. v. Wolf,*
    No. 8:20-cv-02118-PX, 2020 WL 5500165 (D. Md. Sept. 11, 2020) ....................................... 2, 3, 5, 6

*City of Sausalito v. O'Neill,*
    386 F.3d 1186 (9th Cir. 2004) ................................................................................................. 11

*Conn. Light & Power Co. v. NRC,*
    673 F.2d 525 (D.C. Cir. 1982) .................................................................................................. 9

*Ctr. for Biological Diversity v. BLM,*
    698 F.3d 1101 (9th Cir. 2012) ................................................................................................. 16

*Dep't of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ............................................................................................................. 16

*Department of Homeland Security v. Regents,*
    140 S.Ct. 1891 (2020) .............................................................................................................. 14

*East Bay Sanctuary Covenant v. Trump,*
    950 F.3d 1242 (9th Cir. 2020) ....................................................................................... 18, 19, 20

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ................................................................................................................. 14

*GEC US 1 LLC v. Frontier Renewables, LLC,*
  No. 16-cv-1276, 2016 WL 3345456 (N.D. Cal. June 16, 2016) ................................ 17

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
  356 F. Supp. 3d 109 (D.D.C. 2019) ................................................................ 4

*Hooks v. Kitsap Tenant Support Servs., Inc.,*
  816 F.3d 550 (9th Cir. 2016) ................................................................... 3, 4

*J.E.M. Ag Supply Inc. v. Pioneer Hi-Bred Int'l Inc.,*
  534 U.S. 124 ................................................................................................. 6

*Kitchen v. Dep't. of Treasury,*
  535 F.2d 1197 (9th Cir. 1976) ...................................................................... 7

*La Clinica De La Raza v. Trump,*
  No. 19-cv-4980, 2020 WL 4569462 (N.D. Cal. Aug. 7, 2020) ........................ 2, 3, 4

*NLRB v. SW Gen., Inc.,*
  137 S. Ct. 929 (2017) ............................................................................... 4, 6

*Palmer v. IRS,*
  116 F.3d 1309 (9th Cir. 1997) ...................................................................... 8

*Prometheus Radio Project v. FCC,*
  652 F.3d 431 (3d Cir. 2011) ......................................................................... 9

*Shands Jacksonville Med. Ctr. v. Burwell,*
  139 F. Supp. 3d 240 (D.D.C. 2015) ............................................................... 7

*Shinseki v. Sanders,*
  556 U.S. 396 (2009) ................................................................................... 11

*Valle del Sol Inc. v. Whiting,*
  732 F.3d 1006 (9th Cir. 2013) .................................................................... 18

*W. Watersheds Project v. U.S. Forest Serv.,*
  753 F. App'x 465 (9th Cir. 2019) .................................................................. 8

**Statutes**

5 U.S.C. § 706(2)(A) .......................................................................................... 3

5 U.S.C. § 706(2)(C) .......................................................................................... 3

5 U.S.C. § 3345 ............................................................................................. 3, 4

5 U.S.C. § 3346 ............................................................................................. 3, 4

5 U.S.C. § 3347 ........................................................................................... 3, 5, 6

5 U.S.C. § 3347(a) ........................................................................................................... 3

5 U.S.C. § 3348 ............................................................................................................... 4

5 U.S.C. § 3348(d)(1) ...................................................................................................... 4

6 U.S.C. § 113(g)(2) ........................................................................................................ 4

6 U.S.C. § 133(a)(1)(A) ................................................................................................... 4

6 U.S.C. § 133(a)(1)(F) .................................................................................................... 4

6 U.S.C. §§ 251 .............................................................................................................. 11

6 U.S.C. § 252(b)(2)(A) ................................................................................................. 11

6 U.S.C. § 271(b) ........................................................................................................... 11

6 U.S.C. § 291(b) ........................................................................................................... 11

8 U.S.C. 1356(m) ........................................................................................................... 12

8 U.S.C. § 1158(d)(3) ..................................................................................................... 12

44 U.S.C. § 3506(c)(2)(A) ............................................................................................. 10

**Other Authorities**

69 Fed. Reg. 5088 (Feb. 3, 2004) .................................................................................. 12

72 Fed. Reg. 4888 (Feb. 1, 2007) .................................................................................. 12

75 Fed. Reg. 33,446 (June 11, 2010) ............................................................................. 12

84 Fed. Reg. 62,280 (Nov. 14, 2020) .............................................................................. 1

84 Fed. Reg. 67,243 (Dec. 9, 2019) ........................................................................... 1, 10

85 Fed. Reg. 46,788 (Aug. 3, 2020) ................................................................................ 1

**SUMMARY OF THE ARGUMENT**

Defendants' responses to Plaintiffs' arguments lack merit. ECF 27 ("Motion" or "Mot."). The Court should grant the Motion.

(I) Plaintiffs explained that Mr. McAleenan and Mr. Wolf served as Acting Secretaries of the Department of Homeland Security ("DHS") without valid authority under the Homeland Security Act ("HSA") or the Federal Vacancies Reform Act ("FVRA"). Mot. 4-6. Defendants respond that Mr. McAleenan served under an April 2019 Order signed by DHS Secretary Nielsen. But that Order only applied in the event of a "disaster or catastrophic emergency," not Ms. Nielsen's resignation. ECF 69-1; 69-2. Mr. McAleenan therefore had no authority to install Mr. Wolf in his post. *CASA de Md., Inc. v. Wolf*, No. 8:20-cv-02118-PX, 2020 WL 5500165 (D. Md. Sept. 11, 2020). A proper reading of the HSA and the FVRA also confirm that Mr. McAleenan and Mr. Wolf violated the FVRA's 210-day time limit for acting officers. *See* ECF 38. The Final Rule, 85 Fed. Reg. 46,788 (Aug. 3 2020)[1], is without effect under the FVRA, and violates the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(C) and (2)(A).

(II) Defendants do not rebut Plaintiffs' arguments that the Final Rule violates the APA. They contend that DHS has "plenary fee-setting discretion," Opp. 1, and is owed "deference." Opp. 12. But under the APA, the budgets of fee-funded agencies are not "exempted from the disclosure and explanation requirements imposed on other data underlying a proposed rule." *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1132 (D.C. Cir. 1995). Plaintiffs are likely to succeed in showing that the Final Rule is contrary to law under the FVRA, HSA, and INA, Mot. 8-9, and also arbitrary and capricious because DHS "disregarded facts" that underlay its prior policies, and failed to account for "serious reliance interests." *FCC v. Fox Television Stations Inc.*, 556 U.S. 502, 515-16 (2009).

(III) Plaintiffs submitted ample evidence to show the Final Rule causes them irreparable harm. *East Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 845-46 (9th Cir. 2020). *Amici* states, cities, and non-profit organizations confirm that an injunction is in the public interest. Mot. 14-15.; ECF 47-1, 54, 55. Plaintiffs at least raise "serious questions" as to the merits, and the balance of hardships and public interests factors "tip sharply" in their favor. *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). The Court should grant Plaintiffs' Motion.

---

[1] *See* Decl. of Brian Stretch in Support of Reply ("Stretch Reply Decl.") Ex. 35 (AR477-618).

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Defendants' Opposition is packed with conclusory and internally inconsistent statements that do not answer the serious questions in Plaintiffs' Motion for a Preliminary Injunction.[2] Defendants insist that Mr. McAleenan and Mr. Wolf had valid authority to serve as Acting Secretaries of the Department of Homeland Security ("DHS"). Opp. 3-4. But for that proposition, they point to an April 2019 Order issued by Kirstjen Nielsen that applies only in the event of "disaster or catastrophic emergency." *See* ECF 69-1, 69-2. Defendants' assertion that the Order also applies in the event of a resignation contradicts the Order's plain language. Defendants' other attempts to justify the Final Rule also fail.[3] Because the Final Rule suffers from fatal procedural and substantive flaws, it must be set aside under the Administrative Procedure Act ("APA"). Plaintiffs' are likely to succeed on the merits and satisfy all other requirements for a preliminary injunction. The Court should grant Plaintiffs' Motion.

## ARGUMENT

**I.      Plaintiffs Are Likely to Succeed on the Merits of Their Claim that Mr. McAleenan and Mr. Wolf Acted Without Valid Authority.**

Plaintiffs' motion explained why neither Mr. McAleenan nor Mr. Wolf had valid authority to serve as Acting Secretaries of DHS under the Homeland Security Act ("HSA") or the Federal Vacancies Reform Act ("FVRA"). Mot. 4-6. Defendants offer two responses. First, they argue that Mr. McAleenan had valid authority under the HSA pursuant to Secretary Nielsen's April 2019 Order. Opp. 3-4. Second, they argue that the FVRA does not apply because both Mr. McAleenan and Mr. Wolf assumed their posts under the HSA, not the FVRA. Opp. 5. Neither argument withstands scrutiny.

**A.      The April 2019 Order Did Not Grant Mr. McAleenan Authority to Serve as Acting Secretary under the HSA When Secretary Nielsen Resigned.**

Mr. McAleenan had no authority to assume the title of Acting Secretary under the April 2019 Order because that Order expressly amended "Annex A" of "Delegation No. 00106." ECF 69-1 ("Annex A of DHS Orders of Succession and Delegations of Authorities for Named Positions,

---

[2] Defendants' Opposition is ECF 49 ("Opp.") and Plaintiffs' Motion is ECF 27 ("Mot.").
[3] Stretch Reply Decl. Ex. 35, 85 Fed. Reg. 46,788 (Aug. 3, 2020) (AR477-618) ("Final Rule"); Ex. 36, 84 Fed. Reg. 62,280 (Nov. 14, 2020) (AR1-92) ("November Proposal"), Ex. 37, 84 Fed. Reg. 67,243 (Dec. 9, 2019) ("December Proposal"). The November and December proposals are collectively the "Proposals."

Delegation No. 00106, is hereby amended by striking the text of such Annex in its entirety and inserting the following . . . "). Annex A of Delegation No. 00106 only comes into play in the event of a "disaster or catastrophic emergency," ECF 69-2 at Section II(B). In the event of the Secretary's "resignation," Executive Order 13753 governs, not Annex A. ECF 69-2 at Section II(A).[4]

Defendants argue that the HSA authorizes the Secretary to designate an "order of succession" that would supersede Executive Order 13753 in the event of the Secretary's resignation. Opp. 4, *citing* 6 U.S.C. 113(g)(2). Plaintiffs agree Secretary Nielsen had that authority, but she did not exercise it in the April 2019 Order. *La Clinica*, *supra* n.3, *14 ("Had Secretary Nielsen intended to modify the order of succession applicable in case of the Secretary's death, resignation, or inability to perform the functions of the Office, then her order could have so stated."). Instead, she unambiguously amended Annex A to Delegation No. 00106, which applies only in the event of "disaster or catastrophic emergency." ECF 69-2 at Section II(B); *see also* Stretch Dec. Ex. 1 at 7 ("Applying the plain language of the April Delegation, the governing order of succession [], should have been that provided under E.O. 13753 and not Annex A."); *CASA*, 2020 WL 5500165, at *22 (adopting the GAO's conclusion that the "plain language [of the Order] . . . controls [and] speaks for itself" (alterations in original)).

Defendants effectively ask this Court to hold that the April 2019 Order does not mean what it says. They contend the April 2019 Order "controlled the succession order" for all purposes even though the Order expressly states it "amended" Annex A of Delegation No. 00106. *Compare* Opp. 4 *with* ECF 69-1. That contention has no merit. Stretch Decl. Ex. 1 at 9 (finding post-hoc explanations of Nielsen's order "inappropriate, in light of the clear directive of the April Delegation"); *CASA*, 2020 WL 5500165, at *22 ("[T]he Government provides no authority for this Court to eschew the plain meaning of Nielsen's order and divine her intent as meaning something else."); *La Clinica*, 2020 WL 4569462, at *13 (rejecting Defendants' contention that the April 2019 Order "designated the order of succession in all

---

[4] Stretch Decl. Ex. 1 at 7 ("A Secretary's resignation is addressed in E.O. 13753, not Annex A."); *id.* ("Annex A only applies to the Secretary's unavailability as a result of disaster or catastrophic emergency."); *La Clinica De La Raza v. Trump*, No. 19-cv-4980, 2020 WL 4569462, at *13 (N.D. Cal. Aug. 7, 2020) (the April 2019 Order "only replaced Annex A and made no other changes to Delegation No. 00106"); *id.* (Executive Order 13753 governed "when Secretary Nielsen resigned" and not "the amended Annex A, which only applied when the Secretary was unavailable due to disaster or catastrophic emergency"); *CASA de Md, Inc. v. Wolf*, No. 8:20-cv-02118-PX, 2020 WL 5500165, at *21 (D. Md. Sept. 11, 2020) ("On Nielsen's last day of service, she amended Annex A of Delegation Order 000106 [sic], which applied only to succession 'in the event of disaster or emergency'").

1    cases").

2          The plain language of the April 2019 Order and Delegation 00106 confirm that Mr. McAleenan

3    did not have authority to assume the role of Acting Secretary after Ms. Nielsen's resignation. It follows

4    that he had no authority to issue the Proposals at issue in this case, or to amend the orders of succession

5    so that Mr. Wolf could assume office.[5] Stretch Decl. Ex. 1 at 2 (concluding that appointments of Chad

6    Wolf and Ken Cuccinelli were "improper because they relied on an amended designation made by Mr.

7    McAleenan"); *CASA*, 2020 WL 5500165, at *23 (concluding that a rule promulgated under Mr. Wolf

8    violated the APA because Mr. McAleenan lacked authority to install Mr. Wolf as Acting Secretary). The

9    Proposals and the Final Rule are therefore in "excess of . . .authority" and "not in accordance with law"

10   under the APA. 5 U.S.C. § 706(2)(A), (2)(C). For this reason alone, the Final Rule should be set aside.[6]

11       **B.**    **Mr. McAleenan and Mr. Wolf Assumed Their Posts In Violation of the FVRA.**

12            **1.**    **Defendants Cannot Evade the FVRA's Time Limits**

13          Defendants argue that "because Mr. McAleenan and Mr. Wolf each served as Acting Secretary

14   under the HSA, neither's service is subject to the FVRA's time limit." Opp. 5. That assertion relies on

15   two false assumptions that doom Defendants' argument.

16          First, Defendants assume that Mr. McAleenan and Mr. Wolf were properly serving under the

17   HSA. They were not. *See* Section I.A. *supra*. Unless an agency-specific statute "expressly" authorizes

18   designation of another officer, Sections 3345 and 3346 of the FVRA are the "exclusive means" for the

19   temporary appointment of an acting official. 5 U.S.C. § 3347(a). Once a court determines that an acting

20   official is not authorized under an agency-specific statute, it must then consider whether the official has

21   authority under Sections 3345 and 3346 of the FVRA.[7] *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d

22

23    [5] In *La Clinica*, Judge Hamilton determined that Mr. McAleenan did not have lawful authority under the HSA but assumed he could serve under the FVRA because plaintiffs had not challenged his authority under that statute. 2020 WL 4569462, at *14.

24    [6] Also, Mr. McAleenan resigned the day *before* the November Proposal was published so had no valid authority at that time of publication. Mot. 3, 5.

25    [7] *CASA* determined that Mr. McAleenan's appointment was invalid under the HSA but did not consider

26   whether that renders his appointment invalid under Section 3347 of the FVRA. *CASA*, 2020 WL 5500165, at *23. But *Hooks* confirms that after a court determines that an appointment is invalid under

27   an agency-specific statute, it must next consider whether it is authorized under Sections 3345 of the FVRA. 816 F.3d at 556. If not, the official's actions are generally "void." *Id.* at 564. As in *Hooks*, this

28   Court should find that the appointment at issue here violates both the agency-specific statute and the FVRA.

550, 556 (9th Cir. 2016) (analyzing Section 3345 of the FVRA after determining an official's appointment "did not comply" with an agency-specific statute). If the acting official also lacks authority under Sections 3345 and 3346, his actions "shall have no force or effect." 5 U.S.C. § 3348; *Hooks*, 816 F.3d at 564 (actions taken in violation of the FVRA are generally "void"). Here, Defendants do not rebut Plaintiffs' arguments that Mr. McAleenan and Mr. Wolf lacked authority to issue the Proposals or Final Rule under FVRA Sections 3345 and 3346.[8] Therefore, once the Court concludes that Mr. McAleenan and Mr. Wolf were not acting pursuant to any express authority under the HSA, it must also conclude that they were "not acting under section 3345, 3346, or 3347" of the FVRA. The result is that the Final Rule "shall have no force or effect" under the FVRA, 5 U.S.C. § 3348(d)(1), and should be "set aside" under the APA.

Second, Defendants assume that the HSA overrides the FVRA in its entirety. Opp. 5. That assumption is wrong. As Defendants' own authorities confirm, agency-specific statutes must be read "alongside" the FVRA and do not "displace" the FVRA. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 356 F. Supp. 3d 109, 140 (D.D.C. 2019) (citing *English v. Trump*, 279 F. Supp. 3d 307, 319 (D.D.C. 2018) ("[T]he FVRA's text demonstrates 'that it was generally intended to apply alongside agency-specific statutes, rather than be displaced by them.'")). Here, the HSA expressly incorporates the FVRA and generally operates pursuant to its terms. *See* 6 U.S.C. § 133(a)(1)(A), (F); *see also* ECF 38-1 at 12-18.

The FVRA provides a default mechanism for filling a vacancy and a separate default time limit for acting officers. 5 U.S.C. §§ 3345, 3346. The HSA specifies a different mechanism for filling a vacancy "notwithstanding" the FVRA. 6 U.S.C. § 113(g)(2), but it does not specify a different time limit. Still, Defendants contend that the "notwithstanding" clause in § 113(g)(2) applies to *all* of the FVRA's requirements and not just the mechanism for filling a vacancy. Opp. 5. Their interpretation flies in the face of Supreme Court and Ninth Circuit precedent holding that a "notwithstanding" clause only "shows which of two or more provisions prevails in the event of a conflict." *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017); *Hooks*, 816 F.3d at 559 ("notwithstanding" clause "merely 'sweep[s] aside"

---

[8] Although *La Clinica* assumed that Mr. McAleenan had valid authority to serve under the FVRA, at *14, this Court must reach the opposite conclusion based on Plaintiffs' unrebutted arguments that neither Mr. McAleenan nor Mr. Wolf had valid authority under the FVRA. *See* Mot. 5-6; Comp. ¶¶ 258, 261.

1   potentially conflicting provisions) (citing *United States v. Novak*, 476 F.3d 1040, 1046 (9th Cir. 2007) (en

2   banc)). There is no conflict as to the time limit for acting service, so the "notwithstanding" clause does

3   not sweep away the time limit in the FVRA.

4   　　　　Defendants try to avoid this result by suggesting that the HSA's silence on time limits authorizes

5   indefinite service for acting officials. Opp. 5.[9] That cannot be correct. First, Section 3347 of the FVRA

6   only permits an agency-specific statute to create a mechanism for filling a vacancy if the statute

7   "expressly" authorizes an acting officer to serve "temporarily." 5 U.S.C. § 3347. If the HSA allows

8   indefinite rather than temporary service, it does not satisfy the requirements Section 3347. Second, even

9   if an agency-specific statute could "expressly" authorize indefinite rather than temporary service, the

10  HSA does not. It is silent. The Court should not read that silence as permitting indefinite service for

11  acting officials because the HSA was enacted against the backdrop of the FVRA. If Congress had

12  intended for the HSA to permit indefinite service not subject to the FVRA's time limits, it could have

13  said so. Here, reading the HSA's silence as authorization for successive acting officials to head DHS

14  indefinitely without Senate confirmation would defeat the purpose of the FVRA, ECF 38-1 at 3-6. It

15  would create an end-run around the confirmation process for a critical position within the President's

16  cabinet. Such a fundamental change to the Constitutional balance of power requires a clear statutory

17  statement, ECF 39 at 9-19; the HSA's silence does not suffice.

18  　　　　　　　**2.** 　　**This Court Should Not Adopt the FVRA Analysis in *CASA v. Wolf***

19  　　　　After Defendants filed their Opposition, the U.S. District of Court for the District of Maryland

20  correctly held that Mr. McAleenan and Mr. Wolf were not validly appointed under the HSA. *CASA*,

21  *supra* n.3. But before reaching that conclusion, the *CASA* court determined that the FVRA's time limits

22  did not apply to Mr. McAleenan or Mr. Wolf.[10] The FVRA portion of the *CASA* ruling is internally

---

23

24  [9] President Trump nominated Defendant Wolf to serve as DHS Secretary on September 10, 2020. *See*
https://www.congress.gov/nomination/116th-

25  congress/2235?q=%7B%22search%22%3A%5B%22chad+wolf%22%5D%7D&s=2&r=1. This step
would be unnecessary under Defendants' theory in its Opposition, so it is unclear what position the
government actually takes.

26  [10] Among other things, *CASA* assumed that Section 3346 does not apply to an individual appointed
under an agency-specific statute pursuant to Section 3347. But nothing in the text suggests those two

27  provisions are mutually exclusive. Section 3346 does not say it applies only to those *appointed* under
Section 3345, it says it applies to those "serving as an acting officer *as described* under Section 3345."

28  Section 3345 describes officers "serving temporarily due to death, resignation, or unavailability"; that

1    inconsistent. The *CASA* court acknowledged as much, noting the "tension of crediting an agency

2    succession statute as one that provides 'temporary' service that can continue indefinitely." 2020 WL

3    5500165, at *18. It gave three reasons for not resolving that tension in plaintiffs' favor but none should

4    sway this Court.

5         First, the *CASA* court did not think the rule of constitutional avoidance applied because it

6    found the HSA unambiguously displaced the FVRA's timing provisions. *Id.* at *19. But that conclusion

7    did not take into account Supreme Court or Ninth Circuit precedent explaining that a "notwithstanding"

8    clause only applies to conflicts between two statutes. *See supra.* Those authorities either resolve the

9    question in Plaintiffs' favor or at least suggest ambiguity.

10        Second, *CASA* considered it significant that the HSA's legislative history noted "preexisting

11   agency succession statutes" that did not place time limits on acting officers. *CASA*, 2020 WL 5500165,

12   at *19. But references to "preexisting" statutes do not amount to a statement that statutes enacted *after*

13   the FVRA can silently permit indefinite service. Here, the HSA's silence on time limits "does not fairly

14   imply" that the statute was intended to permit indefinite service under Section 3347 of the FVRA, *SW*

15   *Gen., Inc.*, 137 S. Ct. at 93, which expressly allows agency-specific statutes to fill vacancies for temporary

16   service. *CASA*'s view of the legislative history also ignores the fact that the FVRA was enacted to

17   address concerns about "permit[ing] positions to be held by acting officers for years without the

18   submission to the Senate of a nominee." S. Rep. No. 105-250 (1998). Under Defendants' reading of the

19   HSA, the FVRA cannot serve its essential function. That cannot be correct.

20        Third, the *CASA* court did not think its statutory interpretation raised serious constitutional

21   concerns. *CASA*, 2020 WL 5500165, at *19-20. *Amici* explain why that is wrong. *See* ECF 38-1 at 3-6;

22   ECF 39 at 1-9. *CASA*'s reading of the HSA permits a "brazen end-run[] around advice and consent."

23   ECF 39 at 10. It alters the Constitutional balance of power without a "clear statement" of legislative

24   intent. *Id.* at 9-16. It also creates a conflict between the HSA and the FVRA's requirement that agency-

25   specific statutes only permit acting officers to serve "temporarily." 5 U.S.C. § 3347; *see J.E.M. Ag Supply*

26   *Inc.* v. *Pioneer Hi-Bred Int'l Inc.*, 534 U.S. 124, 143-44(2001) ("[W]hen two statutes are capable of

27

28   description can apply to those who assume office under an agency-specific office under Section 3347.
     CASA's incorrect reading of Sections 3346 and 3347 renders its reasoning flawed from the start.

1   coexistence, it is the duty of the courts, absent a clear congressional intention to the contrary, to regard

2   each as effective."). Therefore, this Court should reject *CASA's* reasoning and apply the FVRA's time

3   limit.

4   **II.     Plaintiffs Are Likely to Succeed On The Merits Of Their Other APA Claims.**

5          **A.     Defendants Violated the Procedural Requirements of the APA**

6                 **1.     The Proposals Failed to Disclose the Agency's Thinking and Data**

7          Plaintiffs argued that the Proposals failed to disclose the "thinking and data" behind the Final

8   Rule. Mot. 6. In particular, USCIS did not explain the dramatic change in its financial condition or its

9   skyrocketing costs. *Id.* As a result, the public could not meaningfully comment on the Final Rule. *Id.*

10         Defendants respond that they "adequately explained why [USCIS's] fiscal situation justifies the

11  Final Rule." Opp. 6. For that proposition, they cite 84 Fed. Reg. 62,283-84. Stretch Reply Decl. 36 at

12  AR4-5. But those pages do not explain why USCIS's fiscal situation has changed so dramatically in

13  recent years. *See* Mot. 6-7. Instead, they reflect USCIS's position that it is entitled to "charge fees at a

14  level that will ensure recover of all direct and indirect costs associated with providing immigration and

15  adjudication and naturalization services." *Id.* That statement says nothing about why those costs are

16  skyrocketing or what USCIS is including in its "direct and indirect costs" calculations. Nor does it

17  provide information sufficient to determine the extent to which USCIS is conducting operations and

18  calculating costs within statutory limits. *See Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1135 (D.C. Cir. 1995

19  (agencies must provide enough information for the public to determine if fees cover activities "too far

20  afield" of statutory limits).

21         Contrary to Defendants' assertions, it is not enough to state that the fees are necessary to cover

22  a "growing funding gap," Opp. 7, without explaining operational or accounting changes causing the gap

23  to grow. To satisfy their obligations under the APA, Defendants were required to provide the "grounds

24  of decision" for the USCIS budget and "the essential facts upon which [the budget] was based." *Kitchen

25  v. Dep't. of Treasury*, 535 F.2d 1197, 1200 (9th Cir. 1976); *see also Shands Jacksonville Med. Ctr. v. Burwell*, 139

26  F. Supp. 3d 240, 261-62 (D.D.C. 2015) (agencies must "provide an accurate picture of the reasoning that

27  has led the agency to the proposed rule," and "make available technical studies and data that it has

28

1    employed"). Defendants failed to meet this standard.[11]

2         Defendants are wrong to suggest a "presumption of regularity" permits the degree of

3    nondisclosure in this case. Opp. 7, n.4. Their citation to *Palmer v. IRS*, 116 F.3d 1309, 1311 (9th Cir.

4    1997), is a non-sequitur. *Palmer* is not an APA case; it deals with the presumption of regularity that

5    "normally attaches to IRS assessments." *Id.* Under the APA, the budgets of fee-funded agencies are not

6    "exempted from the disclosure and explanation requirements imposed on other data underlying a

7    proposed rule." *Reno*, 57 F.3d at 1133-34 (rejecting contention that Drug Enforcement Agency's budget

8    was an "unalterable, pre-existing component of the rule that need not be in any way explained to the

9    public"). Defendants criticize Plaintiffs for offering "conjecture" about how USCIS spends its money,

10   Opp. 7, n.4, but the reason Plaintiffs are left speculating is that Defendants failed to disclose the bases

11   for its budget. That failure violates the APA.

12        Defendants try to distract from this basic failure by taking issue with the way Plaintiffs described

13   USCIS's financial condition. First, Defendants say Plaintiffs "conflate and confuse" projected and actual

14   budget figures. Opp. 6. That is not true. For example, Plaintiffs' Motion explained that in FY2017

15   USCIS had an *actual positive* carryover balance of nearly $1 billion. Mot. 6. Now, USCIS has a *projected*

16   *negative* carryover balance of more than $1 billion for FY2020. *Id.* The comparison between the *actual*

17   FY2017 carryover and the *projected* FY2020 carryover is deliberate. The point is that the public has no

18   way to understand why USCIS is projecting a negative carryover balance of more than $1 billion in light

19   of the actual $1 billion positive carryover balance just three years ago.

20        Second, Defendants take issue with Plaintiffs' statement that USCIS failed to explain 60% of its

21   budget. Opp. 6 n.3. But Plaintiffs' statement is correct. Defendants target raising $4.444 billion for FY

22   2019/2020. 85 Fed. Reg. at 46,794 (Stretch Reply Decl. Ex. 35 at AR483) as compared to a projected a

23   revenue baseline of $3.408 billion for FY 2019/2020. Stretch Reply Decl. Ex. 36 at AR9. Thus, the Final

24   Rule was designed to raise an additional $1.036 billion. (Stretch Reply Decl. Ex. 35 at AR483.

25   ---

[11] Defendants cite to *Alaska Dep't of Envtl. Cons. v. EPA*, 540 U.S. 461, 497 (2004) to claim that "the
26   agency's path may reasonably be discerned" here. But in *Alaska*, the Court was able to identify and
     follow the established methodology that guided the agency's analysis. There is no equivalent
     methodology in this case. Also, the Ninth Circuit has interpreted *Alaska* to mean that the court will
27   uphold a "skeletal" agency order if "context allows the court to reasonably discern the agency's path."
     *W. Watersheds Project v. U.S. Forest Serv.*, 753 F. App'x 465, 466 (9th Cir. 2019). Here, the Final Rule does
28   not provide context sufficient to understand the agency's path to its budget calculations.

1    Defendants point to an unrelated discussion of OMB Circular A-25 (Stretch Reply Decl. Ex. 36 at AR4;

2    Opp. 6, n.3), but this says nothing about their budget allocation. But a few pages later, the November

3    Proposal attributes specific dollar amounts to an ICE transfer, current staff, new staff, and "net

4    additional costs." Stretch Reply Decl. Ex. 36 at AR7-8. Adding up these amounts leaves 60% of the

5    budget unexplained.[12] Mot. 6.

6         Third, Defendants challenge with Plaintiffs' statement that USCIS "informed Congress that it

7    has a surplus." Opp. 7, n.5 citing Mot. 9. But for that proposition, Plaintiffs cited Senator Leahy's July

8    Letter which specifically uses the term "surplus" to describe how new information USCIS provided

9    stood in "stark contrast to the revenue forecast provided to Congress earlier this year." Stretch Decl. Ex.

10   31.[13] Plaintiffs do not have all the information Defendants provided to Congress and fairly understand

11   Senator Leahy's letter to suggest a "surplus" given that is the precise term the letter uses. Defendants'

12   attempt to fault Plaintiffs for that interpretation only confirms that Defendants have left the public to

13   "play hunt the peanut with technical information." *Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 530-

14   31 (D.C. Cir. 1982). An agency commits "serious procedural error when it fails to reveal portions of the

15   technical basis for a proposed rule in time to allow for meaningful commentary." *Id.* DHS committed

16   precisely this serious procedural error in its Proposals.

17         **2.      Defendants' Disjointed Process Prevented Meaningful Comment**

18         Defendants did not provide the public with "enough time with enough information to

19   comment" on the Final Rule. *Prometheus Radio Project v. FCC*, 652 F.3d 431, 450 (3d Cir. 2011).

20   Defendants suggest otherwise by stitching together multiple comment periods to claim they provided a

21   "cumulative 63 comment days." Opp. 7.[14] But the public did not have complete or definite information

22   for any of that time. As the Final Rule admits, "DHS provided multiple options for proposed fee

23   _____

[12] Even though the Proposal breaks out the additional costs by year, Defendants ask the Court to assume
24   its stated costs are cumulative. For example, the November Proposal says "Pay and benefits for new
     staff ($116.7 million in FY 2019 and $128.8 million in FY 2020)" (Stretch Reply Decl. Ex. 36 at AR7);
25   Defendants respond that the new staff costs for FY20 are actually $244.9 million because the FY20
     costs include the increases from FY19. Opp. 6, n. 3. If this is the case, Defendants' costs are all the
     more astonishing.
26   [13] Defendants use the term "surplus" to describe carryover in their own documents. Stretch Reply Decl.
     Ex. 35 at AR 304; Ex. 38 at AR 807.
27   [14] This period included multiple holidays when many offices are closed. *See, e.g.*, Stretch Decl. Ex. 13 at
     11 ("USCIS takes the position in its Proposal that business days affect the ability to conduct substantive
28   work, yet ignores its own position in setting a comment due date for the Proposal.").

schedules and explained that the final outcome would be one of the proposed scenarios or another

outcome within the range of the alternatives proposed." Stretch Reply Decl. Ex. 35 at AR492-93. The

wide range of alternatives delivered in piecemeal fashion was designed to "hide" or "disguise"

information, rather than to promote a "genuine interexchange" with the public. *Am. Radio Relay League,*

*Inv. v. FCC*, 524 F.3d 227, 236-37 (D.C. Cir. 2008) (quoting *Conn. Light*, 673 F.2d at 530). For example,

DHS replaced the supporting economic analysis for its proposal without even informing the public.

Mot. 3. And the additional days DHS provided mid-way through the initial comment period were not

"cumulative" days for the original proposal because the December Proposal presented new information,

changed the analysis, and reduced cost calculations without specifying which fees would be lowered or

by what amount. DHS offered the public just 21 days to analyze this new material, even as it shortened

the comment period for related forms from 60 days to 45 days, in violation of the Paperwork Reduction

Act. 44 U.S.C. § 3506(c)(2)(A). A continuous 60 day comment period might sometimes suffice when an

agency presents a complete and definite proposal from the outset, but that is not what happened here.

     Defendants claim that the volume of comments they received shows the comment period was

adequate. It does not. *Becerra v. U.S. Dep't of Interior*, 381 F. Supp. 3d 1153, 1176-77 (N.D. Cal. 2019)

(concluding a "large[] number of commenters does not show that the [agency] provided an adequate

amount of time for comments."). Instead, the dramatic contrast between the 475 comments DHS

received for the 2016 Fee Rule (Opp. 8, n.7) and the 43,000 comments it received for this one compels

the conclusion that this was no ordinary fee rule. Here, the Proposals did not just increase fees; they

radically changed the basis for setting fees from inability-to-pay principles to beneficiary-pays principles,

introduced unprecedented non-waivable fees for asylum, dramatically increased the fee for naturalization

while reducing the fee to renew permanent residence, revised some 59 forms, projected an astonishing

change in the agency's financial position, and generated a 20% budget increase for USCIS to be achieved

by a wide variety of possible scenarios, including a scenario with an unlawful direct transfer of funds to

ICE. *See* Mot. 6-13. The Proposals thus warranted significantly more time for comment than any prior

fee rule proposal.[15]

---

[15] Whether a comment period provides adequate time is necessarily context-specific. *See Becerra*, 381 F. Supp. 3d at 1177. The agency provided 60 continuous days for typical fee rules, Stretch Decl. Ex. 11 at 60-61 (AR023753-54) (describing 60-day comment period for 2007 fee rule and 60-day comment period

1    Defendants try to wave this away as "harmless error." Opp. 8 (citing *City of Sausalito v. O'Neill*,

2    386 F.3d 1186, 1220 (9th Cir. 2004).[16] But Plaintiffs and numerous commenters explained how the

3    irregular process impaired their ability to meaningfully comment on the Proposals, and specified what

4    they would have done with more time.[17] The record here easily satisfies the Ninth Circuit's standard.

5    *Sausalito*, 386 F.3d at 1220 ("[In the rulemaking context, [a court] exercises great caution in applying the

6    harmless error rule" and "failure to provide notice and comment is harmless only where the agency's

7    mistake clearly had no bearing on the procedure used or the substance of decision reached."). Neither

8    *Cal. Wilderness Coal. v. U.S. Dep't of Energy,* 631 F.3d 1072, 1091-92 (9th Cir. 2011) nor *Shinseki v. Sanders,*

9    556 U.S. 396, 409 (2009) show otherwise. *Sanders* does not permit a departure from "consistent case law

10   holding that 'harmless error' requires a determination that the error 'had no bearing on the procedure

11   used or the substance of [the] decision reached.'" *California Wilderness Coal.*, 631 F.3d at 1091–92.

12   **B.    Plaintiffs Are Likely to Succeed In Showing The Final Rule Is Contrary to Law.**

13   Defendants fail to rebut Plaintiffs' arguments that the Final Rule is contrary to law. Mot. 7-8.

14   First, Defendants cannot overcome Plaintiffs' showing that they violated the HSA and FVRA. *See supra.*

15   Second, Defendants fail to show that the Final Rule adheres to statutory limits on USCIS under

16   the HSA and the INA. Instead, Defendants assert that the INA permits DHS to set fees "for all

17   components, not just USCIS," Opp. 9, without regard for the HSA provisions that separate USCIS

18   functions and funding from those of ICE and CBP. *See* 6 U.S.C. §§ 251, 252(b)(2)(A) 271(b), 291(b),

19   296; Mot. 2; ECF 36 at 4-5. The fact that Defendants do not grapple with these provisions' limits on

20   their fee-raising authority confirms the seriousness of the questions Plaintiffs raised. Mot. 8.[18]

---

21   for 2016 fee rule).; it should have provided at least that much for a rule as vast and unprecedented as
     this one.

22   [16] Defendants justify their decision to share cost-modeling software just one week before the end of the
     comment period by stating that they only has one request. Opp. 6, n.6. But comments reflect that

23   "Employees who answer the phone line provided [in the Proposals] have told us they do not know to
     what items the Federal Register notice refers, and cannot help us." Stretch Decl. Ex. 6 at 3.  The fact

24   that only one person succeeded in getting an appointment does not mean that was the only person who
     considered the information relevant to their comments.

25   [17] *See, e.g.*, Comments submitted by Boundless Immigration, Inc., signed by various organizations
     including Plaintiffs, USCIS-2019-0010-12207 at 2 (Feb. 10, 2020) (AR27356-59 at 27357) (Stretch Reply

26   Decl., Ex. 39). Stretch Decl. Ex. 6 at 3 Comments submitted by the Nationalization Working Group
     including Plaintiff organizations, outlining specific analyses they would have conducted with more time.

27   [18] The Ninth Circuit applies a sliding scale that permits an injunction based on "serious questions going
     to the merits" if Plaintiffs show irreparable harm and "the balance of hardships tips sharply in

28   [their]favor. *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

---

Defendants say that "fees" are not "provided to ICE," and the Fraud Detection and National Security Directorate ("FDNS") is not "a joint program with ICE." Opp. 9, n.9. But DHS has also stated:

> FDNS Immigration Officers not only provide support to adjudicators of immigration benefit applications, but also support programs sponsored by law enforcement agencies, such as Joint Terrorism Task Forces, Document and Benefit Fraud Task Forces, and state and local fusion centers. Immigration officers' participation in these programs may be full-time, part-time, or virtual support.[19]

The fact that USCIS funds FDNS officers who participate in "programs sponsored by law enforcement agencies" such as ICE on a "full-time" basis raises serious questions about whether IEFA funds for FDNS are used for "adjudication services." *See* ECF 36.[20] USCIS has also announced a new denaturalization unit that picks up where ICE's Operation Janus left off in 2016.[21] Defendants' Opposition does not show that these programs fall within the limits of USCIS's statutory authority.

Third, Defendants' justification of the unprecedented $50 asylum falls flat. Defendants ignore the statute's requirement that "any person" physically present or arriving in the U.S. may seek asylum. Mot. 8. Although Defendants are correct that 8 U.S.C. § 1158(d)(3) permits a fee, 8 U.S.C. 1356(m) describes the "full cost" of providing adjudication and naturalization services as including services provided "without charge" to asylum applicants. Read together, these provisions permit a fee if it can be waived so that "any person" can access benefits. No other possibility complies with international law as incorporated into U.S. law under the Refugee Act. And until this year, USCIS consistently understood that "Congress directed that the IEFA fund the cost of asylum processing and other services provided to immigrants at no charge."[22] Defendants reversed course on this policy for the unlawful purpose of deterring asylum seekers; the November Proposal expressly states that the asylum fee is to "discourage frivolous filings" (Stretch Reply Decl. 36 at AR41) and the Final Rule Regulatory Impact Analysis states

---

[19] DHS, *DHS State & Local Law Enforcement Resource Catalogue*, Volume VI, May 2018 at 9, https://itcaonline.com/wp-content/uploads/2018/04/OSLLE-Resource-Catalog-Volume-VI-5.25.2018.pdf#_blank.

[20] Defendants refer to an organizational chart to show FDNS falls under the USCIS organizational structure. Opp. 9, n.9. But the question is not where FDNS is situated within DHS but rather what functions its staff perform and whether those functions fall within statutory limits.

[21] DHS-USCIS Ombudsman Annual Report to Congress 2020 at 27-30 (June 30, 2020), https://www.dhs.gov/sites/default/files/publications/20_0630_cisomb-2020-annual-report-to-congress.pdf.

[22] 69 Fed. Reg. 5088 (Feb. 3, 2004); 72 Fed. Reg. 4888, 4890 (Feb. 1, 2007); 75 Fed. Reg. 33,446 (June 11, 2010).

1   "DHS set the fee so that it . . . may deter some filings." Stretch Reply Decl. Ex. 40 at AR 771 (RIA.

2   Defendants say they "disclaimed" their deterrence purpose in the Final Rule, Opp. 10, n. 10, but

3   deleting words from the Final Rule does not change the agency's purpose. In all events, the record

4   contradicts Defendants' claim that the fee is intended to generate revenue. The Final Rule introduced a

5   $50 discount for those granted asylum when they adjust status, negating the claimed revenue generation.

6   Stretch Reply Decl. Ex. 35 at AR531. The record is clear that USCIS does not anticipate a financial

7   benefit from the asylum fee. *Id.* at AR 638.[23] The fee is yet another effort to block asylum seekers

8   contrary to the Refugee Act.

9      **C.    Plaintiffs Are Likely to Succeed in Showing the Final Rule is Arbitrary and
         Capricious.**

10

11         **1.    Defendants Fail To Rebut Plaintiffs' Argument that the Final Rule Relies
               on Unexplained Calculations.**

12         Plaintiffs argued that the Final Rule is arbitrary and capricious because it failed to provide

13   "essential facts" about the USCIS budget and relied on conclusory statements about the agency's

14   financial needs. Mot. 9. Defendants do not event attempt to counter this argument.

15         **2.    Defendants Fail To Show They Rationally Justified Major Policy Changes.**

16         When an agency disregard facts underlying a prior rule, "it must provide a more detailed

17   justification than what would suffice for new policy created on a blank slate. . . . [A]n unexplained

18   inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and

19   capricious change from agency practice." *Becerra*, 381 F. Supp. 3d at 1165-66 (citing *FCC v. Fox*

20   *Television Stations, Inc.*, 556 U.S. 502 (2009)). Defendants contend this standard does not apply and

21   they were only required to assert their "belief" that the new policy is better than the old one. Opp.

22   11. That contention ignores the many "disregard[ed] facts" and "unexplained inconsistenc[ies]" at

23   issue in this case.[24]

24   _____

25   [23] In determining whether the $50 fee is for cost recovery or deterrence, the Court can properly take into
     the other ways this Administration is actively seeking to block asylum seekers. *Supra* n.11. Defendants
     have made no secret of their efforts block access to asylum. *See, e.g.*, ECF 47-1 at 1 n.2 (*citing* Nat'l
26   Immigration Justice Ctr., A Timeline of the Trump Administration's Efforts To End Asylum,
     https://bit.ly/35hPc9K (last visited Sept. 14, 2020). This effort has included a variety of other unlawful
27   regulatory changes. *Id.*
     [24] *See, e.g.*, Mot. 1 (prior DHS interpretation that Congress directed that asylum services be provided
28   at no charge inconsistent with current DHS interpretation that is permissible to charge fees to

1    In particular, USCIS previously explained that it waived fees "because a large percentage of

2    applicants clearly would be unable to pay" full price. Stretch Reply Decl. Ex. 41 ("2016 Fee Rule") at

3    AR1811. But now it assumes that the market for immigration services is "inelastic." Stretch Reply

4    Decl. Ex. 35 at AR486. The Opposition does not offer *any* explanation for why DHS is now

5    disclaiming facts about elasticity on which it based its previous policy. That renders the Final Rule

6    arbitrary and capricious under *Fox* and its progeny.

7    Defendants concede that a "more detailed justification" is required if the prior policy

8    "engendered serious reliance interests that must be taken into account." Opp. 11 (citing *Fox*). That is

9    the situation here. Plaintiffs explained that they and "the public" have relied on the prior policies of

10   offering fee waivers, reduced fees, fee exemptions, and lack of fee for asylum applications. Mot. 12-

11   14. In particular, Plaintiffs have structured their service models based on ability-to-pay principles

12   USCIS has adhered to for decades. Mot. 13-14. Defendants treat Plaintiffs' reliance interests as

13   meaningless. Without authority, they suggest only the reliance interest of individual beneficiaries

14   matter in this case. Opp. 11. For that proposition, they rely on an assumption that only Plaintiffs are

15   not "within the zone of interest" *Id.* But the zone of interest test applies to standing; it is not a

16   measure of reliance. In all events, Plaintiffs surely fall within the zone of interest in this case. Compl.

17   ¶¶ 12, 306-317. Because of the serious reliance interests at issue in this case, DHS[25] was required to

18   provide a rational explanation for its changes beyond a stated change in the Defendants' belief about

19   what should be labeled "equitable." Opp. 14.

20   ### 3.    Defendants Ignored Data and Analysis in the Record

21   Plaintiffs argued that Defendants failed to consider data and analysis in the record. Mot. 11.

---

asylum applicants); Mot. 10 (prior DHS interpretation that ability-to-pay model is equitable inconsistent with current DHS interpretation that beneficiary-pays model is equitable); Mot. 11 & nn. 16-19 (identifying data DHS claimed it "does not have" that the rule will delay application submissions, impede naturalization, impact low-income families, deter asylum); Mot. 12 (prior DHS interpretation that fee waivers were necessary for asylum applicants to access asylum is inconsistent with current DHS interpretation that asylum applicants can afford fee); Mot. 13 (prior DHS interpretation accounted for social value of citizenship is inconsistent with current DHS interpretation discounting value of citizenship

[25] *See Department of Homeland Security v. Regents*, 140 S.Ct. 1891, 1913-14 (2020) (finding harms to DACA recipients' families, schools, employers, and taxing authorities are "certainly noteworthy concerns" for DHS to consider in assessing reliance interests).

1   Defendants respond they did not "disregard" commenters' data and analysis, they "disagreed" with

2   commenters' conclusions. Opp. 11-12. But that assertion does not explain why Defendants claimed to

3   have "no data" on so many critical issues when that data was in fact in the record. Mot. 11. Defendants

4   cannot credibly ask this court to defer to "agency expertise" on issues where they claim to have had "no

5   data," or ignore data in the record.[26]

6       In particular, the Final Rule depends on an assumption that the market for immigration benefits

7   is "inelastic." But that is an assumption, not an application of agency expertise that deserves deference.

8   Indeed, DHS admits it "does not know the price elasticity of demand for immigration benefits." Stretch

9   Reply Decl. Ex. 35 at AR486. The only basis DHS cites for the proposition that the market is inelastic is

10   that it saw "no or limited decreases in the number of benefit after its fee adjustments in 2007, 2010, and

11   2016." Opp. 12. But those fee increases did not price out low-income applicants precisely because

12   USCIS offered fee waivers. It is not rational for DHS to treat its experience with fee increases that

13   *allowed* fee waivers as indicative of what will occur with fee increase that *eliminates* fee waivers. And here

14   DHS increased the fee for naturalization by 81%-266% (and $0 to $1,170 for some), while decreasing

15   the fee to renew permanent residence. In other words, DHS dramatically changed the financial

16   calculation for those permanent residents who could become citizens. DHS stated that it did not take

17   the interplay of these changes into account. Stretch Reply Decl. Ex. 35 at AR 527, but the relative costs

18   of an applicant's options must be taken into account in the agency's financial model.[27]

19       DHS has data sufficient to show that fee waivers have been necessary for a large proportion of

20   applicants; it simply ignored that data. *Compare* Pastor Decl. ¶¶16-19 (analyzing DHS data on effect of

21   past fee increases on application volume) *and* Lawrence Decl. ¶16 (calculating estimate of number of

22   immigrants prevented from applying for naturalization under the Final Rule) *with* Opp. 13, n. 15 (relying

23   on Investopedia for "macroeconomic"[28] theory) *and* Stretch Reply Decl. Ex. 35 at AR487 (failing to

24   acknowledge that the response to past fee rules was dependent on the availability of fee waivers).

25   Moreover, the record reflects that DHS in fact understood that "potential changes to fee waiver policy

---

26   [26] Defendants claim that the Court owes deference to their expertise "especially [since] they agency [was] called upon to weigh the costs and benefits of alternative policies," Opp. 12, but do not cite a single example of where they engaged in a cost/benefit analysis or applied any expertise.

27   [27] Pastor Decl. ¶¶20-23.

28   [28] In fact, price elasticity is a microeconomic, not macroeconomic, concept.

1   could decrease receipts," Stretch Reply Decl. Ex. 43 at AR3305, and recognized that "receipts may drop

2   significantly if fee waiver policies change." *Id.* at AR3306. The Final Rule's assertion that the market for

3   immigration benefits is "inelastic" contradicts the record, and does not reflect any "agency expertise"

4   that warrants deference.

5          Many of Defendants' other assumptions diverge from facts of the record. *Ctr. for Biological*

6   *Diversity v. BLM*, 698 F.3d 1101, 1109 (9th Cir. 2012). For example, Defendants contend that individuals

7   can use a debit or credit card to pay fees. Opp. 12. This is absurd. First, a debit card directly debits from

8   a bank account, so a debit card will not help an individual who does not have money to pay. *Dep't of*

9   *Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019) (the Court is "not required to exhibit a naiveté

10  from which ordinary citizens are free"). Second, many commenters noted that low-income individuals,

11  including asylum seekers, cannot get credit cards. Compl. ¶ 272; *e.g.*, Pl. Mot., Stretch Decl. Ex. 9

12  (OneAmerica Comments) at 14 (AR22969). Defendants did not address these comments.

13         Defendant also ignore many of Plaintiffs' remaining arguments. For example, Plaintiffs argued

14  that the $50 asylum application fee was arbitrary and capricious because DHS said it was intended to

15  deter "frivolous" asylum application but provided no data to show that those with legitimate claims are

16  more likely to have fifty dollars. Mot. 12. Defendants still do not point to any such data. Plaintiffs also

17  argued that deterrence is not a factor Congress intended for USCIS to consider in setting asylum fees.

18  *Id.* Defendants do not rebut that argument. Nor do Defendants grapple with the implications of their

19  prior findings that fee exemptions were necessary because otherwise "a large percentage of applicants

20  would clearly be unable to pay" for services such as "refugee and asylum processing."  Mot. 12. For

21  these and the reasons explained in Plaintiffs' Motion, the Final Rule is arbitrary and capricious.

22  **III.    Plaintiffs Established Irreparable Harm with Uncontroverted Declarations.**

23         Each of the eight Plaintiffs submitted a detailed declaration articulating precisely how it would

24  be immediately and irreparably harmed were the Final Rule to take effect.[29] Defendants did not

25  challenge or contradict this evidence of irreparable harm.[30] Defendants' other arguments are meritless.

26  ---
    [29] Benito Decl. (ECF No. 27-4); Byrne Decl. (ECF No. 27-5); Byun Decl. (ECF No. 27-6); Chenoweth
27  Decl. (ECF No. 27-7); Smith Decl. (ECF No. 27-10); Rodgers Decl. (ECF No. 27-12); Salas Decl. (ECF
    No. 27-13); Stolz Decl. (ECF No. 27-14).
28  [30] *Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1022 (9th Cir. 2016) confirms Plaintiffs have shown
    concrete injury; there, the court concluded that "market concentration statistics and expert declarations"

1    First, it is simply not correct to suggest that "Plaintiffs have not shown that implementation of

2  the Rule between October 2 and this Court's final judgment would thwart their ability to meet annual

3  metrics." Opp. 15.[31] For example, Plaintiff ICIRR explained that "[e]ven if the Rule were held invalid at

4  a future date, the significant interim decrease in volume during the Rule's effective period would place

5  our ultimate deliverables[] requirements out of reach for the relevant years," because "ICIRR and its

6  sub-grantees lack the staff or resources to make up lost volume sufficient to overcome these shortfalls in

7  a shortened period of time." Benito Decl. ¶ 28; *see also* Chenoweth Decl. ¶ 56.

8    Contrary to Defendants' assertions, not all economic harm that Plaintiffs expect is based on

9  "annual performance metrics." Opp. 15. Plaintiff IRC, for example, will be harmed when "the nominal

10  fees that IRC collects from clients ... drop precipitously, creating a budget shortfall for IRC's

11  immigration-services operations." Byrne Decl. ¶ 27; *see also* Smith Decl. ¶ 20. Plaintiff EBSC will likewise

12  lose the "$2,000 for every affirmative asylum case [it] handle[s]" under the terms of its grant. Smith

13  Decl. ¶ 8. Additionally, Plaintiffs that rely on grant funding with annual deliverables requirements have

14  amply shown that they will be immediately harmed as well apart from failing to meet those annual

15  metrics. These Plaintiffs will have to divert resources to address the slowdown, or lose more funding

16  under the same grant[32]; will have to expend resources to help members adjust to the Final Rule[33]; will

17  have ripple effects into other facets of Plaintiffs' operations[34]; and will immediately (and irreversibly) fall

18  behind in their progress towards annual deliverables requirements.[35] These immediate harms will

19  snowball until ultimately annual grant funding disappears.[36]

20    Defendants assert that "[a]ll other injuries Plaintiffs claim have already occurred." Opp. 15. That

21  assertion ignores Plaintiffs' uncontroverted evidence that *after* October 2 they will have to divert

---

showed harm. *Id.* at 1023. Here too, Plaintiffs evidence shows the claimed injury is not "speculative." *See GEC US 1 LLC v. Frontier Renewables, LLC*, No. 16-cv-1276, 2016 WL 3345456, at *5 (N.D. Cal. June 16, 2016) (irreparable harm were "purely speculative" where "Plaintiffs present[ed] no evidence" in support).

[31] Defendants suggest that the "parties may move promptly" for summary judgement but the Administrative Record is over 80,000 pages and will take time to review. That said, Plaintiffs believe the question of whether Mr. Wolf and Mr. McAleenan had valid authority is ripe for summary judgment.

[32] Benito Decl. ¶¶ 16, 33; Byun Decl. ¶ 27; Byrne Decl. ¶ 30.

[33] Salas Decl. ¶ 15.

[34] Benito Decl. ¶¶ 32, 35; Byrne Decl. ¶ 33; Chenoweth Decl. ¶ 48; Stolz Decl. ¶ 32.

[35] Benito Decl. ¶¶ 28, 43; Byrne Decl. ¶ 31; Salas Decl. ¶ 18.

[36] Benito Decl. ¶ 34; Chenoweth Decl. ¶¶ 32, 39-41; Rodgers Decl. ¶¶ 24-25; Salas Decl. ¶ 19; Stolz Decl. ¶ 28.

---

17

additional resources due to the Final Rule[37] and significantly alter their organizational missions and programs.[38] They will not be able to carry out their organizational missions as effectively or at the same levels[39]; and may even have to cease operations altogether.[40] And, Plaintiff CHIRLA brings claims on behalf of its members who are irreparably harmed every day they do not enjoy the immigration benefits they could obtain but for the Final Rule, including the right to vote. Salas Decl. ¶¶ 29-35.

Second, binding Ninth Circuit precedent compels the conclusion that Plaintiffs have shown irreparable harm here. *See, e.g.*, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1019, 1029 (9th Cir. 2013) (organizations established irreparable harm by showing that "their missions have been frustrated and their resources diverted"), *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020) (organizations established irreparable harm by showing "they will suffer a significant change in their programs and a concomitant loss in funding"); *id.* (economic harm is often irreparable in APA cases).

Third, in an attempt to narrow any relief this Court might grant, Defendants incorrectly claim that Plaintiffs "have alleged harm only from the fee waiver and asylum fee provisions." Opp. 15, n.18. In fact, Plaintiffs' allegations of harm are not limited to the fee waiver and asylum fee provisions. Plaintiffs provide a wide range of immigration services,[41] and they have alleged that the Fee Rule will cause harm across those services.[42] For example, Plaintiffs allege harm resulting from the Final Rule's increase in naturalization fees,[43] increase in lawful permanent residence fees for children applying with

---

[37] Benito Decl. ¶¶ 39-41; Byrne Decl. ¶¶ 34, 36-38; Byun Decl. ¶¶ 15-16, 18, 22, 28; Chenoweth Decl. ¶¶ 42-49; Smith Decl. ¶¶ 24, 27, 32, 37; Rodgers Decl. ¶¶ 26, 28, 30-31; Salas Decl. ¶¶ 23-24; Stolz Decl. ¶ 34.
[38] Byrne Decl. ¶ 32; Byun Decl. ¶ 25; Chenoweth Decl. ¶¶ 32-33, 40, 54; Smith Decl. ¶¶ 19, 33; Rodgers Decl. ¶¶ 20-23, 25, 30; Salas Decl. ¶¶ 23, 25; Stolz Decl. ¶¶ 30-31, 33, 36-38.
[39] Benito Decl. ¶¶ 33, 38; Byrne Decl. ¶ 32; Byun Decl. ¶¶ 20-21, 24-25; Chenoweth Decl. ¶¶ 33-36, 40, 51-55; Smith Decl. ¶¶ 21, 23-24, 28-29, 31, 34-36; Rodgers Decl. ¶¶ 25, 27; Salas Decl. ¶¶ 20, 23, 25-26; Stolz Decl. ¶¶ 24-25 & n.3, 29-38.
[40] Byun Decl. ¶ 26; Smith Decl. ¶ 37.
[41] Chenoweth Decl. ¶ 3 (naturalization, DACA, NACARA, TPS, adjustment of status to permanent residence, Liberian Refugee Immigration Fairness adjustments, asylum, SIJS, U and T visa applications, and VAWA petitions); Smith Decl. ¶ 4 (asylum, DACA, TPS, SIJS, U and T visas, permanent residency, naturalization); Byrne Decl. ¶ 6 (immigration legal services including adjustment of status, family reunification and naturalization); Salas Decl. ¶ 4 (immigration legal services include removal defense, asylum, family unity, DACA, naturalization); Byun Decl. ¶ 13 (asylum, TPS, U and T visas, VAWA petitions, unaccompanied minors, adjustment of status, naturalization and more).
[42] Byrne Decl. ¶¶ 26-27; Smith Decl. ¶¶ 34-35; Salas Decl. ¶¶ 14, 29; Byun Decl. ¶¶ 23-24.
[43] Byrne Decl. ¶ 28; Stolz Decl. ¶¶ 24-25; Benito Decl. ¶¶ 27-31; Rodgers Decl. ¶ 20; Smith Decl. ¶35.

---

18

1   parents,[44] and unbundling of interim benefits from green-card applications.[45] Plaintiffs also described

2   harm from the interplay of the new asylum fees and a separate rule that makes asylum applicants

3   ineligible for employment authorization until the applications have been pending for a year.[46]

4        An injunction cannot be tailored as narrowly as Defendants suggest. "When a reviewing court

5   determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not

6   that their application to the individual petitioners is proscribed." *EBSC*, 950 F.3d at 1283 (quoting *Univ.*

7   *of Cal.*, 908 F.3d at 511)). Courts "ordinarily do not attempt, even with the assistance of agency counsel,

8   to fashion a valid regulation from the remnants of the old rule." *Id.* (quoting *Harmon v. Thornburgh*, 878

9   F.2d 484, 494 (D.C. Cir. 1989)). This principle is especially applicable here, where Defendants'

10  "beneficiary-pays" approach sets fees in relation to one another. The Court need not attempt to

11  "fashion a valid regulation from the remnants of the old rule." *Id.*

12  **IV.   Balance of Equities and Public Interest Tip Sharply in Plaintiffs' Favor**

13       The balance-of-equities and public interest factors "tip[] sharply in [Plaintiffs'] favor." *Wild*

14  *Rockies*, 632 F.3d at 1132; Mot. 15 (citing declarations). Since Plaintiffs filed their Motion, eighteen states

15  and the District of Columbia—together representing roughly 45% of the nation's population—have

16  submitted an amicus brief illustrating precisely how the Final Rule "will harm Amici States' economies

17  and public health, frustrate state and local programs designed to help immigrants attain legal status and

18  self-sufficiency, and undermine state and local efforts to further public safety and deter unfair practices."

19  ECF 55 at 1. Twenty-one of the country's largest cities and counties, including New York City, Los

20  Angeles, Chicago, Dallas, Houston, Philadelphia, Portland, Saint Paul, Seattle, Tucson, and Boston,

21  submitted an amicus brief demonstrating that the Final Rule "will do lasting and irreparable harm not

22  just to the millions of immigrants who are eligible to naturalize, but to the municipalities they call

23  home." ECF 54 at 1. And a coalition of humanitarian organizations have explained how the Final Rule

24  will irreparably harm their organizations and the vulnerable populations they serve. ECF 47-1. These

25  briefs confirm the public interest factor tip sharply in Plaintiffs' favor.[47]

26  _____

27  [44] Smith Decl. ¶¶ 28-30; Salas Decl. ¶ 34; Byun Decl. ¶¶ 19-21.
    [45] Salas Decl. ¶ 16.
    [46] Byrne Decl. ¶¶ 9, 35; Byun Decl. ¶ 16.

28  [47] In addition, an injunction will serve the public interest because it will require DHS and USCIS to

1    Against all this, Defendants assert: "If the Court enjoins the Rule, USCIS would continue to

2    forgo millions of dollars of revenue each day, forcing corresponding funding cuts, furloughs, and

3    swelling [application] backlogs." Opp. 15. But USCIS is not lawfully entitled to the fees it would forgo.

4    *See EBSC*, 950 F.3d at 1282 (the public interest "is closely linked with [the court's] determination on the

5    substantive validity of the Rule"). Moreover, Defendants do not offer a shred of evidence to explain

6    why they would necessarily suffer the alleged losses. USCIS was able to operate on a smaller budget and

7    still generate carryover just a few short years ago. Mot. 6. Defendants asserted that the fee increase is

8    necessary in part due to "policy operational changes," Stretch Reply Decl. Ex. 35 atAR561, but these

9    changes have not reduced the backlog and only contribute to inefficiency and waste.[48] Experience since

10   2016 confirms that higher fees and increased staffing do not necessarily reduce backlogs;[49] what matters

11   is how USCIS spends its money and how USCIS staff spend their time. Here, Defendants do not even

12   consider the possibility that they could cut costs and adjust operations to improve their financial

13   condition. Opp. 6-7. Nor do they acknowledge that they have other options such as appropriations and

14   borrowing. Defendants do not face a "Catch 22" due to Congressional design; they face the reality of

15   finite resources. Opp. 15. In all events, the public surely has an interest in preventing a federal agency

16   from running itself into the ground.

17   **V.   CONCLUSION**

18   For the foregoing reasons, Plaintiffs respectfully request that this Court issue a preliminary

19   injunction preventing implementation of the Final Rule or staying its effective date.

20

21

22   ---

23   operate within the bounds of federal law. *See EBSC*, 950 F.3d at 1280 ("[T]he public interest is served by compliance with the APA."). It will also restore the Constitutional balance of power upset by unlawful manipulation of federal appointments. ECF 38-1 at 3-4; ECF 39 at 10.

24   [48] Stretch Decl. Ex. 13 (ILRC Comments) at 17 (AR18383), 148 (AR18514); Ex. 6 (NWG Comments) at 19-22 (AR25289-92); Stretch Reply Decl. Ex. 42 at AR18334-42 (AILA and AIC Comments); Ex. 22

25   (NILC Comments) at 2-3 (AR22734-35); Ex. 9 (OneAmerica Comments) at 6 (AR22961); Ex. 11 (Boundless Comments) at 59 (AR23687); AR12434 (describing pretextual RFEs).

26   [49] The backlog reached historic highs in 2017 *after* the 2016 fee increase due to "new policy demands." Staffing was insufficient because of "declining completions per hour of work.," 2018 Annual Report on

27   the Impact of the Homeland Security Act on Immigration Functions Transferred to the Department of Homeland Security https://www.uscis.gov/sites/default/files/document/data/Annual-Report-on-the-

28   Impact-of-the-Homeland-Security-Act-on-Immigration-Functions-Transferred-to-the-DHS.pdf.

Dated: September 15, 2020.

Respectfully submitted,

*/s/ Brian J. Stretch*

Jesse Bless (*pro hac vice*)
jbless@aila.org
AMERICAN IMMIGRATION LAWYERS
ASSOCIATION
1301 G Street, Suite 300
Washington, D.C. 20005

Brian J. Stretch, SBN 163973
bstretch@sidley.com
Naomi Igra, SBN 269095
naomi.igra@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Samina M. Bharmal (*pro hac vice*)
sbharmal@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

*Attorneys for Plaintiffs*